Scott M. Petersen, #7599
Tanner J. Bean, #17128
FABIAN VANCOTT
215 South State Street, Ste. 1200
Salt Lake City, Utah 84111-2323
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
spetersen@fabianvancott.com
tbean@fabianvancott.com
*Attorneys for Defendant SkyWest Airlines, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH - CENTRAL DIVISION**

| | |
|---|---|
| SHANE ANDREW CASSELL,<br>Plaintiff,<br>v.<br>SKYWEST, INC., d/b/a SKYWEST AIRLINES,<br>Defendant. | **MOTION FOR SUMMARY JUDGMENT**<br>Case No. 2:19-cv-00149-JNP-EJF<br>Judge Jill N. Parrish<br>Magistrate Judge Evelyn J. Furse |

Defendant SkyWest, Inc., d/b/a/ SkyWest Airlines ("SkyWest") hereby moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment against Plaintiff Shane Andrew Cassell's ("Cassell") claims of Failure to Hire, Failure to Accommodate, and Retaliation.

## TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ........ 4

ARGUMENT ........ 21

I. CASSELL'S CLAIMS FAIL BECAUSE HE REJECTED SKYWEST'S REASONABLE ACCOMMODATION AND BECAUSE CASSELL'S REQUESTSED ACCOMMODATION IMPOSES AN UNDUE HARDSHIP. ........ 21

a. Failure to Accommodate ........ 21

b. Failure to Hire ........ 31

c. Retaliation ........ 34

CONCLUSION ........ 36

APPENDIX ........ **Error! Bookmark not defined.**

## TABLE OF AUTHORITIES

**CASES**

*Chavez*, 244 F. Supp. 3d at 1130 ........................................................................................ 35
*Christmon v. B&B Airparts, Inc.*, 735 F. App'x 510, 513 (10th Cir. 2018) ................................ 22
*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015) .......................................... 33
*Eckles v. Consol. Rail Corp.*, 94 F.3d 1041, 1046 (7th Cir. 1996) .............................................. 25
*Ellington v. Murray Energy*, No. 2:07CV766DAK, 2010 WL 3855277, at *8 (D. Utah Sept. 30, 2010)........................................................................................................................ 24, 28
*Equal Employment Opportunity Comm'n v. JBS USA, LLC*, 115 F. Supp. 3d 1203, 1232 (D. Colo. 2015)........................................................................................................................ 25
*Equal Employment Opportunity Comm'n v. Jetstream Ground Servs., Inc.*, No. 13-CV-02340-CMA-KMT, 2016 WL 879625, at *3 (D. Colo. Mar. 8, 2016) ......................................... 32, 34
*Fischer v. Forestwood Co.*, 525 F.3d 972, 979 (10th Cir. 2008)................................................. 35
*Fontelroy v. Day & Zimmerman, Inc.*, 83 F.3d 431 (10th Cir. 1996).......................................... 26
*Graff v. Henderson*, 30 F. App'x 809, 811 (10th Cir. 2002) ....................................................... 27
*Harvey by Blankenbaker v. United Transp. Union*, 878 F.2d 1235, 1242 (10th Cir. 1989)... 23, 26
*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 356 (1977)............................................ 26
*Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1023 (10th Cir. 1994) ...................................... 24, 27
*Paige v. Donovan*, 511 F. App'x 729, 735 (10th Cir. 2013) ....................................................... 34
*Pinsker v. Joint Dist. No. 28J of Adams & Arapahoe Ctys.*, 735 F.2d 388, 390-91 (10th Cir. 1984)........................................................................................................................ 23
*Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008)............................................. 34
*Tabura v. Kellogg USA*, 880 F.3d 544, 549 (10th Cir. 2018)............................. 22, 23, 25, 28, 29
*Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1157 (10th Cir. 2000) ........... 24, 27, 28
*Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1492 (10th Cir. 1989) ..................................... 25, 32
*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 83 (1977).................................................. 23
*Turpen v. Missouri-Kansas-Texas R. Co.*, 736 F.2d 1022, 1027 (5th Cir. 1984)......................... 27
*United States v. Albuquerque*, 545 F.2d 110 (10th Cir. 1976)..................................... 24, 28
*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 133 S. Ct. 2517, 2528, 186 L. Ed. 2d 503 (2013) ................................................................................................................ 34

**STATUTES**

42 U.S.C. § 2000e–2 ....................................................................................................... 24
42 U.S.C. § 2000e-2(h) ................................................................................................... 26

**REGULATIONS**

29 C.F.R. § 1605.2(e)(2) ................................................................................................. 26

## INTRODUCTION

Shane Cassell is a devout Seventh-day Adventist who sincerely believes he is forbidden to work on the Sabbath. He has attempted to work as a pilot at several commercial airlines but has been unsuccessful, because none would guarantee Mr. Cassel a Sabbath-free work schedule. Commercial airlines fly every day of the week, including holidays, and administer trip assignments through a seniority-based scheduling system. Because these systems could not guarantee Mr. Cassell a Sabbath-free work schedule, he either declined job offers, or resigned after he was hired, including at SkyWest Airlines.

SkyWest hired Mr. Cassell in 2016. When he was hired, Cassell indicated he would never, absent exigent and unforeseen circumstances, work on his Sabbath, which constitutes the period from sundown Friday to sundown Saturday. He requested an accommodation that he never be scheduled during his Sabbath. SkyWest offered an alternative, reasonable accommodation: Cassell was permitted to bid according to SkyWest's bidding system, which incorporates a bona fide seniority system imposed by a collective bargaining agreement, as well as swap shifts with other pilots, to avoid working on his Sabbath. Despite his options, a

conflict arose between a scheduled training and Cassell's Sabbath. Cassell resigned rather than attend the training.

Cassell later reapplied to SkyWest but reiterated his request that he never be scheduled for shifts during his Sabbath. Moreover, Cassell made it clear that if ultimately scheduled to work over his Sabbath, he simply would not work. Because Cassell would not agree to work on his Sabbath if his available accommodations did not yield a Sabbath-free schedule, SkyWest declined to rehire Cassell.

This is not a case of first impression. Both case law and the EEOC have recognized seniority-based scheduling systems as reasonable accommodations for pilots and airlines trying to fill work schedules and manage thousands of time-off requests for the Sabbath and other religious holidays.

