Scott M. Petersen, #7599
Tanner J. Bean, #17128
FABIAN VANCOTT
215 South State Street, Ste. 1200
Salt Lake City, Utah 84111-2323
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
spetersen@fabianvancott.com
tbean@fabianvancott.com

*Attorneys for Defendant SkyWest Airlines, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH - CENTRAL DIVISION**

| | |
|---|---|
| SHANE ANDREW CASSELL,<br>Plaintiff,<br>v.<br>SKYWEST, INC., d/b/a SKYWEST AIRLINES,<br>Defendant. | **CORRECTED APPENDIX OF EVIDENCE FOR DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br>Case No. 2:19-cv-00149-JNP-EJF<br>Judge Jill N. Parrish<br>Magistrate Judge Evelyn J. Furse |

**APPENDIX OF EVIDENCE FOR DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

| ***Exhibit*** | ***DESCRIPTION*** |
|---|---|
| A | Cassell Document Excerpts |
| B | Cassell Deposition Excerpts |
| C | Sermon Video |
| D | Whicker Deposition Excerpts |
| E | Jake Whicker Declaration |
| F | Glassey Deposition Vol 1 Excerpts |
| G | SkyWest Document Excerpts |

| | |
|---|---|
| H | Emerson Deposition Excerpts |
| I | Spagnolo Deposition Excerpts |
| J | Spencer Deposition Excerpts |
| K | Aric Arnold Declaration |
| L | Glassey Deposition Vol 2 Excerpts |
| M | Cassell's Responses to SkyWest's First Set of Request for Admissions |
| N | Defendant's Answer to Interrogatories 12 and 14 |
| O | Justin Esplin Deposition Pages |
| P | Todd Emerson Declaration |

DATED this 1st day of July 2021.

/s/ *Tanner J. Bean*
Scott M. Petersen
Tanner J. Bean
FABIAN VANCOTT

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of July 2021, I caused a true and correct copy of the foregoing **CORRECTED APPENDIX OF EVIDENCE FOR DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** to be served via the Court's filing system to the following:

Erik Strindberg
STRINDBERG & SCHOLNICK, LLC
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
erik@utahjobjustice.com

Todd R. McFarland
GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Springs, MD 20902
mcfarlandt@gc.adventist.org

/s/ *Tanner J. Bean*
Tanner J. Bean

# Exhibit A

Exhibit A

SkyWest AIRLINES®

EMPLOYEE FORMS

# Employee Request for Religious Accommodation

PAGE 1 of 2 | REVISION Original | DATE 06/27/12

## Employee Information

Employee Name: Shane Andrew Cassell (First | Middle | Last)  Employee Number: 051321

Original Hire Date: 11/7/2016  Position: Pilot / First Officer

Dept/Location: Training (TRG)  Home Phone: [redacted]

Manager Name: Jake Whicker  Manager Phone: (801) 258-4527

## Accommodation Request Details

*Attach additional pages if necessary.*

1. Describe the purpose of your request for a religious accommodation.

The purpose is to request accommodations with work and training so that I am able to uphold my deeply held, sincere, religious convictions as a Seventh-Day Adventist Christian.

2. Describe how your religious beliefs limit your ability to perform the essential functions of your job. Please be as specific as possible.

As a Seventh-Day Adventist Christian, it is my deeply held, sincere, religious conviction that the period from Friday sundown through Saturday sundown is holy. In keeping with my beliefs on this subject, I am unable to be present for work or training functions during this time.

3. Describe the accommodation or modification being requested and explain how the accommodation will enable you to perform the essential functions of your job. Please be as specific as possible.

I am asking that I not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown. My religious convictions do not limit my ability to perform the essential functions of my job as a pilot. I am just requesting this time off each week.

4. Will you be able to perform all of the essential functions of your job if you receive the requested accommodation? ☒ Yes ☐ No If no, please describe the specific functions you will not be able to perform.

5. Are there any other modifications that would assist you in performing the essential functions of your job? ☐ Yes ☒ No If yes, please describe the other modification(s).

Employee Signature [signature]  Date: 10/26/2016

**SkyWest AIRLINES®**

October 27, 2016

Shane A. Cassell - 51321

RE: Memorandum of Agreement for Religious Accommodation Request

This Memorandum of Agreement is in response to a request for religious accommodation. The company has thoroughly reviewed the information Shane Cassell has provided both verbally and in writing, citing the specific religious observances and desire for company induced scheduling changes.

After extensive evaluation and consideration of the request as well as evaluation of the quality, safety, operational impact as well as training footprint structure for SkyWest, it has been determined that we are unable to honor the specific request with work scheduling. However, as an accommodation we have provided FO Cassell with tools to meet his religious requirements. Options include pursuit of schedule changes as defined by company and departmental resources (e.g. drop/trade shift, bid for desired work assignments, domicile staffing/available shifts).

As standard for all pilots, unexcused work assignment will be addressed as defined by the Flight Operations reliability program PPM 3006.

Thank you for engaging in this dialogue regarding your request. Should you have any questions, please contact me directly.

Coy K. Bryant
Mgr. Employee Relations

Jake Whicker
Mgr. CRJ Training | Flt Ops.

Shane A. Cassell
First Officer

My signature does not relinquish my request for religious accommodation.

DEC 0 1 2016

**SkyWest AIRLINES**

**SUPERVISOR FORMS**

# Termination / Final Check Request

PAGE 1 of 1 | REVISION 16 | DATE 06/01/13

Actual Termination Date: 11/30/16 Employee #: 51321

Employee Name: Shane Cassell Date of Hire: 9/8/16

Location: Training Department: Flight Operations Last Day Worked: 11/30/16

Termination Code: 100 Resignation; Voluntary; Eligible for Rehire

Comments: Religious convictions prevented reported for an assigned shift.

**Company Property Returned:**

| Yes | No | N/A | Item | Amount |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | Uniforms ☐ Part Time ☐ Full Time | $ ____ |
| ☐ | ☐ | ☒ | InFlight Manual | $ 50 |
| ☐ | ☐ | ☒ | Liquor Fund | $ 20 |

| Yes | No | N/A | Item | Amount |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | SIDA Badge | $125 |
| ☐ | ☐ | ☒ | Facility Keys | $ 20 |
| ☐ | ☐ | ☒ | SkyWest ID Badge | $ 25 |
| ☐ | ☐ | ☒ | KCM | $ ____ |
| ☐ | ☐ | ☒ | Parking | $ ____ |

EFB returned

_____ Deduct from my final paycheck (employee's initials)

_____ Returned property documented in i-Manage, anything returned later can be documented by emailing Employmentstandards@skywest.com. Any outstanding property will be submitted for billing and collection.

_____ Returned badges shredded or sent to Employment Standards at HDQ, all Proxy cards must be returned to HDQ.

**Method of Delivery**

☐ Mail

☐ DBC Check

Address: ____

Attn: ____ Location: ____

Check #: ____ Fax #: ____ Time Needed: ____

Is Dayforce up to date: ☐ Yes ☐ No (fax copy of timecard)

**Hours Left to Pay Out**

Regular: ____ Travel: ____

Overtime: ____ Taxable Per Diem: ____

Doubletime: ____ Non-Taxable Per Diem: ____

Training: ____ Other: ____

**I have been informed Company Policy Manual SP 75 Termination Appeals Procedure may provide for an appeal of this termination. I understand I must call 888.273.9994 within five business days from today to have my request considered.**

[signature] Date: 11/30/2016

Separated Employee's Signature

[signature] Phone: 801-219-4521

Department Manager's Name (sign and print)

[signature] Date: 11/30/16

Witness Signature

**PAYROLL USE ONLY**

User ____

Vacation ____

Stock ____

Deductions: ____

Gross $____

Net $____

____ Requested By

____ Approved By

---------- Forwarded message ---------
From: **Jake Whicker** <jake.whicker@skywest.com>
Date: Fri, Dec 2, 2016 at 3:06 PM
Subject: RE: Clarification of yesterdays events
To: Shane Cassell <shanecassell1@gmail.com>
Cc: Coy Bryant <Coy.Bryant@skywest.com>, Dave Moxham <DMoxham@skywest.com>

Good afternoon Shane,

Thank you for reaching out for clarification on this issue. I understand this is a very important matter for you personally and professionally.

On October 27, 2016, we signed a letter regarding your request for Religious Accommodation. The letter states in part:

- It has been determined that we are unable to honor the specific request with work scheduling...
- We have provided FO Cassell with tools...
    - Options include pursuit of schedule changes as defined by company and departmental resources
        - Drop/trade shift, bid for desired work...

You were assigned to report to and attend a shift that begins tonight (Friday 12/2/16) at 1600 and would end at 1800. This shift is a normal part of CRJ Ground training, and unfortunately there were no alternative shifts for which you could trade or bid for in accordance with established practices. The training in this shift is required training and must be completed in its entirety.

After weighing your options, you stated that you were unwilling to attend the training as scheduled this evening. Subsequently, you resigned your employment with SkyWest Airlines. Had you continued your employment and didn't report for or complete the assignment, your employment would have been terminated as this is a required job function.

I have attached your religious accommodation request and a copy of the termination paperwork. If you have any further questions, please work directly with Coy Bryant on this issue.

Respectfully,

Jake Whicker

**From:** Shane Cassell [mailto:shanecassell1@gmail.com]
**Sent:** Thursday, December 01, 2016 3:28 PM
**To:** Jake Whicker
**Subject:** Clarification of yesterdays events

Jake,

I'm emailing you just to clarify what happened Wednesday afternoon regarding my resignation. As you may recall, in October I submitted a request for religious accommodation regarding my need to have Friday sundown through Saturday sundown free from training and work. SkyWest made accommodations by scheduling me in a different CTP class as well as scheduling my simulators outside of those requested hours. However, when told there was no accommodation that could be provided for the one hour of the matrix session that I would miss on Friday December 2, it was difficult for me to accept in that moment and when faced with the option to compromise my deeply held religious convictions or resign, my emotions clouded my ability to think clearly and I fear I may have misunderstood part of the situation. I want to clarify with you that if I had indeed left at sundown on Friday in the middle of the matrix session, my employment with SkyWest would have been terminated. If I am wrong in understanding this, I am withdrawing my resignation and would like to go back to class even if it means waiting until another ground school start date and starting over again.

I would also like a copy of the resignation paper that I signed for my records.

Thank you for your time.

Shane

---

**2 attachments**




**Cassell Term.PNG**
293K

**CASSELL_51321_RELIGIOUS_ACCOM.pdf**
111K

**CHARGE OF DISCRIMINATION**

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

AGENCY: ☒ FEPA ☒ EEOC

CHARGE NUMBER

______________________________ and EEOC

(State or Local Agency, If Any)

| NAME (Indicate Mr., Ms.., or Mr | HOME TELEPHONE NUMBER (Include Area Code) | |
|---|---|---|
| Mr. Shane Andrew Cassell | [redacted] | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
| [redacted] Lebanon, OH [redacted] | | [redacted] |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (*If more than one list below*).

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) | |
|---|---|---|---|
| SkyWest Airlines Inc. | >15 | (435) 634-3000 | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | COUNTY |
| 444 South River Rd | St. George, Utah 84790 | | Washington |
| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) | |
| | | | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | |
| | | | |

CAUSE OF DISCRIMINATION BASED ON (*Check appropriate box(es)*)

☐ RACE ☐ COLOR ☐ SEX ☒ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER (*Specify*)

DATE DISCRIMINATION TOOK PLACE
EARLIEST: 10/27/2016 LATEST: 12/01/2016
☐ CONTINUING ACTION

THE PARTICULARS ARE (*If additional space is needed, attached extra sheet(s)*)

See attached page

I want this charge filed with the EEOC and the State FEPA. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

02/08/2016 — [signature]

Date — Charging Party (*Signature*)

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE: (Month, day and year)

EEOC FORM 5 (Rev. 07/99)

**Attachment to "Charge of Discrimination" discussing particulars of the discrimination**

As I began employment with SkyWest Airlines, I made a request for religious accommodation before I even began class with them. At first, SkyWest Airlines made effort to accommodate me by scheduling my CTP simulator sessions outside of the Sabbath hours (Friday sundown to Saturday sundown). I also filled out paperwork for a religious accommodation which was denied to me in any area that I had control over. At SkyWest, pilots bid for their schedules and training simulator time based off seniority. Seniority was assigned to our class based off the first digit of the last four numbers of our social security number unless you were either a former employee or a member of the SkyWest cadet program, at that point you were given your class seniority based off of the date you joined the company. All others fell below. I was not unwilling to work with my classmates and future co-workers to "drop, trade, and bid" my work shifts as I would like to follow the set methods of operation at SkyWest, however I had no control over anything outside of that, such as ground school or Initial Operating Experience (IOE). I told SkyWest that I was asking for them to accommodate me where I was not able to use the tools given to me to attempt working outside the Sabbath hours, to which I received no response. In emails I received before class, it was made known to me that ground school would be on Monday – Friday from 8am to 5pm. The sun set just after 5:00 pm in Salt Lake City so there would be no conflict. I made sure of this ahead of time to avoid creating unnecessary conflict with SkyWest.

The first week went by fine, and I had no issues. However, the second week I was told that there would be four matrix sessions (essentially learning the checklists and which switches/buttons to push in each phase of operation) that would happen in a different building. Our class would let out at 3:00 pm on those four days and our matrix sessions would then start at 4:00 and go to 6:00, and a second would go from 6:00 to 8:00. The first session fell on a Friday evening. As soon as the problem presented itself, I spoke with the class instructor and was directed to Jake Whicker, the CRJ aircraft training manager. After a few failed attempts to get in touch with him, he called me the evening of November 30th and indicated that he may be able to make an accommodation for me, but would check with Human Resources. I was to check in with him the next day at lunch time to see what accommodation was able to be made. When I met with him at lunch, he had not yet called corporate and said that he would come find me after he had a chance to do so. Not even an hour later, he came and called me out of class to inform me that no accommodation would be made and that I could either "make it work with your religion" and attend the event, not attend the event and be terminated, or resign. I resigned to save myself from being fired as it is my sincere, deeply held belief that Friday sundown to Saturday sundown is a holy time period and I cannot attend work or training functions during that time.

It appears to me that SkyWest made no effort to accommodate me as they took very little time to look at various options that could have been made available to accommodate me. I believe I have been discriminated against. In addition to that, I believe that SkyWest has the pilot staffing to be able to accommodate my request to have Friday sundown through Saturday sundown free from flight duty and I believe their unwillingness to find a reasonable accommodation for me is discriminatory behavior. I am willing to follow their rules and abide by the bidding system in place at SkyWest, however I want SkyWest to work with me if or when I am assigned a flight or training exercise during the Sabbath hours. I do not want to be terminated over my sincere, deeply held religious beliefs.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
# INTAKE QUESTIONNAIRE

Please immediately complete this entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, within 180 days or in some places within 300 days of the alleged discrimination. When we receive this form, we will review it to determine EEOC coverage. **Answer all questions completely, and attach additional pages if needed to complete your responses. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "N/A." (PLEASE PRINT)**

**1. Personal Information**

Last Name: Cassell First Name: Shane MI: A

Street or Mailing Address: [redacted] Road Apt or Unit #: ____

City: Lebanon County: Warren State: OH Zip: 45036

Phone Numbers: Home: ( ) ____ Work: ( ) ____ Cell: [redacted]

Email Address: shanecassell1@gmail.com

Date of Birth: [redacted] Sex: X Male D Female Do You Have a Disability? D Yes X No

**Please answer each of the next three questions.** i. Are you Hispanic or Latino? D Yes X No

ii. What is your Race? Please choose all that apply. D American Indian or Alaskan Native D Asian X White

D Black or African American D Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? American/Caucasian

**Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:**

Name: Scott Cassell Relationship: Father

Address: [redacted] City: Lebanon State: Ohio Zip Code: [redacted]

Home Phone: [redacted]

Other Phone: ( ) ____

**2. I believe that I was discriminated against by the following organization(s):** (Check those that apply)

X Employer D Union D Employment Agency D Other (Please Specify) ____

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here D and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

**Organization Name: SkyWest Airlines**

Address: 444 South River Road County: Washington City: St. George State: Utah Zip: 84790

Phone: (801) 258-4290 Type of Business: Airline

Job Location if different from Org. Address: 1129 N3950 W Salt Lake City, Utah 84116

Human Resources Director or Owner Name: Mr. Coy Bryant Phone: (435) 634-3000

**Number of Employees in the Organization at All Locations:** Please Check (√) One

D Fewer Than 15 D 15 – 100 D 101 – 200 D 201 – 500 X More than 500

CASSELL 014

**3. Your Employment Data** (Complete as many items as you are able.) **Are you a federal employee?** D Yes X No

Date Hired: 11/21/2016 Job Title At Hire: First Officer Pay Rate When Hired: $36.50/Hour

Last or Current Pay Rate: $36.50/Hour Job Title at Time of Alleged Discrimination: First Officer

Date Quit/Discharged: 12/01/2016

Name and Title of Immediate Supervisor: Mr. Jake Whicker

**If Job Applicant,** Date You Applied for Job__________ Job Title Applied For __________

**4. What is the reason (basis) for your claim of employment discrimination?**

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to* Race. *If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to* Retaliation.

D Race D Sex DAge D Disability D National Origin X Religion D Retaliation D Pregnancy D Color (typically a difference in skin shade within the same race) D Genetic Information; circle which type(s) of genetic information is involved: i. genetic testing ii. family medical history iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify: Seventh-Day Adventist

If you checked genetic information, how did the employer obtain the genetic information?

Other reason (basis) for discrimination (Explain):

**5. What happened to you that you believe was discriminatory?** Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you. **Please attach additional pages if needed.**
*(Example: 10/02/06 – Discharged by Mr. John Soto, Production Supervisor)*

**A. Date:** 11/27/2016 **Action:** Unwillingness to accommodate me based upon my request for scheduling my work shifts around the Sabbath Hours, Friday Sundown through Saturday Sundown.

**Name and Title of Person(s) Responsible:** Mr. Coy Bryant

**B. Date:** 12/01/2016 **Action:** Unwillingness to find an accommodation for me when a training I made a request to fin alternative option to a training exercise that would take place after sundown on Friday night.

**Name and Title of Person(s) Responsible:** Mr. Jake Whicker, Mr. Coy Bryant

**6. Why do you believe these actions were discriminatory? Please attach additional pages if needed.**
I believe I was terminated on account of religious discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e, et. seq. I further believe I suffered retaliation on account of my request for religious accommodation, in that I was terminated after asking for religious accommodation not to work past sundown on a Friday evening, which is the Sabbath. I am a Seventh-day Adventist, and I do not work on Sabbath, from sundown Friday to sundown Saturday. Also, please see narrative attached.

**7. What reason(s) were given to you for the acts you consider discriminatory? By whom? His or Her Job Title?**

According to the memorandum that was given to me, SkyWest Airlines cited the quality, safety, operational impact and training footprint structure of the company as a reason that an accommodation could not be made.

**8. Describe who was in the same or similar situation as you and how they were treated. For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance? Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on. Use additional sheets if needed.**

**Of the persons in the same or similar situation as you, who was treated *better* than you?**

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|
| A. | | | |

**Of the persons in the same or similar situation as you, who was treated *worse* than you?**

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|

**A.**________________________________________

**B.**________________________________________

**Of the persons in the same or similar situation as you, who was treated the *same* as you?**

| Full Name | Race, Sex, Age, National Origin, Religion or Disability | Job Title | Description of Treatment |
|---|---|---|---|

**A.**________________________________________

**B.**________________________________________

**Answer questions 9-12 only if you are claiming discrimination based on disability. If not, skip to question 13. Please tell us if you have more than one disability. Please add additional pages if needed.**

**9. Please check all that apply:**

D Yes, I have a disability
D I do not have a disability now but I did have one
D No disability but the organization treats me as if I am disabled

**10. What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent or limit you from doing anything?** (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

**11. Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**
D Yes D No

If "Yes," what medication, medical equipment or other assistance do you use?

**12. Did you ask your employer for any changes or assistance to do your job because of your disability?**
D Yes D No

If "Yes," when did you ask? __________ How did you ask (verbally or in writing)? __________

Who did you ask? (Provide full name and job title of person)

Describe the changes or assistance that you asked for: __________

How did your employer respond to your request? __________

**13. Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)**

| Full Name | Job Title | Address & Phone Number | What do you believe this person will tell us? |
|---|---|---|---|

A. ______________________________

B. ______________________________

**14. Have you filed a charge previously on this matter with the EEOC or another agency?** D Yes X No

**15. If you filed a complaint with another agency, provide the name of agency and the date of filing:** ______________

**16. Have you sought help about this situation from a union, an attorney, or any other source?** X Yes D No
Provide name of organization, name of person you spoke with and date of contact. Results, if any?
Mr. Alan Reinach, Church State Council, 12/02/2016, Results: TBD, but we have begun the process of filing a charge

**Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.** If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. **If you do not file a charge of discrimination within the time limits, you will lose your rights. If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.**

**BOX 1** D I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. **I also understand that I could lose my rights if I do not file a charge in time.**

**BOX 2** X I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that **the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name.** I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

______________________ **Signature** ______________________ **Today's Date**

**PRIVACY ACT STATEMENT:** This form is covered by the Privacy Act of 1974; Public Law 93-579. Authority for requesting personal data and the uses thereof are:
**1) FORM NUMBER/TITLE/DATE.** EEOC Intake Questionnaire (9/20/08). **2) AUTHORITY.** 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)
**3) PRINCIPAL PURPOSE.** The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge. **4) ROUTINE USES.** EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters.
**5) WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION.** Providing this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

Mr. Coy Bryant, et al. June 29, 2017

I understand that SkyWest management is seeking clarity regarding the pursuit of my religious beliefs in light of company policy. I would like to say up front that it has never been my plan nor intent to be a liability to SkyWest airlines as an employee. Since my graduation from university, I have observed from the outside as SkyWest has grown into a regional airline powerhouse. I have the utmost desire to contribute to the success that SkyWest is having in whatever way that I can. It has long been my dream to become an airline pilot, and within that become an airline pilot for SkyWest Airlines. Given my desire to be a pilot for SkyWest, I would like to assure SkyWest management that I will not let my religious beliefs come in the way of allowing SkyWest to operate and function as it always has, with a high level of quality, timeliness, and overall success. I rather feel the opposite. My religion has helped to shape the man that I am today and due to my religious beliefs, I have made the choice to abstain from drugs, alcohol, and an overall negative lifestyle. SkyWest can rest assured that I will represent the company with the utmost professionalism and integrity both on and off the clock. I realize that SkyWest cannot guarantee that I will be provided a schedule that will always allow me to observe my beliefs, therefore it has and will continue to be my intent to use the tools that SkyWest has provided to either bid out of, drop, or trade a shift that may conflict with my beliefs. I have mentors within SkyWest that understand the PBS system. They have offered to teach me how to properly use the system in order to create a schedule that both meets company and personal needs. I am willing to bid for the most undesirable flights, stay at the most junior base, and fly the most junior aircraft in order to avoid conflicts with corporate policy. If there was an unforeseen circumstance, such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended, I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious beliefs. As my tenure increases, my likelihood of conflict decreases due to my increase in seniority, allowing the system to work as designed.

I have the desire and work ethic to make sure that my religious beliefs do not interfere with the day to day operations at SkyWest Airlines. I want SkyWest to know this as well. I do not expect SkyWest to give me special or preferential treatment. At the same time, I appreciate SkyWest's stance as being an Equal Opportunity Employer. As such, if there is a need for an accommodation, I will also bring ideas and recommendations as to how we can work through the problem together so that SkyWest does not feel that I view my beliefs as an entitlement. Such an example could be a simulator breaking during initial training or recurrent training. If I was unable to resolve the issue outside of an accommodation (perhaps another pilot would be willing to trade with me), I would then bring ideas to the appropriate individuals as to how that specific situation could be resolved without interrupting operations while at the same time allowing me to hold to my religious beliefs.

Thank you for your consideration,

Shane Cassell

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Phoenix District Office**

3300 N. Central Avenue, Suite 690
Phoenix, AZ 85012-2504
Phoenix Direct Dial: (602) 640-5000
TTY (602) 640-5072
FAX (602) 640-5071

Charge No.: 540-2017-01195

Shane A. Cassell
[redacted] Road
Lebanon, OH [redacted]

Charging Party

SKY WEST AIRLINES
Sonja Juarez
Employee Relations
444 South River Road
St. George, UT 84116

Respondent

The Charging Party has requested withdrawal of the above referenced charge.

The Federal Government protects Charging Party's right to file a charge and emphasizes that it is unlawful for any person to threaten, intimidate or harass any individual for having filed a charge. It is illegal to coerce or force any Charging Party to request a withdrawal.

The Charging Party's request to withdraw is hereby granted.

The Commission's acceptance of this withdrawal terminates any further processing of <u>this</u> charge.

JUL 2 1 2017
Date

On Behalf of the Commission

Elizabeth Cadle,
District Director

cc: Alan J. Reinach, Esq.
CHURCH STATE COUNCIL
2686 Townsgate Road
Westlake Village, CA 91361

Church State Council
JUL 2 4 2017
RECEIVED

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | AGENCY<br>☒ FEPA<br>X EEOC | CHARGE NUMBER |
|---|---|---|

(State or Local Agency, if Any) and EEOC

| NAME (Indicate Mr., Ms., or Mr | | HOME TELEPHONE NUMBER (Include Area Code) | |
|---|---|---|---|
| Shane Andrew Cassell | | [redacted] | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | DATE OF BIRTH |
| [redacted] | LINCOLN, NE [redacted] | | [redacted] |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (*If more than one list below*).

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) | |
|---|---|---|---|
| SkyWest Airlines | >4000 | (435) 634-3000 | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | COUNTY |
| 444 South River Road | St. George, Utah 84790 | | Washington |
| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) | |
| | | | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | |
| | | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE | |
|---|---|---|
| ☐ RACE ☐ COLOR ☐ SEX X RELIGION ☐ NATIONAL ORIGIN | EARLIEST | LATEST |
| X RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER (Specify) | 11/30/2016 | 7/12/2017 |
| | CONTINUING ACTION | |

THE PARTICULARS ARE (*If additional space is needed, attached extra sheet(s)*)

On November 30, 2016 SkyWest Airlines refused to accommodate my need for a training date change due to it interfering with a sincere and deeply held religious belief I hold. Instead, I was told that there would be no accommodation made, and I was threatened with termination of my employment. To protect myself from being fired, I chose to resign. Due to this, I believe that SkyWest Airlines discriminated against me due to my religious beliefs and I filed a charge not long after.

On June 12, 2017, I reapplied to SkyWest Airlines with the hope that I could work around the scheduling conflict that I had in November. I interviewed on June 22, 2017, started the paperwork to drop my charge on June 29, 2017, and had several conversations in between those dates with the head of employee relations as to how my religious beliefs would not interfere with my ability to perform my job safely and to the best of my ability. However, on July 12 2017, they chose to not hire me. Not long afterwards, the charge was officially dropped. I believe that SkyWest chose not to hire me in part because of my religious beliefs and also due to the fact that I had an open charge against them at the time that they chose not to hire me. I am thus claiming retaliation and re-filing my charge.

I believe I have suffered religious discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964

| | |
|---|---|
| I want this charge filed with the EEOC and the State FEPA. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – (When necessary to meet State and Local Requirements)<br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br>09/19/2017 *[signature]*<br>Date Charging Party (Signature) | SIGNATURE OF COMPLAINANT<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE: (Month, day and year) |

EEOC FORM 5 (Rev. 07/99)

# United States Equal Employment Opportunity Commission
# a
# Pre-Charge Questionnaire
# Coversheet

(c) 2006 Bobum Corp. No copyright claimed to U.S. Government works.

**United Equal Employment Opportunity Commission Stated**

Please answer the following questions:

a. Does your employer have less than 15 employees? NO

b. Did your act of discrimination occur more than 300 days ago? NO

IF YOU ANSWERED YES TO A OR B ABOVE, STOP HERE AND PLEASE CONTACT THE COMMISSION BY PHONE OR BY COMING TO OUR OFFICE. DO NOT COMPLETE THE ATTACHED QUESTIONNAIRE AT THIS TIME. THE EEOC MAY NOT HAVE JURISDICTION TO TAKE YOUR CHARGE OF DISCRIMINATION.

If you answered "NO" to A and B above, please complete the attached questionnaire.

# Employment Opportunity Commission Pre-Charge Questionnaire

## PLEASE READ – FAILURE TO COMPLETE IN FULL WILL DELAY PROCESSING OF YOUR CHARGE

1. Please complete the following information:

| | | | | |
|---|---|---|---|---|
| Shane | Andrew | Cassell | | [redacted]3619 |
| First | Middle | Last | | Social Security Number |
| [redacted] | Lincoln | Nebraska | [redacted] | Lancaster |
| Address | City | State | Zip Code | County |
| [redacted] | | | | [redacted] |
| Home Telephone Number | Alternative Telephone Number | | | Date of Birth MO/DD/YY |

Scott Cassell [redacted] Lebanon, Ohio [redacted]
Name, phone number, and address of a person who can always contact you.

(c) 2006 Bobum Corp. No copyright claimed to U.S. Government works.

Please indicate the following information (as applicable):

Race Caucasian Gender Male National Origin USA Skin Color White

2. Please fill in the following information about the employer:

SkyWest Airlines — Full Company Name

(801) 258-4000 — Telephone Number

1129 3950 W — Address

Salt Lake City, UT — City, State

84116 — Zip Code

Salt Lake — County

3. Address of the company's headquarters. (This information may be found on the company's website or at hoovers.com, dnb.com, or yahoo.com.)

444 South River Road — Corporate Address

St. George — City

Utah — State

84790 — Zip Code

Mr. Coy Bryant: Head of Employee Relations
Name of personnel representative at Corporate headquarters (e.g. Head of Human Resources, CEO/President, or Chairman of Board of Directors)

(c) 2006 Bobum Corp. No copyright claimed to U.S. Government works.

4. Do you have or are you perceived to have a disability? NO

If so, what is it? ______________________

Please describe how your disability limits one or more of your major life activities:

______________________________________________

______________________________________________

______________________________________________

5. What type of discrimination are you claiming (check accordingly):

Race _______ National Origin _______ Religion X Color _______

Sex/Gender (including sexual harassment) _______ Age (over 40) _______

Retaliation X Disability _______ Equal Pay _______

Other: ______________________________________________

6. State your job title and briefly describe your duties (or position applied for).

First Officer: My job duties would be as Second In Command of a CRJ Regional Airliner. I would assist the Captain in pre flight duties as well as help oversee the safety of flight. At the time of the first incident I was in training. At the time of the second incident, I had re-applied for the first officer position.

7. Dates of employment or application November, 7 2016 to November 30, 2016.
Date of second Application June 12, 2017
Date of Retaliation July 12, 2017

8. What is the employment event that caused you to contact the EEOC? (Hiring, layoff, promotion, accommodation, discipline, harassment, sexual harassment, etc.) List the alleged events of discrimination including the start and end dates. (Example: I was discharged on March 3, 1999.)

On November 30, 2016 I was discriminated against due to my religious beliefs and forced into a position that I had to resign in order to protect myself from being fired. On July 12, 2017 I believe that I was retaliated against due to my religion and due to the fact that I had a charge filed against SkyWest Airlines.

(c) 2006 Bobum Corp. No copyright claimed to U.S. Government works.

9. Please write a paragraph about your employment situation. Tell us what happened and why you feel the incident is discriminatory. Be thorough, this information is very important for the investigation. You may attach additional sheets as needed.

As I began employment with SkyWest Airlines, I made a request for religious accommodation before I even began class with them. At first, SkyWest Airlines made effort to accommodate me by scheduling my CTP simulator sessions outside of the Sabbath hours (Friday sundown to Saturday sundown). I also filled out paperwork for a religious accommodation which was denied to me in any area that I had control over. At SkyWest, pilots bid for their schedules and training simulator time based off seniority. Seniority was assigned to our class based off the first digit of the last four numbers of our social security number unless you were either a former employee or a member of the SkyWest cadet program, at that point you were given your class seniority based off of the date you joined the company. All others fell below. I was not unwilling to work with my classmates and future co-workers to "drop, trade, and bid" my work shifts as I would like to follow the set methods of operation at SkyWest, however I had no control over anything outside of that, such as ground school or Initial Operating Experience (IOE). I told SkyWest that I was asking for them to accommodate me where I was not able to use the tools given to me to attempt working outside the Sabbath hours, to which I received no response. In emails I received before class, it was made known to me that ground school would be on Monday – Friday from 8am to 5pm. The sun set just after 5:00 pm in Salt Lake City so there would be no conflict. I made sure of this ahead of time to avoid creating unnecessary conflict with SkyWest.

The first week went by fine, and I had no issues. However, the second week I was told that there would be four matrix sessions (essentially learning the checklists and which switches/buttons to push in each phase of operation) that would happen in a different building. Our class would let out at 3:00 pm on those four days and our matrix sessions would then start at 4:00 and go to 6:00, and a second would go from 6:00 to 8:00. The first session fell on a Friday evening. As soon as the problem presented itself, I spoke with the class instructor and was directed to Jake Whicker, the CRJ aircraft training manager. After a few failed attempts to get in touch with him, he called me the evening of November 29th and indicated that he may be able to make an accommodation for me, but would check with Human Resources. I was to check in with him the next day at lunchtime to see what accommodation was able to be made. When I met with him at lunch, he had not yet called corporate and said that he would come find me after he had a chance to do so. Not even an hour later, he came and called me out of class to inform me that no accommodation would be made and that I could either "make it work with your religion" and attend the event, not attend the event and be terminated, or resign. I resigned to save myself from being fired as it is my sincere, deeply held belief that Friday sundown to Saturday sundown is a holy time period and I cannot attend work or training functions during that time.

It appears to me that SkyWest made no effort to accommodate me as they took very little time to look at various options that could have been made available to accommodate me. I believe I have been discriminated against. In addition to that, I believe that SkyWest has the pilot staffing to be able to accommodate my request to have Friday sundown through Saturday sundown free from flight duty and I believe their unwillingness to find a reasonable accommodation for me is discriminatory behavior. I am willing to follow their rules and abide by the bidding system in

(c) 2006 Bobum Corp. No copyright claimed to U.S. Government works.

place at SkyWest, however I want SkyWest to work with me if or when I am assigned a flight or training exercise during the Sabbath hours. I do not want to be terminated over my sincere, deeply held religious beliefs.

On June 12, 2017 I chose to re-apply at SkyWest Airlines as I had been unable to find full time employment since the incident. I interviewed on June 22, 2017. In February of 2017, I chose to file a charge (charge number 540-2017-01195) due to the events that took place in November. After interviewing, I recieved a phone call from the head of employee relations, Mr. Coy Bryant. We spoke about how I needed to prove to the company that my religious beliefs would not get in the way of how the company operated. I provided a memorandum that stated my intent and plan of action to keep my religious beliefs from interfering with the company operations. I also started the process of dropping my charge, as I felt it may have a negative impact on my getting the job. I spoke with investigator Evette Cabiness, who had been assigned my case about dropping the charge, and it came to light that SkyWest Airlines had not even viewed the charge. She said that she would need to notify SkyWest Airlines a second time that there was a charge against them. I went ahead and started the process. On July 12, 2017 I recieved an email from SkyWest that they were not going to hire me. About a week later, I received a letter in the mail from the EEOC that the charge was officially dropped. I believe that SkyWest Airlines retaliated against me when it was brought to their attention that I had a charge filed against them, and that they also discriminated against me because of my religious beliefs.

10. What was the employer's stated reason for taking this action?

Safety

11. What is the name and title of the employer representative that made the decision in your case that brought about this event? (Identify this person's race, skin color, sex, and/or approximate age, as applicable.)

Mr. Jake Whicker
White male between forty and fifty years old approximately.

12. Provide any other information (medical documentation, witness statements, witness names and/or addresses) that you have available. Be sure and clarify what information witnesses can attest to.

13. Provide a list of names of persons who were treated better than you. Provide their (1) name, (2) race, age, color, national origin, sex and disability status (as applicable), and (3) job titles.

(c) 2006 Bobum Corp. No copyright claimed to U.S. Government works.

14. Provide a list of persons who were treated the same as you. Provide their (1) name, (2) race, age, color, national origin, sex and disability status (as applicable), and (3) job titles.

15. Have you filed a charge in this matter with another agency? If yes, please provide the name, address, and phone numbers of the agency.

16. Have you filed charges against this employer either inside the company or to an outside agency in this matter or in the past? If yes, explain the situation, when it occurred and remedy afforded.

17. Please state what your performance was like (in other words, tell us whether you were performing below standard, at standard, or above standard) and how you can provide this is true (performance evaluations, awards, etc.)

My performance was high. I scored a 97% on my indoc test. I am aware of other individuals who scored the same, but not higher. My simulator instructor also praised my ability to control the aircraft speed and altitude in training.

(c) 2006 Bobum Corp. No copyright claimed to U.S. Government works.

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Phoenix District Office**

Rec'd 5/14

3300 N. Central Avenue, Suite 690
Phoenix, AZ 85012-2504
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Phoenix Status Line: (602) 640-5000
TTY (602) 640-5072
FAX (602) 640-5071

Shane Cassell
626 A Street
Lincoln, NE 68502

Re: EEOC Charge 540-2017-03519

Dear Mr. Cassell:

Enclosed with this letter is a copy of the Respondent's (employer) Position Statement without exhibits. If you would like to respond in writing to the assertions made by the Respondent in its Position Statement[1], please do so no later than 30 days from today.

This is your opportunity to provide any additional information you feel is relevant, or to refute any assertions made by the Respondent in its position statement. Any information you provide will be taken into consideration when a decision is made regarding the case. There is no specific format for your response; however, please ensure:

1. The above-referenced charge number is included on the correspondence;
2. That relevant witnesses are identified, their contact information and a brief synopsis of what they will say is included; and
3. That you do not duplicate information already submitted or provide original documents.

The response should be uploaded through the Public Portal. You may create an account if they have not already done so by visiting the Portal's home page which can be found at https://publicportal.eeoc.gov/portal/SignIn.aspx?From=Home. In the alternative, if you are represented by counsel you can provide your user i.d. and password to your attorney who may upload any response for you.

If for some reason, you are unable to use the Public Portal, please submit the documentation as an Adobe pdf attachment to an e-mail sent to debra.manuele@eeoc.gov. If you do not have access to a computer or the internet, you may mail the response to the above address.

At any time, a Charging Party or Respondent employer may approach the EEOC with a proposal of settlement. Should this occur, the EEOC will facilitate settlement discussions between the parties when appropriate.

You also have the option, at any time, of foregoing the EEOC administrative process and

[1] *By accepting these documents you agree that you will use them only in connection with contemplated litigation and will only show them to persons in a privileged relationship, such as a spouse, clergy, or medical, financial or legal advisor.*

proceeding directly to Federal District Court. If you wish to do so, you must submit a written request for a Notice of Right to Sue to the EEOC. Upon receipt of such request the EEOC will terminate its investigation and issue you a Notice of Right to Sue. (Requests submitted in Charges filed against a public employer will be forwarded to the Department of Justice). If you have questions regarding whether you should request a Notice of Right to Sue, you may want to consult an employment law attorney. A listing of attorneys can be found at www.azbar.org or www.utahbar.org

For additional information regarding filing a lawsuit alleging discrimination please click on the following link https://www.eeoc.gov/employees/lawsuit.cfm

Thank you for your cooperation. Please contact me at 602-640-5028 or send an e-mail to jeremy.yubeta@eeoc.gov if you have any questions or concerns.

Sincerely,

May 10, 2018

Date

Debra Manuele
Office Automation Assistant

cc:

Alan J. Reinach, Esq.
CHURCH STATE COUNSEL
2686 Townsgate Rd.
Westlake Village, CA 91361

Position Statement of SkyWest Airlines

SkyWest Airlines (SkyWest) denies that Mr. Shane Cassell has been subjected to religious discrimination, or any other discrimination based on religious observances or characteristics. As listed herein, SkyWest will demonstrate that Mr. Cassell's request for religious accommodation was thoroughly reviewed, in partnership with Mr. Cassell and available resources offered. In short, it is Mr. Cassell's unwillingness to work that resulted in SkyWest being unable to continue an employment relationship. The accommodations he is seeking will result in an undue hardship, putting SkyWest within its rights to deny employment.

SkyWest responds as follows:

SkyWest hired Mr. Cassell as a pilot on Sept. 1, 2016. After the employment offer was made, Mr. Cassell notified a recruitment specialist of his religious observances. The recruitment specialist was able to place Mr. Cassell in Airline Transport Certification Training Program[1](ATP-CTP or CTP for short) class that did not interfere with his religious Sabbath observances. After his success at CTP, he continued into the next phase of SkyWest ground school training.[2]

On Nov. 30, 2016 he contacted the Flight Operations Training Manager, Jake Whicker and identified that he would be unable to complete his assignment on Dec. 2, 2016 and resigned his employment.

**On November 30, 2016 SkyWest Airlines refused to accommodate my need for a training date change due to it interfering with a sincere and deeply held religious belief I hold.**

This statement is incorrect. SkyWest had been in communication with Mr. Cassell regarding his religious accommodation request (*See Exhibit 1 – Employee Request for Religious Accommodation)* and provided him with tools and resources to assist him in modifying his schedule. These resources were clarified during a conference call and in writing on Oct. 27, 2016. (*See Exhibit 2 – Memorandum of Agreement for Religious Accommodation Request*) After the call and letter, Mr. Cassell began ground school training.

---

[1] CTP is an FAA mandated course which must be completed by a pilot as a pre-requisite to taking the knowledge test for the Airlines Transport Pilot Certificate (ATP). All pilots working for FAR 121 airlines must possess an ATP. One requirement of the ATP certificate is successful completion of the ATP knowledge test. SkyWest offers a CTP course to new hires who do not already possess an ATP. At the completion of this course they are given an endorsement which permits them to take the ATP knowledge test from an FAA approved provider. SkyWest does not proctor ATP knowledge tests. SkyWest's CTP course consists of four ground training sessions and three simulator training sessions. The training sessions are scheduled in multiple locations, varying times, seven days per week.

[2] After CTP, student's transition to Basic Indoctrination, CRJ Initial Equipment Training (3 phases: *Ground Training, Procedures Training, and Simulator Training*). Basic Indoctrination consists of six days of training. Day one is always a Monday with Saturday and Sunday being days off. The sixth day is held on Monday. CRJ Initial Equipment – Ground Training consists of 13 days. Day one is always on a Tuesday. Saturday and Sunday are scheduled days off.

One month later and two days before a training assignment, Mr. Cassell notified SkyWest that he would be resigning his employment effective Nov. 30, 2016, citing his inability to attend training on Dec. 2, 2016 from 1600-1800 MST.

**Instead, I was told that there would be no accommodation made, and I was threatened with termination of my employment. To protect myself from being fired, I chose to resign. Due to this, I believe that SkyWest Airlines discriminated against me due to my religious beliefs and I filed a charge not long after.**

This statement is incorrect. As mentioned above, on Oct. 27, 2016 SkyWest provided Mr. Cassell with an accommodation which included resources and options to help him navigate his schedule needs.

It's important to note that the timing of Mr. Cassell's request was merely 48 hours prior to a mandatory training event. The regulated nature of this training, and the severely limited notice period did not provide SkyWest with the ability to evaluate if there could have been another accommodation that would not pose an undue burden.

**On June 12, 2017, I reapplied to SkyWest Airlines with the hope that I could work around the scheduling conflict that I had in November.**

SkyWest confirms that Mr. Cassell re-applied for a pilot position.

**I interviewed on June 22, 2017, started the paperwork to drop my charge on June 29, 2017, and had several conversations in between those dates with the head of Employee Relations as to how my religious beliefs would not interfere with my ability to perform my job safely and to the best of my ability. However, on July 12, 2017, they chose to not hire me. Not long afterwards, the charge was officially dropped.**

SkyWest confirms that Mr. Cassell spoke with Employee Relations Manager, Coy Bryant regarding his re-employment and anticipated training schedule. These discussions lead to Mr. Cassell providing a letter regarding what he'd be willing to do. (*See Exhibit 3 – Jun. 29, 2017 Cassell Letter*) The explanation, and inference of only being able to work part of his duties, was not a plausible option for the operational environment at SkyWest. Subsequently, Mr. Cassell was not rehired since his declaration of his inability to work on the Sabbath would inevitability be an undue hardship.

It is important to note that SkyWest has a seniority bidding system for awarding training and work schedules. Courts have long held that such systems meet the accommodation requirement of Title VII, as specific employee religious preferences are balanced against the needs and preferences of fellow co-workers. Mr. Cassell had previously been trained on this system and fully understood that there were several tools available to him to generally avoid Sabbath work assignments. Even so, SkyWest could not guarantee that this system would always deliver a Sabbath-free schedule and Mr. Cassell would not commit to work in those instances.

**I believe that SkyWest chose not to hire me in part because of my religious beliefs and also due to the fact that I had an open charge against them at the time that they chose not to hire me. *I* am thus claiming retaliation and re-filing my charge.**

SkyWest denies that he was not rehired due to any filed charges or claims[3]. Rather the provisions Mr. Cassell outlined in his letter on Jun. 29, 2017 posed an undue hardship and SkyWest elected not to commence an employment relationship.

***I* believe I have suffered religious discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.**

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion. . . ."[4] However, notwithstanding any other provision of Title VII, it is not an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority system.[5]

Mr. Cassell made it clear that if the seniority bidding system awarded him a schedule that conflicted with his religious beliefs, and if efforts to trade the trip failed, he would refuse to work as a matter of conscience. Absent a discriminatory purpose, operation of a seniority system cannot be an unlawful employment practice, even if it has some discriminatory consequences.[6] In a seminal case, a clerk for Trans World Airlines (TWA) worked at a base that operated 24 hours a day, 365 days per year. The clerk sought a religious accommodation from working Saturdays; however, scheduling was subject to a seniority-based bidding system. TWA, the union, and the employee could not agree to an accommodation in light of the bidding system, and the clerk was terminated after two missed Saturday shifts. The court announced that an agreed-upon seniority system must not give way to accommodate religious observances. To hold otherwise would cause an undue hardship by requiring the employer to either (1) abandon the seniority system, (2) discriminate against the other employees by forcing them to work a non-preferential shift, or (3) incur extra costs of hiring a replacement for the shift. Title VII does not require an employer to carve out exceptions to a seniority system in order to help an employee meet a religious obligation.

There is also a line of cases applying this rule to Seventh Day Adventists, such as Mr. Cassell. Perhaps the most relevant is *ABF Freight Systems*, where a truck driver was assigned routes based on a seniority-bidding system.[7] He sought to avoid working Saturdays as an accommodation of his beliefs as a Seventh-Day Adventist. The carrier tried to accommodate him and they met with the union to discuss special arrangements, but no agreement was reached. So they offered assistance bidding on routes that would tend to allow duty-free

---

[3] SkyWest is aware of only one charge filed: 540-2017-03519
[4] 42 U.S.C. § 2000e-2(a)(1).
[5] 42 USCS § 2000e-2(h).
[6] *TWA v. Hardison*, 432 U.S. 63, 82 (1977).
[7] *Lee v. ABF Freight Sys.*, 22 F.3d 1019, 1024 (10th Cir. 1994).

Saturdays and offered the use of vacation to avoid Saturday shifts. The driver rejected these offers because he wanted a guarantee to be free from duty every Saturday. The driver sued for religious discrimination, and the court dismissed his claims because his demand caused an undue hardship. Bear in mind that ABF Freight was not required to wait for an actual conflict – it was enough that the employee declared his unwillingness to work, as did Mr. Cassell, if the proposed accommodations failed to ensure no Saturday work assignments.

Where a religious accommodation request conflicts with a bona fide seniority system, SkyWest is under no obligation through Title VII to grant the accommodation. SkyWest complied with Title VII by offering Mr. Cassell the opportunity to use the seniority system to obtain the work schedule that would allow for observance of his religious beliefs. Because Mr. Cassell refused to affirm his willingness to work without a guarantee of all Saturdays off, SkyWest was within the law to refuse to hire him.

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Phoenix District Office**

3300 N. Central Avenue, Suite 690
Phoenix, AZ 85012-2504
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Phoenix Status Line: (602) 640-5000
TTY (602) 640-5072
FAX (602) 640-5071

Shane Cassell
[redacted]
Lincoln, NE [redacted]

Subject: Dismissal of Charge
Charge Number: 540-2017-03519

Dear Mr. Cassell:

The purpose of this letter is to inform you that the EEOC has concluded its investigation of the above-referenced charge of employment discrimination. After reviewing the information in the file including the information you submitted, the EEOC does not believe that additional investigation would result in our finding a violation.

The EEOC has terminated its investigation into your allegations. While we fully understand that the parties to a charge often have very firm views that the available evidence supports their respective positions, our final determinations must comport with our interpretation of the available evidence and the laws we enforce. This letter, and the enclosed documents, will dismiss your case and no further action will be taken by the EEOC.

Enclosed is your Dismissal and Notice of Right to Sue. The Dismissal and Notice will explain your right to pursue the matter in court. If you want to pursue your charge, you may do so on your own by filing in Federal District Court within *90-days from the date that delivery of the Notice was* *__attempted__* *at your last known address of record or 90 days of receipt of the Notice, whichever is earlier. If you do not file a lawsuit within the required 90-day period, your right to file a lawsuit in this matter will expire and cannot be restored by EEOC.*

If you have any questions, please feel free to contact me at (602) 640-5031.

Sincerely,

DEC 0 7 2018

Date

A. Flores by [initials]
Anick Flores
Supervisor

Cc: Alan J. Reinach, Esq.
CHURCH STATE COUNCIL

Church State Council
DEC 1 0 2018
RECEIVED

EEOC Form 161 (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

To: Shane Cassell
[redacted]
Lincoln, NE [redacted]

From: Phoenix District Office
3300 North Central Ave
Suite 690
Phoenix, AZ 85012

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 540-2017-03519 | Anick Flores, Supervisor | (602) 640-5031 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Elizabeth Cadle,
District Director

DEC 0 7 2018
*(Date Mailed)*

Enclosures(s)

cc:

Coy Bryant
Employee Relations
SKYWEST AIRLINES
444 South River Road
Saint George, UT 84790

Alan J. Reinach, Esq.
CHURCH STATE COUNCIL
2686 Townsgate Rd.
Westlake Village, CA 91361

Gmail

Shane Cassell <shanecassell1@gmail.com>

**Thank you for Applying**
3 messages

**SkyWest Recruitment Team** <skywest+email+3ojo-a7540006f9@agents.icims.com> Wed, Jul 12, 2017 at 1:39 PM
To: shanecassell1@gmail.com

SkyWest AIRLINES®

July 12, 2017

Dear Shane,

Thank you for interviewing for the First Officer Pilot 2017-2994 position at SALT LAKE CITY, Utah.

Many qualified individuals applied and were considered for this position. Again we appreciate you taking the time to interview with us. After careful consideration of all candidates and resumes, we regret to inform you that you were not selected for the position at this time; however, we encourage you to monitor our website (www.skywest.com/careers) for future job openings.

We wish you well in your future endeavors and thank you for expressing interest in SkyWest Airlines.

Regards,
SkyWest Airlines Recruitment

Follow us on Twitter, Facebook and LinkedIn

# Exhibit B

Exhibit B

DEPOMAXMERIT
LITIGATION SERVICES

333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

* * *

| | |
|---|---|
| SHANE ANDREW CASSELL, Plaintiff, | Case No. 2:19-cv-00149-JNP-EJF |
| v. | Videoconference Deposition of: |
| SKYWEST, INC., d/b/a SKYWEST AIRLINES, Defendant. | SHANE ANDREW CASSELL |

COPY

* * *

Monday, September 28, 2020
9:41 a.m. MDT

Remotely Via Zoom

* * *

Jessica Croxford
Registered Professional Reporter

A P P E A R A N C E S

For the Plaintiff:

Erik Strindberg
STRINDBERG & SCHOLNICK, LLC
675 East 2100 South
Suite 350
Salt Lake City, Utah 84106

Todd R. McFarland
GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Spring, Maryland
20902

For the Defendant:

Scott M. Petersen
FABIAN VANCOTT
215 South State Street
Suite 1200
Salt Lake City, Utah
84111-2323

Todd Emerson
SKYWEST AIRLINES
444 South River Road
St. George, Utah 84790

* * *

A. My full name is Shane Andrew Cassell.
Q. And what's your date of birth, Mr. Cassell?
A. My date of birth is [redacted].
Q. And your current address?
A. [redacted], Lincoln, Nebraska [redacted].
Q. How long have you been there?
A. Just under two years.
Q. All right. And before that, were you in Nebraska?
A. Yes.
Q. Same place, just different apartment or home or whatever?
A. Yeah, different apartment.
Q. Okay. Have you ever been deposed before?
A. I have not.
Q. I'm going to ask you some kind of goofy questions that may seem goofy to you, but they're kind of important. But just bear with me.
Have you ever been convicted of a crime?
A. No, I have not.
Q. Have you ever been arrested?
A. No, I have not.
Q. Have you ever been in a lawsuit before?

A. No.
Q. All right. I want to talk to you a little bit about your employment history.
Can you just tell me when you graduated from high school?
A. Yeah. I graduated from high school in the spring of 2010.
Q. And what high school was it?
A. Spring Valley Academy.
Q. Where was that?
A. Centerville, Ohio.
Q. All right. And then did you get a job after high school?
A. No. I went to college.
Q. All right. What college did you go to?
A. I attended Andrews University in Berrien Springs, Michigan.
Q. Did you graduate?
A. I did. 2014.
Q. And what did you graduate in -- with?
A. I graduated with a bachelor's in technology in aviation.
Q. Is that what -- were you intending to be a pilot when you went to Andrews?
A. Yes.

Q. Is that a college that gears people toward becoming pilots, or is that just a college -- like a regular college that gives bachelor's degrees in a variety of places?

A. It's a liberal arts college, and they happen to have an aviation program.

Q. I see.

When you graduated in 2014, what did you do?

A. I had a job lined up as an aerial photographer based in Lowell, Indiana.

Q. And you did that for a while?

A. Yeah. I did that until 2016.

Q. All right. And then what did you do in 2016?

A. I applied at SkyWest.

Q. Had you -- in 2016 when you applied at SkyWest, did you have a pilot's license?

A. Yes.

Q. And then is that something that you get from getting your degree at Andrews?

A. Yes.

Q. But you hadn't applied or -- I'm sorry.

You hadn't worked for any kind of airline prior to applying for SkyWest?

A. That's correct.

Q. Let me ask you this: Where were you living at the time that you applied at SkyWest Airlines?

A. When I applied, I was living in Lowell, Indiana.

Q. And why did you apply at SkyWest?

A. Well, SkyWest had and still has an excellent reputation in the industry of stability, a growing fleet, good training, good work culture, compared to a lot of other regionals that don't quite have the same standards that SkyWest does. And I wanted to be a part of a company where the pilots enjoy going to work, that had a good work culture, that had good training and good stability. So that was very attractive to me about SkyWest.

Q. At the time that you applied, did you do any research to decide what kind of a schedule you would be working with at SkyWest?

A. Yeah. I knew an individual that was working there, and I spent extensive time on the phone with him discussing how his schedule was. I actually knew several people that were working there, but one in particular that I spent a lot of time on the phone with, discussing how the schedule

was handled, from training all the way through being a line pilot.

Q. Who was this individual you're talking about?

A. His name is Steve Horne.

Q. H-O-R-N or R-N-E?

A. R-N-E.

Q. And was he a pilot?

A. He was.

Q. Do you know how long he had worked at SkyWest?

A. I don't know exactly. It was eight -- somewhere between eight and ten years.

Q. Okay. How did you know him?

A. He -- I was -- I was given his number by a former professor of mine from Andrews.

Q. Okay. And other than your pilot's license, do you have any other professional licenses besides like -- not talking about a driver's license, but a professional license of sorts?

A. I'm a flight instructor, and I'm also a ground instructor for aviation-related topics.

Q. How long have you had your flight instructor's license?

A. I got it in March of 2013, so six, seven

years.

Q. And your ground instructor's license, how long have you had that one?

A. I don't remember the year I got it, but it was no later than 2014.

Q. Have you ever had your -- either your flight instructor, your ground instructor, or your pilot's licenses suspended or revoked?

A. No, sir.

Q. Have you ever been disciplined by any industry or trade group relative to those licenses?

A. No.

Q. Tell me -- I apologize, but tell me again when you applied to SkyWest.

A. I applied to SkyWest in the summer of 2016.

Q. And at the time, when you were speaking to Mr. Horne, did any -- did the discussion about work schedule come up?

A. Yeah. That was the majority of what we discussed about in our conversations, was the schedule.

Q. What -- do you know, does Mr. Horne have a particular religion that he belongs to?

A. He's also Seventh-day Adventist.

Q. And he's a pilot for SkyWest?
A. He -- yeah, he was working there. He no longer works there.
Q. When did he quit? Do you know?
A. I don't know when he quit.
Q. Or was he terminated, I guess? Do you know if he quit or was terminated?
A. I -- I presume he was not terminated. He's now flying for another carrier, a major airline. So my presumption is that he wouldn't have been able to get that job if he was terminated.
Q. Do you know what airline he's working for now?
A. FedEx.
Q. FedEx?
A. Uh-huh.
Q. Okay. That's a "yes," right?
A. Yes, he's -- yeah, he's working for FedEx.
Q. At the beginning when I said you've got to respond with audibles, that's what I mean, as opposed to "uh-huh."
A. Sorry about that.
Q. It's hard to read. No, it's okay. I'm just trying not to -- so you're not offended.
A. Yeah.

Q. All right. And you are also a Seventh-day Adventist; is that right?
A. That is correct.
Q. And have you been that essentially your whole life?
A. Yeah. I was -- I guess you could say I was born into it. My parents were both Seventh-day Adventists, and they raised me in the church. I made the decision to be a baptized member when I was 10 years old.
Q. And what -- in relation to your religious views about the Sabbath, can you explain those to me?
A. Yeah, I can. So Seventh-day Adventists believe that the Sabbath starts at Friday sundown and ends at Saturday sundown. During this period, we follow what's -- what's written in Exodus Chapter 20, in the 4th Commandment that we're not supposed to do any work between -- in that time period. It's a day of rest from kind of the responsibilities of the world, and we don't partake in commerce or anything like that.
Q. And the sundown, how do you determine what Friday sundown to Saturday sundown is?
A. Well, it kind of depends on who you ask.

But most Adventists will just look at the sundown calendar. Like on the iPhone, it will tell you when sundown is, or you can go to timeanddate.com and it will also tell you. And that's how my family's always -- that's what my family has used. We use the sundown time.

Q. From your phone? Your handheld?

A. Phone or some form of computer.

Q. Okay. And then when it comes to work, you indicated that your religious beliefs prohibit work during the Sabbath; is that right?

A. Correct.

Q. And does that apply regardless of what your work is?

A. Well, I would say that the exception here, if you want to call it that, would be if -- if it's an unforeseen circumstance. So there was a question asked of me later on by SkyWest, would there be any situation you would be willing to work on the Sabbath. I say, yes, if there was an emergency; if someone's life was in danger; maybe there was a maintenance delay or a weather delay that caused us to get stuck at an outstation that was not a SkyWest domicile. I would be more than happy to bring that aircraft back to the domicile.

And the reason I'm willing to do this is because I look at the example of Jesus in the New Testament, and he was not afraid to work in terms of healing on the Sabbath, doing good on the Sabbath. And so I can within -- I can, with good conscience and staying within my religious beliefs, do something like that. But a regularly scheduled event, I would not do during the Sabbath.

Q. So what about -- from your religious beliefs, what about a first responder like a police officer or a firefighter or an ambulance driver? If you were to choose one of those occupations, is that -- does that also prohibit you from working on the Sabbath even though you might be a police officer or a firefighter in your religious belief?

MR. STRINDBERG: I'm going to object to the question. It's not relevant.

But, Shane, you can try to answer.

A. I think it depends on the individual. Some individuals choose not to. Others do. Me personally, I don't know that I have an answer for that necessarily because I don't work in that industry. I would have to consider all the options.

I know that I don't have a problem with healing on the Sabbath. So if somebody asks me to

help with a healing project, I would be more than happy to do that.

Q. (BY MR. PETERSEN): If you had been asked to be, say, a highway patrolman on -- or -- well, let me ask you this: From your religious point of view for a Seventh-day Adventist to be, say, a highway patrolman, would it, from your position -- I'm not asking from your church's, but from your personal belief, would it be appropriate for that person to work on the Sabbath to do highway patrol duties that may or may not involve any kind of healing?

MR. STRINDBERG: Object again. Not relevant. And I don't know if Shane is an expert in these type of religious questions.

MR. PETERSEN: I'm not asking for his expert opinion. I just want his belief.

Q. (BY MR. PETERSEN): Go ahead, Shane.

A. My belief is that if an individual chose -- that was Seventh-day Adventist chose to be a highway patrolman, I would not have a problem with them working, and neither -- if I was in that situation, I would do it.

Q. You would, you said? I'm sorry.

A. Yes, I would.

Q. Okay. Okay. And then why is it that you do not work on the Sabbath?
A. Why is it that I don't work on the Sabbath?
Q. Yeah.
A. Well, like I said, Seventh-day Adventists believe, based off the 4th Commandment, the seventh day of the week is the Sabbath. It starts Friday sundown through Saturday sundown. And in the 4th Commandment, it states, "On that day, you shall do no work."
Q. So the difference for, say, a highway patrolman versus a pilot, is there a -- from your religious belief, what's the difference to you there, if there is one?
A. Well, police officers are called to serve and protect. You have to have that in society to retain law and order. If an individual that is an airline pilot is not able to show up, people don't go on their vacations, et cetera, it's not a -- in my mind, it is not as crucial of a position to healing and protecting and serving in society.
Q. Okay. And you sincerely believe that not working on the Sabbath -- you sincerely hold that belief, that you should not be working on the

Sabbath, which you've identified as Friday sundown to Saturday sundown?

A. I do.

Q. And your belief in that doctrine or that principle, where does that come from, do you know, your belief?

A. Yeah. The 4th Commandment found in Exodus 20. That's what my church believes and that's what I believe.

Q. And how long have you held that belief? Do you know?

A. As long as I can remember being taught it.

Q. Do you know if Mr. Horne worked on the -- on your Sabbath?

A. Mr. Horne told me he had never worked on a Sabbath at SkyWest Airlines.

Q. Did you ever talk to Mr. Horne about his time as a trainee at SkyWest?

A. I did. He said that he did not have difficulties getting through training in regards to keeping the Sabbath.

Q. Was Mr. Horne ever a reserve pilot, that you know of?

A. Yeah, he was.

Q. Do you know where he was domiciled as a

reserve pilot?
A. I -- I do not.
Q. Do you know when he was a reserve pilot, like what year?
A. I don't.
Q. And I know I asked you how long he worked there, and I can't recall your answer. So I apologize.
But do you remember?
A. It was somewhere between eight and ten years. He had been there for a while.
Q. Okay. And you're not sure -- do you know where he was domiciled when you were speaking to him?
A. Yes. When I started speaking with him, he was domiciled in Chicago, and then he switched to Detroit.
Q. I'm sorry. Then he switched to Detroit?
A. Yes.
Q. Okay. And your understanding is that Mr. Horne never worked a Saturday or a Sabbath, as you've identified and described it, ever at SkyWest?
A. That is correct.
Q. And that understanding comes from Mr. Horne?

A. Yes. Conversations we had.
Q. All right. And when you asked him -- or did you ever ask him how he avoided Saturday or Sabbath work?
A. Yeah. That was the majority of our conversations, me asking him, "How did you handle this situation" or "What did you do in this situation?" And he was very helpful in explaining how he had gotten through.
Q. And how did he get through?
A. Well, so as a line pilot, he -- as his seniority group, he was able to bid out of it. When he was younger, he would use things like trading and dropping trips and stuff like that. He told me that when it came to training and IOE, he was able to make requests with the individuals who scheduled those to avoid being placed on -- on a schedule that went over a Sabbath.
Q. Do you know how many flights SkyWest flew each day at the time that you applied?
A. I don't.
Q. Do you know how many flights SkyWest flew at the time that Mr. Horne worked for SkyWest?
A. I do not.
Q. Do you have any understanding as to

whether the amount of work and the number of flights that SkyWest took while Mr. Horne was there increased from the time he started versus the time he left?

A. Well, I -- I'm sure that the amount increased because I know that SkyWest was growing.

Q. Okay. Had you talked to anyone else at SkyWest that avoided a particular day of work?

A. Before I was training, no.

Q. How about while you were training?

A. It was still Steve.

Q. So was Steve the only person that you're aware of who was able, from your understanding, to avoid working any particular day of the week there in flying for SkyWest?

A. I'm aware of one other individual who started after I left.

Q. And who was that?

A. His name is Michael Wahlen.

Q. How do you spell his last name? Do you know?

A. W-A-H-L-E-N.

Q. And what day did he try to avoid working?

A. Sabbath, Saturday -- Friday sundown through Saturday sundown.

Q. Is he also a Seventh-day Adventist?
A. He is.
Q. And a pilot?
A. Uh-huh. Yes.
Q. Do you know when he started working at SkyWest?
A. He started January or February of 2017. I don't know the exact day he started.
Q. And from your understanding, to this day or to the last time you spoke with him, he had not worked a Sabbath?
A. That is correct.
Q. And did you ask him how he avoided it?
A. Yeah, I did. And he shared the same things. The way he organized his bids, there were some that he told me he had to trade and drop during -- as a line pilot. During training, he was able to -- his training schedule was different than mine, so he didn't have the -- the same set of issues that I did. But he was also able to make requests within the training department to not be scheduled when there were areas that were out of his control with the bidding process.
Q. Let me ask you about Mr. Horne.
Is his first name with a P-H or a V? Do

you know?
A. Steven is his first name.
Q. S-T-E-V-E-N or S-T-E-P-H-E-N? Do you know?
A. I don't. I think it's a V, but I don't know.
Q. Okay. Is Mr. Wahlen still at SkyWest?
A. He is, yes.
Q. Do you know if he's a captain or a first officer?
A. He's a first officer, last I knew.
Q. Do you know where he's domiciled last you spoke with him?
A. Detroit.
Q. And do you know if Mr. Horne was a captain or a first officer?
A. Mr. Horne was a captain.
Q. And how long has Mr. Wahlen been at SkyWest? Do you know?
A. He started in early 2017, so it would be a little -- three, almost four years now.
Q. All right. And Mr. Horne was almost -- something like ten, that you were -- that you recall?
A. Yes.

Q. And -- all right. So let me ask you about your training, then.
You -- you were hired as a pilot by SkyWest in the fall of 2016; is that right?
A. Yes.
Q. Do you remember the month?
A. That I was hired?
Q. Yeah. It's not a trick question. If you don't remember, I get it.
A. Yeah, I don't remember when I received my conditional job offer. I -- yeah.
Q. And you applied at SkyWest because you thought they were essentially a better regional airline than their competitors?
A. Yeah.
Q. And you spoke with Mr. Horne.
How many conversations did you have with Mr. Horne before you applied to SkyWest?
A. At least four or five, that I can remember.
Q. How did you know him?
A. He -- I was given his contact information by a former professor of mine. I never actually met him face-to-face.
Q. Okay. And at the time that you applied,

what did you understand your schedule would be like at SkyWest as a trainee? Did you -- or if you had an understanding at the time?

A. Certainly. So in the interview, I asked what the schedule during training was, and they told me that ground school would be Monday through Friday from 8:00 to 5:00, your normal business hours, and that simulators, they couldn't give me, but they told me that it would be random based off simulator availability.

Q. Did you let them know at that time that you were unwilling to work on the Sabbath?

A. No, I did not.

Q. Did you have any concerns that you would be required to work on your Sabbath, at least with simulator training?

A. I had concerns. But I spoke with Steve, and he -- he told me about his experience and that there was usually some simulator slots that you could avoid Saturdays with -- or the Sabbath time period with.

Q. What did Steve do to avoid that simulator training on the Sabbath? Did he tell you?

A. Yeah. He told me he just picked the ones that didn't have a time period over Sabbath. So

sometimes he might be starting at 4:00 in the morning or ending at 2:30 in the morning. He picked the least desirable ones. Or if he couldn't, he told me that the option to trade with another classmate was available as well.
Q. And did he explain how you would do a trade with another classmate?
A. No, I don't think he did.
Q. All right. And then when you started, you're accepted at SkyWest as a pilot, correct?
A. Yes.
Q. And you began training?
A. Yeah, I began training.
Q. And where did training take place?
A. The first portion was a CTP course in Atlanta, Georgia.
Q. And what is a CTP? What does that stand for?
A. I don't know what "CTP" stands for, but I do know that the purpose of the course is for all pilots who fly for a 121 carrier, such as SkyWest Airlines, have to have an airline transport pilot license. In order to get that license, you have to go through a course that's called the "CTP course." It's three or four days of ground school

and ten hours of simulator time where they teach you about how -- basically, how to fly a jet safely. And then once passing that, you can -- you're eligible to take the ATP test.

Q. So when you applied at SkyWest, did you apply to fly a particular plane or just whichever one they wanted to assign you to?

A. I chose the CRJ due to the fact that it was -- it was going to be easier to avoid working on sabbaths in that airframe.

Q. And how did you have that understanding, that if you applied to fly the CRJ, it would easier to avoid sabbaths?

A. I was told that the other airframe was in higher demand, so everybody that had higher seniority in the company was wanting to go to that airframe. And they were hiring newer hires into it, but they were not getting very good schedules. Their seniority did not grow as quickly. So I chose the other one due to the fact that I would have a better chance of my seniority growing faster, which would allow me to bid out of flying during the Sabbath period.

Q. So at the time that you applied, you understood that SkyWest had a seniority system of

some sort --
A. Yeah.
Q. -- for purposes of deciding when people would fly?
A. Yes.
Q. Tell me what you understood the seniority system to be at the time that you applied.
A. I understood that the seniority system was based off of date of hire. And based off of that, you were assigned a schedule based off of your bid preferences in the PBS system.
Q. And you said "PBS system." What's that?
A. Preferential bidding system.
Q. Is that PBS something unique to SkyWest, or is that something that, in your understanding, applies in the industry?
A. As far as I know, there's only one airline that doesn't have that, and they might have switched.
Q. And who is the airline that doesn't have it?
A. PSA Airlines.
Q. Who do you currently work for?
A. Who do I currently work for?
Q. Right.

A. I work for Silverhawk Aviation.
Q. And have you worked for Silverhawk Aviation since your application for a job at SkyWest?
A. I started at Silverhawk Aviation in the fall of 2017.
Q. What's your position there?
A. I'm the assistant chief pilot.
Q. All right. Let me ask you a little bit about Silverhawk Aviation and your job there.
Assistant chief pilot, is that what you were since being hired in the fall of 2017?
A. No. I started at Silverhawk as a captain, a direct entry captain on a King Air 90 aircraft. From there, they allowed me to become a training pilot, an instructor pilot on that airframe. That happened in the summer of 2018.
In the fall of 2019, they added a second airframe to my job description. I became a second-in-command on a Cessna Citation and as well as becoming a check airman on a King Air 90 that I was flying.
Q. On the King Air 90?
A. Yes.
Q. Did you have to go through training with

Silverhawk?

A. Yes, I did.

Q. And how long is training there?

A. It was broken up into sections. The first two or three -- actually, the first month I was there, it was all computer-based training, which I did on my own at home. The -- then they sent me to FlightSafety, which is a simulation company, to get training in the King Air 90 simulator, and that was ten days.

Q. And where was that?

A. Wichita, Kansas.

Q. And so it went for -- it was ten consecutive days?

A. The total time was ten days. I had Saturday off.

Q. Did everybody have Saturday off?

A. Yes.

Q. So you worked Sunday?

A. Uh-huh.

Q. And not Saturday?

A. Correct. Yeah. I had class on Sunday.

Q. Are you aware that Sunday is the Sabbath for some people?

A. Yes, I do.

Q. Do you know whether anyone at Silverhawk during that time sought to have Sunday off?
A. I'm not aware of any.
I would like to clarify that -- that I was the only one from Silverhawk attending at the FlightSafety course.
Q. Okay. So did you ask to have that Saturday off?
A. I did.
Q. And they were okay with that?
A. They were okay with it. Originally, we had Sunday off, and they just moved the class over one day.
Q. So they switched the Sunday for Saturday?
A. Correct.
Q. I see.
How many pilots are at Silverhawk Aviation at the time that you applied in the fall of 2017?
A. Oh. I don't know.
Q. Does Silverhawk have a seniority system to determine what -- who flies what routes?
A. Not like SkyWest.
Q. All right. Explain their seniority system, if they have one.
A. Sure. So our seniority system, if you

"JetInsight" for all of our scheduling. And the way that that works is, flights themselves at Silverhawk are not assigned based off seniority at all. It's -- we have a trip, and we have these two available pilots that are both available, and we just plug them in.

So schedule is -- is just randomly assigned to pilots within their ten-day on-call period. And it's pushed through JetInsight. All the pilots have an application on their -- on their iPads. The company issues an iPad to each pilot. It has this application for JetInsight on there, and the flights show up in there.

Q. So is it fair to say, then, that flights are not assigned at Silverhawk based on the seniority of the pilots?

A. Yeah, that's fair to say.

Q. And so if you said, "I don't want to work on, you know, Friday sundown to Saturday sundown," and you got assigned -- well, let me ask: Would you then simply not be assigned a flight that's on Friday sundown to Saturday sundown?

A. That's how it's -- the agreement between myself and the company has been.

Q. Okay. Do you know if there's any sort of

a pilots' association that's involved in your -- in the pilots' bargaining of terms and conditions of employment at Silverhawk?

A. We don't have one.

Q. Do you know if there have been any efforts to form one?

A. Not to my knowledge.

Q. Do you have any idea about how long -- I mean, I'm -- you -- let me back up.

You indicated that there's about 40 pilots currently. 25 captains, 15 first officers. And your seniority, you're in the top ten or so; is that right? Did I understand that right?

A. Yeah.

Q. So that suggests to me -- you've been there about three years, maybe getting close to four -- that there's a fair amount of turnover; is that fair?

A. We have some turnover. It looks -- it looks worse than it actually is simply because of how fast my seniority grew there. We also went from 9 aircraft to 16 aircraft in the last two years, so we've had to hire a lot of pilots after me.

Q. I see.

A. I'm aware of a handful of individuals that

left to better things or different things. But it's not -- it's not a consistent overturn where we're constantly having to hire to replace. Most of our hiring has been to accommodate the added aircraft.

Q. All right. So is it fair to say, then, that, from your understanding, most of the pilots, around 30 or so, give or take, have less than four years' experience with Silverhawk?

A. Yeah.

Q. And those that have left, have they gone on to major airlines or regional airlines? Or do you have any idea?

A. Some have gone to regionals. Some have gone and worked for larger corporate or charter outfits. Some of them were terminated, and I don't know what they're doing now. Some of them chose to go and just have a complete career change.

Q. Do you know if any of the other 40 pilots are Seventh-day Adventists?

A. We have one.

Q. And does that person, does he or she fly on your Sabbath?

A. No, he does not.

Q. Okay. And have any of the other pilots requested -- at Silverhawk requested to have a

particular day of the week off, like Sunday?
A. No.
Q. Do you know if there have been any conflicts because of you or this other person -- this other pilot not having to work Saturdays?
A. What do you mean by "conflicts"? Like, difficulties in scheduling or actual, like, pilots being disgruntled?
Q. Yeah. Either one. I mean, particularly the latter. So a pilot suggesting, "Hey, I want Saturdays off, and Shane gets them off every time, and that -- that's not fair."
A. There has been -- there have been a couple of pilots that have been frustrated by that, definitely.
Q. And has the company made any formal announcement or response to that, that you're aware of?
A. Nothing formal, that I'm aware of. I know that the chief pilot has discussed with some of them explaining why they give myself and this other individual that particular time period off.
Q. And from your point of view, has that satisfied them?
A. It stops the -- the complaining. I

don't -- I mean, I don't know what's going on in their heads, but it's definitely stopped the complaining.

Q. What did the chief pilot say was the reason that you guys got that Saturday off?

A. Religious observance reasons.

Q. Okay. And it's your understanding that Mr. Wahlen, Michael Wahlen, at SkyWest has never had to work a Saturday?

A. That's my understanding.

Q. And do you have that understanding because that's what he told you?

A. Yes.

Q. So getting back to -- you said that at Silverhawk, they don't have a seniority-based flight assignment.

So what happens if there are four of five pilots for a particular flight on a particular day? How does the company decide, if you know, to whom to assign the flight?

A. Well, we'll typically look at how much each pilot has flown. And if one pilot has flown more, we'll try to schedule them -- try to not schedule them during that day and schedule somebody that's flown less, if possible. But some days, we

just have lots of flights going, so everybody that's available has to fly.

Q. Okay. But that's -- if you're not currently assigned a flight at Silverhawk, you are on call, so to speak, and you may be assigned a flight. Then you have a certain amount -- I think you said two hours -- to get into the airport and be ready to fly; is that right?

A. That's correct.

Q. Okay. And I may have asked you this. I apologize.

Have you worked a Saturday since 2017?

A. No.

MR. PETERSEN: Do you need to take a break, Jessica?

THE REPORTER: Maybe a five-, ten-minute break would be great.

(Recess taken, 10:40 a.m. to 10:56 a.m.)

Q. (BY MR. PETERSEN): Mr. Cassell, do you understand you're still under oath?

A. I do.

Q. Okay. Let me ask you a few more questions about kind of how flights work at Silverhawk.

A question I had is, I think you said that you fly ten on and then five off; is that right --

or work, you work ten on, five off with Silverhawk?
A. That's correct.
Q. So with your Sabbath, how do you work that since ten days on is always going to cover a Sabbath?
A. Yeah. So, like I mentioned, I have an agreement with the company that I don't fly from Friday sundown to Saturday sundown, so they don't schedule me during that time period. If somebody was dying or something, I would make an exception to that, of course, for emergencies, things like that. But they don't schedule me during that time period.
I do get scheduled for trips that maybe leave on a Friday and come back on a Sunday. So I'll leave Friday morning. I'll sit in a hotel on Saturday, and then we'll fly back Sunday. So that happens quite often.
Q. What about the -- I think you mentioned there were some on-call assignments that your company gives out for those whose planes you're maintaining, I guess, or you're flying for them.
What happens when you get an assignment for somebody who wants to fly on your Sabbath?
A. They give it to another pilot.
Q. Oh. So is there never -- has there never

been a time when there are -- no one's available and you take that flight?

A. I've -- we haven't run into that. They've gone through great lengths to avoid scheduling me on that day, and they have been good to their word on that.

MR. STRINDBERG: And, Scott, can I --

Shane, you're talking about Saturday. We should clarify. As Shane said before, the Sabbath is sundown Friday to sundown Saturday. So there may be some instances -- Shane would have to clarify this -- where he's flown after sundown on Saturday. So when you use the term "Saturday" and "Sabbath" interchangeably, it's a little confusing.

MR. PETERSEN: I understand.

Q. (BY MR. PETERSEN): So to that point, Mr. Cassell, if you were asked to fly in the evening on a Saturday after sundown, that doesn't violate your Sabbath, correct?

A. Not at all. I've done that on occasion.

And I would just like to point out, right before we went on break, you asked me if I had ever flown on a Saturday. In my head, I was thinking Sabbath, so I answered no. I have not flown during the Sabbath hours. I have flown after the Sabbath

hours, so...
Q. Okay. Okay. So you mentioned that SkyWest was a -- I think you called it a part one -- a Part 121 or a 121 Part airline.
Do you know what part of the code governs Silverhawk?
A. Yeah. Part 135 as well as Part 91.
Q. 135 and 91?
A. Correct.
Q. And I'm not asking for a legal opinion. But when you say "135" or "91," that's obviously different from Part 121.
In your understanding, what is the difference?
A. Part 121 is scheduled air carrier operations like an airline. Part 135 would be on-demand charter where, if someone's calling and asking, "Hey, I need a jet to go to such-and-such a place," they don't own the aircraft; they're just chartering the jet, but it's on-demand.
Part 91 would be owners or a company. It's something internal, maybe.
Q. So that's like a corporate jet that just needs pilots?
A. Yes.

A. I did not.
Q. And you were applying for positions during that time, based on the documents that were sent to me?
A. Yeah.
Q. And you're not aware of any other -- other than what we talked about with Middletown Regional Flight, any other efforts to get employment that would have any paper relative to that -- those efforts that have not been disclosed? Do you understand my question?
A. Yeah. I'm -- I'm thinking if there were any others.
MR. STRINDBERG: And, Shane, if you need to look through each one of these documents, you can.
A. I -- I have looked through these, the employment applications and stuff. I -- I've put this together as well.
Q. (BY MR. PETERSEN): So the question -- again, it's not intended to be a trick question, but I want it to be comprehensive, which is, is this the universe of documents, that you're aware of, that demonstrates your employment efforts from the time that you left training at SkyWest in the winter of

2016 and the time you were hired by Silverhawk Aviation on September 6th of 2017?

A. One other comes to mind. I applied to be an Uber driver, but they told me my car was too old.

Q. Okay.

A. So that didn't work.

Q. Do you have any documents that would support that?

A. I -- I could possibly dig them up. I would have to look for them. I don't know where they would be.

Q. All right. Other than that, any other airline efforts?

A. None that I'm aware of.

Q. Or other career efforts?

A. No, none that I'm aware of.

Q. Getting back to the time differences.

So when you were made a captain upon being hired at Silverhawk, do you know whether -- you mentioned that your understanding of a Part 121 airline is that it required to go -- to become a captain for a Part 121 airline, you had to have a certain number of Part 121 flight hours; is that right?

A. That's how I understand it.

Q. And when you say "flight hours," those are actual hours from, sort of, take-off to landing?
A. Yeah, essentially. I'm not sure how SkyWest chooses to count, if they count it from when the plane pushes or if it's take-off. But it would be something of that sort.
Q. And is it your understanding also that in order to get those flight hours, you would have to do that as a first officer before becoming a captain?
A. That's how I understand it, yes.
Q. All right. You never became a captain at SkyWest; isn't that right?
A. Correct.
Q. And did you actually ever fly a SkyWest plane when you were working there?
A. No. I never did.
Q. So is it, in your estimation, easier to acquire the kind of flight time that you need to become a captain at a company like Silverhawk that is governed by different regulatory parts than to become a captain at a company that's governed by Part 121, like SkyWest?
A. I wouldn't say it's necessarily easier. It requires hard work either way. There are

definitely more opportunities available to those who take advantage of them. But, you know, you can be a flight instructor like I was for years and bill time that way and go straight to 135, or you could do the same thing and go to a 121.

Both -- yeah, I guess if -- there are more opportunities available for individuals to bill time to become a -- a captain under 135 if the company is hiring at the bare minimum.

Q. All right. Have you spoken to Mr. Wahlen since you left SkyWest?

A. Yeah.

Q. And what was the nature of the conversations that you had with him after leaving SkyWest?

A. All different natures. Mr. Wahlen and I have been friends since 2010, and we've kept in touch. So we've discussed things regarding work as well as just things in our own lives. A good friend of mine.

Q. Did he seem surprised that you were not hired by SkyWest?

A. The second time?

Q. Yes.

A. He did, yeah.

Q. Did he explain why he was surprised?
A. Yeah. SkyWest, in the summer of 2017, as were most every carrier that I was aware of, were very hungry for pilots as there was a lot of overturn from retirements and majors and pilots being called up from regionals hired up in majors. So they were looking to replace, as well as parent airlines were adding more routes.
Q. And that would suggest to you, and I think it suggested to Mr. Wahlen as you're explaining it, that SkyWest needed more pilots, not less pilots; is that right?
A. Yes.
Q. Do you know if Mr. Wahlen has spoken to you, say, in the last year about his schedule for the last year?
A. He's probably -- I think he's mentioned it once or twice what -- like, specifically what days he was flying. There have been no -- no concerns or, "Hey, guys" -- you know, he hasn't -- he hasn't reached out to me about any concerns he has regarding his schedule.
Q. Okay. Do you know whether he's indicated to you if he's had to work on your Sabbath this year?

A. He -- he -- I know he has not worked on Sabbath this year.
Q. And you know that because that's what he told you?
A. He's told me that, yes.
Q. Okay. And that's why he seemed surprised that SkyWest, given the need for pilots, would suggest that you wouldn't be hired?
A. Yeah.
Q. Okay. Do you know how many hours it requires working for a Part 121 airline to go from being a first officer to a captain, how many 121 hours?
MR. STRINDBERG: Objection. Asked and answered.
Q. (BY MR. PETERSEN): All right. You probably did.
Was that 1,000? Is that what you told me?
A. Yes.
Q. Okay. Fair enough.
Do you know whether SkyWest had specific hours that were required just to be hired, flight hours just to be hired as a pilot, a first officer?
A. Yeah. Pilots that were applying had to meet some form of airline transport pilot minimums

whether -- and this is where -- depending on the training program you went through while you were getting your pilot's licenses, depended on how many hours that could be. For those coming from the military, it was 750. If you went through the program I went through, which was a unstructured training program, it was 1,500. And it could be any -- anything in between there depending on where the training came from.

Q. Does Silverhawk have the same hours requirements?

A. Silverhawk requires for their -- for the position I filled, it had to meet full ATP minimums, which is 1,500 hours.

Q. When you say "ATP," what does that stand for?

A. Sorry. Airline transport pilot.

Q. And that's -- is that the same kind of hours as what would be required to be a pilot at SkyWest?

A. That would be the maximum. So to be a -- to be a first officer at SkyWest, pilots could apply -- or could apply under restricted airline transport pilot minimums, which means that they could obtain a restricted airline transport pilot

license, allowing them to act as second in command.

But when you -- my understanding is, when you became a captain, the restriction was lifted from your airline transport pilot license.

Q. All right. You applied at SkyWest at least twice to be a pilot, right?

A. That's correct.

Q. And the first time was in the fall of 2016?

A. The first time was in the summer of 2015.

Q. And when you applied in 2015, you applied just to be a pilot and go through the SkyWest training so that you could fly the CRJ?

A. That is correct.

Q. And your complaint references what you've stated as "certification training program," CTP.

Is that -- what do you mean by that?

A. I'm sorry. You cut out there. Could you repeat the question?

Q. Sorry. Every time I turn my head, I think it's not very good, so I'll try to keep it straight. This Zoom thing's kind of got my notes and --

So you mentioned in your complaint that, at SkyWest, you went through what's called -- what you labeled as "certification training program,"

paragraph 14 of your complaint.
Is that what -- is that pilot training?
A. Yeah. So earlier I -- I might have mentioned, in order to take the airline transport pilot written test, you had -- the FAA, Federal Aviation Administration, mandated that all pilots take a -- had to go through this CTP, or certification training program, course, which was -- it was three or four days of ground school, discussing jet aerodynamics, jet systems, stuff like that. And then it was ten hours in a simulator, full-motion simulator in a transport category aircraft. Since this was required and SkyWest was needing pilots, SkyWest was providing the course.
Q. Do you know whether -- do you get paid to go through that training course?
A. I think my -- yeah, my paycheck reflected that, so I was paid to do that.
Q. Do you know how much you were paid?
A. I -- training guarantee at the time was 65 hours paid at 36.50 an hour, I seem to recall. But that's -- that's my recollection. 65 hours paid out at 36.50 an hour, and it's 65 hours of pay monthly during training.
Q. And how long was the training? Do you

know?
A. The CTP course?
Q. Yes.
A. I was there for a week and a half.
Q. When you say "there," where is "there"?
A. I'm sorry. Atlanta, Georgia.
Q. And you're not from Atlanta?
A. No, I am not.
Q. So did you have to get a hotel or rent a house or something?
A. SkyWest provided lodging for us.
Q. What about your flight from where you were to Atlanta?
A. They provided a flight from -- yeah, from where I was to Atlanta.
Q. Did they feed you?
A. No.
Q. How about transportation? Did you have transportation from the airport to the hotel and to your training?
A. There was an airport shuttle that was operated by the hotel -- sorry. There was a hotel shuttle between the airport and the hotel. It was operated by the hotel. And there was a shuttle between -- I seem to recall there being a shuttle

between the hotel and the training center, but it was right across the street, so most everyone decided to walk.

Q. Okay. But other than your food and your incidentals, everything else was paid for by SkyWest while you were training?

A. Yeah. That's -- that's my -- I would say SkyWest provided lodging, and they provided the airfare to and from, that I know.

Q. Okay. Do you know how much SkyWest -- how much it cost SkyWest to train you?

A. I have -- I don't know how much it cost them to train me.

Q. Did you have any discussions with Mr. Horne or Mr. Wahlen about those costs?

A. No, I did not.

Q. And nobody at SkyWest ever explained to you what the cost of your training would be?

A. No.

Q. All right. So did you successfully complete your training in Atlanta?

A. I did, yeah. I completed the CTP course.

Q. And when the Sabbath came around in Atlanta, what did you do when Friday sundown rolled around?

A. I'm not sure I understand exactly what you're asking. Like, what I did personally or how I handled the potential conflict?

Q. Yeah, that's fair.

So your training, did it ever bleed into your Sabbath while you were in Atlanta?

A. Yeah. The schedule for the CTP course was given to me sometime before. I believe it was in October, that the schedule was given to me. And I saw that I was scheduled Sabbath -- Saturday morning for a simulator session. So I reached out to the individual who was in charge of scheduling. I explained my predicament, and they agreed to move me to a different simulator slot that gave me Saturday off.

Q. Do you know how many simulators are accessible in that training facility in Atlanta?

A. I don't know how many are accessible.

Q. Do you know whether SkyWest owns those simulators or leases them?

A. I -- I don't know.

Q. Do you have any idea how much it costs?

A. I don't know how much it costs.

Q. Okay. But at the time that you're in Atlanta, you were able to reschedule your simulator

training so that you did not have to do your simulator training on a Saturday; is that right?

A. Yeah, that's correct. They --

Q. When did they switch it to?

A. They switched it to -- I think my first simulator session was on Monday, and it was over by Wednesday. It was only three nights.

Q. Okay. So they -- you were originally scheduled for Saturday to Monday, and you ended up getting Monday to Wednesday? Is that -- am I getting that right?

A. That's -- I recall being scheduled Saturday through Monday, and they switched it, yeah. That's correct.

Q. Okay. And so you successfully completed the CTP program.

And what happened next?

A. So I finished that on Wednesday. They flew us to Salt Lake City where our ground training would start for SkyWest from Atlanta. They -- I believe we left the next day. And so we had Friday off to take our -- our written test for the airline transport pilot license, which everybody that was flying out there with me did on Friday.

And then SkyWest had put us in a hotel

where -- for when we would take the test, and then they moved us to a different hotel on Sunday where we were going to remain for our ground training, which was going to start on Monday.

MR. PETERSEN: So, Jessica, do you need another break, or can you go until noon?

THE REPORTER: I can go until noon. That's fine. Thanks for asking.

(A discussion was held off the record.)

Q. (BY MR. PETERSEN): So after that, the flight to Salt Lake and the lodging, all of that, that continued to be paid for by SkyWest?

A. Yeah. SkyWest provided lodging for the pilots that were in training.

Q. And you continued to be paid for the time that you were required to be at places and continue your testing at the 36.50 an hour; is that right?

A. That's my understanding.

Q. Okay. All right. So after that testing, then, you're still not a first officer yet, or are you a first officer? Do you know?

A. No. I am -- I'm sorry. I'm interrupting.

No. I -- I guess -- I applied for the position of first officer. I don't know if SkyWest would have considered me a first officer until after

I passed my check ride or not, though. I don't think they would have. I guess "first officer in training" would be a good way of describing what I was.

Q. Okay. You weren't flying actual passenger flights, though, right?

A. That's correct.

Q. And while you're in this training and then when you're taking your test in Salt Lake City, are you speaking with Mr. Horne or Mr. Wahlen? I can't remember his name now.

A. Mr. Wahlen?

Q. Wahlen. Sorry.

A. I was speaking with Mr. Horne. I called him once. And then I -- I think I -- I was in touch with Mr. Wahlen just explaining to him, "Hey, this is what happened. This is what you can expect in training." He had some questions. That's all.

Q. Did you ever -- sorry. I didn't mean to cut you off. Go ahead and finish.

A. He was starting after I was, so that's why he was curious.

Q. Did you ever talk to them about what it would be like to be a reserve pilot?

A. Yeah. I spoke with Steve about that, and

he shared -- he just shared how he bid and traded, et cetera, to get reserve periods that were outside of the Sabbath hours.

Q. So you -- there are no reserve pilots at Silverhawk that are reserve pilots by title. Is that fair?

A. Yeah, that's fair. That's correct.

Q. You act as reserve pilots in a way, I suspect, because you're there on call at times for anyone who needs a plane to go.

Is that fair, too?

A. Yeah, that's correct.

Q. But there are pilots that are specifically provided the job duties of reserve pilot at SkyWest; is that right?

A. That's how I understand it, yes.

Q. And those pilots are not scheduled a particular leg or line, correct?

A. That's correct.

Q. Tell me what you understand the duties of a reserve pilot at SkyWest to be, if you have an understanding.

A. So I -- I'm sorry. Finish.

Q. Yeah. If your understanding has changed from the 2016 time period when you were applying --

or the 2015 time period to now, I'd like to know the change. But, otherwise, just tell me what your understanding has been about what a reserve pilot does at SkyWest.

A. Certainly. So my understanding -- and this is based off of my limited knowledge -- is that SkyWest had a reserve pool. The pilots were expected to be available. I think it was a two-hour callout for -- if a pilot were to get sick or maybe a flight got delayed inbound and the crew wasn't going to make it to their next airplane, whatever multitude of reasons that the crew couldn't make it to the flight they were supposed to be on, they would call a reserve crew in that was expected to be at the airplane within two hours. They were essentially paid to be available.

Q. Are you familiar with something called a "ready-reserve"?

A. Yeah. The pilot sits at the airport.

Q. And is that different from the reserve duties you just described of being available in two hours?

A. Yeah, that would be different. I -- I -- I recall there being different levels of reserve. There was short-call, long-call, and ready-reserve.

Q. Yeah. And the short-call, is that a time frame that was shorter than the two hours you just described?
A. My understanding is, short-call reserve was two hours, unless it's changed.
Q. And then long call was what?
A. I think it was a 12-hour callout.
Q. Okay. Have you ever heard of a callout being a 30-minute callout?
A. I have not, no.
Q. Okay. And a ready-reserve, tell me how the duties of a ready-reserve differ from the short- or long-call reserves, if you know?
A. Well, the ready -- sorry?
Q. I said if you know.
A. I don't -- like I said, I have very limited knowledge on this because I never experienced it. But my understanding is, ready-reserve sits in the crew lounge or somewhere at the airport with their phone on, and they -- they could be -- you know, they're probably going to be the ones that are called first for anything that's an immediate need, versus the other ones would be categorized for less immediate and maybe, like, up to half a day out with a 12-hour callout.

Q. And what -- do you have any idea as to what the purpose of a reservist is?
A. Yeah.
Q. Go ahead.
A. The reserve pilot essentially fills in when there's a need in the company. Like I said, maybe a crew misses a connection somewhere and they're going to be late, and so the flight they were supposed to be on isn't going to have a crew available if it's going to leave on time. So they call a reservist in, hoping that they'll be there in time to get the flight off on time.
Q. Do you know whether reservists tend to be more senior or more junior pilots?
A. My understanding is, it's a mix of both. Typically, all your new pilots will start off on reserve. But I have heard of senior pilots that like to bid reserve because they live in -- at base close to the airport, and they can just stay at home and get paid.
Q. Do you know whether they're paid -- the reservists are paid as much as those who actually fly a line?
A. My understanding is, reservists are given a 76-hour guarantee. And if they exceed that, then

great. If not, they're going to get paid for at least 76 hours for being available.
Q. And do you know whether that's true on -- at SkyWest, the 76 hours? Is that what your understanding is, is that SkyWest did that?
A. Yeah. My understanding is, SkyWest's minimum guarantee is 76 hours.
Q. Would you sit -- at SkyWest, had you been hired as a pilot and were scheduled as a reservist on your Saturday, would you have sat at the airport as a reservist, a ready reservist over your Sabbath?
A. No. I -- I was -- as I understood, you had to be specifically placed on ready-reserve. That wasn't a choice you had. So if they asked me to do that, I mean, I wasn't willing to take a flight assignment on Sabbath -- during the Sabbath hours that were scheduled out. I would have tried to trade that with some other pilot, drop it, and pick up something else. I would have done my best to move my schedule around so it wasn't a conflict.
Q. And if you had been unable to get somebody to take it, would you have then sat ready-reserve at the airport?
A. No, I wouldn't have.
Q. Would you have called off sick if you had

not been able to fly -- so let me back up.

So let's say that you were hired by SkyWest as a ready reservist and scheduled for Saturday, or for your Sabbath.

And when I say "Sabbath," you know I'm talking Friday sundown to Saturday sundown, right?

A. Yes. Yes.

Q. And you're unable to swap it with somebody. You said you would not fly it.

What would you do at that time -- at that point?

MR. STRINDBERG: I'm going to object to the question. You're asking him to speculate. He was never in that position, Scott. So I don't know if he knows how he would have handled it.

Q. (BY MR. PETERSEN): Let me assume that that's the position that you're in, Mr. Cassell.

By the way, is it "Cassell" or "Cassell"? Am I even pronouncing your name right?

A. It's "Cassell."

Q. Okay. I apologize. I've heard it both ways, and I've been saying "Cassell" the whole time. I meant to ask you, so I apologize. I apparently was right anyway, so...

A. No, it's -- I go by both. I hear both all

the time, so it's no problem.

Q. Okay. So if you had been asked and you couldn't get it off, did you -- had you thought to yourself what you would do at the time?

A. Yeah. I would have called -- if it got to the point where it was beyond my ability to trade, drop, et cetera, I would have called -- probably would have called crew scheduling and let them know. And if they couldn't do anything, I would have called the base chief pilot and let them know that I wasn't going to be available.

I'm not the kind of person that wasn't going to show up unannounced. I would have let -- I would have given as much notice as I was able to to the appropriate individuals, explaining what was going on.

Q. And you wouldn't have lied about it to say like "I'm sick" or anything along those nature -- that nature, right?

A. No. I -- I think that would be dishonest. That doesn't -- I think it's counterintuitive. Later on in the commandments, it talks about not bearing false witness. So break one to not break another doesn't make sense to me.

Q. Okay. Fair enough. So that I can move

off, I'm going to switch gears before lunch.
I am showing you now what are Bates-numbered CASSELL 191 through 193.
Do you see those documents? They're wage and tax statements, W-2s.
A. Yeah.
Q. And I'm looking at the employer on the first one, which is 191.
MR. PETERSEN: And by the way, Jessica, I'd like to mark this one as Exhibit 2, which is -- it'll be Bates numbers 191 to 193.
(Exhibit 2 was marked.)
Q. (BY MR. PETERSEN): The first one, 191, the employer is Middletown Regional Flight Training Institute.
Is that the entity you mentioned earlier that you worked for part-time from December 2016 until early August 2017?
A. Yes, that would be them.
Q. And that indicates that your compensation, your W-2 wages, were, what, $7,198.30; is that right?
A. Yes, that's correct.
Q. Were you given any other compensation through them that is not reported on this W-2?

A. Not that I remember.
Q. Okay. Now I'm going to the next page, CASSELL 192. And this one has Silverhawk Aviation, Inc.
Do you see that one?
A. Yes.
Q. And that one -- oh, let me go back first. 191 is for 2017.
Did you get a W-2 from Middletown Regional Flight that's from 2016?
A. Yes, I -- I would have.
MR. PETERSEN: All right. I -- unless I'm missing it, I don't think I have that one, Erik. Is there a way to get the W-2 for 2016 from Middletown Regional Flight?
MR. STRINDBERG: Do you mean 2017?
MR. PETERSEN: Well, this is 2017. I'm looking for 2016 since he said he worked from December 2016 until early August 2017. So, presumably, he would get two W-2s.
MR. STRINDBERG: I will ask Shane to try to find it.
MR. PETERSEN: Okay.
Q. (BY MR. PETERSEN): Then going to 192, this is -- says it's Silverhawk, and this is also a

2017 W-2. And it shows $14,575.18.

Does that seem to you -- or do you have any reason to think that that's not the amount of income that Silverhawk paid you in the year 2017 for your work for them?

A. That all looks correct.

Q. Then I'm going to the last page, which is 193. This is a 2018 W-2 that shows wages of 58,544.91 for work at Silverhawk.

Have you got any other compensation in 2018 from Silverhawk besides that that is shown?

A. No.

Q. Do you have any -- did you receive any compensation from any other employer in 2018, that you're aware of?

A. No.

Q. How about 2017? Any other income besides what it shows on the two W-2s we've already gone over indicating income from Silverhawk and from Middletown Regional Flight?

A. No, not that I can remember. Just those two companies.

Q. All right. And you don't have any 2016 W-2 statements from any other entities, other than we think you got one from Silverhawk -- or from --

yeah -- or Middletown. Sorry.

MR. STRINDBERG: Scott, we produced a bunch of other tax information, I think, ten days ago. I don't know if it included his other W-2s, but you might want to check those as well.

MR. PETERSEN: Okay. Fair enough. Thank you.

Q. (BY MR. PETERSEN): All right. Then I want to go and mark as Exhibit 3 CASSELL -- if I had done this the way I thought I did it last night, this would not be an issue because this would be a separate file. But, apparently, I didn't do it right, so I apologize. My other files, I think, are better.

This is marked CASSELL 177 through CASSELL 190.

(Exhibit 3 was marked.)

Q. (BY MR. PETERSEN): I'd like to mark that as Exhibit 3 and have you -- as soon as I get up there. I'm sorry. I'm probably bugging your eyes out. I apologize.

Can you -- do you recognize these documents, Shane?

A. Yeah. That was -- there was a request made that I get the schedule that I worked at

Silverhawk. And this was at the time what I was able to produce as far back as December 2018. We changed scheduling software at that point, so anything before then was lost.

Q. Okay. And the schedule that I'm looking at -- and I get it's probably really small where you're at, but it looks like it's -- you've got December 2018, January 2019, February 2019. So it looks like it's by month that there's a schedule.

Is that -- is that a -- well, let me ask this: What are these? What does this show? What do these documents show? Is this something that's handed to you or that you see online? Are you creating this? What are these?

A. This is what's -- this is one view of the schedule that I have available to me. This information can be found -- I sent some duty logs that are a lot cleaner than this that show a day-by-day kind of in a line format that'll give the same information as this. It's a lot cleaner.

MR. STRINDBERG: And we produced those to you, Scott, ten days ago.

MR. PETERSEN: Yeah, I'll talk to you about them.

Q. (BY MR. PETERSEN): So these -- there's

nothing in these documents that are not shown in those later day-by-day schedule documents? Is that a fair statement?

A. Yeah, that's correct. And even on these, I was unable to remove some company events like maintenance and other random company flights that they put on there. So not -- not all of this is entirely reflective of my schedule. This was just the best I could come up with at the time.

Q. So just -- and then I'll move on.

But what are the difference -- what's the difference between the gray, the yellow, and the blue, if anything?

A. I'm looking.

MR. STRINDBERG: Can you make them bigger there, Scott?

MR. PETERSEN: Yeah. It'll bump them off the page, but I can do that. Yes.

Q. (BY MR. PETERSEN): Is that big enough for you, Mr. Cassell?

A. Yeah, I can see that.

So it appears that the gray is -- anything with a line through it, like the dash -- diagonal lines appear to be maintenance. I don't know why some are gray, some are blue, and some are yellow,

though.

Q. Okay. This is not a calendar you prepared; this is something that you pulled off of your company's system?

A. Correct. Yeah. I recognize that it's kind of difficult to read.

Q. And if I were to click on one of these and open it up, it would probably give me more information about the event. Is that fair?

A. Yeah, it would. Anything that says "Silverhawk" is something to do with maintenance or a company flight. Anything else, you'll see it doesn't have the lines through it. That's -- that's all -- those were revenue flights of some sort.

Q. So do you see my cursor, my little hand? I'm circling around. Just to give me an example, I'm looking at this blue one, 12a Silverhawk maintenance, Lincoln-Lincoln.

That's not a flight?

A. Correct, yeah. That was just a -- they pulled an aircraft in for maintenance.

Q. But the one above it that's yellow, Silverhawk Link-Link, that means that is a flight?

A. No. That also looks like maintenance. Like I said, I don't -- I don't entirely remember

what the key here was.

So if you look at NPPD, Lincoln to Lincoln right next to it on December 18, 2018.

Q. Yes.

A. Do you see how that doesn't have lines going through it like the other ones do?

Q. Right.

A. That was a flight that I did.

Q. And these are your -- the other question is: This is your schedule, not somebody else's schedule?

A. Yeah, that's my schedule.

(Reporter clarification.)

A. It is my schedule.

Q. So best you can tell -- we'll get to the other documents. From this document, if it has -- if it doesn't have the vertical lines, the slanted lines through them, that shows a flight?

A. Yes. Oh, hang on. I know what the colors are now. It just came to me.

So the colors represent aircraft types.

Q. So this gray one on December 10, 2018, that shows that you did a flight in a -- whatever aircraft the gray represents?

A. Yes.

Q. What does "Bryan Heart" stand for?
A. Bryan Heart was the name of the client we flew. It's a hospital.
Q. And then LNK to LNK, what does that mean?
A. So LNK is the airport identifier for Lincoln. We flew from Lincoln to another airport and back to Lincoln. So the trip started and ended in Lincoln.
Q. I see. Okay. Okay.
MR. STRINDBERG: Scott?
MR. PETERSEN: Yeah.
MR. STRINDBERG: Not to tell you how to do your job. But Shane earlier said, you know, that he's paid a salary, so the number of hours he flies is not really that important, I would assume.
MR. PETERSEN: Well, I'm just trying to find out what the schedule is.
MR. STRINDBERG: Okay.
Q. (BY MR. PETERSEN): I mean, I'm assuming, Mr. Cassell, that the gray one here, I'd have to -- would it actually indicate how many hours you flew for that flight?
A. It would -- it would not show how many were flown. And that's why, like, the duty logs that I sent at a later date do show, like, how much

flight time was logged, how many hours I was on duty, et cetera, where these just show what was scheduled.

Q. Do you get tips or bonuses for what you fly?

A. If I work on a day that I was scheduled off within my five days off or vacation time that I would have taken, I get paid $500 per day. Some clients --

Q. Plus --

A. I'm sorry. What?

Q. Plus -- I'm sorry.
Just plus your salary?

A. Yes.

Q. In addition to salary. Okay.

A. And then some clients do tip. It doesn't happen very often.

Q. Do you have -- I mean, like, if I said, "How much have you made in -- or how much did you make in 2019 in tips," do you have any idea?

A. I have no idea. Maybe $200. Nothing -- it's not a small amount, but it's not a substantial amount, either.

Q. But you think it's less than $1,000 for the whole year?

A. Yeah. I think it's definitely less than 1,000 for the whole year.

MR. PETERSEN: Okay. All right. Why don't we take a break, and I'll have better documents next time, too.

(Recess taken, 12:05 p.m. to 12:35 p.m.)

Q. (BY MR. PETERSEN): All right. Mr. Cassell, do you understand you're still under oath?

A. I understand.

Q. All right. When you finished your certified training program and then you were flown out to Salt Lake City, how long did your training in Salt Lake City continue? And this is back in the fall of 2015.

A. My understanding was, my training was supposed to go at least another four weeks. I did not stay through the entirety of that. I made it through about a week and a half.

Q. A week and a half.

And then were you paid for that week and a half?

A. To the best of my knowledge, yes.

Q. And then what happened at the week and a half?

A. So after the first week, we had a test over what we covered on the first week on Tuesday. And they gave us a schedule of what was to come over the next -- I think it was the next three weeks.

And the -- that first Friday, there was an event that was scheduled -- it had two parts. Pilots could choose which part they wanted to be a part of. There was a 4:00 to 6:00 p.m. and then there was a 6:00 to 8:00 p.m. This event they called the "matrix session" where they would essentially be teaching pilots. They call them "flows." And what that is is you -- basically, they're teaching you which button, which switch to flip when -- for which phase of flights for takeoff. You flip these in this order. For landing, you want to do these in this order, et cetera.

Sundown was at 5:00 p.m. in Salt Lake City, so neither of those options were going to work. So as soon as I was given that schedule, I went to the class teacher and I said -- I explained my predicament.

And he said, "Well, you need to get in touch with Mr. Jake Whicker." He was not in his office, so I got his phone number from his secretary and -- I believe she was his secretary. And she

said, "Give him a call. He'll call you back."

So I called him. And later that evening, he called me back explaining that there might be a way to accommodate me. Come visit him the next day at lunch.

So the next day at lunch -- excuse me.

Q. Do you need a break?

MR. STRINDBERG: Do you need some water there, Shane?

THE WITNESS: I have a little bit here. Give me -- pardon me for just a second.

MR. PETERSEN: Yeah, no, take a second here.

THE WITNESS: All right. I think I'm okay now.

Q. (BY MR. PETERSEN): Okay.

A. So, yeah. He called me, and he said they might be able to do something to help me, to come visit him the next day at lunch.

I showed up at his office the next day at lunch, and he said he had not had a chance to talk to anybody at that point. This would have been Wednesday afternoon.

So lunch break was over. We all went back into class. And not too long later, maybe 30,

45 minutes after we started class, he came and called me out of class to come to his office. He explained to me that SkyWest would not be providing an accommodation and that I had three options available to me: I could make it work with my religion and show up to the required training event; I could not show up and be fired; or I could resign, effective immediately.

Given the fact that the night before, he said that there might be something that they could do for me, I was kind of expecting a conversation about that. So I was kind of taken by surprise. And I chose to resign because I did not want to put on my record that I had been fired, especially from a airline. So I resigned, effective immediately. And, yeah, that's -- that's basically how it went.

Q. And I think we said that this was in 2015.
But isn't it in 2016? Are we talking about 2016, December?

A. Oh, yes. So I guess some clarification on this. I was confused. I applied in 2015. They offered me a job. The company I was currently working -- had been working at offered me a promotion to chief pilot. And so I weighed my career options, and I thought that, from a career

standpoint, the chief pilot position would be better.

I got into that position and did not enjoy it. So I applied in 2016 with SkyWest again. And this is when all this happened, was in 2016.

Q. Okay. And the company that you applied for in 2015 -- that you applied for.

The company you were working for in 2015, who were they?

A. That company was called "AirScout."

Q. And what kind of company is AirScout?

A. They did aerial photography.

Q. And how long did you work for AirScout?

A. I worked for AirScout during the summers of 2013, 2014, and 2015, and 2016. And fall of 2015, I went full-time, and I worked there through winter as well.

Q. And what did they pay you? How did they pay you?

A. So 2013, 2014, and through the summer of 2015, I was paid per flight hour. I was paid $35 per flight hour. And then from fall of 2015 through fall of 2016, the year that I was a chief pilot, I was paid a salary of 36,000 a year.

Q. Did they offer you any benefits?

A. No benefit. One benefit was, they provided housing, which they took the payment out of my paycheck pretax. That was the only benefit.

Q. Where was this?

A. Lowell, Indiana.

Q. So did you get at W-2 in 2016?

A. From AirScout?

Q. Yeah.

A. I -- yeah, I would have.

Q. Do you know whether it's been produced? That's not a trick question. Just -- I don't know.

A. No. My understanding was, the documents that were requested were from 2017 and onwards, so I produced nothing for 2016.

Q. Okay. But you worked -- did you work with AirScout, then, between the time that you resigned at SkyWest and the time that you were not hired by SkyWest in July of 2017?

A. I did not work for AirScout beyond when I left in 2016.

Q. Okay. In hindsight, do you think that was a good idea, that you worked for AirScout instead of the offer with SkyWest, the initial one?

A. Oh, I don't know. I think there's advantages to both, and there were disadvantages to

the decision I made, too. I gained some invaluable experience in management that I think helped me get into the position that I'm in now. But it definitely was not the most fun I've ever had at a job. So I think it could have gone either way.

Q. Yeah, well, I was going to ask, what was it that you did not like about your job at AirScout?

A. I was working 80 hours a week.

Q. Were you working on your Sabbath?

A. No, I was not working on Sabbath. But they -- they expected long days. And I would get done with a long flight day, and I'd have a bunch of other problems I had to deal with. And it just -- it wasn't enjoyable.

And other -- other things that I don't necessarily want to get into between myself and other parties that didn't always see eye to eye. But it just wasn't fun.

Q. So if you were not working on your Sabbath, you were putting in 13 hours a day?

A. Roughly.

Q. And the things that you didn't -- that you struggled with with other pilots, did those have to do with your religious beliefs or your religion?

A. No, I didn't have -- I didn't have major

conflicts with any of the pilots there.
Q. How many pilots did AirScout employ?
A. Including myself, we had 11.
Q. And how many aircraft did they fly?
A. Four.
Q. Same aircraft?
A. No. These were small single-engine piston-powered aircraft. They're very, like -- four-seaters, including the pilot.
Q. Okay. So I'm showing you what is marked SkyWest 588, and which I would like to mark as Exhibit 4.
(Exhibit 4 was marked.)
Q. (BY MR. PETERSEN): Do you recognize this document at all, Mr. Cassell? Have you seen it before?
A. No.
Q. All right. I am going to just represent to you that it's a Saturday matrix lab for December 10, 2016. I guess -- and it says "instructor" down here at the bottom left going up, Dave Cannon.
Do you recall whether Dave Cannon was your instructor in December of 2016?
A. I do not remember any names of my

instructors.

Q. All right. But it was -- so it was clear, though, at the time, wasn't it, that you had -- that you were going to be scheduled for training that would bleed over into your Sabbath, and you raised that issue with your instructor at the time?

A. Correct.

Q. And who was -- what was Jake Whicker -- what did you think -- what was his position at the time?

A. Mr. Wicker's position was, he was the CRJ training manager, I think is -- was his title. He was the head of training for the CRJ.

Q. And do you know a Dave Cannon?

A. I -- I might have had classes from him, but I don't remember any names beyond Jake's.

Q. Okay. Those -- do you know how many you were training with at SkyWest at the time?

A. There was a little over 30 in the class, I think. Somewhere between 30 and 40.

Q. Do you know whether any of the others were Seventh-day Adventists?

A. I'm not aware of any that were. There might have been, but they didn't make themselves known if that was the case.

Q. Okay. So when you requested that you not work your Sabbath or that it not bleed into your Sabbath, tell me how that came about.

How did you first learn that you were going to be working on your Sabbath and that you -- you know, what did you do at that point? Help me understand kind of the steps as to what happened.

A. Sure. So after we took our test on Tuesday over the previous week's content, they gave us a new binder. The -- I'll provide some clarification. The first week was over -- it was company indoc. So we cover company policies, regulations, operations, specifications, things that apply to how you operate at SkyWest.

The second, third, and fourth weeks and anything beyond that -- I don't remember if it was beyond that, but we were going to talk about the aircraft specifically, getting into the systems, how did the landing gear work, how does the fuel system work, the electrical system, et cetera.

So after the test on Tuesday, they gave us a new binder with material for the upcoming weeks. And it had a schedule in there as well on the first page. I looked it over, and I saw the date and times for that Friday evening.

And that's when I -- I brought it -- we had a break in class. And I went to the teacher, and I explained -- like I said, I explained my predicament to him. And that's when he referred me to Mr. Whicker.
Q. Who was the teacher of the class?
A. I don't remember his name.
Q. Did you talk to either the teacher or Mr. Whicker about whether you could talk to anyone else in your class to see if they would be willing to swap with you? Or were you going to be working over your Sabbath no matter what? In other words -- let me back up.
From what you can see on your schedule, was everybody going to be working over your Sabbath?
A. Yeah. The whole class was scheduled to either be in the 6:00 to 8:00 -- or, sorry, 4:00 to 6:00 or 6:00 to 8:00 time slot on Friday evening.
Q. So what did you think the options would have been, that you would have preferred at the time if the whole class was working during your Sabbath?
A. Sure. I would have been perfectly fine with some one-on-one time with one of the teachers. I would have been happy to come in after class any of the eight days leading up to that or afterwards

before the next session -- because there were four of those matrix sessions -- to make up for it. I would have been happy to come in on a weekend day. If it came down to it, I would have even accepted them putting me in a class later on that didn't have the conflict.

Q. Did the schedule that you got that was working into Friday, was that classroom time or was that simulator time? Do you remember what the class activity was supposed to be?

A. Yeah. So it was -- I guess -- I guess it would be considered classroom time because it wasn't in a simulator. What they did is, they took several touch screen monitors, and they lined them up in a position that simulated the flight deck of the CRJ aircraft. And from there, they would have us -- they told us they were going to have us be going through the sequences and pushing different buttons going through -- like I said, they called them "flows." So you have your takeoff flow. These are the buttons you push when you're getting ready to take off. This is the after-takeoff flow. You do these buttons next.

And that was the point of these matrix sessions. They have four of them scheduled

throughout the system -- the systems training. It was going to be done at the simulator building, but it wasn't going to be in a simulator, was my understanding.

Q. Were you aware of other times where the same activity was taking place, or were you just assuming that, if you got scheduled with another class, it might be in a different time other than that Friday?

A. My hope was that it would be different with another class. And I would have been willing to wait until sundown was after 6:00 p.m. or however late it needed to be to make that work.

Q. Did you bring all that up with your teacher or with Mr. Whicker?

A. No. I was never given the opportunity.

Q. All right. So when your teacher said, "Come talk to Mr. Whicker," then that was the next day?

A. That was the day of. So that was on Tuesday, as I recall. And I went to his office. He was in a meeting. So I got his phone number. I called him after class let out at 5:00. He called me back around 11:00 p.m. or so and asked me to come see him the next day.

Q. So on Wednesday, you went in and saw Mr. Whicker?

A. Correct.

Q. On a time that wasn't training time, I'm assuming?

A. It was during lunch.

Q. All right. And you sat down at his office, or did he come to you? How did that go?

A. I went to his office, and he told me he had not had a chance to speak with anybody about possible accommodations and that he would come and pull me out of class later, or he would come find me later and we would talk.

And then about 30 or 45 minutes after lunch break had ended, he came and pulled me out of class. And that's when he told me that they were not going to make an accommodation.

Q. Did he have somebody with him?

A. He had a -- in the office, between he and I, there was nobody. When I signed the resignation paperwork, he called in a -- one of the secretaries. And I recall him having -- I recall him having been on the phone, or maybe he had Mr. Coy Bryant on the phone still. I know he had been talking to him. I don't recall if Mr. Bryant was still on the phone

with him or not, though.

Q. When he pulled you out after that 30 to 45 minutes later, what did he say? Tell me what the conversation was, the substance of it.

A. The summary of the conversation -- I don't remember exactly how it went. But the summary of the conversation was that SkyWest was not going to be providing an accommodation, and I had three options available to me. I could make it work with my religion, and I can show up to the event on Friday evening; I could not show up to the event, and I would be terminated; or I could resign, effective immediately.

And I was kind of caught off-guard with the options that were given to me, given that he had mentioned the night before that he thought there could be an accommodation made. So being kind of caught off-guard, I chose the latter of resigning because I didn't want to report that I had been fired. I didn't want to be fired.

Q. So did he say, "SkyWest will not provide it" or "SkyWest cannot"? Do you remember his exact words?

A. I recall it being "SkyWest would not." It wasn't a "can."

Q. Did he say why not?
A. He didn't explain why.
Q. Did you ask him?
A. No. I was completely caught off-guard.
Q. Okay. Did you ask for some time to think about it?
A. No, I didn't.
Q. So he offered you could either work it, not show up and be terminated, or resign.
Did he explain to you why he was offering you a resignation?
A. No.
Q. And you picked resignation in order to avoid having a resume that said you were terminated by SkyWest, right?
A. That's correct.
Q. And did you have any other follow-up conversations with Mr. Whicker?
A. Yes. The next day, I sent an email asking for clarification of the events. I don't remember exactly what I said in the email, but I -- I think -- I think I said, "If I misunderstood anything," and I -- I asked him if I misunderstood the fact that I would have been terminated. I said, "I apologize, and I'd like my job back, if possible.

Or if not, you know, this is what it is, but I would like some clarification on what happened."

I believe that email is some -- yeah, right there.

Q. So I'm showing you what's been Bates-numbered SkyWest 38 to 39, which looks like an email chain between you and Jake Whicker; is that right?

A. Correct.

Q. And you just mentioned that you emailed something to Mr. Whicker the next day, which I guess would be Thursday, December 1st?

A. Yeah.

Q. That's what your email looks like.

So tell me what these two emails show, if you know.

A. Sure. Let me read through them.

Q. Sure.

MR. STRINDBERG: Scott, are you going to mark these?

MR. PETERSEN: Yes. This would be Exhibit 5, I believe.

(Exhibit 5 was marked.)

Q. (BY MR. PETERSEN): And, Mr. Cassell, you just tell me when you're ready.

Are you good, Mr. Cassell, or are you still reading?

A. I'm still reading.

Q. I'm not trying to push you. I'm really not. I just didn't know if you were waiting for me.

A. No, it's fine.

Okay. I've read it.

Q. So this first one, which is your email dated December 1, 2016, tell me what the purpose of that email was.

A. Just to make sure that I hadn't acted irrationally. I got caught up in -- I guess my emotions kind of clouded my judgment a little bit, or I perceived that they may have.

Like I said, I was not expecting to be given those three options. I was expecting to have a conversation of, well, these are some options we have for you. The very least being, we'll have you just go to a different ground school and start this over again, which was not provided. I felt as though I had kind of been backed into a corner, which is why I sent that email.

Q. Okay. And then his response, is that what's above?

A. Yeah.

Q. And he references an October 27, 2016, letter, a signed letter regarding your request for religious accommodation. I want to pull that up.

Does this look like -- and I'm adding your email that accompanied that from you and then a response from Coy Bryant.

But let me just go back to -- these are Bates-numbered SkyWest 17 through 19.

Do you recognize those documents?

A. I do recognize them.

Q. Tell me what they are.

A. So this was a document that they requested that I fill out. When I asked -- when I initially requested to have the simulator time switch during the CTP course, they provided this document for me to train out as well -- or, sorry, for me to fill out as well for training and that I was to send it to Coy Bryant.

Q. Okay. And you did that?

A. I did.

MR. PETERSEN: So I want to mark this as Exhibit 6, I believe it is.

(Exhibit 6 was marked.)

Q. (BY MR. PETERSEN): Then there's a response. If you look at Bates number 17, there's a

response on October 27, 2016, from Coy Bryant that says, "The other pilot that has requested accommodation is Mikhail Belov. He gave me permission to disclose this information to you in hopes that you can coordinate your schedule."
Do you know what he's talking about?
A. Yeah. There was another pilot that had requested a form of accommodation. I believe it was also Friday sundown through Saturday sundown off. He was not Seventh-day Adventist. I reached out to him, and we discovered that we were not in the same class.
Q. So that didn't help you in any kind of coordinating efforts?
A. That's correct.
Q. Do you know whether Mr. Belov had to work on that Friday to Saturday time period?
A. I'm not aware.
Q. Did he ever tell you whether SkyWest had agreed that he could not -- that he didn't have to work that day?
A. He didn't mention it.
Q. Okay. So you had one call with him, you think, and that's as far as that went?
A. Yeah. I think we texted back and forth a

couple messages, and then we realized we were not in the same class. So we realized that nothing was going to work there.

Q. So not being in the same class, why did that make it so it wouldn't work?

A. The schedules were most likely going to be different, and we wouldn't have been able to pair up together in any events.

Q. So then going back to Exhibit --

MR. PETERSEN: Is this 4, Jessica, this one here, the one we marked previously?

MR. STRINDBERG: 5, I think.

MR. PETERSEN: So the one we just marked, was that 6?

THE REPORTER: Yes, the last one was 6.

Q. (BY MR. PETERSEN): Okay. Then 5. Okay. Thank you there.

So looking back at Exhibit 5, Mr. Cassell, the response -- there's a response in here from Mr. Whicker saying, "It has been determined." This is the bullet points. Do you see that paragraph? And this is on December 2, 2016. "It has been determined that we are unable to honor the specific request with work scheduling... We have provided FO Cassell with tools..." And then there's a

sub-bullet point. "Options include pursuit of schedule changes as defined by company and departmental resources." And there's an even further indented bullet point, "Drop/trade shift, bid for desired work..."

Do you recognize that wording from Mr. Whicker?

A. Yeah. They sent a letter with a response regarding my request for accommodation.

Q. And was -- this is back in October?

A. Yes.

Q. Did that letter, that you can recall, explain that they -- that SkyWest was unable to honor your request to have Friday at sundown to Saturday at sundown off?

A. They told me that they couldn't guarantee anything and that they gave me these tools listed in this email.

Q. Okay. And what did you understand the tools to be?

A. Trading, drop shifts, bid for desired work, none of which applied to training because it was all assigned, except for simulators, is my understanding.

Q. So at the time, your understanding was

that you couldn't trade any of your training sessions other than the simulator time; is that right?

A. Correct.

Q. And to trade the simulator time, how would you have traded that?

A. I don't know exactly how things work. But my understanding is, if -- if you got a simulator session that you didn't like and you wanted to try and trade with somebody that had one that you did like, you just approach the pilot and ask if they would be willing to trade.

Q. Okay. And did you ever have occasion to do that at SkyWest?

A. No. I never got to simulators.

Q. Okay. If I look at the third paragraph of Mr. Whicker's email, it says, "You were assigned to report to and attend a shift that begins tonight, Friday, December 2, 2016, at 1600 and would end at 1800."

So yours started at 4:00 p.m. and went to 6:00 p.m., right?

A. Yeah, that would have been it.

Q. So the other -- the rest -- there was a chunk of the class that had your scheduled 4:00 to

6:00 time period, and then the other group of the class had a 6:00 to 8:00 p.m. time period?

A. Yes.

Q. And then it says, "This shift is a normal part of CRJ ground training."

Do you agree with that?

A. Yeah. Everybody had to go through it.

Q. Then it said -- it says, "And, unfortunately, there were no alternative shifts for which you could trade or bid for in accordance with established practices."

Do you agree with that?

A. They didn't have any scheduled alternative shifts, no.

Q. And that's because you're in training as opposed to bidding for a line of some sort. Is that fair?

A. Correct.

Q. Okay. Then it says, "The training in this shift is required training and must be completed in its entirety."

Do you agree with that sentence?

A. Yes.

Q. Did you have that discussion with Mr. Whicker or anyone else at -- like Mr. Bryant or

anyone else at SkyWest at or around the October 27, 2016, time period?

A. No, not that I recall.

Q. All right. When you received the email from Mr. Whicker, did you respond to it? Is that the 3:28 email -- or, I mean, not -- I'm sorry.

Did you respond to this email? Not the December 1st at 3:28 email. That's the one you sent to them on the 1st.

He responded on the 2nd, correct?

A. Yeah, he respond -- yeah. He replied on Friday, is what it looks like.

Q. Okay. And then did you reply to him?

A. I don't remember if I replied or not. Yeah, I don't -- I don't recall if I did or not.

Q. He says at the second to last paragraph, "After weighing your options, you stated that you were unwilling to attend the training as scheduled this evening."

Is that true?

A. Correct.

Q. And then it says, "Subsequently, you resigned your employment with SkyWest Airlines."

I think you said you did that in order to avoid it showing up as a termination on your resume;

is that right?

A. Correct.

Q. And then it says, "Had you continued your employment and didn't report for or complete the assignment, your employment would have been terminated as this is a required job function."

Is that consistent with what they told you at or around December 2nd or December 1st?

A. Yes.

Q. Okay. And then it says, "I have attached your religious accommodation request and a copy of the termination paperwork. If you have any further questions, please work directly with Coy Bryant on this issue."

Do you recall whether -- it looks to me from the email that there was a copy of the accommodation form and then your termination paperwork.

Do you remember receiving those at the time?

A. I did receive them.

Q. Okay. So at this point, you had resigned from SkyWest. And then shortly thereafter, you filed a discrimination charge against SkyWest; is that correct?

A. That's correct.
Q. And is it -- was the basis for the discrimination charge that they didn't work with you to give you an alternative means of finishing that training?
A. Yeah.
Q. And then at some point, you withdrew that discrimination charge; is that right?
A. That's correct.
Q. All right. I'm going to show you another document. This is a document that's Bates-numbered SkyWest 42 to SkyWest 43.
(Exhibit 7 was marked.)
Q. (BY MR. PETERSEN): Do you see this document?
A. Yes.
Q. It's a letter from Todd Reinach. I don't know how you say that. Reinach, Reinach.
Do you know how to pronounce that?
A. Reinach.
Q. Reinach? Okay.
And it's dated December 8, 2016.
Have you ever seen this letter?
A. Yes. He -- Mr. Reinach sent it to me.
Q. All right. And do you know why it was

sent to you? Not by your attorney, but why SkyWest sent this letter to you?
A. I don't remember if SkyWest sent this to me or if this was -- Alan sent this to me.
Q. Yeah, sorry. That was a bad question. I wasn't trying to get at who literally sent it to you.
Do you know -- were you ever told what the purpose of this letter was?
A. No.
Q. All right. I'm going to look at -- just go over this letter really quickly with you.
The second paragraph says, "SkyWest employs more than 4,000 pilots."
Do you know -- do you have any reason to disagree that that's an estimate of the number of pilots that SkyWest employed in December of 2016?
A. I have no reason to disagree with that.
Q. And then the second -- the third paragraph says, "As such, we have developed a robust seniority system with shift trades and vacation days to help employees manage their work schedules."
Do you agree with that sentence as a characterization of SkyWest's seniority system?
A. I agree.

Q. And then it says, "As Mr. Cassell gains seniority, he will be able to utilize these tools to avoid working on the Sabbath."
Do you agree with that sentence?
A. I agree.
Q. And it says, "However, over the course of his first few years of employment, when Mr. Cassell has low seniority, he will absolutely and unavoidably be required to work on Saturday and other holidays, as more senior pilots typically avoid working those days."
I want to -- there's a lot in there, but let me ask you one question.
Is it your experience that more senior pilots typically avoid working Saturdays and holidays?
A. In my experience, that is not necessarily the case. I -- I have spoken with some pilots who chose -- go to overnights. They didn't care if they flew over the weekend. Most pilots don't seem to care if they have to fly on a Sunday or a Saturday, typically. They understand the line of work we're in. They're more interested in if the trip is good or not. For example, someone might choose an overnight in Nashville, Tennessee over Flint,

Michigan, even if that meant that they had to fly on a weekend.

Q. Okay. What about the statement, "As Mr. Cassell gains seniority, he will be able" -- I'm sorry. I already asked you that.

"Over the course of his first few years of employment, when Mr. Cassell has low seniority, he will absolutely and unavoidably be required to work on Saturday and other holidays."

Do you agree with that sentence as it relates to working as a pilot at SkyWest?

A. I do not agree with that. As I've said, I know pilots that have avoided it.

Q. Okay. And then the avoiding working Saturdays is through the trading and the seniority and the bid system that you've described. Is that fair?

A. Yes.

Q. Okay. The last paragraph says, "Mr. Cassell resigned from our flight training program because a training class would extend one hour into the Sabbath."

Is that accurate?

A. That's accurate.

Q. "I admire his faithfulness. But if he

returns, he will unavoidably be tasked with working on all or part of the Sabbath for several years to come."

You disagree with that?

A. I do.

Q. Now look at the rest of that sentence -- of that paragraph, "If he has changed his position on Sabbath observance or if he can think of another acceptable accommodation, please let me know and I would be pleased to discuss it with you."

Did you or anyone on your behalf discuss with SkyWest alternative accommodations to just the seniority system and the trading that we've already discussed with SkyWest?

A. I -- I believe I gave some ideas to Mr. Reinach. Whether or not he passed those on, I am not aware.

Q. Okay. I'm not looking for a discussion with Mr. Reinach. I don't need to know what you guys discussed. But can you -- do you -- let me word it a different way.

What other options do you see that SkyWest could have employed at this time, other than what we've already discussed with the bidding system and the swapping, that could have allowed you to work

for SkyWest while still avoiding working on your Sabbath?

A. Certainly. So I'm going to discuss training because this is an area where the system really is not -- it's not implemented.

With training and other training events that are scheduled like this, pilots who have these requests could come to the training manager, and the training manager could look for people within the training department that would be willing to do a session over a weekend or after hours on class -- class days to help those that do need to accommodate -- those types of accommodations, help them get the training that they needed so they can still complete the course.

I was willing to come in on a Sunday and do two hours. It might have been less time, even, because instead of teaching a group of 20, they would be teaching a group of just myself. So we could have done that. I would have also been happy to come in after 5:00 p.m. and work with somebody one-on-one. That was not something that was ever offered to me.

I would have also been willing to wait and do my class later on in the year, maybe in April or

maybe even May or so when the sun went down later to avoid running into this conflict.

I was not aware that this was going to be a problem. Had I known, I wouldn't have even started class at this time. So in the interview, they told me class -- ground school would be from 8:00 to 5:00 Monday through Friday.

Q. Okay. But I thought that you told me that your earlier -- when you filled out what is Exhibit 6, I believe, that -- I'm looking at it now, that there was not a sure -- they couldn't guarantee you wouldn't work a Saturday.

Was that not in reference to training?

A. It did not sound to me as though their response from SkyWest was in reference to training.

Q. So look at page SkyWest 18. It says -- and I'm looking at number 1. It says, "Describe the purpose of your request for a religious accommodation."

It states, "The purpose is to request accommodations with work and training so that I'm able to uphold my deeply held, sincere religious convictions as a Seventh-day Adventist Christian."

Is that language you wrote, or did somebody else write that?

A. I wrote this.
Q. So doesn't that suggest you were talking about training as well?
A. Yes.
Q. And so when they responded that they couldn't guarantee what you were seeking for an accommodation, you didn't understand that it applied to training back then?
A. The tools -- they said that they gave me tools, which would be the bidding system, trading, and dropping. And I knew enough about the training program that that didn't work for that. You were assigned a schedule in the classroom. I can't trade classroom days with another pilot. That wasn't available to me.
Q. And then if you look at number 3 on the same SkyWest 18, it says, "I am asking that I not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown. My religious convictions do not limit my ability to perform the essential functions of my job as a pilot. I am just requesting this time off each week."
So -- and those are your words?
A. Those are my words.

Q. So is it a fair statement to say that you could perform your job's essential functions so long as the performance of those functions did not fall on your Sabbath or otherwise be an emergency -- I know you have an exception for the emergency area. I'm not talking about that. I'm talking about nonemergency items -- that you are able to perform the essential functions of your job, but not if those functions require work on that Sabbath that are nonessential -- or nonemergency?

Hold on. I think you've got an objection coming.

MR. STRINDBERG: The way you phrased it -- yes, I do object. You're basically asking for a legal conclusion since you've used the phrase "essential functions of the job," because it's assuming that working on Saturday is an essential function of the job. So I object to the question as asking for a legal conclusion.

MR. PETERSEN: So let me rephrase it.

Q. (BY MR. PETERSEN): And I'm not using "essential functions of the job" in a legal sense. I'm using it because those are the words you used, Mr. Cassell.

So when you say, "It does not limit my

ability to perform the essential functions of my job as a pilot," is it your position, Mr. Cassell, that working on your Sabbath is not an essential job function?

MR. STRINDBERG: Same objection.

Q. (BY MR. PETERSEN): Go ahead. Essential function of your job as you've listed it.

A. Well, I would choose not to work on Saturday -- or during the Sabbath.

Q. Okay. Do you -- is it your position -- and this -- I'm just asking for your belief, and it's not a legal question that I'm asking for.

But who gets to decide what the job's essential functions are? You or the employer?

A. I think the employer would determine what the essential functions are. They're the ones writing the job description.

Q. Okay. So if SkyWest said to you, "Hey, Mr. Cassell, it's an essential function that you work on some Saturdays whether you want to or not," what would be your response to that?

MR. STRINDBERG: Again, I object. You're asking for a legal conclusion.

Q. (BY MR. PETERSEN): All right. I don't want a legal conclusion. I understand the

objection. But I want your understanding, Mr. Cassell, your opinion.

A. I would -- I would tell them I wouldn't be able to work on Saturdays. I would explain that I would be happy to work on Sundays. I'd request an accommodation at that point.

(A discussion was held off the record.)

MR. PETERSEN: Okay. 42 to 43 I want to mark as Exhibit 7.

(A discussion was held off the record.)

Q. (BY MR. PETERSEN): Do you know whether SkyWest flies -- has flights that go out 24 -- or every single day, 365 days a year, Mr. Cassell?

A. I know they have flights every day.

Q. So you would be familiar that they fly every Saturday?

A. Yeah.

Q. And every Friday and every Sunday?

A. Yes.

Q. And that hasn't changed since before you applied at SkyWest; isn't that correct?

A. Yeah.

Q. Do you know whether SkyWest requires its pilots to be available to fly 24 hours a day, 7 days a week, 365 days a year?

A. The job description when I applied required travel on holidays and weekends.

Q. Wouldn't that suggest to you that they had -- that SkyWest required its pilots to be available to fly any day of the year?

A. Yeah.

Q. When you and Mr. Whicker were discussing at the time of the resignation, did you have any discussions with him about what the schedule would be like after training?

A. He mentioned that I would fight this particular request I had until I gained enough seniority. And I knew that I would. Being low seniority, you get when nobody else wants. And as you gain seniority, you're able to pick. And, yeah, we had that discussion briefly.

Q. Did he explain to you that it would be more difficult or less difficult after training to get Saturdays off?

A. He didn't say either way. He just mentioned being low seniority, you will have a hard time getting your weekends off. And I -- I acknowledge that. And, again, I have no problem taking flights on Sunday or after sundown on Saturday.

Q. Do you know whether he -- you would have -- if you had decided at that time to work the shift or to, you know, go to the training class, there wouldn't have been any additional piece of paper for you to complete or fill out in order to make that decision, would there?
A. I'm not following what you mean.
Q. So at the time, you said they had a form for you to fill out when you resigned; is that right?
A. Correct.
Q. There wasn't a form for just saying, "I'm going to stay and work the shift," right?
A. Correct.
Q. That would have been just, okay, thanks and we'll see you back here when it's time --
A. Yes.
Q. -- right?
A. Yes.
Q. And if you had failed to show and were going to be terminated, were you aware, did they mention a written form or any kind of piece of paper you would need to fill out to take that route?
A. No, they didn't talk about that.
Q. So the only thing that really required a

form that you were made aware of at that time was a resignation; is that correct?

A. Yeah, that I was aware of. I don't know how their termination process works.

Q. Did you say anything to anyone else, Mr. Horne or anyone else, about your resignation?

A. Yeah. I called Steve and I called Michael and I shared what I had experienced. And Steve was very surprised. And I called Michael because I knew he was coming into class just after me, and I told him he might want to wait until the sun goes down later because he still had the option to move his class date back.

Q. So what did he do? Do you know?

A. I don't -- I think he checked sundown times, and he was going to be there at a time where sundown was late enough that it wouldn't have been a problem. So I believe he stayed with his original class date, Michael Wahlen did.

Q. And I mentioned that, in February of 2017, you filed a charge of discrimination. You withdrew that charge.

Why did you withdraw it?

A. I withdrew that -- well, I had applied a third time at SkyWest in the summer of 2017 because

I was not having luck finding work elsewhere. So I withdrew the charge as an act of good faith that I was willing to let the whole thing go if they would give me another chance.

Q. And did it surprised you that SkyWest was willing to look at you again?

A. I -- I guess in my recollection, I didn't really know what to expect. I could have seen it going either way. I knew SkyWest needed pilots badly, but I also knew that there was a little bit of history between myself and the company and was very hopeful that they wouldn't hold that against me. They invited me to an interview.

Q. Did you talk to anybody before you decided to apply again? Anybody at SkyWest. I'm sorry.

A. I spoke with Steve and Michael again and just said, "Hey, this is what I'm considering" and got their opinions on it. I asked Michael some questions about training, some experiences he had had because he had been through it a lot more recently than Steve had. And then I made the decision to pull the trigger and go ahead and reapply.

Q. I'm going to show you Bates number SkyWest 1 through 2 .

Do you see this document? It's a letter from Todd Emerson to Alan Reinach.

MR. STRINDBERG: We're going to make this Exhibit 8?

MR. PETERSEN: This is Exhibit 8, yes.

(Exhibit 8 was marked.)

Q. (BY MR. PETERSEN): Do you recognize or have you ever seen this document, Mr. Cassell?

A. Yes, I have seen this document. It was sent to me.

Q. Was it sent to you around the earlier part of February?

A. I don't remember when it was sent to me. I don't -- yeah, I don't remember. I know that Alan sent me some correspondences that he had had with SkyWest, but I don't remember when it was given to me.

Q. Okay. So it says, "I am writing in reply to your December 12th letter. You felt my statement that Mr. Cassell 'will absolutely and unavoidably be required to work on Saturday and other holidays' was speculation."

Did you have a sense yourself -- and I'm not talking about your discussions with Mr. Reinach. I don't want to know those.

I just want to know, did you -- I think you said that you thought Mr. Emerson's statement that you would have to work Saturday after training was incorrect; is that right?

A. Based off of other pilots' experiences, I would say yes.

Q. Then -- so the sentence of the second paragraph says, "My statement was drawn from conversations with the leadership in our crew scheduling department and based on their long experience."

Did you have any discussions with anyone at -- in the leadership of SkyWest crew scheduling department regarding Saturday work for Sabbath, your Sabbath work?

A. I did not.

Q. The letter says, "Since receiving your letter, I directed an analyst in the flight operations department to review the schedules for 100 recently hired pilots over the past 12 months, including Mr. Cassell's classmates. No matter what scheduling preferences they requested, each pilot got a schedule that required them to work on a Saturday."

Do you have any reason to believe that

that's incorrect?

A. I have no reason to believe that that is incorrect.

Q. Does that surprise -- let's say that that's exactly right, that that's true.

Does that surprise you?

A. Not really.

Q. And why is that, that it doesn't surprise you?

A. Low seniority. You get kind of the bottom of the barrel.

Q. So then the next sentence that Mr. Emerson says, where he says, "None of the 100 pilots, no matter how they bid or attempted to drop or swap an undesirable trip, were able to avoid Saturday work."

Do you know whether there were any Seventh-day Adventists in the 100 pilots he's talking about?

A. I -- I'm not aware. I don't know -- I don't know the parameters for the -- which he selected the 100 recently hired pilots.

Q. Okay. If, in fact, they all worked a Saturday, what would be your explanation as to why every one of them worked at least one Saturday? Do you -- let me rephrase that.

You said it didn't surprise you that -- assuming this is true, it didn't surprise you.

And I guess my question is, why would it not surprise you that nobody could get a Saturday off in all the 100 pilots?

MR. STRINDBERG: Objection. You're assuming facts not in evidence. Specifically, you're assuming that some of these 100 pilots wanted Saturday off. There's no evidence to that effect, Scott.

MR. PETERSEN: That's what I'm getting at.

Q. (BY MR. PETERSEN): Why are you surprised if I say this is true? You said you're not surprised. I want to know why.

A. Sure. In talking with my classmates, the general attitude that a lot of them had that I spoke with was, they knew they were just going to get what they were going to get. They were expecting to work on weekends. They weren't going to necessarily try to bid out of it. They were going to take what gave them the most flight hours, because the ability to upgrade was at -- so short -- and by "upgrade," I mean move from first officer to captain.

Their concern was not days-of-the-week work. Their concern was, let me get as much flight

time as I can; what days, what trips will give me the most flight time so that I can upgrade to captain as soon as possible.

You know, a lot of people were able to do that within a year to 14 months, 12 to 14 months, saying that they were able to upgrade quickly, which is great. But that was what they had to do. They had to fly as much as possible to get that 1,000 hours of 121 time. That's what their concern was.

Q. Okay. Mr. Emerson makes this statement in -- before the end of the second paragraph: "This is because all Monday-to-Friday trips were selected by senior pilots."

Do you agree with that?

A. Yeah, that -- I would -- that does not surprise me.

Q. And then he says, "This is not surprising as most employees attempt to match their work schedules with their family schedules where spouses and children are typically free on the weekends."

Does that seem -- would you agree with that?

A. I would agree with that generally, yeah. Like I said, I've talked with some that don't care about that. But I know that there are some that do,

so, yes.

Q. Do you know whether there's at a -- a Part 121 -- 121 airline, whether there are more flights on, say, Monday through Friday than there are on Saturdays or Sundays? Do you know?

A. I don't know how the schedules were -- I have no idea what the -- what the schedules are like.

Q. Do you know whether Saturdays is a comparatively lighter time to fly?

A. I don't know.

Q. Then going to the next paragraph, it says, "I am sorry that I did not specifically address your concern with training schedules. I would be pleased to discuss how training schedules could be altered to accommodate Seventh-day Adventists who wish to observe the Sabbath. However, in the case of Mr. Cassell, unless he is willing to work on the Sabbath after he leaves training, resuming his training would be futile."

Do you agree -- well, let me ask first: Did you have any discussions with SkyWest after February 3, 2017, regarding how training schedules might be altered to accommodate your Sabbath observance?

A. No, I didn't.
Q. Do you -- did you direct anybody to?
A. No. I --
Q. Go ahead. Sorry.
A. I had left correspondence between SkyWest and myself between Alan Reinach and SkyWest. And he was not -- he was not communicating things to me right away.
Q. Okay. I want to get to the last sentence of this paragraph: "In the case of Mr. Cassell, unless he is willing to work on the Sabbath after he leaves training, resuming his training would be futile."
Do you disagree with that sentence?
A. Yeah. Based off the experiences of other pilots, I would.
Q. All right. And that experience, just to summarize, is, it was your belief that there was a way you could work it out as these others, in your understanding, had done where you could work there as a pilot without working on your Sabbath?
A. Correct.
Q. All right. And the accommodation wasn't -- didn't require any additional work on SkyWest's part; it was use of the seniority and

trading and bidding system? Or was there something additional that you thought needed to happen in order to accomplish that goal?

A. At that point, from the -- from what I had heard from other pilots, once you were out of training, it could be done with the trade, bid, drop process.

Q. So the last sentence of this letter, which is on Bates number 2, "We believe that a balancing of these religious preferences is best met through our seniority system, and the courts have concurred." Forget the courts part.

Do you believe that SkyWest's seniority system provided a proper balance of religious preferences such that you could, within that seniority system, avoid working your Sabbath?

A. I think that it gave an opportunity for it.

Q. Without a guarantee?

A. Without a guarantee.

Q. And if it had turned out that you had not been able to get that Sabbath off, you would not have worked it outside of it being an emergency, correct?

A. That is correct.

Q. And you would not have lied to SkyWest about, say, "I'm going to be sick" when you're not sick. Isn't that fair, too?
A. That's correct.
Q. And so what the fallout of that would have been is just speculative to you at this point?
A. Yeah. Like I -- like I mentioned, as soon it got to the point where I knew -- I would have known I wouldn't be able to get out of a trip that was on a Saturday, I would have called crew scheduling, or maybe the chief pilot would have been the better person to call. I'm not familiar with the policies. It's been quite some time.
I would have called somebody and let them know, "This is what's happening. I will not be attending this work shift" so that they could get a reserve pilot who didn't have a problem working on Saturdays on that shift.
Q. Okay. I'm going to show you what has -- I'm wanting to mark as Exhibit 9.
(Exhibit 9 was marked.)
Q. (BY MR. PETERSEN): Do you recognize this document, Mr. Cassell? It's SkyWest Bates number 49.
A. Yes, I do recognize this.

Q. Tell me what it is, if you recognize it.

A. Yeah. So they -- they handed us a domicile request, and we were able to put what domiciles we wanted on there.

Q. And I have you on line 20, and then there's a -- the whole line is filled out. And I guess the request -- your first choice is DTW.

Isn't that Detroit?

A. That's correct.

Q. And then ORD, is that Chicago?

A. Correct.

Q. And then SEA, is that Seattle?

A. That's correct.

Q. COS?

A. Colorado Springs.

Q. DEN is Denver?

A. Uh-huh. Yes.

Q. PHX is Phoenix?

A. Yes.

Q. Is that SLC? I'm sorry. I'm on the wrong one.

Is that FAT?

A. Fresno, California.

Q. Okay. And then fill out the next three for me because I can't read them very well.

A. Sure. MSP would Minneapolis, Saint Paul; SFO would be San Francisco; and SLC would be Salt Lake City, Utah.

Q. So that was the order of preference you had for a domicile?

A. Correct.

Q. And what was the reasoning, if any, for your rank order there?

A. Sure. They had told us that everybody in class was getting Detroit or Chicago. So those -- I put whichever two -- Detroit's slightly closer to where I would have been living, which was in Cincinnati, Ohio, so I put that as my first one. And then O'Hare was my second one because that was just a little bit further. And I knew I was going to end up with one of those two based off of seniority.

Q. And is the rank order of your domicile request -- did you have any intent that, by rank ordering this way, it might make it more or less easy for you to get Saturday -- your Sabbath off from work?

A. Yeah. I knew that I would either get sent to Detroit or Chicago. I knew that Detroit was a little more junior than Chicago. The pilots there

had lower seniority. So I had the ability to let my seniority grow faster in a base like Detroit as opposed to a base like Chicago, which, while still junior, it would have taken a little bit longer. So I went with what I believed to be the best option for that, which is Detroit.

Q. Do you know how many pilots fly out of -- are domiciled in Detroit, how many SkyWest pilots?

A. I have no idea how many pilots are there.

Q. And you don't have any idea how many of those pilots are first officers?

A. I don't.

Q. Do you know how many ready reservists they had at the time, you know, in November of 2016 in Detroit?

A. I don't know.

Q. Do you know how many long or short reservists they used at the time at this domicile?

A. I do not know.

Q. Okay. Then the Seattle, the Colorado Springs, those others, are those sort of wish list items, or were they all part of your plan to try to pick the most junior domicile so that you could rise up more senior quicker?

A. Those were wish list items. I knew that I

wasn't going to get anything beyond that point, so I just started filling in blanks just because I thought we had to fill all of them out.

Q. Okay. Did you talk to anybody else in your class that -- this list of 34, about which ones you should put or that they were putting?

A. Yeah. There was discussion at -- over -- over dinner or lunch. People -- everybody had where they wanted to be, and everybody had where they felt like they would end up.

Q. Okay. All right. I'm going to show you an email. This is an email from Coy Bryant to you, it looks like. It's dated June 29, 2017.

Do you recognize this email?

A. Yes. That email was in response to a memo I sent regarding exceptions to when I would work during the Sabbath hours.

Q. All right. Hold on, then. So I want to mark this one as Exhibit 10. Mark this one as Exhibit 10, but I want to talk about Exhibit 11 first.

(Exhibit 10 was marked.)

Q. (BY MR. PETERSEN): So let me show you --

(A discussion was held off the record.)

Q. (BY MR. PETERSEN): This one I would like

to make -- this one will be Exhibit 10, and this one I want to mark as Exhibit 11.

(Exhibit 11 was marked.)

Q. (BY MR. PETERSEN): Do you recognize this document, Mr. Cassell?

A. Yes, I do.

Q. Tell me what it is.

It's Bates number 6, by the way. SkyWest 6.

A. So this document was in response to -- well, I'll back up a little bit.

So when I interviewed at SkyWest, long story short, they didn't know I had worked there before. So when that came out, they asked me why I quit. I explained to them sort of what happened. And they told me that they weren't going to tell me no, but they would have to discuss with HR at corporate.

A couple of days after the interview, I got a phone call -- I believe it was a phone call -- from Coy Bryant where he said that he wanted to know kind of what were some exceptions, like what are the parameters of this when you would or wouldn't be able to work on the Sabbath.

So this document was what I sent to him in

response to his question.

Q. Okay. So let me go over this with you real quick. I'm going to start the second sentence. You state, "I would like to say up front that it has never been my plan nor intent to be a liability to SkyWest Airline as an employee."

What did you mean by "liability"?

A. I don't want to cause problems for them in any way, whether -- with scheduling specifically, is what I meant by that.

MR. PETERSEN: Okay. And, by the way, before I get going into this, Jessica, do you need a break?

THE REPORTER: I'm okay if everyone else is.

MR. PETERSEN: All right. I'll keep going. You just let me know, then. How about that?

THE REPORTER: Oh, thanks so much.

Q. (BY MR. PETERSEN): And then it says -- you say, "Since my graduation from university, I have observed from the outside as SkyWest has grown into a regional airline powerhouse." And then you say you want -- essentially, that you want to work with SkyWest and you wanted to be a pilot.

You state -- and this is the sentence

started "given."

"Given my desire to be a pilot for SkyWest, I would like to assure SkyWest management that I will not let my religious beliefs come in the way of allowing SkyWest to operate and function as it always has, with a high level of quality, timeliness, and overall success."

So I think you recognize that SkyWest flies every day of the week.

How, without working on your Sabbath, would you not let your religious beliefs come in the way of allowing SkyWest to operate and function?

A. Well, like I said, I would give adequate notice to the base chief pilot or crew scheduling that I wasn't going to be able to be at a -- on a flight, if I couldn't get out of it, over the Sabbath hours so that they could have somebody to take my place to avoid the flight being delayed.

Q. Okay. And then two sentences later, you say, "I realize that SkyWest cannot guarantee that I will be provided a schedule that will always allow me to observe my beliefs." And it keeps going.

So at that point, that's an acknowledgment I think that we've already gone over, that you might get a schedule that unavoidably has you working a

Sabbath; is that correct?
A. Uh-huh. Yes, that's correct.
Q. And then you state, "Therefore, it has and will continue to be my intent to use the tools that SkyWest has provided to either bid out of, drop, or trade a shift that may conflict with my beliefs."
So if I understand that part of your sentence, that's you suggesting that you will use the bidding system and the tools in place through that bidding system to get out of working on your Sabbath, correct?
A. Correct.
Q. Let me ask you this. You state in here, "bid out of, drop, or trade a shift." I want to talk about each one of those three items.
How do you bid out of a shift at SkyWest? Or how did -- at the time you wrote this, what was your understanding as to how you bid out of a shift?
A. So my understanding -- granted, I never used the system, so I might have not been completely understanding of every aspect of it. But from those who were in SkyWest that I was speaking with that were getting out of working on Saturdays, you would just select what days you don't want to be on or you would select days you do want to be on.

A lot of -- so the two Adventists that I was speaking with said that they just selected their flights to start on Sunday mornings, early Sunday mornings, because that's still the weekend. Not a whole lot of people wanted that, and they had a lot of success with that.

Q. So that's -- that would be just how you bid your legs, the flights, right?

A. Yes.

Q. Okay. And then you say, "Drop."

What does "dropping a shift" mean?

A. This one, I don't know exactly how it works, because I know there are work rules related to it, things you can and can't do.

But my understanding is, you are able to drop flights as long as you didn't go below a certain amount of hours of flight time. So if you were going to drop, you had to -- to go below that certain hours, you had to pick something else up somewhere else to make it so that you were still working enough for the company.

Q. Did dropping a flight have any -- in your understanding, did it require that you have somebody to pick it up, or was it just "dropped" dropped?

A. My understanding is, you could drop.

Q. And somehow SkyWest would get somebody to take it?
A. Yeah. They had, like, open-time boards where they would pay extra for pilots to come in and do shifts that didn't have a crew, stuff like that.
Q. Okay. But if somebody didn't take your offer -- well, let me back up.
When you say "pay somebody extra to take the shift," is that you paying them extra, or is that SkyWest paying them extra?
A. SkyWest would pay extra for certain flights.
Q. Okay. And so if you wanted to drop a shift but you were unaware of anybody that would pick it up, your understanding was, you could still drop it and SkyWest would simply have to get somebody to work that shift?
A. That's how I understood it.
Q. And that understanding, does that come from Mr. Horne and Mr. Wahlen? Is it "Wahlen"?
A. Wahlen.
Q. Wahlen. Sorry.
A. That, and other pilots I knew at SkyWest that were doing the -- that were using the system. I have other acquaintances that are not Adventists

that work there or have worked there.

Q. Do you know whether there was a written policy behind how shifts could be bid and dropped and how all that worked? Like, some writing?

A. Yeah. I believe there was, but I -- I didn't know how it worked because I never got to that point.

Q. Okay. And then you say "or trade a shift."

Tell me how trading a shift is different than bidding out of or dropping a shift.

A. Trading a shift would be if you were unable to drop or you got something on your bid that you didn't like. You could trade what you had with another pilot as long as it was within the legal duty-day parameters for both of you. So --

Q. So as long as -- sorry. Go ahead.

A. I was going to say, maybe I have a trip that's Saturday and Sunday, and then I have the rest of the week off for some reason. And somebody else has a three-day that goes Monday, Wednesday, Thursday, but they had the weekend off. But my trip has more flight time. Maybe the other person would want it, so we would trade.

Q. I see. And as long as both of you were

not over your flight hours or whatever the regulations required that you not go over in terms of time, then you could trade with them?

A. That's how I understood it, yes.

Q. So let me ask this: Why would you ever just drop a flight if you could always trade?

A. It might be easier to drop a flight than -- rather than trade it, because to trade, you have to have somebody else that wants it. To drop a flight, you just drop it.

And, again, I don't know all the work rules associated with that. I know that there were some restrictions with it, but I'm not -- I don't know them. I know that there were some.

Q. Is it possible that the drop and trade is really one policy, that you can drop but only if somebody's willing to take it? Does that ring a bell to you at all?

A. That could be the case.

Q. Okay. Okay. When you say, "They have offered to teach me how to properly use the system in order to create a schedule that both meets company and personal needs," who's the "they" that you're referring to here?

A. The mentors I had within SkyWest. That

would have been Steve Horne and Mike Wahlen.
Q. Okay. And then you said, "I'm willing to bid for the most undesirable flights, stay at the most junior base, and fly the most junior aircraft in order to avoid conflicts with corporate policy."
Help me understand what undesirable flights, junior bases, and junior aircraft -- how would those three items help you avoid Saturday -- or a Sabbath work?
A. Well, there was definitely a pecking order when it came to what aircraft you flew there. All the senior pilots wanted to fly the newer ERJ aircraft, and so they would bid to switch into that one. Those with low seniority that got into -- that did manage to get into the ERJ sat reserve for a long time. And even when they did get off reserve, they didn't really have a lot of control over their schedule.
Those that flew the CRJ were able to have their seniority grow quickly because, you know, people were trying to get out of that airframe. People didn't really like to fly it. So if I stay in that airframe, my seniority grows quicker and I'm able to have more control over my schedule .
Regarding bases, everybody likes to live

in Denver or San Francisco or Seattle. They're beautiful cities with a lot to do. Nobody really wants to live in Detroit or Chicago, especially an airline like SkyWest attracted a lot of West Coast pilots because there weren't a whole lot of airlines that had West Coast bases. So if you wanted to fly for an airline, you would pick SkyWest if you lived in Los Angeles or Salt Lake or Denver because of the bases. So they were trying to get out of Detroit or Chicago or Minneapolis as soon as they could, which caused your -- helped your seniority grow there quickly.

Regarding undesirable shifts, some people might like getting up early. I don't think most people like to go to work at 5:00 in the morning, though. So if I bid for flights that left at 5:00 a.m., I probably had a better chance of getting those than if I bid for flights that left at noon. Flights that left on Sunday would probably be more likely to fall into my -- fall into my bid rather than flights that left on Monday or Tuesday as a junior pilot.

Flights that get back late, too. Maybe they land at midnight or 1:00 in the morning and they have minimum rest. You're on ten hours of

rest, and then you go again.

Q. So -- but you understand, right, that at the time, seniority determined your domicile, correct?

A. Correct.

Q. And seniority was set for you based on the -- the 34 in your training class, you guys got rank-ordered by some system. But within that class, you had a seniority, and then that class was junior to everybody else that was already a pilot; is that right?

A. That's right.

Q. And so when you picked domiciles, your class was subject to everybody else's initial preference, correct?

A. Correct.

Q. And then once you're there, isn't it true that the captains had a seniority system and the first officers had a seniority system? Let me rephrase it.

When you were bidding for something out of training, you would be a first officer, correct?

A. Yes.

Q. And you're not bidding for a captain's spot, correct?

A. Correct.
Q. So you're bidding against other first officers under the seniority system?
A. That's correct.
Q. Okay. And so when you say you're willing to take flights, it's the flights that are available to you as a first officer at the domicile where you've been placed, correct?
A. Correct.
Q. All right. And then you state in here, "If there was an unforeseen circumstance, such as, but not necessarily limited to, a maintenance delay at an outstation and my duty time's extended, I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious beliefs."
So if I understand that sentence, and consistent with what you've testified to earlier today, if you are starting a flight that is intended to either end or begin outside of your Sabbath, and for reasons that are unforeseen, it bleeds one way or the other, you would be willing to take that flight for the benefit of the passengers?
A. Yes.
Q. And finish the flight, really, is, I

think, what you're contending there?
A. Yeah.
Q. And then you state, as your tenure increases, "my likelihood of conflict decreases due to my increase in seniority, allowing the system to work as designed."
Essentially, as you become senior, you can -- you have more power to ensure that you're not working on your Sabbath; is that right?
A. That's correct.
Q. In the second paragraph, the third sentence, you state, "I do not expect SkyWest to give me special or preferential treatment."
And if I understand that sentence, that's your way of saying you're willing to work within SkyWest's seniority system, correct?
A. Yeah. I'm willing to work with them as they see fit, yeah.
Q. And that if that system -- okay.
And then you say, "At the same time, I appreciate SkyWest's stance as being an equal opportunity employer."
What did you mean by that sentence?
A. Well, SkyWest claims on their website to be an equal opportunity employer, meaning that they

don't discriminate against an employee based off of race, religion, disability. There's other things I'm sure that are in there, but I know that those three are included in that.

Q. When you say that you do not expect SkyWest "to give me special or preferential treatment," if you request a religious accommodation, is it your belief that that's not a special or preferential treatment?

A. I would see special or preferential treatment outside of the law, them going far -- I don't expect SkyWest to do anything that would be unreasonable. I'm not asking for -- I never felt that I was asking for anything unreasonable, and that's what I mean by this.

Q. Okay.

A. That's -- that's what I mean.

Q. So "special or preferential" in that sentence is referring to something beyond what the law would require?

A. Correct.

Q. Okay. You state that you will bring -- "I will also bring ideas and recommendations as to how we can work through the problems together so that SkyWest does not feel that I view my beliefs as an

entitlement."

Were there any recommendations that you had and wanted to give SkyWest that you were unable to give them?

A. Yeah. I mean, I don't -- I don't feel that I personally was ever given that opportunity. It appears that, in correspondence between Alan Reinach and Tom Emerson, that the question was raised. However, it was never -- I -- I don't know. It appears that it was never addressed.

Q. When you wrote this letter on June 29, 2017, why didn't you put in what you were asking for if you felt like you didn't have the opportunity before?

A. Well, I -- that's a good question. I guess I was answering the question that was given to me, and I wasn't really going to go beyond that at that point.

Q. Okay.

A. I didn't want to be pushy and tell people how to do their jobs.

Q. Okay. Now going back to Exhibit 10, I believe. This is the Thursday, June 29th email from Coy Bryant.

Is this in response to the letter we just

reviewed?
A. Yeah.
Q. And what were the circumstances that surrounded getting this email? Do you know?
A. I guess the original copy may not have said anything about training. And then I added -- I would have to look at the previous one to see if there was a training aspect added to this or if there's a second one that has it. He wanted to know how I would handle training.
Q. Okay.
MR. STRINDBERG: Scott, would this be a good time to take a short break?
MR. PETERSEN: Yeah, actually, it is a good time. Let's take a five-minute break.
(Recess taken, 2:06 p.m. to 2:13 p.m.)
Q. (BY MR. PETERSEN): Mr. Cassell, you understand you're still under oath, correct?
A. I understand.
Q. So is there any reason that you applied to fly again for SkyWest in June -- or in the summer of 2017 as opposed to another time of year?
A. Yeah. I -- I felt that if -- if I applied and started work when the sun was going down late in the evening, that I had a better chance of avoiding

the problem I had back in the wintertime.

Q. Well, and this is a sincere question.

The worship -- your Sabbath worship actually shrinks as the days of the year get shorter and lengthens as the days get longer; is that true?

A. It's still a 24-hour period. It just shifts when it starts. So in the wintertime, it ends early on Saturday because the sun goes down at 4:30 or 5:00 p.m., so then it's over. But in the summertime, it would be -- it would end later -- start later and end later.

Q. So what would you do in, like, some of the northern parts of Alaska where you get very little sunlight? Does that -- is it a different process to figure out what the Sabbath is?

MR. STRINDBERG: I was going to object because you're asking him to speculate, although I have much the same thought about, what if you were, like, in Iceland, but --

Q. (BY MR. PETERSEN): I'm very -- I understand your point. And it's easy to do when you live in a place like, you know, the United States where we -- we have a fair amount of daylight always at some point. But just curiously speaking, have you thought about that, or is there a doctrinal

point on that?

MR. STRINDBERG: Todd, can you explain?

MR. MCFARLAND: Yeah. And, Mr. Petersen, I am happy to explain this to you. I mean, I'll let his -- the only way I'm weighing in here is as an Adventist.

There are church approaches on this and ways this is handled historically. I'm happy to talk about that later. But I don't know if this is really something that Mr. Cassell should be expected to know.

MR. PETERSEN: Okay. No, that's fair.

Q. (BY MR. PETERSEN): You don't have anything to add, Mr. Cassell?

A. Yeah. I don't really know what they do up there. I've never been there.

Q. Okay. Fair enough. And I agree. It's not exactly relevant. I'm just very curious because of kind of how you're calculating it, so...

MR. MCFARLAND: And I'll be happy to explain how it's historically been handled once we -- yeah, on a break.

MR. PETERSEN: Okay.

Q. (BY MR. PETERSEN): All right. I'm going to show you what have been marked as Exhibit -- this

You're not quite sure what that is, either, correct?

A. Yeah. I would have to dig into my benefits package to figure out what it is exactly.

(A discussion was held off the record.)

MR. PETERSEN: This one, again, I thought was split, but apparently not because I'm an idiot, so...

MR. STRINDBERG: Don't sell yourself short, Scott.

Q. (BY MR. PETERSEN): All right. The last one, Manager Assessment.

What is that, Mr. Cassell?

A. That is the one written performance review that I have for my time at Silverhawk.

Q. Okay. And that was given to you on February 11, 2019?

A. Correct.

Q. And that's the sum total of it, is -- the two questions are answered by your supervisor, Mr. James Allen?

A. Yeah.

Q. All right. Did you meet with him?

A. Nope. It just showed up one day on my account.

Q. Okay. And you've received no other performance reviews since you've been at Silverhawk?

A. I received one at the end of my first year, but it was just an in-person meeting where they basically told me they were happy with my performance. All my performance reviews, the two I've had -- there's this one that's in writing, and that was the extent of it. There was no verbal meeting or anything like that. And then the first one was just a meeting where they sat down with me and they said, "Hey, you're doing a good job."

And everything else has just kind of been in passing, a pat on the back or, "Hey, we need you to do this differently" or something. I haven't had any negative feedback on my performance here, though.

Q. Is Mr. Allen a Seventh-day Adventist?

A. He is not.

Q. Do you know of any others that belong to that religion at Silverhawk?

A. There's one other pilot.

Q. And he's a pilot?

A. He's a pilot.

Q. What's his name?

MR. STRINDBERG: Objection. I don't --

what's the relevancy of this, Scott? I think it's --

MR. PETERSEN: Well --

MR. STRINDBERG: It serves no purpose.

MR. PETERSEN: Well, I -- if I -- if he wants to tell me that Mr. Cassell's worked on Saturday or Mr. Cassell has told him something significant about the religion that impacts what he's testified to today, I think it's worth knowing.

MR. STRINDBERG: No, I disagree. We gave you his logs so you can see whether or not he's worked on Saturdays. So I don't think this -- I think starting to contact other people that Mr. Cassell works with has some real risks. And we would object to it, and I'm going to instruct the witness not to answer that question.

MR. PETERSEN: I don't think you're entitled to instruct him not to answer.

MR. STRINDBERG: I'm going to instruct him whether I'm entitled to or not.

MR. PETERSEN: Okay. I'll just note for the record, then, that I asked for the name of the person who is also a Seventh-day Adventist at Silverhawk, and Mr. Cassell was instructed not to answer that question, which I think is inappropriate

under the rules.

MR. STRINDBERG: Well, I think it's an inappropriate question. And in the scope of a deposition, there's no other way that I can prevent that information from coming out when I don't think it's an appropriate question but I think runs some risks. This is the type of stuff we were talking about before, Scott, when you wanted to subpoena his employer. So that's why I'm doing it.

If we argue about it later and we come to some other conclusion, we'll provide you with a name. But I'm not going to have him answer the question.

MR. PETERSEN: All right. I'm still leaving my objection on there.

MR. STRINDBERG: Understood.

Q. (BY MR. PETERSEN): I'm going to show you an email that was sent. And I'm not -- I just want to know if you've seen this email. It's an email from Spencer Hinckley to Coy Bryant. It's dated September 1, 2016.

Do you see this -- have you ever seen this email, Mr. Cassell?

A. I saw it just a couple of days ago.

(Exhibit 13 was marked.)

Q. (BY MR. PETERSEN): And this is Exhibit 13. SkyWest 26.
I'm just going to ask you if you were aware at or about this early September 2016 time period. It says in the middle of the email, "We have scheduled him into a CTP class that will allow him to not work on Saturday. However, he will definitely be scheduled for reserve duties on a Saturday when he is online."
Did you have an understanding back in September of 2016 that if you were -- that if you passed your training, that you would be scheduled for reserve duties on Saturday?
A. I knew that there was a chance that it could happen.
Q. And then it says, "This will pose a problem for us."
Do you have any idea what he might be talking about?
A. I reckon scheduling.
Q. Okay. "I wanted to give you a heads-up so you can have that conversation with him."
Did Mr. Bryant have a conversation with you after September 1, 2016, about your Sabbath posing a problem for scheduling for reserve duties

once you passed training?
A. I recall getting a phone call from him in relation to the request-for-religious-accommodation form that was sent to me where they discussed that they couldn't guarantee that when I was on the line as a pilot that the bidding process would keep me free from Saturdays. Nothing that we haven't discussed previously. It's kind of the same tune there.
Q. All right. I'm going to show you Exhibit 14.
(Exhibit 14 was marked.)
Q. (BY MR. PETERSEN): This is SkyWest number 21.
Have you seen this document before, Mr. Cassell?
A. Yes, I have.
Q. Tell me what it is.
A. This was SkyWest's response to my request for religious accommodation.
Q. Okay. And if you look at the second paragraph, it says, "After extensive evaluation and consideration of the request, as well as evaluation of the quality, safety, operational impact, as well as training footprint structure for SkyWest, it has

been determined that we are unable to honor the specific request with work scheduling."

My question is, what's the specific request that is referenced here?

A. Well, it would be what I requested in my request for religious accommodation. I asked that they keep me from being scheduled during Friday -- during the Sabbath period for training and work events.

Q. And I'm going to click on this.

Is this the request you're talking about? I can't remember which exhibit it is, but it's SkyWest 17 through 19.

Is this the request?

A. That is the request.

Q. What's that?

A. That is the request.

Q. All right. And it's number 3 specifically, right? "I am asking that I not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown. My religious convictions do not limit my ability to perform the essential functions of my job as a pilot. I am just requesting this time off each week."

That's the specific request that's referred to in that memorandum?

A. That is correct.

Q. Okay. And it then says, "However, as an accommodation, we have provided FO Cassell" -- that's First Officer Cassell?

A. Yes.

Q. -- "with tools to meet his religious requirements."

And those tools are the bidding system we've already gone over probably two or three times. Am I right? Or are there other tools we have not yet discussed?

A. No. That's what it -- drop, trade, shift, yeah, that's the bidding -- that's all done within the bidding system.

Q. All right. And then it says, "As standard for all pilots, unexcused work assignments will be addressed as defined by the flight operations reliability program PPM 3006."

Do you know what that's referring to?

A. That would be a written policy they have on how they discipline pilots.

Q. At the time that you received this October 27th memorandum, did you have an

understanding that, if you refused to work a Saturday as scheduled and you couldn't get somebody to take your shift, that the refusal to work would result in discipline?

A. I understood that.

Q. Did you understand that that discipline could include termination?

A. I understood that as well.

Q. Did you -- at this point when you got this memorandum -- I'm assuming you got a copy since your signature's there. Is that fair?

A. Yeah.

Q. And then under your signature -- just before I forget -- is this your handwriting under your signature?

A. Yes, that is mine.

Q. It says, "My signature does not relinquish my request for religious accommodation."

What did you intend by writing that?

A. I wrote that there because I didn't want my signature -- I didn't basically -- basically, I did not want to sign away any chance of a potential accommodation coming forth later.

Q. Okay. So if I go back to the center -- the middle of the second paragraph, it says,

"However, as an accommodation, we have provided FO Cassell with tools to meet his religious requirements."

Is your handwritten signature below your -- is your handwriting below your signature an indication that you didn't agree that this was an accommodation being offered to you?

A. Well, that's a standard tool given to every pilot that works at SkyWest. They have that bid -- the ability to bid, drop, trade shifts. So I didn't really feel as though it was an accommodation because it was -- it was available to everybody and it's standard practice for everyone who puts their schedule together.

Q. So your writing under your signature is, essentially, an acknowledgment that you're not waiving your position that there should be more than what's listed in Exhibit 14?

A. Yeah. And, again, like when you get into training, I don't have the ability in all situations to bid, drop, or trade. That's when things are assigned, and I need assistance -- I might need assistance from somebody in management to help me by moving a shift or scheduling a separate shift in that situation, which is why I wrote that as well.

Again, like I said, I didn't want to sign away any potential opportunity for an accommodation that could have made itself known in the future. I didn't want to sign that away, which is why I put that comment.

Q. When you got this and you signed this, did you then thereafter go look up PPM 3006?

A. No. This was before I started class, so I didn't have access to any of these documents, that I recall.

Q. Okay. Did anybody contest your handwriting at the bottom? Was anyone upset that you wrote that there?

A. If they were, they never made mention of it to me.

Q. Okay. I'm going to show you what's been marked as -- well, I want to mark as Exhibit 15. And this is Bates number SkyWest 61.

(Exhibit 15 was marked.)

Q. (BY MR. PETERSEN): Do you recognize that document at all? Have you ever seen it?

A. I saw it a couple of days ago. I have no idea where it's from.

Q. It indicates that SkyWest mainland partners provides SkyWest with the flights that

SkyWest is responsible for operating on any given day in a bid period.

Do you understand that SkyWest has no flights that are not either a Delta or a United or an American or an Alaskan flight? In your understanding, do you know whether there are actual SkyWest flights that are on SkyWest planes under SkyWest's logo?

A. My understanding is, all their flights came from Delta, United, American, Alaska. They don't operate -- maybe they do now. I don't know. But my understanding was, all their flights were operated for those carriers.

Q. Okay. And the dates and times of those flights, do you know whether those dates and times were determined by SkyWest or by its partner, like Delta or American?

A. I don't know who determined when the flights would leave.

Q. Do you know what "pairing optimization" means? Do you have any understanding?

A. I do not know, though it clearly states it in the document if I would have just continued to read.

Q. Were you ever explained that there was a

probationary period at SkyWest when you were a reserve pilot?

A. Yeah. I knew I would be on probation. I don't remember what the -- how long it was.

Q. And what did you understand probation to mean when it says you're on probation? What's your understanding? I'm not asking for a legal conclusion. I just want to know what your understanding was.

A. They would kind of be monitoring you a little more closely to see how you fit in at the company, if you had any number of incidents or occurrences that would require disciplinary action. Are you on time, do your -- you know, are there complaints about your dress and attire, showing up in uniform, stuff like that. You know, they're just kind of looking to make sure you are doing everything that's expected of you.

Q. Do you know whether you had more performance reviews on probation than when you're not on probation? Did anyone talk to you about that?

A. I seem to recall them mentioning, like, for the first year, you had to get captains to fill out a certain form for you. And if you didn't, then

it could be met with disciplinary action. But I don't remember anything beyond what I've just said.

Q. Did you have any understanding that, as a probationary employee, you had less security in your employment than if you were not a probationary employee?

A. Yeah, I was -- I was aware of that.

Q. Have you ever heard of the word "pilot reliability"?

A. I -- I guess -- what do you mean?

Q. Just if you've heard that word, "pilot reliability." Is that a reference to punctuality or a timely -- you know, attendance? Do you know?

A. Yeah. I mean, it would make sense that that would be, though I don't know what definition SkyWest would choose to use it. There could be more than just that.

Q. Okay. I'm going to show you -- well, let me go back to Exhibit 15 here. Or 16. Is it 16?

THE REPORTER: It's 15.

Q. (BY MR. PETERSEN): 15. So if -- you've never -- have you ever heard of these five criteria being used for determining how lines are assigned?

A. No. I -- I was -- I don't -- like I said, I never got to get into the bidding system and how

everything worked. I knew that there were some criterias, but I was not made aware of how they determined things aside from seniority.

Q. Okay. And you've mentioned PBS, the preferential bidding system, but you're not aware as to what goes into that system for determining how lines are assigned; is that correct? Other than seniority. Sorry.

A. I know seniority, and I know they have to keep things legal within the time requirements and duty days and everything. And I think that first officers are allowed to put a captain or two on their no-fly list, guys they don't want to fly with for whatever reason.

Yeah, I mean, they're going to -- you know, each -- each domicile is -- or each pilot is matched up with another one in their domicile. So they're not going to -- or at least I don't think they would assign a Seattle-based pilot with a Detroit-based pilot.

Q. Do you know if that ever happens? I mean, is it that you could be paired with somebody on a line that's not from your domicile?

A. I -- I would think not, but I don't know.

Q. Okay. I'm going to show you what's been

marked as Exhibit -- what I want to mark as Exhibit 16. This is SkyWest 300 through 303.

(Exhibit 16 was marked.)

Q. (BY MR. PETERSEN): Do you see this document?

A. I see it.

Q. Have you ever seen this before?

A. I saw just this section of it a couple of days ago.

Q. Okay. You didn't ever look up any kind of a online or paper user guide that was titled "PBS User Guide"?

A. No, I never did.

Q. Okay. And I'll just represent that this is just a few pages of the guide that I pulled out to show you.

But did you ever look at anything that looks like this, "Introduction" or "Advantages of PBS" or "User Guide Overview"?

A. The document very well could have been provided to me. There was a lot of things provided to me the first week of training, and I was not focused on things like this that weren't applicable during training. So it could have been provided to me. I might have looked at it, but I don't recall

ever opening this document.

Q. Okay. I'm going to show you what I would like to mark as Exhibit 17.

(Exhibit 17 was marked.)

Q. (BY MR. PETERSEN): And this is a section, I'll represent to you, of SkyWest's sort of standard practice policies. And this is Bates-numbered 418 to 421.

Have you ever seen this section of SkyWest's policies and procedures?

A. I saw this excerpt a couple of days ago, and I do recall getting a copy of the employee policy or the pilot policy manual on the EF -- the -- they gave us a Windows Surface tablet when we started training. I know this was on there. I don't -- I don't remember if I looked at this specific part of it or not, though.

Q. All right. You don't recall reviewing anything that looked like this or looking at this? It doesn't ring your recollection that you reviewed this at the time -- either of your resignation from SkyWest or at the later time when you reapplied in the summer of 2017. Is that fair?

A. That's fair, yeah. I know that they -- that they didn't pull this out and go through it

when I resigned.
Q. They did not, you're saying?
A. Yeah. If they did, I didn't see it. They weren't quoting from it.
Q. Okay. Do you see, though, under 3A, "Consistent reliability is expected of all company pilots; therefore, it is the pilot's responsibility to be available at the report-for-duty time"?
Would you agree with that statement?
A. I would agree with that statement.
Q. And was that your understanding in 2016 and 2017 that that was SkyWest's policy?
A. Yeah.
Q. Okay. Had you ever heard of a scheduled assignment deviation or a SAD?
A. It sounds familiar, like it was mentioned.
Q. But you -- but sitting here today, you don't remember a specific -- either you investigating as to what it meant or having any specific discussions with anybody about SAD?
A. My recollection -- I'm sorry.
Q. Sorry. Go ahead.
A. My recollection is, it was mentioned in ground school during indoc when we went through -- they went through some company policies. That's

when I seem to recall remembering it.

Q. Okay. Under Sick Calls under 4D, do you see this? It says, "Any pilot who is found to have falsified a sick-leave claim, falsely claimed to be ill, or failed to return from sick leave or a leave of absence as soon as physically able to do so will be subject to immediate termination."

Did you know that that was SkyWest's policy at the time in 2016, 2017?

A. I probably read it in there and would have been aware of it.

Q. Okay. All right.

But if I asked you to comment on some of this, you don't have any specific recollection of having reviewed this particular policy?

A. Not -- nothing that sticks out. Like I said, I -- I do believe that some of this stuff was mentioned during indoc, company indoc, but I don't -- I don't remember how much time was spent on it, if there was any test over it. I think it was just a, "Hey, this is where you can find all this information" kind of talk.

Q. Okay. All right. I'm going to show you what I would like to mark as Exhibit 18. And it is labeled CASSELL 194 through 215. It is labeled

"confidential."

(Exhibit 18 was marked.)

Q. (BY MR. PETERSEN): Can you -- do you recognize -- it's a fair amount of documents, but they all look similar.

Do you know what these are?

A. These are my duty logs, and that would date as far back as December of 2018.

Q. Okay. So what I'd like you to do is just take this first one, CASSELL 194 of Exhibit 18, and tell me -- help me understand how to read this.

MR. STRINDBERG: Would you blow that up a little bit, Scott?

MR. PETERSEN: Yeah. It's going to go -- yeah. I'm going to have to go back and forth because it's going to -- it's going to make it so I can't -- it's not on the same page. Tell me when.

Is that good enough, Erik?

MR. STRINDBERG: Yeah, it is. Thank you.

Q. (BY MR. PETERSEN): Okay. So let me start, Mr. Cassell -- help me understand -- first of all, like, I'm looking at this first one, and it says "December of 2018."

Does that mean it's for the whole month?

A. Yes.

Q. All right. So then if I go back to the left here, what do the Date columns mean? And why are they numerical orders as opposed to an actual date?
A. Well, the first one would be December 1. All of this is assumed to be December of 2018 since it's marked in the top right-hand corner as that. And then you go all the way down to December 1st.
Q. Okay.
A. (Inaudible.)
(Reporter clarification.)
A. It goes -- it would -- it should go down to the 31st of December.
Q. Like that?
A. Yes.
Q. Okay.
A. So this was the first month we used it, so we were still trying to figure out exactly how to do it properly. So if you scroll further down, you would find one that's more accurately filled out. But I can tell you what's going on here.
Q. Well, let's do one that's got more in it.
Is the second month a better one?
A. Yeah, the second month would be better.
Q. All right. This is January 2019?

A. Yeah.

Q. Okay.

A. So this is my crew flight and duty record, January 1st. If you scroll all the way to the right, you'll see the type of assignment that it was. This was a 24-hour rest period. I was off.

Then if you go down to the next line, which would be January 2nd, I flew a flight from Lincoln up to XVG and back down to Lincoln. It was Part 135. That's what the "Reg" says. Within the columns, just working right to left, I had no night landings; two day takeoffs; two day landings; no holds; no instrument approaches.

I -- and then the numbers here, IFR hours, 0.7 flying in clouds or in limited visibility. "Comm hours" would be "commercial hours." It was 3.8 hours. "PIC" would be "pilot in command." "SIC" would be "second in command."

So it shows that I had 3.8 PIC, pilot in command, hours. Rest hours, I had 18.3 hours of rest. And it's saying that I was on duty for 5 hours and 40 minutes. The time on was -- and this is in UTC time. So this would have been 10:30 -- or, no, this is close to 6:00. So it would have been 9:30 and it would be 4:10. So that's when I

went on duty and then when I was off duty.
Q. Okay.
A. Aircraft type, BE9L, that's a King Air. That's the craft registration. November 390PS, N390PS.
Q. So the "A/C type" is aircraft type?
A. Yeah, aircraft type and registration is there. BE9L is the type. N390PS is the aircraft's registration.
Q. Okay. So you get -- you're on salary. But what it shows is from the 1st to the 6th, you only worked on the 2nd, correct?
A. Yeah, that's correct.
Q. Then you worked on the 7th. You had two flights on the same day. That's why they both show the "7" there?
A. Yes.
Q. Then what's the "NA" for the rest hours?
A. That's saying that the rest hours, there was not -- it was not applicable because there was no rest requirement prior to the flight --
Q. Okay.
A. -- which, with Part 91, you will get that. There's no regulation governing how much -- how much a pilot can fly, how long they can be on duty, and

once or twice, but it was just like, "Yeah, this is our" -- Steve brought it up once or twice. He's like, "Yeah, this is who we have. Instead of a union, we have SAPA."

Q. Did they suggest that that was a negative, that somehow SAPA didn't represent them?

A. No, not necessarily.

Q. Have you had any discussions with any of the other airlines with whom you've applied prior to working for Silverhawk regarding accommodations to your religious observance needs?

A. Yeah. With -- I applied at Republic Airline, I applied at PSA, and I applied at GoJet as well. And with each of them, I had the discussion, and I got the same response from PSA and GoJet. They -- they told me that they were not -- they didn't say they wouldn't hire me, but they said, "You're going to run into problems." And Republic would not even interview me.

Q. "Problems," meaning conflicts with your Sabbath?

A. Yeah.

Q. Do you know whether those airline companies had seniority systems?

A. Republic and GoJet have -- to the best of

my knowledge, have the PBS system. And then at the time, PSA had what they call a "SAP," schedule adjustment period. It works a little bit differently, from what I've been told, but I couldn't give you the details on that.

Q. But they would not even consider hiring you because they -- it was their position that you were going to have problems with scheduling?

A. GoJet and PSA offered me jobs, but they told me that they could not guarantee anything. Republic would not interview me.

Q. Have you filed any discrimination charges against either of those three companies?

A. I have not.

Q. Why not?

A. Well, I had one going with SkyWest, and I didn't want to take on a bunch of legal work, I guess. I didn't want to -- I didn't want to fight more than I -- I don't know. SkyWest was enough for me.

Q. Okay. Do you believe that the way those airlines treated you in telling you that they couldn't guarantee no work on the Sabbath was a violation of the law?

MR. STRINDBERG: Objection. Objection.

Misstates his testimony.

Q. (BY MR. PETERSEN): Okay. Let me back up a little bit.

Do you have any -- do you believe that the way those other three airlines treated you was legal, in your understanding?

MR. STRINDBERG: I'm going to object to the question. That calls for a legal conclusion. He's not a lawyer.

Q. (BY MR. PETERSEN): Go ahead. What's your understanding?

A. Well -- allow me a minute to think. So they never stated that they would fire me over it. They just said, "We can't guarantee that your schedule will be free from Saturday conflicts." And then they -- they said, "We're offering you a job, but understand that this is what you'll be up against here."

I never got to a point where I felt that I needed to ask them for an accommodation because I never got into training with them. So in what they said, they told me, "Hey, yes, you're going to be up against this is, and we'd like to offer you a job." So I don't feel that that was illegal.

Republic choosing not to interview me,

that potentially could -- I could probably make a case out of that, maybe. I don't know. I would be more likely to. But at the moment, I don't have a desire to do so.

Q. The PSA offer and the other offer, why didn't you take one of those?

A. Because it was going to be the same situation that I ran into at SkyWest for an airline.

Q. You realized that you're going to have problems ensuring your Sabbath free of work?

A. Yes.

Q. Correct?

A. Correct.

Q. And that was essentially a deal-breaker for you for employment purposes?

A. Yeah.

Q. Okay. All right. Do you think that SkyWest's -- do you -- are you aware of any airline that's a Part 121 airline that indicated that -- that indicated to you that they would be able to accommodate your religious Sabbath without problems, similar to what you've been told by PSA and SkyWest and the other airline? I can't remember that other airline's name. It's not Republic. The other one.

A. I'm not aware of any airlines that -- that

have guaranteed such.

Q. Do you believe that SkyWest's failure to hire you in the summer of 2017 was caused by your filing a complaint against SkyWest in February of 2017?

A. I -- I believe the reason that they -- that SkyWest chose not to hire me could have had something to do with that, in addition to the fact that I had requested an accommodation in the past.

Q. All right. Did somebody make you think that? I mean, did anyone say anything to you at SkyWest that would indicate to you that SkyWest was upset or angry about the fact that you had filed a discrimination charge in February of 2017?

A. No.

Q. Did anyone at SkyWest indicate to you that they were upset or angry because you had earlier requested an accommodation at the end of 2016?

A. No.

Q. Other than your belief that you think it's based in one of those two items, do you have any other statement or document or evidence that you're aware of at SkyWest that would support your belief that SkyWest's decision not to hire you was related to a prior request for accommodation or a prior

discrimination charge?

MR. STRINDBERG: Object to the question. You're asking him basically to do the work of an attorney to determine what facts support his claim, and that's not an appropriate question.

MR. PETERSEN: I'm going to ask it.

Q. (BY MR. PETERSEN): I just want to know if you have any other evidence or comment or piece of paper.

A. I personally do not.

Q. Okay. Are you aware of anybody who possesses such a piece of paper or evidence at this point?

A. My attorney might.

Q. Okay. And your belief as to why you resigned, your position on that is that you were not willing to work it the day -- that portion of your Sabbath that was -- that your training session was bleeding into, and you didn't want to be terminated, which you knew was inevitable if you didn't work it, is that right, and that's why you resigned?

A. That's why I resigned, yes.

Q. Okay. And while I know that you believe that SkyWest may have not hired you in 2017 in part because of -- in whole or in part because of your

request for accommodation earlier or your filing the charge, that's not what SkyWest told you was the reason for not hiring you; isn't that right?

A. SkyWest sent me an email saying that they were not going to hire me. I don't remember exactly what was in that email.

Q. Do you recall anything along the lines of it being -- that it being your -- that the -- that SkyWest's position was that there would be no way you could avoid Saturday work at some point as a newly hired reserve pilot?

A. SkyWest had -- they made that position clear in emails that they sent back and forth between Todd Emerson and Alan Reinach.

Q. And even as far back as February 2017's letter from Todd to Mr. Reinach, it indicated the same thing; isn't that right?

A. Yes.

MR. PETERSEN: All right. Let me take a five-minute break. I may be done.

Are you going to ask any questions, Erik? I'm assuming not.

MR. STRINDBERG: Probably not. But it depends what else you come up with.

MR. PETERSEN: All right. Let's take five

minutes, and then I may be done or I may have a couple of last-minute questions. So just give me a second.

(Recess taken, 3:44 p.m. to 3:50 p.m.)

MR. PETERSEN: All right. Going back on.

I don't have any more questions at this time.

MR. STRINDBERG: We don't have any, either.

We'll read and sign. Jessica, could you send the transcript to me and I'll get it to Shane?

THE REPORTER: Sure.

Copy orders?

MR. STRINDBERG: For myself, I just want it electronically.

MR. PETERSEN: Digital is fine with me.

(Signature requested.)

(Whereupon, the taking of this deposition was concluded at 3:50 p.m.)

* * *

Original transcript filed with Mr. Petersen.

Reading copy submitted to Mr. Strindberg.

# Exhibit C

Exhibit C

# EXHIBIT C

*December 7 Shane Cassell*, Lincoln Northside Seventh-day Adventist Church (Dec. 14, 2019), https://www.youtube.com/watch?v=y6ZOdFilmzo&t=2s

Also available by accessing: https://fabianvancott.sharefile.com/d-s4d3b9abd5dee49f8a338972838a85a62

# Exhibit D

Exhibit D

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | | |
|---|---|---|
| SHANE ANDREW CASSELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 2:19-cv-00149-jnp-dao |
| vs. | ) | |
| | ) | Judge Jill N. Parrish |
| SKYWEST, INC., d/b/a | ) | Magistrate JudgeDaphne A. Oberg |
| SKYWEST AIRLINES, | ) | |
| | ) | |
| Defendant. | ) | |
| ______________________________ | ) | |

REMOTE DEPOSITION OF JAKE WHICKER

January 15, 2021

Salt Lake City, Utah

Repored by: Ann Fleming, CSR, RPR

P R O C E E D I N G S

JAKE WHICKER,

called as a witness, having been first duly sworn remotely, was examined and testified as follows:

EXAMINATION

BY MR. STRINDBERG:

**Q. Good morning, Mr. Whicker. My name is Erik Strindberg. I represent Shane Cassell in a lawsuit we have against SkyWest Airlines -- not SkyWest -- yeah, SkyWest Airlines. Thank you for making yourself available today.**

**You indicated you hadn't had your deposition taken before, so let me go over some ground rules. I will be asking you a series of questions. You need to answer them truthfully and to the best of your ability. If you don't remember something, tell me that. If you don't understand one of my questions, let me know; I'll try to rephrase it.**

**Let's try and not to speak over each other. And that's sometimes hard, particularly on Zoom, but I'll try and let you finish your answers and if you let me finish my questions. What else? Lastly, I guess, you need to answer audibly. Shaking your head**

**and going uh-huh (affirmative) or huh-uh (negative) doesn't leave for a clear record. So yes, no, that type of thing.**

A. Okay.

**Q. Do you understand those instructions?**

A. Yes.

**Q. Please state your name.**

A. Jacob Whicker.

**Q. Mr. Whicker, what is your address?**

A. 345 South 200 East, Willard, Utah 84340.

**Q. Thank you. Is there anything which would prevent you from answering truthfully? In other words, are you tired or taking medication that might interfere with your cognitive abilities?**

A. No.

**Q. Where are you currently employed, Mr. Whicker?**

A. I work for FedEx Express.

**Q. And when did you go to work for FedEx Express?**

A. September of 2018.

**Q. What do you do for FedEx Express?**

A. I'm a pilot crew member.

**Q. Prior to FedEx Express where did you work?**

A. SkyWest Airlines.

**Q. Why did you leave SkyWest Airlines, if I might ask?**
A. Just career advancement.
**Q. When did you join SkyWest?**
A. June of 2000.
**Q. And were you at SkyWest continually from June of 2000 until September of 2018?**
A. Affirmative.
**Q. You said affirmative?**
A. Affirmative. Yes.
**Q. And what was the first position you held at SkyWest and how long did you hold it?**
A. I was a pilot at SkyWest for the whole time I was there.
**Q. Did you start out as a captain or first officer? What was your first position?**
A. I was a Brasilia EMB 120 first officer for approximately one year.
**Q. Then what position did you move into?**
A. CRJ first officer for approximately three years.
**Q. And after that?**
A. EMB 120 captain for approximately three years.
**Q. Then?**

A. Then a CRJ captain for the balance of the time.
**Q. So when did you start being a captain on the CRJ?**
A. I believe it was around 2007. The dates get a little muddy but, you know, the years, but close to 2007.
**Q. And what was your home domicile?**
A. Salt Lake City.
**Q. When you were the CRJ captain, what routes did you typically fly? Or did it vary every month?**
A. Yeah, it varied. Just wherever SkyWest flew. You want more specifics than that like cities?
**Q. I mean did you have enough seniority at some point to bid a regular line that you flew?**
A. Yes. Well, so a regular -- what do you mean by a regular line?
**Q. I'm using the word to mean where you'd fly the same flights every month.**
A. That rarely happened.
**Q. It's my understanding that at some point you had something to do with the training program, training of pilots?**
A. Yes. Yes.
**Q. When did you start being involved with**

**training?**
A. 2010.
**Q. And how long were you -- what position were you in?**
A. In 2010 I was an instructor for the CRJ.
**Q. How long did you hold that position?**
A. I would say -- I'm estimating -- three years.
**Q. What was your next involvement in the training program?**
A. I was a manager for Advanced Qualification Program.
**Q. What was the Advanced Qualification Program?**
A. The Advanced Qualification Program is an FAA sanctioned program for pilot training governed by the Federal Aviation Regulations.
**Q. And do all pilots go through it, all SkyWest pilots?**
A. All SkyWest pilots go through Advanced Qualification, yes.
**Q. And what's involved in this Advanced Qualification Program? Is there classroom work, simulator work? What exactly is involved in it?**
A. The Advanced Qualification Program

encompasses training from the very beginning, say, what we call basic indoc through ground school, simulators and includes the initial operating experience in the aircraft. So it concludes at the end of the initial operating experience.

Actually, Advanced Qualification also includes recurrent training as well, the annual recurrent training. So there's the initial portion and the recurrent training portion.

**Q. So the initial portion of Advanced Qualification Program, is that something that all newly hired pilots go through then?**

A. Yes.

**Q. I think we've just been referring to it as the training program, but I gather what you're saying is the formal name is the Advanced Qualification Program, correct?**

A. Yes. And for point of reference, airlines that do not have an Advanced Qualification Program are governed by a certain part of the Federal Aviation Regulations that's separate and it's not advanced. It's old school, so to speak.

**Q. Okay. Maybe at some point I'll ask you about that. I've heard there's been a term referenced, the CTP training. Do you know what that refers to?**

A. Probably -- I think it's called Certified Training Program or Commercial -- I'm somewhat sort of familiar with it. I was never directly involved with, but I know what it is.

**Q. Is it part of this initial Advanced Qualification Program?**

A. No, it's not.

**Q. Is it something pilots have to do before they go into this qualification program?**

A. It's completely separate. It's not related at all. In fact, it's not even directly related to an airline.

**Q. Who runs the CTP programs?**

A. You can get a CTP program -- you could buy one privately from anybody, from any company that offers it such as FlightSafety or L3.

**Q. Those are companies?**

A. Yes, those are flight training businesses.

**Q. Back in 2016 and 2017 was SkyWest sending its newly hired people to the CTP programs?**

A. I don't recall the exact dates, but SkyWest did have an in-house -- they did offer a CTP program for new hires who needed an ATP.

**Q. And where was that program located physically?**

A. I don't know if it had a central location. The training was conducted wherever SkyWest had resources available, but as far as administration of the program, I'm not certain on that.

**Q. So let's go back to this Advanced Qualification Program. You said you'd been the manager and that would have been approximately 2013?**

A. Yeah.

**Q. And how long did you hold that position?**

A. Actually, you know, that sounds -- no. No. I became a ground -- let's see. Honestly, I would guess it was around 2014-2015, right in there. I know the dates don't line up. I don't know the exact day when I started.

**Q. And when you became the manager for this program, did you continue to fly as well as a pilot?**

A. Yeah.

**Q. So you split your time between the two?**

A. Yeah. I flew very little. The manager ATP job, there was enough work associated with it that I basically flew enough to stay current.

**Q. And how many hours a month is that?**

A. Less than ten.

**Q. And where was this program, the qualification program, where was it physically located?**

A. My job was located in Salt Lake City.

**Q. And is that where most of the training for that program occurred or was it spread out?**

A. It's spread out wherever we had training resources.

**Q. So tell me the steps. The pilot, I guess, goes to the CTP program, gets their certification, they then enter this initial qualification program. Tell me how the training is structured. In other words, do they start in the classroom? What goes on?**

A. So are you talking about CTP? What's the question?

**Q. This qualification program that you were involved in that you were the manager of, how is that structured?**

A. You're asking about it from a pilot perspective or from the FAA perspective?

**Q. Well, from a pilot perspective, specifically the program you were manager of, what would happen? A pilot would come in. Were they put in a classroom? What would go on?**

A. Okay. So the Advanced Qualification Program covers training for the entire company and not just for the CRJ, and it has different components to it. It has CRJ qualification, it has CRJ recurrent, it

has ERJ qualification, ERJ recurrent, basic indoc. There's an instructor course. There's -- advanced qualification is quite a bit bigger than CRJ training.

So you don't want to talk about Advanced Qualification as much as you want to talk about CRJ training; is that correct?

**Q. Just a second. Yes, but what I'm trying to focus on, Mr. Whicker, is a new pilot, you know, obviously, this case is about Shane Cassell who was hired as a pilot. Someone who is newly hired back in 2016 or 2017, just tell me how the training was structured because I've never been through it. In other words, I know that Shane said he would go to Salt Lake City. So what would happen then? Was he in classes? I just want --**

A. Okay.

**Q. -- the structure.**

A. Alright. Thank you. When a pilot would report for class, they had -- well, first of all, they either had to have an ATP license or they had to have completed that CTP course, which is separate from us.

**Q. Understood.**

A. And then they would have approximately a week of what we call basic indoctrination and that was classroom training and then there was approximately

three weeks of CRJ specific training.

**Q. Was that also classroom?**

A. Classroom training, yes. And then approximately five sessions, and I'm using the word approximately because I don't remember the details. It's been a while. But approximately five sessions of what we call FTD or fixed training device training and then approximately 13 full flight simulator sessions. You know, so all of this is interspersed with days off, and the whole process takes between 60 and 100 days to complete.

**Q. And then this approximate five sessions of fixed training, was that what has also been referred to as matrix training?**

A. No. No.

**Q. What is the matrix training?**

A. Matrix training was considered part of ground school. It was supplemental to what the students learned in the classroom, and a matrix device is a computer-aided cockpit.

So the students would, to supplement their classroom training, they would spend approximately eight hours with the matrix devise usually in groups of two with an instructor to help reinforce what they learned in the classroom.

**Q. And how many -- when you say eight hours of matrix training, was that all at one time, or was it split up into segments?**

A. If I recall correctly, it was four sessions, two hours each.

**Q. And that was part of you said the ground school?**

A. Yes. Yes. The matrix session coincided with, you know, the previous day or couple of days of lessons.

**Q. Back in 2016 and 2017 -- let me ask you this. In 2016 you were still the manager for this Advanced Qualification Program, correct?**

A. Yeah, correct.

**Q. When did you leave that position?**

A. I was only in that for about one year and then I was the manager for CRJ training for just two years and a couple of months until, up until the time of my departure from SkyWest.

**Q. So what was the difference between being a manager for the Advanced Qualification Program and manager for the CRJ training?**

A. Like I alluded to, the manager for Advanced Qualification is -- it's the administration of training for the entire airline for pilot training and

it encompasses a lot of -- well, a lot of paperwork, regulation, compliance with the FAA programs, instructor training; whereas, the managers of CRJ training is specific to CRJ initial and CRJ continuing qualification training.

**Q. So do you recall when you became manager of the CRJ training program?**

A. It was two years and a few months before I left, so I think it was May 2016. That's close.

**Q. So you retained that position until approximately September of 2018?**

A. Correct.

**Q. And did you continue to fly as a pilot when you were the manager of the CRJ training program?**

A. Yes, to maintain currency, yes.

**Q. So you have the ground school, which is you said about a week of indoctrination and then three weeks of CRJ specific classroom thing, which includes training on the matrix, correct?**

A. Correct.

**Q. Then you said they would have approximately five sessions of -- I'm not sure I got it. Fixed training?**

A. Yeah, FTD is the initial, the acronym, and the fixed training device.

**Q. Okay. What's involved in that?**

A. Fixed training device moves beyond classroom knowledge like systems knowledge and more into how the pilot is expected to operate the aircraft at SkyWest. So, for example, how you're going to move the switches and when for different phases of flight.

**Q. And where does that training take place? In a classroom?**

A. No, it's in a -- SkyWest used -- at the time they used full flight simulators without the motion.

**Q. And back in 2016 and 2017, where were these full flight simulators for the CRJ's located?**

A. They were at FlightSafety in Salt Lake City. Occasionally we would use them in other locations as well.

**Q. Where is FlightSafety located?**

A. It's at the Salt Lake International Airport.

**Q. Could these full flight simulators that you use as part of the FTD training, could they also be then used for simulator sessions?**

A. Yes.

**Q. And these fixed training device sessions, approximately five sessions, how long did each one**

**last?**

A. There was a two-hour briefing prior to the session and the session itself was four hours and then there was 30 minutes to an hour debriefing after the session.

**Q. And there would be five, approximately five of those almost seven-hour sessions?**

A. Yeah.

**Q. Over how long a period of time?**

A. It depended on -- it just depended on the resources and how they were scheduled. Sometimes they were altogether five days in a row and some days, sometimes it was two on and a couple days off or a day off and two more sessions or three more sessions. It just varied on the resources.

**Q. Who did the scheduling for the fixed training device training than the simulator training?**

A. There's a department that scheduled all the resources: Simulators, FTD's, matrix, classroom instructors and it was -- I don't know what you'd call them. It was under the Training Department. There was a group of people that scheduled all of those resources. It was like crew support, but different.

**Q. Where were they located? In St. George?**

A. Correct.

**Q. Do you know who the head of that department was who did the scheduling, group that did the scheduling?**

A. Her name was Kim Ence.

**Q. How is the last name spelled?**

A. E-N-C-E.

**Q. And how would that process take place; the scheduling of the FTD and the simulator? In other words, let's assume you have your teaching or these new pilots are in the CRJ specific part of the training. Would you then interface with Ms. Ence and say, look, we have X number of pilots coming up? How did that work?**

A. I did very little planning like projected interface with Kim. The only time I really interfaced with Kim and her team was when things, when there was irregular operations. For example, if a pilot called out sick or if a simulator was inoperative, those types of things, then I would reach out to Kim and we would work out, try to find a solution to fix the schedule. Even then, sometimes I would just make a phone call and say, hey, this pilot missed a session and they would handle it.

**Q. Back in 2016-2017, how many pilots would typically be in this preliminary CRJ training? In**

**other words, how big was a typical class?**

A. Estimate between 30, and, boy, you're -- I really have to speculate. SkyWest at the time was hiring between 40 and 80 a month for the CRJ.

**Q. I gather from the way you say it that that was a lot of hires, a lot of hiring?**

A. Yes. Yes. You know, a typical normal time hiring really for any airline would be 20 a month.

**Q. When did this accelerated hiring start?**

A. I'm not exactly sure, but it was around 2015-2016.

**Q. How long did it continue?**

A. Until February this year -- honestly, I have to be honest with you. I left; it was still going in September 2018. That's the last time I was involved with it.

**Q. Okay. I was just smiling because of --**

A. Yeah.

**Q. -- last year has been a little unusual.**

A. It has.

**Q. Particularly in the airline and airplane business.**

A. Yes, it has.

**Q. These simulators that were used for the FTD training and the simulator session, how many**

**simulators were there for the CRJ in Salt Lake?**
A. In Salt Lake City I think there were four CRJ simulators in Salt Lake.
**Q. Were they owned by SkyWest or rented by SkyWest; whatever the --**
A. No, they were leased by SkyWest, yes, the contractual agreement with FlightSafety International.
**Q. Did SkyWest lease simulators at any other locations?**
A. Yes.
**Q. Where?**
A. We usually had simulators in Atlanta. We would occasionally use simulator resources in Cincinnati, St. Louis. I think that's it.
**Q. Were there any in Denver?**
A. Oh, yeah. I forgot about Denver. Yes. FlightSafety stood up a facility in Denver probably while I was the manager, but we did have two simulators in Denver.
**Q. Do you know how many you had in Atlanta?**
A. It varied. There were several CRJ simulators there. Other airlines used them as well, but we would have between one and three simulators in Atlanta depending on the month.
**Q. How about Cincinnati?**

A. I don't recall. We didn't have a lot of pilots in Cincinnati or St. Louis. We didn't -- you know, if we had a training line that went out there, it was just a few people. It wasn't a lot.
**Q. If a pilot was doing their ground school training, CRJ ground school training in Salt Lake, would they necessarily do their FTD and simulator sessions in Salt Lake or could they be sent to another city?**
A. They could be sent to another city.
**Q. How often would that occur?**
A. Usually the FTD was completed in Salt Lake City but not always. Simulator sessions were often sent elsewhere.
**Q. Why was that?**
A. Just resources. The simulators are used for initial training and continuing qualification training, and, so, it just depended on where, what the company needed to accomplish all of the training objectives for not just initial but for everything. And, so, wherever there were open sessions, they would tend to send the new hires to.
**Q. I gather from what you said earlier, this Kim Ence or her group would do the scheduling?**
A. Yeah.

**Q. So she would be the one to say, okay, we need to send X number of pilots to Denver, that type of thing?**

A. Yep.

**Q. And when you were the manager over the CRJ training, did you actually do any of the ground training yourself?**

A. Well, while I was the manager?

**Q. Yeah.**

A. Not that I recall.

**Q. Did you do any of the FTD or simulator training?**

A. I did do a little bit of simulator training for continuing qualification.

**Q. But not for the new hires?**

A. No.

**Q. So what would happen -- let's say, focus first on the matrix training. You said they would have a session with the trainers. Were you bringing in pilots who would help you conduct those kind of trainings like the matrix training?**

A. Matrix training was conducted by ground instructors. It's the same instructors that taught the classroom.

**Q. Were those ground instructors pilots?**

A. They didn't have to be, but, generally, yes. There may have been exceptions, but, generally, yes.

**Q. Who conducted the FTD training?**

A. We had dedicated FTD instructors, but there may have been some crossed, like there might have been a ground instructor that also did FTD or there could be and FTD instructor who also taught sim. There was a little bit of crossing.

**Q. Were most of them active pilots? In other words, you were saying when you were the manager you would do some minimal flying to keep certified and qualified. Were these instructors in the same situation where they would do some flying so they could stay qualified?**

A. Yeah, all but just a couple of them were pilots on the SkyWest Airlines seniority list.

**Q. Do you recall who Shane Cassell is?**

A. Yes. I couldn't picture him in a lineup, but I remember interactions with him.

**Q. At some point, did you learn that Shane needed accommodation for his religious beliefs?**

A. Yes.

**Q. How did you learn that?**

A. I don't recall if HR had sent me something

or if Shane approached me directly. I don't recall exactly if I learned it from Shane directly or if I learned it from HR. I don't know.

**Q. Let me show you -- and this is really going to be a test of my technological feat. I'll try to share a screen here. Do you see what's been marked as Exhibit 13?**

A. Affirmative.

**Q. Exhibit 13 appears to be an email or something dated September 1st, 2016 from Spencer Hinckley to Coy Bryant. Have you ever seen this email before?**

A. First time I saw it was when -- is it Dunja -- sent it to me. That's the first time I saw it.

**Q. And you said at some point either Shane approached you or someone from HR approached you, is that correct, regarding the need for religious accommodation?**

A. Yes.

**Q. Was it Coy Bryant in HR or someone else?**

A. I don't recall.

**Q. What were you told was needed as far as accommodation?**

A. You know, I don't recall because I don't

know -- there was an email that I think I was cc'd on it or I didn't understand it that referred to previous accommodation for Shane and I didn't know what it was talking about.

And now that I've seen your documents that were shared with me by Dunja, I see that there was an accommodation made of sorts for CTP. I suspect that's what it was, but there was an email thread that I just caught a piece of, and, so, at some point, HR reached out to me, and it could have been Coy or it could have been someone else that said, we may have an accommodation in this class to do.

Whether or not that -- whether or not I saw that before I talked to Shane or after, I don't know.

**Q. When you say that, you're referring to the exhibit we just looked at, September --**

A. No. I've never seen that exhibit that you just showed me.

**Q. So it was some other email chain that you saw?**

A. Yeah. It was just a note that, hey, you may have an accommodation in this class.

**Q. Do you recall who it was from?**

A. I don't.

**Q. Let me . . . I'll share with you hopefully what's been marked as Exhibit 6.**

A. I see it.

**Q. Which is a series of emails between Coy Bryant and Shane Cassell. Are these the emails you recall receiving?**

A. Honestly don't remember.

**Q. Have you ever seen this email or this exhibit before?**

A. I'm not certain that I had or hadn't, this particular email. I don't remember.

**Q. But you recall receiving some email that made some reference to Shane needing a religious accommodation; is that correct?**

A. I remember some traffic, some conversation, some communication about accommodation and I don't even remember, honestly remember, if it was about Shane. Like I don't remember if it was about Shane or about somebody else.

**Q. So were there pilots before Shane Cassell who had requested an accommodation?**

A. I don't know if there were pilots before Shane, but there were a couple of pilots who had requested accommodation.

**Q. What types of accommodations were they**

**requesting?**

A. There was . . . Trying to think of a specific case that I can remember. So, honestly, I can't remember. I know, I just know I've been through this process, this religious accommodation process. I'd gone through it a couple of times with HR and I don't recall if it was before Shane or after Shane and I don't remember who it was.

**Q. While you were the manager over the CRJ training, did you keep any kind of records or files that would somehow list out these accommodation issues?**

A. No.

**Q. Okay. So as I understand what you're saying, at some point you became aware that Shane needed a religious accommodation, and what did you understand that accommodation was that he needed?**

A. I understood that he needed to be relieved from all duty from sundown on Friday night to sundown on Saturday night.

**Q. And you learned that either from HR or from some email you saw or from Shane talking with you directly; is that correct?**

A. Correct.

**Q. What did you do when you received that information regardless of how you received it?**

A. If I knew that there was accommodation needed -- so at some point when I realized, when I recognized that Shane had this need and reached out to HR, I reached out to HR. I don't recall if it was Coy Bryant or Nicole Chapman. Those are the two people I worked with most frequently and I don't recall who it was and I would just ask them to guide me through it. They usually handled the process.

**Q. There was an issue that came up with Shane in 2016 regarding matrix training, scheduling of the matrix training. Does that refresh your recollection at all?**

A. I'm familiar with what it is, yeah, what the issue.

**Q. What do you recall about that issue?**

A. Shane, if I remember correctly, was scheduled for a matrix session that would encroach on the sabbath day because the sun set during the session and he did not want to attend that session.

**Q. How did you learn that? Was it from Shane, or was it from someone else?**

A. It was from Shane.

**Q. And tell us the best of your recollection what he had said to you and what you said to him in the course of that conversation.**

A. About that particular session?

**Q. Yes, about that issue, matrix training.**

A. He told me about his religious belief about keeping the sabbath and about how it starts at sunset on Friday and ends at sunset on Saturday. I asked him about the seasons. Like what about summer; does the time change? And he said, yes.

So, essentially, you know, the sabbath day shifts in the summer. It's shorter. I asked him if there was . . . You know, if he was willing to work during that time. He said no. Trying to remember if we talked about anything else about it. That's all I remember specifically asking him about it or talking to him about it.

**Q. What did you do after you had this conversation with him?**

A. I don't recall exactly what I did. Like I don't know. I don't recall if I -- I mean you mean immediately after talking to him?

**Q. Right. I gather what he was saying to you -- tell me if I'm wrong -- is that he had been scheduled for matrix training class that went past sundown on Friday; is that correct?**

A. Uh-huh (affirmative).

**Q. That's a "yes"?**

A. Yes.
**Q. So you have a pilot coming to you with a scheduling conflict. What did you do at that point? Did you call someone or email someone about possible schedule changes?**
A. I don't recall the exact timing, but I would have reached out either via phone call or email to HR. I may have reached out to Training, but I don't remember, you know, the scheduler to see if there was another shift. I doubt that I would have done that. Almost certainly, though, would have talked to HR. I would have talked to my boss as well.
**Q. Who was your boss?**
A. His name is David Moxham.
**Q. It's been represented to us that Coy Bryant was the HR person handling this issue at that time. Does that refresh your recollection of who you would have spoken with in HR?**
A. No. I mean I believe you. I worked with Coy a lot. There was a transition between working with Nicole Chapman and Coy Bryant and I don't know when it was.
**Q. What do you recall saying to this person in HR about your conversation with Shane?**
A. I don't recall the exact conversation.

**Q. Tell us the best of your recollection what you said.**

A. Honestly don't recall the conversation at all. I don't remember it. I know that it happened. I know I reached out to him, but I don't recall what the conversation was.

**Q. You said you also probably talked with your boss, David Moxham. What do you recall about that conversation?**

A. I told David that I had a student that was unwilling to attend the session due to religious beliefs.

**Q. What did Mr. Moxham say?**

A. I don't remember. I mean he -- I don't recall if he even said anything or if he responded. We were just following the process to -- you know, we identified that there was a concern of religious nature. We went to the HR and followed the guidance that HR provided. Dave didn't get involved in it other than just being aware.

**Q. Let's sort of not back up but go slightly sideways here for a moment. You said that the matrix training that the pilots usually did in groups of two; is that correct?**

A. Yes.

**Q. Who assigned those groups? In other words, who assigned the pairings?**

A. Those groups were -- they were assigned during class during the first week of ground school, CRJ ground school, and I think it was based on their bid. So we had a training bid for their training schedule after ground school or -- and I guess it included the matrix. I don't remember exactly how the sessions were assigned now that you mention it. I think they were -- so we had a training bid that handled FTD and sim.

As far as the matrix goes, I don't know how we decided who the students were paired with and at what time.

**Q. Let me show you --**

A. I don't remember.

**Q. Let me show you an exhibit that's been previously marked as Exhibit 4, which is not quite from the same time period we're talking about but it's similar. Can you tell us what Exhibit 4 is? I can blow it up if you want?**

A. It looks like a matrix lab signup, which is separate from what we're talking about.

**Q. What do you mean it's separate from what we're talking about?**

A. It's not formally part of ground school. It's not required training. It's not part of the Advanced Qualification Program. It was a -- this was kind of a -- if I'm understanding what this is, I don't recognize the instructor, but if I understand what this is, we would offer one of the Saturdays during ground school that the students could go to a matrix device and they could sign up for it randomly on their own and we would have one instructor between the four different matrixes.

We would have one instructor available basically to answer questions about the airplane, about the systems, about the switches, about class, about ground school, about the test -- not the test, but the upcoming test, you know, getting ready, preparing for it. It was kind of a just a lab with one instructor that was available.

**Q. So if a student felt that he or she needed additional training, they could sign up to that additional matrix training?**

A. Yes. Yeah. It was a way to get access to an instructor outside of scheduled time.

**Q. Do you recall at all how the regular matrix training was assigned?**

A. I don't. Now that you've asked the

question, I don't. I know the FTD and simulator schedules were bid. I can't remember. I don't remember how we allocated the matrix time. I don't.

You know, when I taught ground school, I don't think we had the matrix devices, and, so, I wasn't intimately involved in that, or at least I don't remember having them. So that process, I don't know how it was handled.

**Q. Was there someone under you who handled the matrix training, so like the manager over matrix training?**

A. No. No. It was part of ground school. No.

**Q. So you said that you recall Shane came to you and he said that there was an issue, a conflict with the sabbath regarding his matrix training; is that correct?**

A. Uh-huh (affirmative).

**Q. That's yes?**

A. Yes.

**Q. And you talked to someone in HR and your boss, David Moxham. Did you do anything else?**

A. Not that I remember.

**Q. Did you make any effort to try to at least reschedule the matrix training for Shane so there**

**wasn't a conflict?**
A. I considered all of the available matrix shifts that we had with instructors available and the matrix available at the same time. All of them encroached on the sabbath.
**Q. Was that typical? Were they always Friday, the Friday evening-Saturday period?**
A. Yes. There was a session from four p.m. to six p.m. and a session from six p.m. to eight p.m.
**Q. On Friday?**
A. On Friday. And if I remember correctly, yes, and during that time of year there had always been an after sunset conflict.
**Q. Was that, when you say there was always a four to six and six to eight matrix training schedule for Fridays, was that for every single class, CRJ class?**
A. Yes, as far as I can remember. There was a time when we had to split classes, you know. When we were hiring a lot, we had to divide -- say we had 80 people in a class. We would divide that class into two classes of 40. I don't remember how, exactly, how we managed the matrix then. I don't recall if there was a, like, a Thursday-Saturday schedule to help manage the number of students. Honestly, I don't recall.

**Q. Would you as the manager get some kind of printout, or was there some kind of a printout posted would show the students when their matrix training was scheduled?**

A. They never gave it to me. I mean I could have gotten it. I could have went and found it somewhere, but they didn't send it to me. I didn't really get involved with the scheduling.

**Q. So this Kim Ence or people under her would create some kind of schedule that was sent out correctly to the student pilots?**

A. For FTD and sim, yes. For matrix, that was handled really in the classroom with the ground school instructors. It was part of class. It was part of the classroom.

**Q. Could there have been some modification of the matrix training so that it didn't encroach on the sabbath?**

A. Not without interrupting ground school itself, the classroom time itself.

**Q. Why is that?**

A. Or scheduling something on a Saturday. In order to get a student in a matrix not on the sabbath, you know, sundown Friday to sundown Saturday, we would have had to let out a class sooner or change a class

day. You know, not do class on Friday night or Fridays and do one on Sunday, or we would have had to have made a drastic change that would have been very difficult to manage with the number of students and the resources that we have available such as the matrix and the instructors.

**Q. What hours would typically -- sorry. I didn't phrase that very well. In the ground school, when did it typically start in the morning and when did it typically end each day?**

A. Ground school was scheduled from 8:00 to 5 p.m. every day and on matrix days the students would get out at 3 and that could give them time to get from the training facility over to the matrix, which was not at the hangar, not at the training facility at the time and because of the finite resources, I mean the limited number of matrix devices, half the students would go from 4 to 6 and the other half would go from 6 to 8 p.m.

**Q. Where you said the training facility, where was that in relationship to where these matrix devices were located?**

A. The classrooms were at the SkyWest training facility in Salt Lake City, which is approximately a mile and a half or two miles from

FlightSafety. It's also on the airport, but it's just around the bend, so to speak.

**Q. So why did the students need two hours to get from training classroom to FlightSafety?**

A. They would get out of class at three and they would have an hour to get over to FlightSafety and, so, they would either take their own vehicle if they had their own vehicle or they'd take hotel transportation.

Most of them would go -- it was just scheduled for an hour for logistics to get, okay, you're moving out of the classroom at the training facility and those of you that have matrix at four p.m., it starts -- you know, you've got an hour to get there. It's just logistics of transportation.

So, from a company perspective, we have to provide transportation for these people, for these pilots, and, so, logistically getting the people from the training facility to their hotel, which it was adjacent to FlightSafety, sometimes the hotel would take multiple trips.

I mean they have one ten-passenger van and they'd have to make four trips and it just takes time. So there was just a little bit of flex in the schedule.

**Q. This issue with the matrix training came**

**up, I'll represent to you and we can look at documents, but it came up right at the end of November 2016, the very beginning of December. And at that time sundown, I'll represent to you, was at about 5 p.m. Was there any discussion that you had with your HR or David Moxham about trying to get Shane and his partner into the matrix, say, like at 3:00 or 3:10 so that he could finish up by 5?**

A. I don't recall a discussion like that, but if we -- I mean if he started at 3:10, he would -- if we did the scheduled session, he'd been done after sundown.

**Q. Do the sessions have to be 2 hours or could they have been 1 hour and 50 minutes?**

A. They were required, they were scheduled per our Advanced Qualification Program to be two hours.

**Q. But did they have to be, I guess what I'm getting at, Mr. Whicker?**

A. If the student was, if the instructor and the student were able to complete the syllabus in less than two hours, that would be okay. Conversely, if the student and the instructor were not able to complete the session in two hours, it would be required to go into an extra session, an additional session, and we saw both.

**Q. When you say an additional session, would the session keep going or would another session be scheduled at a later time?**

A. It would have to be scheduled at a later time because the resources, the matrix resources and other resources were so tightly scheduled that there would be another group waiting to start the lesson.

**Q. Was matrix training ever done -- you said it was either Friday/Saturday or Thursday/Saturday. Did you ever back in the end of 2016 do a matrix training on a day other than Saturday, like Thursday/Monday, Friday/Monday, Friday/Sunday, that type of thing?**

A. Not that I recall. Never. We never did that. We never scheduled -- remember, matrix is part of ground school and the idea is that you go to ground school and then you go over to the matrix and you solidify with visual tactile interface what you learned at ground school. So we wouldn't have classroom on Friday and then Sunday or Monday have somebody go to matrix that I recall, wouldn't have somebody go to matrix to learn what they did then. It was designed to go together hand in hand.

**Q. Was there any training at ground school on Sundays?**

A. Not -- we had one class that we taught on Sundays. It was what we called differences training for different -- there's three variants of the CRJ. There's a CRJ 200, 700, 900. We did differences ground school on a Sunday.

**Q. How long would that last?**

A. It was one day.

**Q. Would the new pilots go through that, or was that part of the advanced?**

A. They would usually do it after they passed their simulators.

**Q. Was matrix training ever done on a Sunday?**

A. No.

**Q. Would there have been -- I understand what you're saying. You would do the ground school, the classroom training and you wanted people to get into the matrix training at the end of that day. Was there anything, though, that would have prevented you from like having them to the classroom training on Friday and the matrix training on Sunday?**

A. The resource scheduling would be part of it. So we're dealing with matrix is a resource, the classroom is a resource, simulator is a resource, the instructor is also a resource, so instructor availability.

We were required to provide time off. I don't remember exactly what time off is required to be provided, but we couldn't, for example, we couldn't train a pilot seven days a week and we weren't allowed to work an instructor seven days a week. So there were constraints in the schedule. I'm not exactly sure how --

**Q. When you say you weren't allowed to, was that an FAA regulation or a SkyWest regulation?**

A. SkyWest policy manual, the pilot policy manual.

**Q. I'm going to show you what's been marked as Exhibit 14. Is that your signature on Exhibit 14?**

A. Yes.

**Q. Did you draft this document?**

A. No.

**Q. Who did?**

A. I don't know.

**Q. Were you consulted about the contents of this document?**

A. Yes. I don't know about this specific document, but, yes. I mean this subject, yes.

**Q. Who did you -- who consulted with you on this subject?**

A. I don't remember if it was Coy or if it

was Nicole.

**Q. And the subject being fashion some kind of accommodation for a pilot who needed the sabbath off?**

A. The discussion that was had about this was more about the training footprint and the schedule and the resources. It was more about that.

**Q. What do you mean; the training footprint?**

A. So the training footprint about is there -- you know, could we do -- could we move this session there? Could we move that session here? How does this work? How does matrix and ground school fit together? How does FTD fit with ground school?

So I was asked about how the schedule works, how it's mapped out and how everything fits together with the other resources classrooms, instructors, FTD's, matrix, simulators.

So either Nicole or Coy talked to me about trying to understand how it works. They also talked to me about bidding schedules.

**Q. What do you recall about those discussions about bidding schedules?**

A. We talked about, we definitely talked about FTD and sim training. I don't recall, you know, I do not recall exactly how the students were assigned either that 4:00 session or that 6 p.m. session. I

don't recall how that happened in class. I know it happened in class, but that's all I remember.

**Q. Looking at this document, there's this highlighted sentence where it says after extensive evaluation and consideration of the request as well as the evaluation of the quality, safety and operational impact as well as training footprint structure for SkyWest, and it goes on, it's been determined that we are unable to honor the specific request with work schedule.**

**Is this what you were referring to; discussions with either Coy or Nicole about how the training was structured?**

A. I don't know if that line is referencing exactly the discussion I had with them.

**Q. Then there's this, the end of that paragraph there's -- it goes on to say, However, as an accommodation, we have provided FO Cassell with tools to meet his religious requirements. Options include pursuit of schedule changes as defined by company and departmental resources, paren, e.g., drop/trade shift, bid for desired work, assignments, domicile staffing/available shifts. Do you know what that's referencing; these tools?**

A. Yeah. So we invited Shane or encouraged

him to try to find other classmates that would allow him, you know, that had shifts that would work for him. Those are the same resources like so let's -- so let's say I'm in class and I've got a wedding that I want to attend, but I have a sim session that's on that day, well, if I can work out a shift trade to make it work, that would work. I mean that's something that was permissible. You know, training, you can't really trade a ground school day per se. It's just scheduled. It is what it is, kinda.

**Q. Mr. Bryant said that these tools were also referring to things that Mr. Cassell could have used to avoid flying on a Saturday once he passed -- once he got out of training. Did you have any discussions with Coy or with Nicole about what would happen regarding scheduling for Mr. Cassell once he was out of training?**

A. No.

**Q. So you don't recall drafting this document. You do recall signing it; is that correct?**

A. Correct.

**Q. And were you present when Shane signed it?**

A. I don't know. Usually I would be the one that -- I mean I would say -- I don't recall specifically if I was with Shane when he signed it, but I suspect he was, but I don't know that for certain.

**Q. We've been going for a while.**

A. For example, if I wasn't there, usually I would put by telephone or something like that. I mean that was my -- it was not unheard of for me to notate I was not present.

**Q. So the fact that there's no notation means that you were probably present when you signed it?**

A. Yeah, mostly likely I was there.

**Q. Do you recall any discussions with Shane when you signed it, when he signed it and when you signed it?**

A. No.

**Q. We've been going for a little while. Why don't we take a 10-minute break.**

A. Okay.

**Q. And continue on at 10 to ll.**

(Break)

**Q. I'm going to back up. We've just been looking at Exhibit 14, which is that memorandum of understanding. Let me show you another document here, which actually precedes the Exhibit 14. This is dated 10/27, and Exhibit 14 was -- well, the same date. Were you ever shown this document, Mr. Whicker? It's an email between Shane and Coy Bryant and I'll -- Shane's email refers to I have attached the completed religious**

**accommodation form to this email.**

A. I think this is the form that I saw that I mentioned earlier that I saw in an email that passed through. I think that's it. And I hadn't thought of this Mikhail fellow in this email before until I saw these documents that were shared with me by Dunja, but I vaguely remember that.

**Q. Earlier you would you had been testifying that at some point you were shocked that you were copied on an email chain and you didn't quite know what was going on with it; is that correct?**

A. Yeah. I think it was this one.

**Q. And this email chain, which is Exhibit 6, did it also include the Employee Request For Religious Accommodation form?**

A. I don't recall. I don't recall.

**Q. And this discussion you had with HR, with David Moxham discussion I should say, did those take place after you saw Exhibit 6?**

A. Yes.

**Q. You said that Shane came to you; there was this issue with the matrix training. What was the next thing you recall occurring?**

A. I don't recall how many conversations I had with Shane, but I remember that he was -- I believe

I spoke to him a couple of times on the phone. I think we had some long conversations. I remember asking him about what he expected to do flying a line, how he expected to hold the sabbath off. I remember asking him if he thought that was possible.

I know at some point he resigned, as well, but as far as, you know, we had two conversations, I don't remember that. I don't remember specific details about how often we talked, but I know that it was more than just the first time he talked to me.

**Q. Did you take notes or anything of any of these conversations?**

A. No, I did not.

**Q. You said one of the topics you talked about was once he was flying a line, if he thought it was possible to avoid flying on the sabbath. Do you recall what he said to you in response to that?**

A. His response was that he knows other Adventists that have never flown -- or that have never had to violate the sabbath. That's what he told me.

**Q. Did you pass that information on to anyone; HR or to Moxham or anyone?**

A. I don't remember if I did or not. I suspect I did, but I don't remember.

**Q. Anything else you recall about these**

**conversations with Shane?**

A. I remember that Shane was upset, emotionally distraught. I remember thinking that he talked to his dad a lot about this. So his father was a mentor of sorts, I think. I remember asking Shane -- I remember discussing, you know, all the different options like, hey, Shane, you know, these are your different options. You could -- I mean if you were sick for your matrix sessions, then we would be forced -- that would force us to manage it. And he said, well, I'm not going to do that. I remember because he has great integrity, Shane does. And I wasn't really suggesting that he be sick, but I was -- I was just exploring where he was at with this.

I remember asking him about, you know, if you were here in July, would this be different? This is a discussion we had and he said, yes, it would be totally different.

**Q. Did you have any discussions about him stopping training and starting training in the spring or the summer when the sundown was later?**

A. Other than just the conversation of talking about would this be different if you were here in the summer, I don't remember any other discussion about postponing training or anything of that nature.

**Q. I assume since you mentioned it, I assume that there were times that these trainees, someone would get sick and not be able to attend a matrix session. Did that ever occur?**

A. I can't remember a specific time it occurred for matrix. It occurred occasionally in ground school and occasionally in sim. Somebody would get the flu or something. I don't remember a specific case in matrix. It may have happened.

**Q. If someone got sick and couldn't attend a training session, ground school training session, what would you do? How would you handle that?**

A. If you miss a session, there's really not -- we don't have -- we didn't at the time have the resources to get you caught up within the timeframe that was available because everything was so constrained, and, so, what we usually would do is what we call reset somebody and what that meant was that pilot would essentially join the following class. We'd send them home for two, three, four weeks and they would join the following class and start over.

**Q. Was there any discussions with Shane when this issue of the matrix came up about resetting him to a later class?**

A. Not that I recall.

**Q. Anything else you recall about these discussions with Shane?**

A. Shane would have been concerned about -- I remember he asked about being terminated. You know, if I -- he asked me specifically if I don't show up for this shift, what's going to happen?

And, you know, he was -- every pilot is very sensitive about being fired because it blacklists you pretty bad; I think more so than a lot of industries. So he was concerned about it. So we discussed that. You know, well, if you resigned, you wouldn't get fired. If you don't show up for your shift -- I don't remember verbally telling him specifically he'd be terminated or anything like that, but I may have.

But we definitely talked about, you know, you could resign if you're worried about being terminated over this. And he was. He was concerned about it.

**Q. Who was the chief pilot for SkyWest at the time; was it Roy Glassey?**

A. The assistant, I honestly don't know. There were two what we call system chief pilots. One was Shane Losee and one was Roy Glassey and I don't know when Roy started.

**Q. Did you have at any point a talk with either of them about the situation with Shane?**

A. No.

**Q. I'm going to show you another document.**

MR. STRINDBERG: Tanner, we used this document, but I don't think we labeled it. Did we.

MR. BEAN: It's 637.

MR. STRINDBERG: No, it's SkyWest 00037 see at the bottom there.

MR. BEAN: Yeah. I'm fine with marking it as Exhibit 37, that would be coincidental, the page number.

MR. STRINDBERG: Let's mark the document, which is SkyWest 37 -- that's the Bates number -- as Exhibit 37, ironically enough.

(Exhibit 37 marked)

**Q. Mr. Whicker, do you recall this document? Is that your signature at the bottom?**

A. Yes.

**Q. Below that there is a witness signature. Do you know who that is?**

A. That is Taylor Smith.

**Q. What position did Taylor Smith hold?**

A. Taylor was an admin in training.

**Q. Did you prepare this document?**

A. Yes.

**Q. And did you have any discussions with anyone at HR or anyone else regarding this document before you filled it out or while you were filling it out?**

A. No.

**Q. You have up here that he was eligible for rehire. Why did you put that down?**

A. That's a standard code. So when you select, when somebody resigns voluntarily, unless they -- there was a code that was voluntary, eligible to rehire and I can't remember if there is one voluntary ineligible for rehire, but it was like a drop-down list.

**Q. So in other words, if you entered I guess here it says 100 resignation, if you entered that, it would then fill out the rest of the fields saying voluntary, eligible for rehire?**

A. Correct.

**Q. And when you signed this and Shane signed it, where were you? Were you in your office or somewhere else?**

A. The problem is I don't remember exactly where we were, but I remember the event after. I'm almost sure, I'm all but certain we were at the

training facility in Salt Lake City.

**Q. Did you have an office at the training facility?**

A. Yes. Actually, we must have been at the training facility because Taylor Smith worked there. That's where Taylor worked.

**Q. Once this was signed, what did you with it, this form?**

A. I would have scanned it and emailed it to HR.

**Q. There's some initials up here. Do you know what those represent?**

A. No.

**Q. I'm going to show you another document. It's Exhibit 5 and it starts the bottom is an email from Shane to you dated December 1st and the subject is clarification of yesterday's events. Do you recall receiving this email?**

A. Yes.

**Q. A few moments ago you referred to the event after. What were you referring to?**

A. After he signed his resignation paperwork, I don't know if it was 30 minutes or an hour later, but I left the office to drive home, so it must have been later in the day, and he was walking from the training

facility to the hotel and I picked him up and took him to the hotel.

**Q. Did you have a discussion while he was in the car with you?**

A. Yes.

**Q. What did the two of you discuss?**

A. Religion.

**Q. What about religion?**

A. About convictions and about integrity and character and about my own faith and his faith. We shared a common belief in Christ and expressed our kind of mutual path trying to keep the sabbath -- we're different faiths -- but keep the sabbath and how we look at it, but we discussed faith.

**Q. Do you recall anything more or more detail about that conversation about keeping the sabbath?**

A. No.

**Q. I gather, and tell me if I'm misinterpreting it, but based on the conversations you had with Shane and your own beliefs, you understood where Shane was coming from and why it was important to him not to work on the sabbath; am I correct?**

A. Yes.

**Q. And did you feel that he was acting honorably when refusing to work on the sabbath?**

A. Yes.

**Q. Now, I'm scrolling up on Exhibit 5 and it's an email that you wrote back to Shane the next day, Friday, December 2nd. Was this something you drafted on your own?**

A. I don't remember. I think I did, but I don't remember.

**Q. You say down here at the bottom, had you continued employment and didn't report for or complete the assignment, your employment would have been terminated, as this is a required job function. Are you referring to that if Shane had not attended the matrix training, he would have been fired; is that what that's in reference to?**

A. Yes.

**Q. You sent this or you copied this to Coy Bryant and Dave Moxham. Did you have any discussions with either of them after you sent it to them?**

A. Not that I can remember.

**Q. And up here this reference in the second paragraph clearly signed a letter. That was in reference to the document we looked at before, correct, Exhibit 14?**

A. Yes. I don't know if it was Exhibit 14, but, yes, the religious accommodation letter that Coy

had produced for him to sign.

**Q. There's a reference here in this next line says, we have provided. Is that -- who was that a reference to?**

A. I'm guessing SkyWest, generally. Yeah. I'm guessing SkyWest, generally. I don't know if that's a direct quote out of that letter from Coy or not.

**Q. I'm going to stop sharing. Okay, so Shane resigns, which is Exhibit 37, which is dated, I believe, November 30th; he then sends you an email the next day; you respond the following day, December 2nd. Did you have any other conversations with Shane after you responded to him on December 2nd?**

A. Not that I remember.

**Q. Have you ever had any further discussions with Shane after December 2nd at any time?**

A. It's possible that he emailed me or called me or text me. You know, I would say like immediately after that, December 2nd, maybe within a week or two, but in the last couple of years, no.

**Q. Did you learn at some point that there was a series of communications that took place between Shane's attorney and SkyWest, particularly Todd Emerson?**

A. No.

**Q. We sent you some of those, Dunja sent you some of those documents, some letters.**

A. Okay.

**Q. Had you ever seen those before we sent them to you? And I'll show you one of them for example. I don't want to belabor the point, but this is Exhibit 7. It's a letter that Mr. Emerson wrote to Alan Reinach. Had you ever seen this letter prior to Dunja sending it to you in preparation for this deposition?**

A. No.

**Q. Were you made aware after around this time period, December 2016, that there was this dialogue between Alan Reinach and Mr. Emerson going on?**

A. No.

**Q. Did you learn at some point in the late spring of 2017 that Mr. Cassell had reapplied for a pilot position at SkyWest?**

A. Ask again?

**Q. Did you learn that the following spring of 2017 that Mr. Cassell reapplied for a position at SkyWest?**

A. I learned that when Dunja reached out to me a month ago or so because I Google searched Shane's

name and saw a video where he talked about his second interview.

**Q. I'm going to show you another exhibit. This is previously marked as Exhibit 29. It's, I gather, sort of a form letter but the important part is dated June 15, 2017. It says, We are pleased to invite you to a pilot interview with SkyWest Airlines on 6/22/2017. So you were not informed back in June of 2017 that Mr. Cassell had been invited for an interview?**

A. No.

**Q. I will pull up another document. I've put up Exhibit 11, which is a letter that Shane wrote regarding religious beliefs and his need for an accommodation to the Mr. Coy Bryant. It's dated June 29, 2017. Prior to Dunja sending you this exhibit, had you ever seen that before?**

A. No.

**Q. I'm going to pull up one other. Mr. Whicker, I've put up what's been previously marked as Exhibit 34. It's a letter from SkyWest Airlines, recruitment to Shane dated July 12, 2017 saying that, We regret to inform you that you were not selected for the position at this time.**

**So do you have any knowledge, Mr. Whicker,**

**of the fact that -- or the events that occurred in 2017 where Shane applied for another position with SkyWest and SkyWest -- I guess the term they used was regretted, told him that they would not hire him? Do you have any knowledge of what occurred in 2017?**

A. No.

**Q. You were still doing CRJ training in June and July of 2017, were you not?**

A. I was. Affirmative.

**Q. At that time was the matrix training still scheduled for Friday evenings? Would the session take place on Friday evening?**

A. Yes.

**Q. Let's take a quick break. I'm going to confer with my co-counsel and then we can -- I'll probably be done. Mr. Bean may have some questions for you, though, but give us just a few minutes here.**

A. Okay.

(Break)

MR. STRINDBERG: I have no further questions, Mr. Whicker.

MR. BEAN: We don't have any at this time either.

MR. STRINDBERG: So we'll end this deposition. Mr. Whicker, you have the opportunity to

read and correct this deposition. Would you like a copy of it sent directly to your home and you can go over it and if there are any errors in the transcription or if you misspoke or something, you can make that correction?

MR. BEAN: Looks like he's not getting audio.

(Pause for technical difficulties)

MR. BEAN: Erik, do you have an email address for Jake? I can find it. Okay. Jake can correct me if I'm wrong on this, but I believe his address is JKWhicker@gmail.com.

(The remote deposition concluded at 11:41 a.m.)

* * *

(Signature was requested.)

VERIFICATION

STATE OF _______________)
) ss.
COUNTY OF ______________)

I, JAKE WHICKER, being first duly sworn remotely on my oath, depose and say:

That I am the witness named in the foregoing deposition taken the 15th day of January, 2021 consisting of pages numbered 1 to 62, inclusive; that I have read the said deposition and know the contents thereof; that the questions contained therein were propounded to me; that the answers to said questions were given by me, and that the answers as contained therein (or as corrected by me therein) are true and correct.

Corrections Made: Yes_______ No_______

_____________________________
JAKE WHICKER

Subscribed and sworn to before me this ________ day of ________, 2021, at ___________________, Utah.

________________________________
Notary Public for Utah
Residing at______________, Utah.
My Commission Expires: ________.

# Exhibit E

Exhibit E

Scott M. Petersen, #7599
Tanner J. Bean, #17128
**FABIAN VANCOTT**
215 South State Street, Ste. 1200
Salt Lake City, Utah 84111-2323
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
spetersen@fabianvancott.com
tbean@fabianvancott.com

*Attorneys for Defendant SkyWest Airlines, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH - CENTRAL DIVISION**

| | |
|---|---|
| SHANE ANDREW CASSELL,<br><br>Plaintiff,<br>v.<br><br>SKYWEST, INC., d/b/a SKYWEST AIRLINES,<br><br>Defendant. | **DECLARATION OF MR. JAKE WHICKER**<br><br>Case No. 2:19-cv-00149-JNP-EJF<br><br>Judge Jill N. Parrish<br>Magistrate Judge Evelyn J. Furse |

I, Jake Whicker, declare and state as follows:

1. Except as otherwise stated herein, the following testimony is based on my own personal knowledge and information.

2. I am over the age of eighteen and am competent to testify.

3. I am currently a pilot crew member for FedEx Express.

4. Prior to working at FedEx Express, I was the Manager of SkyWest Airline's CRJ Training.

5. I met the Plaintiff in this case, Mr. Shane Cassell, during my time at SkyWest Airlines.

6. In preparing for my deposition in this case, I Googled "Shane Cassell." The search returned a YouTube video titled "December 7 Shane Cassell," and dated December 14, 2019, which is available at the following URL: https://www.youtube.com/watch?v=y6ZOdFilmzo&t=2s

7. I watched the video and recognized Mr. Cassell.

8. The video depicts Mr. Cassell at a pulpit giving a sermon at his church.

9. The church appears to be Lincoln Northside Seventh-day Adventist Church, as that is the organization that posted the video to YouTube.

10. During the video, Mr. Cassell recites, at length, the story of his experience with SkyWest Airlines.

11. I declare under criminal penalty under the law of Utah that the foregoing is true and correct.

EXECUTED June 27, 2021, at Willard, Utah.

Jake Whicker

# Exhibit F

Exhibit F

# Remote 30(b)(6) Deposition of SkyWest Airlines

## Roy William Glassey, Jr.



Date: September 30, 2020

Case: Cassell vs. SkyWest, Inc.

Civil No: 2:19-cv-00149-jnp-dao

*Reporter: Vicky McDaniel, CSR, RMR*

ASSOCIATED REPORTING & VIDEO

*Next-Level Litigation Support*

The Owyhee
1109 Main Street, Suite 220
Boise, Idaho 83702

Phone: (208) 343-4004
Facsimile: (208) 343-4002
production@arvboise.com
arvboise.com

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | | |
|---|---|---|
| SHANE ANDREW CASSELL,<br><br>Plaintiff,<br><br>vs.<br><br>SKYWEST, INC., d/b/a<br>SKYWEST AIRLINES,<br><br>Defendant. | ) | Civil No. 2:19-cv-00149-jnp-dao<br><br>Judge Jill N. Parrish<br>Magistrate JudgeDaphne A. Oberg |

REMOTE 30(b)(6) DEPOSITION OF SKYWEST AIRLINES

ROY WILLIAM GLASSEY, JR.

September 30, 2020

Salt Lake City, Utah

Repored by: Vicky McDaniel, CSR, RMR

REMOTE 30(b)(6) DEPOSITION OF SKYWEST AIRLINES

BE IT REMEMBERED that the remote deposition of ROY WILLIAM GLASSEY, JR., 30(b)(6) designee for SKYWEST AIRLINES was taken via videoconference by the Plaintiff before Associated Reporting & Video, Vicky McDaniel, Court Reporter in and for the County of Salt Lake, State of Utah, on Wednesday, the 30th day of September, 2020, commencing at the hour of 9:36 a.m. in the above-entitled matter.

APPEARANCES (Remotely):

For the Plaintiff: STRINDBERG & SCHOLNICK, LLC
By: Erik Strindberg, Esq.
1516 West Hays Street
Boise, Idaho 83702
Telephone: (208) 336-1788
Facsimile: (208) 287-3708
erik@utahjobjustice.com

ASSOCIATED GENERAL COUNSEL
GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS
By: Todd R. McFarkabd, Esq.
12501 Old Columbia Pike
Silver Springs, Maryland 20902-6600
Telephone: (301) 680-6321
Facsimile: (301) 680-6329
mcfarlandt@gc.adventist.org

For the Defendant: FABIAN VANCOTT
By: Scott M. Petersen, Esq.
215 South State Street, Suite 1200
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
spetersen@fabianvancott.com

A. Yes. In the additional domiciles I would assure that we had a staff or pilot oversight.

**Q. And that staff would be headed by an assistant chief pilot?**

A. No. That staff would be headed by me.

Maybe I'll -- the chief pilot is the manager level leader over the grouping of domiciles in his region, his or her region, and each station will have, or each domicile will have a staff. There will be necessary staffing, whether an assistant chief pilot or flight operations supervisor. But we have a staff that's on site, and then the regional chief pilot would maintain oversight of the region.

**Q. Okay. But I guess you're using -- I am confused because you're using the terms "assistant chief pilot" versus a "chief pilot" and a "regional chief pilot." A regional chief pilot is over what?** A number of different domiciles?

A. The domiciles that are assigned to his particular region.

**Q. So in 2016, how many regional chief pilots were there for SkyWest, if you know?**

A. I recall six.

**Q. Okay. And then in -- and how many different domiciles were there in 2016 for SkyWest?**

MR. PETERSEN: Objection. Outside the scope.

**Q. (By Mr. Strindberg) Go ahead.**

A. Well, it varies. We've had as many as 20 domiciles. I don't recall specifically how many were in the time frame you mentioned.

**Q. Okay. And then in these other domiciles, going back to Houston, Atlanta, Denver, Colorado Springs, Minneapolis, and Detroit, you said there would be a staff on site. And who -- was the assistant chief pilot the head of that staff in each one of those domiciles that were under you as you were chief pilot in Chicago?**

A. You're asking me who was in charge of a specific domicile?

**Q. Yes.**

A. Well, the assistant chief pilots would assist. They provide a local supervisory presence.

**Q. That's what I mean. That's what I asked.**

A. Correct.

**Q. As you said, you couldn't be in more than one place at a time?**

A. Correct.

**Q. But you had ultimate authority over those domiciles?**

A. Correct.

**Q. But you then said at some point Minneapolis got its own chief pilot? Was that sort of an upgrade? Did the domicile grow as far as number of flights that warranted having a chief pilot on site?**

A. I don't recall if Minneapolis had a full chief pilot or an assistant chief pilot initially during the opening.

**Q. Now does it have a chief pilot?**

A. Yes. Minneapolis has a chief pilot and two supervisors as operations staff on site.

**Q. In August of 2016, what position did you move into?**

A. Company chief pilot/director of flight operations.

**Q. So you're now over all of the regional chief pilots and chief pilots beneath them? Is that correct?**

A. Yes.

**Q. Let me just ask directly, what are your job duties as company chief pilot/director of --**

A. There are numerous job duties that are listed. You may have access to the listing SB3100. But in general, my position is to fulfill the Part

119 chief pilot responsibilities for the company as well as maintain oversight of the pilots to assure compliance with policy procedures and ultimately -- or maintain safety of operations.

**Q. And what physical location do you work out of now?**

A. My primary work location is headquarters. However, I also work out of -- as needed, I move around the system to other domiciles as well.

**Q. Headquarters is in St. George?**

A. Headquarters is St. George, Utah.

**Q. You have been designated to answer questions about attendance issues, and we sort of have a catch-all category, impact on other pilots if Cassell had been hired and not required to fly on the Sabbath. Is that correct?**

A. Say that again, please.

**Q. You've been designated as the person to answer certain questions regarding attendance and then some sort of catch-all other issues regarding the impact on other pilots if Cassell, my client, had been hired. Is that correct?**

A. I presume so. That's the reason for this deposition.

**Q. Well, what were you told was the reason**

**for your deposition today?**
A. I'll answer yes to that.
**Q. Yes to what? That --**
A. What you just asked me.
**Q. Okay.**
MR. PETERSEN: Do you want to restate that?
MR. STRINDBERG: No, that's fine.
**Q. (By Mr. Strindberg) What have you done to prepare for this deposition?**
A. Just general briefing as to the deposition process and what my function would be.
**Q. Did you review any documents?**
A. I actually looked in the attendance policy at SP3006, which I actually review quite often.
**Q. Okay. Anything else you looked at?**
A. Just the general pilot policy manual.
**Q. Okay.**
A. Well, you've seen that as everything from reserve policy to attendance to everything for the pilots.
**Q. Just opening a document here. Okay. So let me ask a general question, and maybe we can drill down on some stuff. I assume that SkyWest requires its pilots to fly their assigned flights. Correct?**

A. Yes.

**Q. But I assume at times that pilots for one reason or another cannot fly a flight, don't want to, whatever. How does SkyWest handle that?**

A. Well, can you be more specific?

**Q. Well, I guess, first of all, if a pilot doesn't show up or calls -- well, let me start from the beginning. If a pilot's not able to fly a flight, a line, what are they supposed to do?**

A. Well, those details, we have a very specific reliability program that outlines the process for the pilots. You're asking if a pilot cannot fly a trip today, what would he do?

**Q. Correct. What is the process that they're supposed to do?**

A. The pilot would contact that crew support, which is our scheduling department, and/or OCC, the Operations Control Center. But the primary point of contact would be crew support to let them know they are unavailable.

**Q. And where is crew support located?**

A. In headquarters in St. George.

**Q. And when the pilot contacts crew support, is he or she asked any information or asked why they're not allowed to -- or not, not allowed -- why**

**they're unable to fly a trip?**

A. Well, that depends on who takes the call, what they ask. I don't know what they're asking with each call. But the pilot policy directs the pilot to provide a reason for their absence, which would be illness, emergency, fatigue, for example.

**Q. Okay. So if a pilot has called in, he or she says they can't fly, what happens next at SkyWest as far as covering that flight?**

A. Well, the crew support department, scheduling, will utilize resources to prevent the cancellation of set flights. Notably, a reserve is called if available. There are different things that they will have to do depending on the situation, but they will work to cover the flights.

**Q. What different things would they have to do to cover a flight other than calling a reserve?**

A. Call a reserve if available. And if a reserve is not available, they have some other resources they could try, which are not always successful. They could post a trip in open time to be picked up if there's somebody that's available and willing to pick that up on an off day. They can reflow other pilots' trips so they're not flying their planned schedule, they're flying something

different to cover for the person that was absent. It's not as simple as just calling a reserve.

**Q. But the first thing they would try to do is see if there was a reserve at that domicile to cover that flight; is that correct?**

A. Correct.

**Q. And I gather -- maybe you don't know this, but we've been told that in 2017 most of the new pilots coming out were being assigned to either Minneapolis, Detroit, or Chicago as their domiciles. Are you -- do you understand that to be the case?**

A. Those are known to be more junior domiciles.

**Q. More junior? Is that what you said?**

A. Yes.

**Q. And what do you mean by "more junior"?**

MR. PETERSEN: Hold on. I want to make an objection first, Roy. If I'm going to make an objection -- I don't know if you can hear me, Todd or Roy, but just make sure I get my objection in before you respond.

I want to object that this is outside the scope of his 30(b)(6) testimony.

Okay, go ahead. If you can answer it, go ahead.

THE WITNESS: Okay. Restate the question, please.

**Q. (By Mr. Strindberg) You said that Chicago, Minneapolis, and Detroit were referred to as junior, more junior domiciles. What do you mean by that?**

A. Traditionally, yes.

**Q. What do you mean by that, though, "more junior"?**

A. Pilots that are new to the company are likely to be assigned one of those locations based on their seniority.

**Q. Why is that?**

MR. PETERSEN: Objection. Same objections.

MR. STRINDBERG: Scott, can we -- don't answer that question. Scott, let me just go to this gallery view. I understand what he's been designated to talk about. It sounds to me like, though, the witness yesterday, there were certain questions that the witness could not answer, specifically how many new or additional pilots had been assigned to these three domiciles, how many pilots had been transferred out, changes in seniority, those type of things. It seems to me like, because of Mr. Glassey's experience

with the company, that he might be able to answer those questions. And I think since the witness yesterday could not answer those questions, that I should be allowed to question him about it.

MR. PETERSEN: The questions you asked yesterday were statistical questions. It wasn't -- that was just whether he knew those actual numbers. And -- I mean, you can ask Mr. Glassey. If he knows the answer, he can answer them, but he's not here to testify on behalf of SkyWest as to those topics. So --

MR. STRINDBERG: Well, but Scott, this is what I'm asking you about. Your witness yesterday could not answer certain questions about those domiciles, pilots going in, flights and whatnot. It seems to me that Mr. Glassey is really the person who should have been designated to answer those questions. So what I'm asking is if I may question him about that as part of this 30(b)(6) deposition. If not, we'll just notice his deposition up for another time.

MR. PETERSEN: Well, like I said, you can ask Mr. Glassey the questions. It's outside the scope of what he's been designated to testify about. I have not discussed those issues with Mr. Glassey at

all, and I don't know what he knows. So as I understand the federal rules, you can ask Mr. Glassey in his individual capacity if he knows the answer. If he does, he can state the answer. But he's not being designated as a SkyWest representative on those topics.

MR. STRINDBERG: Yeah, but the person you designated could not answer those questions, and that's why we kept the deposition open.

MR. PETERSEN: I understand what you're saying. I don't think -- I mean, ask Mr. Glassey. I'll be shocked if Mr. Glassey knows the statistics that you asked yesterday. That's not something people have in their head. And that would be something that would be a big test of memory, even to have a 30(b)(6) witness that has that information in their head. But go ahead and ask him. If he knows, he can answer it.

I think what you want, Erik, are the answers to interrogatories. I mean, ask us the questions and we can get you -- we can do the math and analyze the data to pull the statistics that you asked yesterday and provide those to you in response to an interrogatory. That's the appropriate method. I'm not trying to be difficult. I'm saying what you

want are numbers based on statistics that vary over time, vary over location; and I would be very shocked if Mr. Glassey knows that in his head. Go ahead.

MR. STRINDBERG: He might have a pretty good idea. I don't expect him to know, you know, absolute numbers. And as I said, we will send you some interrogatories and requests for production of documents on those topics that were not answered. But it seems to me that Mr. Glassey might be able to answer some of these questions, and I think that they should be part of his 30(b)(6), since Steve-O yesterday could not answer them.

MR. PETERSEN: Well, like I said, I'm not going to change that position, because that's not what we -- that SkyWest has prepped him to testify about. If he knows the answer and it turns out it's the correct answer, then, you know, we can forego you needing to send an interrogatory on it. But I'm not going to agree today right now that he's the SkyWest company representative on the topics for which he's not designated. That's all I'm saying.

MR. STRINDBERG: SkyWest had an obligation, though, to designate someone who can answer all of those questions, and Mr. Spagnolo was not able to answer all of those questions. So yeah,

I'm asking, basically, if you will designate him to answer questions that Mr. Spagnolo was not able to answer.

MR. PETERSEN: And the answer is right now, no, I'm not going to say that he's the new SkyWest designee when we've not even had the chance to explore that with him. I mean, as you just indicated, Erik -- look, I'm not trying to be tough, difficult to you here. But you know how this works. And SkyWest gets to designate its employees, its representatives and talk to them; and if it needs to explore with that witness what they know or what they need to learn, then it will do that so that you get the proper -- the proper answers that you need.

MR. STRINDBERG: But Scott, you failed to do that in regards to a number of the topics we designated. I'm trying to save everyone time, okay? Maybe Mr. Glassey knows some of this information. Maybe he can help us ask the right questions in regard to some of this information. I'm trying to save you time, trying to save me time. I'm trying to save Mr. Glassey time. I assume he has better things to do than sitting for depositions.

MR. PETERSEN: Well, like I said, ask him the questions. And if his answers at the end of the

day we can analyze with SkyWest and it turns out that he's right, then I have no problem going back meeting with you and saying, hey, the testimony that Mr. Glassey gave was correct, and we'll allow that to be designated as 30(b)(6) testimony. But I can't say that now without -- without any kind of preparation ahead of time. So that's -- I think that's a fair compromise.

MR. STRINDBERG: Thank you.

**Q. (By Mr. Strindberg) Okay, Mr. Glassey. We were talking about Minneapolis, Chicago, and Detroit domiciles, and you said they're referred to as junior domiciles. I think you then said -- I asked you why they're referred to as more junior domiciles, and you said younger -- or new pilots, I should say, are assigned to those domiciles. Is that correct?**

A. Well, in many cases, yes. In general. However, it's all based on seniority. Pilots put in their preference, and seniority dictates their assignment.

**Q. But when someone's in training, I know they designate which domiciles they'd like to go to, but then the company assigns them a domicile out of training. Is that correct?**

A. Domiciles are awarded based on seniority requests.

**Q. Right. But for a training class, it's the seniority within that training class is how they're assigned. In other words, if the person with the most seniority in the training class wants to go to Detroit, he or she would get that choice. Correct?**

MR. PETERSEN: Let me just make a -- so we don't re-argue this, I'm going to object to this whole line of questioning as it's outside the scope, given the discussion we just had. I just don't want to be viewed as having waived my right to object.

Does that make sense, Erik?

MR. STRINDBERG: Agreed. Agreed.

MR. PETERSEN: Okay.

**Q. (By Mr. Strindberg) I'm more interested, Mr. Glassey, in people coming out of training classes, okay? I understand we covered transfers between domiciles for established pilots. But someone coming out of training class, yes, they use the seniority within the training class to give people their choices or not give them their choices; but generally SkyWest will decide which domiciles new hirees are going to be assigned to. Correct?**

A. Well, what do you mean SkyWest will

decide? SkyWest doesn't decide. The seniority system decides.

**Q. Decides which domicile. We were told that in 2017 the new hirees from this class in the middle of 2017 were all sent to either Detroit, Minneapolis, and Chicago. That's something that SkyWest decided, correct?**

MR. PETERSEN: Hold on. Objection. Mischaracterizes the prior testimony.

**Q. (By Mr. Strindberg) You can answer.**

A. The way you framed up the question, I'm not -- not sure I understand your question.

**Q. What don't you understand?**

A. Well, perhaps restate the question for me. Restate your question.

**Q. We were told that in the summer of 2017 new hirees, new pilot hirees for SkyWest after they got out of training were sent either to Detroit, Minneapolis, or Chicago. And what I asked was is it true that it was SkyWest that decided that those new hirees would go to one of those three domiciles?**

MR. PETERSEN: Objection. Vague and ambiguous; mischaracterizes prior testimony.

**Q. (By Mr. Strindberg) Go ahead and answer, Mr. Glassey.**

A. I'm not looking at the class awards or the domicile awards of 2017. I would have to look at those awards. But the awards are based on seniority, and within the -- I don't remember what we had in 2017 -- 20 domiciles when there were openings. I always put in their preference. They're screened by seniority and awarded on seniority. So I don't know how else to answer your question accurately.

**Q. Well, why is it, then -- SkyWest has told us this; this information has come from SkyWest -- that in 2017, that class in the middle of the year, all of the hirees went to Detroit, Minneapolis, and Chicago. Are you saying that every person in that class wanted to go to one of those three cities?**

A. I'm not saying that.

MR. PETERSEN: Hold on. I want to object. Look, I'm okay with you asking him questions relative to the items that you claim Mr. Spagnolo didn't respond to yesterday. But he testified to all of this stuff yesterday. This isn't a spot for you to try to get different testimony from a different 30(b)(6) witness who wasn't designated on this topic.

MR. STRINDBERG: I am not trying to get different testimony, Scott. I'm trying to lay some foundation for some of these questions about pilots

who have been transferred in and out of some of these domiciles. That's all.

MR. PETERSEN: Ask him -- ask him the numerical questions you had yesterday, and if he can answer them, you can ask how he knows. But this doesn't seem to me to get there. What it looks like to me is you're just trying to get him to testify to the same things that Mr. Spagnolo already testified to.

MR. STRINDBERG: No, I'm not.

MR. McFARLAND: Let's take a break and let Erik and I talk. Okay?

(Recess from 10:18 a.m. to 10:30 a.m.)

**Q. (By Mr. Strindberg) Mr. Glassey, I apologize. I think we were speaking past each other before we took a break. Let me try to clarify what I was trying to get at. Is my assumption correct that it's SkyWest that decides how many pilots are needed in each domicile?**

A. Well, are you asking me if SkyWest makes a business decision on how many pilots are needed to support the flying out of each location?

**Q. Yes.**

A. Well, certainly.

**Q. So if in 2017 the hirees, as I said, we**

**were told all went to Detroit, Minneapolis, or Chicago, I gather that that's where SkyWest decided that it needed additional pilots. Is that correct?**
A. I don't know where everybody went in 2017.
**Q. I'm representing to you -- SkyWest told us that all the hirees, at least from the middle of 2017, went to those three domiciles. Was that because that's where SkyWest needed additional pilots, additional first officers?**
A. Again, I don't know where specifically everybody in 2017 was assigned as a new first officer. But, you know, per your previous question, the company knows where or determines where personnel staffing is needed. So the bidding system works and, based on seniority, pilots get assigned where they're left to be assigned. Not everybody gets their first choice.
**Q. Do you know where -- which domiciles SkyWest needed additional pilots in in 2017?**
A. Not without extensive historical research, I don't know.
**Q. Since you were over those areas, at least until 2016, do you know if Detroit, Minneapolis, and Chicago needed additional first officers in 2016 and 2017?**

MR. PETERSEN: Objection. Lacks foundation. Speculation. Go ahead.

Same objection as the continuing one, by the way, just because we took a break.

MR. STRINDBERG: That's fine.

MR. PETERSEN: Okay.

THE WITNESS: Well, again, I would have to look at -- do some research, quite frankly, to give you accurate numbers, which I don't have off the top of my head. But pilots were certainly assigned to those domiciles.

**Q. (By Mr. Strindberg) And is that because they were needed in those domiciles? Is that why they were assigned there?**

A. We wouldn't assign a pilot to a domicile they're not needed in.

**Q. Were those three domiciles growing, and by that I mean having more flights in the 2016-2017 period?**

A. I'd have to -- I can't answer that without looking at numbers. Domiciles grow. Domiciles grow and shrink continually based on several factors. So I can't answer that question with any specific data.

**Q. I don't need specific data. I'm just trying to get a feel, Mr. Glassey, if Minneapolis,**

**Detroit, and Chicago in that 2016-2017 time period were generally growing as far as the number of flights out of each domicile.**
A. Again, I would have to look at data, but probably. We've had growth in those areas.
**Q. And, again, and this all started, you had said that those domiciles tended to be more junior. And what did you mean by that?**
MR. PETERSEN: Objection. Asked and answered.
Go ahead.
**Q. (By Mr. Strindberg) Go ahead.**
A. Well, newer pilots generally would be assigned to the domiciles that -- so a junior domicile, that's just a slang phrase for a domicile that generally has pilots of lower seniority. And those are generally lower domicile seniority.
**Q. And why were those three domiciles, as you say, referred to as -- slang as "junior domiciles"?**
MR. PETERSEN: Objection. Lacks foundation. Speculation. Go ahead.
**Q. (By Mr. Strindberg) Go ahead, Mr. Glassey.**
A. I just answered that.
**Q. I guess the way to ask this: why were**

**there more junior pilots being assigned to those domiciles in 2016 and 2017?**

A. Well, we would have to ask the more senior pilots why they did not want to be domiciled in one of those locations when they had a chance to bid for them.

**Q. Do you know how many new or additional first officers were assigned or transferred into Detroit, Minneapolis, and Chicago in 2017?**

A. No.

**Q. Do you know how many pilots, or specifically first officers left or were transferred out of those three domiciles in 2017?**

A. I don't know that.

**Q. Were there more first officers being assigned or transferred into those three domiciles than were leaving those domiciles in 2017?**

A. I don't know.

**Q. You don't know if the domiciles were growing or not is what you're saying?**

A. It depends upon the month and the year. It's very dynamic.

**Q. And what causes that change -- why is it so dynamic? What causes that?**

A. Our partners -- well, we have a flight

schedule to maintain with our partners, and when they give us more flying we need more pilots. When they -- the flying from one location to another, based on the schedules, we need to just assure that we have adequate staffing in each location where the flying is.

It's -- it's very common in the airline business that one domicile that has a lot of flying one month can shrink and flying can move to another domicile. On the other side, it can grow. Flying moves around with the market.

**Q. Huh. Okay. Do you have any idea how many of the pilots in those three domiciles -- Detroit, Chicago and Minneapolis -- were required to take flights that included flying time between Friday sundown and Saturday sundown near 2017 to 2020?**

A. I don't know.

**Q. Do you have any idea --**

A. Are you asking me how many pilots were required to fly on a time frame?

**Q. Yes.**

A. Many were scheduled initially to protect the schedule. I don't have a number for you.

**Q. Are Saturdays busy days or slower days, generally, for flights?**

A. Saturdays, I don't know if Saturday is different, but there's substantial flying on Saturdays. Seven days a week there's substantial flying being covered.

**Q. Do you know how in 2017, 2018, in those three domiciles how quickly a first officer would move up the seniority list for that domicile?**

A. That's impossible to answer without other information. It depends on attrition, it depends on the flight schedule that month, depends on the projected flight schedules. I can't answer that question accurately. We've had periods here where pilots who expect to be on reserve for a very limited time frame end up being on reserve for several years, such as back in the 2009 era when there was a slowdown in the aviation business. So I can't answer that question accurately.

**Q. Is there a slowdown -- I assume there's a slowdown in the aviation business this year. Correct?**

A. Certainly.

**Q. Prior to this year, 2017, 2018, 2019, was the aviation business generally growing?**

A. In which area?

**Q. Again, Detroit, Chicago, and Minneapolis.**

A. I don't know. I'd have to look at historic data to see what the previous requirements were based on the requirements of the time frame you're mentioning. But we were hiring pilots.

**Q. Which, I gather, means that there was need for more pilots, which means there was more flights in that period of time. Is that correct?**

A. There are several factors that affect the need for pilots -- attrition, flight schedule. There's other things that affect the need for pilot numbers, but attrition was driving a need for pilots.

**Q. What was causing the attrition --**

MR. PETERSEN: Objection. Lacks foundation.

**Q. (By Mr. Strindberg) -- in that three-year period?**

A. What do you mean what was causing the attrition?

**Q. Well, I assume that attrition can -- people get too old to fly, people die, people move to other airlines. That's what I mean. That's what I'm asking.**

A. Yes, all of the above.

**Q. Was there one factor that was causing the attrition more than other factors?**

A. I'd have to look for -- look at the detail for accuracy, but we had attrition for pilots going to other carriers, other positions. Again, I can't answer that with any accuracy without referring to a report.

**Q. No, and I understand that, Mr. Glassey. I'm just assuming that as a chief pilot you have sort of a feel for what's happening with your pilot group. So I'm not asking you to give me, you know, a specific number, 67 percent left because of this reason. I'm just asking generally what your understanding was as to why pilots were leaving.**

A. General drivers were pilots leaving for positions with other carriers, different types of carriers. There were positions opening up in these other carriers due to many things. We do know about some retirements because of mandatory retirement age that created positions at the other carriers that some of our pilots would choose to seek employment at those other carriers. Again, a multitude, but probably more industry movement.

**Q. Do you have any idea in these three domiciles we've been talking about -- Detroit, Minneapolis, and Chicago -- how long a first officer coming out of training could expect to be on reserve**

**status?**

A. I don't know.

**Q. Is that information available anywhere?**

A. It's dynamic, but reserve status -- the expectation, and this is -- I don't -- unfortunately, this is anecdotal, but the expectation is reserve lasts several months. That's the expectation.

**Q. Uh-huh.**

A. New pilots expect to be on reserve for several months in a more junior domicile. If they coincidentally live in one of those more junior domiciles, that's a better situation than somebody that does not reside in that particular geographic location, and they have to commute and set up housing and other things to be available.

**Q. The expectation was at least several months is what you're saying?**

A. Could be.

**Q. In 2017, do you know -- were any of these first officers who were coming out of training in those three domiciles, were any of them going directly to bidding on lines, bidding on routes, or were they all going to reserves?**

A. I don't know. If any received a line it would be an anomaly, but I don't know specifically.

**Q. Okay. I'm going to show you a document. Can you see this document, Mr. Glassey?**
A. I can, yes.
**Q. Is this the pilot reliability policy you were referring to before?**
A. Well, this is the section in our pilot policy manual that addresses the pilot reliability program.
**Q. I have a couple of questions. And this is part of the policy manual that you reviewed prior to this deposition; is that correct?**
A. Yes. I review this entire policy fairly often.
**Q. Is it your responsibility as the chief pilot to determine if a pilot is going to be disciplined for being -- for missing flights?**
A. Ultimately, yes.
**Q. So this is really the crux of what I'm asking, want to ask you about. It says here: "Excessive occurrences and schedule assignment deviations." What is an occurrence, first of all?**
A. Well, I believe it's defined in here. An occurrence is an absence from duty.
**Q. So someone not flying an assigned flight, is that an occurrence?**

A. If somebody is absent, unable to come to work or late or otherwise disruptive in the schedule -- well, the best way to describe it is right out of the policy here. It's --

**Q. Is that these various items here?**

A. Absences, correct. So "occurrence" is used just as a phrase that if somebody is unavailable to work, it's an occurrence.

**Q. And if an occurrence occurs -- I apologize for that -- does someone then get a schedule assignment deviation, a SAD?**

A. It depends on the reason for the occurrence. The SADs are defined. The schedule assignment deviation is a type of an absence. It could be a late report, it can be failure to show up, it can be calling off absent within I believe it's 30 minutes of the scheduled report time. Those are coded as SAD, S-A-D. There are different codings for different absence types. SAD is just one of those codings.

**Q. Okay. And I'll just go down here. I believe SADs are covered --**

A. There it is, yeah.

**Q. Right. So if a pilot -- you said -- say a pilot can't make a flight because he or she is sick.**

**Would that result in a SAD?**
A. No. That would result in a sick call.
**Q. What if a pilot were to drop -- or not show up for a flight or notify crew scheduling that he could not fly at a particular day because it was his Sabbath? Would that result in a SAD?**
MR. PETERSEN: Objection. It's vague and ambiguous.
THE WITNESS: A SAD is very specifically defined here. A SAD is an absence coding for one of these items. So if somebody is unavailable for any reason within -- you know, and they notify crew support late, that would be coded as a SAD. If they notify -- it says there in subpart E, or line E, a pilot calls in sick no sooner than 30 minutes before is required, whether they want to go golfing, fishing, whatever they want to do, even if they are sick, based on your previous question, technically that would be a SAD if they call off sick or ill within 30 minutes of their report time.
So SADs have to do with those items that are listed there specifically. An absence is an absence. However, absences are coded differently based on the nature of the absence.
**Q. (By Mr. Strindberg) And who does the**

**coding?**

A. Initially, it's crew support who receives the call.

**Q. Okay. And you said "initially." What happens after the crew support gets the call and fills out a SAD? Who does it go to at that point?**

A. Well, it goes in the pilot's reliability history page. And there are reports that can be drawn to review reliability, which is a daily operation of the chief pilots, and they would see who's called off absent and the reasoning.

**Q. So in Minneapolis and Detroit where you said you, at least initially, had assistant chief pilots, are those the ones who are looking at these reliability reports?**

A. All the full-time chief pilots and assistants as necessary in their particular areas of oversight.

**Q. At what point would a pilot receive discipline for being absent, for missing a flight?**

A. Well, that could happen on the initial call. It depends on the nature of the absence.

**Q. Well, this lawsuit involves -- our client is a Seventh-Day Adventist and will not fly between Friday sundown and Saturday sundown, his Sabbath.**

**What if he had been hired and called in and said, I can't fly this flight because it is on my Sabbath? What kind of a SAD would that be coded as?**

A. That wouldn't be -- the problem is it doesn't matter what the reason is. If a pilot is able to fly but refuses to, that's in violation of our pilot policy manual.

**Q. Okay.**

A. If he calls and says, I'm going fishing on Saturday or I'm going golfing on Wednesday. If they're able to fly, they have an obligation to meet and they won't meet it, it's a willful disregard for the reliability program which they've agreed to. So it could be the first instance that they would receive discipline.

**Q. And what type of discipline would they receive, say, on a first occurrence of that kind of call-off?**

A. Well, we look at each absence, each on its own merits, look at extenuating circumstances. But if it's simple disregard for a schedule based on something else -- well, we have a pilot -- they're scheduled to fly and they just choose not to; they're able to fly, they're scheduled to fly, and they decide not to fly, that could result in termination.

**Q. On the first occurrence?**
A. It could.
**Q. Does it generally?**
A. Generally what we try to do is -- we'll refer to human resources for something that -- like what you described. But if a pilot just states that they have a reason that they cannot fly and they don't fly, we just toss it over to human resources to determine if there's something else. But if somebody just doesn't want to fly because it's Wednesday, they're obligated to fly. They have to maintain a schedule.
The point is we have employees that have an obligation, and they need to meet that obligation. If they can't meet the obligation, we'll look at individual circumstances; And if it's something as you described, we send it over to human resources. They're trained to look at how to deal with these.
**Q. When you say something that I described, you mean where a pilot calls off because of religious beliefs?**
A. Well, that's what you mentioned. In my view, I'm looking at just a pilot calling off for any reason. So we look at each absence, and if it's in the area that you mentioned, we refer it to human

resources.
**Q. Do all missed flights result in human resources being called, or just certain types?**
A. Well, there are certain things that are out of our area of expertise. So if I have a pilot that calls me and states that he has a -- he just doesn't want to fly because he's riding a motorcycle on Tuesday afternoon, that's not something I would send to human resources. If there's something that goes beyond that, as you described, I would refer it to human resources.
**Q. Have you ever had a situation where a pilot has said he couldn't fly on a particular day because of religious observance?**
A. Yes.
**Q. More than one?**
A. I don't recall. I just -- I remember -- I vaguely remember one, and I just referred it to HR.
**Q. And what was the circumstance? What do you remember about that occurrence?**
A. I don't remember specifically. Just, the pilot needed a day off for an observation, and I said -- I referred it to human resources.
**Q. And do you know, was that pilot disciplined for that?**

A. I don't -- I don't recall what led up to that specifically. But it was -- it was just dealt with by HR.

**Q. Let me have you look at -- while we're looking, let me look back at this policy, Mr. Glassey. Under "Attendance" it says "unnecessary and/or excessive occurrences from duty are considered failure to assume responsibility." Is what constitutes an excessive occurrence defined anywhere? I haven't seen it in your policies.**

A. Excessive, again, we look at the individual circumstance. One could certainly be excessive if it's irresponsible. If it's something the pilot's been counseled, disciplined, and then it continues, it becomes excessive. If you're looking for just a number, there are too many variables.

However, a pilot illness, pilots cannot fly when they are ill. That's against regulations and safety practices. Pilots must be fit for flight. If they're not fit for flight, they call off sick. Those would be excused, certainly. And we can request a, quote, doctor's excuse if need be if there are excessive sick calls, to determine if the pilot is misusing the attendance policy.

**Q. You said "we." You used the term "we."**

**Who makes those determinations of whether something's excessive or something's excused?**

A. Well, the pilot's supervisor, their assigned chief pilot reviews these.

**Q. So if Mr. Cassell, for example, had been assigned to Detroit, that would be the assistant chief pilot located in Detroit would look into the reasons for his absence?**

A. It could be, yes, under direction of the region chief pilot as well.

**Q. When you were regional chief pilot over that area, would you be notified by your assistant chiefs when someone was absent?**

A. Possibly, yes. Most likely, because we all look at the same absence reports. So I would know at the same time the assistant would know.

**Q. And are those absence reports generated daily?**

A. Yes. They're continuously generated.

**Q. Okay. Let me look at -- let me just pull up another document here. I've pulled up policy 3024, "Corrective Action and Employment Separation." Are you familiar with this policy?**

A. I am.

**Q. And reading through this -- well, in**

introduction it says: "List of factors which might affect the chief pilot's decision-making process," and that's in reference to level of discipline. The term "chief pilot," is that referring to the chief pilot or assistant chief pilot at the specific domicile?

A. It is referring to the chief pilot who will work in coordination with his assistants, his staff.

Q. So when you were the regional chief pilot, you would be the one who would decide if someone should be disciplined and what level of discipline?

A. Yes.

Q. And then you have -- there's categories of inappropriate behavior, and there's several categories, A through F. Are you familiar with those categories?

A. I am.

Q. And if someone were to call off, say, I cannot fly because of religious observance, which category would that fall under?

A. If that was -- I would send that over to human resources for review.

Q. And who in human resources would you interface with?

A. Employee relations is the first point of contact.

**Q. Is there a specific person there?**

A. Well, there's a team.

**Q. So there's no one person you call?**

A. Well, there are those we work with, you know, and that varies, but there's -- you have a director of human resources. There are also the managers of -- I'm sorry; director of employee relations, and then there are the managers of employee relations. So I can give you a list of names that are there today. Is that what you're asking?

**Q. Well --**

A. I would contact the position of manager of employee relations contact.

**Q. Are the managers of employee relations assigned geographic territories? Is that how you would decide who to call?**

A. I don't -- I don't know how they assign them. They generally have somebody that is working with each department, but I don't know their structure.

**Q. And once the matter was referred to human resources, specifically a pilot calling off for**

**religious observance reasons, what would happen then after human resources was informed?**

A. Are you asking me what human resources would do?

**Q. Well, what you know. I mean, if you know what human resources does, you know, that's fine; you can answer it. But what, as far as you know, would happen next? In other words --**

A. My understanding is employee relations would -- an HR team would engage in the interactive process to determine if they can make a -- or if a reasonable accommodation can be made.

**Q. Okay. And would they inform you as the chief pilot what was going on?**

A. I don't understand your question. You mean during the interactive process or the conclusion?

**Q. Both, during the interactive process and the -- once it was done.**

A. Well, I'd have to defer to them regarding the details of the process. I presume they would -- during the process if information is needed, I would presume that they would do whatever they needed to do to seek information. But at the conclusion I would be informed whether a reasonable accommodation was

made or not or what the accommodation was. I would just follow their direction.

**Q. Would HR also tell you as the chief pilot which category of inappropriate behavior that call-off fell into?**

A. That's really not what -- I don't think that's relevant here. They would let us know if there is a reasonable accommodation and what it is or not.

**Q. And if there was not, what would happen? What would you as the chief pilot do at that point?**

A. Well, we would treat the absence based on its -- the circumstances surrounding the absence.

**Q. Right. What I'm trying to get at is there's these different -- under these policies there's what are called -- well, first of all, it starts out, it talks about the chief pilot and the decision-making process. That decision-making process is referring to the disciplinary process, correct?**

A. Well, the decision-making processes refer to the appropriate corrective action for the infraction.

**Q. Okay. So -- and then -- we use the term "corrective action." And then it goes on that**

**there's categories of inappropriate behavior, and there's six different categories. And you said in the situation I gave you where someone calls off for religious observance reasons, you would refer it to HR; they would, you think, engage in the interactive process. Would they -- say they came back and said there was no accommodation we can make. Would you as the chief pilot then decide which category of inappropriate behavior this fell into?**

A. Well, again, we would determine the appropriate level of corrective action if the pilot -- if it's determined the pilot is obligated to fly that schedule, we would notify the pilot and likely document -- we would document that in a corrective action document to assure that -- and provide counsel and coaching to assure that pilot knows what the obligation is.

**Q. Right. The levels of corrective action are next. There's verbal warning, written warning, letter of instruction, counseling statement, suspension, and separation. Is it up to -- when you were chief pilot, or now your replacement is chief pilot, regional chief pilot, were you the person that would decide what level of corrective action was warranted if someone missed a flight for religious**

**observance reasons?**

A. Well, again, what you stated would be referred to HR. And if that pilot is obligated to fly the schedule as assigned, it doesn't matter what the reason of the absence is; they failed to comply with the reliability program. If there's a reasonable accommodation made, we assist with that pilot's, you know, helping them with fulfilling their needs with the accommodation.

But to answer your question, it doesn't matter why they're not there. If there's no accommodation that applies, we would follow the reliability program. And if you look at the levels, it's self-explanatory. There are several levels of corrective action that we would select, based on the circumstances.

**Q. And who decides which level to select of the corrective action?**

A. Well, it says in the policy the chief pilot, and that would be in conjunction with me. So we work together. I work with the region chief pilots, and we determine what's appropriate corrective action for the circumstance.

**Q. What does SkyWest typically do -- and I understand, Mr. Glassey, that there's different**

**reasons why people might call off. Some might be, you know, a better excuse, you know, than others. But say someone just calls off and it's an unexcused absence. Typically, what would SkyWest do on the first occurrence?**

A. Well, it -- again, I need more detail to answer that. But we could do anything up to and including termination. The deciding factor is if a pilot is able but not willing, that becomes -- that moves into the realm of insubordination. If a pilot is willing but unable, we would look at the circumstances. For instance -- well, it's really that simple.

**Q. Okay. Have you as chief pilot ever disciplined someone or fired someone the first time that they fail to take a flight, even though they're able to do so but they're unwilling?**

A. I don't remember. Likely there have been several terminations. I'd have to look back. But it's very unusual that we have a pilot who -- it's very unusual for any pilot to state they're just not going to fly, and they're able but unwilling.

**Q. What I'm trying to get at -- and I understand what you're saying that there's different variables, obviously, so you can't have a firm rule.**

**But generally, does SkyWest give someone a chance? In other words, if you miss a flight, there's no good reason for it; in your words, you're able but unwilling to take the flight, would you typically issue first a counseling statement to that person, or would you go directly to termination?**

A. It depends on the circumstance.

**Q. Have you ever terminated someone after they miss one flight?**

MR. PETERSEN: Asked and answered.

Go ahead.

THE WITNESS: Again, I'd have to look back. I've been doing this for several years, and we have terminated pilots for failure to comply with reliability.

**Q. (By Mr. Strindberg) Right. I'm just trying to understand at what level of failure to comply with reliability would you terminate someone?**

A. Well, I've answered that. Insubordination. You know, when reliability -- noncompliance to the reliability program is just part of an insubordination act. That pilot would be terminated. We don't tolerate insubordination.

**Q. If a pilot were to say, I can't fly because of my religious beliefs, would you consider**

**that to be insubordination?**
A. I would refer that to human resources.
MR. PETERSEN: I want to object. It calls for a legal conclusion.
**Q. (By Mr. Strindberg) You said that HR would look to see if there could be an accomodation. What if HR came back and said, there is no accommodation? You as chief pilot then have to decide, as you told us, that you have to decide if it warrants discipline. So what I'm asking is under those circumstances, HR has come back and said there's no accommodation we can grant for this pilot, would you consider that pilot's refusal to fly for religious reasons insubordination?**
A. I would consider that pilot's refusal to fly if they are willing -- or, I'm sorry -- if they are able to fly but just unwilling and outside of our requirements and there's no accommodation, I would consider that refusal to fly, and that would be an unexcused absence for whatever reason. They don't have an accommodation not to fly. So they're able, they're just unwilling. So that is treated consistently.
**Q. Okay. I'm just asking -- you said it's treated consistently. What would typically happen on**

**the first occasion?**

MR. PETERSEN: Objection. Asked and answered.

MR. STRINDBERG: Well, he hasn't answered it.

**Q. (By Mr. Strindberg) Let me ask a better question. If someone decides they want to go golfing and calls off, says, I'm not going to take this flight because I'm going golfing, you consider that to be the same as someone who says, I can't take this flight for religious reasons?**

MR. PETERSEN: Objection. Calls for a legal conclusion.

Go ahead.

THE WITNESS: In that case there's a pilot who is scheduled, has an obligation, who is able but unwilling, would result in corrective action.

**Q. (By Mr. Strindberg) So is the answer to my question yes, that you would consider those to be equivalent?**

MR. PETERSEN: Same objections. Go ahead.

THE WITNESS: If a pilot is scheduled and unwilling to meet their obligation for any reason, that's an unexcused absence and it requires corrective action.

**Q. (By Mr. Strindberg) Okay. So is the answer to my question you would treat a pilot who calls off for -- because they want to golf the same as someone would calls off for religious reasons, you would treat those the same?**

MR. PETERSEN: The same objections; asked and answered. Go ahead.

THE WITNESS: I've already answered that question. We have a pilot who has an obligation, they're refusing to meet their employment obligation, requires corrective action.

**Q. (By Mr. Strindberg) Someone who calls off to golf versus someone who calls off for religious reasons, would they receive the same level of discipline?**

MR. PETERSEN: Same objections. Now, you've asked that question -- I know you don't like his answer, but it's still an answer. He's answered it about four times.

MR. STRINDBERG: He actually hasn't, but the question stands.

**Q. (By Mr. Strindberg) Would they warrant the same level of discipline?**

A. When a pilot refuses their obligation, they're subject to corrective action.

**Q. I'm asking if they would be subject to the same level of corrective action. There are six levels of corrective action in the policy. That's all I'm asking.**

A. Well, is this the first occurrence? Second?

**Q. Yes.**

A. Third? They would be -- yeah.

**Q. Yeah what? They would be treated the same?**

A. Well, we have a policy, and we apply it fairly and consistently. So the answer is yes.

**Q. Okay. Thank you.**

**And in the past, in your experience, have you generally fired someone for their first unexcused absence?**

MR. PETERSEN: Objection. Asked and answered.

**Q. (By Mr. Strindberg) You can answer, Mr. Glassey.**

A. Well, again, I don't remember. Possibly. I'd have to look back at records.

**Q. That was one of the questions we asked, whether there's a certain number of assigned flights a pilot can miss or not take without being**

**disciplined; and I'm just wondering if there's a pattern. In other words, someone's late in my office, okay. If it happens once or twice, it's not a big deal. If it's a consistent issue, it becomes a bigger deal and may warrant discipline up to termination.**

**I'm just wondering if there's some -- whether it's formal or informal, if there's some -- you as the chief pilot, if you have some practice that you follow. In other words, you give someone one free miss, so to speak. They do it again, then they're terminated. That's all I'm getting at.**

A. Okay. Well, again, there are levels of discipline in our step corrective action process, and we can move to any level that's appropriate for the infraction. So one absence that's unexcused could, in theory, end up in termination. We would more likely counsel, correct, and define expectations for that pilot moving forward; and then if it continues or it occurs again, it would likely end up in a higher form of discipline, potentially termination.

**Q. Okay. That's what I was getting at. Would you consider before termination suspending that pilot for some period of time? Have you ever done that?**

A. Policy requires that, so we would suspend and then review the case.

**Q. And who does the review of the case?**

A. Well, the pilot's supervisor. Employee relations, if need be.

**Q. And then decides what after they review the case?**

A. We determine the appropriate level of corrective action, based on the facts of the individual case.

**Q. A suspension, though, without pay is one of those possible levels of corrective action, correct?**

A. It's possible, yes.

**Q. Have you as chief pilot used that level of corrective action?**

A. Oh, I'm sure I have. I've used administrative leave, suspension, both with and without pay. Normally it's with, while it's under review, and then we adjust pay status if need be.

**Q. When you were the regional -- well, even now, when you're a regional chief pilot, now as the chief chief pilot, I mean, is it -- who has the most influence on the level of discipline? Is it the chief pilot who is located at the domicile, or are**

**you the person that makes the final decisions regarding discipline or corrective action?**

A. I'm not sure what you mean by "who has the most influence."

**Q. Well, in other words, does the -- say the missed flight happens in Detroit and there's an assistant chief pilot there. Does that assistant chief pilot make a recommendation that goes to the regional pilot that then goes to you? What's the sort of process by which you decide what level of corrective action to take?**

A. Well, the process is I would -- we would discuss the occurrence and then follow the standard -- follow the process to gather the facts, investigate. I'm not sure what you're -- are you asking without -- without authorization from me?

**Q. Well, I'm trying to find out the process. In other words, some companies, the immediate supervisor can recommend discipline, and the next level supervisor then has to approve it. In other companies the immediate supervisor can't recommend or decide on discipline; it has to come from higher up. So I'm just trying to find out who actually makes the actual decision as to what level of discipline or, in your terminology, corrective action is applied.**

A. Oh. Ultimately it would be me. And the assistants who have front line supervisory duties would certainly report the facts and assist with their chief pilot and ultimately me on what the appropriate follow-up would be.

**Q. Okay. So it's sort of a group process is what you're describing?**

A. Well, we assure we follow the appropriate channels and make sure that the discipline or corrective action is fair and consistent and accurate and within policy.

**Q. Are there records kept anywhere? You talk about fair and consistent. Are there records kept anywhere which would -- that you can look at and say, oh, in this prior case we did X, Y, and Z?**

A. Well, certainly records are kept.

**Q. When you're faced with a situation, some policy violation, whether it be a missed flight or something else, you keep talking about you want it to be consistent. Is there something you can refer to which will show you what you or SkyWest has done in other similar situations?**

A. Well, we have records on each employee that contain details on everything an employee record would contain.

**Q. Right. But you talk about discipline being consistent. In other words, am I correct in saying that you want employee B to be treated consistently with employee A? Is that what you're saying?**

A. Well, I said that we -- we use fairness and consistency in our policy application. Are you asking if there's a benchmark for missed days or if we keep records on personnel? I'm not sure I understand what you're asking me.

**Q. Well, how do you make sure that the level of corrective action you use is consistent between different pilots?**

A. Well, we apply it as the policy guides us to.

**Q. Right. But the policy doesn't tell you which level of corrective action to use. It says that the chief pilot decides. So I'm just trying to decide if there's -- or find out how you as the chief pilot determine or make sure that the discipline you're giving to a pilot is consistent with what you've done in the past.**

A. Well, the policy, and we read that, the policy does provide guidance to review the individual circumstance, if there are extenuating

circumstances -- I'm paraphrasing, but it provides for that, so we do that with each individual. We don't look at circumstances with one pilot and ignore circumstances with another pilot.

**Q. Right. I guess I -- what are you not understanding what I'm asking? In other words, when you used the term -- let me see if I can explain myself. You used the term you want discipline to be consistent. That to me means that you want it to be consistent between pilots who do the same thing. So I'm just wondering how you make sure you're consistent between pilots so that you don't discipline one pilot more harshly than another pilot.**

A. We apply the policy consistently. We come out -- now, are you asking if I compare --

**Q. Yes --**

A. -- a current case with a previous case?

**Q. Yes.**

A. We can.

**Q. Do you do that?**

A. We can, yes.

**Q. And are there records kept which allow you to make the comparison? I mean, do you have a chart somewhere which shows for people who missed one flight we generally give them, you know, level four,**

**counseling statement? Is there some records you have that you can refer to?**

A. We have individual pilot records that we can look at for similar infractions.

**Q. But there's no -- it's not been compiled somewhere that you can look at; you have to go to the individual files?**

A. Well, we have several sources of information. Are you focused on any infraction or attendance?

**Q. Attendance. That's what we've been talking about.**

A. Okay. With attendance we actually have a -- we have several information sources. We have a daily report. We can pull a report for any time frame, and that will show -- one benchmark we use is the 12-month running total of absences, and we can see if the pilots are above or below the company-wide average.

But then we would need to look at individual pilot records to see what the circumstances were, because with -- there's multiple different circumstances regarding absences. So we would take a look at -- we can take a look at those if need be.

But if you're asking for a chart that I go in and I put in three absences here and move up to the sick column and it indicates something, that's too simple. These are people that we need to work with to determine what drove the absence, to determine if the absence was driven by willful negligence, insubordination, illness -- the list goes on.

**Q. Thank you. Okay, let me go on to another topic which I think should be fairly quick. And the question that's posed -- I'll just read it. It says: "What would the impact on other pilots be if Cassell had been hired and not required to fly on the Sabbath?"**

**In other words, if you had granted his request for religious accommodation, and "you" being SkyWest, so that he didn't have to fly on the Sabbath, what would the impact be on other pilots?**

A. Well, it could be extensive. The circumstance, regardless of the reason for not flying on a Saturday or that time frame, we would have a pilot who does not have the seniority, based on our collective bargaining agreement, which is our pilot policy manual, that pilot that is granted that exception not to work on that specific day would --

it would require somebody else would have to work that for him. It would be out of seniority order, so it would be in breach of the policy that our nearly 5,300 pilots follow and live by.

So not only would it be a seniority violation, there is a domino effect. A reserve pilot would have to be called to cover the trip that is now open for that particular reason. If there's no reserve pilot to call, we would have to call in others on their off days and pay overtime. We would disrupt multiple -- potentially disrupt multiple other schedules trying to amend schedules, reflow pilots to get the flying covered if we did not have a reserve pilot. It's a simple breach of seniority, and it's unfair to everybody that's senior to that pilot.

**Q. Have you ever been in any situations where pilots believe there's been a breach of seniority in regards to bidding trips?**

A. There have been questions, yes. We're not bidding trips, to answer your question.

**Q. Well, for bidding trips. In other words, where a pilot says, hey, look, I have more seniority than this other pilot; I wanted this trip but he got it. Has that type of situation ever come up?**

MR. PETERSEN: Hold on. Objection. It's outside the scope.
Go ahead. Go ahead, Roy.
THE WITNESS: Again, that scenario would cause severe disruption to that pilot that feels that seniority was breached. It's a situation where a pilot who's compliant with our policies and seniority system has been wronged if that happened. So we don't do that. We follow the policy.
**Q. (By Mr. Strindberg) In 2016 when Mr. Cassell applied for a job, he asked for an accommodation of being excused from flying on the Sabbath. Did anyone consult with you about that to see if it would be possible to accommodate that request?**
A. I don't recall being consulted about that, no.
MR. STRINDBERG: Okay. Let's take a break, then we can wrap this up.
MR. PETERSEN: How long?
MR. MCFARLAND: Ten minutes.
(Recess from 11:34 a.m. to 11:45 a.m.)
**Q. (By Mr. Strindberg) Mr. Glassey, a couple of things I need to clarify. You talked about that there was some report that you can look at that**

**showed company averages regarding absences. Is that correct?**

A. Yeah. There's a couple things. There's a report that we can pull that just shows who's absent and what their counts are; but there's a report that all the pilots get that shows them their reliability specifically, and it shows them the company-wide average as well.

**Q. So it's two different reports, you're saying?**

A. Well, there's reports that we use as managers to track pilots, and then pilots actually have access to see what their particular performance is for attendance. Again, we use "reliability" and "attendance" interchangeably.

**Q. And the reports that the managers use regarding reliability or attendance, does that have a name, that report?**

A. I guess crew reliability.

**Q. So if we -- the reason I'm asking is this is a document we may want to ask SkyWest for. So if I were to ask for the managers' report on crew reliability, that would be sufficient so that SkyWest would know what I'm looking for, this report that you've stated?**

A. I'm not sure. It's a tool that we use to track reliability, so I'm not sure if it would serve your purpose as a report or not. But it's what we can do to look and see who was absent yesterday or last month or whatever.

**Q. But I gather -- you said there was some report that sort of tracks so you could look at averages, like, over what, a 12-month period, something like that?**

A. Well, it's just a raw average of total missed days. But, again, those days, every day has a specific circumstance, and that's not reflected in this report. This report just shows a name, a number.

**Q. So, what, it would have like Joe Jones, three absences, that type of thing? Is that what you're saying?**

A. It could, yes.

**Q. And for what period of time is that report? I mean, do you do it by year or month, or what?**

A. We look at it daily to see who called out absent throughout the day. We can look at it throughout the day. You know, we track attendance, and that's one of the tools we use to see if our

people are coming to work or not.

**Q. Right. But I thought -- the way you made it sound like is that there was some report that would give you company averages for absences over some period of time.**

A. The pilots, they select a link on their particular -- on our SkyWest Online page, and it shows a graph that shows their absence count in the last 12 months.

**Q. Okay.**

A. And it totals -- just a count, just to give them an idea of how many days they've missed. Emergency code, sick code, SAD code, other absences such as fatigue or -- they're not in there. But it just shows them. And, again, it's just a raw number with no detail.

But it also shows the company-wide average. For instance, I think last time I looked at it, it was 5.3 days. And that average could be anything. That's sick days where pilots cannot legally fly because they're physically ill. So if somebody gets the flu or -- well, the flu's a great example. If a pilot has a four-day trip, two days off and then another four-day trip and they can't fly those trips, that will show eight absences. But

# Exhibit H

Exhibit H

# Remote Deposition of

# Todd C. Emerson



Date: October 2, 2020

Case: Cassell vs. SkyWest, Inc.

Civil No: 2:19-cv-00149-jnp-dao

*Reporter: Susette M. Snider, CSR, CRR, RPR*

ASSOCIATED REPORTING & VIDEO

*Next-Level Litigation Support*

The Owyhee
1109 Main Street, Suite 220
Boise, Idaho 83702

Phone: (208) 343-4004
Facsimile: (208) 343-4002
production@arvboise.com
arvboise.com

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | | |
|---|---|---|
| SHANE ANDREW CASSELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 2:19-cv-00149-jnp-dao |
| vs. | ) | |
| | ) | Judge Jill N. Parrish |
| SKYWEST, INC., d/b/a | ) | Magistrate JudgeDaphne A. Oberg |
| SKYWEST AIRLINES, | ) | |
| | ) | |
| Defendant. | ) | |
| ______________________________ | ) | |

REMOTE DEPOSITION OF TODD C. EMERSON

October 2, 2020

Salt Lake City, Utah

Repored by: Susette M. Snider, CSR, CRR, RPR

REMOTE DEPOSITION OF TODD C. EMERSON

BE IT REMEMBERED that the remote deposition of TODD C. EMERSON was taken via videoconference by the Plaintiff before Associated Reporting & Video, Susette M. Snider, Court Reporter in and for the County of Salt Lake, State of Utah, on Friday, the 2nd day of October 2020, commencing at the hour of 10:03 a.m. in the above-entitled matter.

APPEARANCES (Remotely):

For the Plaintiff: STRINDBERG & SCHOLNICK, LLC
By: Erik Strindberg, Esq.
1516 West Hays Street
Boise, Idaho 83702
Telephone: (208) 336-1788
Facsimile: (208) 287-3708
erik@utahjobjustice.com

ASSOCIATED GENERAL COUNSEL
GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS
By: Todd R. McFarkabd, Esq.
12501 Old Columbia Pike
Silver Springs, Maryland 20902-6600
Telephone: (301) 680-6321
Facsimile: (301) 680-6329
mcfarlandt@gc.adventist.org

For the Defendant: FABIAN VANCOTT
By: Scott M. Petersen, Esq.
215 South State Street, Suite 1200
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
spetersen@fabianvancott.com

P R O C E E D I N G S

TODD C. EMERSON,

called as a witness, having been first duly sworn remotely, was examined and testified as follows:

EXAMINATION

BY MR. STRINDBERG:

**Q. Please state your full name.**

A. Todd Covey Emerson.

**Q. And your current address?**

A. Work?

**Q. Sure. That's fine.**

A. 444 South River Road, St. George, Utah 84790.

**Q. May I call you by your first name?**

A. Please.

**Q. So, Todd, I imagine, I could be wrong, that you're fairly familiar with depositions, so I'm not going to go over the preliminaries with you.**

**How long have you been with SkyWest?**

A. Seventeen years.

**Q. And what position do you currently hold with SkyWest?**

A. I'm the director of government and legal

affairs.

**Q. And have you always had that position, Todd?**

A. Yes.

**Q. What involvement, if any, do you have with -- I guess you guys call it the employee relations department?**

A. Yes.

**Q. What involvement do you have with that department?**

A. Generally employee relations works independently of me, but when they run into problems that require legal advice or when a lawyer pops up in one of their cases, then they will walk it over to me seeking legal advice or hand the case off to me to communicate with counsel for the employee or whoever is grieving.

**Q. Okay. Are you the only attorney that SkyWest has, in-house attorney?**

A. Yes.

**Q. And who -- who is the director of employee relations currently?**

A. Casey Madsen, spelled with a C.

**Q. Is that a man or a woman?**

A. That's a man.

**Q. And was Casey Madsen the head of employee relations in 2016 and 2017?**

A. Yes.

**Q. And I assume that Mr. Madsen is located in St. George along with you somewhere?**

A. Yes. We're in the same building.

**Q. How did you become involved in the Shane Cassell issue on his request for accommodation?**

A. I believe my first involvement was when I was contacted by employee relation manager Coy Bryant, who told me he had been contacted by a lawyer representing Mr. Cassell.

MR. STRINDBERG: Let me pull up -- it's offering to give me a tour. I don't want a tour.

MR. PETERSEN: Hit the share screen.

MR. STRINDBERG: Yeah, I want to make sure I have the right screen. Okay.

**Q. (By Mr. Strindberg) Todd, can you see this? This is an Email, I believe, from Alan to Coy Bryant. Were you shown this Email?**

A. Yes.

MR. PETERSEN: Hold on. What time period are you talking about? Are you talking about the time that Coy first spoke with him, Erik?

MR. STRINDBERG: Yeah. I was just about

to get to that. Thanks.
MR. PETERSEN: All right.
**Q. (By Mr. Strindberg) Do you recall when Coy Bryant first contacted you about Mr. Cassell and his request for an accommodation?**
A. I am estimating. I don't have a specific independent recollection, but I'm estimating that Mr. Bryant contacted me on December 5th, 2016, and showed me this Email from Mr. Reinach. That would have been my first involvement in the matter.
**Q. And what did Mr. Bryant tell you about the Shane Cassell situation?**
**Q. He told me that he had received this Email from Mr. Reinach, and I asked him to -- he explained the case to me, and he told me that a trainee pilot, who was a Seventh-Day Adventist, had asked for guaranteed Saturday-free work -- I should say sabbath free, as he counts his sabbath from Friday sundown to Saturday sundown, and that they had gone through the interactive process, "they" being Mr. Bryant, consulting with Jake Whicker, who is a trainer in Salt Lake City, and Mr. Cassell to talk about the rigors of the training course and line flying and what accommodations should be made to help him avoid sabbath work, but that they could not guarantee he**

**would never be assigned Saturday work, that he would thereafter have to decline for some reason and have a conflict with his requirement to be able to fly.**

**Q. Did Coy Bryant use the word "guarantee"? In other words, did he say that Shane was asking him to guarantee that he wouldn't work on the sabbath?**

A. I don't recall if he used the word "guarantee." The conflict boiled down to there were certain instances where Mr. Cassell would be willing to violate his sabbath and others where he would not; but after talking about the reasonable accommodation, the tools, the scheduling, the systems available to him at the end of that process, Mr. Cassell indicated that it was insufficient for his needs and he would still run afoul of his sabbath if that system did not produce a schedule or a result where he was free from sabbath labor.

**Q. Did Mr. Bryant, when he talked with you, tell you what reasonable accommodations and tools that he and Jake Whitaker [sic] had talked with Shane Cassell about?**

A. Jake Whicker, W-i-c-k-e-r [sic].

**Q. Yes. Sorry.**

A. Yes.

**Q. What did he tell you they said to**

**Mr. Cassell about possible accommodations?**
A. He said they discussed the preferential bidding system and seniority scheduling systems used by SkyWest from the first day of training that flowed into line flying and the tools available in those systems to add, drop, swap, trade, bid-avoid, use vacation, all of the different avenues you could adjust -- I'm sorry -- that you could request a particular schedule, and if that schedule was undesirable, you could use other tools to modify that schedule. That's what he discussed with Mr. Cassell.
**Q. And he relayed this to you when he talked with you on or about December 5th?**
A. Yes.
**Q. And I gather that neither Coy Bryant or Jake Whicker are still with SkyWest. Is that correct?**
A. Coy Bryant is not with SkyWest. I don't know about Jake Whicker.
**Q. And what position did Jake have?**
A. He was a training instructor in Salt Lake City. I don't know his specific job title, but he would have led other trainers and supervise them as they ran training classes. He might have done some training himself.

**Q. Did Mr. Bryant, when he talked with you -- first of all, was that an in-person conversation with Mr. Bryant?**

A. Yes.

**Q. And where did it take place?**

A. Right here in this office.

**Q. Did Mr. Bryant discuss with you or tell you what the issue had been when Mr. Cassell was in training?**

A. Yes.

**Q. What did he tell you in that regard?**

A. He told me that Mr. Cassell had been scheduled for matrix training, and that training would violate Mr. Whicker's sabbath because it began on a Friday afternoon or evening and was scheduled to continue past sundown Friday, that Mr. Cassell was unwilling to do that because it violated his religious tenet of not working on the sabbath.

**Q. Did you ask Mr. Bryant if he and Mr. Whicker had explored options for rescheduling that matrix training?**

A. Yes.

**Q. And what did Mr. Bryant say when you asked him?**

A. Mr. Strindberg, I don't recall.

**Q. Erik, please. We've known each other for a while.**

A. Erik, I don't recall. It's either Mr. Bryant or Mr. Whicker who answers my questions about how matrix training -- and I would think Mr. Whicker as the person who conducts it. So whether I got this information from Mr. Bryant or Mr. Whicker, I was informed that the training was tightly scheduled and regulated, that it was done with a partner. You sat at a computer screen that was very close to a flight simulator, but not a flight simulator, and you and your partner working together as a mock flight crew operated this matrix computer for several hours together as a team and that this training needed to be unbroken because immediately the class moves on to the next thing. So rescheduling it would not just mean rescheduling Mr. Cassell but also another classmate who would need to sit with him and operate the matrix in tandem.

They also told me, and I knew independently, that even missing one day of training, particularly at the early stages, would require the trainee to reboot and start over. For example, if they called in sick that day and said, I have the flu, they would not reschedule that class. That

trainee would be pulled from class and then would have to restart training at another class in the future, to highlight the rigorous-type, fast, compacted nature of training to get these pilots on line as fast as possible.

**Q. I gather from what you're saying that at some point you talked with Jake Whicker. Is that correct?**

A. Yes.

**Q. And I'll represent to you that the response -- and we'll look at it in a moment -- your response to Alan Reinach was dated December 8th, 2016.**

A. Yes.

**Q. Does that help you place when you talked with Jake Whicker?**

A. Yes.

**Q. When did you talk with Jake?**

A. Sometime between December 5th and December 8th.

**Q. Was Coy Bryant involved in that conversation when you talked with Jake?**

A. I don't recall if he was present when I telephoned Mr. Whicker.

**Q. Go back for a moment to Coy Bryant, the**

**conversation you had with Coy Bryant. Is there anything you recall discussing with Coy Bryant on or about December 5th, 2016?**

A. Not that I can recall at this moment.

**Q. Did Coy show you any of the documents that had been created back when the training issue came up?**

A. Coy came into my office with his file.

**Q. Okay.**

A. In that file there was paperwork. I can't remember, as I sit here today, what I examined with him on December 5th. I have at some point seen the memorandum of accommodation that was signed by Mr. Whicker and by Mr. Cassell. That might have been on December 5th, Erik. It might have been sometime after. I can't tell.

**Q. Okay. I appreciate that.**

**Let me just show you a couple of documents. Maybe that will refresh you. Do you remember if this was one of the documents that you were shown by Coy Bryant on or about December 5th?**

A. I don't recall if this is one of the documents I saw on December 5th.

**Q. Let me scroll up through it. Included with it is this -- and if you can't read it, I can**

**blow it up again -- is the request for religious accommodation that Mr. Cassell had filled out back in November. Did Coy show you that document on or about December 5th?**

A. Yes.

**Q. Let me show you another document. Did Coy show you this document on or about December 5th?**

A. I believe so.

**Q. I gather from what you're saying, Todd, that you were not consulted about this memorandum of agreement back in October of 2016?**

MR. PETERSEN: Hold on. I just want to caution the witness.

Don't testify about any attorney-client discussions that -- the fact of being consulted is fine, but don't go any further.

**Q. (By Mr. Strindberg) Unless you want to, Todd.**

MR. PETERSEN: I'm instructing you not to go any further.

MR. STRINDBERG: I understand.

THE WITNESS: I'm going to take a minute and read this.

**Q. (By Mr. Strindberg) Okay.**

A. There's nothing I can tell you about this

document. I don't know who wrote it, whether it was Mr. Bryant or Mr. Whicker. Our standard procedure would be for Mr. Bryant to write it in consultation with Mr. Whicker for accuracy and also a plain understanding of how things work in CRJ training and flight operations.

I sometimes review documents like this for a legal consult. I don't remember if I was involved, if I reviewed or edited or gave any legal advice on this document. It's possible, but I don't have an independent memory of being involved with either reviewing or editing or commenting on this document. I do know clearly that it was reviewed by me at least as early as December 5th.

**Q. So what you're saying is you don't remember if you were consulted back in October, but you did review this document prior to responding to Alan Reinach's Email?**

A. That's true. It would be -- it wouldn't be uncommon for Coy to walk something like this to me and say, Would you look at it; this is a tough one. But I don't know if he did. I don't remember. For me the memory sparks at the start of the Reinach Email, my involvement in this matter.

**Q. Okay. I want to highlight here the phrase**

**"domicile staffing." Did Mr. Bryant talk with you about domicile staffing?**

A. Yes.

**Q. And what did he say about domicile staffing?**

MR. PETERSEN: For clarification, we're talking about that December 5th time frame?

MR. STRINDBERG: Yes. Thank you, Scott.

THE WITNESS: Domicile staffing relates to post-training and line flying employment. And so when me and Mr. Bryant spoke about that, it would have been in relation to what happens after training. Like I said, I didn't write this, but my understanding as I read this is they're communicating to Mr. Cassell that they're talking about scheduling him as a pilot, not in addition to training, but what he's going to encounter over the course of his career. We're not hiring trainees. We're hiring pilots, of course, to go out and fly.

**Q. (By Mr. Strindberg) Did he explain, though, what he meant by domicile staffing?**

A. Well, if your question is did we talk about this document and ask -- did I ask him what he meant by domicile staffing when he wrote it, I don't remember a conversation like that. When we talked

about a reasonable accommodation, what had been done so far for Mr. Cassell and what could be done in the future, we certainly discussed domicile staffing.

**Q. And what in regards to domicile staffing? In other words, how would that affect -- well, did you discuss how domicile staffing might affect someone's ability to avoid working on the sabbath?**

A. We did.

**Q. And what did you and Coy discuss?**

A. I don't have an independent recollection of what we discussed with domicile staffing. But Coy had been with SkyWest for maybe two to three years at that point, and I had been with SkyWest maybe 15, 14 at that point. I wanted to make sure he understood how domicile staffing worked. He's focused, of course, on fixing the training problem, but do we also understand as we divide any kind of accommodation for him that when he hits his first domicile, he will be a reserve with no schedule, typically has to work what other pilots are unwilling or didn't want to work, called in for sick days. And it's going to have an impact certainly on weekends. So having -- making sure that Coy understood, and he did, what happens next with trainees when they enter line flying.

**Q. Is it your understanding that in some domiciles -- I think Mr. Glassey has talked about junior domiciles -- that pilots move up the seniority list more quickly than other domiciles.**
A. How pilots move up the seniority list is independent from which domicile they're at. The concepts are not related.
**Q. I understand. But the bidding for lines with flights is done by domicile, correct?**
A. Correct.
**Q. And in some domiciles I assume that there's more pilots leaving, which would affect your ability to bid a better line, better flights, correct? People above you on the seniority list are leaving their domicile, correct?**
A. Yes.
**Q. And, also, when a domicile is adding a lot of junior pilots with less seniority than you, that would also impact your ability to bid lines, correct?**
A. Yes.
**Q. You didn't discuss that with Coy, though?**
A. I don't recall.
**Q. Let's go -- okay. One other document I want to have you look at. Did Coy show you or did Jake Whicker show you this Email which was between**

**Whicker and Cassell?**

MR. PETERSEN: Which Email? You're not showing us anything, Erik.

MR. STRINDBERG: Ah. Sorry. I forgot.

MR. PETERSEN: By the way, I just want to point out, too, I'm not sure you're identifying by Bates number the items you've shown so for, so I don't know what kind of record we're going to be looking at.

THE WITNESS: We'll start over. Let's just scratch and go back to 10:05.

MR. STRINDBERG: Thank you, Scott, for telling me.

In that regard, the document that I showed to Todd first, which was Alan's Email, Alan Reinach's Email to Coy Bryant dated December 4th, is marked CASSELL 6. We then looked at the form that had -- well, let me just pull it up. We then looked at what was Exhibit 6, which is SkyWest 17 through 19, and that is the Email that Shane wrote along with the request for religious accommodation that he made.

And then we were looking at -- we were talking about the memorandum of agreement for religious accommodation request. We were looking at Exhibit 14, which was SkyWest 21.

Thank you for pointing that out, Scott. It's easy to forget that we're not here in person.

Okay. I've now pulled up the document which is CASSELL 425, and let me go back in my notes here. Scott, do you remember offhand what exhibit number we're up to? I have -- the last one I have was Exhibit 22, which is SkyWest --

MR. PETERSEN: Yeah, I think that's right. I think this would be 23.

MR. STRINDBERG: Okay. So we will mark this exhibit, again, CASSELL 5 -- 4 through 5, as Exhibit 23.

(EXHIBIT 23 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) Did Mr. Bryant or Mr. Whicker at some point show you this Email chain, which is now Exhibit 23?**

A. At some point, yes.

**Q. Do you recall when?**

A. I do not.

**Q. Was -- was it on or about December 5th, or did you see it at some later point?**

A. I couldn't tell you.

**Q. And is it your understanding that Mr. Cassell was told that if he didn't resign -- that if he didn't show up for the matrix training, that he**

**would be fired?**
A. No, that's not my understanding.
**Q. What is your understanding?**
A. My understanding is that Mr. Whicker explained what happens when a pilot misses a key training event, that typically that pilot has to restart at a different training class maybe weeks or months down the road. It could end up with a termination if they don't come back to class and don't want to be rescheduled. But by missing a key training event, it couldn't be made up in that training footprint but would cause a reboot somewhere down the road.
**Q. Did Mr. Whicker tell you that he had told Mr. Cassell that?**
A. Yes.
**Q. The reason I ask is -- let's look at this. Shane wrote to Jake Whicker on December, and he said:**
**I'm emailing you just to clarify what happened Wednesday afternoon regarding my resignation.**
**And he goes on from there. Do you want to take a moment to read that?**
A. Yeah. Would you give me --
**Q. Yes.**

A. Okay. I've read it.
Q. Okay. The key -- you know, he -- Mr. Cassell lays out what had occurred, but then he says here:

I wanted to clarify with you that if I had, indeed, left at sundown on Friday in the middle of a matrix section, my employment with SkyWest would have been terminated.

So he asked Mr. Whicker that, and then Mr. Whicker writes back to him and discusses a number of things, how they had signed this letter regarding the religious accommodation, discusses then how you were assigned to report to and attend the shift that began Friday -- begins tonight Friday, 12/2, at 1600 or 4:00 p.m. and would end at 1800, 6:00 p.m., and how this training is required. It must be completed in its entirety.

And then he says here:

Had you continued your employment and didn't report to work to complete the assignment, your employment would have been terminated as this is a required job function.

Did Mr. Whicker tell you that he had told Mr. Cassell something else, the something else being that if he didn't complete it, he would have to start

**training again?**

A. My discussion with Mr. Whicker about what happened, he said that Mr. Cassell had come to him and said he was unable to work out a trade with another pilot or use the tools available to him to get out of the Friday evening training and that he didn't understand -- he'd been able to work around it before, but it wasn't working this time; that Mr. Whicker explained to him the importance of being in that class, that it was different than the other event he had circumnavigated and that he needed to be there or it would require him to either restart the training or be terminated, that it couldn't go past that point.

He said that Mr. Cassell was -- it was a quick meeting. He was emotional, maybe upset. It was understandable. This was a deeply held religious belief for him. He had -- it was sort of a rash resignation. He said, Okay, I quit, you know, and -- as an honorable expression of his faith, and that that was the substance of their exchange. It wasn't particularly long, but that he did tell him, If you miss the class, it's going to end your training. You're either going to have to restart or yes, you would be terminated.

**Q. All right. What I'm getting at, though, Todd, you know, this letter from Mr. Whicker -- in Email Mr. Whicker makes no mention of restarting training. It just says "would be terminated." So that's the difference. In other words, you know, between telling someone they would be terminated or giving them the option of starting training at a later date, that's a big difference.**

**Did you -- did you ever ask Mr. Whicker why he hadn't included this option of starting training at a later time in his Email to Mr. Cassell?**

A. Let me correct a little misconception there, Erik. When he says I have included a copy of the termination paperwork, Mr. Cassell had resigned. It's not that we made up our mind and, Here, you're fired. At this point Mr. Cassell had resigned, so Mr. Whicker is giving him a copy of the paperwork that comes along with a resignation and a termination of employment.

So if you're reading this as, we're done talking, you're fired, that's not it. He sent him the form again to continue this discussion with HR, to make that application, and -- and his paperwork that was consistent with that, he resigned a few days earlier.

And so -- and again, my understanding from discussing this with Mr. Whicker is that in their discussion about what would happen on Friday, he did highlight the importance to Mr. Cassell of not missing that class because it would end his -- it would end his training at this point. We couldn't go on without him, or he couldn't go out without us. So he'd have to either reboot or resign.

And I believe the resignation was the way to make it back to another class in the future, so he wasn't terminated for cause or for insubordination, but that he was eligible for rehire and could come back and try again if the schedule was better for him. That was my understanding from talking with Mr. Whicker.

**Q. Okay. So that's what Mr. Whicker told you that he had said to Mr. Cassell?**

A. Yes. The reason my mind goes there, Erik, is the resignation is his lifeboat to another class in the future, which was part of their discussion. The termination for insubordination, he would never be rehired or have a chance, likely, to work at SkyWest again; but this discussion of, well, you could resign and work in the future -- he was allowed to resign. I'll put it to you that way. In

Mr. Whicker's mind, that gave him the opportunity to try again in the future when they could work out another training footprint or scheduling footprint with him. That was the substance of our discussion.

**Q. But did Mr. Whicker tell Mr. Cassell what was in his mind regarding starting another training session?**

MR. PETERSEN: Objection. Speculation. Lacks foundation.

Go ahead.

THE WITNESS: I don't know.

**Q. (By Mr. Strindberg) And you said something -- did I understand this correctly, that Mr. Whicker indicated to you that he had told Shane that he could continue talking with employee relations about an accommodation?**

A. It was my understanding from talking to Mr. Whicker that he was hesitant to do this process without HR's involvement and that he had either asked Shane to reach back out to Coy or Whicker had reached out to Coy Bryant. But there was a discussion of -- I know Mr. Whicker was hesitant to simply end the training or terminate without getting involvement from HR. He -- he knew he was stuck with a situation he didn't have the training or background to resolve

on his own.

**Q. Did either Mr. Whicker or Mr. Bryant tell you that the two of them had talked on this right at the beginning of December about Mr. Cassell and the training issue?**

A. When Mr. Bryant briefed me on December 5th about the Shane Cassell matter, he told me he had been working closely with Jake Whicker and had consulted with him the week of the resignation.

**Q. Did he tell you what he and Mr. Whicker had talked about?**

A. Probably.

**Q. Do you recall what he told you that he and Mr. Whicker had talked about?**

A. Not today. Not at this point.

**Q. Is there anything that would refresh your recollection?**

A. Nothing comes to mind.

**Q. Did you ever ask -- the issue here, this matrix training that started at 4:00 p.m. and ended at 6:00 p.m, at that time of year, sundown is approximately at 5:00 p.m.**

**Did you ever ask Mr. Whicker if it would have been possible to move up the matrix training by an hour so that it started at 3:00 p.m. instead of at**

**4:00 p.m.?**
A. I don't recall.
**Q. These computers that this matrix training is done on, the facility where those computers are located, is that owned by SkyWest?**
A. The facility is owned by SkyWest, yes.
**Q. And does SkyWest control the scheduling for the matrix training?**
A. I don't know.
**Q. And where is that facility located, Todd?**
A. Salt Lake City, Utah, at the Salt Lake International Airport.
**Q. And is it still located there?**
A. Yes.
**Q. And do you know if the computers belong to SkyWest, the computers on which this matrix training is done?**
A. These training devices are extremely expensive, and I know that we own some and we lease some. And we lease from third parties and sometimes have to share with other carriers. I don't know if the matrix device falls into that category as other simulators do, but they can be tens of millions of dollars and thousands of dollars an hour to operate or lease. So whether we have sole control over

scheduling these devices or not I couldn't tell you, particularly in December of 2016, as I sit here today.

**Q. Okay. And who would be the best person to ask those type of questions to?**

A. David Moxham.

**Q. Who is David Moxham?**

A. He is the director of training for flight operations.

**Q. How is his last name spelled?**

A. M-o-x-h-a-m.

**Q. And where is he -- where does he work out of?**

A. I believe he resides in Denver, Colorado, and he's principally stationed at our Denver training facility, although he spends a good deal of time at the Salt Lake training facility.

**Q. Okay. So we started out -- I had shown you the Email from Alan Reinach to Coy Bryant that started this discussion, which is Cassell 6. Why don't we mark that as Exhibit 24.**

(EXHIBIT 24 WAS IDENTIFIED.)

MR. STRINDBERG: And, Scott, you and I, I think at some point next week, will need to probably sit and make sure we have all the exhibits properly

marked and identified, since --
MR. PETERSEN: Okay.
MR. STRINDBERG: -- it's been a little chaotic.
**Q. (By Mr. Strindberg) And if at any point you need a break, Todd, just tell me.**
MR. PETERSEN: I'm having a sinus headache or something, so I want to go take some drugs if I can at some point, so in the next 15 or 10.
MR. STRINDBERG: Let's take a break until eleven o'clock. Is that okay?
MR. PETERSEN: That's okay.
THE WITNESS: If my counsel needs drugs, can I switch to another lawyer, Erik? Will you allow?
(Laughter.)
(Recess from 10:52 a.m. to 11:09 a.m.)
MR. STRINDBERG: Okay. Let's go back on the record.
**Q. (By Mr. Strindberg) Okay. So we were -- we had started all this -- we were looking at -- and I will share the screen -- what's now been marked as Exhibit 24, CASSELL 006. Todd, you told us about the conversation you had with Coy Bryant; then you told us about a conversation you believe you had with Jake**

**Whicker on the phone. Have you told us everything that you can recall about your conversation with Jake Whicker?**

A. Yes.

**Q. Okay. I'm going to show you a document. It's a letter -- appears to be a letter dated December 8th, 2016. It's CASSELL 007 through 008. Let's designate that as Exhibit 25.**

(EXHIBIT 25 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) Todd, is this a letter that you authored? Is that your signature on the second page?**

A. I authored it, and that is my signature.

**Q. Prior to sending this letter, which is dated December 8th, 2016, to Alan Reinach, did you talk with anyone else besides Coy Bryant and Jake Whicker about Mr. Cassell?**

A. Yes.

**Q. Who else did you speak with?**

A. Sarah Wimberly.

**Q. And who is Sarah Wimberly? In other words, what position does she hold?**

A. She's a lawyer.

**Q. Is she employed by SkyWest?**

A. No.

**Q. Do you know who she's employed by?**
A. The law firm of Ford & Harrison.
**Q. And where are they located?**
A. Several offices across the country. She's in Atlanta.
**Q. What was the purpose for speaking with Sarah Wimberly?**
A. I was seeking her legal counsel.
**Q. You don't care, I imagine, to tell us what you and she discussed, do you?**
MR. PETERSEN: I direct you not to answer on the basis of attorney-client privilege.
**Q. (By Mr. Strindberg) Besides Coy Bryant, Jake Whicker, and Sarah Wimberly, did you speak with anyone else about Mr. Cassell and his request for an accommodation prior to sending this letter to Alan Reinach, "this letter" being Exhibit 25?**
A. I have no memory of speaking to anybody else.
**Q. In this letter you talk about the robust seniority system. I have that highlighted. What is your understanding of who developed the seniority system and when it started?**
A. My understanding is the pilot seniority system at SkyWest, it predates me, so it began in the

late '70s, early '80s as a way to schedule the pilots. I couldn't give you an exact date.

**Q. And so we're clear, there's this pilot association called SAPA?**

A. Yes.

**Q. SAPA does not have a collective bargaining agreement with SkyWest?**

A. It does. SkyWest and SAPA are subject to the collective bargaining agreement.

**Q. And have you produced that document to us?**

A. I don't know.

**Q. What is that document called?**

A. The Pilot Policy Manual, PPM.

**Q. So you believe that the Pilot Policy Manual is a collective bargaining agreement?**

A. Yes. Let me amend my answer. I know you have reviewed parts of our collective bargaining agreement with Mr. Glassey and Mr. Spagnolo; so I don't know if the entire thing has been produced, but you certainly have portions of it.

MR. PETERSEN: We have produced it.

MR. STRINDBERG: Right. I don't think there's any question there.

**Q. (By Mr. Strindberg) So it's your opinion that the Pilot Policy Manual is a collective**

**bargaining agreement?**
A. Yes.
MR. PETERSEN: Hold on. Objection. Calls for a legal conclusion.
Go ahead.
THE WITNESS: Same answer.
**Q. (By Mr. Strindberg) And let me explore that. Can SkyWest make changes to that collective bargaining agreement unilaterally?**
A. No.
**Q. To that policy manual unilaterally?**
A. No.
**Q. What is the process that SkyWest has to go through to make changes to that Pilot Policy Manual?**
A. Anytime management or the pilot group wish to alter one of the terms and conditions found in the collective bargaining agreement, one side or the other will call for a meeting. It's generally between the president of SAPA and his board and the members of management to oversee that policy issue, and they will bargain and negotiate for a change to the contract. It is not closed. It's open and amendable and can be changed at any time if the parties agree.
**Q. And what happens if the parties don't**

**agree on the change?**

A. Then there's no change.

**Q. Is SAPA recognized by any governmental agencies as a union representing pilots?**

MR. PETERSEN: Hold on.

Objection. Calls for a legal conclusion.

Go ahead.

THE WITNESS: What do you mean by governmental agency?

**Q. (By Mr. Strindberg) Well, any agency associated with either the federal government or the state government. Does anyone recognize SAPA as an independent union?**

MR. PETERSEN: Same objections.

THE WITNESS: You mean agency in the executive branch of the federal government?

**Q. (By Mr. Strindberg) Any branch of the federal government.**

A. I'm not aware of any agency recognizing SAPA as a union, no.

**Q. Let me show you another document, Todd. This is the Pilot Policy Manual or portions thereof, and I will designate -- it starts at SkyWest 389. And it's not continuous, but I will designate this as Exhibit 26.**

MR. PETERSEN: Hey, Erik, do you want to designate the entire manual as Exhibit 26 so that when we refer to it we can just refer to the pages?

MR. STRINDBERG: I was just going to suggest that. I don't have all the pages here, but let's agree that we will --

MR. PETERSEN: I do. Just let me -- just give me a second. Keep going, and I'll pipe in in a minute.

MR. STRINDBERG: Okay.

**Q. (By Mr. Strindberg) Todd, one other question about this policy manual. You said that if there was going to be a change, SkyWest would meet with the -- usually with the president of SAPA.**

**Who is the president of SAPA currently?**

A. Currently it is Aric Arnold. He spells it A-r-i-c.

**Q. I was thinking you were spelling Arnold there for a moment.**

**Okay. And do you know how long Aric Arnold has been president?**

A. I would estimate four years.

**Q. If you know, is the president of SAPA elected?**

A. Yes.

**Q. So you had said earlier that if SkyWest wanted to make a change in the policy manual that it would meet generally with the president of SAPA. Did I understand you correctly?**

A. Yes.

**Q. And if, say, the parties, you and Mr. Arnold, agree on some change, does that change get voted on by the members of SAPA?**

A. Sometimes.

**Q. When would it be voted on by members and when wouldn't it be voted on?**

MR. PETERSEN: Objection. Calls for a legal conclusion.

Go ahead.

THE WITNESS: My understanding is that SAPA has empowered its president and executive board to negotiate on its behalf and enter into agreements on certain policies which do not require an entire membership vote to ratify. However, anytime we negotiate pay and compensation, any change to the pilot pay package is put out to the pilot group for a ratifying vote.

**Q. (By Mr. Strindberg) The pay scale, though, is not contained in the Pilot Policy Manual, is it?**

A. I believe that it is.
**Q. Okay. So you believe that pay issues are voted on, but other changes to the Pilot Policy Manual are not subject to a vote by the membership?**
A. Erik, I don't know where SAPA draws the line between what it decides to put out to a pilot vote versus what it negotiates or is empowered to negotiate without a pilot ratification. I can tell you that issues of compensation always go out to a pilot vote, and they're sometimes bundled with other policy changes.
But I also know that the president of SAPA can -- he's authorized to sign a policy change on behalf of SAPA. Say it's three words in a paragraph that get changed. I have seen it where the president of SAPA has signed on behalf of the membership without asking 5,000 pilots to vote on a three-word policy change.
Does that make sense?
**Q. Yes. Thank you for the clarification.**
**Do all of the pilots at SkyWest belong to SAPA?**
A. Yes.
**Q. When you become a pilot at SAPA [sic], are you automatically enrolled as a member of SAPA?**

A. When you become a pilot at SkyWest, you are automatically a member of SAPA, yes.

**Q. And do the pilots pay dues to SAPA?**

A. They do not.

**Q. Who funds SAPA? In other words, like, I assume the president gets some money or some compensation for being president. Who pays for that?**

A. The president of SAPA's compensation is paid for by SkyWest Airlines.

**Q. And the president of SAPA, does he have duties other than being president of SAPA?**

A. The president of SAPA is a captain who is licensed and qualified to operate his aircraft and will fly from time to time to remain current on that aircraft and is compensated for line and revenue flying. But the majority of his time is spent doing SAPA business, so it is a hybrid of line flying pay and compensation for his full-time work at SAPA.

Does that make sense?

**Q. Yes. I missed a word you said. Is -- predominantly his time is spent on SAPA business? Is that what you were saying? You broke up there.**

A. Yes.

**Q. Are there any other members of the executive team of SAPA who also devote a predominant**

**amount of their time to SAPA business?**
A. I don't know.
**Q. The other people on the executive team or executive board at SAPA, are they also paid by SkyWest?**
A. Yes.
**Q. If SAPA feels that there's -- that SkyWest has violated the Pilot Policy Manual, does it have a right to file a grievance over that violation?**
A. Yes.
**Q. And who does that grievance get filed with?**
A. The vice president of flight operations.
**Q. And the vice president of flight operations, is that Mr. Glassey?**
A. No.
**Q. Who is that?**
A. Tracy Gallo.
**Q. Is that a man or a woman?**
A. That's a man.
**Q. And if SAPA does not like a decision that Tracy Gallo makes, does it have a right to go to arbitration, which would involve a hearing before a neutral hearing officer?**
A. We have not negotiated an arbitration

provision with SAPA in our CBA.
**Q. So the answer, then, is no, they cannot go to arbitration over a decision of Tracy Gallo's?**
A. It could. SkyWest would have to agree to arbitrate. There is no arbitration right found in the CBA.
**Q. Okay. Thank you.**
**Do the pilots at SkyWest have the right to strike if they're not satisfied with, say, the wage scale that's being offered?**
A. Yes.
MR. PETERSEN: Objection. Calls for a legal conclusion.
Go ahead.
**Q. (By Mr. Strindberg) I didn't hear your answer, Todd.**
A. Yes.
**Q. And has that ever occurred?**
A. Not to my knowledge.
**Q. And what would SkyWest do if its pilots went on strike? Would it fire them?**
MR. PETERSEN: Objection. Calls for a legal conclusion, speculation, and to the extent it involves attorney-client privilege.
MR. STRINDBERG: I didn't hear you, Scott.

MR. PETERSEN: Can you hear me?
MR. STRINDBERG: Yeah. I heard your objection, but there was something you added on --
MR. PETERSEN: Yeah. I just -- and to the extent it calls for attorney-client privilege. Are you saying whether they have the right to fire or whether that's a business decision that SkyWest would make? The first may be a legal conclusion, but it's not attorney-client. The second is.
MR. STRINDBERG: So are you instructing him not to answer?
MR. PETERSEN: Well, I want a clarification on your question before I instruct him. Are you suggesting in theory they have a right to fire them if they strike? Or are you saying would they, in fact, fire them if they strike?
MR. STRINDBERG: Well, I'm sort of asking both.
MR. PETERSEN: All right. Well, if I don't get clarification, I'm going to claim that it calls for attorney-client privilege and instruct Mr. Emerson not to answer.
MR. STRINDBERG: And you believe it's attorney-client privilege about whether they would fire a pilot who went on strike; is that correct?

MR. PETERSEN: Yeah. You're asking their legal counsel whether the company would fire its employees if they strike, and that's a legal -- that's asking him what his legal opinion would be about it.

**Q. (By Mr. Strindberg) Okay. Does the company have any policies regarding how it will deal with pilots that go on strike, any written policies?**

A. I don't know. It's possible.

**Q. But you're not aware of them, sitting there?**

A. I would have to do some research.

**Q. Okay.**

MR. PETERSEN: As a side note, before you move on, the Bates numbers for the Pilot Policy Manual are SkyWest 389 to SkyWest 586.

MR. STRINDBERG: Okay. And we'll make that -- when we get all of our exhibits together, we'll make that Exhibit 26; is that correct?

MR. PETERSEN: Yeah.

MR. STRINDBERG: Okay.

(EXHIBIT 26 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) Todd, I'm going to have you look in a second at part of that manual, policy manual. It's -- SkyWest 529 is the page**

**number. Let me share that with you. Okay. And it is titled "Seniority Standard Practice 3021."**

**Are you familiar with that provision in the policy manual?**

A. I am.

**Q. I want to draw your attention to Section 1A(3) and specifically this line which I've highlighted which reads:**

**Except as otherwise provided in this policy manual, seniority will govern all pilots in the case of upgrade, displacement, filling of vacancies, furlough, recall, or assignment due to expansion or reduction in schedule -- schedules.**

**There's no mention made there of seniority governing regarding bidding. Is there some provision somewhere in this manual that you're aware of in which it says that seniority shall govern in regards to bidding? I ask that because I could not find any such provision, Todd.**

A. Assignment due to expansion or reduction in schedules refers to the flight assignments that pilots receive every month. If the schedules -- let me just say this covers bidding, but I'm not aware -- I could do some research and look; but if you're

asking whether the word "bidding" appears in the Pilot Policy Manual, it's a huge document and I'd need to do some research.

**Q. So I understand your answer, you believe this last bit here that -- this last phrase, "assignment due to expansion or reduction in schedules," it's your opinion that that covers bidding rights? Is that what you were telling me?**

A. Among many things, one of the things that would fall under that would be pilot bidding for their schedules, yes.

**Q. All right. But you're not aware offhand of any specific language which says seniority will govern in the case of bidding?**

A. Not off the top of my head, no.

**Q. Okay. And let's go back to Exhibit 25, which is your letter dated December 8th. It says here -- let me highlight it here. This whole paragraph or sentence there, sentence fragment.**

**...over the course of his first few years of employment, when Mr. Cassell has low seniority, he will absolutely and unavoidably be required to work on Saturday and other holidays.**

**What was the factual basis for you saying that, Todd?**

A. There are two or three bases. First one, over the course of my employment at SkyWest, I've had occasion to interact with pilots as they wished to negotiate different terms of their collective bargaining agreement and improve their quality of life; and a constant refrain from new hire pilots is that it is next to impossible to get a weekend or a holiday off.

So a new pilot will say, I've never seen my son play soccer. He plays soccer every Saturday, and I've missed nine of his last ten games. How do we fix that? Or a pilot say, I haven't opened presents with my children on Christmas in two years. How do we fix that?

And as we analyze certain fixes, it all comes back to the seniority-based bidding system and the marketplace for shifts and schedules that these pilots compete for. The only way really to address that problem that new hire pilots face is to renegotiate seniority and status, which SAPA has never been willing to do as a group. That's the first basis.

The second basis is speaking to a crew scheduler by the name of Jay Oyler about this problem and having Jay walk me through the difficulties of a

new hire pilot on reserve avoiding weekend and holiday work.

**Q. And did you -- Okay. That's two. Any other bases for that statement?**

A. The third one would be speaking to Roy Glassey about the same subject.

**Q. Any other basis for that statement that he would absolutely and unavoidably be required to work on Saturdays and other holidays?**

A. That's all that comes to mind.

**Q. You said you -- in response to junior pilots complaining about working on Saturdays or weekends and holidays, you analyzed certain fixes. What types of fixes were you looking at?**

A. Those fixes would involve moving away from scheduling, compensating, rewarding pilots based on their seniority and moving to a merit or some other system of incentives where a junior pilot would be as -- as easy to get a Saturday off as a more senior pilot.

But, again, as I said, that would take sacrificing seniority, which is a sacred cow in the industry, and certainly to the pilot group. They much prefer to be compensated and scheduled and rewarded based on their seniority more than any other

factor. So reducing or eliminating a pilot's seniority has typically been a non-starter in any negotiation.

**Q. And who has told you that the seniority -- pilot seniority is a sacred cow? Has someone said that to you or something like that, or is that something you've picked up in the course of your interactions with pilots?**

A. "Sacred cow" is my term.

**Q. All right. But has someone said to you something similar along those lines, that seniority is super important to the pilots?**

A. Yes.

**Q. And who has said that to you?**

A. Current and past presidents of SAPA, as well as members of management who have engaged in these discussions before and found them very difficult to alter or change.

**Q. Has SkyWest tried to change the seniority system or how it worked?**

A. Yes.

**Q. On how many occasions?**

A. I couldn't tell you. It comes up from time to time at contract negotiations. It usually doesn't get very far.

**Q. And when you say "contract negotiations," you mean negotiations regarding the pay scale; is that correct?**

A. Pay scale and work rules and quality of life issues for the pilots, yes.

**Q. When did your discussion with Jay Oyler regarding this issue of working on Saturdays and holidays come up?**

A. I had multiple discussions with Mr. Oyler on this subject. The first one would have been the week of December 5 --

**Q. So we talked --**

A. -- briefly, and then extensively throughout the month of December and January.

**Q. So what did you and Jay talk about during the week of December 5th in regard to schedule issues?**

A. We talked about how pilot seniority works in relation to scheduling, particularly for a new hire pilot.

**Q. Do you recall any other specifics of that conversation?**

A. I was dialed in on Mr. Cassell's concern, so I was asking Mr. Oyler to teach me about how pilots are scheduled, how they bid, what the

preferences are and if it was possible for a new hire pilot to bid-avoid sabbath work with success over the long haul.

**Q. Did you ever talk, as you recall -- and I can pull it up if you want, the memorandum that you thought Coy Bryant prepared. This was a discussion of tools or reasonable accommodations, including dropping flights, swapping, trading, things like that.**

**Did you have any discussions with Jay Oyler about whether a new hire might avoid working on the sabbath using those tools or what you referred to as reasonable accommodations that were offered to Shane?**

A. Yes.

**Q. And when did you have that discussion with Mr. Oyler?**

A. Multiple discussions with Mr. Oyler that would have commenced the week of December 5 and --

**Q. Go ahead.**

A. -- and through February of 2017.

**Q. Can you separate those discussions out, or do they blend together?**

A. That has been my labor all day, Erik. I've tried very hard to -- I've seen all of the

documents, of course, and I'm trying to parse in my mind specific conversations and first times that I've seen things. So I can only tell you that I spoke to Jay Oyler prior to writing my December 8th letter about the ability of a pilot to successfully avoid Saturday assignments during their first year or so until they had enough seniority to use their tools more effectively.

Now, I already understood all the tools just from working here for 14 years. Asking him what a bid-avoid is or a swap or a trade, that I already had foundational knowledge of. We discussed probabilities and likelihoods if -- of avoiding a sabbath assignment for a new hire pilot in the first 12 months. I didn't have those answers, and I needed his expertise to help.

**Q. And what did Mr. Oyler tell you, did he say to you?**

A. It was his opinion it would be impossible for a new hire pilot to avoid weekend or holiday work completely, guaranteed, never get stuck with one of those assignments. He viewed that as an impossibility within the first 12 months.

**Q. And that was his opinion, I gather, is what you're telling us?**

A. Yes.
**Q. And that -- these discussions included using not only the bid process but these other tools or reasonable accommodations you talked about, such as dropping flights, posting them on the board, trades, swaps, those types of things?**
A. Yes.
**Q. Did you specifically talk about those other tools with Mr. Oyler?**
A. I don't know if we spoke about each tool separately or said taking all the tools at a pilot's disposal in their first year. The conversation, I believe, at least from my side, was, Jay, if a pilot makes their only choice, only preference to avoid Saturday, that is the only thing they care about, using all the tools at their disposal, could they avoid Saturday work? And his response was no.
**Q. What position did Jay have at the time?**
A. He had the same position that Steve Spagnolo occupies now, which I believe is the manager of crew support scheduling.
**Q. And is Jay still with SkyWest?**
A. No. He left, and Steve-O took his position.
**Q. Do you know why Jay left?**

A. I don't know why.

**Q. Do you know where he's currently working, if he's working?**

A. I believe Jay is at another airline. I don't know which one.

**Q. How is his last name said?**

A. O-y-l-e-r.

**Q. I assume at the time you were talking with him in early 2017 -- or late 2016 or early 2017, he was living in St. George. Is that correct?**

A. I don't know where Jay lived, but he worked at headquarters in St. George.

**Q. Do you know where he lives now?**

A. I do not.

**Q. Did you -- during this period of time -- and I gather you're using the December through early February time period because you wrote this letter on December 8th, and as we'll look later in your mass communications to and from Alan Reinach were about February, early February, February 6th. Is that correct? Do you remember that?**

A. That's right. In mid-February we -- Mr. Reinach and I met at a mediation the following year and had verbal communications, but I don't recall any other written communication with

Mr. Reinach after February of 2017.

**Q. Did you during that period of time make any effort to determine if there were any other Seventh-Day Adventists who were working for SkyWest?**

A. No.

**Q. Have you ever tried to determine if there were other Seventh-Day Adventists working for SkyWest, whether they were able to avoid working on the sabbath?**

A. No.

**Q. And let me broaden that, because there's obviously some other religious groups, I'm thinking of religious Orthodox Jews, who would not work on the sabbath, either. Have you ever tried to find out if you have any Jewish pilots who observe the sabbath who work for SkyWest?**

A. Your question is have I tried to find out. Certainly they've come to my attention over time, but we don't have a database where we track employees by religion. I would have no way of knowing how many or whether any particular employee was a Seventh-Day Adventist unless they self-identified as such. So I am aware that we have Orthodox Jewish employees as well as Seventh-Day Adventists as that is brought to my attention through their self-identification.

**Q. And are any of these Orthodox Jews pilots?**
A. Yes.
**Q. And do they observe the sabbath?**
MR. PETERSEN: Objection. Speculation. Go ahead.
THE WITNESS: I know of one orthodox SkyWest pilot who observed the sabbath. I don't know if all the other Orthodox Jewish pilots that work for us observe the sabbath or not.
**Q. (By Mr. Strindberg) And when did this -- this Orthodox Jewish pilot you've referred to who observes the sabbath, when did he or she start working for SkyWest?**
A. I don't know.
**Q. And what is that person's name?**
A. I don't know.
**Q. And do you know whether or not this one Orthodox Jewish pilot was able to avoid working on the sabbath by using these various tools you've identified?**
A. He was not.
**Q. And how do you know that?**
A. I was told that by Roy Glassey.
**Q. And when did Roy Glassey tell you that?**
A. I don't remember the first time, but it

was recently brought to my attention in preparation for my deposition and his.

**Q. You said you're also aware that there are some Seventh-Day Adventist pilots working for SkyWest?**

A. Yes.

**Q. And how did you learn that?**

A. I believe through Mr. Reinach during the course of discovery this week.

**Q. And when did Mr. Reinach tell you that there were Seventh-Day Adventist pilots working for SkyWest?**

A. During the course of the mediation.

**Q. And did you ever attempt to determine who those pilots were and ask them if they were able to avoid working on the sabbath?**

A. I don't know how to answer. Let me just say I'm hesitant, because all of this happens in a mediation, Erik. I don't know if I'm legally able to disclose the conversations that were had at that mediation and the names that were offered and how -- I simply don't know, and I don't want to violate the terms of the mediation agreement.

But I can generally tell you that Mr. Reinach gave the names of some Seventh-Day

Adventists who were successful pilots at other flying operations and said some had attempted to apply at SkyWest and not made it very far.

And then you also have Mr. Emerson, Seventh-Day Adventists actually working for you now, whether you know it or not. He didn't give me their names I think out of -- I don't know why, some caution. And the discussion -- and I don't know --

Scott, I don't know, like, designate this part? I mean, I'm talking to you.

MR. PETERSEN: Well, let me just -- let me just --

THE WITNESS: I mean, we're talking among the parties, everybody --

MR. PETERSEN: Hold on a second, Todd.

So I wasn't at the mediation, Erik. My understanding is, though, that it was -- it was agreed to be confidential. And so, you know, I didn't -- I haven't looked at any kind of signed confidentiality statement there. We're not in a position to want to unilaterally breach confidentiality at that mediation, so I -- I mean, I'll put the ball in your court, Erik, as far as that goes, because I wasn't there. But I did ask if the mediation -- if Todd's understanding of the mediation

was it was confidential, and the answer is yes, so we're not inclined to disclose what was confidential in that mediation.

MR. STRINDBERG: I'm not really asking what happened at the mediation or what was said at the mediation. I'm more asking if, based on what he learned at the mediation, Todd then contacted Seventh-Day Adventist pilots to see if they were able to avoid working on the sabbath.

MR. PETERSEN: Well, that's a different set of questions than what I heard. I heard you asking him what these conversations with Mr. Reinach were on, whether those pilots existed and then their names. And if those were disclosed to him in the mediation, I would instruct him not to answer them based on confidentiality.

If the answer is after the mediation you looked up certain pilots to see if they were able to avoid Saturday work, I think that's a fair question, generally, but not if it requires him to disclose the names and those names were somehow disclosed during the mediation.

So maybe -- I mean, what you're saying to me now, Erik, is a little different than my understanding of what your line of questions were.

MR. STRINDBERG: Right.

MR. McFARLAND: This is Todd. And maybe I'm just being particularly dense. I mean, I agree that mediations are generally confidential, but that's usually with the same people that were involved. I mean, even though it's different people, I mean, neither Erik nor I nor you, Scott, were there. We all represent the same people, so I don't see how -- I agree it's confidential, but I don't see how discussing it in this would violate confidentiality. We may have to mark part of this deposition as being confidential, but maybe I'm missing something.

MR. PETERSEN: Well, I wasn't counsel for SkyWest in the mediation, so if he discloses it to me and then I'm aware -- we haven't designated this deposition to be confidential, so if it were used in a motion or at a hearing, it would not be confidential at that point. I'm just trying to avoid any allegation that we somehow are disclosing outside of the confines of that mediation any information that we agreed at the time to be confidential.

MR. STRINDBERG: My understanding of the confidentiality in mediation is somewhat different. I mean, you know, obviously you can't disclose, you

know, or use, say, at trial something -- say, Yes, SkyWest offered us money in the mediation to settle this. I mean, that would clearly be -- something like that would be inappropriate, not just based on the confidentiality in mediation. But discussing a name or names that came up, I don't see how that would be prohibited. But let me ask --

THE WITNESS: Can I just -- can we take a break and let me consult with my counsel? I'm concerned about breaking an agreement, and I don't want to do that for my own personal liability. So --

**Q. (By Mr. Strindberg) Let me ask one -- let me ask a foundation question. This was a mediation with Mr. Cassell and his attorney?**

A. Mr. Cassell was present along with Alan Reinach and a mediator I believe from the Equal Opportunity Employment Commission.

MR. PETERSEN: And I just want to point out that usually in those -- and I'm not talking about a legal confidentially, it's that the parties agree; they sign a document. And the mediator for both EEOC and UALE generally say to the parties, Everybody knows that the discussions and conversations had are confidential so that you could be free to say what you think. And I have always

interpreted that -- and I couldn't repeat any of the language of the little signature you do, but you do sign something. And I've always interpreted that as it means, look, if I say stuff to you that would -- maybe isn't involving the amount we're offering or the amount you want to accept or you're demanding, but all the discussions about the facts of the case given in that mediation are kept confidential. That's my understanding.

But I haven't -- you know, I've looked at that document. I just don't want SkyWest to breach an agreement it made with the EEOC and your client. And since I wasn't there, I mean, the disclosure to me is not -- is outside the confines of that mediation, is kind of what -- I just want to be careful.

MR. STRINDBERG: Right. And I'm not so much interested in names. I mean, if I were to ask Mr. Emerson if he was given the names of any SkyWest pilots at that mediation, Seventh-Day Adventist pilots, and did he subsequently try to contact them to determine if they were able to avoid working on the sabbath, would you object to that?

MR. PETERSEN: In those subsequent conversations he would be -- you'd be asking him to

disclose the names of those people? Let me talk to Todd, and then let's get back to you. Because I want to get more information about the confidentiality.

MR. STRINDBERG: Okay. Let's take a two-minute break.

MR. PETERSEN: Okay.

(Recess from 12:02 p.m. to 12:19 p.m.)

MR. PETERSEN: So, Erik, I've got a couple of things. SkyWest is willing to talk about the mediation, but only if both parties on the record agree to waive confidentiality. And that's a concern to us as a bigger picture thing.

But I also am not convinced that -- I think your line of questions, -- I don't know that you need to go there, because your line of questions can be taken along with just the communications that we all know in the record are back and forth between Mr. Reinach and Todd.

MR. STRINDBERG: Right.

MR. PETERSEN: Does that make sense?

MR. STRINDBERG: Yeah, I agree. We sort of got off in this tangent because your client first said that he didn't know about any Seventh-Day Adventist pilots because they don't keep records of it, but then he mentioned that he learned the names

of some at this mediation. That's the only reason we got there. I just want to know if he's talked with any Seventh-Day Adventist pilots working for SkyWest and, if so, whether they've been able to avoid working on the sabbath. I don't really care --

MR. PETERSEN: Yeah. I mean, we would prefer -- let's not do anything about the mediation and instead just ask the questions I think directly --

MR. STRINDBERG: One second, Scott. Let me have a few minutes. Alan just called me. Hold on.

MR. PETERSEN: Okay.

(Recess from 12:20 p.m. to 12:24 p.m.)

MR. STRINDBERG: Okay. Let's go back on the record.

Todd Emerson, you're muted.

**Q. (By Mr. Strindberg) Okay. Let's try to avoid this whole mediation issue. Todd, have you ever talked with any Seventh-Day Adventist pilot working for SkyWest and asked them if they were able to avoid working on the sabbath?**

A. No.

**Q. You had mentioned that there was an Orthodox Jewish pilot. Have you talked with that**

**person?**
A. No.
**Q. You got the information about that pilot from Mr. Glassey, you said?**
A. He refreshed my recollection, yes.
**Q. So you -- when you say he refreshed your recollection, you had talked with this pilot at some point, the Orthodox Jewish pilot?**
A. I have never spoken to the Orthodox Jewish pilot. In the course of my responsibilities, legal puzzles like this will come up from time to time in over 17 years. That one was rattling around in the back of my brain, and Mr. Glassey reminded me of the time that an Orthodox Jewish pilot requested a sabbath exemption and how we dealt with it.
**Q. How did you deal with it?**
A. The same way.
MR. PETERSEN: Whoa, whoa, whoa. If the question is how did SkyWest deal with it, that's fine.
MR. STRINDBERG: Yeah.
MR. PETERSEN: If it's how you dealt with it, Todd, then don't answer that.
So what's the -- is that SkyWest --
**Q. (By Mr. Strindberg) How did SkyWest**

**address that request?**

MR. PETERSEN: Go ahead.

THE WITNESS: It is my understanding that we engaged in the interactive process with this pilot who ran into conflicts with sabbath observance. He was offered the preferential bidding system and its various tools as an accommodation. He understood that -- or came to the belief that that accommodation would not guarantee him a sabbath-free schedule and chose to resign.

**Q. (By Mr. Strindberg) Did he -- did he resign before he actually started flying for SkyWest?**

A. It is my understanding that he was flying for SkyWest and at some point received -- Erik, I think, if I remember correctly, he became observant sometime over the course of being a pilot. Let me make sure I've got that right. So I believe he trained and was flying without being sabbath observant, and then there was a renaissance or conversion of faith where it became important to him to have the sabbath free. And then we couldn't work it out, and he resigned.

**Q. Okay. Thank you. Well, that was a long detour for no apparent reason, but that's how it goes.**

**Todd, I'm going to go back to your letter of December 8th. You mention here:**

**He will absolutely and unavoidably be required to work on Saturdays and other holidays.**

**I gather from this that the more senior pilots who want holidays off often seek to have holidays off. Is that correct?**

A. That has been my experience, yes.

**Q. Does SkyWest have any difficulty in filling flights that occur on holidays?**

A. Yes.

**Q. And how does SkyWest address that issue?**

A. There's a combination of factors that come into play with a very popular holiday, we'll say Christmas. So a bid will go out. Somebody low seniority will end up with a Christmas trip on their schedule. They will try to add, drop, swap, or get rid of it and cannot. They -- they become suddenly ill on Christmas Eve, and reserve is then pulled up to handle that trip so that we are able to cover the flight.

So between a combination of having extra reserves available around the holidays and emphasizing the importance of pilot reliability, we

do get those holidays covered. But the difficulty is there. It's just incredibly important to a lot of people, and they'll do everything possible to avoid working them, which means sometimes dipping into our reserves who will end up flying on that holiday.

**Q. We were talking about the -- your statement here that you absolutely and unavoidably would be required work on Saturdays and other holidays, and you said you talked with Jay Oyler and Roy Glassey.**

**Tell me about the discussions you had with Roy Glassey which led you to believe that Mr. Cassell would absolutely and unavoidably be required to work on Saturdays?**

A. The conversation with both gentlemen was informational for me. I'm not a crew scheduler and I'm not a chief pilot, so I don't really know how it works unless somebody teaches me. So the point of speaking to Mr. Glassey as a chief pilot who runs a domicile and seen it work in action, and then Mr. Oyler, who had actually been tasked with assembling the schedules and filling in reserves when somebody didn't make it, was to answer my question about whether or not a Seventh-Day Adventist could successfully avoid Saturday work. So I talked to

both of them because they had different perspectives.
**Q. And did Mr. Glassey say anything different than Mr. Oyler had said to you?**
A. No. He said from his experience as a chief pilot it would be incredibly difficult to impossible for a new hire pilot to not work a Saturday sabbath over the course of his first year.
**Q. Did either of them know whether or not there had ever been a pilot with SkyWest who had attempted to avoid working on the sabbath?**
A. Yes. I believe Mr. Glassey was the chief who dealt with the Orthodox Jewish pilot --
**Q. Okay.**
A. -- who was attempting to do that.
**Q. Was there ever any discussion around this time, this December to February time frame that we've been talking about, any discussion with either Mr. Oyler or Mr. Glassey or anything about, say, allowing Mr. Cassell not to work on Saturdays in exchange for him being required to work on some of these holidays which SkyWest has trouble filling?**
A. I don't recall.
**Q. So when you say you don't recall, does that mean you didn't have any conversations, or does it mean you might have had some of those**

**conversations and just don't remember them?**

A. It would be improbable to have that conversation from SkyWest's side as something SkyWest would do to the schedule, as we would be constrained from doing that under the seniority bidding system we have negotiated with the pilots. What you just suggested would be an excellent idea for Mr. Cassell to attempt, to trade a holiday for a weekend under the PBS system. But for SkyWest to agree to do that and impose it would violate our CBA, and we couldn't do it without violating the contract.

So asking me if we had that discussion, maybe. It wouldn't last long, because you're suggesting that we violate the CBA. So if Roy raised that or I raised that, somebody would have said, The pilots will go bananas if you do that.

**Q. Did you -- did either you or did you ever direct anyone to talk with SAPA to see if they might be willing to work with SkyWest to accommodate Mr. Cassell's request for a sabbath off?**

A. Erik, I'm not being tough. That was compound. There was, like, three or four things in there. Can you just break up that question up a little bit?

**Q. Sure. Did you -- in regards to**

**Mr. Cassell, did you ever contact SAPA to ask if they might be willing to work with SkyWest to accommodate Mr. Cassell's request?**

A. I did not.

**Q. Did you ever direct anyone or ask anyone to contact SAPA to ask them if they would work with SkyWest to accommodate Mr. Cassell's request?**

A. I did not.

**Q. Did you ever tell SAPA that there was this issue that had come up with a request for a sabbath accommodation?**

A. I have likely had hundreds of conversations with the president or board of SAPA since this incident. We certainly talked about it. I don't know when or in what context, but it wouldn't surprise me that SAPA knows about it and had discussions.

**Q. But do you have a recollection of ever asking them whether in regards to Shane or someone else, you know, Hey, SAPA, if we have an issue that comes up for a request for a sabbath accommodation, would you be willing to work with us to try to accommodate the pilot?**

A. Yes.

**Q. You've had those discussions?**

A. Yes.
**Q. And with whom at SAPA?**
A. Aric Arnold.
**Q. And do you recall when those conversations took place?**
A. Winter of 2019.
**Q. Why were you discussing that with Aric Arnold in the winter of 2019?**
A. I met with SAPA in the winter of 2019 for a long-ranging meeting, maybe four to five hours long, where we discussed this CBA, SAPA's bylaws and 10 to 15 open items and issues that they wanted to discuss. In the course of that discussion -- and I don't know if it was specific to Mr. Cassell or generally -- I raised the issue of whether SAPA had flexibility from their side to compromise seniority and allow one of their pilots seeking an accommodation to, I don't know, be granted a waiver or find a way to put it into the CBA to grant more flexibility in these areas.
**Q. And who were you meeting with from SAPA?**
A. I met with the SAPA board. The entire board wasn't present. It might have been their executive board. I believe there are 20 members of the SAPA board and maybe five that constitute their

executive board, which would be the president, vice president, secretary and perhaps a couple others. I see the room; there's five to six people in it. I know Aric Arnold is there. I couldn't identify, as I sit here today, the other attendees.

**Q. And where did the meeting take place?**

A. Denver, Colorado.

**Q. And were there minutes taken of that meeting?**

A. I don't know.

**Q. Were there recordings made of that meeting?**

A. I didn't take any minutes or make any recordings.

**Q. Was there any kind of a memorandum prepared after the meeting detailing what had been discussed and agreed upon?**

A. I don't know. I didn't prepare a memorandum.

**Q. So explain to me, this issue of sabbath observance, was that specifically discussed? I guess I didn't quite follow you. Was that a specific topic?**

A. It was like this. I'm going to call you Mr. Strindberg because I'm going to use the word

"Aric," but Aric means Aric Arnold. So I would say I said something along the line of, Aric, we have from time to time pilots who want particular days off for sabbath observance or other religious holidays, Yom Kippur, Ramadan, Easter. It comes up. Is there a way -- is there any way for us to work this into the contract so that we can get there?

Aric's response is, I don't see how any of the other pilots will give up their seniority and put at risk working at Christmas, Easter or something else for somebody else who wants it. You get into the difficult position of determining what a deeply held religious belief is.

**Q. Let me interrupt you. Is that -- are you saying what Aric said to you?**

A. I'm summarizing. My question is, What do you think, Aric? Can we get to a place in the contract where we can negotiate exceptions into the seniority for a religious observance, and the answer was no. He explained his answer, but in the end it was no.

**Q. What was the explanation he gave you?**

A. Too hard to juggle with 5,000 pilots. What if they all want Christmas? How can you distinguish between somebody who's religiously

observant and really wants Christmas versus some dude who just wants off Christmas? Everybody's going to want off Christmas. I can't deal with 5,000 pilots yelling at me over who gets Christmas. We have to stick with the system.

**Q. Going back for a moment regarding this idea, this holiday -- trading holidays for Saturday work, when you were having those discussions with Coy Bryant and Jake Whicker in early December before you wrote the December 8th letter, did that idea ever come up?**

MR. PETERSEN: What idea?

**Q. (By Mr. Strindberg) The idea that maybe one accommodation would be to allow Mr. Cassell to not work on the sabbath in exchange for requiring him to work on these holidays that SkyWest had trouble staffing.**

A. I don't recall it coming up.

**Q. Thank you.**

**In this letter -- and I'll pull it back up on the screen -- in the last line there, you talk about another acceptable accommodation. Did you have anything in mind when you used that phrase, "another acceptable accommodation"?**

A. I -- what I had in mind was whether

Mr. Reinach or Mr. Cassell had any other ideas to discuss --

**Q. Okay. And what --**

A. -- to accommodate his needs.

**Q. Are you able to tell us what would have been an acceptable accommodation from SkyWest's point of view?**

MR. PETERSEN: No, don't answer that. That's attorney-client privilege if there's something published; but if that's something he's conjuring up because of discussions internally, I'd say don't answer that question.

MR. STRINDBERG: Well, Scott, he's talking about an acceptable accommodation, so I'm trying to determine what would have constituted an acceptable accommodation. He's used the phrase. I think I'm entitled to know that, particularly in the context of this lawsuit.

MR. PETERSEN: All right. So -- well, with that clarification -- so your question is was there an acceptable accommodation he had in mind in relation to Cassell at the time this was going on? Is that what your question is?

MR. STRINDBERG: No. It's broader than that. He's talking about another acceptable

accommodation, and I guess I'm asking him to define what would have constituted an acceptable accommodation from SkyWest's point of view.

MR. PETERSEN: I guess if you can limit it to what he was thinking at the time, I'm okay with that, but not something that would come up later on down the road, if anything.

Does that make sense?

So, Todd, I'm going to instruct you to answer -- if you can come up with -- if there's a response to that question relative to the time frame, go ahead.

THE WITNESS: I'm sorry. Would you restate the question?

**Q. (By Mr. Strindberg) Back in December of 2016 when you wrote this letter, you used the phrase "another acceptable accommodation." What would SkyWest have considered to be an acceptable accommodation at that time?**

A. I don't know.

**Q. One question -- and maybe you're not the person to answer this, Todd, but when pilots are on reserve, is seniority an issue as far as the days they bid for, or are the days that people are on reserve just assigned by someone in --**

A. You're right, I'm not the person to ask; but it is my understanding that a reservist with higher seniority will get the reserve schedule they prefer ahead of a reservist with lower seniority.

**Q. Do you know, are the -- are reserves -- reserve pilots regularly used by SkyWest, or are they just there for emergencies?**

MR. PETERSEN: Objection as to vague and confusing.

Go ahead, Todd, if you understand what he's saying.

THE WITNESS: I do understand what you're saying. From my experience and understanding in the legal department divorced from operations, it is my understanding that reserves are regularly used and called upon to handle flights.

**Q. (By Mr. Strindberg) Do you know -- I'll show you -- let me pull it up. As you know, we were looking at Exhibit 22 at some point, which was this chart that had been prepared showing the number of reserves by jurisdiction -- or by domicile, I should say, broken down by captains and then by first officer.**

**Do you have any idea -- like, for example, in January of 2017 this shows, you know, like, 8**

**reservists in Detroit and 23 in Chicago. Is MSP Minneapolis?**

A. Yes.

**Q. So it shows 57 at Minneapolis.**

**Do you have any idea how many of those pilots, reserve pilots at those jurisdictions would have actually been asked to cover a shift or a flight?**

A. Not with any certainty, no.

**Q. Knowing that you're not certain, what would be your answer?**

MR. PETERSEN: Objection. Calls for speculation.

Go ahead, Todd, if you can.

THE WITNESS: I'll give you my business understanding. Pilots are expensive. We don't like to pay them to sit around and do nothing. We're going to schedule reserves because historically that particular domicile has drawn heavily on or not at all on reserves. And so going off of years' worth of experience, historical demand and operations, one domicile may have a much higher complement of reserves than another, but it is due to need and historical experience of needing to -- if we're going to take off and land and complete our flights on

time, we may very well need to call reserves in to handle it.

Minneapolis you pointed to is a very large hub for Delta Air Lines, and it doesn't surprise me at all to see that amount of reserves there so that we can supply flexibility around the system. The fact that they're sitting in Minneapolis doesn't mean they're just needed for Minneapolis; it means they're sitting in a hub and we can put them on an airplane and get them to Tallahassee really quickly for a problem there.

And Scott's going to club me for saying too much, because I can't help it, but those reserves, you're wrong to think of them just sitting in one city. They're sitting in a hub where they can be dispatched all over the country as quickly as possible to meet a need. So it's not just that Minneapolis pilots don't come to work like they should or have poor lockability, it's just that we can dispatch reserves from Minneapolis much better than we can from Sioux Falls, South Dakota.

Not a two-word answer. Sorry, Scott.

MR. PETERSEN: I instruct you not to answer on our communications.

THE WITNESS: Erik, the longer you wear me

down, I'm just going to keep yapping. So keep going. I'll give you my Social Security number; I'll tell you where all the secrets are.

**Q. (By Mr. Strindberg) I don't want your Social Security number.**

**So I gather that what you're saying is SkyWest obviously doesn't want to ever have to cancel a flight, because that costs money, and that's, I guess, balanced against you don't want too many reserve pilots sitting around because that also costs SkyWest money?**

A. Half of that's right. We don't want too many reserves sitting around, because it costs money. Canceling a flight, the money is a small aspect of it. Canceling of a flight causes massive disruptions for the passengers, for the crews and for our partners. So we're graded from Delta and United and American for how reliable we are, and late and canceled flights are hard on our business relationship and obviously very hard on passengers who want to be at a wedding tomorrow in Fresno but their flight canceled.

So the -- the difficulty of canceled flights -- one particular canceled flight isn't going to cost a tremendous amount of money, but it's going

to cost a lot more in passenger goodwill and goodwill of our partners.

MR. STRINDBERG: Thank you.

Scott, I have a bit more here. Do you guys want to take a break and grab something to eat?

MR. PETERSEN: Yeah, I'd like to. I mean, I don't know what Todd is thinking. I could go on if you need to, but I have a small reserve tank that needs to be refilled on a regular basis. I may not look small, but I have a small tank.

MR. STRINDBERG: Why don't we take a half hour. It's now five minutes to one. Let's come back at 25 minutes after one.

(Recess from 12:54 p.m. to 1:34 p.m.)

**Q. (By Mr. Strindberg) I just wanted to follow up on a couple of things about the reserves. You said that there was, like, historical data on how many reserve pilots were needed. Who would have that information at SkyWest?**

A. Steve-O would be a good place to start. That's who I would call. I said Steve-O, like a nickname, which stands for Steve Spagnolo, S-p-a-g-n-o-l-o. He goes by Steve-O. That's Steve with a v, a dash, and a capital O.

**Q. So you're saying I can just give him a**

**buzz, right?**

MR. PETERSEN: No.

THE WITNESS: But -- well, I don't -- I'm happy to give that information to Erik in some form if you'd like to analyze it.

**Q. (By Mr. Strindberg) Okay. Let's go --**

A. By that I mean historical reserve needs in these different domiciles, whatever. Send us an interrogatory and I'll give you the data.

MR. PETERSEN: By the way, Erik, too, just to clarify, you asked Todd if there was any reference in the Pilot Policy Manual to bidding. There's actually a huge section, so I was going to just clarify. I don't think Todd realized that.

THE WITNESS: Oh, no, I did. It's a bad memory exam, but SP3017 covers scheduling and preferential bidding in the Pilot Policy Manual.

MR. PETERSEN: For your reference, Erik, it starts on page 489, SkyWest 489. I have not looked to where it ends, but that's the chunk. I meant to bring that up while you were talking to him, and I got sidetracked. So, sorry.

**Q. (By Mr. Strindberg) Okay. So, Todd, just to refresh your recollection, we have been talking about the letter you sent to Alan Reinach on**

**December 8th. Let's actually move forward a little bit. I'm going to show you a letter dated December 12th from Alan Reinach, which is addressed to you.**

**Do you recall receiving this letter from Alan?**

A. I do.

**Q. And I'll represent to you -- we can look at it, and we will in a second -- you didn't respond to this until February 3rd of 2017. Why was there a delay in responding to him?**

A. I remember reading Mr. Reinach's letter, and he claimed that I had not addressed his concerns and I didn't provide any factual basis for my assertion that his client would unavoidably be scheduled to work on his sabbath during the initial period of his employment.

**Q. That's the part I have highlighted there in yellow.**

A. Yeah. So I decided to direct Mr. Oyler to back up his opinion with research that was data based more than him opening up something on a computer screen and looking at it, saying, It will never work, I've never seen it work, can't think of a time I've ever seen it, to actually draw a sample set from this

time period that I could show to Mr. Reinach to further the discussion and help us find that reasonable accommodation if there was one.

So this took about a month, maybe a little bit longer. December is a very busy time for any airline, and especially us. So around Thanksgiving and Christmas is all hands on deck. I don't think we had an analyst who was free to do this until after the new year.

**Q. Did you give Mr. Oyler any specific instructions on how to go about his analysis, or did you just say you wanted backup for this opinion?**

A. No. I -- I asked him to study a hundred pilots that had been recently hired and see if in the first year of their employment they were able to avoid working on a Saturday. That was the parameters of the research assignment I gave him.

**Q. Okay. Did Mr. Oyler do the research, or did he assign it to someone else?**

A. It's my understanding he assigned it to an analyst in his department.

**Q. And who was that?**

A. I don't know.

**Q. Did you have any discussions with that analyst directly?**

A. No.
**Q. Is this what you received back from the analyst, obviously without the names blacked out?**
A. No.
**Q. What did you receive from the analyst?**
A. I didn't receive anything from the analyst.
**Q. Did you receive anything from Mr. Oyler?**
A. No.
**Q. How was the results of that investigation communicated to you?**
A. Via conversation with Mr. Oyler.
**Q. And when did that take place?**
A. Sometime at the end of January 2017.
**Q. And what did -- and where did this conversation take place?**
A. SkyWest headquarters.
**Q. And who was involved in the conversation?**
A. Myself and Mr. Oyler.
**Q. And tell us what he said and what you said.**
A. I was pressing Mr. Oyler for the results of the research because I knew that Mr. Reinach was waiting for a reply. So the initial conversations would have been follow-ups: Are you done? How's it

coming?

And at some point in the end of January Mr. Oyler called me and said, We've got this study done. And I asked him what the results were, and he reported that of the 100 pilots that they studied hired in 2016, and maybe even a little earlier, but of a hundred pilots that he could see a year's worth of their schedule, that none of those 100 pilots had successfully avoided working on a Saturday.

**Q. And do you know how Mr. Oyler or the person he assigned to do the task did the actual analysis, what they looked at, what parameters they used?**

A. Other than the parameters I gave them -- I don't even know if they followed those parameters, to tell you the truth, because I didn't see the data or question the analyst. I followed up with Jay on my question, Having done the research, did you find 100 pilots you could track for 12 months recently hired? Were any of them able to avoid Saturday work? I don't know if I put Friday night in there. I think we discussed it, and it was too difficult or onerous. And I said, Fine, let's just stick with Saturday for now and see what we get.

And the report came back of 100 recently

hired pilots tracked for 12 months, which would include most, if not all of their reserve period, did any avoid a Saturday work assignment. And his answer was all of the 100 pilots have worked a Saturday. They were not able to avoid it. At least one; I don't know how many.

But I was looking for a percentage. I gave him a hundred because I thought he'd come back and say, no, 97 percent had to work a Sunday, and so he -- well, actually, all of them. 100 percent of those pilots somewhere along the way had to work a Saturday was his answer.

**Q. I'm going to pull up again what's been marked as SkyWest 1858 and 1859. And we've previously marked this as an exhibit. It's Exhibit 20.**

**Have you ever seen this document before? Just a second. I haven't shared it. I apologize. Have you ever seen this document before?**

A. Yes.

**Q. When did you see it for the first time?**

A. Earlier this year. I'm going to say spring.

**Q. And what were the circumstances under which you first saw it?**

A. This document was created to respond to interrogatories and requests for production issued by your client.

**Q. So this document, Exhibit 20, SkyWest 1858 and 59, does not reflect the research that Mr. Oyler did back in early 2017?**

MR. PETERSEN: Mischaracterizes his testimony.

**Q. (By Mr. Strindberg) Todd?**

A. Yeah, I heard you. I don't know if it does or not.

**Q. What do you understand Exhibit 20 to be, then?**

A. Exhibit 20 was created with the following parameters. Not having actually received a physical report from Mr. Oyler and Mr. Oyler no longer being here, we went back to the data set, and I asked an analyst to track 100 pilots that had been hired in early 2016 and track their Saturdays worked to replicate the research assignment that I had handed to Mr. Oyler in February of -- January of 2017.

**Q. Do you know how closely this replicated what Mr. Oyler did?**

A. Like I said earlier and you pointed out, Erik, I don't know how Jay ordered the research from

his analyst, and I don't know which analyst he used. So I gave this analyst the same instructions I gave Jay, to go with that same data set and pull the same sort of report.

It is my hope and intention that it replicates or gives the same data that Jay drew and saw and reported, but I can't tell you if I have captured the same 100 pilots that Jay looked at or, you know, if I've got 95 out of 100 or 10 are missing. I can't tell you for sure if this is a perfect replication of the research that Mr. Oyler did.

But the data still exist, so the instruction to this analyst was to replicate the same assignment that was given to Mr. Oyler, and this is the report that he generated on my instructions.

**Q. And who was the analyst you asked to do this?**

A. His name is Paxton, P-a-x-t-o-n. Let me -- if you'll allow me to look up his last name, I'll spell it correctly for you.

**Q. Go ahead.**

A. It's a little bit exotic. Last name Catten, C-a-t-t-e-n.

**Q. And do you know how Mr. Catten chose the**

**100 pilots?**

A. I do not.

**Q. The left-hand column here, the employee numbers, how are employee numbers given out?**

A. The first line is 53,197.

**Q. Right.**

A. The first employee ever hired at SkyWest, his employee number is 1.

**Q. Okay.**

A. This employee was the 53,197th employee hired.

**Q. Okay. So someone I noticed on here, like, a 20 -- 27000, that employee, that pilot would have been hired a lot sooner than -- or a lot earlier than the pilot who has No. 53000, correct?**

A. Not necessarily. That indicates to me that this is a rehire and that this employee might have been hired 10 to 15 years ago, quit, left and has now returned. Your employee number will never change. You won't get a second employee number if you are a rehire, so seeing a number half the size of the other ones tells me he's a rehire.

**Q. Did you tell -- I guess I'm just trying to get at, I mean, did you tell him to look at pilots hired between two dates, two certain dates, or what?**

A. Yes.

**Q. What were those dates?**

A. I told him to begin with January 1, 2016 --

**Q. And --**

A. -- and start tracking from there. I also said I wanted to capture pilots that would have historically been hired around Mr. Cassell's time when he was hired in October. This analyst pointed out that if we start back at January 1, 2016, we may not actually capture his class. We get a hundred people before we get there. So he adjusted his search closer to March or April to get there.

So, as I understand it, his hundred pilots that he chose were hired or went through class in early 2016 but didn't start actually flying until April, March -- April, May of 2016, which would get us closer to Mr. Cassell's class to track what happened after that.

So to answer your question, he altered the research assignment that I initially gave him.

**Q. And do you know -- so did this include the pilots who were in that class that Mr. Cassell was in in November of 2016?**

A. I don't know. I'd need to double-check

that.

**Q. Do you know why these -- you've explained this one variance, the 20 -- 20-something-thousand number, but do you know why the numbers are not consecutive?**

A. I think this chart is ordered -- I think it's ordered by the pilot's name, which has been redacted.

**Q. Okay. And this is Saturdays worked, and there's a series of numbers here. For what period of time is that? In other words, numbers of Saturdays worked, during what time period or length of time?**

A. I believe it's out of a 12-month period, although, as you can see, several of these pilots quit before they made it to 12 months. So it's however much they worked in the first year of their employment for these 100 pilots. They might have quit in training, as some did. They might have made it the full 12 months.

**Q. Do you know what domiciles these pilots were assigned to after training?**

A. I don't.

**Q. SkyWest answered one of our interrogatories that I recall indicating that the pilots hired in late 2016 and 2017 were basically or**

**entirely being sent to Detroit or Minneapolis or Chicago. Does that comport with your understanding?**

A. Yes.

**Q. Do you know if these hundred pilots, other than the ones who washed out or terminated in training, were all from those three domiciles?**

A. I -- I don't know with any certainty. The majority of them would certainly go to those domiciles, although a few of them may have landed in others.

**Q. And why would you say the majority certainly would have been in one of those three domiciles?**

A. Those three domiciles are major hubs. Detroit is a major hub for Delta; Chicago is a major hub for United; Minnesota is a major hub for Delta. And so these are excellent staging points for new hires and reserves to be based so that they can fill in for flying as needed out of those hubs, but also then immediately dispatched to other locations and fill in as needed for missing pilots. So new pilots tend to go to reserve and tend to go to major hubs in the system.

**Q. What are the major hubs for SkyWest?**

A. Now or --

MR. PETERSEN: Let me -- I'm going to object. It's vague and ambiguous. Are you asking for where SkyWest major hubs are or where another airline's major hub is where SkyWest has a presence?

MR. STRINDBERG: The latter.4.

MR. PETERSEN: Okay.

THE WITNESS: I'm sorry. Now I'm confused. Do you want Delta's hubs or SkyWest hubs?

**Q. (By Mr. Strindberg) Well, you talked about Minneapolis, Chicago, and Detroit being major hubs for Delta and United.**

A. Yes.

**Q. So are there other major hubs for the carriers that SkyWest works with?**

A. Yes.

**Q. And where are those other major hubs?**

A. Atlanta is a major hub for Delta. So is Cincinnati, so is Detroit, so is Minneapolis, so is Seattle. United's major hubs are Houston, Los Angeles, Denver, San Francisco, and Chicago. American --

**Q. Any other --**

A. -- major hubs are Dallas; Dulles, which is also a major hub for United; Phoenix. And Alaska Airlines' major hubs are Seattle, Portland,

San Francisco and Los Angeles.

**Q. And are those the four -- what do you call them? A parent company -- not parent companies. How do you refer to Delta, United, American and Alaska?**

A. They are either code share partners or major airlines or our contract partners. We do regional flying for those four carriers.

**Q. And Salt Lake City is not considered a major hub?**

A. Sorry. It is. That is a major Delta hub. Thank you.

**Q. And does Delta fly to -- does SkyWest have other what it would consider major hubs that are other than these cities that you've given me?**

A. No.

**Q. And so I understand what you're saying, is the reason that people are -- that new pilots would be sent to Minneapolis, Detroit and Chicago is because if they're on the reserve board, it's easier to get them to lesser airports, smaller airports to fill in as needed?**

A. That's right. Those three airports are located in the Midwest, making it easier to get someplace in the country versus a domicile like Los Angeles or Seattle. There's a bunch of reserves

there. They are helpful regionally, but you can't do much with them nationally.

**Q. Were Detroit, Minneapolis and Chicago new hubs in 2016?**

A. No.

**Q. Had they been growing? And by that I mean were there more flights out of those hubs that SkyWest was covering since 2016, not including this year?**

A. I don't know that data. It's certainly shrinking this year.

**Q. Do you know -- if Paxton Catten, when he did this list, or Mr. Oyler back in 2017, do you know if either of them actually contacted any of these pilots who are on the list?**

A. If they did, they didn't tell me, and it would be extremely surprising if they did. Their job was to crunch data.

**Q. The reason I ask is you used the term that these studies showed that pilots were not able to successfully avoid working on a Saturday. You don't know based on this data whether or not any of these pilots attempted to avoid working on Saturday, do you?**

A. I couldn't tell you which, if any,

particular pilot attempted to avoid working on Saturday. When I questioned Mr. Oyler, I said, Can you see their preferences?

Yes.

Can you tell whether or not they attempted to bid-avoid Saturday?

His answer was, Saturday, Sunday, Easter, holidays, yes. They -- those are popular bid-avoids.

**Q. So --**

A. We didn't drill down to anything beyond that.

**Q. So are you saying that Mr. Oyler back in 2017 looked at the monthly bid preferences for each one of the pilots that was on his list to determine if they had tried to bid around a Saturday or holiday at that point?**

A. He looked at some and then stopped.

THE REPORTER: I'm sorry. I didn't hear the question.

**Q. (By Mr. Strindberg) Do you know how many pilots he looked at their preferences for?**

A. I don't.

**Q. Do you know if Paxton Catten did the same thing earlier this year or whenever it was when he created this document by looking at bidding**

**preferences for these pilots?**

A. I don't know. That wasn't his assignment.

**Q. So after getting Alan Reinach's letter from December 12th, is there anything else you did in preparation for responding to that letter besides having Mr. Oyler crunch the data?**

A. I don't recall doing anything else to prepare to respond to the letter.

**Q. Did you talk with anyone else other than Glassey or the other people you mentioned about the issue?**

A. At some point I spoke with Lori Hunt, who is my supervisor, and kept her apprised of my work, which would have included this.

**Q. What position does Lori Hunt have?**

A. She's the vice president of people.

**Q. Was she over human -- employee relations as well?**

A. She is.

**Q. And the purpose for speaking with her was what?**

A. To keep her updated on the projects I was working on.

**Q. It wasn't substantive? In other words, you weren't asking her whether she thought**

**Mr. Cassell could be accommodated; you were just telling her what was going on?**
A. Yes.
**Q. Okay. Todd, I'm showing you what's been marked -- it hasn't been marked. It's Cassell 10 to 11.**
MR. PETERSEN: There is a SkyWest version that we did mark as an exhibit in Mr. Cassell's depo, I believe, but you can -- it was a SkyWest version, so you can mark this one.
MR. STRINDBERG: I guess we're up to Exhibit 26.
(A discussion was held off the record.)
MR. PETERSEN: It's 27. 26 is your Pilot Policy Manual.
(EXHIBIT 27 WAS IDENTIFIED.)
**Q. (By Mr. Strindberg) Okay. Exhibit 27, which is Cassell 10 and 11, Todd, can you tell us what this is?**
A. Would you mind pulling it down a little further?
This is a letter I authored to Mr. Reinach on February 3rd, 2017.
**Q. That's your signature there?**
A. It is.

**Q. I want you to look at this paragraph here where you discuss the training schedules. You say:**

**I would be pleased to discuss how training schedules could be altered to accommodate Seventh-Day Adventists who wish to observe the sabbath. However, in the case of Mr. Cassell, unless he is willing to work on the sabbath after he leaves training, resuming his training would be futile.**

**Are you saying in there that it would have been possible to accommodate Mr. Cassell's sabbath beliefs during the training session, or during training.**

A. It appeared that that had already happened in his prior trip through training when he was doing CBT training and had another class where there was conflicts. The training department was able to work around it until he ran into matrix training where they couldn't. But there had been some flexibility in the training department that we could continue to explore, and I was happy to do it. But we needed to have a better understanding of what happens once he's out on a line, so I wanted to have that discussion with Mr. Reinach.

**Q. And you're also aware that perhaps some of**

**the, like, matrix conflict could have been avoided if that class had occurred, say, during June of the year when days are longer so that sundown is later on Friday, correct?**

A. If the same scenario that happened on December 3rd happened in June?

**Q. Right.**

A. It would not have caused a conflict, as I understand Mr. Cassell's religious requirements.

**Q. You say:**

**However, in the case of Mr. Cassell, unless he is willing to work on the sabbath after he leaves training, resuming his training would be futile.**

**Why were you not willing or unwilling to allow him to go through training and for him to determine whether he could avoid working on the sabbath using the tools that you say were available to him?**

A. Because Mr. Cassell at that point had declined the accommodation offered to him and made it clear that if the accommodation still results in a Saturday schedule that he could not add, drop, or swap, he would refuse to fly it.

**Q. When had he declined accommodation?**

A. With his discussions with human resources and Mr. Whicker they had with him I believe in October and again in December, as they came to understand his religious requirements, it was ultimately a guarantee of sabbath-free scheduling with some exceptions for emergencies or other issues; but if he had been handed a sabbath schedule on Tuesday and he could not add, swap, or drop it, he would decline to work it because that would not be an emergent situation or a continuation of a flight that he had already began, which was a rejection of the accommodation we offered.

**Q. So, Todd, are you saying that if he had said to -- and maybe you're not the person that can answer this. If he had said to Coy Bryant or Jake Whicker back in November of 2016, Okay, that accommodation is acceptable, you would have allowed -- you would have made an accommodation in his training schedule to allow him to continue?**

A. You've got two parts there.

**Q. I do.**

A. I don't -- I don't know if --

MR. PETERSEN: Hold on. I'm going to object. It's a compound question. Go ahead.

MR. STRINDBERG: It's actually not.

**Q. (By Mr. Strindberg) Go ahead.**

A. If Mr. Cassell had accepted the reasonable accommodation, his training would have continued, certainly. If -- it's difficult because you've mixed two things there, Erik.

Let me go to his training. If there had been a reasonable accommodation we could have worked out with his training and he says, I accept these terms and conditions of my employment, I will use the preferential bidding system and all the tools available to me to avoid sabbath work, but if I get a sabbath assignment, I'll do it, he would absolutely be hired, kept on and kept in the system.

**Q. Well, I guess the question, though, is he was forced to quit because he was told that they couldn't adjust his matrix training on December 6, 2016. If he had -- and I'm not necessarily agreeing with what you said, but if he had said, Yes, the accommodation you're giving me as far as using these tools is enough, would there have been an adjustment made regarding his matrix training back in December of 2016?**

A. I don't know. I don't believe so. They're two different issues.

**Q. Right. He resigned instead of being**

**terminated because SkyWest refused to give him an accommodation during his training session, correct?**

MR. PETERSEN: Mischaracterizes his testimony. Calls for a legal conclusion.

THE WITNESS: SkyWest did give him an accommodation during his training session. Mr. Cassell found that to be insufficient for his needs and rejected it.

**Q. (By Mr. Strindberg) Yeah, but, Todd, you just said that I was conflating issues, and now your answer is doing the same thing.**

**During the training session, okay, when he was scheduled for the matrix training on December 2nd, which would have run into the sabbath, SkyWest refused to accommodate him in training by changing that schedule or assigning him to a different matrix training, correct?**

A. Correct.

**Q. The accommodation, as you call it, that was offered to him had nothing to do with training, it had to do with what happened when he became a pilot and was actually flying for SkyWest, correct?**

A. Well, both. The accommodation is the seniority-based scheduling system, which applied to him in both departments. My -- and you're right,

it's easy to conflate the two. But if he returns in the summertime, as you spoke earlier, and never runs into a sundown problem on Friday -- and the other accommodations that had previously been made for him in training, with his CBT training and the other mentioned somewhere saying, you know, you did this twice for me, how come you can't do it now, those apparently were accommodations that training could make.

So there is a blend of accommodations that are not an undue burden and are possible for SkyWest to make and some that SkyWest does not. So if he had returned in the summertime and the sundown problem was not an issue for matrix training, my point is we still haven't resolved the elephant in the room, which is what happens for the next ten months when you actually fly the line.

**Q. I understand your position.**

**Do you know how the matrix classes or sessions were assigned? In other words, my understanding is that someone in the training department assigned people to the various matrix training slots; it was not something that was bid on based on seniority. Is that your understanding as well?**

A. No.
**Q. What is your understanding of how the matrix sessions were assigned?**
A. Matrix sessions were posted and made available for pilots to choose when to go to matrix training based on their seniority. They go in pairs because the matrix has to be operated by two pilots at once. The pilot in that pair with the highest seniority will have the first pick of matrix scheduled training classes. The pair pilot with the lowest seniority will get what's left over.
I don't know how Mr. Cassell or and his partner shook out in this situation, but I do know that their matrix training was assigned on a seniority-based scheduling system. It was not randomly assigned by the company.
**Q. And how do you know that to be the fact?**
A. I learned that from Dave Moxham, the director of training that we spoke about earlier.
**Q. And where was the matrix classes or matrix class slots posted?**
A. I don't know.
**Q. David Moxham has basically taken Jake Whicker's position; is that correct?**
A. No. He has always been there and would

have been Jake Whicker's boss at the time.

**Q. Who's taking Jake Whicker's position?**

A. I don't know. We're not doing any training right now. We haven't hired a pilot in six months; so...

**Q. I won't ask you why.**

**How much has your schedules been cut back, if I may ask?**

A. In April it was cut back 70 percent.

**Q. Wow.**

A. It has climbed gradually to about 50 to 60 percent and holding.

**Q. Do you know how the partners in the training class -- you said two people had to go into whatever -- the matrix simulator at one time. Do you know how partners were chosen?**

A. It's my understanding that they chose each other. They would pair up.

**Q. Do you know -- did you ever ask Mr. Whicker if he asked anyone who had more seniority to bid for a better matrix class if they would be willing to switch and allow Mr. Cassell to take their place?**

A. My understanding is that all of those options were explained to Mr. Cassell, and he

attempted those, was unable to work it out with the other pilots to get a schedule that was agreeable to him.

**Q. Do you know if any of the matrix classes, back in that period, right around December 1st, if any of them were scheduled during daylight hours on a day other than Saturday?**

A. I don't know.

**Q. Do you know if Mr. Whicker or anyone else in the training department tried to help Mr. Cassell switch matrix classes or matrix partners?**

A. The help that I understood he received was guidance and instruction on using those tools to interface with other pilots to get the schedule that he wanted.

**Q. I don't know if, like, someone -- do you know how many pilots there were in that class?**

A. I do not.

**Q. And what's a typical class -- what was a typical class?**

MR. PETERSEN: You're talking about in 2017, middle of 2017, right?

MR. STRINDBERG: Late 2016.

MR. PETERSEN: Late 2016, okay.

THE WITNESS: Roughly 30 pilots.

Q. (By Mr. Strindberg) Do you know if Mr. Whicker or anyone in the training department got up in front of the class and asked if anyone would be willing to trade with Mr. Cassell?
A. I do not.
Q. Okay. In your letter -- let's go back to it -- you talk -- I just highlighted or will highlight it.
My statement was drawn from conversation with the leadership in our crew scheduling department and based on their long experiences.
Who is the leadership you're referring to there.
A. The director of crew scheduling is a woman named Anita Spencer. Her second in command was Jay Oyler. That's who I mean when I talk about the leadership of the crew scheduling department.
Q. And is Anita still there?
A. Yes.
Q. And I gather crew scheduling, their function is to schedule pilots and to schedule reserve pilots. Is that correct?
A. Among other things, yes.
Q. What other things do they do?
A. I understand that they receive all the

flying assignments from our major partners about a month and a half to two months in advance. And then they pair that flying with aircraft type and pilots available and certified to fly those aircraft, and they attempt to build the most efficient schedules possible and then put together a schedule that is published and available for bid to not only the pilots, but also the flight attendants, who access the preferential bidding system to bid for and obtain a schedule for the following month.

**Q. So did you -- prior to sending out this February 3rd letter to Alan, did you also talk with Anita Spencer about the issue?**

A. Yes.

**Q. And when did you talk with Ms. Spencer about it?**

A. My first call on this issue was likely to her all the way back in December. Anita's response then and ever since has been, it would seem impossible to me to avoid a Saturday schedule, but you should talk to Jay Oyler. He runs this day in and day out and knows it backwards and forwards.

So she gave me an opinion based on her experience, which is, like, 30 years of doing this; but because she wasn't hands-on and running the

system like Jay did, she referred me to him.

So when I say my statement was drawn from conversations with the leadership, I got Anita's opinion, but her referral to our subject matter expert, Jay Oyler.

**Q. Did you have other conversations with Anita Spencer about the possible accommodations for Mr. Cassell other than --**

A. No.

**Q. And have you told us about all your conversations with Jay Oyler about the subject matter of accommodations for Mr. Cassell?**

A. I would estimate I had four to five conversations with Mr. Oyler over this time period. It's difficult for me to parse them, but I could tell you there was an initial discussion in December in preparation for answering Mr. Reinarch's letter and more extensive fact-based data research conversations with him over December and January to prepare the February 3rd letter.

**Q. Do you recall the substance of any of those subsequent conversations?**

A. Some of them were follow-ups on where is my data, question, will we see the report soon, how's it coming, his staffing issues. And then once the

report was produced, longer questions with him about what it meant, what he did, how do you know no pilot was ever required to work on a Saturday? So he answered probably 20 to 30 of my questions on that as he referred to whatever data report his people gave him in the preparation for the February 3rd record.

I couldn't give you the dates. I can tell you that the most substantive conversations happened at the end of January, early February, and the first conversation in December.

**Q. Do you recall any of the other questions you asked Mr. Oyler?**

A. I asked him if he could see their bidding preferences. Can you tell if they tried to avoid a Saturday, for example. He said yes, he could see that.

**Q. And this is where he apparently looked at the monthly preferences or bids that these people had put in; is that correct?**

A. Some of them.

**Q. Some of them?**

A. His comment was, Todd, you're asking now for me to do thousands of records. You take a hundred pilots times 12 months, you've got 1,200 bids and all of their preferences. And I didn't do that,

but I'll start to look. What do you want to look for?

Then did any of them make it a high priority not to work a Saturday? And as he looked at a report, he said, I am seeing that. Do you want me to look at all 1200?

I said no.

**Q. What do you mean made it a high priority?**

A. So as Mr. Spagnolo testified, there were several layers of preferences that a pilot could put into the system.

**Q. I think seven layers. Right?**

A. Yes. And within those layers are multiple preferences as well, so you might have 20 to 30 different variables. And I understand it works where if you -- whatever you put in first and make your highest priority, the algorithm will then do its best to give you that if it's left over. If your number one choice is no Saturday flying and it's now your turn to come to the market and get some work, but all the remaining work is Saturday flying, then your second choice will now be honored. Your first choice will be ignored because it couldn't be filled. The second choice is I never want to work with Jeff Smith, and then they'll see, oh, Jeff is on these

four flights. So then you'll get what you want --

**Q. So do you --**

A. -- to avoid another crew member, for example.

**Q. So do you know if any of those pilots you looked at actually put as their number one preference no Saturday flying?**

A. I recall asking Jay, Look at it for me. You don't have to look -- spend weeks on it, but tell me if bid-avoiding Saturday is something you see high ranked and appearing often.

**Q. Yeah. And when I --**

A. He got back to me later and said, Yes, I'm not going to look at all 1200. I've looked at a couple. I'm telling you I see it all the time; they want their weekends off and holidays and a Saturday avoid is common.

**Q. And when you say I've made it a higher priority, you're not saying they made it number one priority, but it was -- what? -- one of their top -- what? -- two, three, four, five preferences?**

A. That's what I understood him to be saying, yes.

**Q. Okay. So there's not a precise --**

A. By the way, Erik, they don't fill out all

30, right? At some point you go, Here's the things I want; here's the things I don't want. And they may not complete the rest of the preferences. So they may not care what day of the week they work, and so it's just not even listed at all.

**Q. All right. I remember that from the manual. You don't have to fill out every level of preference.**

**You referred to Mr. Oyler, and then later this year using the data set, crunching information on the data set. What were you meaning there? What are you referring to when you say "the data set"?**

A. I probably misspoke. What I mean is all of this data still exists. It's --

**Q. It's what? You broke up.**

A. It's knowable.

**Q. Okay.**

A. The data still exists, so although Jay Oyler did not deliver a report to me in 2017 when your client asked to us produce the data, reports, information that I referred to in my letter, this is our best effort at replicating the research that was done then. It may not be spot on, granted; but the data exists. And we could query it any number of different ways. I did my best to replicate the study

that was done in 2017.

**Q. And does that data still exist? In other words, Mr. Glassey wasn't clear about that on how far back the bids -- the monthly bids were kept. Do you have any idea?**

A. We didn't go -- so let me clarify. I don't know that this is drawn from the monthly bids. This data is drawn from what happened. So what actually happened we have. Did you work Saturday? When were you hired? How many Saturdays did you work? And at the time you can see bid and bid preferences. I don't know how long those bids and bid preferences are archived or stored. I don't know.

**Q. All right. Sorry. Just a second. Pulled up the wrong document here.**

**I'm going to show you a document which has been Bates stamped SkyWest 3 -- 3 and 4. We'll make that Exhibit 28.**

(EXHIBIT 28 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) I guess it starts, Todd, with an Email from Johanna Baker and Alan Reinach, and she's forwarding, I assume, your February 3rd letter.**

**Who is Ms. Baker?**

A. She's a paralegal that works for SkyWest Airlines.

**Q. Okay. And the attachment that -- it says:**

**Please see Todd Emerson's response letter.**

**That's the letter we just looked at, correct?**

A. Yes.

**Q. And do you recall receiving this Email back from Mr. Reinach?**

A. I do.

**Q. And you then responded to him later that same day?**

A. Yes.

**Q. Did you have any follow-up conversations with Mr. Reinach prior to the mediation that you both attended?**

A. I don't believe I ever had a conversation with Mr. Reinach until the mediation, and I believe this is the end of our written communication until the mediation.

**Q. Was there any written communication after the mediation with Mr. Reinach?**

A. I don't believe so.

**Q. Have you ever had any written communications with Todd McFarland?**

A. That's possible. I see him copied here. So this is an example of a written communication with Mr. McFarland, but I believe that's because Mr. Reinach copied him on his earlier message. But a direct written letter to Mr. McFarland, I -- it might have happened if he took over from Mr. Reinach. I think I spent my time communicating only with Mr. Reinach, but there might be communication like this with Mr. McFarland.

**Q. Okay. Did you learn at some point that Mr. Cassell had reapplied for a position with SkyWest? And I don't know exactly when the application was, either May or June of 2017.**

A. Yes.

**Q. And how did you learn that?**

A. Coy Bryant brought it to my attention.

**Q. And how did he bring it to your attention?**

A. I believe he walked into my office with a copy of an Email that he received from Mr. Cassell and told me that he had reapplied and maybe had even been interviewed for a position at SkyWest and had run into the same issue with can he get a guaranteed sabbath-free schedule.

**Q. Let me show you a document. I've shown you a document. It's CASSELL -- marked CASSELL 161**

**0to 162. We'll make that Exhibit 29.**
(EXHIBIT 29 WAS IDENTIFIED.)
**Q. (By Mr. Strindberg) Have you ever seen this document before?**
A. Can you tell me the Bates numbers again, Erik?
**Q. 161 --**
A. To 62?
**Q. -- to 162.**
MR. PETERSEN: Okay.
MR. STRINDBERG: You can see it on your screen, can't you, Scott?
MR. PETERSEN: Yeah. Well, some of it. You just had it above the numbers so I couldn't see the numbers.
MR. STRINDBERG: Okay. I did that purposely.
MR. PETERSEN: I bet you did.
**Q. (By Mr. Strindberg) Todd, do you remember -- have you ever seen this document before?**
A. This is a form letter with some variation. I've seen this form letter before. This particular letter addressed to Mr. Cassell I can't say. This might be the first time I've ever seen it.
**Q. I'm going to show you another document.**

**It's SkyWest 81.**

MR. STRINDBERG: Do you see that, Scott?

MR. PETERSEN: I can't see the Bates number, but that's fine.

MR. STRINDBERG: We're going to mark that Exhibit 30.

(EXHIBIT 30 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) And these are a series of emails between Chandler Larsen, Jaime Sorensen and Monica Polad.**

**Who is Chandler Larsen?**

A. Chandler Larsen is a woman who used to work in our human resources department.

**Q. And she's no longer there?**

A. She's not.

**Q. And who is Monica Polad?**

A. Monica is also a specialist who works with the human resources department.

**Q. Is she still there?**

A. Yes.

**Q. And Jaime Sorensen, who is that?**

A. She's a manager in the human resources department, and she still works here.

**Q. But Chandler does not, is what you're saying?**

A. That's correct.

**Q. Have you ever seen this document, Exhibit 30, before?**

A. Yes.

**Q. And when did you first see it?**

A. During document production.

**Q. Did you see it back in June of 2017?**

A. No.

**Q. Did you -- at any point have you had any conversations with Chandler, Monica or Jaime regarding Mr. Cassell or his request for accommodation?**

MR. PETERSEN: Hold on. Prior to June of 2017. If you've had discussions with them since then, don't answer that.

MR. STRINDBERG: Why can't he answer it since then?

MR. PETERSEN: Because we're in litigation. If he's had discussions with them since litigation has started, it would be in his capacity as counsel for SkyWest. Those would be attorney-client.

MR. STRINDBERG: Not all communications that an attorney has are attorney-client privileged, and so --

MR. PETERSEN: I understand. That's why you're asking about this. My point is -- well, I guess maybe I'm premature. You ask him the time, place, manner of the communications, and then I'll respond then.

MR. STRINDBERG: Okay.

**Q. (By Mr. Strindberg) At any time have you had any conversations with Chandler, Monica or Jaime about Mr. Cassell or request of an accommodation he had made?**

A. Yes.

**Q. When did those conversations -- conversation or conversations take place and with whom was it, or were they?**

A. I have never had a conversation with Chandler Larsen about Shane Cassell. I have never had a conversation with Monica Polad about Shane Cassell. I have had several conversations with Jaime Sorensen about Shane Cassell and broadly how we handle requests for accommodations during the recruiting process.

**Q. And these conversations with Jaime, did they take place before or after June 26th, 2017?**

A. I don't recall any discussions with Jaime about this matter prior to the last two years. All

of my conversations with her have happened since the inception of the litigation.

**Q. Okay. And you considered them to be giving -- those conversations, you were giving her legal advice?**

MR. PETERSEN: If you want to hold on, let me think about that and talk with --

MR. STRINDBERG: If the answer is -- if he says yes, I'm not going to claim he's waived the privilege, if that helps.

MR. PETERSEN: Okay. Yes, it does help.

I just would clarify, Todd, if it's seeking by her or you giving legal advice, then the answer is it's attorney-client privileged and you do not answer the question.

THE WITNESS: My conversations with Jaime were me seeking information from her about how our recruiting process interfaces with applicants who request a religious accommodation at the start, in interview or before they make it to training, and how -- what her processes are for handling those. But it was more to educate me, to help me give advice to the company. So I don't know if that's work product or helped me form my mental impressions, but I'm asking her questions to help me do my job.

MR. PETERSEN: Erik, I'm okay if you ask him about what she told him.

MR. STRINDBERG: Okay.

**Q. (By Mr. Strindberg) What did Jaime tell you in the course of those conversations?**

A. She told me that pilot recruiting is a team effort by the flight operations who sometimes use actual pilots to go out, interview, evaluate and help us hire pilots. And, also, the employee relations department is involved. And employee relations is there for these type of questions, because pilot recruiters are not trained to handle them and may have an immediate response that, Well, if you won't commit to work 365 days of the year, you're not qualified for this job. That would truly be the case unless that person said, But it's for a religious reason.

That pilot and recruiter is not trained to handle that, so then it would get kicked over to HR for analysis. That was help, and then instruction back to flight operations on whether they should accept or reject the applicant. That's what she told me.

**Q. And do you know why all three of these people got involved in this situation of rehiring or**

**possible rehiring of Shane in June of 2017?**

MR. PETERSEN: I'll object as speculation. Lacks foundation. He testified he hadn't seen the documents.

But here's my point, Todd. You can answer that if you have a factual basis for that decision that comes prior to the litigation.

MR. STRINDBERG: Right. And I asked him why. So I'm really asking a yes, no question; then if he says yes, I'll ask him why or how he knows that.

THE WITNESS: Yes.

**Q. (By Mr. Strindberg) And how do you -- tell me why all three of them got involved in the Cassell rehire -- possible rehire in June of 2017.**

MR. PETERSEN: Only if that is based on percipient knowledge -- well, knowledge contemporaneous with the events, not that came out after the fact.

THE WITNESS: Chandler has copied in her boss and another worker who has the ability to help her with this problem. That's why Chandler has copied Jaime. Jaime was her boss. And -- I'm sorry. That was Monica. So Jaime is both Monica and Chandler's boss. So I'm reading this backwards.

Monica has flagged it, has copied her peer, Chandler, and sent it to her boss, Jaime, with this question. And then we see Chandler's response above back to her peer and to her boss. It doesn't surprise me to see these three people engaged in this topic.

**Q. Let me show you another document. It's Bates numbered SkyWest 5, and we will make it Exhibit 31.**

(EXHIBIT 31 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) Have you ever seen this document before, Todd?**

A. Yes.

**Q. And when did you first see it?**

A. During the production stage of this litigation.

**Q. So when Coy Bryant informed you that Shane had reapplied at SkyWest, he didn't show you this document?**

A. I don't recall Coy sharing this Email with me in our meeting, no.

**Q. Do you know -- and I realize you didn't write this or were copied on it, but Chandler talks about:**

**I don't think I can actually regret him on those circumstances, so how would you like to**

**move forward?**
**Do you know what she means by "I don't think I can actually regret him"?**
MR. PETERSEN: Objection. Speculation. Lacks foundation.
MR. STRINDBERG: But, Scott, again, I'm asking him if he knows what she's referring to.
MR. PETERSEN: Okay. I understand. Go ahead.
THE WITNESS: I understand what Chandler's saying. Is that your question?
**Q. (By Mr. Strindberg) Basically. It really gets down to what does it mean, "regret"? What does that term mean?**
A. Well, it's regret like a regret letter: We regret to inform you we can't hire you. It doesn't mean we'll regret it if we do hire him. "Regret" is a term of art in our recruiting department, so it's a euphemism for "reject."
**Q. Okay.**
A. That's what she means. I don't think I can actually reject him under those circumstances, so how would you like me to move forward? Chandler is a recruitment/hiring specialist. She's flagged this issue and kicked it up the chain to two different

managers who can help her. That's what she's doing.
**Q. And she also refers here to "our review board." Do you know what the review board is that --**
A. Yes.
**Q. -- she's referring to?**
**What is that?**
A. It's my understanding that when we interview and recruit pilots, their first interview is with a single recruiter, typically a pilot, not someone from HR. And that pilot is reviewing their qualifications, experience, their résumés and giving them verbal quizzes to see if they understand aeronautics and flying and are worth a deeper look. They also ask basic questions to see if they understand the job and are willing to perform it.
If one of those recruiters thinks they've found a qualified applicant that presents a problem that they can't resolve, they kick it up to a review board, which is three or four recruiters who meet together to discuss the issue. Also, I understand those are all flight operations. They're pilots or employees from flight operations.
So I understand this letter to mean that Shane Cassell's recruiter liked him, recommended him, but flagged the scheduling conflict and sent it up to

the review board, who said we can't hire him because of his scheduling conflicts. But Chandler did her job and caught it or weighed in and said I don't think in this case we can regret him based on his refusal to work Saturday, because it's a religious issue that has legal implications.

So she has stopped the process of rejecting or regretting him and looped it in to Coy and Jaime for review from their subject matter expertise, and she's taken it away from flight operations, because they may not know what they're doing when it comes to accommodating an applicant who asks for a religious exemption to our scheduling policies.

**Q. And when you talked with Coy and he told you that -- about this reapplication by Shane Cassell, did he come and meet with you in the office again?**

A. Yes.

**Q. But he didn't bring this Email with him?**

A. I don't recall seeing it.

**Q. Do you recall him bringing any documents to you?**

A. Yes.

**Q. What do you recall him bringing to you?**

A. He brought an Email he received from Shane Cassell.

**Q. Okay.**

MR. PETERSEN: Hey, Erik, in five minutes or so or when you're done with this, I need a break to use the restroom, if that's okay.

MR. STRINDBERG: Let's take a break right now.

Let's just mark this. I just pull up Cassell 20, and we'll make that Exhibit 32.

Let's take a break now.

(EXHIBIT 32 WAS IDENTIFIED.)

(Recess from 2:56 p.m. to 3:08 p.m.)

MR. STRINDBERG: Okay, let's continue.

**Q. (By Mr. Strindberg) We're getting close there, Todd.**

**I'm going to show you what we just marked as Exhibit 32, which is a letter, memo from Shane to Mr. Coy Bryant.**

**Did you ask Coy Bryant to get some more information from Shane?**

A. Yes.

**Q. And what did you ask Mr. Bryant to do?**

A. I asked Mr. Bryant to clarify with Shane whether, if he was handed a Saturday schedule through

the PBS bidding system that he could not add, drop, or trade after having used all of the tools at his disposal, would he refuse to fly, because this Email doesn't quite answer that question. It has several scenarios, but it's still missing the central question.

**Q. Okay. I think you're anticipating some questions I'm going to ask. Let's just back up for a moment.**

**So you apparently had talked with Coy Bryant sometime before June 29th regarding Mr. Cassell's new application for employment; is that correct?**

A. No. I'm sorry. When we left off in the deposition, I told you that I had a conversation with Coy in my office and that this was the document he brought with him. That was my re-engagement in Mr. Cassell's reapplication to SkyWest.

**Q. So you didn't ask Mr. Bryant to get this document from Shane himself; he already had it when he came to speak with you?**

A. Well, I guess as I sit here I don't know. My recollection is that Coy Bryant sometime in June 2017 brought it to my attention that Mr. Cassell had reapplied, had the same religious requirements

and that it had landed back in his department to work out the problem or the accommodation.

And I got -- maybe -- we had that conversation before this Email came in, but for me it's a good marker in time for my re-engagement. It would have been that week, that day, certainly that month, not prior. But since my last communication with Alan Reinach I didn't have anything to do with this matter, so Mr. Bryant approached me again to inform me that Mr. Cassell had reapplied and the application was pending.

**Q. And when he informed you of that, did he have the document we were just looking at, 32, which was Shane's statement?**

A. I don't know. But at some point in that time frame we reviewed this document together.

**Q. Okay. Let's -- we'll get back to that document in a second.**

**Let's look at this document. It is a series of emails. It starts with a portion blacked out, attorney work product.**

(Cell phone interruption.)

MR. STRINDBERG: Sorry. That was Siri wanting to take part in the deposition.

MR. PETERSEN: That was not Siri. That

was an English Dude.
MR. STRINDBERG: I know. No, that's my Siri.
THE WITNESS: Sounded like Cedric.
MR. STRINDBERG: I apologize for that.
**Q. (By Mr. Strindberg) Okay. So this is a series of emails. It's SkyWest 9 and 10. We will mark these as Exhibit 33.**
(EXHIBIT 33 WAS IDENTIFIED.)
**Q. (By Mr. Strindberg) Have you ever seen this before? It starts, first of all, with an Email from Shane to Coy, subject: Memo regarding religious beliefs. And I don't know if it was deposition or otherwise. Shane has said that the document we just looked at, Exhibit 32, is what was attached to this Email. And then Coy, I guess, sends to it Glassey, and then I assume it goes to some attorney. I don't know if it was you or not.**
**But does that refresh your recollection of when or how you ended up seeing Exhibit 32, which is Shane's statement?**
A. Yes, it does.
**Q. So tell me, what's been refreshed?**
A. Okay. So the -- I'm off a couple weeks. Shane sends this Email on Thursday, June 29, to Coy,

who 12 days later sends an Email to Roy Glassey saying he's read it and he thinks it has solved the problem. At that point I can tell you that Roy responds to me and Coy with questions about the Email and asked me to re-engage in the issue. And Coy and I then meet. So the meeting I'm describing happens on or after July 11th.

**Q. And these -- these questions --**

A. That's the re-engagement now in the case. That's -- I'm now re-engaged.

**Q. And these questions that Roy posed, they were -- what? -- in the form of an Email?**

A. Yes.

MR. STRINDBERG: Scott, I don't think that's been produced to us.

MR. PETERSEN: What you see is blocked out. I need to look at that, given where we are.

MR. STRINDBERG: Okay. Yeah. Because I'm not sure if --

THE WITNESS: That Email was sent to me seeking legal advice and copied Coy. So you understand, if there's a log, this is Roy Glassey to Coy Bryant and Todd Emerson. That's the next Email, and it's Roy seeking legal advice.

**Q. (By Mr. Strindberg) Okay. So you got**

**that -- is there a date -- I don't have the loggings on me. What's the date that Roy forwarded this to you, the part that's been blocked out?**
A. I don't know without the log.
**Q. But sometime, I gather, in July?**
A. I think the same day.
**Q. Okay. And based on the Email that you get from Roy with these questions, do you then contact Coy and set up a time to meet with him?**
A. Roy's Email is the impetus for our meeting. I don't know if Coy came to me or I called him.
**Q. And he came in, and he had -- did he have with him what we've previously marked as Exhibit 32, which is Cassell's memo to him, or letter, dated June 29th?**
A. Yes. It might have been electronic. We might have pulled it up and looked together at it on a screen, or it might have been a piece of paper. But we reviewed this Email together.
**Q. And I assume you read it and you saw it, and I've highlighted part of it, that Shane was saying that, I realize that SkyWest cannot guarantee that I will be provided a schedule, and he goes on to talk about how he intends to use these tools that**

we've talked about to either bid out of, drop or trade a shift that may conflict with my beliefs. He then discusses a mentor, and he goes on from there.

I assume you read that part which he claims he was not asking for a guarantee. Correct?

A. I read that part, correct.

Q. After you reviewed this with Coy, what did you and he talk about?

A. How to respond to Mr. Cassell with some follow-up questions about the accommodation he's seeking and what he is and is not willing to do.

Q. Anything else you asked or told Coy?

A. Anything else would be legal advice that I offered him.

Q. But did you direct or ask Coy to talk with Mr. Cassell again to answer some questions?

A. I did.

Q. And what were those questions you asked him to ask Mr. Cassell?

A. I asked him to find out from Mr. Cassell if, after using all the tools available to him, he ended up with a Saturday schedule; and then using all the tools available to him under the PBS system to avoid that Saturday schedule, he was nonetheless saddled with a sabbath Saturday schedule, would he

work it or decline it. We need to know his answer to that question.

**Q. And do you know if Mr. Bryant then contacted Shane Cassell?**

A. I don't know. I can't tell you for sure. It's my understanding that he did what I asked him to do. And I don't know if it was an Email or telephone call, but Coy responded sometime down the road that ultimately Mr. Cassell required a guarantee that he ultimately not be scheduled on a sabbath.

**Q. And this response to you from Coy, was it in writing or orally?**

A. Most of our communication was in person. We worked very close to each other geographically in the building. So I have no independent recollection other than to say Coy and I discussed this case 95 percent of the time and wrote about it or sent emails maybe for a very small sliver of the communication as we consulted.

**Q. And did Coy use the term "guarantee"? In other words, did he say that Cassell wanted a guarantee that he wouldn't have to work on a sabbath?**

A. Might have said "assurance" or another synonym for guarantee, but that's how I remember it.

**Q. And how did you respond to Mr. Bryant?**

A. I reminded Mr. Bryant that we can't make those assurances or guarantees or promises due to our contractual obligation to run the scheduling system the way we negotiated it with SAPA.

**Q. Did you ask Mr. Bryant to contact SAPA and see if they might be willing to help SkyWest accommodate Mr. Cassell's request?**

A. No.

MR. PETERSEN: I think you're getting into legal discussions with Mr. Emerson with the actors that are dealing with your client, so I'm going to -- I'm going to instruct him not to answer those types of questions from here on. You're way in the gray area, which is --

MR. STRINDBERG: Right. I understand what you're saying, Scott. I think it's -- you know, the legal advice is apparent. I mean, I think we all know what position SkyWest took on this, so, you know.

MR. PETERSEN: Well, I realize that. And, look, I'm trying to be -- I understand what you're doing, and we're trying to be cooperative on that; but selective waiver is not generally allowed in attorney-client communications. And so, you know, I'm not -- I think we've tried to limit what Todd's

testified to as to what his actual involvement has been as the HR -- when he puts on the HR hat versus the legal hat. I think we're now in an area where I'm not comfortable, I think, that he's got the HR hat on.

MR. STRINDBERG: Okay. I understand that, and you guys have been very cooperative. I mean, if you allow him to answer as to what he told Coy Bryant, I would not consider that a waiver of anything beyond that conversation, if that helps.

MR. PETERSEN: Well -- and I think he answered it, so -- didn't he?

THE WITNESS: I believe the question was did I ask him to go to SAPA and get a waiver.

MR. PETERSEN: Yeah, and he said no.

**Q. (By Mr. Strindberg) And did you tell Coy that without the, what you say, assurance about Shane Cassell -- did you ask or did you tell Coy that because SkyWest could not assure that Cassell would never work on a sabbath that you could not -- SkyWest would not hire him?**

MR. PETERSEN: Let me just caution you, Todd. So to the extent that you're a decision-maker on the business side, I think it's a fair question. To the extent that you're advising those who would be

decision-makers on the business side, then do not answer that.

Do you want to take a break and just let us talk that through for a couple of minutes?

MR. STRINDBERG: Sure.

THE WITNESS: That would be helpful. Thank you.

(Recess from 3;25 p.m. to 3:29 p.m.)

MR. STRINDBERG: Let's go back on the record.

**Q. (By Mr. Strindberg) Mr. Emerson, do you know who made the decision not to rehire Shane Cassell?**

A. I'm sorry. Just a minute. Is that -- I'm sorry. Just a minute.

(A discussion was held off the record.)

THE WITNESS: I'm sorry. What was your question?

**Q. (By Mr. Strindberg) My question was who made the decision not to rehire Shane Cassell?**

(A discussion was held off the record.)

MR. PETERSEN: Hold on.

(A discussion was held off the record.)

THE WITNESS: I remember the question; I can answer it. I don't know for sure as I sit here

today. I'd have to do some research.

**Q. (By Mr. Strindberg) Do you know who would have the authority to make the decision not to hire someone?**

A. Roy Glassey certainly. The members of that pilot review board, they could have stopped it before it got to Roy. It appeared that Roy was engaged at this point, so I gave instruction and legal advice to Coy. He left with that, and I don't know who ultimately made the decision not to rehire, whether that was the pilot recruiter, pilot review board, Mr. Glassey.

But the ultimate authority for hiring and firing pilots comes from the flight operations department, not from HR and not from me. We are advisors who typically give them a full appraisal of the situation, and then they act upon our advice.

**Q. I can't remember exactly what Mr. Glassey told us. Was he the chief pilot by July of 2017?**

MR. PETERSEN: If you remember.

THE WITNESS: I don't know his position in 2017. The top chief pilot -- there's a designation on our FAA certificate for chief pilot. That is Tracy --

THE REPORTER: Tracy who? I'm sorry.

THE WITNESS: Next in line of command is Roy, and I believe he was at the time. And whatever Roy's position was at that time, that decision made it to him.

MR. PETERSEN: I'll tell you, Erik, my notes from his depo say it was 2016 when he was made company chief pilot and director of flight operations.

MR. STRINDBERG: Thank you.

I'm going to pull up another document here. It's Cassell 176. We will mark it as Exhibit 34.

(EXHIBIT 34 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) This appears to be some sort of a form letter. Have you seen this letter before, Todd?**

A. No.

**Q. Were you aware that someone from SkyWest Airlines Recruitment was going to reject Shane's application before it was sent out?**

A. No.

**Q. Let's change subjects for moment. I gather from some of the documents that you guys provided to us that other employees have asked for religious accommodation over the years; is that**

# Exhibit I

Exhibit I

# Remote 30(b)(6) Deposition of SkyWest Airlines

## Steven Spagnolo



Date: September 29, 2020

Case: Cassell vs. SkyWest, Inc.

Civil No: 2:19-cv-00149-jnp-dao

*Reporter: Vicky McDaniel, CSR, RMR*

ASSOCIATED REPORTING & VIDEO

*Next-Level Litigation Support*

The Owyhee
1109 Main Street, Suite 220
Boise, Idaho 83702

Phone: (208) 343-4004
Facsimile: (208) 343-4002
production@arvboise.com
arvboise.com

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| SHANE ANDREW CASSELL, Plaintiff, vs. SKYWEST, INC., d/b/a SKYWEST AIRLINES, Defendant. | Civil No. 2:19-cv-00149-jnp-dao<br>Judge Jill N. Parrish<br>Magistrate JudgeDaphne A. Oberg |

REMOTE 30(b)(6) DEPOSITION OF SKYWEST AIRLINES

STEVEN SPAGNOLO

September 29, 2020

Salt Lake City, Utah

Repored by: Vicky McDaniel, CSR, RMR

**Q. (By Mr. Strindberg) You said you asked Justin for the data. What specifically did you ask him to provide you?**

A. I asked him to see if he could query those three domiciles that we talked about -- the Chicago, Detroit, Minneapolis for the 2017 to 2020, just trying to get him -- or ask for a list of all the pilots and their seniority for each month during that time frame in each of those domiciles, and I just asked him if he could pull that data somehow.

MR. PETERSEN: I think he's getting mixed up between the two types of documents, Steve-O. The one that was just shown to you is the Saturday work document.

THE WITNESS: Oh, okay. Yeah, so that one -- that one was produced by Paxton, not Justin.

MR. STRINDBERG: Right. I was asking about Justin, Scott.

MR. PETERSEN: Oh, I'm the one out in left field. I apologize.

THE WITNESS: Yeah. So Justin, I just asked him if he could produce something like that. He sent me back a short while later that information, asked if that's what I was looking for. I let him know, yeah, that's what I was looking for.

**Q. (By Mr. Strindberg) So it shows -- it's by month by domicile?**
A. Correct.
**Q. And it has, what, the list of each pilot on it and where they rank in the --**
A. Yeah, seniority -- correct. Their seniority number, their information, which domicile they were in for each month in that time frame.
**Q. Does it have any other information about the various pilots?**
A. What do you mean by various information?
**Q. Well, such as what planes they're qualified to fly.**
A. Oh. So I only pulled the CRJ fleet, so I didn't pull any ERJ data, just CRJ fleet.
**Q. And why only CRJ fleet?**
A. That was the fleet that Mr. Cassell was scheduled for or hired to fly.
**Q. So is there a different seniority list for the -- what are the other planes? The ERJ?**
A. There's not. The seniority list is what it is for all pilots. So -- so obviously, it -- you -- yeah, your seniority doesn't change depending on which aircraft you're on. Your seniority is your seniority. So if you transfer, you go from one

aircraft to a different aircraft type, your seniority follows you, whatever you're hired with or whatever your pilot seniority was.

**Q. Okay. And you said you talked with Tina Edelson (phonetic) about the PBS system; is that correct?**

A. Yeah. Tina Eaton, correct.

**Q. And what did you discuss with her in regards to that system?**

A. Just asked her basic questions. One, I wanted to get the history from her about when PBS first came into play here at SkyWest, so just the origins of PBS, and asked her about some of the properties of PBS that they can perform or just put in their bid.

**Q. Okay. And lastly, you talked with Virginia -- is it Roskey?**

A. Dorosky.

**Q. Dorosky. And what did you talk with her about?**

A. Just how she -- how that -- the pilot seniority works as far as when they are first hired, when they're assigned a domicile, where in the process they're assigned their first domicile.

**Q. Great. Before we go on, I forgot -- you**

**said you hadn't been deposed before. You understand you're under oath, correct?**
A. I have been deposed before.
**Q. Oh, you have?**
A. Yes.
**Q. So you're generally familiar with it. You understand you're under oath, so you're sworn to tell the truth?**
A. Yes, I understand.
**Q. Is there anything that would prevent you from doing so today?**
A. No.
**Q. Okay. What did you talk with Trisha -- is it -- trying to get her last name. Trisha Bennett. You already told me. Anita Spencer you also said you talked with. Is that correct?**
A. Yes.
**Q. Okay. Anything else you did to prepare for today's depo?**
A. I read over the policy, seniority reference in the PPM, the Pilot Policy Manual, just to kind of refresh myself a little bit with it. Read over the PBS users guide a little bit.
**Q. I imagine that was fun reading.**
A. Yeah.

**Q. Okay. Well, let's start talking about the seniority system. When was the seniority system developed, and who was involved in developing it?**

A. So seniority, as far as I understand, has been around since the very first pilots here at SkyWest. That would be sometime in the '70s. I don't have an exact date. But they've been -- they've been working on their schedules based on seniority since the very first pilots here.

**Q. And do you know who developed the seniority system?**

A. I don't, no.

**Q. Now, there's some group, I believe it's called SAPA, which represents pilots. Is that correct?**

A. That's correct.

**Q. What was their involvement, if any, in developing the seniority system?**

A. I believe the seniority system was developed before they came into existence.

**Q. When did SAPA come into existence?**

A. I honestly don't know the exact timeline they came in.

**Q. Excuse me one second. I think I'm getting notifications on my Outlook.**

(A discussion was held off the record.)
**Q. (By Mr. Strindberg) So I want to -- what role, if any, has SAPA had in changing or modifying or anything like that regarding the seniority system since it's been in existence?**
A. So SAPA's role, they're the representative group for the pilots to initiate or make change or create new policy for the pilots. So anything that's located in the Pilot Policy Manual, which is where seniority is housed is in the Pilot Policy Manual. So if the company or SAPA would like to change that seniority policy, they would have to either present it or agree to it, and it has to be agreed upon from both sides. So they -- that policy can't change without their involvement.
**Q. And what policy are you referring to?**
A. So seniority itself is a specific SP in the Pilot Policy Manual, so there's a section that talks about how seniority is applied.
**Q. I'm going to share a screen with you. Can you see this, Steve-O?**
A. Yes, I can.
**Q. It's titled "Seniority Standard Practice 3021." Is that what you were just referring to regarding the seniority?**

A. Yes, that's correct.

MR. STRINDBERG: I'd like to -- what I've done, Scott, if it's okay with you, I have a number of sections from the policy manual, and I want to make them just one exhibit so we're not having multiple exhibits. So Exhibit 21 will be composed of SkyWest document No. 389 to 397, 413 to 422, 511 and 529 to 533.

(EXHIBIT 21 WAS IDENTIFIED.)

MR. PETERSEN: Those are all sections of the policy manual?

MR. STRINDBERG: Yes.

MR. PETERSEN: All right.

**Q. (By Mr. Strindberg) So Steve-O, is this the only place that the seniority is discussed in the manual?**

A. When you say "discussed," what do you mean?

**Q. Is there any other place where the terms and conditions of seniority are set forth, or is this Section 3021 the only place?**

A. Yeah, I believe this is the only place where the terms and conditions would be established. I'm sure it references the word "seniority" in other places, but that would be speaking to how it's

applied, not what it is or how it's accrued.

**Q. Okay. So why don't you give me -- instead of me asking specific questions here, why don't you tell me generally how the seniority system works. How is a pilot assigned seniority and how is it used by the pilot thereafter?**

A. Okay. So pilot seniority is established when they first attend their new hire class. Their seniority is determined -- there's a couple of things that can determine how their seniority is established. So if you are a current employee of SkyWest, say you're transferring from a different department, you've been working ground operations, airport operations and you become a pilot, been working for SkyWest, then your seniority is determined on how long you've been with the company. So if there's multiple pilots in the same class that have also -- were current employees of SkyWest, then it depends on who's been with SkyWest the longest to determine their seniority.

Otherwise, if you're a brand-new pilot coming off the street, first being hired, then your seniority is determined by the last four of your Social Security number.

**Q. Okay. So let's not worry at this point**

**about people transferring from one job to another. Let's talk about pilots coming in. So a new pilot coming in, say, when Shane Cassell came in, or if he had come in in 2017, he would have gotten some sort of a seniority number; is that correct?**

A. Correct, pilot seniority number.

**Q. And does that number stay the same throughout that pilot's tenure with SkyWest?**

A. Yeah, so long as they don't, you know -- I mean, if they quit and get rehired, then it wouldn't -- they don't get their old seniority number back. But, yeah, as long as their employment's continuous in that position, then it remains the same.

**Q. So would I be correct, then, to say that the old -- the pilot who has the most tenure with SkyWest would have a seniority number of 1?**

A. The pilot with -- the pilot that's been a pilot with SkyWest the longest, yes, would have the seniority of 1, longest tenure.

**Q. Okay. So does -- so say that a pilot who has seniority number 1 retires. Does everyone's number change, or do they just stay the same thereafter?**

A. Oh, sorry. Yeah, so they would move up,

basically, based on -- yeah, so they would move up. If that person quit or retired ahead of them, they would all move up by that amount.

**Q. So would they get new seniority numbers?**

A. Yes.

**Q. Okay. So it's not like security numbers where they stay the same forever; these numbers vary depending on who's above you, if they leave or for whatever reason --**

A. Yeah. So their position doesn't change but their seniority number does.

**Q. What do you mean that their position doesn't change?**

A. Meaning where they're at on that seniority list. We can't leapfrog somebody into a different seniority. So they stay in the same position, but that actual number, seniority number does change based on attrition.

**Q. Okay. So when -- I gather that when SkyWest hires pilots, they go through some training so that there's usually a group of pilots who are hired at one time and go through the training at one time. Is that correct?**

A. Correct.

**Q. Within that training class, how are the**

**seniority numbers assigned?**

A. So -- so, again, it's based off of their first day of class. We set the date of their seniority, and then from there, where there's multiple people being hired or starting class at the same time, that's where you have to look at if any of those pilots were previous or -- sorry, excuse me -- current SkyWest employees or not, and if they weren't, then that's where they start going off of their -- the last four of their Social Security number to determine where they fall in the seniority list.

**Q. So is the seniority number -- is it an actual number, or do you just use the date of hire?**

A. No, it's a seniority number. So they're given a number right from the beginning, and that puts them in the list wherever they land. And then that number changes based on attrition and that sort of thing.

**Q. Okay, let me share this with you. So this was Exhibit 20 that we looked at.**

A. Okay.

**Q. The left-hand column has -- it says "Employee" and then it has a number.**

A. Uh-huh.

**Q. 53197, 54207. Is that the seniority number?**

A. No, that's their employee I.D. number that the company establishes for all employees.

**Q. Okay. So this -- how many digits is a typical seniority number for pilots?**

A. For pilots, one to four digits.

**Q. How many pilots are there employed by SkyWest currently?**

A. I'd be giving a rough estimate, but I believe it's around -- I think we're just a little over 5,000 pilots.

**Q. Okay. So if the seniority -- if your seniority number changes based on whether people above you retire or leave, how often do you get a new seniority number?**

A. Well, there's attrition, you know, sometimes daily. So your seniority number could change on a daily or weekly basis.

**Q. How would the pilot, a pilot know that there's been a change in his or her seniority number?**

A. They can review a seniority list on SkyWestOnline, and that will tell them their current position.

**Q. And who actually assigns the seniority**

**date? Who's responsible for that? Or seniority number.**

A. The pilot staffing coordinator is the one that establishes that.

**Q. And who is that?**

A. Virginia Dorosky.

**Q. And is she responsible for changing the seniority list that the pilots can access?**

A. I don't think she actually -- I think she gives the information, but I don't think she does the -- changes the actual list. I don't know that for sure.

**Q. Okay. So once you have the seniority date, what is it used for?**

A. So with your seniority, that's how your schedule is essentially determined. So when you go to bid, your -- your bid for your schedule, your award is going to be awarded based off of your seniority. It's also used for things like master vacation. So when you're requesting master vacation, that's based off of your seniority as well. So your seniority drives a couple of different things.

**Q. Okay. Well, let me make sure I understand it. So if an officer -- and some of this all -- some of these topics overlap, obviously. Is the seniority**

**date used to assign pilots to different domiciles?**

A. Yes. That's also used to determine transfers as well.

**Q. How about with new pilots coming in?**

A. Yes.

**Q. How would --**

A. Sorry.

**Q. You know with -- you have a group of, say, 20 pilots coming in in a training class; and my understanding, based on one of the interrogatories, is that in 2017 most of those -- or all of those new pilots were assigned either Chicago, Minneapolis or Detroit. Is that correct?**

A. Yes, correct.

**Q. How -- who decided, or how was it decided which pilot would go to which domicile?**

A. So they -- based on their pilot seniority, they all, while they're in class, will put their preference of where they want to be domiciled. It could be anywhere -- any of the domiciles they can submit a request for, but it's -- depending on where we need to position them is where they're placed. But their seniority will determine -- so say, for example, I'm the most senior in the class and I have Minneapolis as my number one choice, Detroit is my

second, Chicago is my third. If I'm the number one in the class, then I'm going to get my first choice of where I want to be placed, because we are filling spots in that Minneapolis domicile.

So each one, you'll go to the next most senior, see if they're -- see their selection where they prefer to be. If there's nobody in that, then they take that opening.

**Q. And I don't know if I let you answer, if I wasn't listening careful enough. And seniority within each class, how is that decided?**

A. Seniority in each class is determined --

MR. PETERSEN: Hold on. Just so that you know, Steve, if I make an objection, just hold off until I make the objection, and then you can answer.

THE WITNESS: Yes.

MR. PETERSEN: I make sure I object. Asked and answered. Go ahead.

THE WITNESS: Yeah. So seniority within each class is based on whether you are a current SkyWest employee or based on your last four digits of your Social Security number.

**Q. (By Mr. Strindberg) And those people who are current SkyWest employees get a higher seniority number -- or I guess lower, really, meaning they're**

**higher on the list?**
A. Correct.
**Q. Okay. So for new hires coming in, they have this -- they rank where they want to go, and that uses seniority, their seniority number to sort that out. So, in other words, if you're sending in a class, five people are going to be sent to Minneapolis; and if the people with the five highest seniority numbers all choose Minneapolis, they get their choice. Is that what you're saying?**
A. That's correct.
**Q. Okay. So once they get to a domicile, do they get a different seniority number, or does it stay the same?**
A. No, their seniority always stays the same where they're at on the list. However, where you're at within that specific domicile is important as well, because you're bidding against the rest of those that are in that domicile. So you may be bidding -- out of 150 pilots, you may be pilot number 100 bidding for a specific month. But that could change. You may not be bidding number 100 every month. Again, your total seniority as a pilot never changes. You stay on the list.
But say, for example, you had a senior

pilot transfer into that domicile that is senior to you, then that would bump you down the list as far as where your seniority holds in that domicile. Or if one transfers out, then you could be up in the seniority list in that domicile.

**Q. Do you get a separate domicile seniority number, or is that --**

A. They -- yes and no. I mean, you will see where you bid in that seniority, so in essence you have a number of what you bid for that month in that domicile. But you're not -- the company doesn't say, this is your -- we don't issue you a new seniority number, if that makes sense.

**Q. Okay. The computer system somehow knows that pilots with certain seniority numbers are assigned to a certain domicile; is that correct?**

A. Yes, correct.

**Q. So say you're a pilot in Minneapolis and you want to transfer to another domicile. How does or when does seniority come into effect there?**

A. So for transfers, when you want to transfer you would submit for a transfer, and if there's an opening in the domicile that you're looking to transfer into, then we look at all the pilots that are looking to transfer into that

domicile and it would be awarded based on their pilot seniority.

So you're matched up against -- there could be pilots -- you're in Minneapolis, another pilot in Chicago, another pilot in Detroit; all three of them want to go to Denver, for example, and there's an opening in Denver. We would look at which of those three pilots has the most pilot seniority to determine who gets the slot in Denver.

**Q. Are there different seniority numbers or dates, whether you're a captain versus a first officer?**

A. No. Your pilot seniority is the same regardless of your position.

**Q. But when -- if someone's a captain and they're bidding on routes, they're competing against other captains and not against the first officers. Correct?**

A. Right. So it's still position specific, equipment specific, and domicile specific when they're bidding. So they're only bidding against other captains in their domicile on the same equipment when they bid.

**Q. What do you mean by "equipment specific"?**

A. Aircraft type. So whether it's ERJ or the

CRJ, different aircraft types.

**Q. Are some pilots trained on both types of aircraft?**

A. No. You can only be in one aircraft type at a time.

**Q. I know in the CRJ there's a number of different CRJs. Is that correct?**

A. That's correct, different variants of the CRJ.

**Q. If you qualify on one CRJ, are you qualified in all three?**

A. Not automatically. You do have to do additional training, but we do train -- if you're a CRJ pilot, you will get training on all the variants of the CRJ aircraft.

**Q. Okay. And is that done in the initial training or is it done later?**

A. It's generally done within usually a month or so after their initial training. So, generally speaking, they would get training on the CRJ200 during their Initial Operating Experience; and then once they pass that, they're qualified on the 200 to operate; and then their training is scheduled shortly after that to get experience in the other variants, 700 and the 900.

**domiciles in 2017?**
A. I think just in the first month there was -- as I looked at it, there was about 600 total pilots. So in January of 2017, 600 pilots on those lists -- or on the list.
**Q. So January 2017, 600 pilots between -- between all three?**
A. All three, correct.
**Q. And can you break down how many of those pilots were in Minneapolis, how many in Detroit, and how many were in Chicago?**
A. I don't have that number off the top of my head. I could -- I could research that and get that number, yes, but I don't have that number off the top of my head.
**Q. What would you have to do to research it?**
A. That would be part of the information that was pulled from Justin Esplin. So we had to pull it off of that Excel report that he gave me.
**Q. When we take a break, which we will do here shortly, would you be able to look and see how many pilots were assigned to each domicile in 2017, each of those three domiciles?**
A. Yes.
**Q. Okay.**

MR. PETERSEN: By a particular month, Erik? Because the domicile numbers may change month to month.

THE WITNESS: Yeah, it's going to change month to month.

**Q. (By Mr. Strindberg) Do they change dramatically month to month?**

A. No, I don't -- I wouldn't say dramatically, no.

**Q. Let's take a 10- or 15-minute break here. Why don't you choose like July of 2017, 2018, 2019, and 2020 and tell me how many pilots were in each of those domiciles.**

A. In July of each of those years?

**Q. Yeah. Let's take July, because that's about when the class was that he was in. So is 15 minutes enough for you to do that?**

A. Yeah, I should be able to pull that in 15 minutes.

**Q. Let's come back at 11 o'clock, then.**

A. Okay.

(Recess from 10:45 a.m. to 11:01 a.m.)

**Q. (By Mr. Strindberg) So I was asking you about the number of pilots in those three domiciles, '17, '18, '19, and '20. What were you able to find**

**out?**

A. Okay. So in July of 2017 in Detroit there were 268, Minneapolis 155, Chicago 249.

**Q. Okay. And that's both first officers and captains?**

A. That's just first officers.

**Q. Okay, good. Thank you.**

A. July 2018, Detroit had 237 Minneapolis 256, and Chicago 300.

**Q. Okay.**

A. July 2019, Detroit had 287, Minneapolis 211, Chicago 339. And in July of 2020, Detroit was 199, Minneapolis 220, Chicago 327.

**Q. And is this just first officers on the CJs?**

A. Correct, yes.

**Q. CRJs, right. Sorry.**

A. Yeah.

**Q. Is that the only aircraft that fly out of those three domiciles?**

A. Minneapolis and Chicago both fly the ERJ, but not -- I'd have to check the dates. Minneapolis isn't -- it doesn't go back as far as 2017 on the ERJ.

**Q. Okay. And Detroit is just the CRJs?**

A. Correct.

**Q. So the numbers you've given me are first officers who are qualified on CRJs in those three domiciles?**

A. Yes.

**Q. Were you able to determine how fast someone would move up on the seniority list in each of those domiciles, say, in that four-year period?**

A. I -- I don't know, no, how fast they did. Do you mean just off the top of my head?

**Q. From the data you looked at. In other words -- and I'm talking about relative place on the seniority list. Like, in other words, if someone was in Detroit and they came in and they were the bottom person on the totem pole, how long would it take them to rise up in seniority and how fast would they rise up relatively on the list?**

MR. PETERSEN: I'm going to list an objection as vague and ambiguous as to the term "rise up."

Go ahead.

THE WITNESS: Yeah, I don't know exactly how long it takes them. It is -- it's always been a very -- where -- how you move up depending on where you're at, where you're based at, depending on

attrition numbers, that sort of thing.

**Q. (By Mr. Strindberg) And this is getting into a little bit of some of the other topics, but I gather new hires are placed on a reserve board. Is that correct, or used as reserve pilots?**

A. It also depends on where they bid, meaning --

**Q. Well, focus on these three domiciles.**

A. Yeah. Generally speaking, when you first come off of training you are going to be a reserve.

**Q. Was that the case for these three domiciles in 2017?**

A. I would have to look at each individual to see when -- when they went on reserve or when they came off reserve. I don't know for sure.

**Q. That data is available, though?**

A. Yes. I could research that.

**Q. And, again, this is somewhat jumping ahead, but is it possible to determine -- would it be possible to determine how long it would take a first officer in each of these domiciles to actually get their first choice for trips?**

A. Can you explain what you mean a little bit by "first choice for trips"?

**Q. And, again, this is jumping ahead. I**

**gather in the bidding process each of the pilots bids on the trips that he or she wants. Correct?**

A. Correct.

**Q. And do they rank, you know, number one choice, number two choice, that type of thing?**

A. Yes. There's -- there's different layers within the PBS system where they would put their preferences in.

**Q. Okay. So can you tell, or is there data available which would tell us when a pilot -- first officer in each one of these domiciles was able to get their first preference, their first bid preference?**

A. Yeah, it probably -- it probably exists. I don't know for sure. Going back, historically, looking at that to see if it's something that we have archived on their actual preferences -- yeah, I don't know that for sure.

**Q. I'm just taking a note.**

**What I'm getting at, Steve-O, and obviously I don't want to be -- I'm not trying to hide anything. The issue here is Saturday, you know, flights for Shane Cassell. He, because of his religious beliefs, would not fly on the Sabbath. I'm just trying to find out if he had been assigned one**

**of these three domiciles, how long it would have taken him before he could have been guaranteed that he wouldn't have a Saturday flight, in other words, where he could bid flights that did not involve Saturday travel. That's what I'm getting at.**

A. Yeah. That would be very difficult to determine or predict, because there's lots of variables that would go into that. So yeah, that would be hard to say when exactly you could guarantee it. Because it's not even necessarily a guarantee at any point, because it's not as though as you reach a threshold that you stay at that threshold forever.

For example, if -- and 2020 is a good example of this. You may be bidding a line or being able to hold a line and not be on reserve back in 2019, but because the flying is reduced here at SkyWest in 2020 with the COVID, then we may not have as many lines anymore; and so you may have -- you may go from being a line holder to being on reserve in 2020, even though a year has passed.

**Q. Right. But 2020 is an unusual year, I gather. Is that correct?**

A. Yes, it is.

**Q. The reason I ask is because I know there are some pilots in some of the domiciles that have**

**enough seniority that they have -- is it called a standing bid, where every month they get the same flights month after month and they're able to hold that because of their advanced seniority?**

A. Yes. The standing bid they can submit -- any pilot can have a standing bid, which just means they don't have to go into the software every month and put it in again, all their settings. They basically just are -- like save settings, this is my preferences for every month.

**Q. Right. Would the -- I gather each domicile has its own chief pilot. Is that correct?**

A. That's correct.

**Q. Would the chief pilot have a pretty good idea about how long it would take before a pilot coming in in 2017 could be guaranteed that he wouldn't have to work on a Saturday?**

A. No, I don't think a chief pilot's the best resource, especially looking backwards. Chief pilots have changed in that time, so they may not even be domiciled in that domicile, or they may oversee multiple domiciles. So, yeah, I don't know that the chief pilot's the best resource.

**Q. Who would be the best resource for trying to determine how long it would be before a pilot**

**hired in 2017 could get their first preference on bid choices?**

A. Honestly, you would probably have to just pull up each individual pilot and do research on each individual pilot to determine how long it took them. It's going to vary between -- again, depends on where you're based. It depends on the growth of the company at the time. It depends on where the flying is being allocated. So there's lots of variables that would potentially affect how long you would be on reserve in a particular domicile.

**Q. Okay. These numbers you've given me about the number of first officers in each of the domiciles in the middle of '17, '18, '19, and '20, there's some variation, like Minnesota -- Minneapolis, excuse me, goes 155, and then it goes up by about 100, and then it goes down by a good 45, that type of thing. Detroit also goes -- sort of goes up and down. What causes -- do you know what causes that variance in the number of first officers in those domiciles?**

A. It's all based on our flying and how many block hours we had and where that flying is allocated. It depends on where our partners are requesting us to fly. And so that could change those numbers in each domicile and the number of pilots

required to do that flying out of that domicile.

**Q. Can pilots be involuntarily switched between domiciles by SkyWest?**

A. They -- like, a domicile closure could involuntarily force them out, so if a domicile closes then they may be forced out of there. But SkyWest doesn't force pilots out of a domicile that's active.

**Q. Well, but say -- say Detroit, for example, say there's less flights in Detroit and more and more flights out of Chicago. And I don't know if that's the case. I'm just using that as an example. Could SkyWest tell a pilot that they needed to transfer to the Chicago domicile where they could have more hours?**

MR. PETERSEN: Hold on. I just want to object. It's outside the scope of this topic, so this isn't going to bind the company.

Go ahead.

THE WITNESS: Yeah, they don't force them out. They would look to see who wants to go to Chicago and try to award transfers based on who wants to leave there.

**Q. (By Mr. Strindberg) Okay. If someone -- if someone goes out on -- do you know what family medical leave is?**

A. Yes, I do.

**Q. Say a pilot goes out on family medical leave. Does that affect their seniority at all?**

A. No, it doesn't affect their seniority.

**Q. How about if they're gone for a more extended period of time, say, six months because of a serious illness that keeps them out six months? What happens to their seniority number at that point when they come back?**

A. Well, they still --

MR. PETERSEN: Hold on. Hold on. I'm going to object. It's irrelevant and assumes facts not in evidence, and it's outside the scope.

Go ahead.

MR. STRINDBERG: It actually isn't. It's one of the questions that's listed, Scott.

MR. PETERSEN: Based on -- based on illness? I don't see that.

MR. STRINDBERG: Well, it says -- the question was how the seniority system/bidding system operates when a pilot needs leave under the FMLA or accommodation under the ADA.

MR. PETERSEN: You can ask that question.

MR. STRINDBERG: Okay.

**Q. (By Mr. Strindberg) Say a pilot's out for**

**six months and they've been granted leave under the Americans with Disabilities Act because of, say, a serious medical condition. What happens to their seniority place when they come back to work?**

A. Their seniority doesn't change.

**Q. If they're --**

A. It doesn't pause. It doesn't -- they stay the same seniority that they were when they left.

**Q. So the only time you would lose your seniority is, what, if you leave the company for any reason?**

A. Correct.

**Q. What remedy, if any, does a pilot have if he or she does not feel that seniority has been followed in the bidding process?**

A. They can -- they can dispute that claim, generate a file through SAPA, that complaint, and it's researched. If it's determined it was -- it was violated, then it's rectified.

**Q. And who researches -- researches it?**

A. It would depend on what -- what was being objected to or being raised as what the issue was that was violated.

**Q. I assume it would -- could come up if a pilot who has a higher seniority date sees a pilot**

fall in that category as having the partial line and partial reserve. So some trips awarded, some reserve awarded in the same month. And then the reserve number, just understanding that's the number of reserve lines, so that means each one of those reserve lines is going to have 18 total duty days in their reserve line, so each one of those pilots.

**Q. So I guessing I'm a little confused. Is this -- is this the number of pilots or the number of lines?**

A. It's -- it's pilots, but it's -- the lines match up with the pilots, the number of pilots. So that's the amount of flying there is for that many pilots, but this is -- these numbers would reflect how many are bidding in that domicile.

**Q. Okay. What constitutes a line?**

A. So a line would be enough pairings to meet the minimum credit hour requirement.

**Q. And what's the minimum credit hour requirement?**

A. 75 hours.

**Q. I started to ask you this. Let me close this out. Just a second.**

**So you don't know, sitting here, how long it would take someone, say someone who was hired in**

**the middle of 2017 to move from a reserve to a -- to be able to bid on actual lines, do you?**

MR. PETERSEN: Objection.

Go ahead.

THE WITNESS: I don't know. Sorry.

**Q. (By Mr. Strindberg) And within the lines, and I guess we'll go over this, but someone can bid on a line but not get their first choice; correct?**

A. That's correct.

**Q. So the next question would be you don't have the information as to how long it would take before not only can someone bid on a line but that they're guaranteed of getting their bid, their first choice?**

A. Yeah, that would be -- that would be difficult to even, I think, extract, because that's still -- it's very vague as far as saying you're going to be guaranteed your first choice of what you want. Unless you're number one in that domicile, you're probably not guaranteed your first choice of what you want.

MR. STRINDBERG: Scott, I notice -- I'm just trying to ask these questions so that we can formulate these in interrogatories to you or get the information.

**Q. (By Mr. Strindberg) Do they keep -- do you know, Steve, if they keep a history of people's bids by month?**

MR. PETERSEN: Hold on. Objection; outside the scope.

Go ahead, Steve, if you know the answer.

THE WITNESS: I don't know to what detail or to how long it's kept for as far as specific bid making, no.

**Q. (By Mr. Strindberg) And do you have any information as to how many pilots, say, in these three domiciles we're talking about -- Detroit, Chicago, and Minneapolis -- for the years 2017 to 2020 have been required to fly between Friday sundown and Saturday sundown?**

A. I don't have that number.

**Q. Do you know who would?**

A. It would likely be similar to the information that was extracted previously from -- that Paxton pulled, and I would say that's one of the documents we reviewed earlier. But it would be -- yeah, it would be something that would be time consuming to try and find all that information. But it's probably there; the data is probably there to be able to extract it.

**Q. Are Paxton and -- I forget the other gentleman's name -- Justin, are they like the data gurus? Is that part of what they do?**

A. So Paxton, within our department he is the -- so he's the manager of systems and standards. So he's kind of our liaison between IT and our department. So if he requests information from IT, he would be the one that would request that, generally. And then Justin Esplin is the vice president of information technology here at SkyWest, so he's familiar with where to pull data.

**Q. Do you know, is there a lot of transferring between domiciles by pilots?**

A. What do you mean by "a lot"?

MR. PETERSEN: Objection. It's vague and ambiguous.

Go ahead.

**Q. (By Mr. Strindberg) Do you know how often pilots transfer between domiciles?**

A. I mean, we generally have transfers every month. As far as like individual pilots, I don't know how often each individual pilot, you know, transfers. That would depend. We generally have a handful of transfers every month.

**Q. And in this chart we just showed -- I'm**

**trying to pull it up again -- where it shows a number of lines, you said that even though it shows a certain number of lines, those lines aren't guaranteed; in other words, some of the pilots bidding on it might get some lines but also some days on reserve. Is that correct?**

A. That's correct.

**Q. Okay. Let's --**

A. There is a guaranteed number of lines, but that's -- but if you're outside the guaranteed number of lines, then you could end up with a hybrid schedule.

**Q. Do you know what the -- my computer's not cooperating. Probably going to crash any moment.**

MR. MCFARLAND: He was very prophetic. Let's go off the record here. I'll call him.

(A discussion was held off the record.)

**Q. (By Mr. Strindberg) So I was about to ask or was asking -- let me just pull that up again, your great little chart.**

**On this chart, Steve, can you tell -- like, I just have the first page, like, it has Detroit, 76 pilot lines and nine reserves. Do you know how many of those 76 were guaranteed?**

A. I could -- I can find out the exact

number. I don't know what it is off the top of my head, but I'm guessing it would be around probably 67, 68, give or take five or so.

**Q. Okay, let's talk more about bidding. Can you give me a general -- to start out with, a general idea on how the bidding process works? So the mechanics of it, and then we can go from there and break it down a little bit.**

A. Sure. So every pilot has their -- their pilot seniority which they're bidding in within their domicile position and equipment. They would enter the -- the Preferential Bidding System, or PBS is the system that we use, the software that we use to be able to bid in.

What they do is each month there's a bidding window that they'll go in and submit their bid for the following bid month, and during that time they would make their selections where they can. They can choose specific preferences that they would like to have, and they can put them in what we call layers. So those layers are kind of like your priority of what you would like to have. And so in each layer you can -- you can submit a number of preferences that you would like. And then --

**Q. How many layers are there?**

A. Seven layers.

**Q. Okay.**

A. So you have the different layers, and then you put in your preferences in each of the layers. And then when it goes to award, it takes the most senior person in that domicile and equipment and position. Then it will look at their layer one, see what they want and award them based on their preferences, what they would like. And then it goes to the second most senior pilot in the domicile. Does the same thing, looks at their layer one. If they can complete a line in their layer one, then it will complete their line in layer one. If it can't complete their line in layer one, it will look at layer two, see if they can complete a line in layer two. It goes on, so on and so forth, until it gets through each pilot that's within the domicile with position and equipment.

**Q. Okay. So when is this bidding window?**

A. It's the 10th through the 15th of each month, and you're bidding on the following month each month.

**Q. And how many -- so you have five days to bid it; is that correct?**

A. That's correct.

**Q. And then at some point are you notified of what you've been awarded?**

A. Yes. So the 10th opens; the 15th is when it closes. It takes the system roughly two to three days to process all the bids and do the awards. And so it's generally around the 18th where we would then start to work on transitions, which is where if, for example, you had one of those pilots that was only -- was not within the guaranteed line range and didn't have enough hours to complete a line, that's where our transition schedulers would go in and add reserve days to complete their line. So they have to have their schedules per policy -- make sure I get the date right here. For pilots, their schedules have to be published by the 22nd at 8 p.m. Mountain Time.

**Q. Okay. Okay. So let me start asking you some specifics, then, about this. And maybe I don't have my terminology correct, but I gather that in these preferences you bid on certain trips. Is that correct? Is that the right terminology?**

A. You can, yeah. Trips, pairings is what we call them, which a pairing is just a set amount of flights that make up one trip. So a pairing length could be one day, two days, three days, and four days. So they can -- they can -- that's one of the

preferences that they can bid on. They can bid for specific trips; they can bid for specific overnights; they can bid for specific days that they want to work. They can bid on report times and release times of the trips. They can bid for a certain amount of layover time or time in the hotel. They can bid to have a certain amount of days off between trips. So there's -- there's a number of different preferences that they can select or put in.

**Q. Do most pilots bid on specific trips or --**

A. They -- I don't know for sure if they -- most pilots bid for specific trips. No, I don't know the answer to that.

**Q. So a trip could be something like Detroit to Chicago, Chicago to Detroit. That could be one trip?**

A. It could. Generally, they're going to be longer than that. You know, like I say, the pairings can be locals. They can be two days, they can be three days. We -- our pairings are generally built -- four days is usually the longest pairing that we'll build. But that pairing could have -- you know, it could be a round trip from Chicago to Detroit, then it goes to, say, Alpena or Lansing overnight, and then comes back to Detroit, does

another round and goes to a different overnight. So, yeah, it's going to be composed of multiple flight segments within that pairing.

**Q. When you say "pairing," what's the definition of the word "pairing"?**

A. It's like another word for trip. So pairing is comprised of approximate flight segments.

**Q. Okay. And when a pilot goes into the system on the 10th to the 15th, is there a list of these trips or --**

A. Yes.

**Q. And who creates that list?**

A. Crew planning builds those pairings.

**Q. And do they stay the same month to month, or do they vary?**

A. They will vary. It depends on the schedule that our partners are asking us to fly.

**Q. Are there some that remain -- in each domicile that remain pretty constant month to month?**

A. Yeah. You'll have some that are --

**Q. But others that vary?**

A. Yeah.

**Q. And you said that -- is the goal just to get each pilot to fly about 75 hours a month? Is that correct?**

A. It -- usually around 80 hours is about the average. But it will take the preferences that the pilot's requesting as well. Some may bid -- they have an option to bid below the minimum, which if the PBS can award that, it will award that. They can request, say they want a credit range of up to 100 hours, and so it can award their preference and they may, you know, get 100 hours. So it just depends on each pilot's seniority and what every other pilot is bidding for as well.

**Q. Okay, I didn't understand your answer there. So what's the minimum that a pilot can fly?**

MR. PETERSEN: Objection. Vague and ambiguous; calls for a legal conclusion.

**Q. (By Mr. Strindberg) Minimum number of hours per policy that a pilot can fly.**

A. So they can -- so there's a guaranteed line amount of 75 hours. They can bid to waive that and say, oh -- down to 58 hours and 36 minutes is the actual minimum, minimum hours that they're supposed to maintain. So they can bid to waive that minimum 75 hours. If a pilot's within the guaranteed number of line amounts and then they put to waive min, then they're not guaranteed the 75 hours that the company would normally guarantee for them. So they could --

they're basically saying, I want less hours than the minimum hours you're guaranteeing me. And if the system can award that, then it will award that.

**Q. And how does your seniority affect a bid, like, to waive the number of hours?**

A. So you would need to -- generally speaking, the more senior you are, the better chance you have of getting the waive minimum granted.

**Q. Okay. Let's look at -- I'm going to share a screen with you. This was a document that was provided to us by SkyWest, I think, in response to our question about how flights are paired. Have you ever seen this document before?**

A. I think I just read through the document yesterday. Yes.

**Q. Okay, let's go over it. So the first line: "Our main line partners provide SkyWest with the flights SkyWest is responsible for operating on any given day in a bid period." This is like you told us before. In other words, United or Delta would say, we need these numbers of flights. And would they also tell you where, which locations?**

A. Correct. So they'll send a file that says, we want you to fly to these cities at these times on these days; and they'll give it to us for a

month at a time.

**Q. And when does SkyWest receive that?**

A. We typically get that about the first of the month prior to the month that's being bid upon. So, for example, we're about to receive our files for the November bid period here within the next couple of days.

**Q. Okay. The next line says: "These flights are compiled." What does that mean?**

A. So what they do is they take each of the files from our partners and put it into a pairing optimizer, which will look at turn times and different things to make sure that there's -- they're putting these trips together in an efficient manner, essentially, so that they can add them up so you don't have -- you know, it tries to avoid super long sits, because it's inefficient to have a plane sitting on the ground not doing anything. So it will optimize these pairings and kind of come back to say, this is the best utilization for this flight range or flight set.

**Q. So when you say "pairing," do you mean -- is that referring to pairing trips between different locations like Detroit to Chicago, Chicago to Minneapolis, to somewhere else back to Detroit?**

**Would that be a pairing of flights? Is that what it refers to?**

A. So that -- the optimization tells you what flights to pair together, and then the planners actually build the pairings themselves. They're the ones that put them into an actual pairing that they bid on.

**Q. And who at SkyWest does the actual pairing?**

A. Crew planning.

**Q. And when it says "separated into fleet types," I'm assuming that's the type of airplane that will be used?**

A. That's correct.

**Q. And is it SkyWest who decides which airplane -- type of airplane to use?**

A. No. Our partners generally tell us what aircraft they want the route to be flown on.

**Q. Okay. And then it says "some factors considered in pairing optimization are, 1, crew domiciles and staffing in each domicile." How does that affect this pairing process?**

A. So depending on how many pilots you have at a specific location, it may -- a certain flight may work better in a different domicile pairing than

another, based on the number of pilots you have. So, for example -- trying to think of the city. You may have routing that goes through -- a trip that goes through Houston. But if, for example, you are short on pilots in Houston and you would like that Houston flight to be filled with another pairing in another domicile where there's better staffing, then you can tell it to do that and build it from another domicile. So it may be -- so, say, Denver to Houston, for example, may end up in the Denver pairing instead of the Houston pairing.

**Q. Okay. Would I be correct in saying that most of these -- this type of calculating or calculations are done by the computer --**

A. Yes.

**Q. -- I mean, in some respect?**

**"Crew qualifications in each domicile," what does that refer to?**

A. Just the number of qualified pilots that you have in each domicile.

**Q. No. 3 is "crew legality and crew legality buffers." What does that mean?**

A. So we're bound by federal aviation regulations and specific crew legalities, meaning, for example, how much a pilot can be -- it's called

flight time, which would be essentially the time that they're in the cockpit with the door closed until the door opens again. So they're bound by daily limits, by monthly limits, by yearly limits as well as -- another one is called flight duty period where that would be the amount of time that they're on duty. So from the time that they report until the time that they're done operating the aircraft that day, their flight duty periods. So there's different restrictions on a daily basis for that, on a weekly basis for that, and on a monthly basis for that.

So it will -- when it's creating these pairings, it has to look for that to make sure that there's -- it's not doing too much flight time on a specific day or too much flight duty period, or FDP, on a specific day.

It will also take into consideration rest that's required. Pilots are required to have a certain amount of rest. So they have to make sure the pairings are giving enough room to get their legal rest as well.

**Q. Okay. Number 4 is "operational performance buffers." What is that referring to?**

A. That's talking about you try to give a certain amount of turn times, you know, in certain

markets based on historical data to make sure that when we're filling a trip that's not just efficient but it's also feasible to make sure that we're getting the flights out on time. So it's making sure that there's enough room between the flights that they can still turn around and get that next flight out on time so our operational performance goals are being met.

**Q. Okay. The last one is "crew member qualify of life requests." What is that referring to?**

A. So the pairings themselves are not just simply based on efficiency. There are some representatives from both SAPA and SIA -- SIA is like the equivalent of SAPA for flight attendants. And these people will meet with the planners on a monthly basis and give some feedback as to what types of trips the crew members like. And if we can accommodate some of those requests, try and build the pairings, you know, so that they feel like they're getting some quality of life out of those pairings, then we'll try to accommodate some of those requests as well. So it's -- the company is trying to be efficient, but they're also trying to balance that with quality of life of the crew members as well.

**Q. Is there some type of pairings that crews like more than others?**

A. It depends. There are certain domiciles that tend to like certain pairings better than others. I can give you an example. In Salt Lake City they tend to like split-duty pairings.

**Q. What kind of pairings?**

A. We called split-duty, which what it does is it typically -- it reports late in the evening and it generally just flies one segment, one flight segment, and then they go to a hotel for about six, seven hours or so. And then they come back and fly one flight segment back to the domicile. So it's all considered continuous duty, meaning there's not a legal rest period to break up the two different flight segments and -- so it reports really late and releases really early the next morning. So generally, their rest is occurring during the middle of the day, but they do get, you know, a short rest at the hotel at night. Some people really enjoy that because they can -- you know, it helps for daycare issues or whatever. They can -- they're home during the day. So some just prefer that. They also pay pretty well as well. So --

**Q. This -- and I'll object for Scott. This**

**is outside the scope of questions. But how are pilots paid? Is it by flight hour or --**

A. There's a formula. There's --

MR. PETERSEN: I have an objection. Hold on. I do need to note an objection. Thanks.

Go ahead.

MR. STRINDBERG: I objected for you, Scott.

MR. PETERSEN: I know. I'm not sure the judge thinks that works, though. We'll see.

Go ahead.

THE WITNESS: Yeah, so it depends. The answer is there's a formula that we'll take. It could be based off of their flight time, it could be based on their total duty for that day, or it could be what we call a minimum daily guarantee, which guarantees a certain amount of credit regardless of how long you're on duty for. So, for example, if you just have maybe one flight that takes two hours for one day, you're guaranteed a minimum of four hours total pay for that day with the minimum daily guarantee.

MR. STRINDBERG: Let's mark SkyWest 61 [sic] as Exhibit 23, I believe. Is that correct, Vicky?

MR. PETERSEN: I think we already marked this one yesterday, didn't we? Go up and look. Isn't this the one we just went over, 61 [sic]?

MR. STRINDBERG: You're right. Don't mark it. Yeah, I had the paralegal put on the exhibit numbers for the ones we marked already.

MR. PETERSEN: I was actually going to say, I was really impressed that you even put those on.

MR. STRINDBERG: I know, and then I ignored it. Don't tell my paralegal, though. Okay.

**Q. (By Mr. Strindberg) I'm going to call up another -- this is several pages from the PBS guide, and it was previously marked as Exhibit 16. And you said this was the guide you had taken -- you spent hours laboring over, Steve. Is that correct?**

A. I did look over this guide, yes.

**Q. Okay, let's look at -- and I didn't -- as with Scott, I didn't take all of the pages because it gets pretty dense. But let's go -- ask about some of these terms in the index. The first one is "preassigned." What is that referring to?**

A. So preassigned would be, for example, you may have training that's due in a specific month. So we would block that off your schedule and -- so that

it doesn't award you a pairing during that time that you're scheduled to be going to training. So that's something that we know in advance you will be off for specific days. It also could be vacation that's already been preapproved, master vacation. So it just blocks your schedule off for a specific amount of time.

**Q. Okay. And when the pairings come up that the pilots can see, does it tell them what type of aircraft is going to be used?**

A. Yes. They can see what aircraft.

**Q. And what happens if a pilot, like, bids on a pairing that is being flown by an aircraft they're not qualified to fly? Is that just rejected by the system?**

A. Yes, the system will reject it.

**Q. The next thing is "off days." What are off days?**

A. Days they're not scheduled to work.

**Q. And who decides what off days the pilot is to have?**

A. The pilot can request specific off days as part of their preferences. But ultimately, their seniority will dictate or determine which off days they have.

**Q. I notice, if we look at page 303, in the middle there I have -- it says: "Crew members have the flexibility to choose mixed pairings." What's a mixed pairing?**

A. I don't know what it's referring to on that.

**Q. Then the second one is "days off." So what you're telling me is that even if a pilot requests days off, if they don't have enough seniority they may get assigned a flight or a shift that goes over the day off they designated?**

A. Correct.

**Q. Is there any way to determine how often that occurs?**

A. How often they requested a specific day off but were awarded something over it? Is that what you're asking?

**Q. Yes. Yes.**

A. I don't know if that -- that data is stored anywhere. I don't know for sure.

**Q. While we're on this sentence, the next one is "line values." What is a line value?**

A. So the amount of credit that they're requesting for the month.

**Q. Pairings again you've explained. That's**

**this grouping of flights; is that correct? Is that the proper terminology?**

A. Correct.

**Q. "Pairing properties," what does that mean?**

A. Pairing properties would be like things specific within a pairing that they're requesting. So it could be overnight cities, the amount of layover rest they're requesting, specific cities that they're wanting to fly to. So stuff that is contained within a pairing.

**Q. Okay. And is that also -- is that sort of the definition of a pairing property, the next one?**

A. Line property?

**Q. Okay, yeah. Line property, right here.**

A. Yeah. So line property --

MR. PETERSEN: What's the question?

**Q. (By Mr. Strindberg) What is the definition of "line property"?**

A. So line property would be saying, I want these -- like, one-day pairings or two-day pairings or three-day pairings. I want specific days off between these pairings. So it talks about not specific information within the pairing but the types.

**Q. Can you give me an example of that?**

A. Yeah. So you could say, I want to have -- I like two-day pairings, and you can say, I would -- I prefer to have two days in between my different pairings. So you're setting different parameters to award the lines out, not specific parameters within the pairing.

**Q. The next item is "reserve." What is that referring to?**

A. So reserves also bid -- they can bid for specific days. And so it's going to talk about how they can -- how they bid on a reserve line.

**Q. Now, we got into this a little bit earlier, but when people come out of training, when pilots come out of training, are they generally put on the reserve board? Is that what you call it, being on the reserve board?**

A. Yeah. So they'll finish their training. It could be anytime during the month that they finish their training. They won't be in that bid for that specific month that they finish because they -- we don't add them to the bid until they already successfully completed training. So to complete their schedule for that month, we will build them reserve days in order to build up their line for that month, complete their line.

**Q. The month being where they're just completing training, or the following month?**

A. So it depends on the timing of when they complete their training. If they didn't complete their training in time to be entered into the bid for the next month, then we also build them a reserve schedule for the following month.

**Q. And in the three domiciles we're talking about -- Detroit, Minneapolis, and Chicago -- were all the new hires back in 2017 put on the reserve board first, at first?**

A. I don't know that without looking at their schedules.

**Q. What would you have to look at to determine that?**

A. I'd have to pull up each individual pilot and just see what they were scheduled after their completion of training.

**Q. So are records kept that show for pilot A in this month, that pilot got these bids, and the next month that pilot got a different set of bids? Are those records kept somewhere?**

A. So I can -- I can see what their -- what their schedule ended up with. I don't know how long the records are kept or what's kept as far as what

was bid for in that month, bid that month; but I can go back and pull up data to see what they actually completed that month.

**Q. But there's no way -- I gather from what you just said, there's no way of determining whether or not their actual schedule was what they had bid for?**

A. I don't know for sure if they can -- if we can extract that data or not. I don't know how long that's kept for.

**Q. Would that be something for Justin or --**

A. That would --

**Q. -- the other gentleman, Paxton?**

A. Yeah, probably. Justin would probably know. Crew planning might know as well. So Trisha Bennett, manager of crew planning.

**Q. While I'm asking you about reserves, can a pilot, say a pilot has more seniority, can they bid into the reserve pool? In other words, can they decide not to take an assigned line but would rather just be in reserves?**

A. Yes, they can.

**Q. Who decides how many reserve pilots there are going to be per domicile per month?**

A. So that's predetermined based off of --

again, that's that information that we went over at the beginning when we returned back from this -- so that the target lines and reserve lines, those are predetermined based off of the amount of flying that we have in each particular domicile.

**Q. And if someone's on a reserve, do you call it being on the reserve board? What -- how do you refer to it?**

A. I don't know if I understand the question.

**Q. I'm just trying to get a terminology, Steve-O. In other words, if I'm a new pilot and assigned to be a reserve, do you say that they're on the reserve board, or you just refer to them as reserves?**

A. Generally, they're just referred to as reserves, or reserve line holder.

**Q. Reserve line holder, okay. And if someone is a reserve line holder, how many -- are they assigned days they have to be available to work?**

A. Yes. They're given 18 duty days throughout the bid month.

**Q. And what's a duty day?**

A. It would be a reserve availability period, which is 12 hours if you're a short-call reserve or 24 hours if you're a long-call reserve.

**Q. So, yeah, yesterday the three terms came up -- short-call reserves, long-call reserves, and ready reserves. Are you familiar with all three terms?**

A. Yes, I am.

**Q. So a short-call reserve, that means what? You have to be ready to fly within 12 hours, you said?**

A. Short-call reserve is a 12-hour reserve availability period, meaning they have 12 hours where they're supposed to be available to answer their phone for a potential assignment. If they are called out, they have two hours to report, or at least two hours to report.

**Q. Okay. Is one 12-hour shift considered a duty day?**

A. Correct.

**Q. What is the long-call reserves?**

A. The long call reserve, they're on for 24 hours that they need to be available to answer their phone. However, their callout, if they're called for an assignment, it's a minimum of 12 hours of notice.

**Q. And this 24-hour shift, is that considered a duty day or is it multiple duty days?**

A. That's one duty day.

**Q. Okay. And then what's a ready reserve?**

A. A ready reserve is -- it's a reserve that's already -- it can be just an assignment where you're scheduled to go to the airport and sit at the airport to be available for really -- like a quick call-out. So they have 20 minutes from the time that they're contacted to go to the aircraft. So it would be kind of there to protect last minute stuff that comes up.

**Q. And who decides that which of these categories a reserve line holder is going to be assigned to?**

A. So the policy requires a minimum of 20 percent of all reserve lines be built as long-call reserve, and the rest are all going to be short-call lines. To determine which one you get, again, it's a bid preference, so it would be awarded based on seniority.

**Q. And the ready reserves, is that also something you bid on?**

A. No, it's not. That's just something is that is assigned outside of the bid, similar to like a trip assignment would be given.

**Q. Who does the assignment outside of the**

**bid?**

A. The crew scheduling department.

**Q. And what do they base that assignment on?**

A. What do you mean by what do they base the assignment on?

**Q. Well, you said it was done outside of the bid. Who decides -- say in Detroit, I don't know, if you had one of those and there was like 13 reserve lines, I gather what you're telling me is 20 percent of those, or about three of them would be these long-call reserve lines. Is that correct?**

A. Correct.

**Q. And 80 percent would be the short-call reserve line?**

A. Correct.

**Q. Then who -- you said someone in crew scheduling chooses people to be ready reserves to basically go to the airport and sit?**

A. Yeah. So crew schedulers are the ones that handle the daily operation. So they're the ones that are taking sick calls, emergency calls, and re-crewing the daily operation as things unfold. So they're responsible for the planning to make sure that the flights still go out on time. They'll make a determination whether or not we need somebody to

sit ready reserve at the airport, and they will make that assignment to either a short call -- well, as a ready reserve assignment, it has to go to a short call. We can't call a long-call reserve to just go sit at the airport, per policy.

**Q. And who do they -- how do they decide which of the short-call reserves will get the duty of being a ready reserve?**

A. So it's all based -- all of our assignments -- again, ready reserve is treated the same as like a trip would be assigned. And so whether it's a trip or a ready reserve, there's specific parameters that we have to meet or follow to determine who that assignment goes to. And so they -- they would follow those parameters and assign it according to the parameters set up in policy.

**Q. And what are those parameters?**

A. For example, bucket is generally the first thing that's considered. And by "bucket" I mean the number of days you're available. We try to match up with the length of the assignment. So if you're only on reserve for one day, then we're going to try to assign a one-day pairing or a ready reserve assignment to that -- to match up with that. It would look at the bucket. It looks at duty and rest

considerations, meaning it looks at the pairing's report time and release time. And it will look at how long that duty would be, whether they have been on reserve prior to that time or sitting reserve that day prior to the assignment, or it will look at how much rest that they had from their previous assignment.

So there's lots of different, like, factors that kind of determine the duty and rest considerations. And then if everything is equal on all those, then it looks at seniority and we'll assign it based on seniority.

**Q. I gather that being a ready reserve is not a favorite status among pilots?**

A. It's, again, one of those personal preferences. I would say, generally speaking, yeah, it's not a preferred --

**Q. If someone is a reserve line holder, can they designate the days they want off?**

A. Yes, they can request specific days off. And, again, it would award based on seniority, whether it can accommodate those preferences.

**Q. Is there an ability, like, if you -- someone, let's say Cassell had been working and assigned a Saturday as a reserve line holder. Is**

**there somebody he can call and ask if he can go be assigned to a different day?**

A. There is the ability to swap reserve days. There is a set of parameters that have to be met to be able to do so. But yes, there is ability to swap reserve days or trade reserve days with another reserve.

**Q. Are swaps and trades the same thing?**

A. No, because a swap could be like with yourself. A trade would generally be with another pilot.

**Q. How do you swap -- how do you swap with yourself?**

A. So you swap one day for a different day. So you maintain the amount of -- same amount of duty days for the month, but you essentially move it -- make one day a duty day and swap it for an off day, and that off day becomes your duty day and your old duty day becomes your off day.

**Q. And can any of the reserve line holders do that?**

A. They can request it, yes.

**Q. And who decides whether or not the request is granted on a swap?**

A. It's based off of the number of -- based

off of our staffing. So it looks at how many reserves we need for each particular day for our minimum reserve staffing level, and it also will look at other -- there's other restrictions that are put in place, meaning you would have to back it up to another set of reserve days.

You can't -- for example, say you have five reserve days in a row and you want to take the last day of that reserve block and just put it into the middle of off days. You can't -- the system won't let you just put a one random reserve day in the middle of off days. You have to have it backed up to another set of reserve days, one of the restrictions.

**Q. So the swaps are approved by the PBS system?**

A. No. It's -- it's done post bid. So after PBS has already awarded them a reserve line, they would request this through what we call SkedPlus is the internal program.

**Q. How is that spelled?**

A. S-k-e-d-P-l-u-s.

**Q. Okay. Okay. And when you enter into the SkedPlus system, where does it go? Where does the request go?**

A. So SkedPlus is what the pilots use to view their schedules and exchanges. So they would go in, click on a day, request a swap, and then it goes through a system that reads all the parameters. There's already logic set up to go through all the parameters to see whether or not it can be approved, And it will either automatically approve it or deny it based on whether it meets the parameters or not.

**Q. Are there some days in the week where fewer reserves are needed than other days?**

A. Yeah. Minimum reserve staffing levels can vary. Generally speaking, they're greater on the weekends. We have more of a need for reserves on the weekends.

**Q. Why is that?**

MR. PETERSEN: Objection. Lacks foundation.

Go ahead.

THE WITNESS: Historical data has shown that that's where the majority of our call-offs or absences come are on the weekend.

**Q. (By Mr. Strindberg) Do the chief pilots have any authority to switch reserve days?**

A. You mean for one of their pilots? Is that what you mean?

**Q. Yes.**

A. No. They have to follow policy the same.

**Q. What if a number of the reserve line holders all request a certain day off, like July 24th, and it brings the number of reserves down below a minimum? How does the system decide who gets stuck with working that holiday?**

A. That question is kind of broad. It depends on what point you're requesting that time off. Do you mean during the bid? Do you mean after the bid's been awarded? Do you mean prior to the bid's even open? I guess it depends on what specifically -- or when you're asking for that.

**Q. How would you ask for it before the bid's open?**

A. Master vacation. So you would request a specific day off through master vacation.

**Q. And if you ask for it during the bid process, are you more likely to get it than if you request it after the bids are assigned?**

A. Not necessarily, because the bid -- during the bid process it's all done by seniority anyway, so it doesn't up your chances of getting it when you're doing it that time.

Now, after the bid -- I mean, after the

bid would be kind of like your last chance to try and get that off. So if you weren't awarded it, you ask for it in the bid -- well, say you ask for it in master vacation and it's already taken, so you ask for it in the bid. The bid didn't award it because of your seniority. Then your last chance would be after the bid you could -- you can still request either time off, like a vacation day post bid, which is determined based on the staffing numbers, or you would request it by trying to trade or swap that day.

**Q. But if, say, a bunch of people, a number of people on reserve all requested the same day off post bid, would it award the most senior people the day off?**

A. Post bid, it's a first come first serve. So whoever requested for it would be looked at first.

**Q. Okay. So a trade is where you trade a day, I'll work Saturday if you work Sunday type of thing?**

A. Correct, with another pilot.

**Q. And a swap is where you swap one of your reserve days for a day off?**

A. Right. You swap -- yeah, swap your reserve and off days around on your schedule.

**Q. And sitting here, you don't know how long**

**in 2017 and 2018 a new pilot would be on the reserve status or be in reserve status you, do you?**

A. I don't.

MR. PETERSEN: It's been asked and answered.

Go ahead.

THE WITNESS: I don't.

**Q. (By Mr. Strindberg) And these prioritized layers, you said there were seven different layers?**

A. Correct.

**Q. And is each layer like a group of trips, or can it be like layer one, I want certain days off? What constitutes a layer?**

A. A layer would be whatever preferences -- you could have multiple preferences in a single layer that you're requesting. There's obviously a strategy in bidding that you want to do, and so -- so each layer, you know, if there's something that's, you know, you absolutely need to have off and that's your number one priority, then you may want to just have that thing in that first layer. Because what the system will do is they'll look at every one of those properties that you're requesting in that layer, and it will try to meet all of the things that you're requesting in that layer. If it can't, it's going to

move to the next layer.
So if you said I want this specific day off in layer one, but you also said I also want to have four days to overnight in Nashville, and it can't -- it can't award you both of those things that you're requesting, then you may have just lost your opportunity to get the day off that you really wanted. Because it can't give you both things you want in layer one, so it's going to try to go to layer two to get your preferences. So there's definitely a strategy to how you bid.
**Q. Does the system take some of your requests from layer one and add it to part of your request in layer two? Or if it can't meet, say, layer one, it just rejects it totally?**
A. I don't know that for sure. I don't know if it will reject everything. I'm not sure.
**Q. But what you're saying is that if a pilot really needed, say, as in this case, religious accommodation of a Sabbath off, if that was their one -- seriously one request in layer one, they'd be more likely to get it?**
A. No, because it's still -- it's based off of seniority. So just because you have it as your number one thing, you're not -- that doesn't mean

that you're more likely to get it because it's your number one thing. Because if all the pilots senior to you also want that thing, then you're not likely going to get it.

**Q. Right. What I meant was it's more likely you would get it than if you had multiple criteria in that one layer?**

A. So I don't know for sure, but I believe so. That's how that would work.

**Q. Right. Even in that example you just used, if you wanted a particular day off and a four-day trip to Nashville --**

A. Yeah.

**Q. -- you'd most likely --**

A. That's my thinking as to how it would work.

**Q. Excuse me one second.**

MR. PETERSEN: Do you want to take a five-minute break, Erik?

MR. STRINDBERG: Why don't we do that, five minutes. Six after we'll come back.

(Recess from 2:02 p.m. to 2:09 p.m.)

**Q. (By Mr. Strindberg) A couple of other questions on this Exhibit 16. What is the standing bid?**

A. So a standing bid would be, say you want the same preferences every single month. So you don't have to log in the system every month, you can just place a standing bid saying, these are my preferences, this is what I want. This is what I want. You just set it and then you don't have to worry about logging in to request it every month.

**Q. "Monthly bid" is what you've been discussing. This is the bid you enter between the 10th and the 15th of the month?**

A. Correct.

**Q. Reserve bid, anything you need to add with that?**

A. No.

**Q. What's a clearing bid?**

A. Honestly, I don't know just off the top of my head. I think what it -- and it's just speculation, but I think what it means is clearing what your request was. So if you had a standing bid, it's how you would clear that to place your bid. Yeah, without going to the actual document itself, I don't know exactly what it's talking about.

MR. PETERSEN: If you have it there, Erik, maybe you can show him the section. Maybe that would refresh his memory.

MR. STRINDBERG: I don't have the entire PBS guide. I'm just using your exhibit.

MR. PETERSEN: I see.

**Q. (By Mr. Strindberg) Are there -- do you know what the term "stand-up flight" means?**

A. Yeah. So a stand-up -- I refer to it as a split-duty. It's the same thing. So a stand-up is a pairing where they report late in the evening, generally fly one late to an overnight, go to a hotel for six or seven hours, come back and fly one early flight in the morning back to the domicile and finish up.

**Q. And how does that differ from a two-day trip?**

A. There's no rest period on a stand-up -- or a legal rest period on a stand-up as opposed to a two-day would have a full minimum ten hours between.

**Q. You talked about that -- what was it? -- 58 hours and 36 minutes is the minimum number of flight time that a pilot is supposed to have each month. Is that correct?**

A. Credit.

**Q. Credit.**

A. Yes.

**Q. So the credit is somewhat different than a**

**flight hour?**

A. A credit would be composed of flight hours. It could be duty time, it could be deadheading time or time that they are -- they sit in the back of a flight to position, you know, themselves to continue flying. So it's all that credit that's added together. The flight is part of that.

**Q. Is there a maximum amount of flight time that a pilot can have per month?**

A. Yes. It's bound by the legalities or FARs that there are.

**Q. Do you know what it is offhand?**

MR. PETERSEN: Objection. Calls for a legal conclusion, lacks foundation, outside the scope.

Go ahead.

THE WITNESS: A hundred hours in 28 days is the max flight time.

**Q. (By Mr. Strindberg) And does SkyWest use that same maximum?**

MR. PETERSEN: Same objection.

THE WITNESS: No, we have buffers in place.

**Q. (By Mr. Strindberg) Is there a minimum or**

**maximum number of flights, not flight hours, but flights that a pilot can do each month?**

MR. PETERSEN: Same objections.

THE WITNESS: No, there's not a minimum or maximum number of actual flights.

**Q. (By Mr. Strindberg) What happens if a pilot falls beneath the 58.36 -- or 58 hours 36 minutes minimum duty time?**

A. Policy states that they could get -- could be responsible for their insurance benefits, for example, if they fall below minimum hours.

**Q. If they don't bid on enough lines, though, the system would then automatically give them some reserve status. Is that correct?**

A. No. If they don't bid on lines it will award them flying, but it won't be anything that they necessarily requested. It would be essentially what's left over.

**Q. Is there ever a situation in any domiciles where not all the lines are bid, in other words, not all of the flight pairings are actually bid for?**

A. Yes. So it will -- the system knows what all the pairings are, and so even whether someone requests them or not, you may be awarded a pairing that you didn't request at all.

**Q. Is there ever a situation where there's more pairings in the domicile than pilots to fill them?**

A. Yes. You may end up where you don't have -- where you have leftover pairings from the bid, which would go into company open time is what we call it. And then the company would be responsible to get those covered, generally with the reserve.

**Q. Once the bids come out, and I can't remember which day you said they -- they're published on the 22nd of the month, you said?**

A. Correct.

**Q. Can pilots at that point trade or attempt to trade pairings?**

A. Yes, at 8 p.m. on the 22nd.

**Q. "APM," what does that mean?**

A. 8 p.m. is the time when it opens.

**Q. Oh, eight, is that what you said?**

A. Yeah.

**Q. How do they go about trading pairings?**

A. That's to the SkedPlus system that we talked about a little bit earlier. They would go in, and that's where they can see any company open time. That's where they could go in and request to drop a trip or pick up, trade, that sort of thing.

**Q. Okay. You used a new term, "drop." Is that different than trading and swapping?**
A. Yes.
**Q. What is "dropping"?**
A. So depending on our reserve staffing levels, a pilot can request to just simply be -- drop a trip into company open time, meaning they just drop it off the schedule and the company takes responsibility for that trip.
**Q. What are their parameters for doing that?**
A. We have to have our minimum staffing -- or above our minimum staffing level requirements to be able to drop.
**Q. And the minimum staffing -- I'm sorry; this is all these new terms. The minimum staffing level is what, again?**
A. The minimum staffing level is something the company determines. It's essentially the number that says this is the number of reserves we would like to have in this domicile on this particular day. And so if there's more reserves than what that minimum reserve number is, then the pilot can drop it. If we're below that number, then they wouldn't be able to drop it.
**Q. And is the ability of a pilot to drop a**

**pair -- do you say drop the pairing? Is that sort of the terminology?**

A. Drop, yeah.

**Q. And is that -- is that also constrained by how many duty hours that person has?**

A. So a drop, they would be restrained by the minimum hours, the 58, 36. So, yeah, they could be restricted from that. But they can use their paid time off to be able to maintain their minimum credit hours.

**Q. Is it possible to determine how often, particularly in these three domiciles that we're talking about in 2017 and 2018, pilots were able to just drop pairings?**

A. Yes, that data does exist. We would be able to see if requests were made and how many were approved and how many were denied.

**Q. And the system, again, is the SkedPlus system?**

A. SkedPlus, correct.

MR. PETERSEN: Hold on a second. Is that SkedPlus, P-l-u-s, or SkedPlus with the little plus sign?

THE WITNESS: Technically, it's SkedPlus, P-l-u-s, with the plus after it. So it's kind of

redundant. SkedPlus+.

MR. PETERSEN: Okay.

**Q. (By Mr. Strindberg) How does a pilot use the SkedPlus+ system to initiate a trade?**

A. So a trade would be with another crew member. In a trade they can -- they can post a pairing for trade, meaning they go in and select that trip and say, I would like to trade this trip for a different -- or I'm open. They can put in their comments, I'm open to these certain days, and so they would post that as a trade. And then another pilot can go in and see what trips are posted, and they can -- they can make an offer to that pilot and say, I have this trip on these days, if you'd like to trade. They can propose that trade, and those pilots would just have to accept the trade.

**Q. And are there any constraints on trading?**

MR. PETERSEN: Objection. Asked and answered.

Go ahead.

THE WITNESS: Yes, they still have to meet the legality requirements, so they can't go into anything that would create a crew legality or go into a buffer that we have.

**Q. (By Mr. Strindberg) And the buffer is the**

**number of hours between SkyWest's maximum and a legal maximum a pilot can fly per month?**

A. Yes. So not just flying, but also rest buffers, duty period buffers. But yes, it's whatever the regulation requires and what SkyWest maximum hours are. That would be the buffer.

**Q. And how does -- okay. How does the system work if a pilot wants to swap pairings, in other words, change one of their pairings for another one?**

A. So that would be an exchange. Again, it looks at the minimum reserve staffing levels for the days you're looking to drop. And if we're -- if it's the exact same days, then the system will approve it regardless of the staffing levels, because your minimum reserve number doesn't change; you're just exchanging the exact same days. But if there's any day that's different on the exchange, then we would have to be above our reserve minimum staffing level on the days you're trying to drop for the system to approve it.

**Q. Say if a pilot wants to swap a Monday-Tuesday flight for a Tuesday-Wednesday pairing, okay, and that's approved. Do the Monday flights then get posted on the SkedPlus+ for other people to bid on, or do they just get assigned to**

**reserves?**

A. So they go into open time, same place that they picked the other pairing up from. So it would be available for another pilot to pick up, unless it's within a specific window where we start assigning the trips from open time to reserves.

**Q. So any pairings that are not bid on are put into this open time for people to bid on or to pick up, and -- and if a pilot wants to trade or swap or drop, that also goes into open time?**

A. Correct.

**Q. Is it true that a pilot can offer, say, I want to drop this flight and offer to pay some extra money to another pilot to take it?**

A. Yes, they can post a trip so they're not necessarily looking to trade, but they're just trying to get rid of a pairing. They can put in comments that they're willing to pay X amount of dollars for someone to pick that up.

**Q. Is that called also a drop?**

A. That's still a trade, but it's not -- it's still considered a trade, but it's just a trade down. So you're trading away your pairing, not picking anything else up in exchange.

**Q. Is there any -- do you have any idea, say,**

**in these three domiciles you've been talking about, how -- what percentage of pairings are traded, swapped, or dropped in any one month?**

A. No, not off the top of my head. I'd have to dig through that data.

**Q. And where would that data come from? The SkedPlus+ system?**

A. Yeah, SkedPlus records a lot of transactions.

**Q. I want you to look at -- I'll share this with you. It's been previously marked as Exhibit 14, and this was a memorandum of agreement that Mr. Cassell was asked to sign. And I have highlighted a part there. You can take a moment just to read that.**

A. Yeah, I'm done reading that.

**Q. So we've talked about dropping -- drops and trading. If a pilot drops a flight posted on the SkedPlus system, are they penalized in any way?**

A. No.

**Q. Is there a maximum number of times they can drop trips?**

A. They can trade down once every 24 hours.

**Q. Is trading down different than dropping?**

A. It's the same thing. Trade down is more

specific, saying -- it could include an exchange where you, for example, say you trade your three-day pairing for a two-day pairing in open time. Since you're giving away one day back to company open time, that's considered a trade down. So it could be that or just a straight drop of your three-day pairing would also be a trade down. So anything where you reduce the amount of duty days, that you give up more duty days than you pick up, then that's considered a trade down.

**Q. So drops are types of trade-downs?**

A. Correct.

**Q. And if someone trades down or drops and the reserves fall below the minimum level, the system will deny it. Is that correct?**

A. Yes. If by dropping a trip it would bring us at or below our minimum reserves, then it would be denied.

**Q. Does the system give -- if someone wants to drop a pairing, does the system give other pilots an opportunity to pick it up before it's denied?**

A. No. Generally, if they're denied a drop, that's where they would post it to try to have another pilot pick it up.

**Q. Post it as a trade or a trade down?**

A. Yeah.

**Q. A trade would not be denied unless, again, it somehow impacted the reserve level?**

A. Or some kind of legality.

**Q. And are there usually -- in these three domiciles were there usually more reserves than the minimum requirement?**

MR. PETERSEN: Objections. Calls for a legal conclusion. Lacks foundation.

Go ahead.

THE WITNESS: Yeah, "it depends" is the answer on that. It varies from month to month. And so during this time frame, it would just depend.

**Q. (By Mr. Strindberg) In this letter it talks about "as an accommodation, we have provided First Officer Cassell with tools to meet his religious requirements," which, as I mentioned before, meant not working from Friday sundown to Saturday sundown. Do you have an opinion as to whether he could have avoided working on the Sabbath through drop, trades -- drops and/or trades until his seniority got high enough so that he could bid out of Saturday flights?**

MR. PETERSEN: Hold on. Objection. Outside the scope; calls for speculation; lacks

foundation.

Go ahead.

THE WITNESS: I don't know what time frame you're looking, but I would say in my opinion it would be very difficult for a pilot to be guaranteed to have that time off every single month until they're able to hold the seniority to be able to bid that off. I think that would be very difficult.

**Q. (By Mr. Strindberg) Even in a place like Detroit?**

MR. PETERSEN: Same objections.

Go ahead.

THE WITNESS: Yes, even in a place like Detroit.

**Q. (By Mr. Strindberg) Does SkyWest ever post -- maybe not right now with COVID, but prior to the pandemic, would SkyWest ever post flights other than at the beginning of the bidding cycle?**

MR. PETERSEN: Are you meaning post for bids? Hold on. Posting for bids?

MR. STRINDBERG: Yes. Well, maybe not even posting for bids. Let me ask it a different way.

**Q. (By Mr. Strindberg) You said that you get -- SkyWest would get these requests for these**

**flights from the carriers, you know, around the first of the month. Would SkyWest ever -- or does it ever get a request after the first of the month? In other words, Delta says, hey, we need a couple of extra flights from point A to point B after the first of the month?**

A. Yes, we do occasionally get requests like that from our partners.

**Q. And how is that handled by SkyWest? How are those requests filled?**

A. So if we're able to accommodate the request, we would simply build a pairing and publish it in open time, and it would be made available for any pilot to pick up until it falls into the window of assignment for reserves.

**Q. And "open time" is, again, the SkedPlus system?**

A. Open time is -- it's not the SkedPlus system. Open time is all the open trips that don't currently have a pilot or a crew member assigned to one of the positions. So it's what the schedulers use to assign trips to reserves. So it's kind of the pool of all the pairings that might have one position uncovered, and once all that open time comes within a certain window, a time frame, then we start adding

reserves to that open time to fill all those positions.

**Q. So I'm clear: so is this open time part of the PBS system, or is it its own system?**

A. No. Open time is -- it is -- it's not really part of a system per se. It's just -- trips from open time could be a result of PBS being unable to award all the pairings in the bid. It could be a result from SkedPlus drops. It could be a result from our partners requesting additional flying posted. So it's just kind of that area where -- that pool where everything's put together on stuff that has any kind of uncovered position on it.

**Q. And do pilots have access to open time?**

A. Yes.

**Q. And can they pick up extra trips or extra pairings from open time, subject, of course, to the legal requirements and whatnot, rest requirements?**

A. Yeah, subject to legal requirements, there are -- there's a restriction on certain pairings in open time. An exception would be a pairing that was granted off with paid time off and vacation or user. If that pairing was granted with vacation user, then that's not open for them to pick up. It's only available for exchange of exact same days.

**Q. Okay. Do pilots access the PBS system and the SkedPlus system and open time through, what, various computer programs?**

A. SkyWest Online houses access to those, which is our intranet, our company internet.

**Q. You used the term before, the pilot "calls off." What does that mean?**

A. It's like a sick call or emergency call, something where they remove themselves from duty for whatever reason.

**Q. Can a pilot call off because he or she didn't want to fly on the Sabbath?**

MR. PETERSEN: Objection. Outside the scope; speculation; lacks foundation.

Go ahead.

THE WITNESS: Sorry. Was the question could a pilot --

**Q. (By Mr. Strindberg) Call off.**

A. Yeah, that wouldn't be considered an emergency call, which would fall under the reliability program.

MR. STRINDBERG: And Scott, so I'm clear, this is something that the other witness is going to deal with, the reliability program, because it gets into attendance issues?

MR. PETERSEN: That's right, Roy Glassey.

**Q. (By Mr. Strindberg) I think I know the answer to this, but let me ask it. If pilots are out because -- under family medical leave or because of an ADA request, how is that handled in the PBS system?**

MR. PETERSEN: Objection. Vague and ambiguous.

Go ahead.

THE WITNESS: So I guess it depends. Depends. If you're out for an extended period, so several months, then you start, end itself. If you are only out for, say, a week because a spouse is having surgery or something and it's been approved under the FMLA, then that would be preassignment, and that preassignment would go on prior to them bidding, and then the award would come -- would be awarded around that preassignment.

**Q. (By Mr. Strindberg) Okay. I didn't pull it up, but let me just read it to you in Exhibit 16 on page 302 -- why don't we just pull it up. There's a term here, "golden days." What does that refer to?**

A. A golden day is a guaranteed day off. And pilots are given five golden days per year. And they -- similar to master vacation, there's an amount

of slots that are predetermined that state you can -- you know, this many pilots can be off on each day, and that's determined on domicile size and that sort of thing. So the pilot can go in and request golden days for specific days to try and guarantee the time off.

**Q. In other words, if a pilot didn't want to fly, say, on Thanksgiving, that could be one of their golden days?**

A. Correct. We do have restrictions on those, so I guess I should specify. You can't do it on a holiday itself. Day of, day before, day after, you can't request a golden day on a company recognized holiday. But yes, that concept is correct.

So if you -- I would say it's probably more -- a better example would be your kid's birthday or your anniversary, you know. If you wanted to make sure that you had the anniversary off so a spouse doesn't get angry at you for forgetting, then you would request a golden day.

**Q. Very civil. I'll pull up Exhibit 20 again. Oops, wrong exhibit. Sorry.**

**Steve, you had said that you had looked at this before. Is that correct?**

A. Yes, I've seen it.
**Q. And you looked at it in preparation for this deposition; is that correct?**
A. I'm sorry. I didn't catch the full question.
**Q. Did you look at this in preparation for this deposition?**
A. Yes.
**Q. And what was your purpose in looking at it?**
A. Just to see the information that was obtained through the data that was requested.
**Q. And do you know who prepared this list?**
A. This is something that I requested from Paxton Catten.
**Q. When did you request it?**
A. I don't recall the specific date off the top of my head.
**Q. Was this something you requested because you received the request from Todd Emerson?**
A. Yes.
**Q. And what exactly were you asked to -- what did you ask Paxton to do?**
A. I believe it was a hundred pilots to see if they were able to have, or if they were -- if they

worked a Saturday within their first year from being hired, and it was a specific time frame where those hundred pilots came from.

**Q. So it says "first Saturday worked." So with these employees, these pilots, do you know when they were hired?**

A. Yeah, that information is available. I don't know exactly off the top of my head, but yeah, that information is available.

**Q. But all of these first Saturdays, I guess, that they worked are listed are sometime in 2017. Does that give you an idea as to when they were first hired?**

A. Again, I don't know off the top of my head. If I recall correctly, I believe it was around November of 2016.

**Q. Okay. And were they from one class or were there multiple classes?**

A. It was a hundred pilots, so there would have been multiple classes.

**Q. How many pilots are typically in a class?**

MR. PETERSEN: Objection. Outside the scope.

Go ahead if you can.

THE WITNESS: I don't know the numbers of

how many they -- they fill.

**Q. (By Mr. Strindberg) If someone goes into a class in November, say November of 2016, when would they actually start working, i.e., flying?**

A. Generally, the training footprint's about two months. Then they would need to do IOE, or their Initial Operating Experience, which is -- sorry. So two months of ground training, and then Initial Operating Experience would take typically about a month after their ground training to complete the IOE as well. So, generally speaking, about three months would probably be a good estimate from when they first go to class to when they would have a schedule built.

**Q. And IOE is what, exactly?**

A. Initial Operating Experience.

**Q. And what does that involve?**

MR. PETERSEN: Objection -- hold on, hold on. Objection. Outside the scope; lacks foundation; speculation.

Go ahead.

THE WITNESS: That's basically their on-the-job or hands-on training. That's where they're in the aircraft doing -- operating a live flight with a check airman or a pilot that's

designated or authorized to do training on an aircraft with a pilot that's in training.

**Q. Do you know if any of these hundred pilots that are on Exhibit 20 attempted to avoid working on Saturdays?**

MR. PETERSEN: Same objections.

Go ahead.

THE WITNESS: I don't know.

**Q. (By Mr. Strindberg) So you didn't ask Paxton to look at their -- what they were -- what pairings they had actually bid for?**

A. No. I don't know if the data exists that shows what their actual bid preference was for that. This is just actual data, what actually occurred.

**Q. And the Saturdays worked, would that be the time they actually worked, or could they just be in reserve status? Actually, that's a poor question. Does that mean they flew on that Saturday, or were they just on reserve status?**

A. That would be -- they were paid that day, meaning they could be reserve or it could have been a flight.

**Q. And if we asked, you would be able to tell us the start date for each one of these employees?**

A. Yes.

MR. STRINDBERG: Okay, let's take a break. I want to talk with Todd, then we can finish up.

(Recess from 2:52 p.m. to 3:04 p.m.)

MR. STRINDBERG: We have no further questions. We'd like to keep this portion of the deposition open. There were a number of questions I can send, detail them, to you letter that he was not able to answer. So I think we have a right to keep the deposition open. But it's our intent to do what you suggest on some of these things, like changes in the seniority list and whatever, and send you some interrogatories. But we will keep this deposition open in case we have to bring Steve back or some other person to finish answering those questions.

MR. PETERSEN: Well, I'm not going to concede that you can have it open, but that's fine. You know, we're not going to say absolutely no. And so we'll on deal with it as we come, I guess. Make sense?

MR. STRINDBERG: So --

MR. PETERSEN: I do have -- I do have two or three questions I want to ask, actually about eight, that I'm just going to ask in follow-up.

MR. STRINDBERG: Okay.

///

EXAMINATION

BY MR. PETERSEN:

**Q. So I just wanted to ask you a couple of questions regarding vacation days, a couple of questions regarding golden days, and then a couple of questions regarding dropping lines or line dropping.**

**First of all, on vacation days, when you're a new hire, how are vacation days awarded to you?**

A. So for vacation, you don't start accruing vacation time until you've been with the company for six months. That's when your vacation time starts to accrue, but you're not eligible to use vacation until you've been with the company for one year.

**Q. Okay. And can you use vacation after lines have been awarded?**

A. Yes, you can request vacation after lines have been awarded. It would be based off of staffing, whether or not we can approve or deny.

**Q. And is seniority a factor in whether or not a vacation request is granted?**

A. It is in master vacation. So pre bid, it is based off of seniority. But post bid, it's not based off of seniority. It's first come, first serve on the request.

**Q. Okay. As far as golden day, you testified about golden days. For a new your hire, how are golden days accrued?**

A. So for a new hire, golden days aren't eligible for a new hire until they've had 90 days of employment. Then they are allotted five golden days per calendar year. And the amount of golden day slots that are available, generally there's just one golden day slot per day per position in domicile and equipment. Those -- those are made available once a year where it's opened up, and then it's -- they're awarded on a first come, first serve basis.

So for a new hire, so those are opened up generally in October, so we're -- in a couple of weeks we will open up the golden day slots for 2021. And so once it's open, it will be on a first come, first serve basis. And it's -- like I say, generally speaking, there's one slot per day per position. There's a couple of outliers for a couple domiciles.

**Q. Are there any differences -- first of all, can a -- can a reserve pilot use a golden day after the lines have been awarded?**

A. No. Golden days can't be requested after the lines have been awarded. Golden days are always prebid days that they request. So it's a

preassignment.

**Q. So if a pilot got his line, if he got his award, whatever his lines were, and he wanted to use a golden day, you don't get to then use a golden day to sort of trump a day that he didn't like that you were assigned a line?**

A. No, you can't.

**Q. What is the difference, if any, between a golden day and a vacation day?**

A. So golden days and master vacation both have to be requested prior to the first of the month prior to the month that it's being bid on. Then after that has closed, that time period is closed. So, for example, pilots can request master vacation or golden days from November up until October 1st. Once that closes on October 1st, golden days can't be requested at all for November.

You can't request master vacation, either, but you can request vacation post bid. Again, that's determined based off of staffing as opposed to master vacation, which has just available slots with regards to staffing levels. There's a number of slots available for master vacation.

**Q. Last question. As far as dropping lines after they've been awarded, can a reserve drop a**

**reserve line?**

A. No. A reserve always has to maintain the 18 duty days. So, yeah, you can't just drop a duty day.

**Q. So when you were testifying about how the process for dropping lines that are -- those are for lines that are not reserve lines; is that correct?**

A. Correct. Dropping a trip into open time would be only for line holders.

MR. PETERSEN: Okay. That's all I've got for now.

FURTHER EXAMINATION

BY MR. STRINDBERG:

**Q. Let me follow up on that, Steve. But a reserve could try to drop one of the reserve days, correct?**

A. Not just, say, drop. They can't just give away a reserve day to the company.

**Q. But they could either -- they could try swapping it or trading it?**

A. Yes. They can swap -- so they can swap to where they have the same amount of duty days, 18 duty days, and just swap it.

**Q. Swap it.**

A. Swap those days. But they can't just

straight drop a duty day.

**Q. What happens if on a reserve, say they're scheduled to work five -- have five reserve days in a row and on the first reserve day they get placed into a three-day trip. Does that then constitute three reserve days?**

A. Sorry. Can you repeat that?

**Q. Right. I gather that these reserve days are grouped together. In other words, you might get five of them in a row, correct?**

A. Correct.

**Q. Say on day one, the reserve person is placed into a trip that lasts three days. Does that count, then, as three reserve days for them?**

A. Yeah, those are still duty days. Is that what you're asking?

**Q. Yes.**

A. As far as counting towards the 18 duty days?

**Q. Yes.**

A. Yes, those three days would count towards the 18 duty days.

**Q. Thank you.**

MR. PETERSEN: All right. Thank you.

We would like to read and sign.

THE WITNESS: Sorry. Just as a follow-up to that, so when you're assigned a trip to you as a reserve, you can't then try and swap a day. Once you've been assigned a trip, you're -- those days are established, basically, on your schedule. Just to clarify.

MR. STRINDBERG: Okay, thank you.

(A discussion was held off the record.)

MR. PETERSEN: Vicky, do you need any information from me for the read and sign? I would to make sure I get the electronic mini that's searchable with the index, and then something for Mr. Spagnolo to read and sign.

MR. STRINDBERG: All right. I would like an electronic version. I would like both the full size electronic and the mini.

(The remote deposition concluded at 3:14 p.m.)

* * *

(Signature was requested.)

# Exhibit J

Exhibit J

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | | |
|---|---|---|
| SHANE ANDREW CASSELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 2:19-cv-00149-jnp-dao |
| vs. | ) | |
| | ) | Judge Jill N. Parrish |
| SKYWEST, INC., d/b/a | ) | Magistrate JudgeDaphne A. Oberg |
| SKYWEST AIRLINES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

REMOTE DEPOSITION OF ANITA SPENCER

February 24, 2021

Salt Lake City, Utah

Repored by: Kelly Fine-Jensen, CSR, RPR

upgrade -- up for a transition class, they have to have initial operating experience. She does that. And then as of October 2020, she is now also over the scheduling of simulator and training events.

**Q. Okay.**

A. And then I have Virginia, who is a supervisor. And she is over our crew records. And she just started that position when we -- we also took over crew records in October.

**Q. So, Trisha, in crew planning, they're the -- well, what do you call her? Is it a division or a sub department or --**

A. Yeah. Department.

**Q. Okay.**

A. Crew planning department.

**Q. This crew planning department that Trisha's over, they're the ones who put together the pairings; is that correct?**

A. That is correct.

**Q. And then the one that -- I'm sorry. My handwriting is so poor I didn't get it. The person over day-to-day operations?**

A. Yes. She's the manager over crew scheduling.

**Q. And who is that again?**

A. Shauna Gardiner.

**Q. So, I gather, does the crew scheduling involve both the bidding process, and then after the bids are -- after assignments are made, any changes that need to be made on a day-to-day basis?**

A. Yes. That goes to the crew scheduling department.

So, once it is passed over, the monthly bid awards are awarded, it's passed from crew planning over -- and their schedules are loaded, and they -- and now those crew schedulers take over.

**Q. And how many people are in crew scheduling?**

A. Crew scheduling, there's approximately 68.

**Q. And how many in crew planning?**

A. Crew planning, there are -- there's a supervisor and three crew planners.

**Q. And over -- and crew payroll, that Steve-O as I remember you said he was referred to -- how many people there?**

A. There's a supervisor and there are currently 13 crew pay coordinators.

**Q. Okay. In crew scheduling, how is that organized? I mean, is that sort of divided up into different groups that do different things?**

A. Yes. It is. Within crew scheduling you have your day-to-day schedulers. And then you have operations coordinators. They -- so, there's -- you've got Shauna, who is the manager. Then you've got supervisors over the day-to-day operations. Then you've got the day-to-day schedulers. Then you've got supervisors over the coordinators. And then you've got the coordinators. The coordinators are the ones that are working with the operations control center, dispatch, and they are checking legality. They're doing reflow. They're working with maintenance control, the dispatchers, and ensuring that our crew members are legal all throughout each and every day.

**Q. Okay. So, the day-to-day subdivision, they're the ones who do do the bidding, and then handle any changes that are made after the bids are set?**

A. The bidding, the PBS bidding, once the pairings are complete, all that is done in crew planning.

**Q. Well, okay.**

A. Once that is finalized, that moves over. The schedules are loaded. And then the crew schedulers start working on the schedules from there.

**Q. Okay. So, I -- and we'll get into this in a little bit in more detail. But I gather there's a lot of switching that goes on, adds, drops, trading, and swaps and things like that. Who is over that?**

A. That is -- that's Shauna. Her area is over that. They're the day-to-day.

And trades and adds and drops would be considered in the day-to-day.

**Q. Okay. So, they handle the trades, the adds and drops. What exactly then are the operations coordinators doing?**

A. They're the ones working with our maintenance control, our OCC department. And ensuring that the legalities -- that the pilots and flight attendants are legal for their trips.

**Q. So, give me an example then of what -- what an operations coordinator might be doing on any one day.**

A. Okay. So, they're watching legalities within our computer system. And once -- if, say, a pilot -- they're watching their duty time, their flight time. They're making sure that all the reflows -- instead of sending a crew member from Salt Lake to Colorado Springs, we have to send them to Denver, we have to update that in the system and

ensure that they are legal before, during, and after any reflow. So, they're watching their flight times all throughout the day. They're watching their duty times throughout the day. Because we've got to reschedule them and call out a reserve if they are exceeding any of the FARs.

**Q. How much flight time can a pilot have in any one day?**

A. They cannot -- the pilots -- you're going to put me to the test on this one.

**Q. Well, you can probably give me any answer because I wouldn't know if you're right or wrong.**

A. They can't go over -- it's within a flight duty period. And it depends on how many legs that they do, what time they started in the day.

I'm going to be honest with you, I would need a little cheat sheet to go over if they started at 4:00 a.m., how many duty hours they could do.

But they -- they cannot go over eight hours in a day.

**Q. Okay. So, I'm gathering that even after the schedules are set by -- in crew planning, that there's a lot of juggling that goes on on a day-to-day basis?**

A. A day-to-day basis, yes, there could be.

Absolutely. You could be reflown, you know, any time. If a plane breaks down or we have a sick crew member, we do reflow our crew members, yes.

**Q. What does it mean to "reflow" a crew member?**

A. To reflow? If I've got a pilot that calls in sick, as an example, I'll find a pilot that's already working and switch their route to accommodate that sick call until we can get a reserve there to take over for the sick crew member.

**Q. Let's not use 2020. But, say, in 2019, on any one day do you have an idea of how many flights SkyWest handles?**

A. How many flights prior to 2020?

**Q. Yeah.**

A. Yeah. We were doing, depending on the day, it was anywhere from 1,800 to over 2,400 before COVID hit.

**Q. And do you have any idea -- well, are certain days of the week busier than others?**

A. No, not necessarily. You know, you've got -- it depends on the day. But some may be heavier than others. But I'm going to say -- there -- there may be some days. And what those days are, I would have to look at a flow sheet to see what the

days are. But some days -- like yesterday may have been a hundred flights less than today. I don't have the exact number, no.

**Q. But it's not like you can say Tuesdays are the busiest day? It just varies week by week?**

A. Yeah. I would have to look and see what the flight count is on each day.

**Q. And of these 1,800 to 2,400 flights a day, do you have any idea how many of them get rescheduled or there has to be reflows done?**

A. I don't.

**Q. When did the PBS bidding system go into place?**

A. We've had that for about 15 years. We started -- it was about 15 years ago.

**Q. Besides crew support, what other departments are there within flight op -- operations?**

A. Within flight operations, we have the pilots, which is flight operations. And then we have flight training. And I'm trying to think of Chris Brown's position. I just drew a blank. But we have -- well, we did have safety. We don't have safety anymore. So, flight operations would be the pilots and training.

**Q. So, the department of flight operations**

**has pilots, training, and crew support?**

A. Yes.

**Q. And when you say it has the pilots, what does that mean?**

A. That is -- they're responsible for the management of all the pilots for SkyWest.

**Q. And who is currently over the pilot department of flight ops?**

A. Roy Glassey.

**Q. And when you say the management of the pilots, what do you mean?**

A. The chief pilots -- so, you have Roy Glassey. He has chief pilots. And then the pilots. So, pilots report to the chief pilot, and then report to Roy Glassey.

**Q. Okay. So, what are -- what are they doing then on a day-to-day basis?**

A. The chief pilots?

**Q. Yeah. Yeah. In other words, I'm asking more on a department basis. What does that department doing?**

A. They're -- they're over the leadership -- you know, managing the pilot group. And the domiciles within, you know, our system.

**Q. Do they have anything -- does the pilot**

**group have anything to do with scheduling or is that done all by crew scheduling?**

A. Crew scheduling. If they have an issue with a crew member that needs -- we need to cover them for any reason, they would call -- they would call the crew scheduling department.

**Q. Okay. So --**

A. They don't do it themselves. No.

**Q. Okay. So, in other words, say they had to take a pilot off line, I don't know, for disciplinary reason, they would then call your department, who's scheduling, and ask for a substitute?**

A. Yes.

**Q. And are all three of these, the pilot department, the training department, the scheduling, are they all located there in St. George?**

A. They -- crew support is here in St. George.

The director of training is based in Denver. They have offices in Denver and Salt Lake.

**Q. Uh-huh (affirmative).**

A. And we also have Chris Brown in flight operations. But for the life of me, I drew a blank on his title.

And then Roy Glassey has an office here in

St. George and Chicago, yes.

**Q. And you keep referring to Chris Brown, is he a different department?**

A. No. He's a director in -- and he -- he -- I'm totally drawing a blank on what his title is. But he -- he sets up the -- the -- not qualifications, but he works with Tracy as a director. And I couldn't tell you exactly what he does.

**Q. But he's within your group, within crew scheduling?**

A. No. He's underneath Tracy Gallo. He's a director.

**Q. Steve Spagnolo, when we were deposing him, referred to a pilot staffing coordinator. I think he said her name was Virginia Dorosky?**

A. Yes. She works for me.

**Q. What does she do?**

A. What she does is when pilots want to upgrade, she -- she staffs the classes. So, if somebody wants to upgrade or they want to transition into another airplane, they submit a bid. If they want to transfer domiciles, they submit a bid. And new hires, she does new hire placement, based on the bids that they submit and where our openings are.

So, they put it into a computer system, and she awards it based on where the openings are.

**Q. And which department is she -- she's in crew scheduling, I gather?**

A. She is -- she is within crew support. She directs -- she reports directly to me. She's with crew records.

**Q. Okay. There was a reference in the depositions to the CrewTrac system. That's capital C-R-E-W, capital T-R-A-C. What is the CrewTrac system?**

A. The CrewTrac system is our daily scheduling system that we use. So, our crew management system. It has the crew members' schedules. And that's what we use to manage each crews' schedule. So, if somebody calls in sick, we're updating in there. Once they do their PBS bid, it loads into CrewTrac. So, it's our daily management system.

**Q. Mr. Glassey, when we took his deposition initially said that pilots can call into crew support if they need to -- if they're going to be absent or if they need changes made. Is that correct?**

A. That is correct.

**Q. Who would they be calling?**

A. The crew schedulers.
**Q. And how many of them are there again?**
A. Within the crew scheduling area, again that includes the coordinators, there's about 68 or so.
**Q. Okay. Back in 2016 and 2017, who was doing scheduling for training?**
A. For training? That is -- would have been Kim Ence.
**Q. Do you know in what department?**
A. Flight training.
**Q. Does that department not exist anymore or has it just been brought under crew scheduling?**
A. The scheduling of it has been brought into crew support, yes, as of October of 2020.
**Q. Do you know -- do you understand or know what SAPA, S-A-P-A, is?**
A. Yes. I do.
**Q. And what is it?**
A. It's the SkyWest Airlines Pilot Association.
**Q. Do you know when that association started?**
A. I don't recall. No.
**Q. Mr. Spagnolo said that he thought the seniority system that's in place at SkyWest started**

**before SAPA came into existence. Do you have any knowledge of whether that's true or not?**

A. That is true.

**Q. When did SkyWest start using the seniority system?**

A. As far as an exact year and date, I do not have that. But I would expect that it was in the 1980s. If not earlier. I started in '83. And back then, they had a seniority list.

**Q. Okay. And do you know when SAPA came into existence?**

A. I could not tell you what year, no.

**Q. But it was sometime later, sometime after 1983?**

A. Yes.

**Q. And the seniority system, I gather it's used for bidding purposes; correct?**

A. Yes. You're -- you're bidding seniority -- excuse me. Your seniority is -- your bid is based on your seniority.

**Q. What else is seniority used for?**

A. Seniority? Your bidding, your transfers, your training slot, your monthly -- well, the bidding, the monthly schedule.

**Q. Okay.**

A. It's used also for your compensation. So, if you have five years, you're paid this. If you have six years -- so, your seniority -- or your longevity with the company. Not necessarily your seniority.

**Q. I have a couple of sort of cleanup questions about domiciles and some bidding issues.**

**How are staffing levels at each of the domiciles determined?**

A. They are determined by the -- the need of our partners. We have -- we have domiciles -- and they may fluctuate up or down each month. But they are determined by the schedules that our partners give to us. And we monitor how many lines and how many reserves monthly that we need in each of those domiciles.

**Q. And who's doing that monitoring of the lines and reserves?**

A. I do.

**Q. And what do you look at? Is there some program you receive or --**

A. We do it based on how many PBS lines that we have, how many -- there's -- there's a number of items that we're looking at. How many pilots we have going out to training, how many pilots that we have

on leave of absence, what our PBS -- what the pairings -- how many pairings that we have within that scheduled month, how many PBS lines we're participating, the total number of pilots in that domicile, how many lines we need, how many reserves we need. There's quite a bit that goes into it.

**Q. And is there some formula for determining how many reserve pilots you need based on the number of lines or flights that are being flown or does that vary?**

A. We have a range, that we try and stay within the range of 18 percent for our reserve compliment in each domicile. Some domiciles may be a little bit higher, depending on what region they're serving and the reserve coverage in it.

**Q. So, it's my understanding the pilots are assigned to a particular domicile; correct?**

A. That is correct.

**Q. So, what happens -- say you're at the bottom of the seniority list and you're in Detroit and the number of pilots needed in Detroit goes down, are you transferred to another domicile? What happens?**

A. If it's just a month fluctuation, then you're on reserve. If you were holding a line and

the lines go down because our partner has pulled flying out or redirected that flying, if we -- if we do not anticipate that flying coming back, we just won't award any transfers into that domicile. But if it is a complete reduction, then we would reduce or close the domicile.

But just a monthly fluctuation, it's just -- if you're on the -- I'll say the bubble, if you're on the bubble holding a line or holding reserve, you may be reserved next month if the lines have gone down.

**Q. Okay. And if there's a pattern of reduced flights into the domicile, are pilots then asked to transfer to another domicile?**

A. Yes.

And a pilot can request a transfer at any time. Yes.

**Q. It's my understanding that in -- around the middle of 2017, new pilots were being -- new first officers were being sent to, in particular, Detroit, the Detroit domicile. Do you recall that?**

A. I -- I don't recall the numbers. But where Detroit was a very junior domicile, we were sending quite a few new hires there, yes. As far as a number, I do not know that.

**Q. So, who would have made that decision as to we need to send new hires to Detroit? Is that also something you would be determining?**

A. Yes. Virginia and I meet monthly and go through that.

**Q. So, you said as far as reserves, you aim for approximately 18 percent. Would it be 18 percent of the pilots at any one domicile would be on reserve status? Is that what you mean?**

A. Yes.

**Q. I understand that there's three different types of reserve: short call, long call, or ready reserve; is that correct?**

A. Yes.

**Q. What's the difference between the three?**

A. A short call is a 12-hour call. And you -- so, you would be on reserve for a period of 12 hours. And you can be called and be expected to be to the airport within two hours.

Long call, you're on a call for 24 hours. And your expected call is 12.

And --

**Q. You said, "your expected call is 12." What do you mean?**

A. We could call you out and you'd have to

report to the airport within 12 hours.

**Q. Okay. Thank you.**

A. And then we have ready reserve. And that ready reserve is an airport ready.

**Q. So, the pilot is in the airport?**

A. Yes. That's correct.

**Q. And who decides how many reserve pilots should be on short call, long call, or ready reserve?**

A. We evaluate that monthly, if you're going to be an a.m. reserve, p.m. reserve.

And the long calls are based on the policy. So, we have -- for the amount of pilots that you have, 20 percent of those pilots that are on reserve have to be considered a long call. They can be converted to a short call throughout the month, but 20 percent of them have to be considered long call. Unless they choose to be short call.

**Q. And that is by policy, you said?**

A. Yes.

**Q. And who decides how many ready reserves there needs to be?**

A. Ready reserves, we'll staff ready reserves on a daily basis at the airports. And it's primarily in our hubs. But that's the day-to-day schedulers that would be doing that.

**Q. If you are a reserve pilot -- or reserve status, and say you're a short call, how many 12-hour periods are you on short call in a month?**

A. You could be on short call 15 to -- 16 to 18.

**Q. And if you're on long call reserves, how many days per month?**

A. Same.

**Q. And same for ready reserves?**

A. Yeah. Because they're -- a ready reserve is technically a short call that's been converted to a ready reserve. And it's just part of their short call -- or their reserve day.

**Q. Does that -- does ready reserve, does that vary day-to-day? Like can you anticipate you might need more ready reserves say because of a snowstorm or something?**

A. Yes. It does change day to day.

**Q. And I gather in the bidding process, a pilot, even if they have enough seniority to bid a line, can choose to bid or be a reserve; correct?**

A. They can. Yes.

**Q. Or they can bid some combination, take some flights during the month and serve as a reserve on certain days; correct?**

A. No. It's one or the other. It's -- you're either going to bid a line holder or you're going to bid reserve. You can't do -- you can't pick certain pairings and then pick reserve on the rest of the month. It's one or the other.

**Q. But you did say that there's some pilots who -- and I can't remember the term you used -- composite was it?**

A. Yes. It is composite. They're technically considered a reserve. But they are reserve that we will load pairings on and try and get them enough flying to be a full composite. And if they're not a full composite, they do have reserve days on them.

But they're still considered a reserve if they've got reserve days on them.

**Q. Okay. But a pilot then has to choose bidding a line or bidding as a reserve?**

A. Yes. And he'll do that when he's doing -- sorry. Should do that when they're making their PBS bid.

**Q. And I -- I don't think we need to go into it, but I gather the PBS has seven different levels of preferences you can bid?**

A. Yes. They do.

**Q. Wow. And if a pilot bids for reserve status, can they choose the days they bid? How does that work?**

A. They can bid days off, but it's all awarded based on seniority.

**Q. Okay. And just so I understand, say you're a pilot in Detroit, how would you know what flights you could actually bid on?**

A. The pairings -- once planning is done with the pairings, they load them into the PBS system. And you can see what pairings are available in that domicile.

**Q. Say in any one domicile not all of the pairings are bid on, what happens then?**

A. They -- if they can -- so, it'll award by seniority. And then any pairings that are left over, it's going to start from the bottom of the seniority and fit in to bid lines that can take the additional pairing. Or it will leave them into what we call "open time."

But we try and fit them in the bid line so we don't have open time.

**Q. So, let me see if I understand. Say a series of flights or pairings are not bid on in Detroit, do you then give those to the person on**

**reserve who has the least seniority in Detroit or do you start taking pilots from other domiciles?**

A. Initially, when the PBS is going through and putting all the pairings on, we're going to try and push them onto all the lines first. But if for some reason they don't all fit, then we leave them in open time. Crew members can pick them up on their days off. And if they're not assigned, we will put them on a composite line or reserve.

But, yes, we will also bring -- if we run short on reserves, we will bring a reserve from another domicile.

**Q. And what is "open time"?**

A. Open time is any pairing that is not assigned to a pilot.

**Q. And how do pilots access open time?**

A. Through our system. Through our computer system.

MR. STRINDBERG: Okay. Why don't we -- we've been going almost an hour. Why don't we take a five-minute break and then we'll come back. So, say a minute or two after 10:00.

MR. BEAN: Okay. Sounds good.

(Break taken at 9:57 to 10:05 a.m.)

**Q. (By Mr. Strindberg) Welcome back.**

**Anita, we at one point asked -- or one of the requests we asked from SkyWest was: For each day during the relevant period, please produce the crew reliability reports for first officers trained on CRJ provided to managers that Mr. Glassey referred to in his deposition.**

**Did you have -- and we narrowed that down through some discussion to Friday, Saturday, and Sundays, and just for Detroit.**

**Did you have anything to do with collecting the information that SkyWest provided in response to that request?**

A. No. I did not.

**Q. Okay. I'm going to show you now -- I'm going to share my screen with some luck here. Hold on.**

**Anita, can you see this screen?**

A. Yes. I can.

**Q. Okay. Somehow I've managed to lose you, but that's okay.**

MR. STRINDBERG: And, Tanner, we're going to mark this -- it's out of order because of the switch in the depositions. This will be marked as Exhibit 41.

MR. BEAN: Okay.

(EXHIBIT 41 WAS MARKED.)

**Q. (By Mr. Strindberg) This was the information provided to us by SkyWest in regards to reliability reports. It was provided to us in two different formats, one of which is this spreadsheet.**

**Do you get these -- these type of reliability report every day, Anita?**

A. No. I do not.

**Q. Does someone in your department get it?**

A. No.

**Q. Do you know to whom this report goes?**

A. I do not. I'm not even sure what this report is.

**Q. But we asked for a "crew reliability report." Do you know what the crew reliability report is?**

A. No. Other than an absence report, I do not. I don't do anything with reliability.

**Q. What is the "absence report"?**

A. Just a report on absences. Crew members that have called off.

**Q. And what format does it come in?**

A. It -- it's just a report that -- I don't know the format. It's a report that you pull off from our system.

**Q. Okay. Which system is that?**
A. SkyWestOnline.
**Q. Okay. I want to ask you a couple of questions.**
**There's a Code Key there, do you see that? And it has -- starts with SIC, sick.**
A. Yes.
**Q. I guess that's self-explanatory.**
**Who determines if someone is sick? Is that the pilot's determination?**
A. Yes. They will call in and tell us that they're sick or need to be pulled "emergency."
**Q. Okay. And then the next one is emergency, EMR.**
**What does that refer to? At what point does an absence get coded as "emergency"?**
A. An absence coded as an emergency should be any kind of an absence other than them personally being sick.
**Q. So, could you give me an example?**
A. A family member is sick. Not -- not necessarily themselves that are calling off sick, but maybe they're calling off for a family member.
**Q. Then the next one ONP, as in Paul, off no pay. What does that refer to?**

A. Off no pay would be they have been removed off without compensation.

**Q. And who would have removed them?**

A. I would say a chief pilot.

**Q. Okay. So, some sort of a disciplinary action, that type of thing?**

A. Yeah. It could also be if they had to be taken off for a legality reason, off no pay.

**Q. What do you mean a "legality reason"?**

A. If, as I was describing earlier, the people run the reports, if for some reason they had to be removed from their schedule, and with no compensation, if they had a conflict on their schedule.

**Q. Can you give me an example of that?**

A. Let me think. If they had -- let's say they picked up a trip and it conflicted with another trip because of something that they may have done on their schedule, they would be removed on that.

**Q. Okay. And that would be coded as "off no pay"?**

A. Yes. Possibly, yes.

**Q. Who enters these absence codes?**

A. Enters them as far as where? Enters them into the CrewTrac system?

**Q. Well, this report we've got of absences, it has Column D absence code. Who puts that in?**

A. Okay. Those would come -- the absence codes are added into CrewTrac. And those would be added by a crew scheduler.

**Q. Okay. Then there's an absence code, ADM, for administrative leave. When would an absence be coded for administrative leave?**

A. Administrative leave would be a code that we would put on requested by a chief pilot.

**Q. Can you give me an example of when something would be coded "admin leave"?**

A. Yes. If a chief pilot calls in and says Pilot A needs to be removed from his trip administrative leave, we just code it as "ADM."

**Q. How does that differ from the prior code, off no pay?**

A. Off no pay is they're just being taken off. A chief pilot could call in and say, you know, Pilot A needs to be removed from their schedule for personal reasons. And if they don't have, you know, any time off to take or they've been denied, based on the chief pilot making the decision, it could be off no pay.

**Q. Okay. FLA, family leave of absence. What**

**does that refer to?**

A. That would be if you've been approved for a Family Leave Act. But any type of a family leave approved.

**Q. Military leave of absence, MIL. I assume that is self-explanatory?**

A. That is correct.

**Q. And then the next one EMV, emergency (pulled from vacation bank). What is that referring to and how does it differ from the other "emergency"?**

A. That is if you're calling off emergency and rather than -- "emergency" is removed from what we call your user bank, your user time.

And if you would rather have your emergency compensation taken from your vacation bank, then we put that code in there, EMV. That tells the crew payroll department to remove the emergency from vacation rather than user.

**Q. So, this would be -- the pilot would have to tell someone in crew scheduling that they wanted it pulled from the vacation bank when he actually called in; is that correct?**

A. Correct. Yes.

**Q. The next one is "fatigue." What is that referencing?**

A. Fatigue is if you are not fit to complete your schedule as scheduled, you call in and you can call off "fatigue."

**Q. And who makes that determination that someone is not fit?**

A. A crew member.

**Q. Can a chief pilot also make that determination?**

A. The chief pilot would -- no. The crew member calls off. And they call in and say that they're "fatigue."

The chief pilot, if they're calling off for a crew member, they would normally put them down either "emergency" or "administrative leave." They normally do not call and say -- put them down as "fatigue."

The pilot makes that decision that they are "fatigue," and that's the code that we use.

**Q. Okay. OJI, on-the-job injury. I assume that's straight forward, someone's been injured and can't fly, it would get coded as OJI; is that correct?**

A. That is correct.

**Q. The next one is SAD, S-A-D, scheduled assignment deviation. What is that referring to?**

A. That is any time -- if you call out a reserve and they do not call you back or they -- it's -- there's a list in our policy of schedule assignment deviations. If a crew member does not meet their report time, they delay a flight, just -- there's a handful of what is called "scheduled assignment deviations." We put those on.

Crew support, crew schedulers, use those primarily when a crew member does not meet their reserve call out time.

**Q. So, it's crew scheduling that determines if someone -- if an absence gets coded as a SAD; is that correct?**

A. Yes. Yes.

**Q. Okay. And then the last one SKV, sick, how is that different from sick which is coded SIC?**

A. That's the same as the "emergency." Rather than using -- sick automatically comes out of a user bank. If you call in sick, you can use your vacation bank rather than your user bank. And that's -- so, SKV and EMV are basically the same. Sick, you're personally sick. Emergency, you're calling in for anything other than you personally being sick.

**Q. Would I be correct in saying that if**

**there's an absence in duty, and you're a pilot calling in sick or for an emergency or fatigue, that that -- you usually -- crew scheduling usually doesn't have much notice that that's going to occur; correct?**

A. Sick or emergency, generally we get them the day of. And it could be, you know, hours before their scheduled show time or, in some cases, it is at their show time.

**Q. And I see here, looking at this -- I mean, for example, this first one, September 1st, 2017, it looks like there were 11 first officers in Detroit on that day who were off for one reason or another.**

**Then that Saturday, looks about to be the same number.**

**Is that a pretty typical percentage, would you say, where you have ongoing absences on a daily basis?**

A. I couldn't tell you that that was average.

**Q. Do you -- do you have any way of determining what the average is for pilots?**

A. There's -- you could run an average -- an average report.

**Q. Roy Glassey, in his last deposition, said something about he saw an average company wide for --**

**I think he used the figure -- 5.3 days per year pilots were absent.**

**Does that sound about right?**

A. That, I don't know. That -- I don't do the absences with crew members, other than scheduling them.

**Q. Who handles the absences?**

A. It would -- their reliability is all within Roy Glassey's area.

**Q. But if someone calls in sick or there's an emergency, your department then has to do the rescheduling, not Roy Glassey's department?**

A. That is correct.

**Q. So, who -- if a pilot is sick, who do they call? Do they call their chief pilot or do they call your department?**

A. They call crew support.

**Q. And you -- do you then notify someone in Roy Glassey's department?**

A. No. We do not make a phone call to them unless the crew member needs to be transferred.

**Q. What do you mean "transferred"?**

A. If they want to talk to their chief pilot, we would then transfer them.

But, no. We -- if somebody calls in sick,

they do not have to be transferred to Roy Glassey or a chief pilot. We take care of the absence and start covering the shift.

**Q. So, are you saying then that -- I'm going to stop sharing the screen.**

**Are you saying then that the chief pilot may never know if a pilot's been absent on any particular day?**

A. The chief pilot has a report that they can run.

**Q. And when you say, "the chief pilot," do you mean Roy Glassey or do you mean chief pilots at the various domiciles?**

A. Both, technically, could run the report.

**Q. And do you know, do they run those reports on a regular basis?**

A. I do not know.

**Q. And I gather when a pilot is absent, say sick, they call in "sick" or "fatigue," you said it was those -- let me make sure, I'm reading my notes here -- that's the operations coordinators that get involved and have to do the reflowing reassignment; is that correct?**

A. No. The operations coordinators -- well, if somebody calls in sick, the scheduler -- the crew

scheduling area takes care of it.

The operations coordinators are dealing with reflows, like weather reflows or mechanical reflows and legalities.

**Q. Okay. But the day-to-day -- so, the day-to-day people would then handle the reflows?**

A. Yes.

**Q. Who actually calls out and notifies a reserve that they're needed? Where does that come from?**

A. In crew scheduling.

**Q. Someone in this day-to-day operations?**

A. Yes.

**Q. Does it ever happen when you run out of reserve pilots?**

A. Yes.

**Q. How often does that happen?**

A. It -- it varies. It depends on the operations for the day. And what domicile. How many absence calls we've taken.

**Q. Is that a regular -- a fairly regular occurrence, that you actually run out of pilots -- or run out of reserves?**

A. No. It -- it -- that's a hard question to answer because it varies day-to-day and by position

and by domicile. And every day is different.

**Q. Okay. I'm going to share another screen with you.**

**Okay. This has been previously marked as Exhibit 14. It's dated October 27, 2016. It's regarding Shane Cassell. Memorandum of Agreement for Religious Accommodation Request. And it's signed by Shane, Jake Whicker. And I believe eventually it was signed by Coy Bryant as well.**

**Have you ever seen this document before?**

A. No. I have not.

**Q. Back in 2016, Shane was in the training department and submitted a request for a religious accomodation.**

**Did anyone ever tell you back then that he had submitted such a request?**

A. No.

**Q. In the second paragraph there, the second sentence: "It has been determined that we are unable to honor the specific request with work scheduling."**

**That was a request that he not be scheduled on his Sabbath, which was Friday, sundown to Saturday, sundown.**

**But then they say, "However, as an accommodation, we have provided FO Cassell with tools**

**to meet his religious requirements. Options include pursuit of schedule changes as defined by company and departmental resources." And then it lists: "Drop/trade shift, bid for desired work assignments, domicile staffing/available shifts."**

**Let me just ask you about those.**

**How would a pilot -- or how could a -- I'll make it specific to Shane. How could Shane have used "bidding for desired work assignments" to avoid working on his Sabbath?**

A. How could he have used those tools?

**Q. Yes. Yes.**

A. Once he is online, we have a program that crew members can add trips, they can drop trips. Those are all based on the availability of reserve staffing. So, dropping a shift -- yeah. That -- it goes back to the reserve staffing and availability that you have in each domicile and each position, if that is available.

The bidding system is where they're talking about "bid for desired work assignments." That's the PBS bidding system that I'm assuming they're talking about there.

Drops would be dropping to another crew member. And if they are able to drop that, then it

is now the other crew member, his or her responsibility, to pick that trip up and fly it once it is approved.

**Q. Okay. Well, let me ask you specifically. In this letter, this agreement, they list out these tools. And why don't we go in reverse order.**

**What is "domicile staffing"? How would choosing a domicile help someone avoid working on the Sabbath?**

A. Domicile staffing and available shifts, that -- domicile staffing is going to be your reserve availability, depending on how the domicile is staffed with reserve availability, if you can drop your trip into open time or take user or vacation time.

**Q. Okay. Regarding domicile staffing, what was going on in the middle of, say, 2017 in Detroit? Were there a lot of reserve pilots available?**

A. I do not remember what was happening in that domicile in 2017.

**Q. There's a reference there then to "available shifts."**

**Do you know what that's referring to?**

A. I do not. I -- available shifts would be domicile staffing/available shifts to pick up in open

time. That's -- that would be if there's available shifts for you to trade with or to pick up.

**Q. Okay. "Bidding for desired work assignments," you said this was the monthly bidding through the PBS system; correct?**

A. Yes. PBS is the monthly bidding, yes. Once you are through with all your training and your IOE, then you would get a schedule.

**Q. Okay. So, the tool they're referring to is that a pilot could enter something in the PBS bidding system indicating that he or she didn't want to work on the Sabbath; is that what that's referring to?**

MR. BEAN: I'm just going to object to the point here that, you know, she's referring to what she's assuming here. She doesn't know, you know, what the author of this document meant.

Thank you.

MR. STRINDBERG: Thank you.

**Q. (By Mr. Strindberg) Go ahead, Anita.**

A. Yeah. And on this, the drop -- the shift trade, the work assignments, the domicile staffing, and available shifts are all once they are trained and online and bidding their monthly schedules with pairings.

**Q. And "drop/trade," that's -- that refers to once the bids have been -- or the flights have been assigned for the month, then a pilot can go into this -- the computer and drop and trade shifts; is that correct?**

A. Yes. Once they have a schedule -- once they've completed all training and they have a monthly schedule.

**Q. What's the difference between a "drop" and a "trade"?**

A. A drop is if you're dropping your trip just to open time. And if there is staffing, the company will take ownership of that drop and assign it or leave it into open time for someone else to pick up.

A trade is you're trading your assignment with another pilot.

**Q. So, say someone -- say Shane had a flight on Saturday, and he put it into open time as a drop, would that automatically be accepted by the system if there were enough reserves around or might it somehow be denied?**

A. Can you say that again?

**Q. If someone say -- I'll use Shane. Say he had been assigned a trip that conflicted with the**

**Sabbath and he put that into -- he dropped it into open time, would that drop automatically be accepted or would it sometimes be rejected by the company?**

A. As a line holder, if he was a line holder, he could request to drop that. If there was ample staffing, then it would be -- he would be able to drop that and the company would assign it to a reserve or leave it in open time for someone else to pick up.

**Q. When would he know whether or not his drop had been accepted?**

A. We try and clear those out, you know, as they come in. Sometimes there's a lag. Sometimes there's a few hours lag, just depending on the workload that the crew schedulers have. We try and get to them within 24 hours.

**Q. So, are there people in crew scheduling, I gather, these day-to-day operations people, they're actually monitoring the open board?**

A. Yes.

**Q. There's also been the term used, "pick ups." What is a "pick up"?**

A. A pick up would be picking up from open time. It can be referred to as picking up from another crew member.

**Q. Okay. And is it true that when something -- when a flight -- a pairing goes into open time, it's first come, first serve as to who gets that flight?**

A. When a pairing goes into open time?

**Q. Yes.**

A. Yes.

**Q. So, whichever pilot happens to be monitoring the open time, he or she sees a flight pairing that they like, they can grab it, and seniority is not an issue at that point; correct?**

A. Yes.

**Q. There's also the term "swap." What does that refer to?**

A. Swap would be swapping a -- like you're pairing tomorrow with another pairing on Friday, you're swapping your trip for another trip.

**Q. How is that different, if I may ask, than a trade?**

A. A trade is trading with a pilot. And, swap, you're trading with the company open time.

**Q. Okay. So, a trade is prearranged between pilots, while a swap is just letting go of one trip and you put it in open time and you pick up another trip in open time?**

A. Based on availability, yes.
**Q. And then also the term "trade downs" has been used. Do you know what that refers to?**
A. "Trade down"?
**Q. Yes.**
A. No. I do not.
**Q. Can a pilot in open time drop a flight or a pairing and replace it with a reserve day?**
A. No.
**Q. But the company can do that?**
A. The company would only put you on reserve as a line holder if there were legs within your pairing that were canceled or reflowed.
**Q. We asked the company to provide us a whole bunch of information regarding drops and trades and all of these types of things. And they provided us with a series of spreadsheets pertaining to Detroit. And I'll show you those in a minute.**
**But did you have anything to do with the company collecting that information?**
A. No. I did not.
**Q. Okay. I'm going to show you what we will mark as Exhibit 39. And part of the spreadsheet was given to us by SkyWest in answering the Fifth Set of Written Discovery.**

(EXHIBIT 39 WAS MARKED.)

**Q. (By Mr. Strindberg) So, let me show you that.**

**Okay. Can you see my screen there?**

A. Yes. I can.

**Q. Okay. I will -- let me read here the -- what this is answering. "For each domicile, per bid period, the number of lines that were traded or swapped between first officers."**

**And I will represent to you that this is -- we agreed that they would just give us this information for Detroit.**

**So, this is the information: The number of lines that were traded or swapped between first officers during this approximately two-year period.**

**Does the number of swaps and trades surprise you or is that just something that happens on a regular basis?**

A. I'm not sure where this data is. And as far as the number of trades, I do not have that information.

**Q. Okay. You would say that -- are you in a position to say that trading and swapping is fairly common among pilots?**

A. Yes. They do have that ability.

As far as how many, I do not have that number.
But they do have the availability to do that amongst themselves.
**Q. Let me show you the next one, which is Tab 11(b), as in boy. It says, "For each domicile, per bid period, the number of lines that were posted by a first officer seeking to have another first officer take the line, flight, or trade it for another line or flight.**
**And, again, we just -- by agreement, this was limited to Detroit.**
**And this shows, you know, anywhere between, what, approximately 600 and, roughly, 1,700 flights per month were posted by first officers who wanted to drop or trade.**
**Do you have any knowledge of whether that's pretty typical in most domiciles?**
A. I do not.
**Q. Who would have that information, do you think?**
A. It would have to be pulled out of the system.
**Q. Well, I gather that's where this came from, the system.**

A. Yeah. I don't -- I don't know who pulled it or when. I don't -- I don't have the information of if this is typical or not because that is not something that I review.

**Q. But you are in a position to say that posting of trips in open time by pilots is fairly common? In other words, whether they want to trade or get different flights; is that correct?**

A. They do have that available to them. Yes.

**Q. And they have that availability and it's used on a regular basis, I gather; correct?**

A. I -- I would assume so. I -- I don't know how many.

**Q. Okay. Let me just see one other thing.**

**This is part of the same spreadsheet. It's Tab 10(d) of Exhibit 39. It's the number of flights that were covered by a reserve first officer in Detroit on Friday, Saturday, or Sunday during this approximately two-year period.**

**I mean, again, do you -- this is not something you monitor personally; correct?**

A. That is correct.

**Q. Would someone in crew scheduling, day-to-day operations, be monitoring this type of activity?**

A. I'm not even sure what this is gathering.

You read that it was reserve call outs or --

**Q. The interrogatory was: The number of lines -- but that was interpreted to mean flights or pairings -- that were being operated out of Detroit where a reserve first officer was assigned to fly, regardless of reason.**

**So, I guess these are the number of flights or pairings where a reserve officer was called out to take a flight in Detroit.**

A. Yeah. I do not -- I do not monitor that, nor pull those reports.

MR. STRINDBERG: And, Tanner, who is the gentleman who you said collected that information again?

MR. BEAN: That's Justin Esplin. He's VP of IT.

We'll be getting a verification to you tomorrow on that.

MR. STRINDBERG: Okay.

**Q. (By Mr. Strindberg) What is -- there's a reference, Anita, to the Sked, S-K-E-D, Plus, P-L-U-S, system.**

**Do you know what that is?**

A. I do. It is --

**Q. What is it?**

A. SkedPlus is where crew members can go in to view their schedule and make requests on their schedule.

**Q. What kind of requests?**

A. To add, drop, request vacation.

**Q. Did -- is the SkedPlus system different than the open time system or are they all integrated?**

A. They can view open time within their schedule in the SkedPlus system.

**Q. Okay. It's my understanding that a pilot can also call crew scheduling to request changes; is that correct?**

A. Yes. They can.

**Q. And how does that work?**

A. A crew member can call -- they can call the crew scheduling line and talk to a crew scheduler about changes that they would like to do on their schedule.

They can -- they can request it online through SkedPlus or they can call crew scheduling.

**Q. When they request it online through SkedPlus, does that mean they just post something in open time or do they submit some kind of specific**

**request?**

A. They can post it themselves on -- within SkedPlus, yes.

**Q. That would be called "posting it in open time"?**

A. Yeah. Or "request to drop."

**Q. Okay. But, again, they can also -- as you were saying, they can also, instead of doing it online, they can call crew scheduling and say, hey, I would like to make a change?**

A. Yes. They -- they can for certain things.

Like a trade, they're going to do online with the two pilots.

They can request a drop. They can request user vacation.

We generally have them go to SkedPlus first when they do that, before calling crew support.

But a crew scheduler, yes, can help them.

**Q. Why do you have them typically go to SkedPlus first?**

A. Because it puts them in the order that they're received.

**Q. I mean, is it -- does crew scheduling try to work with the pilots when they request modifications to their schedule?**

A. As much as possible. They're going to have to evaluate if there's other people in what we call the "queue." Because the pilot could call crew support and jump the queue. And, so, that's why we request that they do it through SkedPlus, because we have to manually check the queue to make sure that there's nobody requesting ahead of them. Schedulers will look at reserve availability and help answer questions that way as well.

**Q. You said there would be a queue. A queue for what?**

A. The SkedPlus queue, where crew members are requesting user time, vacation time. There may be others that have not been processed prior to a pilot calling us.

**Q. So, in other words, a queue might develop if people wanted Christmas off, for example?**

A. Yes. It could. The queue is the requests that are coming in. And it queues them in the order that they've been requested. So, if you've got -- there's ten people in the queue, and another pilot is calling in to crew support, we can't -- we can't bypass that queue. We've got to evaluate that queue before we can process the phone call.

**Q. So, the queue would be a queue of pilots**

who maybe wanted to drop a flight or trade a flight, that type of thing?

A. Yeah.

Q. I'm going to show you a document which has been previously marked as Exhibit 24.

There's the number on it.

This is an e-mail that Alan Reinach, who was an attorney representing Mr. Cassell at the time, sent to Coy Bryant regarding the fact that Mr. Cassell was forced to resign his position.

Have you ever seen this document before?

A. No. I have not.

Q. Mr. Reinach's e-mail was responded to by Todd Emerson. And I can show you that document as well.

Have you ever seen this letter before?

A. No. I have not.

Q. Do you recall talking with Mr. Emerson about this situation?

A. No.

Q. At any point?

A. No.

Q. So, you don't recall Mr. Emerson coming to you and asking you whether Mr. Cassell might be able to avoid working on Saturday after he was hired?

A. No. I do not.

**Q. Has anyone ever asked you that?**

A. No.

**Q. Do you have an opinion -- we looked at Exhibit 14, where the company provided Mr. Cassell with certain tools, as they called it, which he could use to avoid flying on a Saturday once he was hired.**

**Do you have an opinion as to whether or not those tools would have allowed him to avoid working on the Sabbath?**

A. I don't know that it would have stopped him from working. He has those tools available to him, and if the resources were available, then he could have potentially been successful in dropping his trips.

**Q. The company has stipulated that if Mr. Cassell had been hired in 2017, he would have been assigned to Detroit.**

**I gather in Detroit there were lots of new pilots being assigned there, so people were moving up the seniority list fairly quickly; is that true?**

A. I do not recall how the domicile was moving back in 2017.

**Q. Have you -- prior to this deposition or being asked to be a deponent here, did you have any**

**idea who Shane Cassell is?**
A. No. I did not.
**Q. Had you ever heard that name?**
A. No.
**Q. Do you have any knowledge as to what this litigation is about?**
A. No. I do not.
**Q. I'll represent to you that Mr. Cassell resigned a position at SkyWest in late 2016 because of a conflict with his training.**
**I gather at the time, training scheduling was done not in your department; correct?**
A. That is correct.
**Q. And who was doing it again?**
A. It was -- the manager was Kim Ence.
**Q. And is she still over training scheduling?**
A. No. She is not.
**Q. Who is now over training scheduling?**
A. Trisha Bennett.
**Q. Do you know, does the training scheduling under Trisha Bennett, do they also schedule the Matrix training?**
A. The "Matrix training"?
**Q. Yes.**
A. Can you tell me what Matrix training --

Q. Matrix training is some kind of computerized system which -- it's not -- it sort of replicates a pilot being in the cockpit of a plane, sort of one step down from simulators. So, it's some kind of computerized system.

Do you know if the training department, and the training schedule under Trisha Bennett, schedules Matrix training?

A. I believe so. That, I -- I can't confirm.

Q. I gather that would be something that Trisha would have to answer?

A. Yes.

Q. Kim Ence, the prior scheduler, is she still with the company? Do you know?

A. No. She is not.

Q. When did she leave?

A. October of 2020.

Q. Okay. Do you know where she went?

A. I believe she retired.

Q. So, as I was saying, I represented to you that Shane Cassell had to resign his position with SkyWest in the fall of 2016.

He then reapplied and was interviewed the following year, in the early summer of 2017. But SkyWest refused to hire him, saying that they

**couldn't accommodate his religious requirements.**
**Did anyone consult you at that time about hiring Mr. Cassell?**
A. No.
**Q. Did anyone ask you at that time, Roy Glassey or anyone, ask you whether or not SkyWest might be able to accommodate his religious -- his request for a religious accommodation?**
A. No.
**Q. I'm going to show you another exhibit.**
**This has been previously marked as Exhibit 22. This was something that Steve Spagnolo used during his deposition.**
**Have you ever seen this document before?**
A. No. I have not.
**Q. He indicated -- in looking, say, at -- and Detroit is DTW; correct?**
A. That is correct.
**Q. On January, it's got 76 lines. That would represent -- would represent 76 separate pilots; is that correct?**
A. That would be correct.
**Q. And the number of reserves would be the number of people on reserves for that month; is that correct?**

A. That would be correct.

MR. STRINDBERG: Okay. Let's take a break. And I'll check my notes to see if there's any other questions that I have.

(Break taken at 10:58 to 11:03 a.m.)

**Q. (By Mr. Strindberg) Anita, I just have one or two more questions.**

**I had asked you about whether or not you thought Shane could have avoided working on the Sabbath using these various tools that SkyWest gave him or had available, such as dropping and trading and bidding and things like that, and you said he might have been able to.**

**Who would be -- is there someone who works for you or someone else at SkyWest who would be in a better position to answer that question than you?**

A. No. Because it would be speculation if he could have held it or not. It's all based on if he's -- if he's trying to drop a trip, it's all based on if there were resources available to cover his trip.

**Q. Okay. So, what you're saying -- just let me make sure it's clear -- it would be very hard to determine in the abstract whether or not someone could avoid -- a new pilot could avoid working on the**

**Sabbath using the tools available to him or her at SkyWest?**

A. If they -- okay. So, say that again. Because I may have this confused a little bit with what you may be asking. So, you're asking if they could avoid working a Saturday or Sunday?

**Q. Just -- well, the Saturday in this case, the Sabbath, Friday night to Saturday night.**

A. Very unlikely.

**Q. And why do you say, "very unlikely"?**

A. Because he would have been junior in the system. And it would -- it's all based on seniority and preferences of all of those above.

**Q. And are you saying that more senior people tend to try to get the weekends off?**

A. Yes.

**Q. But the dropping and trading and all that stuff, that's not based on seniority; is it?**

A. Dropping and -- trading is based on another crew member wanting to pick your stuff up.

Dropping is if resources are available at the time you are requesting.

**Q. And that's not based on seniority; correct?**

A. It's based on when you submit your

request.

**Q. So, as I understand it, you say it's unlikely, but it would very much depend on the domicile and just sort of depend on what's going on in any one week in that domicile as to whether he could avoid working on the Sabbath; is that what you're saying?**

A. It -- it -- can you repeat your question?

MR. STRINDBERG: Kelly, would you read it back?

(Record read as follows:

"QUESTION: So, as I understand it, you say it's unlikely, but it would very much depend on the domicile and just sort of depend on what's going on in any one week in that domicile as to whether he could avoid working on the Sabbath; is that what you're saying?")

THE WITNESS: Yes. It is unlikely that he could bid it. It would depend on the resources available.

MR. STRINDBERG: Thank you.

I have nothing further.

MR. BEAN: No questions from us.

MR. STRINDBERG: Tanner, do you want her to read and review?

MR. BEAN: Anita, basically what they're asking you here is you can get a copy of your deposition and you can go through it. And if you find there's any inconsistencies, typos, something that was incorrectly reported, you can read that and give a correction.

Is that something you would want to do?

THE WITNESS: Yes.

MR. BEAN: Okay. And we'll get a copy of that over to you once that's ready.

(The remote deposition concluded at 11:07 a.m.)

* * *

(Signature was requested.)

VERIFICATION

STATE OF ______________)
) ss.
COUNTY OF _____________)

I, ANITA SPENCER, being first duly sworn remotely on my oath, depose and say:

That I am the witness named in the foregoing remote deposition taken the 24th day of February, 2021, consisting of pages numbered 1 to 74, inclusive; that I have read the said deposition and know the contents thereof; that the questions contained therein were propounded to me; that the answers to said questions were given by me, and that the answers as contained therein (or as corrected by me therein) are true and correct.

Corrections Made: Yes_______ No_______

___________________________
ANITA SPENCER

Subscribed and sworn to before me this ________ day of ________, 2021, at __________________, Utah.

_______________________________
Notary Public for Utah
Residing at______________, Utah.
My Commission Expires: ________.

REPORTER'S CERTIFICATE

STATE OF SALT LAKE )
) ss.
COUNTY OF UTAH )

I, KELLY FINE-JENSEN, Certified Shorthand Reporter and Registered Professional Reporter in and for the State of Utah, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn remotely by me to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 17th day of March, 2021.

KELLY FINE-JENSEN
CSR, RPR

# Exhibit K

Exhibit K

Scott M. Petersen, #7599
Tanner J. Bean, #17128
**FABIAN VANCOTT**
215 South State Street, Ste. 1200
Salt Lake City, Utah 84111-2323
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
spetersen@fabianvancott.com
tbean@fabianvancott.com

*Attorneys for Defendant SkyWest Airlines, Inc.*

---

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH - CENTRAL DIVISION**

| | |
|---|---|
| SHANE ANDREW CASSELL,<br><br>Plaintiff,<br>v.<br><br>SKYWEST, INC., d/b/a SKYWEST AIRLINES,<br><br>Defendant. | **DECLARATION OF ARIC ARNOLD**<br><br>Case No. 2:19-cv-00149-JNP-EJF<br><br>Judge Jill N. Parrish<br>Magistrate Judge Evelyn J. Furse |

I, Aric Arnold, declare as follows:

1. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them under oath.

2. I am the President of the SkyWest Airlines Pilot Association ("SAPA"), the Pilots' designated collective bargaining representative under the Railway Labor Act. I have been the President of SAPA for 3 years, and prior to

that, I had been SAPA's Secretary since 2015.

3. I have been employed as a pilot by SkyWest for approximately 20 years. During this time I knew that SAPA was bargaining with SkyWest on my behalf to establish the terms and conditions of my employment. SAPA has been representing pilots in collective bargaining since approximately 1992 and certainly for as long as I've worked for SkyWest.

4. SAPA and SkyWest management engage in arms-length negotiations on the terms and conditions of the pilots' employment, including wages, work schedules, various quality-of-life conditions, and other matters. These form the collective bargaining agreement between SAPA and SkyWest, which is known as the Pilot Policy Manual. Neither SAPA nor SkyWest may unilaterally alter the terms and conditions established in the CBA.

5. SAPA members enjoy a seniority-based scheduling system that awards pilots their choice of domiciles and schedules. This seniority system is vital to SAPA and its member pilots. SkyWest has not asked, and I would never agree to, a change in the scheduling system that degrades a senior pilot's ability to choose their preferred work schedules or avoid less desirable assignments.

I declare under the penalty of perjury of the laws of the State of Utah and the United States of America that the foregoing is true and correct and that this declaration was executed on June 28, 2021 in Denver, Colorado.

SAPA President
Capt. Aric Arnold

# Exhibit L

Exhibit L

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | | |
|---|---|---|
| SHANE ANDREW CASSELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 2:19-cv-00149-jnp-dao |
| vs. | ) | |
| | ) | Judge Jill N. Parrish |
| SKYWEST, INC., d/b/a | ) | Magistrate JudgeDaphne A. Oberg |
| SKYWEST AIRLINES, | ) | |
| | ) | |
| Defendant. | ) | |
| ______________________________ | ) | |

REMOTE DEPOSITION OF ROY WILLIAM GLASSEY, JR.

February 24, 2021

Salt Lake City, Utah

Repored by: Kelly Fine-Jensen, CSR, RPR

**session."**

**Do you recall reviewing this note?**

A. Yes.

**Q. I'll keep scrolling so we can get through to the end.**

A. Okay.

**Q. This is just some notes on the -- some scenario he had to go through.**

**And then this talks about: "Recognizes how big a deal it is to have a third chance. Appreciates the opportunity."**

A. Okay. You can scroll down.

Yeah. This -- this -- I recognize this.

**Q. Okay. So, are these -- a moment ago, Roy, you said you reviewed some interview notes. Are these the interview notes you were referring to?**

A. These are.

**Q. And when did you review them?**

A. Well, they were -- I don't recall the date. But following the interview, the file was sent to me for review, which I did.

**Q. Following -- I'll represent to you, and I don't think there's any dispute, Mr. Cassell was offered a job in 2015. He turned that down because some -- it had nothing to do with SkyWest. He then**

**was hired in the latter part of 2016, and ran into this conflict in the training, which caused him to resign. And then applied again in 2017. So, there were these three separate interviews and hirings and job offerings.**

**When was the file sent to you?**

A. I don't recall the date. There's an e-mail that would get sent to me. So, I would have to look for that to tell you what date it was sent. But it was post-interview.

**Q. Was it -- can you put a year on it? Was it in 2017?**

A. Well, is that when this interview occurred? 2017? I believe it was.

**Q. The third interview was in 2017, yes.**

A. Then it was sent to me shortly after that interview. The comments on this -- well, go ahead.

**Q. No. Go ahead. Say what you were going to say.**

A. No. This was sent to me after the interview in '17.

**Q. Okay. I'll ask you more about that in a second. But --**

MR. BEAN: Hey, Erik, did you want to mark that?

MR. STRINDBERG: Yes. We will mark that as Exhibit 44. SkyWest 69 through 78 are the Bates numbers it.

Thank you for reminding me.

MR. BEAN: Thank you.

(EXHIBIT 44 WAS MARKED.)

**Q. (By Mr. Strindberg) I'm going to ask you about that in a moment, Roy.**

**At the end of -- end of 2016, Mr. Cassell's attorney sent a letter which referred to Mr. Emerson, Todd Emerson, who I gather is in the room with you. And there was some correspondence that went back and forth between that attorney, a gentleman by the name of Alan Reinach, went back and forth between him and Todd Emerson.**

**Were you -- did you see any of that correspondence between the two attorneys?**

A. No. It does not sound familiar.

**Q. Let me show you -- just so we can orient you in time.**

**I'm showing you what's been marked as exhibit -- previously marked as Exhibit 7.**

A. Okay.

**Q. This is a letter from Mr. Emerson that was sent to Alan Reinach, addressing some of the issues**

**he had raised -- Mr. Bryant had raised in his e-mail.**

A. Okay. Can you scroll down?

**Q. Yes.**

A. Okay.

**Q. Have you ever seen this document before?**

A. I don't recall seeing this. No.

**Q. Do you recall having any conversations with Mr. Emerson about Mr. Cassell or his request for an accommodation around this time period, which is December of 2016?**

MR. BEAN: Erik, I'll object to the extent this goes to any privileged information that you were seeking legal advice in this matter.

MR. STRINDBERG: Are you going to direct him not to answer then?

MR. BEAN: There might be another question or two before we get there.

**Q. (By Mr. Strindberg) Well, the general question -- I just want to know if he had any conversations with Todd Emerson about Mr. Cassell or his need for an accommodation around this time, around December of 2017?**

MR. BEAN: And, Roy, you can go ahead and answer that.

THE WITNESS: I don't -- I don't recall

specifically that. No.

**Q. (By Mr. Strindberg) You say you don't recall that "specifically." Is there something generally you recall?**

A. No. I'm just -- you were asking the question. And as posed, I don't recall a conversation.

**Q. Okay. I can re-share this with you, but in the letter -- let me just share it again.**

**It says here -- and I can try and outline it. Be really clever.**

**One of the statements that Mr. Emerson says is: "When Mr. Cassell has low seniority, he will absolutely and unavoidably be required to work on Saturday and other holidays as more senior pilots typically avoid working those days."**

**Have you at any point had any conversations with Mr. Emerson regarding whether or not someone -- a new pilot could avoid working on Saturdays?**

A. Well, it's -- perhaps. Everybody knows -- in my experience, weekends off just are not available for newer pilots. Traditionally, weekend scheduling is put on the more junior pilots. Senior pilots are generally able to have more of an opportunity. And

it depends on the base. But junior pilots get stuck working weekends. My experience is they just can't get weekends off.

**Q. Okay. My question, though, was: Did you ever talk with Todd Emerson about that topic?**

A. I don't recall. Perhaps. I mean, this is several years ago. And we've had lots of conversations about pilot policies and such in general.

**Q. Well, I'm specifically referring to Shane Cassell and his request for an accommodation, which was to try and avoid working on his Sabbath, which was Friday night to Saturday night.**

A. Again, I don't recall specifically. But in my experience, a junior pilot will -- it's very unlikely a junior pilot would be able to get Fridays, Saturdays, and Sundays off.

**Q. But you don't recall having a conversation with Todd Emerson about that issue, about Shane Cassell's requested accommodation?**

A. Well, I've just answered that. This is four years ago and I've had several conversations. So, to connect it per your question, I can't answer that accurately.

**Q. Several conversations with Todd or with**

**other people?**

A. I -- I don't understand what you're asking me.

**Q. Well, you just said you've had several conversations. So, I want to know who you've had conversations with?**

A. You need to be more specific on the conversations' subject matter. Because my statement was general. I speak with HR. I speak with Todd. I speak with my chief pilots. I speak with the front line pilots.

Who are you asking about a conversation with?

**Q. Okay. I'll be more specific. Thank you.**

**Have you ever talked with Todd Emerson about Shane Cassell and his religious beliefs and the need to have the Sabbath off?**

A. Are you asking me if I consult with our legal team if there is somebody that is requesting an accommodation?

**Q. Well, I'll ask that next.**

**I'm first asking specifically about Shane Cassell. Have you ever talked about Shane Cassell with Todd Emerson?**

A. I -- I may have. I don't recall

specifically. But...

**Q. Okay. Have you ever talked with Todd Emerson about any pilot who was requesting some sort of an accommodation because of their religious beliefs or practices?**

A. I don't -- I don't recall.

**Q. Do you have any recollection of talking with Todd Emerson about an Orthodox Jewish pilot who was requesting the Sabbath off?**

A. I -- I don't recall specifically. No. I'd have to look in my notes. I don't recall.

**Q. What notes would you look at, Roy?**

A. I don't have notes, really, on something like that. I would just -- I don't recall.

Do you have a name for that individual? It might help me recall.

**Q. I don't.**

**Do you recall any conversations with anyone at SkyWest about whether it might be possible to alter someone's schedule so they wouldn't have to work on the Sabbath?**

A. I vaguely -- and this might be connected to your earlier question. I vaguely recall a pilot that needed a specific day off. I don't recall which day. And I just sent that over to -- to human

resources.
**Q. Do you recall who in human resources?**
A. I don't recall. Whoever the HR manager was at the time.
**Q. What else do you recall about that?**
A. That's -- that's about -- really nothing more than that. There was a need for a day off. It was something to refer to HR, so I did.
**Q. And do you know what the outcome of that was, of that referral?**
A. I -- I don't recall specifically. No.
**Q. Do you know of any situations in which SkyWest has granted any type of religious accommodation to a pilot?**
A. I don't know.
**Q. You don't know of any? And I'm going beyond just scheduling issues, Roy. I'm talking about maybe a religious accommodation regarding a piece of clothing, that type of thing.**
A. I don't know.
**Q. I'm going to show -- share with you a document which we will mark as Exhibit 43.**
(EXHIBIT 43 WAS MARKED.)
**Q. (By Mr. Strindberg) And it's a two page document. I'll start at the second page.**

**It is from someone -- a Jason Cordova. Do you know who that is?**

A. Yes. Jason is no longer with the company. But Jason was a -- he was part of the interview -- pilot selection team.

**Q. And were they -- that pilot selection team, was that part of human resources?**

A. Well, no. This -- Jason -- I'm trying to think back. He worked in the pilot sourcing section for flight operations. So, Jason was a coordinator. He conducted interviews, along with the pilot recruiting team.

**Q. Okay. And, so, it says: "I've placed the following pilot candidate on the hiring dashboard for your review."**

**Do you know what the "hiring dashboard" is?**

A. That's the software system we use to record interview -- well, keep the resume, the interview notes, and all that. It's the hiring tool.

**Q. Okay. And then let's look at this -- I'm going to reduce the size a little bit so we get more of it in here.**

**It says, "Ian Whiting." First of all, who is Ian Whiting?**

A. Ian Whiting, he's currently a flight operations analyst. But back in -- that's 2017? Ian was -- he had oversight of the pilot sourcing activities. So, that's why he would be consulted here.

**Q. And what do you mean by "pilot sourcing"?**

A. Pilot hiring.

**Q. It says: "Can you give me a call on this one when you get a moment, please?"**

**And you say: "Will do."**

**I assume you did, at some point, talk with Mr. Whiting about Mr. Cassell then?**

A. I don't recall if I called him on this or not.

**Q. Do you recall receiving this e-mail from Ian regarding Mr. Cassell?**

A. I -- well, I suppose I do. I receive several e-mails. This one looks familiar.

**Q. Okay. What did you do regarding Mr. Cassell and this e-mail you received from Ian Whiting?**

A. Nothing regarding this e-mail.

But if you scroll down to the bottom of that, from Jason Cordova -- down further. Okay. That was sent -- that was sent to Ian. And then I

receive something that looks just like that normally.

**Q. Well, I gather just -- it appears -- this seems to be a string of e-mails that was put together.**

A. Okay.

**Q. For example, in other words, this -- this top part with SkyWest -- or, excuse me, the bottom of SkyWest 79 seems to be attached to what's the top of 80, SkyWest 80. And then I guess attached to this, it says, "Shane Cassell resume."**

A. That's a standard e-mail that's sent out when there's an applicant that needs further review.

**Q. Okay. And then I gather it was forwarded to you from Ian.**

**Were you also forwarded Shane Cassell's resume?**

A. Well, I would have had an e-mail that looked just like that one down there from Jason Cordova for me. So, this one to Ian, he likely was assuring that I had that in my review bin.

**Q. So, someone else would have sent it to you directly is what you're saying?**

A. Well, right. One of the recruiters. Jason Cordova, perhaps, in this case. I'd have to look. But I imagine I received the same e-mail.

**Q. Okay.**

A. Sent to Ian first and then to me or in duplicate. But I should have received an e-mail.

**Q. Okay. So, you recall receiving the e-mail either from Jason Cordova or from Ian Whiting.**

**What did you do once you got it?**

A. I conducted a file review.

**Q. And what's involved in conducting a file review?**

A. I review the interview notes.

**Q. Anything else?**

A. Well, review the interview notes, the resume to determine if the applicant will be -- move forward for hire.

**Q. Do you do that with every applicant or just ones that are referred to you?**

A. Those that are referred to me. They're put in a -- what's called a "review bin."

**Q. Okay. And who puts them in the review bin? In this case, would it have been Ian or Jason?**

A. No. In this case, it would have been -- whoever is listed on that -- more than likely, Jason, in this case. But whoever conducted the interview that required the further review.

**Q. Okay. And what do you recall about your**

**review?**

A. Well, I reviewed the application. And it was quite clear that there was a schedule -- the applicant was unable to accommodate the schedule that we were hiring pilots for.

**Q. And why was that?**

A. What do you mean "why was that"? Why was he unable --

**Q. Yeah. What was -- what did you feel was lacking?**

A. Well, he expressed that he would -- he had scheduling limitations that he would be inflexible on. And the notation -- if you want to go back to that previous interview note from 2017, I'll point out exactly what was said.

**Q. Okay.**

A. Yeah. He was inflexible. So, we --

**Q. Those were --**

A. He stated his insubordination before he even started.

**Q. Okay. Just give me one second.**

A. Okay.

**Q. I'm going to pull up again Exhibit 44. And I'll go down to the bottom.**

**Are these the notes you're referring to,**

**Roy?**

A. I'm not seeing anything on the screen.

**Q. Yeah. Sorry. I apologize. Probably rather look at that than me, I'm sure.**

A. Okay. So, "Additional Comments. Third interview." It says, "Has expressed unwillingness to be flexible with schedule without any exception."

**Q. Is that what you were referring to when you said that he was expressing he would be insubordinate?**

A. Yes.

**Q. So, once you reviewed these minutes -- or excuse me, these notes, do you recall what else you reviewed?**

A. Well, just this -- I don't recall specifically, but anything I had in this document.

And, also, if you move up, it has a statement that he had been hired -- where was it? Just scroll on up, if you would, please.

**Q. Well, it says here, "Emphasized the reality of schedule bidding and reserve. Explained that we are a 24/7/365 operation."**

**Is that what you're referring to or do you want me to keep going?**

A. That's one of the lines. But the entire

document's looked at.

But it's quite clear from the interview notes that the applicant was unable to work the schedule.

**Q. And that was because he had told the -- I assume he had told the interviewers that he needed to have the Sabbath off; is that what you're referring to?**

A. I don't know what he told the interviewers, other than he had a schedule restriction and he would be inflexible.

**Q. Now, let me show you another document, though.**

**I've put up what's been marked as Exhibit 11, which is a letter that Shane wrote to Coy Bryant regarding this issue of the Sabbath observance.**

**Why don't you just take a moment to read that.**

**Do you want me to make it bigger, Roy?**

A. I can see. I'm squinting a little bit.

**Q. I can make it a little bigger.**

A. That's better right there. Okay.

Okay. Can you scroll down, please? Okay.

**Q. Have you ever seen that document before?**

A. Yes.
**Q. When did you see it?**
A. I don't recall. Whenever it was sent.
**Q. Was this document -- Exhibit 11, was this part of the materials you reviewed?**
A. What's that?
**Q. Was this document, this letter from Shane outlining his religious beliefs and observances, was that one of the documents you reviewed as you were reviewing his application?**
A. No. This was after the application -- this wasn't part of the application process.
So, go to the date on this.
**Q. Right. This is June 29th. The e-mails from Ian that we had just looked at were June 22nd. So, about a week earlier.**
A. So, what date was the regret notification sent?
**Q. Let me show you that document.**
**This is a document --**
A. I can't see it.
**Q. Sorry.**
A. It's still obscured.
MR. BEAN: I think we might have lost Erik for a second there.

(Brief pause.)

**Q. (By Mr. Strindberg) I believe this is the regret letter you were referring to, Roy?**

A. No. That's -- that looks like the regret. No. I hadn't seen that.

**Q. Okay. Well, you were asking for the date of the regret letter. So --**

A. No. What I wanted was the date of that memo from Jason Cordova.

**Q. That was June -- the one we looked at a moment ago was June 22nd.**

A. Okay. And what was the date of the letter that Shane sent?

**Q. June 29th.**

A. Okay.

**Q. And then this was -- Shane was informed on July 12th that he would not be hired.**

A. Okay. And you had a question about -- you asked -- did you ask if I reviewed that letter as part of the file review?

**Q. Well, part of your review of the situation.**

A. No. No. The interview notes are what I reviewed.

**Q. Okay. And what did you do after you**

**reviewed the interview notes?**

A. I elected to not further the application. I recommended regret.

**Q. And who did you recommend that to?**

A. What I do with the -- well, I notify our HR team, who puts that in a queue to notify the applicant of the decision.

MR. STRINDBERG: And -- okay. Let's take a break at this point. Todd -- my Todd -- needs a moment. And then we'll get back, say, in ten minutes.

MR. BEAN: Okay.

(Break taken at 12:55 to 1:18 p.m.)

**Q. (By Mr. Strindberg) So, Roy, let's just make -- get the dates correct.**

**The e-mail we looked at from Ian was dated 6/22. Okay.**

**And the regret letter, which was Exhibit 34, was July 12th. So, 20 days later.**

**And then we looked at this Exhibit 10, which was the -- excuse me, Exhibit 11 -- which was the --**

A. And I can't see that. I'm just seeing where the exhibits were -- okay. Here we go.

**Q. Exhibit 11 is dated June 29th.**

A. Okay.
**Q. And you said after reviewing the interview notes, you contacted HR. Do you know when you contacted HR? The date?**
A. I don't recall the date.
**Q. Do you recall how you contacted them?**
A. E-mail response.
MR. STRINDBERG: Tanner, have you produced that e-mail? I don't recall seeing an e-mail from Roy to HR.
MR. BEAN: Let me check the e-mails here real quick.
I could be wrong about this, but I don't have an e-mail from Roy to HR.
THE WITNESS: Well, it could have been a phone call. I don't -- I don't recall, you know. I get these notifications about the review board and I'll reply regret or accept, depending on the file. And sometimes it's a phone call.
**Q. (By Mr. Strindberg) And would you have had -- we don't have an e-mail. If you had called them, who would you have called?**
A. Whoever sent the notification over. Which would be, in this case -- well, it could be -- it could be anybody that's involved in the hiring

process.

**Q. But it would likely have been either Jason or Ian?**

A. Or a point of contact in HR. Again, I don't recall. It's been four years ago.

**Q. And you said a few seconds ago you would have typically, what, just said accept or regret, that type of thing?**

A. Yes. It's generally the most efficient. And that's -- yeah.

**Q. And do you know if that's what you did in this case?**

A. I said I don't recall.

**Q. Okay.**

A. It's four years ago.

**Q. Do you know -- this Exhibit 11, which is June 29th, so approximately seven days after you were notified of the issue with Shane Cassell, do you know if you contacted HR before or after you received this June 29th letter, which is Exhibit 11?**

A. Well, I -- the regret decision was made before that letter.

**Q. Okay. But you do recall receiving this letter, which is Exhibit 11? I can share that again with you.**

A. Yeah. If you would pull that up again.
Oh, yes. I saw that. But long after the regret.
**Q. Okay. And did you contact Coy Bryant after you received this letter?**
A. I don't -- I don't recall. I believe it was just shown to me.
**Q. By whom?**
A. I don't -- I don't recall. It's -- I don't know.
**Q. Do you recall any conversations with Coy Bryant about getting such a letter from Shane?**
A. Only that he still did not indicate unrestricted schedule adherence. He didn't -- he didn't get to the core issue in this letter.
**Q. That -- is that what you told Coy Bryant?**
A. I don't recall what I told Coy Bryant.
**Q. And why do you believe that Mr. Cassell had not gotten to the core issue in this letter?**
A. Well, read the letter. It's quite clear.
**Q. Well, could you just -- why don't you look at it and tell me what in that letter you feel showed that he didn't get to the core issue?**
A. You want me to read the sentences? What do you want me to do?

**Q. Yes. Why don't you tell me which sentences.**

A. Well, I know there's a sentence that's missing.

Okay. Let's take a look here. "SkyWest can rest assured I will represent the company with the utmost professionalism and integrity both on and off the clock. I realize that SkyWest cannot guaranteed that I will be provided a schedule that will always allow me to observe my beliefs. Therefore, it has and will continue to be my intent to use the tools that SkyWest has provided to either bid out of, drop, or trade a shift that may conflict with my beliefs. I have mentors within SkyWest that understand the PBS system. They have offered to teach me how to properly use the system in order to create a schedule that both meets company and personal needs. I'm willing to bid for the most undesirable flights, stay at the most junior base, and fly the most junk aircraft in order to avoid conflicts with corporate policy. If there was an unforeseen circumstance, such as, but not necessarily limited to, a maintenance delay at an out station and my duty time was extended, I would be willing to fly the aircraft back to the base, as my concern for the

safety and wellbeing of my passengers falls within my religious beliefs."

**Q. Okay.**

A. He does not state that if I -- if he bids a schedule for PBS and gets an assignment on the day he wants off, the Sabbath in this case, he does not state that he will -- if he's unsuccessful in utilizing our tools, he will honor the schedule.

**Q. Okay. So, are you saying it's not so much what's in this letter as what's not in the letter?**

A. He just -- he did not state that if unsuccessful after using all the tools that are available, that he would honor his schedule.

**Q. I'm going to have you look at -- okay. And your recollection, just so I'm clear, is by the time you were shown this letter, which is Exhibit 11, you had already told HR not to go forward with hiring Mr. Cassell; is that correct?**

A. Correct. Shortly after reviewing those interview notes that you saw, I made my decision to regret.

**Q. Okay. Let me show you another document.**

**Okay. This has previously been marked as Exhibit 30. It's a series of e-mails. One is from Monica Polad, Jaime Sorenson, a copy to Chandler**

Larsen.

And then on top is from Chandler Larsen back to them.

And do you know who Chandler Larsen is?

A. She was in the HR department.

Q. How about Monica Polad?

A. Yeah. It's down here in the signature line. She's in the HR department.

Q. And Jaime Sorenson, do you know who that is?

A. He's with HR.

Q. Okay. Were any one of those three the people you talked with when you told them to regret Mr. Cassell?

A. I don't recall. They would all be notified when the regret decision is made. But I don't recall.

Q. Okay. There's a sentence here: "Based on conversations Coy has had with Shane, we will probably have to get Todd in the loop."

Coy said that's a reference to Todd Emerson.

Around this time, late June of 2017, did you have any conversations with Todd Emerson about hiring or not hiring Shane Cassell?

MR. BEAN: Object. Asked and answered.

**Q. (By Mr. Strindberg) Go ahead.**

A. Ask that again, please.

**Q. In late June of 2017, did you have any conversations with Todd Emerson about hiring or not hiring Shane Cassell?**

A. At that time, I don't recall.

**Q. So, when you say you don't recall, does that mean it's possible you had some or -- and you just don't recall or are you saying you just didn't have any?**

A. It means I don't recall.

**Q. Recall whether or not you talked with him; is that what you're saying?**

A. You asked the question, and I don't recall if I did or not.

**Q. Okay. Thank you.**

**Let me show you another.**

**I'm showing you what's been previously marked as Exhibit 10, which is an e-mail from Coy Bryant to Shane Cassell regarding the letter regarding his religious beliefs. It says, "Can you add one more aspect of what happens if your training goes late?"**

**Have you ever seen this e-mail before?**

A. No. I don't recall seeing that. No.
**Q. I'm showing you, hopefully, some e-mails that have been previously labeled as Exhibit 33. And particularly focusing on this one from Coy Bryant to you, dated July 11, 2017.**
**Do you recall receiving that one?**
A. Yes.
**Q. And Coy indicated, as I remember, in his deposition, that attached to this e-mail was that June 29th letter from Cassell.**
**What, if anything, did you do when you received this e-mail from Coy?**
A. What do you mean what did I do?
**Q. Well, I assume you read it; right?**
A. I -- I read it. But my -- but the regret decision was made long before this -- this came across.
**Q. Okay. So, you read it. And then are you saying you didn't do anything further?**
A. Well, I'm not sure I understand your question. What do you mean "didn't do anything further"?
**Q. Well, when one gets an e-mail, one can read it and trash it or respond to it or it can cause you to take some other actions, like calling someone.**

**Did you do any of those things?**

A. I don't recall what I did after reading that.

**Q. There is a blacked out part here that says, "Attorney work product," which indicates that an attorney, I think Mr. Emerson, somehow contributed to this discussion.**

**Does that refresh your recollection of whether or not you had any discussions with Todd Emerson about hiring or not hiring Shane Cassell?**

MR. BEAN: And, Erik, I'll object to the content of that conversation obviously as privileged.

**Q. (By Mr. Strindberg) Right. And I'm not asking about content. I'm just asking if it refreshes his recollection whether he talked to Todd.**

A. Well, I don't recall. If it's blacked out, I can't see what's in there.

**Q. I'm going to show you another e-mail here in a second, with any luck.**

**This is a -- an e-mail which has been previously marked as Exhibit 36. And it's from Chandler to Sorenson and Kolb. And it says, "How does this sound to you guys?"**

**Have you ever seen this before?**

A. No. I don't recall seeing that.

# Exhibit M

Exhibit M

Erik Strindberg (Utah Bar No. 4154)
**STRINDBERG & SCHOLNICK, LLC**
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
(t) 801.359.4169
(f) 801.359.4313
email: erik@utahjobjustice.com

Todd. R. McFarland (*Pro Hac Vice)*
Associate General Counsel
Office of General Counsel
**General Conference of Seventh-day Adventists**
12501 Old Columbia Pike
Silver Springs, MD 20902-6600
(t) 301.680.6321
(f) 301.680.6329
Email: mcfarlandt@gc.adventist.org

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT DISTRICT OF UTAH**

| | |
|---|---|
| SHANE ANDREW CASSELL,<br><br>Plaintiff,<br><br>v.<br><br>SKYWEST, INC., d/b/a SKYWEST AIRLINES,<br><br>Defendant. | **PLAINTIFF'S RESPONSES TO DEFENDANT SKYWEST AIRLINES' REQUESTS FOR ADMISSIONS**<br><br>Case No.: 2:19-cv-00149-JNP-EJF<br><br>Judge Jill N. Parrish<br>Magistrate Judge Evelyn J. Furse |

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiff responds to these Requests as follows:

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**

Admit that, at all times relevant to this lawsuit, you were aware SkyWest utilized a seniority-based bidding system to create work schedules for SkyWest pilots.

**ANSWER:**

Admit in part and denied in part. Plaintiff was told that SkyWest utilized a seniority-based bidding system but denies the Request in part as he believes that SkyWest's method for assigning bidding rights was not based solely on seniority. Plaintiff also recalls being told that during initial operating period (after he completed simulator training) that he would be assigned flights.

**REQUEST FOR ADMISSION NO. 2:**

Admit that, at all times relevant to this lawsuit, SkyWest's seniority-based bidding system creates monthly work schedules that are published several days in advance of the start of each month.

**ANSWER:**

Admitted in part and denied in part. Plaintiff was told that SkyWest published monthly work schedules in advance of each month. But Plaintiff denies the Request in part as he believes that SkyWest's method for assigning bidding rights was not based solely on seniority.

**REQUEST FOR ADMISSION NO. 3:**

Admit that, at all times relevant to this lawsuit, your sincerely held religious belief proscribed you from working as a commercial airline pilot on the Sabbath, which is defined as the period after sundown Friday continuing until sundown the following day (Saturday).

**ANSWER:**

Admitted in part and denied in part. Plaintiff's sincerely held religious belief does

proscribe him, in most circumstances, from working as a commercial airline pilot on the Sabbath, which is defined as sundown Friday continuing until sundown the next day (Saturday). However, the Request is denied in part because, as SkyWest was informed at the time Plaintiff applied for a position, "[i]f there is an unforeseen circumstance, such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended, I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious beliefs."

**REQUEST FOR ADMISSION NO. 4:**

Admit that, at all times relevant to this lawsuit, you would not violate this sincerely held religious belief (*i.e.*, working on the Sabbath) by operating a SkyWest flight which commenced during the Sabbath, which was assigned to you in advance by the seniority based bidding system, and which you were unable to exchange, swap, or drop under SkyWest's scheduling system.

**ANSWER:**

Admitted in part and denied in part. As set forth in response to the previous Request, Plaintiff had informed SkyWest that there were unforeseen circumstances under which he would have been willing to fly on the Sabbath. However, Plaintiff admits that if weeks before a flight date he had been assigned to a flight that started on the Sabbath, he would have not taken the flight. Plaintiff also incorporates his partial denials to requests for Admission 1 & 2.

Dated this 14th day of January, 2020.

/s/ *Erik Strindberg*
Erik Strindberg
*Attorneys for Plaintiff.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of January 2020, I caused a true and correct copy of the foregoing **PLAINTIFF'S RESPONSES TO DEFENDANT SKYWEST AIRLINES' REQUESTS FOR ADMISSIONS** to be served via email to the following:

Scott Petersen
Nathan Tenney
Jennifer Anzures
FABIAN VANCOTT
215 S. State Street, Suite 1200
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
Facsimile: (801) 531-1716
spetersen@fabianvancott.com
ntenney@fabianvancott.com
janzures@fabianvancott.com

/s/ *Erik Strindberg*

# Exhibit N

Exhibit N

Scott M. Petersen, #7599
Tanner J. Bean, #17128
**FABIAN VANCOTT**
215 South State Street, Ste. 1200
Salt Lake City, Utah 84111-2323
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
spetersen@fabianvancott.com
tbean@fabianvancott.com

*Attorneys for Defendant SkyWest Airlines, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH - CENTRAL DIVISION**

| | |
|---|---|
| SHANE ANDREW CASSELL,<br><br>Plaintiff,<br>v.<br><br>SKYWEST, INC., d/b/a SKYWEST AIRLINES,<br><br>Defendant. | **DEFENDANT'S RESPONSES TO PLAINTIFF'S FIFTH SET OF WRITTEN DISCOVERY TO DEFENDANT**<br><br>Case No. 2:19-cv-00149-JNP-EJF<br><br>Judge Jill N. Parrish<br>Magistrate Judge Evelyn J. Furse |

Defendant SkyWest Inc., d/b/a/ SkyWest Airlines ("Defendant" or "SkyWest"), pursuant to Rule 33 and 36 of the Federal Rules of Civil Procedure, hereby responds to Plaintiff Shane Andrew Cassell's Fifth Set of Written Discovery to Defendant as follows:

**PRELIMINARY STATEMENT**

SkyWest affirmatively states that the responses disclosed by SkyWest herein are based upon information and documents that are presently available to and specifically known by SkyWest and disclose only those contentions that presently occur to SkyWest. It is anticipated that further investigation, discovery, and analysis could supply additional facts, and meaning to

the unknown facts, as well as establish entirely new factual conclusions and legal contentions, and may identify or require additional persons with knowledge or responsive documents, all of which may lead to additions or changes to the contentions and information presented herein. SkyWest expressly reserves the right to supplement these responses.

Further, the responses and documents produced in response to Plaintiff's Fifth Set of Written Discovery to Defendant have been limited in the following ways, as mutually agreed to by the parties, unless indicated otherwise in the responses. Responses are limited to (1) the domicile of Detroit and Detroit-domiciled first officers, (2) first officers qualified to fly the CRJ aircraft, (3) information for Fridays, Saturdays, and Sundays, and (4) the use of the term "line" has been interpreted to mean "pairing," "flight," or "assignment" where that is more consistent with SkyWest's scheduling terminology.

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 7:** The following information is needed for First Officers ("FOs") who were qualified to fly the CRJ (i.e., had finished their training and had been assigned to a domicile) for the period of June 1, 2017 through December 31, 2019 (the "relevant time period"):

a) For each week during the relevant period the number of FOs who were employed by SkyWest at each domicile;

b) For each month (or bidding period) during the relevant period the number of FOs at each domicile who had enough seniority to bid a line and were actually flying that month; and

c) For each Friday and Saturday during the relevant period the number of FOs at each domicile who were on short call reserve, long call reserve or ready reserve and could

be assigned to fly (i.e., the total number of FOs who were 'on call by each day).

**RESPONSE:** *See* Excel document provided herewith.

**INTERROGATORY NO. 8:** The following information is needed for First Officers ("FOs") who were qualified to fly the CRJ (i.e., had finished their training and had been assigned to a domicile) for the period of June 1, 2017 through December 31, 2019 (the "relevant time period"):

a) For each day during the relevant period the number of FOs at each domicile (even if they were not scheduled to fly that day) who were not available to fly, regardless of the reason;

b) For each day during the relevant period the number of FOs at each domicile who had bid a line or trip that was operating on that day who were not available to fly, regardless of the reason;

c) For each day during the relevant period the number of FOs at each domicile who were on reserve duty who were not available to fly, regardless of the reason.

**RESPONSE:** *See* Excel document provided herewith.

**INTERROGATORY NO. 9:** The following information is needed for First Officers ("FOs") who were qualified to fly the CRJ (i.e., had finished their training and had been assigned to a domicile) for the period of June 1, 2017 through December 31, 2019 (the "relevant time period"):

a) For each day during the relevant period, the number of FOs at each domicile who were on reserve duty who were not required to fly that day;

b) For each day during the relevant period, the number of FOs at each domicile who

were on reserve duty who were assigned to fly that day;

c) For each day during the relevant period the number of FOs at each domicile who were on reserve duty who were required to fill in for an absent or unavailable FO from the same domicile or were assigned a line (or part of a line), for whatever reason, that originated out of their own domicile.

d) For each day during the relevant period, the number of FOs at each domicile who were on reserve status who were required to cover a flight for a FO who was assigned to a different domicile or were assigned a line (or part of a line), for whatever reason, that originated out of a different domicile.

**RESPONSE:** *See* Excel document provided herewith. Note that the term "line" has been substituted for "pairing."

**INTERROGATORY NO. 10**: The following information is needed for First Officers ("FOs") who were qualified to fly the CRJ (i.e., had finished their training and had been assigned to a domicile) and for lines that flown by CRJs, for the period of June 1, 2017 through December 31, 2019 (the "relevant time period"):

a) Then number of lines that were being operated out of each domicile each day;

b) The number of lines that were being operated out of each domicile where a reserve FO was assigned to fly (regardless of the reason);

c) For each domicile, the number of lines, per day, that could not be flown because a FO was not available.

**RESPONSE:** *See* Excel document provided herewith. Note that the term "lines" has been substituted for "flights." Specific to 10(c): SkyWest tracks flight cancellations due to missing "crew" but does not consistently track whether a captain, first officer, or a combination

of the two was the cause of the cancellation. Given this, the attached Excel document indicates 28 occurrences during the relevant time period where a flight in range of DTW was possibly cancelled due to an unavailable first officer.

**INTERROGATORY NO. 11**: The following information is needed for First Officers (“FOs”) who were qualified to fly the CRJ (i.e., had finished their training and had been assigned to a domicile) for the period of June 1, 2017 through December 31, 2019 (the “relevant time period”):

a) For each domicile per bid period, the number of lines that were traded or swapped between FOs;

b) For each domicile per bid period, the number of lines that were posted by a FO seeking to have another FO take the line (or flight) or trade it for another line or flight.

**RESPONSE**: *See* Excel document provided herewith. Note that the term “lines” has been substituted for “assignments.”

**INTERROGATORY NO. 12:** If SkyWest had not refused to hire Shane Cassell in July of 2017, which ground school class would he have attended (by date) and what would his seniority number have been (or what are the seniority number of the person who would have been immediately ahead of Cassell in seniority and the seniority number of the person who would have been immediately after him).

**RESPONSE:** Mr. Cassell would have attended an August 2017 ground school class. The best comparisons for Mr. Cassell’s seniority would be pilots with employee numbers 58148 and 57893. Pilot 58148 transferred from DTW to ORD in November 2017 and then again to SFO in December 2017, where they briefly held a line in March 2018, but fell back to reserve status in April 2018. Pilot 58148 became a permanent line holder when transferred to

DEN in July 2018. Pilot 57893 stayed in DTW until becoming a line holder in April 2018.

**INTERROGATORY NO. 13**: If SkyWest had not refused to hire Shane Cassell in July of 2017 and if he had chosen Detroit as his first preference, would he have been assigned to that domicile (and if not, to which domicile would he likely have been assigned) and on what date.

**RESPONSE**: Yes, Mr. Cassell would have been assigned to the domicile of Detroit, approximately in August 2017.

**INTERROGATORY NO. 14**: For the domicile(s) you've identified in response to the previous interrogatory (i.e., Detroit or elsewhere) how long did the two FOs whose seniority numbers would have bracketed Cassell's remain on reserve status and when did they have enough seniority to bid lines.

**RESPONSE**: *See* Response to Interrogatory No. 12.

**INTERROGATORY NO. 15:** For the relevant period, indicate by month (or by bid period), where the two FOs whose seniority would have bracketed Cassell's stood on their domicile's seniority list for FOS (e.g., 180th out of 180, or 10th out of 180).

**RESPONSE**: *See* Excel document provided herewith.

**<u>REQUEST FOR PRODUCTION OF DOCUMENTS</u>**

**REQUEST NO. 18:** For each day during the relevant period, please produce the Crew Reliability Reports for FOs trained on the CRJ provided to managers that Mr. G[l]assey referred to in his deposition.

**RESPONSE:** *See* documents SkyWest_1956-2049 produced herewith.

**REQUEST NO. 19**: For the relevant period, produce the pay scales for FOs flying the CRJ and documents which show on average how many hours each FO in Detroit, Minneapolis, and Chicago were flying and how much each was being paid per month.

**RESPONSE**: *See* documents SkyWest_1952-1955 produced herewith.

DATED this 28th day of January, 2021.

**FABIAN VANCOTT**

/s/ *Tanner J. Bean*____________
Scott M. Petersen
Tanner J. Bean

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of January, 2021, I caused a true and correct copy of the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFFS' FIFTH SET OF WRITTEN DISCOVERY TO DEFENDANT** to be served via email to the following:

Erik Strindberg
STRINDBERG & SCHOLNICK, LLC
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
erik@utahjobjustice.com

Todd R. McFarland
General Conference of Seventh-day Adventists
12501 Old Columbia Pike
Silver Springs, MD 20902
mcfarlandt@gc.adventist.org

*/s/ Tanner J. Bean*
Tanner J. Bean

# Exhibit O

Exhibit O

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| SHANE ANDREW CASSELL,<br>Plaintiff,<br>vs.<br>SKYWEST, INC., d/b/a SKYWEST AIRLINES,<br>Defendant. | Civil No. 2:19-cv-00149-jnp-dao<br>Judge Jill N. Parrish<br>Magistrate JudgeDaphne A. Oberg |

REMOTE DEPOSITION OF JUSTIN ESPLIN

March 3, 2021

Salt Lake City, Utah

Repored by: Heidi Hunter, CSR, RPR, CCR

**officer was not available. First of all, we asked in terms of lines but you answered this in terms of flights, correct?**

A That's correct.

**Q And then in your answer, you qualified that. You said that the information your system, the Sabre CrewTrac system, does not track whether a captain, first officer, or a combination of the two were the cause of the cancellation; is that correct?**

A That's correct.

**Q Is there some other program that would tell us whether a first officer or the lack of a first officer caused any of these cancellations?**

A No. A Sabre is the program that tracks that information. It does track when a flight was canceled because of a pilot issue. It does not designate whether that was a first officer issue, a captain issue, or a combination, or some other issue with the pilot staffing. It's not as granular as you're hoping to report on here.

**Q As one might hope. One second here.**

**Let me just -- I want to check one thing here. I'm going to show you what we will mark as Exhibit 40.**

(EXHIBIT # WAS MARKED.)

**Q And I'll represent to you what we did was we took the information from column 9A and column 10C, and 10C being the flight cancellations, and we compared that with whether or not there were any first officers available on Friday, Saturday, and Sunday.**

**And we found that in each one of these days where you showed some cancellations, not the weekdays. We're not concerned about weekdays, but on the weekend days, that there were always reserve officers, reserve first officers available.**

**Would that -- would that indicate to you that it was not the lack of a first officer which caused the flight to be canceled?**

A No, that would not necessarily indicate that.

**Q Why not?**

A The flights may have been in different times of day than when they were available on reserve for one. The flights may have been at a location where they were not sitting reserve, may have been a Detroit pairing, but the flight was in Chicago and we couldn't get them to Chicago in time. Things like that. If no reserve is available, it may not have been timely or even possible to get them to that flight on time.

**Q But like, for example, on 10/20/17 it shows there were first unused first officers in Detroit and**

**there was one flight missed. I mean, that would -- there must have been a first officer in Detroit available, right?**

A I would say there were reserve first officers in Detroit on that day, or that they were available when that flight needed to be flown, I cannot comment.

**Q When you pulled up this information on flight cancellations due to missing crew, did you provide or obtain information on what specific flights were canceled?**

A Yes. I produced a list of specific flights that were canceled and the comment and reason why they were canceled.

**Q And what did this comment say?**

A It's a free text comment that may say: Missing pilot or may say, "Pilot got sick." Or it's just a free text comment that has a bunch of different random texts.

**Q As you've just indicated, when you responded to 10C for each domicile for Detroit the number of flights per day that could not be flown, that might have been a flight that -- a trip that started in Detroit but the flight could not be flown might have been between two other locations other than Detroit.**

A That's correct.

**Q And -- I mean, there were reserve pilots in other places besides Detroit. So the problem may have been that there was not a reserve pilot in a different domicile, correct?**

A Possible.

**Q Is it possible, Mr. Esplin, to narrow down from 10C whether the reason that the flight was canceled was because of lack of first officers in Detroit?**

A I don't believe it's hundred percent possible to do that accurately.

**Q Okay. I'll share the screen again. These are probably fairly straightforward: Interrogatory Number 11A was for each domicile per bid period the number of lines. And I assume that needs to be changed to the number of flights that were traded their slot between first officers. So how did you go about obtaining this information?**

A This information was pulled from our SkedPlus application, which is a self-service web application that crew members use to trade pairings with each other or with the company. And I ran a report of all transactions that were successful in this SkedPlus application. That's what number you see here.

**Q Did you have to write your own query or is that a standard report that can be run in SkedPlus?**

A I had to write my own query for that as well.

**Q And then 11B, I gather you also did that through SkedPlus, that was number the lines that were posted by a first officer?**

A Yes. It came from SkedPlus, and this was a count of all transactions in SkedPlus by a Detroit first officer that were successful or unsuccessful or that were never attempted to be picked up by another crew member. So it essentially is a representation of all transactions attempted in SkedPlus by reserve -- a Detroit first officer.

**Q What's the difference between being unsuccessful or not being picked up by another officer?**

A So unsuccessful might be that I had a pairing out there that I wanted someone to pick up. My buddy tried to pick it up and trade with me. But it was denied because of legality or some other reason that was not eligible to be on his schedule. So that would be a failed or unsuccessful transaction.

Not picked up could be a pairing that I put out there to be picked up but nobody attempted to pick up it. So there was never any attempt to try to get that pairing, that was counted as one attempt or one posted pairing that was unsuccessful.

**Q And the SkedPlus system, there have been**

**references other depositions to sort of posting it on the open board, that's what you were referring to?**

A The swap board or open time are two terms they use.

**Q I'm going show you again we looked at briefly before, Exhibit 41. What exactly were you asked to do in creating Exhibit 41?**

A I don't remember the exact wording of the request that came to me. But in essence it was -- they want the absences that are reported in the crew reliability tool used by the chief pilots. So we want an extract of that data is essentially how the request came to me.

**Q Is the crew reliability reports, did that come from Sabre or is that some other system?**

A Yes. It originates from Sabre. We pulled the data out of Sabre, and it's stored in our own database and used to report in those reports.

**Q So did you also for this one have to write your own query?**

A Yes.

**Q And I've asked you this before: You're not exactly sure why the numbers here differ from the numbers that were given to us in answer to Interrogatory Number 8A; is that correct?**

A I don't remember what 8A was.

**Q 8A was for each day during the relevant period the number of first officers at Detroit who were not available to fly regardless of the reason.**

A Yeah. That was a different filter, different set that were used to pull that report. They're unrelated data.

**Q I didn't understand that answer, Mr. Esplin. What do you mean they're unrelated data?**

A I didn't use the same filter on those two interrogatories there. For 8A not available to fly. I reported on anyone that was not flying and not assigned a reserve on that day. And in this report, I reported anybody that had a specific absent code on their schedule. So it was two different unrelated requests as far as I was concerned.

**Q I misspoke. I meant in regards to 8C. The reason that the information on 8C is different than --**

A Yeah. I recall 8C used a larger list of absent codes, which is why it would probably be slightly different than the one that came from the crew reliability shorter list of absent codes.

**Q And the codes you used would show up if we were provided with the queries you used for each of these spreadsheets?**

A Yes.

(EXHIBIT 47 WAS MARKED.)

**Q I'm going to show you what we have marked as exhibit or will be marked as Exhibit 47. We asked for information regarding Stephen Horne and a Michael Wahlen. Did you obtain this information as well or were responsible for generating this information?**

A Yes.

**Q Did you do it through the Sabre CrewTrac?**

A The data came from CrewTrac combined with some data from Flight Track, the other Sabre application.

**Q Did you have to write your own query to do this?**

A Yes.

**Q How were you -- was there some way when did these queries, does it check to make sure that the pilot actually flew the flights on those specific days?**

A Yes. This query only included flights that were not canceled that were flown by this crew member as an operating crew member. It did not include what we would call a deadhead where they're just sitting in a seat but not actually flying a plane.

**Q Whenever a pilot flies a leg or whatever, do they have to enter something that would show they were actually the pilot on that flight?**

A Yes, pilots have to check in for a flight or activate for a flight.

**Q Who do they check in with or activate with?**

A They have an application on their iPad that lets them activate for a flight, which validates that they are the right pilot sitting on the right airplane activating for the correct flight.

**Q When they activate, somehow that is included or goes into the CrewTrac or Flight Track database?**

A It's recorded in a database. It's not recorded in a CrewTrac or Flight Track.

**Q What database is it recorded in?**

A It's an in-house database that we use to track those activations.

**Q Did you search that in-house database in preparing this information for Horne and Wallen?**

A No. We didn't need to check that information. That information validates they're on the right flight, but the actual schedules assigned to them in CrewTrac is the system of record of what they flew. And I looked at the schedules in CrewTrac and Flight Track to report this information.

**Q Isn't it possible that the pilot is assigned a flight that they may not end up flying it?**

A No, that's not possible. If the pilot didn't

# Exhibit P

Exhibit P

cott M. Petersen, #7599
Tanner J. Bean, #17128
**FABIAN VANCOTT**
215 South State Street, Ste. 1200
Salt Lake City, Utah 84111-2323
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
spetersen@fabianvancott.com
tbean@fabianvancott.com

*Attorneys for Defendant SkyWest Airlines, Inc.*

---

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH - CENTRAL DIVISION**

| | |
|---|---|
| SHANE ANDREW CASSELL,<br><br>Plaintiff,<br>v.<br><br>SKYWEST, INC., d/b/a SKYWEST AIRLINES,<br><br>Defendant. | **DECLARATION OF MR. TODD EMERSON**<br><br>Case No. 2:19-cv-00149-JNP-EJF<br><br>Judge Jill N. Parrish<br>Magistrate Judge Evelyn J. Furse |

I, Todd Emerson, declare and state as follows:

1. Except as otherwise stated herein, the following testimony is based on my own personal knowledge and information.

2. I am over the age of eighteen and am competent to testify.

3. I am currently the Legal Director for SkyWest Airlines.

4. I am familiar with the financials associated with training new SkyWest pilots.

5. SkyWest spends roughly $27,000 on every pilot it sends through training.

6. Due to the high training cost, newly hired SkyWest pilots do not become profitable for SkyWest for 1.5 years.

7. I declare under criminal penalty under the law of Utah that the foregoing is true and correct.

EXECUTED June 28, 2021 at Saint George, Utah.

Todd Emerson
Legal Director, SkyWest Airlines