Mr. Cassell's claims fail for two reasons. First, he rejected the reasonable accommodations offered by SkyWest, and second, Cassell's preferred accommodation was both unreasonable and constitutes an undue hardship on SkyWest. Acquiescing to Cassell's request for guaranteed time-off on his preferred schedule would disrupt SkyWest's bona fide seniority system, its collective bargaining agreement, and cause other pilots, more senior to Cassell, to work Cassell's less-desirable Friday-Saturday shifts. For these reasons, Cassell's claims

fail as a matter of law and undisputed fact. The Court should grant SkyWest's motion for summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Cassell is a practicing Seventh-day Adventist and sincerely holds the religious belief that one must not perform work on the Sabbath, a period lasting from Friday sundown through Saturday sundown. (Exhibit A, at CASSELL_001, 13, 16; Shane Cassell Dep., attached as Exhibit B, at 15:1-22, 16:9-12, 19:1-11, 19:23—23:9.)

2. For Cassell, an exception to the belief against performing work on the Sabbath exists for unforeseen circumstances, such as emergencies or when there is life in danger, especially where there is a healing element to the work. (Cassell Dep., Ex. B, at 16:9—17:8, 17:24—18:2, 167:10—168:2.)

3. Cassell determines at what time the Sabbath begins and ends by viewing a sundown calendar on his phone or on a computer. (Cassell Dep., Ex. B, at 15:23—16:8.)

4. Before Cassell applied for employment with SkyWest, he spent "extensive time on the phone" with individuals working at SkyWest, including at least one pilot who was also a Seventh-day Adventist. In those conversations, Cassell discussed "how the schedule was handled, from training all the way

through being a line pilot.” (Cassell Dep., Ex. B, at 11:17—12:2, 13:17—14:3, 26:16-20, 84:23—85:3; *December 7 Shane Cassell*, Lincoln Northside Seventh-day Adventist Church (Dec. 14, 2019), https://www.youtube.com/watch?v=y6ZOdFilmzo&t=2s, attached as Exhibit C, at 4:35-5:04; Jake Whicker Dep., attached as Exhibit D, at 59:24—60:2; Declaration of Jake Whicker, attached as Exhibit E, at ¶¶ 6-10.)

5. Through these discussions, Cassell gained an understanding that SkyWest used a seniority-based shift bidding system. (Cassell Dep., Ex. B, at 29:5—30:22; Ex. C, at 3:14-5:04.)

6. Additionally, through his discussions, Cassell believed that at least two Seventh-day Adventist pilots working for SkyWest had managed to completely avoid work on the Sabbath. (Cassell Dep., Ex. B, at 12:3-9, 13:23-25, 20:13-21, 21:20—22:18 (Mr. Horne), 23:12—24:23, 50:7-13, 74:23—75:5 (Mr. Wahlen).)

7. This belief was incorrect, as both pilots had worked numerous shifts that infringed on the Sabbath. (Ex. A, at CASSELL_002049-2122.)

8. Additionally, before Cassell applied for employment with SkyWest, he knew that SkyWest had flights every day. The job description for Cassell’s position required travel on holidays and weekends. Cassell knew that after his

training he could be scheduled to work on a Saturday. (Cassell Dep., Ex. B, at 138:11—139:6, 191:10-15; *see also* Roy Glassey Dep., Vol. 1, attached as Exhibit F, at 37:24—38:4.)

9. During the interview process with SkyWest, SkyWest told Cassell that ground school (training required before Cassell could begin regular shifts) in Salt Lake City, Utah would be scheduled Monday through Friday from 8:00 a.m. to 5:00 p.m., but that simulator training scheduling would be random because it was based on simulator availability. (Cassell Dep., Ex. B, at 26:25—27:10.)

10. Cassell was hired by SkyWest as a pilot on September 1, 2016. (Ex. A, at CASSELL_001, 15, 32; Cassell Dep., Ex. B, at 26:3-5.)

11. On or before this same date, Cassell notified a SkyWest recruitment specialist of his Sabbath observance. He was able to schedule Cassell for classes in a required Airline Transport Certification Training Program ("CTP") held in Atlanta, Georgia that did not conflict with Cassell's Sabbath observance. (Ex. A, at CASSELL_032; Cassell Dep., Ex. B, at 28:14—29:4, 77:15—79:8, 81:4—82:3; Ex. C, at 5:40-6:50; Exhibit G, at SkyWest_000026; Todd Emerson Dep., attached as Exhibit H, at 101:1-19, 106:3-6.)

12. SkyWest's training program, including the CTP course and ground school, is mandatory and tightly scheduled. (Cassell Dep., Ex. B, at 125:4-7, 125:19-23; Whicker Dep., Ex. D, at 9:10-22, 13:18-21, 46:8-10 ("You know, training, you can't really trade a ground school day per se. It's just scheduled."), 51:1-21; Ex. G, at SkyWest_000038; Emerson Dep., Ex. H, at 12:20—13:5.)

13. SkyWest leases various training resources, such as flight simulators, across the country to train its pilots according to resource availability. (Whicker Dep., Ex. D, at 17:12-19, 21:24—23:4.)

14. Among other things, during Cassell's training, Cassell received training on SkyWest's shift bidding system which gives senior pilots more power than junior pilots to select preferred schedules. (Ex. A, at CASSELL_033.)

15. SkyWest's seniority system has been in place since the early 1980s. It is reflected in SkyWest's Pilot Policy Manual. (Ex. G, at SkyWest_000529-34; Emerson Dep., Ex. H, at 33:20—34:2; Steven Spagnolo Dep., attached as Exhibit I, at 19:1-9, 20:16-19; Anita Spencer Dep., attached as Exhibit J, at 28:24—29:9.)

16. SkyWest's Pilot Policy Manual is a collective bargaining agreement ("CBA") between SkyWest and the SkyWest Airlines Pilot Association

(“SAPA”), an organization that was created in the 1980s. (Ex. G, at SkyWest_000389-586; Emerson Dep., Ex. H, at 34:3—36:20; Spencer Dep., Ex. J, at 29:10-15; Declaration of Aric Arnold, attached as Exhibit K, at ¶¶ 2-4.) A Letter of Agreement between SkyWest and SAPA is found on the first page of The Pilot Policy Manual. (Ex. G, at SkyWest_000397.)

17. SAPA and its pilot members have consistently and successfully opposed any efforts or discussions aimed at altering, eliminating, or obtaining exceptions to the seniority system. (Emerson Dep., Ex. H, at 47:15-22, 48:21—49:25, 69:23—70:16, 71:18—72:20, 73:20—75:5; Ex. K, at ¶ 5.)

18. SkyWest assigns seniority to new hires based on their hire date. If two pilots share the same hire date, then the employee with the lowest last four digits of their social security number receives higher seniority. (Cassell Dep., Ex. B, at 30:6-11; Ex. G, at SkyWest_000150; Spagnolo Dep., Ex. I, at 22:2-24, 24:25—25:12, 29:9-22.)

19. Seniority is used in SkyWest’s bidding system to determine “an employee’s shift, workweek, area of work and line preference. Preference on domicile transfers is also given on the basis of bidding seniority.” (Ex. G, at SkyWest_000150; *see also* Cassell Dep., Ex. B, at 129:19-25, 166:2-16; Ex. C, at 3:14-5:04; Glassey Dep., Vol. 1, Ex. F, at 28:10—29:2, 29:16—30:2,

30:16—31:14, 33:5-17; Spagnolo Dep., Ex. I, at 27:13—28:3; Spencer Dep., Ex. J, at 29:16-24.)

20. SkyWest's Preferential Bidding System software ("PBS") manages pilot shift scheduling. "PBS builds lines based on crewmember preferences, available pairings, seniority, and operational needs," among various other expressed preferences which pilots rank with varying levels of importance. (Cassell Dep., Ex. B, at 30:6-13; Ex. G, at SkyWest_000303, 300-88; Spagnolo Dep., Ex. I, at 72:4—73:18, 74:16—75:9, 77:15—78:8, 87:17-25, 88:7-12, 88:21—90:11, 92:17-22, 95:11-19, 98:18-22, 104:8—105:11; Spencer Dep., Ex. J, at 36:22-25.)

21. SkyWest has used PBS for at least fifteen years. (Spencer Dep., Ex. J, at 23:12-15.)

22. The PBS system does not apply to the scheduling of pilots' training shifts. However, seniority is still used when pilots wish to use a training device, or attend a limited size training event, offered at different hours, days, or locations. (Cassell Dep., Ex. B, at 123:21-24, 135:9-15, 159:19-21, 162:2-7, 196:19-21, 200:24—201:3; Whicker Dep., Ex. D, at 33:1-14, 34:23—35:8. 44:20—45:2; Spencer Dep., Ex. J, at 54:3-8, 54:21—55:8.)

23. On October 27, 2016, Cassell submitted a written request for religious accommodation. (Ex. A, at CASSELL_001, 32; Cassell Dep., Ex. B, at 82:15—83:4, 102:11-20, 111:8-25, 120:12-22, 193:11—194:3, 197:6-10; Ex. G, at SkyWest_0000017.)

24. Cassell requested that he "not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown." He indicated to SkyWest that there was no "other modification that would assist [him] in performing the essential functions of [the] job." (Ex. A, at CASSELL_001; *see also* Whicker Dep., Ex. D, at 28:13-19; Ex. G, at SkyWest_000078; Emerson Dep., Ex. H, at 9:4-17, 102:10—103:12.)

25. On October 27, 2016, SkyWest held a conference call with Cassell to discuss his accommodation request. That same day, it sent Mr. Cassell a letter, which he acknowledged with his signature, indicating that after "extensive evaluation and consideration of the request as well as evaluation of the quality, safety, operational impact as well as training footprint structure of SkyWest," SkyWest was denying Cassell's requested accommodation. Instead, SkyWest offered Cassell a different accommodation: "pursuit of schedule changes as defined by company and departmental resources (e.g. drop/trade shift; bid for desired work assignments, domicile staffing/available shifts)." (Ex. A, at

CASSELL_002, 32; Cassell Dep., Ex. B, at 123:8-24, 192:15—193:9, 194:4-16; Whicker Dep., Ex. D, at 44:7—45:2, 45:16—46:10; *see also* Ex. C, at 6:61-7:22 ("... they sent it back and they said, 'no we're not going to be able to guarantee you a schedule with Sabbaths off because of our seniority system for scheduling.' I was like, well I kinda figured that anyway. So, I decided to continue because my friend that was working there told me, 'You should be able to work around this.'"); Emerson Dep., Ex. H, at 9:18—10:11; Spencer Dep., Ex. J, at 52:3—55:17, 56:21—57:13).

26. This accommodation was also available to other pilots for their scheduling preferences. (Cassell Dep., Ex. B, at 196:8-10.)

27. SkyWest noted that if Cassell elected to utilize this accommodation, that the "standard for all pilots unexcused work assignment [would] be addressed as defined by the Flight Operations reliability program PPM 3006." (Ex. A, CASSELL_002; Cassell Dep., Ex. B, at 194:17—195:8.)

28. SkyWest's Pilot Reliability Program states that "it is the pilot's responsibility to be available at the report for duty time," that "[e]xcessive occurrences and schedule assignment deviations (SAD) will result in disciplinary action," and that "excessive occurrences from duty are considered failure to assume responsibility and are ultimately cause for termination." (Ex.

G, at SkyWest_000418, 546; *see also* Glassey Dep., Vol. 1, Ex. F, at 19:22—20:1, 20:6-12, 42:1—44:24, 49:4-24.)

29. A SAD includes where a "pilot fails to attend a scheduled day of ground school, and the absence has not been prearranged and approved by the Flight Operations Department." (Ex. G, at SkyWest_000420; *see also* Cassell Dep., Ex. B, at 204:5—205:1.)

30. Cassell understood that missing a shift could result in discipline, including termination. (Cassell Dep., Ex. B, at 195:24—195:8, 203:2-17; *see also* Glassey Dep., Vol. 1, Ex. F, at 45:23—47:2, 56:24—57:13, 63:13-21.)

31. SkyWest uses software called SkedPlus+ for pilots that want to trade, swap, or drop shifts for which they have already been scheduled after bidding through PBS. (Spagnolo Dep., Ex. I, at 111:9—113:10, 114:3—116:24, 133:24—134:23; Spencer Dep., Ex. J, at 59:22—60:4, 63:2-15.)

32. Shifts can only be traded, swapped, or dropped if approved by SkyWest. (Spencer Dep., Ex. J, at 55:9—56:20, 57:22—58:1, 64:4-6; Justin Esplin Dep., attached as Exhibit O, at 48:2-24.)

33. Subsequent to the October 27, 2016 conference call and letter, Cassell commenced and completed the CTP course in Atlanta. (Ex. A, at CASSELL_032.)

34. During ground school in Salt Lake City, Cassell was expected to complete "matrix sessions" in which a trainee is paired with a partner. Matrix sessions put into practice the concepts trainees learn in classroom instruction. Trainees selected matrix shifts in pairs according to their seniority. (Cassell Dep., Ex. B, at 103:9-16, 113:7—114:4; Whicker Dep., Ex. D, at 14:16-25, 15:6-10, 23:22-24, 32:21-25, 33:1-14, 34:23—35:13, 37:9-15, 41:15-23, 4:24—45:2; Emerson Dep., Ex. H, at 12:3-14, 107:2-17, 108:13—109:3.)

35. On Friday, December 2, 2016, there were two available matrix shifts for those in Cassell's ground school class: 4:00 – 6:00 p.m. or 6:00 – 8:00 p.m. (The shifts were split because of limited matrix device resources.) Cassell was assigned to report to a training shift from 4:00 – 6:00 p.m. There were no other training shifts for which Cassell could have swapped with another pilot without disrupting the schedule of ground school for all other trainees. (Ex. A, at CASSELL_004; Cassell Dep., Ex. B, at 103:1-16, 112:14-18, 124:21—125:18; Whicker Dep., Ex. D, at 35:24—36:13, 37:16—38:6, 38:16-19, 41:1-23, 42:12—43:6, 51:1-21; Emerson Dep., Ex. H, at 11:7-18, 12:8—13:5, 24:2-8, 105:12-18.)

36. On December 2, 2016, sundown was at approximately 5:00 p.m. in Salt Lake City, meaning Cassell's Sabbath conflicted with either of the

available training shifts. (Cassell Dep., Ex. B, at 103:17-19; Emerson Dep., Ex. H, at 128:19-22.)

37. On November 30, 2016, Cassell contacted a training manager and told him he would miss the matrix shift because of the conflict with his Sabbath. After discussing the matter with Cassell, SkyWest indicated that if Cassell missed the matrix shift, he would have to begin his training anew or be terminated. Shortly after, Cassell resigned. (Ex. A, at CASSELL_003-5, 32; Cassell Dep., Ex. B, at 103:19—105:16, 116:2—117:16, 126:16—127:9, 131:19-24, 229:15-22; Whicker Dep., Ex. D, at 29:9—30:25, 32:7-12, 35:14-20, 48:21—49:10, 49:25—50:25, 51:1-21, 52:1-19, 54:7-14, 57:8-15; Ex. G, at SkyWest_000029-30; Emerson Dep., Ex. H, at 11:7-18, 21:23—23:25, 25:12—27:4, 105:12-18.)

38. In response to an inquiry from a lawyer from Mr. Cassell's church, SkyWest analyzed data of 100 pilots hired a year prior to Mr. Cassell. It found that no matter what scheduling preference the pilots requested under SkyWest's bidding and seniority system, or what attempts they made to swap shifts, every pilot received a schedule that required them to work on at least one Saturday during that year. The average pilot worked seventeen Saturdays during the one-year period. This was an unsurprising finding for SkyWest, as the newly hired

pilots lacked seniority to consistently obtain the most desirable Monday-Friday shifts through SkyWest's bidding system. (Cassell Dep., Ex. B, at 144:17—145:3, 147:10—148:1; Ex. C, at 3:14-3:55 (". . . if I've been with a company for two weeks, I'm probably gonna get the flight that leaves at five a.m. on Friday morning and comes back at midnight on Monday. That's just how it works."); Ex. G, at SkyWest_000001, 1858-59; Emerson Dep., Ex. H, at 46:16—48:10, 52:17—53:17, 66:1-9, 68:11—69:7, 85:10—93:19, 97:19—98:22, 111:15—112:5, 113:11—115:23; Spencer Dep., Ex. J, at 72:3-16; Roy Glassey Dep., Vol. 2, attached as Exhibit L, at 29:17—30:3, 30:10-17.)

39. Cassell filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 8, 2017. He alleged that SkyWest had not properly evaluated his request for a religious accommodation, did not present him with sufficient accommodation options, and was motivated to do so by a religiously discriminatory motive. (Ex. A, at CASSELL_012-13; Cassell Dep., Ex. B, at 141:20-22.)

40. Cassell reapplied for a position as a pilot with SkyWest on June 12, 2017. (Ex. A, at CASSELL_026, 28, 33; Emerson Dep., Ex. H, at 119:10-16.)

41. During the reapplication process, Cassell notified the EEOC of his intent to withdraw his charge of discrimination. The EEOC responded that

SkyWest had not yet viewed the charge and that it would again convey the charge to SkyWest before it being withdrawn. (Ex. A, at CASSELL_028; Cassell Dep., Ex. B, at 141:20—142:4.)

42. No one at SkyWest indicated to Cassell, in writing or otherwise, that they were aware of the EEOC charge or upset with Cassell for filing it. (Cassell Dep., Ex. B, at 228:2—229:10.)

43. In connection with Cassell's reapplication to SkyWest, on June 29, 2017, he submitted a letter in an attempt to provide further clarity regarding his religious beliefs and his previously requested accommodation.

44. In the letter, he stated "I realize that SkyWest cannot guarantee that I will be provided a schedule that will always allow me to observe my beliefs, therefore it has and will continue to be my intent to use the tools that SkyWest has provided to either bid out of, drop, or trade a shift that may conflict with my beliefs." He continued, "If there was an unforeseen circumstance, such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended, I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious beliefs. As my tenure increases, my likelihood of conflict decreases due to my increase in seniority, allowing the system to work as designed." He

added, "I do not expect SkyWest to give me special or preferential treatment." (Ex. A, at CASSELL_020; Cassell Dep., Ex. B, at 156:10—157:1, 158:19—159:12, 167:10—168:18; Emerson Dep., Ex. H, at 136:21—137:6; Glassey Dep., Vol 2, Ex. L, at 46:11—48:13; *see also* Ex. C, at 3:14-3:55.)

45. However, Cassell expressed to his interviewers and other SkyWest personnel that he was unwilling to work any shifts falling on his Sabbath. (Ex. G, at SkyWest_000078, 85-86; Emerson Dep., Ex. H, at 119:10-23, 137:7—139:4; Roy Glassey Dep., Vol. 2, Ex. L, at 38:2-20, 39:5-11, 40:2-11; *see also* Cassell Dep., Ex. B, at 150:13-25.)

46. SkyWest would have hired Cassell if he acknowledged SkyWest could not guarantee him a Sabbath-free schedule and he agreed to perform all assigned duties, including those that might fall on his Sabbath, if the accommodation could not avoid that assignment. (Emerson Dep., Ex. H, at 104:2-13.)

47. On July 12, 2017, SkyWest notified Cassell that it was not extending an offer of reemployment. (Ex. A, at CASSELL_033, 176.)

48. On July 21, 2017, the EEOC provided notice that Cassell's charge of discrimination was formally withdrawn. (Ex. A, at CASSELL_021.)

49. On September 19, 2017, Cassell filed a second charge of discrimination with the EEOC. Cassell reasserted his allegations from his withdrawn charge and added allegations that SkyWest had declined to rehire him because of his religious beliefs and because he had brought the first EEOC charge against SkyWest. (Ex. A, at CASSELL_022.)

50. On December 7, 2018, the EEOC dismissed Cassell's second charge of discrimination and issued a right to sue letter, noting that after its investigation, "the EEOC does not believe that additional investigation would result in our finding a violation." (Ex. A, at CASSELL_039-40.)

51. Cassell initiated this suit by filing his Complaint on March 4, 2019.

52. In response to SkyWest's requests for admission, "Plaintiff admit[ed] that if weeks before a flight date he had been assigned to a flight that started on the Sabbath, he would not have taken the flight." (Plaintiff's Response to SkyWest's Request for Admission, attached as <u>Exhibit M</u>, at Nos. 3-4.)

53. Had Cassell successfully completed training with SkyWest, he would have first become a reserve pilot, remaining on call to fill in for gaps that often arise from a pilot falling ill, a flight scheduling change, etc. (Cassell Dep., Ex. B, at 84:23—85:3, 85:13—89:7, 198:25—199:4; Emerson Dep., Ex. H, at 96:16—97:2; Spagnolo Dep., Ex. I, at 44:2-10, 90:12—91:7; Spencer Dep., Ex.

J, at 21:21—22:10; Defendant's Responses to Plaintiff's Fifth Set of Written Discovery to Defendant, at Nos. 12 and 14, attached as Exhibit N.)

54. Because reserve pilots are often needed to fill in, SkyWest tries to staff each of its domiciles with 18% reserve pilots, adjusting that number for domiciles that have more reserve pilot demand. (Spencer Dep., Ex. J, at 31:7-15, 33:6-10.) Despite this, SkyWest's domiciles sometimes run out of reserve pilots. (Spencer Dep., Ex. J, at 50:14—51:1.)

55. Reserve pilots are normally on a two-hour call and are not required to be on site. Some of these reserve pilots may be assigned a "ready reserve" shift, which requires the pilot to be physically at the airport and available to fly upon 20 minutes notice. Ready reserve shifts are not bid for or awarded through the PBS system, other than for reserve pilots to obtain days off, but are assigned to a reserve pilot based on need, logistics, and, at times, seniority. (Spagnolo Dep., Ex. I, at 94:6—98:12; Spencer Dep., Ex. J, at 33:11—34:25, 35:9-18, 37:1-5.)

56. If assigned to a reserve pilot shift that required Cassell be present at the airport on his Sabbath, he would not have presented himself if he were unable to trade the shift with another pilot. (Cassell Dep., Ex. B, at 89:8-24, 91:2-24.) The same is true for any other shift Cassell might have been assigned. (Cassell Dep., Ex. B, at 150:13-25, 151:7-18.)

57. If SkyWest granted Cassell's requested accommodation of a guaranteed Sabbath-free work schedule, the impact on other SkyWest pilots would be extensive. Principally, it would require pilots with higher seniority to fill in for Cassell (effectively moving Cassell ahead of pilots with greater seniority) which violates SkyWest's seniority system and CBA. Additionally, Cassell's absence from the schedule would cause a domino effect, triggering the use of a reserve pilot, or, if no reserve pilot were available, requiring other pilots to come in on their days off and paying them overtime. In turn, these changes could disrupt multiple flight schedules and cause SkyWest to reschedule the staffing or occurrence of other flights. (Glassey Dep., Vol. 1, Ex. F, at 70:9—71:16.)

58. The training cost of a new pilot is roughly $30,000.00. (Declaration of Todd Emerson, at ¶ 5, attached as Exhibit P.)

59. SkyWest pilots do not become profitable for SkyWest for 1.5 years. (Ex. P, at ¶ 9.)

## ARGUMENT

**I. CASSELL'S CLAIMS FAIL BECAUSE HE REJECTED SKYWEST'S REASONABLE ACCOMMODATION AND BECAUSE CASSELL'S REQUESTSED ACCOMMODATION IMPOSES AN UNDUE HARDSHIP.**

It is well established that employees are not entitled to the religious accommodation of their choice but are only entitled to a *reasonable* accommodation. Here, Cassell rejected the reasonable accommodation SkyWest proposed and insisted on his own. This rejection of a reasonable accommodation is, alone, sufficient to support summary judgment for SkyWest on all of Cassell's claims.

Even if Cassell could demand a Sabbath-free work schedule, Title VII does not require employers to grant religious accommodations that impose undue hardship on the employer. Here, Cassell's requested accommodation that he never be scheduled to work on his Sabbath imposes undue hardship on SkyWest. It would result in labor strife among SkyWest's numerous pilots, who jealously guard their seniority benefits and would quickly bring action against SkyWest for violating is collective bargaining agreement. It also requires SkyWest to incur a substantial financial burden.

**a. Failure to Accommodate**

The core of Cassell's case is the allegation that SkyWest failed to

accommodate his Sabbath observance. Title VII religious accommodation claims are subject to a burden-shifting standard. A plaintiff/employee establishes "a prima facie claim by showing that 1) the employee has a bona fide religious belief that conflicts with a job requirement; 2) the employee informed the employer of this conflict; and 3) the employer fired the employee for failing to comply with the job requirement." *Tabura v. Kellogg USA*, 880 F.3d 544, 549 (10th Cir. 2018); *Christmon v. B&B Airparts, Inc.*, 735 F. App'x 510, 513 (10th Cir. 2018) (unpublished). Once an employee establishes this prima facie case, the burden shifts to the defendant/employer to "1) to rebut an element of Plaintiffs' prima facie claims; 2) to show that it provided a reasonable accommodation for Plaintiffs' religious practice; or 3) to show that it could not offer a reasonable accommodation without undue hardship." *Tabura*, 880 F.3d at 550; *Christmon*, 735 F. App'x at 513.

SkyWest admits that Mr. Cassell's beliefs are sincerely held and that he put SkyWest on notice of the conflict. After consulting with Mr. Cassell, SkyWest offered him the well-established accommodation of a seniority-based bidding system with flexibility (but no guarantee) to avoid Sabbath work. As such, SkyWest met its obligation to accommodate Mr. Cassell, even though he preferred a different accommodation. As the Tenth Circuit has noted, "*Any* reasonable

accommodation by the employer is sufficient to meet its accommodation obligation." *Tabura*, 880 F.3d at 551 (emphasis added) (quotation omitted). For this reason, an "employee is not entitled to the accommodation of his choice." *Id.*; *see also Pinsker v. Joint Dist. No. 28J of Adams & Arapahoe Ctys.*, 735 F.2d 388, 390-91 (10th Cir. 1984) ("Title VII requires reasonable accommodation. It does not require employers to accommodate the religious practices of an employee in exactly the way the employee would like to be accommodated."). "Once the employer has provided a reasonable accommodation, it need not further show that each of the employee's alternative accommodations would result in undue hardship." *Tabura*, 880 F.3d at 551.

It was not reasonable for Mr. Cassell to expect a special exemption from SkyWest's CBA or seniority system. In a case directly on point, the Supreme Court held an employer is "not required by Title VII to carve out a special exception to its seniority system in order to help [an employee] to meet his religious obligations." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 83 (1977). "[A]bsent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Id.* at 82; *Harvey by Blankenbaker v. United Transp. Union*, 878 F.2d 1235, 1242 (10th Cir. 1989) ("the fact that a seniority system has a

discriminatory impact is not alone sufficient to invalidate the system; actual intent to discriminate must be proved."); *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1023 (10th Cir. 1994) ("Reasonable accommodation does not mean that an employer must deny the shift and job preference of some employees in order to accommodate or prefer the religious needs of others.") (cleaned up)).

The Tenth Circuit has held that encouraging an employee to swap shifts with other employees to avoid conflicts with religious belief is a reasonable accommodation. *See Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1157 (10th Cir. 2000) ("In *United States v. Albuquerque*, 545 F.2d 110 (10th Cir. 1976), we held that an employer had done all that was reasonably required under 42 U.S.C. § 2000e–2 once it had encouraged the employee to try to find another employee to swap shifts with him so that he could avoid working on Saturdays in violation of his religious beliefs. We held that it would have been unreasonable to require the employer to go further and attempt to arrange a schedule swap for the plaintiff."); *Ellington v. Murray Energy*, No. 2:07CV766DAK, 2010 WL 3855277, at *8 (D. Utah Sept. 30, 2010) ("The undisputed facts show that Defendants reasonably accommodated Mr. Ellington's religious beliefs by allowing him to swap or trade shifts"). Additionally, an employer can "meet its obligation to accommodate its employees' religious

practice by using a neutral policy," like a shift bidding system available to all employees, "so long as that policy reasonably accommodates the employee's religious needs." *Tabura*, 880 F.3d at 554.

Beyond Cassell's requested accommodation being unreasonable, it also imposes an undue hardship. "An employer incurs an undue hardship if it must bear more than a de minimis cost in order to give [an employee] Saturdays off to observe his Sabbath." *Id.* at 557 (quotation omitted). "Any cost in efficiency or wage expenditure that is more than de minimis constitutes undue hardship. The cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable due to a religious conflict can amount to undue hardship." *Id.* at 557-58; *Equal Employment Opportunity Comm'n v. JBS USA, LLC*, 115 F. Supp. 3d 1203, 1232 (D. Colo. 2015). "Any proffered hardship, however, must be actual; an employer cannot rely merely on speculation." *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1492 (10th Cir. 1989) (cleaned up).

Additionally, disruptions caused to a bona fide[1] seniority system by a

---

[1] A "'bona fide' seniority system is one that was created for legitimate purposes, rather than for the purpose of discrimination." *Eckles v. Consol. Rail Corp.*, 94 F.3d 1041, 1046 (7th Cir. 1996). In the Tenth Circuit, the bona fide nature of a seniority system is evaluated under a non-exhaustive four-part test:

> (1) whether the seniority system operates to discourage all employees equally from transferring between seniority units;

religious accommodation, as a matter of statute and regulation, constitute an undue hardship when the accommodation "would deny another employee his or her job or shift preference guaranteed by that system." 29 C.F.R. § 1605.2(e)(2); *see also* 42 U.S.C. § 2000e-2(h).

Accommodations that cause employers to violate collective bargaining

---

> (2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);
> (3) whether the seniority system had its genesis in [religious] discrimination; and
> (4) whether the system was negotiated and has been maintained free from any illegal purpose.

*Harvey by Blankenbaker*, 878 F.2d at 1242, 1244, 1250 ("The key element of a bona fide seniority system under § 703(h) is its lack of purposeful discrimination.") ("these factors are not talismanic indicators of intent; instead, they serve as a partial means to an end, not the end itself. . . . The district court must consider the totality of the circumstances and any evidence, direct or circumstantial, that bears on the motives of the defendants, whether or not such evidence is relevant to any of the [four] factors."). *See, e.g., Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 356 (1977); *Fontelroy v. Day & Zimmerman, Inc.*, 83 F.3d 431 (10th Cir. 1996) (unpublished) (dismissing challenge of seniority system as not bona fide where no evidence regarding "actual intent to discriminate," a "prerequisite to liability," was presented).

SkyWest's bidding system incorporates a bona fide seniority system required by SkyWest's collective bargaining agreement with SAPA. Although SkyWest does not here delve into a full analysis of the four-part test above, it argues that the test's overarching principle demonstrates the bona fide nature of SkyWest's seniority system. There is no evidence that SkyWest's bidding or seniority system was created with actual or purposeful intent to discriminate against religious employees generally, much less against Seventh-day Adventist employees that observe the Sabbath from Friday sundown to Saturday sundown.

agreements impose an undue burden. *Graff v. Henderson*, 30 F. App'x 809, 811 (10th Cir. 2002) ("the duty to accommodate does not require the employer to take steps inconsistent with a valid CBA"); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1156 (10th Cir. 2000) ("Under *Hardison*, the duty to accommodate Thomas's beliefs does not require the Postal Service to violate the [CBA's] LMOU."); *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1023 (10th Cir. 1994) ("Nor does Title VII require an employer to violate a valid labor agreement to accommodate an employee.") ("This practice would violate the provisions of the collective bargaining agreement, subject ABF to a potential fine and would clearly impose more than a de minimis cost on ABF."); *see also Turpen v. Missouri-Kansas-Texas R. Co.*, 736 F.2d 1022, 1027 (5th Cir. 1984) ("we do not construe section 701(j) to require an employer to bypass duly elected bargaining representatives to negotiate directly with individual employees. Such a construction would run counter to basic principles of national labor policy as expressed with specific regard to the railway industry in the Railway Labor Act.").

Here, Cassell made two requests for religious accommodation. He first made a request that SkyWest accommodate his Sabbath observance during CTP training, which he made and obtained through a recruitment specialist. (*See Statement of Fact* [hereinafter "SAF"] ¶ 11.)] SkyWest was able to schedule Cassell for a slot in

the first phase of training that did not conflict with Cassell's Sabbath.

Shortly before Cassell began the CTP course, he made a second and written request for a religious accommodation, requesting that he never be scheduled for a shift falling on his Sabbath. (SAF ¶¶ 23-24.) SkyWest denied Cassell's requested accommodation and offered another—the use of SkyWest's bidding system and shift swapping with other pilots. (SAF ¶ 25.) Both the bidding system and the shift swapping system are neutral, reasonable accommodations that have been found to fulfill an employer's duty under Title VII. *See Thomas*, 225 F.3d at 1157; *Albuquerque*, 545 F.2d 110; *Ellington*, No. 2:07CV766DAK, 2010 WL 3855277, at *8; *Tabura*, 880 F.3d at 554.

While SkyWest's proffered accommodation did not guarantee that Cassell would never be scheduled for a shift during his Sabbath, to "be reasonable, an accommodation need not provide a 'total' accommodation; that is, [an employer] is not required to guarantee [an employee] will never be scheduled for a Saturday shift." *Tabura*, 880 F.3d at 550; *id.* at 553 ("we see no need to adopt a per se rule requiring that an accommodation, to be reasonable, must eliminate, or totally eliminate, or completely eliminate, any conflict between an employee's religious practice and his work requirements").

When Cassell was scheduled for a training shift that conflicted with his

Sabbath and for which no alternative shift existed, Cassell resigned, rejecting SkyWest's proffered accommodation as insufficient and indicating that only a complete elimination of the conflict between his shift scheduling and his Sabbath observance would suffice. But as noted in *Tabura*, Title VII does not require SkyWest to completely eliminate the conflict between Cassell's scheduling and Sabbath observance in order for its accommodation to be reasonable. Thus, Cassell rejected the reasonable accommodation SkyWest offered him. Because Cassell rejected SkyWest's reasonable accommodation, this Court need go no further to dismiss Cassell's claims. *See Tabura*, 880 F.3d at 551.

But even assuming Cassell could choose his preferred accommodation, his request of a complete elimination of the conflict between his scheduling and Sabbath observance imposed an undue hardship on SkyWest. First, Cassell's requested accommodation would force SkyWest to violate its bidding system which incorporates a bona fide seniority system. The case law, statute, and regulation above make clear this constitutes an undue burden because it would cause other SkyWest pilots with greater seniority to take a back seat to Cassell's scheduling preferences. In practice, this would require SkyWest to exempt Cassell entirely from the bidding process executed through the PBS software for shifts falling on Cassell's Sabbath. It may even require Cassell to be exempted from the

PBS bidding software altogether, as PBS is a highly complex and interwoven program which factors in numerous points of data and expressed preferences from each of SkyWest's pilots. At the very least, Cassell's requested accommodation would require SkyWest to assign Cassell disproportionate seniority power for shift bidding involving his Sabbath. None of this is required by Title VII and its implementing regulation.

Second, because SkyWest's seniority system is mandated by its collective bargaining agreement with SAPA—a provision that SAPA and its member pilots vigorously guard—violation of the seniority system is also a violation of the collective bargaining agreement. This, too, amounts to an undue burden.

Third, SkyWest was not required to rehire Cassell when he declared, in advance, that he would not work if the accommodation failed to yield his preferred time off. It is irrelevant whether the scheduling might have worked out in his favor, if only SkyWest had overlooked his accommodation rejection. But SkyWest had a good faith basis for believing Cassell would shortly resign (again) due to its vast experience in scheduling numerous pilots and the survey it conducted of 100 pilots hired the year prior to Cassell, none of which successfully used the scheduling tools to completely avoid a Saturday shift. Indeed, knowing that Cassell would be scheduled for a Saturday shift if rehired, SkyWest reasonably expected another

resignation or termination of Cassell's employment when the conflict again presented itself.[2]

Rehiring Cassell despite his statistically certain failure to avoid a Saturday shift would impose a substantial cost on SkyWest. SkyWest expends $30,000 dollars on every pilot it sends through training. Moreover, newly hired pilots like Cassell do not become profitable for SkyWest for 1.5 years. Thus, rehiring and retraining Cassell, who had already received much training from SkyWest, would impose a financial burden of at least $30,000 dollars, with no hope that SkyWest could recoup that investment because Cassell would never make it to profitability before he again resigned or was terminated.

**b. Failure to Hire**

Cassell's Failure to Hire claim, which is centered around SkyWest declining to rehire Cassell, is subject to a nearly identical burden shifting framework as failure to accommodate claims. Indeed, one might call this claim a variant or aspect of a claim for failure to accommodate, as one court in the Tenth Circuit has recently suggested.[3] A plaintiff/employee establishes a prima facie case for failure

---

[2] Mr. Cassell apparently believed that other Seventh-day Adventists had successfully used the accommodation at SkyWest to completely avoid sabbath work. This, it turns out, was not true. (SAF ¶¶ 4-7.)

[3] *See Equal Employment Opportunity Comm'n v. Jetstream Ground Servs., Inc.*, No. 13-CV-02340-CMA-KMT, 2016 WL 879625, at *3 (D. Colo. Mar. 8,

to hire based on failure to accommodate a religious practice by showing that "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was not hired for failure to comply with the conflicting employment requirement." *Toledo*, 892 F.2d at 1486 (cleaned up). "Once a plaintiff has made out a prima facie case, the burden shifts to the employer to show that it was unable reasonably to accommodate the plaintiff's religious needs without undue hardship." *Id.*[4] This claim, too, fails because Cassell rejected SkyWest's reasonable accommodation and because Cassell's requested accommodation imposed an undue hardship.

During the reapplication process, in a letter to SkyWest, Cassell appeared to

---

2016) ("Thus, it appears that the legislative intent behind the addition of this definition was to ensure that employees were protected from adverse actions (i.e., the failure to hire or retain), not to create a separate, stand-alone cause of action for the mere failure to accommodate.").

[4] The court in *Jetstream Ground Servs., Inc.*, phrased this burden shifting standard another way, although with the same substantive effect: "a plaintiff may establish such a case by showing that (1) she had a *bona fide* religious belief that conflicted with an employment requirement; and (2) her need for an accommodation was a motivating factor in the employer's decision to take an adverse employment action against her." 134 F. Supp. 3d at 1318. "If the employee establishes a *prima facie* case, the burden shifts to the defendant employer to (1) conclusively rebut one or more elements of the plaintiff's *prima facie* case, (2) show that it offered a reasonable accommodation, or (3) show that it was unable to accommodate the employee's religious needs reasonably without undue hardship." *Id.* (cleaned up).

indicate his willingness to accept and follow SkyWest's proffered accommodation, despite it providing no guarantees that Cassell would not be scheduled for a shift on his Sabbath. (SAF ¶¶ 43-44.) However, that willingness was undercut by the oral representations Cassell made to his interviewers that if he were ever scheduled for a shift on his Sabbath, he would not appear. (SAF ¶ 45.) That willingness is further undercut by the admission Cassell has made in this litigation—"Plaintiff admits that if weeks before a flight date he had been assigned to a flight that started on the Sabbath, he would not have taken the flight"—as well as Cassell's deposition testimony to that point. (SAF ¶¶ 52, 56.) Thus, during the rehire interview process, Cassell again indicated that he was rejecting SkyWest's reasonable accommodation—he would never work a shift on his Sabbath regardless of whether, despite his best efforts through shift swaps and the bidding system, he was scheduled to work.

And as stated above, Cassell's requested accommodation for a complete elimination of the conflict between his scheduling and his Sabbath imposed an undue hardship. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015) ("Title VII of the Civil Rights Act of 1964 prohibits a prospective employer from refusing to hire an applicant in order to avoid accommodating a religious practice that it could accommodate *without undue hardship*." (emphasis

added)). Thus, for the same reasons as expressed above, Cassell's claim for failure to hire fails because of Cassell's rejection of SkyWest's reasonable accommodation and the undue hardship Cassell's requested accommodation imposed on SkyWest.

**c. Retaliation**

Cassell also asserts a retaliation claim, alleging that SkyWest failed to rehire him because he filed a charge of discrimination with the EEOC. A plaintiff establishes a prima facie case for retaliation by showing "(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Paige v. Donovan*, 511 F. App'x 729, 735 (10th Cir. 2013); *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008). On the first element, "to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the [statute]." *Jetstream Ground Servs., Inc.*, 134 F. Supp. 3d at 1323. On the third element, the causation standard "require[s] proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 133 S. Ct. 2517, 2528, 186 L. Ed. 2d 503 (2013); *Chavez*, 244 F. Supp.

3d at 1130. "[O]nce the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a non-discriminatory reason for the conduct, and then the plaintiff has the burden of demonstrating pretext." *Fischer v. Forestwood Co.*, 525 F.3d 972, 979 (10th Cir. 2008).

Even assuming that Cassell has demonstrated a prima facie case, Cassell's claim fails because discriminatory retaliation was not SkyWest's motivation for its decision not to rehire Cassell. Rather, as explained above, SkyWest did not rehire Cassell because he again rejected SkyWest's proffered accommodation and because Cassell's requested accommodation imposed an undue hardship on SkyWest.

Cassell has failed to provide any evidence that SkyWest was motivated by retaliatory animus in reaction to Cassell's first EEOC charge. Rather, as stated above, SkyWest has provided considerable evidence that it declined to rehire Cassell because of his rejection of SkyWest's reasonable accommodation and because Cassell's request for a complete elimination between his scheduling and his Sabbath would impose an undue burden on SkyWest. But for Cassell's insistence on an accommodation that would allow him to avoid all Sabbath work, SkyWest would have hired Cassell. But following SkyWest's proposed accommodation would require Cassell to use the bidding system and shift

swapping knowing that, at least until he acquired sufficient seniority, there were no guarantee he would be able to avoid all shifts scheduled during his Sabbath. Cassell was unwilling to utilize that accommodation.

There is no indication that SkyWest's stated reason for declining to rehire Cassell—his rejection of SkyWest's reasonable accommodation and the undue hardship his requested accommodation imposed—was actually a pretext for retaliation against him due to his filing of an EEOC charge. Cassell can provide no documents or communications in which SkyWest even mentioned the EEOC charge in connection with declining to rehire Cassell. Rather, all the documentation and communications evidence a discussion of the viability of Cassell's requested accommodation. Thus, because SkyWest relied upon valid, nonretaliatory reasons for declining to rehire Cassell, Cassell's retaliation claim fails.

## CONCLUSION

Because Cassell rejected SkyWest's reasonable accommodation and because Cassell's request for an accommodation imposed an undue hardship on SkyWest, his claims for failure to accommodate and failure to hire fail. Cassell's claim for retaliation fails, too, because SkyWest validly relied upon Cassell's rejection of its proposed accommodation and the undue hardship Cassell's requested accommodation imposed in declining to rehire Cassell, both nonretaliatory

motives. Thus, the Court should grant SkyWest's motion for summary judgment and dismiss all of Cassell's claims with prejudice and upon the merits.

DATED this 28th day of June, 2021.

/s/ *Tanner J. Bean*
Scott M. Petersen
Tanner J. Bean
FABIAN VANCOTT

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of June, 2021, I caused a true and correct copy of the foregoing **MOTION FOR SUMMARY JUDGMENT** to be served via email to the following:

Erik Strindberg
STRINDBERG & SCHOLNICK, LLC
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
erik@utahjobjustice.com

Todd R. McFarland
General Conference of Seventh-day Adventists
12501 Old Columbia Pike
Silver Springs, MD 20902
mcfarlandt@gc.adventist.org

*/s/ Tanner J. Bean*
Tanner J. Bean