Erik Strindberg (Utah Bar No. 4154)
**STRINDBERG SCHOLNICK BIRCH**
**HALLAM HARSTAD THORNE**
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
(t) 801.359.4169
(f) 801.359.4313
email: erik@utahjobjustice.com

Todd. R. McFarland (Pro Hac Vice)
Associate General Counsel
Office of General Counsel
**General Conference of Seventh-day Adventists**
12501 Old Columbia Pike
Silver Springs, MD 20902-6600
(t) 301.680.6321
(f) 301.680.6329
Email: mcfarlandt@gc.adventist.org

*Attorneys for Plaintiff*

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| SHANE ANDREW CASSELL,<br><br>Plaintiff<br>v.<br><br>SKYWEST, INC. d/b/a SKYWEST AIRLINES,<br><br>Defendant. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SKYWEST'S CORRECTED MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-CV-00149 JNP-DAO<br><br>Judge Jill N. Parrish<br>Magistrate Judge Daphne A. Oberg |

Plaintiff Shane Andrew Cassell (hereinafter "Cassell"), by and through his undersigned attorneys, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby submits this Memorandum in Opposition to SkyWest's Corrected Motion for Summary Judgment (Dkt. #48):

## INTRODUCTION

SkyWest refused to rehire Cassell in 2017 because he would not guarantee that, if needed, he would fly on the Sabbath in violation of his strongly held religious beliefs. Nonetheless, SkyWest argues it is entitled to summary judgment because Cassell rejected the accommodation it had offered him in 2016 and demanded a Sabbath-free schedule. The facts underlying SkyWest's argument are disputed and at trial the trier-of-fact easily could find that Cassell made no such demands, and that SkyWest refused to rehire him to avoid allowing him to use the accommodation it had agreed to the prior year. This factual dispute by itself precludes summary judgment. SkyWest also argues that granting an accommodation to Cassell would have caused it to violate its seniority system thereby constituting an undue hardship. This too is disputed. SkyWest knew that pilots were unable to take their assigned flights on a regular basis and had multi-layered procedures in place to cover for those pilots which operated without violating the seniority bidding system (and therefore could have covered a few flights for Cassell if that had even been necessary). Additionally, it is disputed whether SkyWest's bidding system really was covered by a collective bargaining agreement and therefore could not be modified, or whether SkyWest

had the discretion to deviate from it. This dispute as to whether an accommodation would have caused an undue hardship is an additional reason why summary judgement should be denied.

Cassell is a member of the Seventh-day Adventist Church and abides by its teaching not to perform work on the Sabbath, which starts at sundown on Friday and goes to sundown on Saturday. He is also a pilot who would like to further his career by working for SkyWest Airlines ("SkyWest"). Cassell first applied for a position with SkyWest in 2015, was offered a job, but declined the offer. Cassel reapplied the following year and began training in October of 2016. Shortly thereafter Cassell's need to avoid work on the Sabbath became known to SkyWest when a conflict developed in his training schedule. He asked not to be assigned any shifts on the Sabbath but was told SkyWest would not agree to that. However, SkyWest offered him the accommodation of using its regular bidding and post-bid systems wherein pilots can trade, drop, or swap flights to avoid Sabbath work. Cassell agreed and the parties entered into a Memorandum of Agreement for Religious Accommodation Request ("Memorandum of Agreement" or "2016 accommodation") which memorialized their agreement. Unfortunately, shortly thereafter a conflict developed when one training session was schedule to last past sundown on Friday. Because the Memorandum of Agreement did not address training schedules and SkyWest would not reschedule the session, Cassell was faced with being terminated or resigning.

SkyWest Training Manager Jake Whicker and Employee Relations Manager Coy Bryant counseled Cassell to resign so he would be eligible for rehire. They also suggested that he reapply after day light savings began as this would eliminate the conflict with the Friday class. After talking with a friend who was also a Seventh-day Adventist and had completed his training with SkyWest that spring, Cassell reapplied in June of 2017. While Cassell's application was pending, he prepared a letter at the direction of Bryant, which emphasized that he was not asking for SkyWest to guarantee a Sabbath free work schedule and that he would use the tools provided in the 2016 accommodation to avoid Sabbath shifts. Cassell also explained that there were unforeseen circumstances under which he would fly on the Sabbath. Nonetheless the Chief Pilot/Director of Flight Operations for SkyWest, Roy Glassey, rejected Cassell's application because Cassell refused to pledge to work on the Sabbath if scheduled. According to Glassey "[Cassell] stated his insubordination before he even started." This litigation followed.

SkyWest first argues that by offering "[Cassell] the well-established accommodation of a seniority-based bidding system with flexibility (but no guarantee) to avoid Sabbath work" in the fall of 2016 it has fully met its legal obligations. *Defendant's Motion for Summary Judgment, Dkt. #48 (hereinafter "Def. Mot."), p. 22.*[1] Additionally,

[1]SkyWest's primary argument focusing on what happened in 2016 when Cassell was hired by SkyWest but was then forced to resign is misplaced. Cassell did file a Charge of Discrimination regarding his forced resignation in 2016, but he subsequently withdrew that charge. When SkyWest refused to rehire him in 2017, Cassell filed a second Charge of Discrimination. It is this claim which is at issue in this litigation. Nonetheless, whether SkyWest provided (or could

SkyWest contends that Cassell rejected this proffered accommodation, and instead demanded that SkyWest guarantee a Sabbath free schedule. *Def. Mot. pp. 22, 28-9*. Because it is not clear if SkyWest acknowledges that Cassell has made out a *prima facie* case, **Argument I** discusses this issue and shows that Cassell has made out a *prima facie* case of discrimination. **Argument II** addresses how SkyWest's claims that Cassell rejected the 2016 accommodation and demanded a guarantee of no Sabbath work are not supported by the undisputed facts. And that the trier of fact could find the opposite - that Cassell accepted SkyWest's accommodation and SkyWest refused to rehire Cassell in 2017 because it did not want to provide the accommodation it had agreed to the previous year.[2]

SkyWest next argues that even if it had hired Cassell in 2017 with the accommodation it offered in 2016 this would have created an undue hardship for the company because the accommodation would not have eliminated all Sabbath shifts and Cassell would have had to quit to avoid violating his Sabbath beliefs. SkyWest contends that as a result it would have incurred the expense of training a new pilot. *Def. Mot. pp. 30-1*. Significantly, by arguing that the 2016 accommodation would not have eliminated the

provide) Cassell with a reasonable accommodation, or in the alternative, whether providing him with an accommodation would create an undue hardship, are still at issue, although they arise in a different factual context than discussed in SkyWest's first argument.

[2]Cassell's failure to hire claim (Count I) and the failure to accommodate claim (Count II) are separate and distinct legal theories. However, in this case the failure to hire claim arises from, and is directly related to, SkyWest's failure to provide Cassell with a reasonable accommodation when he reapplied. Accordingly, those two claims and SkyWest's defenses will be addressed together (in **Arguments I – V**).

requirement that Cassell work on the Sabbath, SkyWest undercuts its first argument – that it offered Cassell a reasonable accommodation. As with the reasonable accommodation argument, the material facts underlying this undue hardship argument are in dispute. First, the whole premise of SkyWest's argument – that the 2016 accommodation would not have eliminated all Sabbath flights – is disputed. Rather, the trier of fact could find that the 2016 accommodation would have allowed Cassell to avoid Sabbath work, thereby negating any undue hardship. (See **Argument III**). Moreover, even if Cassell had not been successful in avoiding a few Sabbath assignments, there is a question of fact as to whether SkyWest could have covered those flights without incurring an undue hardship (**Argument IV**).

SkyWest also argues that providing Cassell with an accommodation would breach its "Collective Bargaining Agreement" because bidding by seniority was mandated by the CBA. *Def. Mot. pp. 29-30*. This contention is also at issue, as a trier of fact could find that SkyWest had the discretion to deviate from the strict confines of the bidding system and therefore if a more senior pilot was required to take a flight for Cassell there would be no violation of the seniority system. Secondly, it is disputed whether the documents SkyWest refers to as a CBA was a binding agreement (**Argument V**). Lastly, **Argument VI** shows that SkyWest's motivation for refusing to hire Cassell in 2017 is at issue and therefore Cassell's retaliation claim also should not be dismissed.

## CASSELL'S RESPONSE TO SKYWEST'S STATEMENT OF FACTS

1. *Cassell is a practicing Seventh-day Adventist and sincerely holds the religious belief that one must not perform work on the Sabbath, a period lasting from Friday sundown through Saturday sundown.*[3]

RESPONSE: Admitted. Cassell believes that no work should be performed on the Sabbath (with certain exceptions as set forth in response to the next paragraph) based on the 4th Commandment from Exodus 20 which states "On that day, you shall do not work." He has held this belief for as long as he "can remember being taught it." *App. Exh. 2, Cassell Dep. 19:6-20:12*.

2. *For Cassell, an exception to the belief against performing work on the Sabbath exists for unforeseen circumstances, such as emergencies or when there is life in danger, especially where there is a healing element to the work.*

RESPONSE: Denied as incomplete. Cassell testified that in addition to those instances listed by SkyWest there were other circumstances under which he would work on the Sabbath:

> So there was a question asked of me later on by SkyWest, would there be a situation you would be willing to work on the Sabbath. I say, yes, if there was an emergency; if someone's life was in danger; maybe there was a maintenance delay or a weather delay that caused us to get stuck at an outstation that was not a SkyWest domicile. I would be more than happy to bring that aircraft back to the domicile.

*App. Exh. 2, Cassell Dep. 16:15-25*. In addition, Cassell submitted a statement to SkyWest in June of 2017, which set forth the following parameters as to when he would work on the Sabbath:

---

[3] Cassell has not included Defendant's record citations contained in Dkt. #48.

> If there was an unforeseen circumstance, such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended, I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious beliefs.

*App. Exh. 10*.

3. *Cassell determines at what time the Sabbath begins and ends by viewing a sundown calendar on his phone or on a computer.*

RESPONSE: Admitted – although Cassell makes clear that he was not unilaterally or arbitrarily deciding when the Sabbath began, but rather this is a process that his family and other Seventh-day Adventists use to determine when sundown occurs for their location. *App. Exh. 2, Cassell Dep. 15:23-16:8*.

4. *Before Cassell applied for employment with SkyWest, he spent "extensive time on the phone" with individuals working at SkyWest, including at least one pilot who was also a Seventh-day Adventist. In those conversations, Cassell discussed "how the schedule was handled, from training all the way through being a line pilot."*

RESPONSE: Denied. Cassell did speak with Steve Horne before he was hired by SkyWest in the fall of 2016 (hire is not at issue here – see paragraph 10 below and the Additional Material Facts (hereinafter "Additional Facts")) but SkyWest's description of what Cassell learned from his multiple conversations with Mr. Horne is incomplete. Horne also explained to Cassell how he had avoided working on the Sabbath by trading, dropping, and swapping flights, the tools which made up the 2016 accommodation. And how during training sessions he was able to avoid working on the Sabbath by picking simulator slots that did not conflict with the Sabbath and by making requests of staff not to be scheduled on the Sabbath. *App. Exh. 2, Cassell Dep. 12:2-13, 21:15-22:18, 26:16-28:8*. Additionally,

after Cassell resigned from SkyWest on November 30, 2016, Cassell talked with Michael Wahlen, who had been hired by SkyWest in November of 2016. Wahlen also discussed with Cassell how he avoided Sabbath work by the way he organized his bids and by dropping, trading, and swapping flights after he became a line pilot. Wahlen also told Cassell that during training he was able to make requests of the training department to not be scheduled on the Sabbath. *App. Exh. 2, Cassell Dep. 23:13-25:14; App. Exh. 11; App. Exh. 37, Dec. of Wahlen.*

5. *Through these discussions, Cassell gained an understanding that SkyWest used a seniority-based shift bidding system.*

RESPONSE: Admitted though incomplete. As set forth in the Additional Facts, Cassell also learned that SkyWest had a post-bid system that allowed pilots to swap, drop and trade flights and pairings after they were assigned flights through the bidding process. *App. Exh. 4, Esplin Dep. 48:11-49:11; App. Exh. 12, Tabs 11(a) & 11(b).*

6. *Additionally, through his discussions, Cassell believed that at least two Seventh-day Adventist pilots working for SkyWest had managed to completely avoid work on the Sabbath.*

RESPONSE: Admitted. But see the response to paragraph 7.

7. *This belief was incorrect, as both pilots had worked numerous shifts that infringed on the Sabbath. (Ex. G, at SkyWest_002050-2123.)*

RESPONSE: Denied. Exhibit G, at SkyWest_002050-2123 assigns the wrong "Day of the Week" (column 3) to the "Flight Dates" (column 2). Specifically, the flights that are shown has having taken place on Friday actually took place on Wednesday, and the flights

designated as occurring on Saturday actually took place on Thursday. This can be confirmed through any number of ways, such as at the website Calculator.net, or in an Excel spreadsheet. *App. Exh. 36, Declaration of Yoko Fujioka-Matthew.*

The complete flight histories for Horne and Wahlen (also produced by SkyWest) confirm that SkyWest miscalculated the days of the week. *App. Exh. 13*. The complete flight history shows that Wahlen has <u>never</u> flown during the Sabbath by using the same "tools" offered to Cassell in 2016. The same history shows that there have been a handful of times early in his career that Horne flew on the Sabbath. However, Horne recommitted himself to the teaching of the Seventh-day Adventist Church of not working on the Sabbath towards the end of 2011. From that time forward he only flew on the Sabbath if a flight was delayed or the like. *App. Exh. 37, Wahlen Dec.*⁋*17; App. Exh. 38, Horne Dec.*⁋*3-6.*

8. *Additionally, before Cassell applied for employment with SkyWest, he knew that SkyWest had flights every day. The job description for Cassell's position required travel on holidays and weekends. Cassell knew that after training he could be scheduled to work on a Saturday.*

RESPONSE: Denied – SkyWest has not provided a job description for the position sought by Cassell – First Officer on the CRJ. However, it is admitted that Cassell knew that SkyWest had flights on holidays and weekends.

9. *During the interview process with SkyWest, SkyWest told Cassell that ground school (training required before Cassell could begin regular shifts) in Salt Lake City, Utah would be scheduled Monday through Friday from 8:00 a.m. to 5:00 p.m., but that simulator training scheduling would be random because it was based on simulator availability.*

RESPONSE: Denied as not material. Cassell was hired by SkyWest in September 2016, completed the CTP course in Atlanta, and then started ground school training with SkyWest in Salt Lake City, which he understood would take place between 8:00 a.m. and 5 p.m. Cassell was forced to resign on November 30, 2016, because Matrix training (training using computer monitors) conflicted with his Sabbath observance. Cassell is not seeking damages arising from this constructive discharge. *Complaint, Dkt. #2, ⁋ 18*. Rather his claims arise from SkyWest's failure to rehire him in June of 2017. *Id., Counts I, II and III; App. Exh. 2, Cassell Dep. 110:2-128:9, 141:20-142:4.* Accordingly, what SkyWest may or may not have told Cassell about simulator training is not material to this litigation

10. *Cassell was hired by SkyWest as a pilot on September 1, 2016.*

RESPONSE: Admitted.

11. *On or before this same date, Cassell notified a SkyWest recruitment specialist of his Sabbath observance. He was able to schedule Cassell for classes in a required Airline Transport Certification Training Program ("CTP") held in Atlanta, Georgia that did not conflict with Cassell's Sabbath observance.*

RESPONSE: Denied as not material (See response to paragraph 9).

12. *SkyWest's training program, including the CTP course and ground school, is mandatory and tightly scheduled. (Cassell Dep. Ex. B, at 125:4-7, 125:19-23; Whicker Dep. Ex. D, at 9:10-22, 13:18-21, 46:8-10 ("You know, training, you can't really trade a ground school day per se. It's just scheduled."), 51:1-21; Ex. G, at SkyWest_000038; Emerson Dep. Ex. H, at 12:20—13:5.)*

RESPONSE: Denied as not material (See response to paragraph 9). In addition, the cited testimony and exhibits do not support the facts set forth in this paragraph. Rather, they just go to SkyWest's contention that when Cassel was in training in the fall of 2016

there were no alternative matrix sessions he could attend (other than those that conflicted with his Sabbath observance) and that if any trainee missed a session, he or she would "essentially have to join the following class" as there was no time for that person to catch up. *App. Exh. 9, Wicker Dep. 51: 10-21; App. Exh. 2, Cassell Dep. 125:4-14*. Additionally, the cited portion of Emerson's deposition consists of inadmissible hearsay testimony (he is simply repeating what he was told by Whicker and Bryant) and should not be considered.

13. *SkyWest leases various training resources, such as flight simulators, across the country to train its pilots according to resource availability*

RESPONSE: Disputed as not material. The availability of flight simulators or other training resources and the training of pilots are not at issue in this case. See response to paragraph 9 above.

14. *Among other things, during Cassell's training, Cassell received training on SkyWest's shift bidding system which gives senior pilots more power than junior pilots to select preferred schedules.*

RESPONSE: Denied. SkyWest has not cited to any testimony or document which supports this statement of fact. The document it cites to is the Position Statement it submitted to the EEOC in response to Cassell's first Charge of Discrimination (which was withdrawn and is not at issue here) and was not a training document. *SkyWest's Appendix, Dkt.#48-1 (hereinafter "Dkt.#48-1"), bates numbered Cassell 030-035*. Nonetheless. Cassell admits that he knew that SkyWest had some sort of seniority system used in the bidding process. *App. Exh. 2, Cassell Dep. 29:24-30:19.*

15. *SkyWest's seniority system has been in place since the early 1980s. It is reflected in SkyWest's Pilot Policy Manual.*

RESPONSE: Admitted that SkyWest claims the seniority system has been in place since the early 1980's. However, the remaining portion of paragraph is denied because seniority for the purposes of bidding on flights (which is the issue in this case) is <u>not</u> covered in the Pilot Policy Manual. The Pilot Policy Manual sets forth how seniority dates are assigned and how seniority is handled when a pilot transfers domiciles (i.e., home base or airport) and states that seniority will be used for the following: "Except as otherwise provided in this policy manual, seniority will govern all pilots in the case of upgrade, displacement, filling vacancies, furlough, recall, or assignment due to expansion or reduction in schedules." It does not mention using seniority during the bidding process. As set forth in response to paragraph 19 below, seniority as it applies to the bidding process is covered in the Company Policy Manual. *App. Exh. 34, SkyWest 389-586.*

16. *SkyWest's Pilot Policy Manual is a collective bargaining agreement ("CBA") between SkyWest and the SkyWest Airlines Pilot Association ("SAPA"), an organization that was created in the 1980s.*

RESPONSE: Denied. SAPA is not certified by the National Mediation Board and is therefore not a recognized representative under the Railway Labor Act which can enter into agreements that are binding on the employer (and employee). In addition, under 29 U.S.C. §402(j)(2) a duly recognized representative is required to file reports with the Department of Labor, and SAPA has not filed any such reports. *App. Exh. 35, Declaration of Ezzy Khaosanga.* SAPA is simply an "in-house association" and all pilots automatically

become members when they are hired. The operation of SAPA and the president and members of the executive committee are funded by SkyWest. In addition, employees cannot have their grievances heard by an independent third party, but instead are decided by SkyWest's VP of Operation. *App. Exh. 3, Emerson Dep. 39:20-42:6*.

17. *SAPA and its pilot members have consistently and successfully opposed any efforts or discussions aimed at altering, eliminating, or obtaining exceptions to the seniority system.*

RESPONSE: Disputed as not material. See the Response to paragraph 19 below.

18. *SkyWest assigns seniority to new hires based on their hire date. If two pilots share the same hire date, then the employee with the lowest last four digits of their social security number receives higher seniority.*

RESPONSE: Admitted.

19. *Seniority is used in SkyWest's bidding system to determine "an employee's shift, workweek, area of work and line preference. Preference on domicile transfers is also given on the basis of bidding seniority."*

RESPONSE: Denied as incomplete because SkyWest had the discretion to deviate from the seniority bidding system in assigning flights, work shifts, etc. Seniority as it applies to the bidding process is addressed in the Company Policy Manual, and not the Pilot Policy Manual. *App. Exh. 14, spec. SkyWest 150*. The policies in the Company Policy Manual could be changed by SkyWest at any time without approval from SAPA:

> Policies set forth in the SkyWest Airlines Company Policy and the SkyWest Airlines Employee Handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between the employer and any of its employees. The provisions of the policy and handbook have been developed at the discretion

> of management and may be amended or cancelled at any time at the organization's sole discretion.

*App. Exh, 14 SkyWest 000114*, Policy 51.1 ⁋B. In addition, the Company's policy on seniority and bidding (SP-64, *SkyWest 000150*), provides:

> B. In cases where strict adherence to bidding seniority would be likely to have an adverse impact on the safety of operations, our customer or ability to serve our customer, management reserves the right to assign personnel as needed to insure a sage and efficient operation.

20. *SkyWest's Preferential Bidding System software ("PBS") manages pilot shift scheduling. "PBS builds lines based on crewmember preferences, available pairings, seniority, and operational needs," among various other expressed preferences which pilots rank with varying levels of importance.*

RESPONSE: Admitted.

21. *SkyWest has used PBS for at least fifteen years*.

RESPONSE: Admitted.

22. *The PBS system does not apply to the scheduling of pilots' training shifts. However, seniority is still used when pilots wish to use a training device, or attend a limited size training event, offered at different hours, days, or locations.*

RESPONSE: Admitted – though not material (see response to paragraph 9 above).

23. *On October 27, 2016, Cassell submitted a written request for religious accommodation.*

RESPONSE: Admitted – Cassell submitted his request for a religious accommodation while he was in the CTP class in Atlanta (before training started in Salt Lake City). *App. Exh. 02, Cassell Dep. 120:1-121:5*.

24. *Cassell requested that he "not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown." He indicated to SkyWest that there was no "other modification that would assist [him] in performing the essential functions of [the] job."*

RESPONSE: Admitted. – Cassell did submit a Request for an Accommodation form asking not to be scheduled during the Sabbath, although the second "quotation" is a paraphrase of question 5 on the form he submitted (to which he answered "no".) *App. Exh. 15*.

25. *On October 27, 2016, SkyWest held a conference call with Cassell to discuss his accommodation request. That same day, it sent Mr. Cassell a letter, which he acknowledged with his signature, indicating that after "extensive evaluation and consideration of the request as well as evaluation of the quality, safety, operational impact as well as training footprint structure of SkyWest," SkyWest was denying Cassell's requested accommodation. Instead, SkyWest offered Cassell a different accommodation: "pursuit of schedule changes as defined by company and departmental resources (e.g. drop/trade shift; bid for desired work assignments, domicile staffing/available shifts)." ... see also Ex. C, at 6:61- 7:22 (". . . they sent it back and they said, 'no we're not going to be able to guarantee you a schedule with Sabbaths off because of our seniority system for scheduling.' I was like, well I kinda figured that anyway. So, I decided to continue because my friend that was working there told me, 'You should be able to work around this.'").*

RESPONSE: Admitted – However, the October 27, 2016, document was not simply a letter but a "Memorandum of Agreement for Religious Accommodation Request" and was agreed to and signed by Cassell, Coy Bryant in Employee Relations and Jake Whicker who was manager of CRJ (a type of plane) training. *App. Exh. 16.*

26. *This accommodation was also available to other pilots for their scheduling preferences. (Cassell Dep. Ex. B, at 196:8-10.)*

RESPONSE: Admitted that the accommodation or "tools" set forth in "Memorandum of Agreement for Religious Accommodation Request" were available to all pilots. *App. Exh. 16; App. Exh. 2, Cassell Dep. 196:8-10; App. Exh. 7, Spagnolo Dep. 111:9-116:24.*

27. *SkyWest noted that if Cassell elected to utilize this accommodation, that the "standard for all pilots unexcused work assignment [would] be addressed as defined by the Flight Operations reliability program PPM 3006.*

RESPONSE: Admitted.

28. *SkyWest's Pilot Reliability Program states that "it is the pilot's responsibility to be available at the report for duty time," that "[e]xcessive occurrences and schedule assignment deviations (SAD) will result in disciplinary action," and that "excessive occurrences from duty are considered failure to assume responsibility and are ultimately cause for termination."*

RESPONSE: Admitted.

29. *A SAD includes where a "pilot fails to attend a scheduled day of ground school, and the absence has not been prearranged and approved by the Flight Operations Department."*

RESPONSE: Denied as not material (and not a complete definition of the term.)

30. *Cassell understood that missing a shift could result in discipline, including termination.*

RESPONSE: Admitted - however, the testimony of Glassey should be disregarded because Glassey never conveyed his understanding of the disciplinary process to Cassell and therefore it cannot be used to support what Cassell knew. It should also be noted that Glassey testified that a pilot would most likely only be counseled if he had one unexcused

absence and that harsher punishment would be meted out only if the pilot had additional unexcused absences. *App. Exh. 5, Glassey Dep. Vol. I*[4] *63:7-21.*

31. *SkyWest uses software called SkedPlus+ for pilots that want to trade, swap, or drop shifts for which they have already been scheduled after bidding through PBS.*

RESPONSE: Admitted.

32. *Shifts can only be traded, swapped, or dropped if approved by SkyWest.*

RESPONSE: Admitted in part and denied in part. It was very common, for pilots to trade, swap and drop flights and, as Anita Spencer, manager of Crew Support, testified, Crew Support tried to work with pilots to facilitate such changes "as much as possible." *App. Exh. 8, Spencer Dep. 64:23-65:*9. Further, SkyWest only would deny trades, swaps and drops of flights if no other pilot picked up the posted flight and assigning it to a reserve pilot caused the number of reserve pilots to fall below minimum requirements. Further, pilots could pick up any flight they wanted unless it put them in conflict with legal requirement for rest periods, hours flown in a month, or a similar governmental restriction. *App. Exh. 7, Spagnolo Dep. 114:17-115:20, 118:13-119:4*. And pilots were not penalized for drops or trades and could engage in such activity once every 24 hours. *Id. 117:10-118:10.* The Crew Support department continually monitor SkedPlus+ and tried to have all flights that are dropped or traded "cleared" within 24 hours. *App. Exh.8, Spencer Dep. 56:10-20*.

[4] Glassey's 30(b)(6) deposition testimony, from September 2020, will be referenced as Glassey Dep. Vol I, whereas his individual deposition testimony, from February 2021, will be referenced as Glassey Dep. Vol. II.

33. *Subsequent to the October 27, 2016 conference call and letter, Cassell commenced and completed the CTP course in Atlanta.*

RESPONSE: Denied as not material. See response to paragraph 9 above.

34. *During ground school in Salt Lake City, Cassell was expected to complete "matrix sessions" in which a trainee is paired with a partner. Matrix sessions put into practice the concepts trainees learn in classroom instruction. Trainees selected matrix shifts in pairs according to their seniority.*

RESPONSE: Denied as not material. See response to paragraph 9 above.

35. *On Friday, December 2, 2016, there were two available matrix shifts for those in Cassell's ground school class: 4:00 – 6:00 p.m. or 6:00 – 8:00 p.m. (The shifts were split because of limited matrix device resources.) Cassell was assigned to report to a training shift from 4:00 – 6:00 p.m. There were no other training shifts for which Cassell could have swapped with another pilot without disrupting the schedule of ground school for all other trainees.*

RESPONSE: Correct but not material. See the response to paragraph 9 above.

36. *On December 2, 2016, sundown was at approximately 5:00 p.m. in Salt Lake City, meaning Cassell's Sabbath conflicted with either of the available training shifts.*

RESPONSE: Correct but not material. See the response to paragraph 9 above.

37. *On November 30, 2016, Cassell contacted a training manager and told him he would miss the matrix shift because of the conflict with his Sabbath. After discussing the matter with Cassell, SkyWest indicated that if Cassell missed the matrix shift, he would have to begin his training anew or be terminated. Shortly after, Cassell resigned.*

RESPONSE: Admitted. See the response to paragraph 9 above and the Additional Facts.

38. *In response to an inquiry from a lawyer from Mr. Cassell's church, SkyWest analyzed data of 100 pilots hired a year prior to Mr. Cassell. It found that no matter what scheduling preference the pilots requested under SkyWest's bidding and*

*seniority system, or what attempts they made to swap shifts, every pilot received a schedule that required them to work on at least one Saturday during that year. The average pilot worked seventeen Saturdays during the one- year period. This was an unsurprising finding for SkyWest, as the newly hired pilots lacked seniority to consistently obtain the most desirable Monday-Friday shifts through SkyWest's bidding system.*

RESPONSE: Denied as incomplete. First, the data do not reflect, nor did SkyWest know, if any of the 100 pilots attempted to avoid working on the Sabbath. *App. Exh. 3, Emerson Dep. 97:19-99:2*. Additionally, as Cassell testified, new pilots generally wanted to get as many flight hours as possible so they could quickly upgrade from First Officer to Captain. Because SkyWest experienced a higher rate of absences on the weekend, a junior pilot who wanted more hours and did not care if he/she flew on the Sabbath would very likely choose Saturday flights. *App. Exh. 2, Cassell Dep. 145:22-147:9*. Second, the research did not focus on pilots who just flew out of Detroit, the domicile to which Cassell would have been assigned.[5] *App. Exh. 3,Emerson Dep. 94: 4-10*. The Detroit domicile was rapidly expanding in 2017. This meant that new pilots quickly moved up in seniority and within a short time frame could, if they chose, bid Sabbath free schedules. *App. Exh. 37, Wahlen Dec. ¶10*. Finally, the document produced by SkyWest was created for this litigation and was SkyWest's attempt to recreate the research that had been done in 2017. *App. Exh. 3, Emerson Dep. 85:89:6*.

[5] SkyWest has stipulated that if Cassell had been hired in 2017 he would have been assigned to the Detroit domicile. See Defendant's Responses to Plaintiff's Fifth Set of Written Discovery to Defendant (dated January 28, 2021), response to Interrogatory # 13. *App. Exh. 17*.

39. *Cassell filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 8, 2017. He alleged that SkyWest had not properly evaluated his request for a religious accommodation, did not present him with sufficient accommodation options, and was motivated to do so by a religiously discriminatory motive.*

RESPONSE: Admitted but not material. This charge that was withdrawn and is not at issue in this litigation.

40. *Cassell reapplied for a position as a pilot with SkyWest on June 12, 2017.*

RESPONSE: Admitted.

41. *During the reapplication process, Cassell notified the EEOC of his intent to withdraw his charge of discrimination. The EEOC responded that SkyWest had not yet viewed the charge and that it would again convey the charge to SkyWest before it being withdrawn.*

RESPONSE: Admitted.

42. *No one at SkyWest indicated to Cassell, in writing or otherwise, that they were aware of the EEOC charge or upset with Cassell for filing it.*

RESPONSE: Denied. Cassell has testified that no one at SkyWest told him that SkyWest was upset about his filing a charge. He did not discuss whether SkyWest knew about his charge. *App. Exh. 2, Cassell Dep. 228:2—229:10.* Moreover, less than a month after the EEOC told Cassell it would notify SkyWest a second time of his pending charge, SkyWest rejected Cassell's application and refused to hire him. *App. Exh. 18.*

43. *In connection with Cassell's reapplication to SkyWest, on June 29, 2017, he submitted a letter in an attempt to provide further clarity regarding his religious beliefs and his previously requested accommodation.*

RESPONSE: Admitted but incomplete. Cassell submitted the letter because he received a call from Coy Bryant in Employee Relations asking him if there were some exceptions [to not working on the Sabbath] and what those parameters were. *App. Exh. 2, Cassell Dep. 156:8-25.*

44. *In the letter, he stated "I realize that SkyWest cannot guarantee that I will be provided a schedule that will always allow me to observe my beliefs, therefore it has and will continue to be my intent to use the tools that SkyWest has provided to either bid out of, drop, or trade a shift that may conflict with my beliefs." He continued, "If there was an unforeseen circumstance, such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended, I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious beliefs. As my tenure increases, my likelihood of conflict decreases due to my increase in seniority, allowing the system to work as designed." He added, "I do not expect SkyWest to give me special or preferential treatment."*

RESPONSE: Admitted.

45. *However, Cassell expressed to his interviewers and other SkyWest personnel that he was unwilling to work any shifts falling on his Sabbath. (Ex. G, at SkyWest_000078, 85-86; Emerson Dep. Ex. H, at 119:10-23, 137:7— 139:4; Roy Glassey Dep. Vol. 2, Ex. L, at 38:2-20, 39:5-11, 40:2-11; see also Cassell Dep. Ex. B, at 150:13-25.)*

RESPONSE: Denied. In his June 29th letter Cassell made clear that there were circumstances under which he would fly on the Sabbath, which was communicated to SkyWest through Coy Bryant. *App. Exh. 10.* Further, the documents and deposition testimony cited by SkyWest are inapposite. Glassey never spoke or communicated with Cassell so he cannot testify as to what Cassell said or did not say to interviewers or other SkyWest personnel. Similarly, Emerson never spoke or communicated with Cassell.

Emerson did correspond with Cassell's then attorney, Alan Reinach, but Reinach never said that Cassell would never work on the Sabbath. *App. Exh. 19.* Additionally, *SkyWest 00078, 85-6* (the documents cited by SkyWest) purport to be notes made by an interviewer in 2017 but they have not been verified, are not verbatim and the person entering the notes has not been identified. Finally, Cassell did not say in his deposition at page 150 that he would never work on the Sabbath. Rather, he reiterated that there were circumstances under which he would work on the Sabbath.

46. *SkyWest would have hired Cassell if he acknowledged SkyWest could not guarantee him a Sabbath-free schedule and he agreed to perform all assigned duties, including those that might fall on his Sabbath, if the accommodation could not avoid that assignment. (Emerson Dep. Ex. H, at 104:2-13).*

RESPONSE: Admitted, although SkyWest has never communicated to Cassell that it would have hired him if he had said he would take a flight on the Sabbath if he could not avoid working using the preferential bidding system and the other "tools" available to him.

47. *On July 12, 2017, SkyWest notified Cassell that it was not extending an offer of reemployment.*

RESPONSE: Admitted

48. *On July 21, 2017, the EEOC provided notice that Cassell's charge of discrimination was formally withdrawn.*

RESPONSE: Admitted that the letter from the EEOC indicating that Cassell has withdrawn his Charge is dated July 21, 2017. It is not known when SkyWest received the notice.

49. *On September 19, 2017, Cassell filed a second charge of discrimination with the EEOC. Cassell reasserted his allegations from his withdrawn charge and added allegations that SkyWest had declined to rehire him because of his religious beliefs and because he had brought the first EEOC charge against SkyWest.*

RESPONSE Admitted in part, denied in part. Cassell did file a second charge of discrimination alleging that SkyWest refused to hire him "in part because of my religious beliefs and also due to the fact that I had an open charge against them at the time they chose not to hire me." *App. Exh. 20*. However, although the charge form references the constructive discharge from the prior year, Cassell is not seeking damages arising out of that discharge. See Response to paragraph 9 above.

50. *On December 7, 2018, the EEOC dismissed Cassell's second charge of discrimination and issued a right to sue letter, noting that after its investigation, "the EEOC does not believe that additional investigation would result in our finding a violation."*

RESPONSE: Admitted that the EEOC issued a Dismissal and Notice of Rights letter dated December 7, 2018, which states

> The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes.

*App. Exh. 21.*

51. *Cassell initiated this suit by filing his Complaint on March 4, 2019.*

RESPONSE: Admitted.

52. *In response to SkyWest's requests for admission, "Plaintiff admit[ed] that if weeks before a flight date he had been assigned to a flight that started on the Sabbath, he would not have taken the flight."*

RESPONSE: Denied as incomplete. Cassell's responses to Requests for Admission no. 3 & 4 read as follows:

> **<u>REQUEST FOR ADMISSION NO. 3</u>:** Admit that, at all times relevant to this lawsuit, your sincerely held religious belief proscribed you from working as a commercial airline pilot on the Sabbath, which is defined as the period after sundown Friday continuing until sundown the following day (Saturday).
>
> **<u>ANSWER:</u>** Admitted in part and denied in part. Plaintiff's sincerely held religious belief does proscribe him, in most circumstances, from working as a commercial airline pilot on the Sabbath, which is defined as sundown Friday continuing until sundown the next day (Saturday). However, the Request is denied in part because, as SkyWest was informed at the time Plaintiff applied for a position, "[i]f there is an unforeseen circumstance, such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended, I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious beliefs."
>
> **<u>REQUEST FOR ADMISSION NO. 4</u>:**
> Admit that, at all times relevant to this lawsuit, you would not violate this sincerely held religious belief (*i.e.*, working on the Sabbath) by operating a SkyWest flight which commenced during the Sabbath, which was assigned to you in advance by the seniority-based bidding system, and which you were unable to exchange, swap, or drop under SkyWest's scheduling system.
>
> **<u>ANSWER:</u>**
> Admitted in part and denied in part. As set forth in response to the previous Request, Plaintiff had informed SkyWest that there were unforeseen circumstances under which he would have been willing to fly on the Sabbath. However, Plaintiff admits that if weeks before a flight date he had been assigned to a flight that started on the Sabbath, he would have not taken the flight.

*App. Exh. 22.*

53. *Had Cassell successfully completed training with SkyWest, he would have first become a reserve pilot, remaining on call to fill in for gaps that often arise from a pilot falling ill, a flight scheduling change, etc.*

RESPONSE*:* Admitted that Cassell probably would have been a reserve pilot when he first got out of training (if he had been hired by SkyWest in 2017). It should be noted, however, that the deposition testimony of Emerson, Cassell, Spencer, most of Spagnolo, and Defendant's Response to Interrogatory no. 12, do not support the facts alleged by SkyWest in this paragraph. In addition, Spagnolo did testify that that he did not know how long a pilot would be on reserve status. *App. Exh. 7, Spagnolo Dep. 44:2-45:18. Id.*

54. *Because reserve pilots are often needed to fill in, SkyWest tries to staff each of its domiciles with 18% reserve pilots, adjusting that number for domiciles that have more reserve pilot demand.*

REPONSE: Admitted in part and denied in part. Admitted that SkyWest tries to have about 18% of its pilots on reserve status at each domicile and that Spencer testified that very occasionally SkyWest would run out of reserve pilots at a particular domicile. However, the data provided by SkyWest in Response to Interrogatory 9(a) shows that in Detroit on Fridays and Saturdays from June of 2017 through the end of 2019, there was always at least 1, and usually several, CRJ First Officers (those who were trained on the CRJ aircrafts) available as reserve pilot who were not assigned flights. *App. Exh. 12, Tab 9(a).* And on most Fridays and Saturdays during 2017-2019 SkyWest used excess CRJ First Officers domiciled in Detroit to take flight for First Officers from other domiciles. *App. Exh. 12, Tab 9(d).* Additionally, if it had been needed, SkyWest could have transferred reserve pilots `between domiciles on an as-needed basis. *App. Exh. 3, Emerson Dep. 96:16-97:2.*

55. *Reserve pilots are normally on a two-hour call and are not required to be on site. Some of these reserve pilots may be assigned a "ready reserve" shift, which requires the pilot to be physically at the airport and available to fly upon 20 minutes notice. Ready reserve shifts are not bid for or awarded through the PBS system, other than for reserve pilots to obtain days off, but are assigned to a reserve pilot based on need, logistics, and, at times, seniority.*

RESPONSE: Admitted and Denied. Admitted that there are three categories of reserve pilots. Ready reserves were required to be at the airport while waiting to see if they were assigned a flight (or be able to present themselves for a flight within 20 minutes). Short reserves were on call for 12 hours and had to be able to be at the airport within 2 hours. Long reserves were on call for 24 hours and were given 12-hour notice if they were to take a flight. Twenty percent of reserve pilots were "long calls" and all other reserves were designated as short reserves. *App. Exh. 8, Spencer Dep. 33:11-35:13; App. Exh. 7, Spagnolo Dep. 95:3-19.* Denied that ready reserve shifts were not bid on. Spencer testified a ready reserve was technically a short reserve who had been converted to a ready reserve, and pilots bid on the days they did not want to be on reserve status through the PBS system. Crew Support did have the discretion to "convert" a pilot who was on short reserve, to ready reserve status, but only on the days that have been assigned through the bid process. *App. Exh. 8, Spencer Dep. 35:9-22.36:17-21, 37:1-5; App. Exh. 7, Spagnolo Dep. 95: 20-96:2.*

56. *If assigned to a reserve pilot shift that required Cassell be present at the airport on his Sabbath, he would not have presented himself if he were unable to trade the shift with another pilot.*

RESPONSE: Admitted that Cassell testified that if he was assigned a ready reserve shift on the Sabbath he would try to trade, drop it, or pick up another shift but if he had been unable to do so he would not have worked on the Sabbath. He also indicated that if on reserve status or if he had been assigned a flight on the Sabbath that he could not trade, drop, or swap, he would have notified either Crew Support or the chief pilot ahead of time so SkyWest could get a pilot to cover for him. *App. Exh. 2, Cassell Dep. 89:8-24, 91:2-24, 150:13-25, 151:7-18.*

57. *If SkyWest granted Cassell's requested accommodation of a guaranteed Sabbath-free work schedule, the impact on other SkyWest pilots would be extensive. Principally, it would require pilots with higher seniority to fill in for Cassell (effectively moving Cassell ahead of pilots with greater seniority) which violates SkyWest's seniority system and CBA. Additionally, Cassell's absence from the schedule would cause a domino effect, triggering the use of a reserve pilot, or, if no reserve pilot were available, requiring other pilots to come in on their days off and paying them overtime. In turn, these changes could disrupt multiple flight schedules and cause SkyWest to reschedule the staffing or occurrence of other flights. (Glassey Dep. Vol. 1, Ex. F, at 70:9—71:16.)*

RESPONSE: Denied. While Cassell requested in 2016 that he not be assigned Sabbath shifts he agreed to the alternative accommodation offered to him by SkyWest – that he use the bidding process, and drops, trades, and swaps to avoid working on the Sabbath. This post-bidding process did not violate SkyWest's seniority bidding process. Further, Cassell never demanded that SkyWest guarantee him a Sabbath free schedule. *See Response to paragraph 26 above, App. Exh. 16*. Additionally, as set forth in the *Declaration of Wahlen* (*App. Exh. 37*) the 2016 accommodation would have been sufficient for Cassell to avoid working on the Sabbath so there would have been no disruption to

other pilots nor any domino effect. Further, the assertion that SkyWest might have had to call in pilots and pay them overtime, and/or disrupt flights if no other pilots were available is inaccurate. As set forth in response to paragraph 54 above, there were always CRJ reserve First Officers available in Detroit on Fridays and Saturdays who could have taken any flights that Cassell was unable to drop, trade or swap. *App. Exh. 12, Tab 9(d).*

58. *The training cost of a new pilot is $27,000.00.*

RESPONSE: Cassell does not have sufficient information to either admit or deny this paragraph. Additionally, SkyWest has not provided any documentary foundation for this claim. *See Dkt. # 48-1, Emerson Dec, Exhibit K.*

59. *SkyWest pilots do not become profitable for SkyWest for 1.5 years.*

RESPONSE: Cassell does not have sufficient information to either admit or deny this paragraph. *See Dkt. # 48-1, Emerson Dec, Exhibit K.*

## ADDITIONAL MATERIAL FACTS

**Chronology of Cassell's interactions with SkyWest**

1. Cassell first applied to be a pilot at SkyWest in 2015. Although he was offered a position, he decided not to accept it because his then current employer, AirScout (which did aerial photography), promoted him to chief pilot. *App. Exh. 2, Cassell Dep. 77:10-15, 105:17-106:12.*
2. Because Cassell did not enjoy being a chief pilot at AirScout he had several conversations with Steven Horne, a Seventh-day Adventist member who had been

working at SkyWest since May of 2007, about potential Sabbath conflicts if he went to work for SkyWest. *App. Exh. 2, Cassell Dep. 11:17- 12:16, 105:17-106:2; App. Exh. 38, Horne Dec. ¶8.*

3. Horne told Cassell that he did not have any difficulty keeping the Sabbath during training. Horne also discussed how to avoid working on the Sabbath once Cassell became a pilot and explained how to use the bidding process and how dropping and trading flights worked. *App. Exh. 2, Cassell Dep. 20:17-21, 22:1-18; App. Exh. 38, Horne Dec. ¶8.*

4. Cassell reapplied at SkyWest in the Summer of 2016. Before starting his training with SkyWest, Cassell completed a CTP course in Atlanta, Georgia. *App. Exh. 2, Cassell Dep. 77:11-80:9.* [6]

*5.* While at the CTP course Cassell asked, and the trainers agreed, to move his simulator training so that it would not conflict with the Sabbath. *App. Exh. 2, Cassell Dep. 81:5-15.*

*6.* Cassell's request apparently was sent to Coy Bryant who was a manager in SkyWest's Employee Relations Department assigned to pilots. *App. Exh. 1, Bryant Dep. 30:11-31:13; App. Exh. 23.*

[6] During his deposition Cassell mistakenly stated he reapplied at SkyWest in the Summer of 2015 but then clarified that he had misspoken and meant 2016. *App. Exh. 2, Cassell Dep. 105:17-20.*

*7.* Cassell's request prompted Bryant to send Cassell an Employee Request for Religious Accommodation form. Cassell filled it out and returned it to Bryant*. App. Exh. 24; App. Exh. 1, Bryant Dep. 32:21-33:2; App. Exh. 2, Cassell Dep. 120:1-23.*

*8.* After talking with other employees in Employee Relations and with Jake Whicker, who was a training program manager, Bryant sent an email to Cassell saying that SkyWest couldn't grant him the exact accommodation he had requested (not to be assigned Sabbath flights). Instead, SkyWest would offer him "all the tools available" to avoid working on the Sabbath. These included using the bidding system, swapping and trading flights, and "all that stuff." *App. Exh. 1, Bryant Dep. 33:3-25; App. Exh. 9, Whicker Dep. 43:12-46:20; App. Exh. 25.*

9. SkyWest's proposed accommodation was set forth in a "Memorandum of Agreement for Religious Accommodation Request" which Bryant prepared and sent to Cassell (who signed it along with Bryant and Whicker). In relevant part the memorandum provides:

> It has been determined that we are unable to honor the specific request with work scheduling. However, as an accommodation we have provided FO Cassell with tools to meet his religious requirement. Options include pursuit of schedule changes as defined by company and departmental resources (e.g. drop/trade shift, bid for desired work assignments, domicile staffing/available shifts)

*App. Exh. 25; App. Exh. 1, Bryant Dep.40:8-42:7; App. Exh. 9, Whicker Dep. 46:11-47:12*.

*10.* The "tools" in the 2016 accommodation, which were available to all SkyWest pilots, only addressed flight schedules and did not address conflicts that might arise during training. *App. Exh. 7, Spagnolo Dep. 104:11 -119:4*; *App. Exh. 2, Cassell Dep. 195:24-197:5; App. Exh. 1, Bryant Dep. 42:3-7.*

11. Cassell started training with SkyWest in Salt Lake City in November of 2016. When Cassell received his schedule for the second week of training he learned that a computer-based Matrix training class was scheduled for 4 to 6 pm on Friday. At that time of the year, sundown in Salt Lake City was 5 p.m. Cassell immediately contacted Whicker and Bryant to discuss the conflict. *App. Exh. 2, Cassell Dep 102:24-105:16*.

*12.* Apparently, the only way to accommodate Cassell would have been to start and end the ground school an hour earlier (which would have allowed the first Matrix training class to end by sundown.) Bryant asked Whicker to make this change, but Whicker did not discuss it with his boss, who was the person who had the authority to do so. *App. Exh. 9, Whicker Dep. 35:14-41:23; App. Exh. 1, Bryant Dep. 44:6 - 47:4.*

*13.* The next day Whicker told Cassel that SkyWest would not provide him with an accommodation which would have allowed him to complete Matrix training before sundown. He then told Cassell he had three options: make it work with his religion

and show up at the class, not show up and be fired, or resign effective immediately. *App. Exh. 2, Cassell 104:16-105:16.*

*14.* Both Whicker and Bryant told Cassell that if he resigned, he could return for a class in the spring when the extended day light hours would eliminate the conflict with the Matrix training. Accordingly, Cassell chose to resign. *App. Exh. 1, Bryant Dep. 44:23-45:14; App. Exh. 9, Whicker Dep. 49:25-50:25.*

*15.* Whicker marked on the termination paperwork that Cassell was eligible for rehire because he had resigned. *App. Exh. 9, Whicker Dep. 53:10-55;13; App. Exh. 26.*

*16.* Whicker sent an email to Cassell a day or two later reaffirming that Cassell had resigned from his employment because of the Matrix training conflict and to avoid being terminated. Whicker reiterated that SkyWest had agreed to an accommodation which provided Cassell with "tools" that he could use to avoid working on the Sabbath. *App. Exh. 11; App. Exh. 9, Whicker Dep.56:2-58:8.*

*17.* Cassell told Michael Wahlen, a friend and Seventh-day Adventist who was applying for a pilot position with SkyWest, what had occurred. A few months later, Wahlen was able to avoid the Matrix training conflict by not starting his training until day-light savings time. *App. Exh. 2, Cassell Dep. 23:12-25:12, 141:5-19(Cassel also told Horne what had happened); App. Exh. 37, Wahlen Dec.* ¶*6.*

*18.* After completing training Wahlen began flying as a First Officer on the CRJ airplane and was domiciled in Detroit. Wahlen only held a reserve assignment for three

weeks and during that time was not required to work on the Sabbath. By his second month Wahlen was able to start bidding a line (a set group of flights and trips for the month) and was largely able to avoid Sabbath assignment. When he could not bid out of a Sabbath flight, Wahlen was able to trade it away by posting it on Open Time. Within roughly six months Wahlen had enough seniority that he could avoid all Sabbath conflicts through the bidding process and did not need to trade flights with another pilot. In sum, Wahlen was able to avoid flying on the Sabbath using the accommodation that SkyWest had agreed to provide to Cassell. Wahlen told Cassell of his success in avoiding Sabbath shifts. *App. Exh. 2, Cassell Dep. 50:7-13; App. Exh. 37, Wahlen Dec.* ¶¶*10 -15* ; *App. Exh. 13*.

*19.* Because Wahlen was successful in completing training and having a flight schedule that did not conflict with the Sabbath, and following the suggestions of Whicker and Bryant, Cassell reapplied to SkyWest in the summer of 2017. *App. Exh. 2, Cassell Dep. 141:20-142:23.*

*20.* During the application process Bryant learned that Cassell had reapplied for a position with SkyWest. Bryant was told that although SkyWest was aware of what had occurred the prior year, Cassell had done very well on his interviews "so he looked good and was going to come back." *App. Exh. 1, Bryant Dep. 55:3-15.*

*21.* Bryant called the pilot recruiter and told him that the training conflict Cassell had in 2016 no longer existed because of the time change. Bryant also told the recruiter

that it would be good to have Cassell go through training and begin to work as a pilot to see if the "tools available to him" would allow him to avoid Sabbath flights. Bryant also told Larsen, another recruiter, that Cassell might be able to make his schedule work and that SkyWest could not discriminate based on religion. *App. Exh. 1, Bryant Dep. 56:19-59:25; App. Exh. 27.*

*22.* Bryant also called Cassell and asked him to explain the parameters of when he would work on the Sabbath. Cassell prepared several drafts of a letter to address the specific issues that Bryant raised - such as what he would do if his flight was delayed into the Sabbath due to maintenance issue or weather, and how he would handle conflicts during training. *App. Exh. 2, Cassell 156:4-170:10; App. Exh. 1, Bryant Dep. 65:14-68:3; App. Exh. 28.*

*23.* Cassell explained, in his letter, that he was not asking SkyWest to guarantee a Sabbath free schedule and that he would use the "tools SkyWest has provided to either bid out of, drop, or trade a shift that conflicted with his beliefs. *App. Exh. 2, Cassell 156:4-170:10; App. Exh. 28.*

24. Cassell also indicated that if there was an unforeseen circumstance, "such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended [into the Sabbath], I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious

beliefs." Cassell also explained how he would avoid conflicts during training sessions. *App. Exh. 2, Cassell 156:4-170:10; App. Exh. 28.*

25. Bryant sent copies of the letter to Glassey, SkyWest's Chief pilot, Whicker, and several other persons in Employee Relations. Bryant sent the letter to Glassey with a cover email that reads "[b]ased on the attached email Employee Relations recommends we allow Shane Cassell an opportunity. Certainly it is your call. *App. Exh. 1, Bryant Dep. 68:20 -72:4; App. Exh. 29.*

26. Before receiving Cassell's letter, Glassey was asked to review the interview notes which had been entered into the "hiring dashboard." The 2017 interview notes read in part "Has expressed unwillingness to be flexible with schedule without any acception [sic]" and "the team has concerns of reliability." Glassey did not review anything else, nor did he talk with Cassell. *App. Exh. 30; App. Exh. 6, Glassey Dep. Vol II, 33:21- 40:11*.

27. Based on these notes alone, Glassey decided that Cassell was unable to "accommodate the schedule we were hiring pilots for" and that because he was "inflexible" (according to the notes) "he states his insubordination before he even started." *App. Exh. 6, Glassey Dep. Vol II 37:25-38:20, 48:9-13; App. Exh. 5, Glassey Dep. Vol. I 59:5-23 (stating that pilot who refused to fly for religious reasons (but were otherwise able to do so) would be considered insubordinate.)*

28. After reviewing the file Glassey told HR to reject (or regret according to SkyWest's terminology) Cassell's application. *App. Exh. 6, Glassey Dep. Vol II 25-43:3*.

29. SkyWest notified Cassell in a letter dated July 12, 2017, that it would not hire him. *App. Exh. 31; App. Exh. 1, Bryant Dep.76:19-77:3.*

**SkyWest plans for Pilot Unavailability**

*30.* The Crew Support department ("Crew Support"), which is headed by Anita Spencer, is responsible for, among other things, planning flight schedule and assigning pilots. Planning involves taking the routes or flights that they receive from their partner airlines and building them into "pairings" (groups of flights) and "lines" (a group of pairings) which the pilots bid on. *App. Exh. 8, Spencer Dep. 7:14-13:22.*

31. One factor that Crew Support must account for in scheduling and assigning flights is pilot absences and other situations where pilots are unable to take their assigned flights. According to Glassey, on average, pilots miss their assigned flights 5.3 days a year. *App. Exh. 5, Glassey Dep. Vol. I. 75:3-76:3.*

32. Information provided by SkyWest also shows that just for the Detroit domicile, between approximately 10 and 20 CRJ First Officers[7] were unable to take their scheduled flight on every Friday, Saturday and Sunday from September 9, 2017, through the end of 2019. *App. Exh. 8, Spencer Dep. 39:19-42:22; App. Exh. 32* (which shows absences for any number of reasons including family and military

[7] This is the position, airplane (CRJ) and domicile that Cassell would have had if SkyWest had hired him in 2017.

leave, sickness, fatigue, and pilots who were off with no pay); See also *App. Exh. 4, Esplin Dep. 28:13-29:24, 49:5-51:1; and App. Exh. 12, Tab 8(c)* (which shows even more absences than Dep. Ex. 41).

33. Pilots are required to notify Crew Support if they are unable to fly and provide a reason for their absence. This gives Crew Support the opportunity to have the flight covered by another pilot. As discussed by Spencer, head of Crew Support, if a pilot called in sick, for example, Crew Support would first try to find a pilot who was already working and switch their route to accommodate the sick pilot. This was referred to as "reflowing" a pilot. *App. Exh. 8, Spencer Dep. p. 22:2-10, 49:18-50:12; App. Exh. 5, Glassey Dep. Vol I 20:23-21:15*.

34. In addition, to ensure that flights were not canceled, Crew Support determined the number of reserve pilots (who can fill in for absent pilots) that were needed at each domicile, based on the number of lines (a line is a pilot's assigned flights for the month) and how many pilots were on leave or out for training. *App. Exh. 8, Spencer Dep. 30:8-31:15*.

35. Generally, about 18% of the pilots in each domicile were on reserve status, meaning that they are available to fill in for absent pilots. *App. Exh. 8, Spencer Dep. 33:6-34:25*.

36. Although it varied by month, SkyWest had between approximately 200 and 400 First Officers trained on the CRJ assigned to the Detroit domicile. *App. Exh. 4, Esplin Dep. 19:14-22:7; App. Exh. 33, tab 7(a)*.[8]

37. And on any Friday, Saturday or Sunday, SkyWest usually had between thirty and fifty CRJ trained First Officers on reserve status in Detroit who were available to take flights for absent pilots. *App. Exh. 4, Esplin Dep 24:6-25:9; App. Exh. 33, tab 7(c)*.

38. This number was needed because there was a lot of day to day juggling of flights and crews – such as when a plane broke down or a crew member was sick or otherwise absent. *App. Exh. 8, Spencer Dep. 21:21-22:10, 50:5-13*.

39. SkyWest's data show that on Fridays through Sundays, the majority of reserve First Officer pilots in Detroit were given flights. *App. Exh. 4, Esplin Dep. 34:1-11; App. Exh. 33, tab 9(b)*. This included flights where the pilot who had bid the flight was absent for one reason or another. *App. Exh. 4, Esplin Dep. 36:15-37:23; App. Exh. 33, tab 9(c)*.

40. But at no time did SkyWest's Detroit domicile run out of First Officer reserve pilots on a Friday, Saturday or Sunday from mid-2017 through the end of 2019. *App. Exh. 4, Esplin Dep. 30:9-32:7; App. Exh. 12, tab 9(a)*

[8] A pilot could only take a flight for a pilot of the same rank and in the same type of aircraft he was trained to fly. Since Cassell would have been trained as a First Officer on the CRJ and assigned to Detroit, the data provided by SkyWest was limited to CRJ trained first officers domiciled in Detroit and for weekends (Friday- Saturday - Sunday).

41. In fact, reserve First Officer pilots in Detroit were often used to cover flights from domiciles other than Detroit. *App. Exh. 4, Esplin Dep. 36:15- 37:9; App. Exh. 12, tab 9(d).*

**The Swap, Drop, and Trade "Tools" offered to Cassell are Regularly used by Pilots**

42. SkyWest allows pilots to trade, swap or drop flights (after flights have been assigned through the bidding process) through the SkedPlus+ system. Swapping involves a pilot trading one flight or pairing (a group of linked flights) for another flight or pairing without involving another pilot. Trading involves trading flights or pairings with another pilot. Dropping a flight or pairing involves posting the flight into the SkedPlus+ system on Open Time, which allows other pilots to pick up the flight or pairing if they chose to do so. Pilots can also post a flight or pairing in Open Time and offer to pay the pilot who picks up the flight or pairing some sum of money. Pilots are not penalized for dropping a flight and can trade down (i.e., take a shorter flight or pairing) or swap once every 24 hours. *App. Exh. 7, Spagnolo Dep. 99:8-19, 104:11-24, 111:9- 113:10, 114:3-116:24; App. Exh. 37, Dec. of Wahlen; App. Exh. 8, Spencer Dep. 54:21-55:17, 57:13-58:1.*

43. Once a flight is in Open Time, it is a first come, first serve as to which pilot picks up the flight. In other words, picking up flights after they are posted in Open Time is not based on seniority but rather when the pilot submits a request. *App. Exh. 8, Spencer. Dep. 57:1-:12, 72:17-73:1.*

44. Pilots can also call Crew Support directly to request a change in their schedule. *App. Exh. 8, Spencer Dep. 63:12-22.*

45. This post-bid process of exchanging flights was used extensively. For example, in the Detroit domicile First Officers who were qualified to fly the CRJ airplane traded some 522 flights in October of 2017 alone and posted some 1690 flight on SkedPlus+ for other pilots to pick up. *App. Exh. 4, Dep. of Justin Esplin, 48:11-49:11; App. Exh. 12, Tab 11(a) & 11(b).*

## LEGAL ARGUMENT

Summary judgment is only appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. Rule 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In deciding a motion for summary judgment, the Court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Burke v. Utah Transit Auth.,* 462 F.3d 1253, 1258 (10th Cir.2006). The Court, therefore, focuses on whether, based on that evidence and those inferences, reasonable jurors "can properly proceed to find a verdict for the party ... upon whom the *onus* of proof is imposed." *Anderson v. Liberty Lobby,* 477 U.S. 242,252 (1986). Further, in making its decision, this Court must not make any credibility determinations nor weigh the evidence. *Liberty Lobby, Inc.*, 477 U.S. at 255).

**Applicable Law**

Title VII makes it an "unlawful employment practice for an employer" … "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's …religion." *42 U.S. §2000e-2(a)(1).* The term religion "includes all aspects of religious observance and practice, as well as belief . . ." *42 U.S. §2000e*(j). Importantly, "Title VII requires that "an employer, short of 'undue hardship,' make 'reasonable accommodations' to the religious needs of its employee.' *TWA*, 432 U.S. at 66 …. "Accommodate …means … allowing the plaintiff to engage in

her religious practice despite the employer normal rules to the contrary."'" … *Tabura v. Kellogg USA*, 880 F.3d 544, 550 (10th Cir. 2018), *quoting Abercrombie & Fitch*, 135 S.Ct. at 2032 n.2. And "an accommodation will not be reasonable if it only provides [the employee] an opportunity to avoid working on some, but not all, Saturdays." *Id.*

The Supreme Court in *Abercrombie & Fitch* made clear that the rule in failure to hire/failure to accommodate cases such as the present one is not complicated:

> Thus, the rule for disparate-treatment claims based on a failure to accommodate a religious practice is straightforward. An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions. . . . If the applicant actually requires an accommodation of that religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer violates Title VII.

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768, 773-74 (2015).

In the context of summary judgment, the Courts generally apply the "familiar burden shifting" approach albeit with a significant difference regarding burdens of proof. First, the employee bears the burden of making out a *prima facie* case. This is usually recited as requiring the employee to show that 1) he has a bona fide religious practice that conflicts with a job requirement, 2) the employee notified the employer of this conflict, and 3) the employer took an adverse action against the employee (such as failing to hire them) for "failing to comply with the job requirement." *Tabura v. Kellogg, USA*, 880 F.3d 544, 549 (10th Cir. 2018).

Once the employee has made out a *prima facie* case, the burden then shifts to the employer to either

> (1) Conclusively rebut one or more elements of the plaintiff's prima facie case, (2) show that it offered a reasonable accommodation, or (3) show that it was unable to accommodate the employee's religious needs without undue hardship.

*Thomas v. National Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000). Importantly, this is not just a burden of production, as in most Title VII cases. Rather the employer has the burden of proving that it either provided a reasonable accommodation or that it could not provide one without incurring an undue hardship. *Toledo v. Nobel-Sysco, Inc*., 892 F.2d 1481, 1486 (10th Cir. 1989); *Tabura*, 880 F.3d at 558. Finally, whether an accommodation is reasonable "is ordinarily a question of fact to be decided by the fact finder" as is the question of whether the employer will incur an undue hardship. *Tabura,* 880 F.3d at 554, 558.

## I. CASSELL HAS MADE OUT A PRIMA FACIE CASE

SkyWest admits that Cassell has satisfied the first two elements of the prima facie case: his religious beliefs and practices are well founded and that he put it on notice of the conflict. *Def. Mot. p. 22*. While not explicitly admitting that Cassell has also satisfied the third element (it failed to hire him because he would not comply with the job requirement) it tacitly does so by not attempting to rebut it and instead focusing solely on the reasonableness of its alleged accommodation and the issue of undue hardship. *Def. Mot. pp. 23-30.*

In any event, the undisputed facts show Cassell has satisfied the third element as well. As summarized in SkyWest's facts, Todd Emerson, its in-house attorney, testified

that if Cassell "had agreed to perform all assigned duties, including those that might fall on his Sabbath" SkyWest would have hired him. *SOF* ¶46.[9] Or in other words, SkyWest chose not to hire Cassell in 2017 because it believed that Cassell's religious beliefs conflicted with what SkyWest viewed as an absolute job requirement – flying on the Sabbath if assigned. And because Cassell's religious beliefs would prevent him flying on the Sabbath, he was, *a priori*, prevented from performing all job duties of a pilot. Glassey, SkyWest's Chief Pilot was even more direct. Glassey testified that he was the person who rejected Cassell's application in 2017 and did so because he believed Cassell would be unable "accommodate the schedule we were hiring pilots for." *AMF* ¶¶26-9. And for Glassey this meant that even though this conflict was due to Cassell's religious beliefs, refusing to work on the Sabbath was intolerable defiance: "he states his insubordination before he even started." *AMF* ¶27. To Glassey, it was essential that Cassell agree in writing that if he could not use the tools given to him by SkyWest to avoid Sabbath work, he would work on the Sabbath in violation of his religious beliefs. *AMF ¶27.* And because Cassell failed to do so, this meant (for Glassey) that Cassell would not be able to comply with all job requirements. This satisfies the third element of the *prima facie* case.

In sum, the undisputed facts show that Cassell has made out a *prima facie* case of failure to accommodate his religious beliefs. The burden therefore shifts to SkyWest to

[9] The facts set forth in SkyWest's fact paragraphs will be referred to as *SOF* ¶____; those set forth in Cassell's response to SkyWest's fact paragraphs will be referred to as *RSOF* ¶___; and the Additional Fact paragraphs will be referred to as *AMF* ¶____.

prove that either it did provide Cassell with a reasonable accommodation which he rejected or would not accept or that it couldn't provide any accommodation without incurring undue hardship. The disputed facts are such, however, that whether SkyWest has met its burden on either point cannot be decided at this stage of the proceedings.

## II. WHETHER CASSELL REJECTED SKYWEST'S ACCOMMODATION IS DISPUTED

SkyWest first argues that it fulfilled its legal duty by offering Cassell an accommodation in 2016 but that Cassell rejected this accommodation because it was "insufficient" and demanded that "only a complete elimination of the conflict . . . would suffice." *Def. Mot*. p. 28-9. SkyWest does not and cannot cite to any statement made by Cassell (or his representative), or any document, in which Cassell supposedly rejected the 2016 accommodation (or demanded a guarantee of no Sabbath assignments.) Instead, SkyWest argues that Cassell rejected the accommodation by resigning in early December of 2016. *Def. Mot*. p. 28-9. And that when he reapplied in 2017, Cassell demanded a guarantee he would not be assigned Sabbath shifts, which was also rejection of the 2016 accommodation. *SOF* ¶46. Neither argument is supported by undisputed facts.

### a. It is disputed whether Cassell rejected SkyWest's accommodation by resigning in 2016

The sequence of events in 2016 shows that a trier-of-fact could find that Cassell's resignation was not a rejection but rather an affirmation of the accommodation extended by SkyWest. During the first phase of training, a conflict developed when some of the

training sessions were scheduled for the Sabbath. While Cassell was able to schedule around the conflict, HR representative Coy Bryant was notified that Cassell's religious beliefs prevented him from working on the Sabbath. Because this might cause a problem once Cassell completed training, Bryant contacted Cassell and sent him an Employee Request for Religious Accommodation form. On that form Cassell did ask that SkyWest agree to not schedule him for shifts on the Sabbath, but Bryant told Cassell that SkyWest could not guarantee a Sabbath free schedule. Rather, he could use the tools available to all pilots to avoid working on that day. Cassell agreed and this was memorialized in the Memorandum of Agreement which was signed in late October of 2016. *AMF ¶¶4-9.*

Towards the end of November Cassell started the second phase of his training with SkyWest. Shortly thereafter SkyWest provided him with a training schedule which showed that one portion of the training would occur on the Sabbath. Because the accommodation memorialized in the Memorandum of Agreement did not address possible training conflicts, Cassell immediately raised the conflict with the training supervisor, Whicker. *AMF ¶¶10-12*. Shortly thereafter, Whicker told Cassell that the training could not be moved and if he didn't attend, he would be terminated and would be ineligible for rehire. *AMF ¶¶12-13.* Whicker and Bryant then counseled Cassell that if he resigned he could reapply once daylight savings started and the extended day light hours would have eliminated the conflict. Cassell heeded their counsel and resigned so that he could later reapply. *AMF ¶14.* Whicker's email memorializing Cassell's resignation reiterated that

SkyWest had provided Cassell with the accommodation memorialized in the Memorandum of Agreement.[10] *AMF* ¶16.

A trier-of-fact could reasonably conclude that under these facts, Cassell's resignation was not a rejection of the accommodation which was provided by SkyWest. Cassell never said that he was dissatisfied with the accommodation or found it inadequate; rather he accepted the accommodation when he signed the Memorandum of Agreement a month before he resigned. In addition, Cassell resigned rather than allow SkyWest to terminate him so that he would be eligible for rehire, and could take advantage, at a later time, of the accommodation he and SkyWest had negotiated. If Cassell was rejecting the 2016 accommodation (to which he had just agreed) it would have been likely that he would have allowed SkyWest to terminate him thereby foreclosing any hope of future employment with the company.

**b. There is substantial evidence that Cassell did not reject the 2016 accommodation when he reapplied in 2017**

Following Bryant's and Whicker's advice, Cassell reapplied the following spring/summer even though SkyWest had not promised any additional accommodations. *AMF* ¶¶17-9. This, by itself, is further evidence that Cassell had not rejected the 2016 accommodation. SkyWest argues otherwise, but the best evidence it can offer is an

[10]While a company cannot always relay on a neutral policy to provide an adequate accommodation, Cassell agrees that the 2016 accommodation tools offered by SkyWest was reasonable under the facts of this case.

unverified note entered by an unnamed interviewer which read in part: "Has expressed unwillingness to be flexible with schedule without any acceptation [*sic*] Based on his history with SkyWest and his schedule constraints, the team has concerns of reliability" *SOF ¶45*. To interpret these notes as an indication that Cassell rejected the 2016 accommodation and was demanding a guarantee of no Sabbath flights would be giving the benefit of the doubt to SkyWest, which is of course improper. Moreover, after the initial interview, Cassell prepared a letter at Bryant's request, which emphasized that he was not demanding a guarantee of no Sabbath work and if hired would utilize the tools offered in the 2016 accommodation:

> I realize that SkyWest cannot guarantee that I will be provided a schedule that will always allow me to observe my beliefs, therefore it has and will continue to be my Intent to use the tools that SkyWest has provided to either bid out of, drop, or trade a shift that may conflict with my beliefs. I have mentors within SkyWest that understand the PBS system. They have offered to teach me how to properly use the system in order to create a schedule that both meets company and personal needs, I am willing to bid for the most undesirable flights, stay at the most junior base, and fly the most junior aircraft in order to avoid conflicts with corporate policy.

*SOF ¶44, AMF ¶¶23-4.* Cassell also indicated that there were circumstances under which he would work on the Sabbath:

> If there was an unforeseen circumstance, such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended, I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious beliefs. As my tenure increases, my likelihood of conflict decreases due to my increase in seniority, allowing the system to work as designed.

*Id.*

In contrast, SkyWest has not, and cannot, point to any statement, written or oral, where Cassell demanded that he be guaranteed all Sabbaths off. Because Cassell's letter specifically reiterates his willingness to use the tools set forth in the 2016 accommodation and recognized that SkyWest could not guarantee a schedule that comported with his religious beliefs, SkyWest cannot argue that the undisputed facts show that Cassell rejected the 2016 accommodation when he reapplied in 2017. Further, the trier-of-fact could conclude that Cassell resigned in 2016, rather than be fired, so that he could take advantage of the 2016 accommodation in the future. In short, the facts are such that the trier-of-fact could find that Cassell neither rejected the 2016 accommodation when he resigned, nor demanded a guarantee of no Sabbath work when he reapplied. Accordingly, the facts which are central to SkyWest's argument regarding whether it offered Cassell a reasonable accommodation are disputed and not ripe for resolution on summary judgment.

**c. The trier-of-fact could conclude that SkyWest did not rehire Cassell to avoid accommodating his religious beliefs**

Moreover, a trier-of-fact could find that SkyWest refused to rehire Cassell in 2017 not because he had rejected the 2016 accommodation or was demanding a guarantee of no Sabbath work, but rather to avoid having to provide him with any accommodation whatsoever. Glassey rejected Cassell's 2017 application without waiting for Cassell's letter or before talking with Bryant, or anyone else, about the situation, or even considering whether an accommodation might be possible or even had been offered. *AMF ¶26*. Rather,

upon reading the interview notes Glassey immediately and unilaterally rejected Cassell's application, claiming that Cassell was unable to meet the schedule SkyWest was hiring pilots for. *AMF ¶28*. And when Glassey finally did read Cassell's letter, he claimed that Cassell had missed the core issue – that he would work on the Sabbath if he could not utilize the "tools" to avoid the assignment. For Glassey because Cassell would not guarantee to work on the Sabbath in violation of his religious beliefs, he was being insubordinate. *AMD ¶27*. Glassey's actions and comments evidence a clear animus towards Cassell for even requesting an accommodation and show that SkyWest chose to not hire Cassell in 2017 to avoid having to deal with a pilot who might need an accommodation. As the Supreme Court concluded, if "the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer violated Title VII." *Abercrombie & Fitch,* 575 U.S. at 773-74. Because the motivation behind SkyWest's refusal to rehire Cassell is at issue, summary judgment on Cassell's Failure to Hire claim (Count I in the Complaint) should not be granted.

## III. THE 2016 ACCOMMODATION WOULD NOT HAVE CAUSED AN UNDUE HARDSHIP FOR SKYWEST

SkyWest also argues that if had provided Cassell with the 2016 accommodation it eventually would have suffered an undue hardship. *Def. Mot*. pp 30-1. This, argues SkyWest, was because the 2016 accommodation really would not have eliminated every Sabbath conflict and therefore Cassell would have resigned rather than violate the Sabbath. SkyWest then would have incurred, needlessly, the cost of training a new pilot. SkyWest

argues that Cassell would have been forced to work on the Sabbath based on two set of facts: 1) the data show that even the two Seventh-day Adventist pilots who tried to avoid working on the Sabbath, Steve Horne and Michael Wahlen, were required to do so; and 2) a survey it conducted of 100 new pilots shows that every pilot worked on the Sabbath. *Id.* Neither argument is persuasive as the actual data show that it would have been possible for Cassell to avoid working on the Sabbath using the tools set forth in the 2016 accommodation. However, SkyWest's argument of undue hardship fails for an even more fundamental reason. SkyWest goes to some length to argue that the 2016 accommodation it offered to Cassell was reasonable and that swapping, trading, and dropping of shifts would have afforded him the necessary accommodation. *Def. Mot*. pp 22-4. Having so argued, SkyWest is precluded from now arguing that offering the same accommodation to Cassell in 2017 would have constituted an undue hardship:

> The employer violates the statute unless it "demonstrates that [it] is unable to reasonably accommodate ... an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Thus, where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship. As *Hardison* illustrates, the extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship.

*Ansonia Bd. Of Educ. v. Philbrook*, 479 U.S. 60, 68-9 (1986); *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013).

In addition, the evidence SkyWest relies on to argue that Cassell would have been forced to work on the Sabbath actually shows the opposite. First, SkyWest's contention that Wahlen and Horne were forced to work on the Sabbath (and therefore Cassell would have as well) is simply wrong. SkyWest's argument is based on a document it produced during discovery which is bates numbered *RSOF* ¶*7*. However, calendars for the dates referenced in that document prove that the flights SkyWest show occurring on Friday and Saturday actually occurred on Wednesday and Thursday. *Id.* This "error" is confirmed by the complete flight histories for Wahlen and Horne that SkyWest created and produced immediately after producing the above reference document. The complete flight histories are Bates numbered *SkyWest 002124-2444 (RSOF* ¶*7)*. Quite bluntly, SkyWest knew, or should have known, that its day-of-the-week calculations were in error and by extension, should not have made the argument it did.

When the correct days of the week are assigned, the actual data show that Wahlen and Horne were successful in not working on the Sabbath. *RSOF* ¶*7*. Wahlen, who started working a few months before Cassell would have started (if he had been hired) and was also assigned to Detroit as a FO on the CRJ airplane, has <u>never</u> worked on the Sabbath. As he states in his declaration, Wahlen only held the reserve assignment for three weeks and during that time was not required to work on the Sabbath. By his second month Wahlen was able to start bidding a line (a set group of flights and trips for the month) and was largely able to avoid Sabbath assignment. When he could not bid out of a Sabbath flight,

Wahlen was able to trade it away by posting it on the trade or . Within roughly six months he had enough seniority that he could avoid all Sabbath conflicts through the bidding process and did not need to trade flights with another pilot. AMF ¶18.

Horne's ability to largely avoid Sabbath flights shows that Wahlen's experience was neither unique nor a fluke. When Horne was hired by SkyWest he did fly on a few Sabbaths. However, in 2011 he became more committed (or recommitted) to the teachings of the Seventh-day Adventist Church and thereafter made a conscious and determined effort to avoid working on the Sabbath. *RSOF* ¶*7*; AMF ¶¶2-3. From then on, the times Horne was required to work on the Sabbath were in unforeseen situations such as when a flight was delayed or the like. *Id.*[11] Significantly, the times after 2011 that Horne did fly on the Sabbath it was for the same reasons that Cassell stated, in his 2017 letter, he would fly on the Sabbath.

The new pilot survey relied upon by SkyWest also does not show that Cassell would have been forced to work on the Sabbath. It is not disputed that SkyWest's survey shows 100 new pilots working on at least one Saturday.[12] However, the survey was based on flight records and the surveyor did not determine whether any of the 100 pilots tried to avoid working on the Sabbath (as Cassell would have). This is significant because as Cassell

[11] There was one situation in the summer of 2011 when Horne was required to work on Sabbath and was disciplined for not doing so. He addressed this issue by changing to a different domicile where he had more seniority and could for a line that did not include Sabbath flights.

[12] The survey apparently looked at Saturday flights as opposed to looking at flights during the Sabbath.

testified, new pilots generally wanted to get as many flight hours as possible so they could quickly upgrade from First Officer to Captain. Because SkyWest experienced a higher rate of absences on the weekend, a junior pilot who wanted more hours and did not care if he/she flew on the Sabbath would very likely choose Saturday flights. *RSOF ¶38.*

In addition, the new pilot survey did not focus on Detroit (where Cassell would have been assigned) and was for a period before 2017. This was significant because a new pilot assigned to Detroit in 2017 would have gained seniority for bidding purposes very quickly. Detroit was a less favored domicile which meant senior pilots tended to move to another domicile as soon as possible. In addition, the Detroit domicile was adding new flights in 2017, which required SkyWest to assign many new pilots there once they completed training. These two factors meant that a new pilot in Detroit quickly moved up the seniority list and in short order could bid on, and be assigned, the schedule they wanted. *RSOF ¶38.* Wahlen is a good example of this as he was able to bid out of all Sabbath work within a few months. *AMF ¶18.* Accordingly, the survey was neither an accurate predictor of how long it would have taken a Detroit-based Cassell to bid out of all Sabbath work nor whether he would have been forced to work on the Sabbath.

In sum, the facts SkyWest relies upon to claim an undue hardship are disputed. SkyWest's own records show the success that Wahlen and Horne had in avoiding Sabbath flights. Nor has it presented any evidence that Cassell would have been less successful than Wahlen or Horne in avoiding Sabbath work. And the survey that SkyWest relies upon in

support of its argument is less than conclusive on the issue of whether Cassell would have flown on the Sabbath. Accordingly, the trier-of-fact could find that SkyWest incorrectly concluded that Cassell would have been required to fly on the Sabbath if he was hired in 2017. And because of this, the trier-of-fact could conclude that Cassell would not have been forced to resign and SkyWest would not have incurred an undue hardship by being required to hire a new pilot. The Court in *Toledo v. Nobel-Sysco, Inc*., 892 F.2 1481, 1489-90 (10th Cir. 1989) stated that it was "skeptical of hypothetical hardships." This is clearly the case here. Whether hiring Cassell in 2017 and affording him the 2016 accommodations would have caused an undue hardship for SkyWest is not resolvable on summary judgment.

## IV. IT IS ALSO A FACT QUESTION WHETHER SKYWEST WOULD HAVE SUFFERED UNDUE HARDSHIP IF IT COVERED FOR CASSELL ON THE SABBATH.

SkyWest also argues that if it had been required to cover a few Sabbath flights for Cassell (either because the 2016 accommodation had not eliminated all such conflicts, or because it had guaranteed him a Sabbath free schedule as it falsely claims he was demanding – see **Argument II**) it would have caused an undue hardship by forcing more senior pilots to take a "back seat to Cassell" in violation of the seniority bidding system.[13] *Def. Mot.* pp. 25-6, 29-30. SkyWest presents no evidence or facts, however, to show that

[13] If the Court agrees that there are triable issues of fact as set forth in **Arguments II** and **III,** it need not reach the arguments set forth in this section and the next (**Argument V**). However, the factual disputes over whether covering Sabbath flights for Cassell might have caused an undue hardship and violated what SkyWest refers to as the CBA are additional reasons why summary judgment should be denied.

occasionally assigning other pilots to cover for Cassell would disrupt the seniority system by requiring more senior pilots to cover for him. Rather, it just assumes that would be the case.

In actuality, the facts are such that the jury could conclude that "covering" for Cassell would have no more disrupted or violated the seniority system than when SkyWest had to cover for pilots for other reasons. On any given Friday and Saturday from 2017-2019, just in Detroit, between roughly 10 and 20 First Officers qualified on the CRJ (as Cassell would have been) were unable to take their assigned flights. *AMF ¶32*. The reasons for these absences varied – from such things as a pilot being sick, or fatigued, off on family or military leave, an emergency or an on-the-job injury. As Glassey testified, on average for one reason or another, every pilot missed 5.3 days of assigned flights per year. *AMF ¶31.* In other words, the need to fill in, or cover, for pilots who could not take, or had missed, a flight was an ongoing and regular occurrence that SkyWest had to plan for if it were to maintain its flight schedules.

SkyWest used a multi-layered approach to making sure that all flights were covered. First, SkyWest had an elaborate post-bid process where pilots who knew they would be absent or unavailable could post that flight on Open Time, so that other pilots could pick it up (if they wanted more flight hours) or could trade the flight for one they had been assigned. *RSOF ¶¶5, 31, 32 and AMF ¶42.* In addition, pilots were allowed to swap one of their own flights for another flight if it was available. This post-bid system was used

extensively and consistently. For example, just among First Officers in Detroit trained on the CRJ, in October of 2017 some 1690 flights were posted on the SkedPlus+ system and 522 flights were traded among First Officers. *RSOF ¶5, AMF ¶45.* Importantly, trades, swaps, or drops were approved unless it caused the level of reserve pilots to fall below operational minimums. *RSOF ¶32*.

SkyWest had additional ways to cover flights when a pilot could not take his/her assigned flight. As discussed by Spencer, head of Crew Support, if a pilot called in sick for example, Crew Support would first try to find a pilot who was already working and switch their route to accommodate the sick pilot. This was referred to as "reflowing" a pilot. *AMF ¶33*. Additionally, on any given day SkyWest assigned about 18% of pilots to one of three classes of reserve status so that they could fill in for pilots who were absent. *AMF ¶¶35,* 37. SkyWest also staffed each domicile with additional reserve pilots on the weekends to cover for anticipated call offs. *AMF* ¶36. In Detroit this meant some 30 to 50 FO officers were on reserve duty every weekend day to cover for other pilots. *AMF* ¶37, *RSOF ¶54.* Some of those reserve pilots covered for pilots flying out of Detroit while others were sent to other domiciles to cover for pilots there. *RSOF ¶54*. While the majority of Detroit FO reserve pilots were given flights, the data from SkyWest show that from mid-2017 through the end of 2019 on every Friday to Sunday, SkyWest had reserve FO pilots in Detroit who were not used, and who could have filled in for other pilots, including presumably, filling in for someone who needed a religious accommodation. *AMF* ¶¶39-40, *RSOF ¶54*. In short,

the use of reserve pilots, under the facts of this case would not have created an undue hardship for SkyWest. See for example *Antoine v. First Student, Inc.*, 713 F.3d 824, 840 (5th Cir. 2014.) (Finding that use of swaps and replacement drivers if allowed under the CBA might not constitute an undue hardship).

This multi-layered system for covering for absent pilots operated within the parameters of the seniority system. In fact, pilots picked up flights from Open Time on a first come first serve basis, without regard to seniority. And the use of reserve pilots was not considered a violation of the seniority system. Indeed, SkyWest has presented no evidence to show that the seniority status or rank of a pilot was even considered when a reserve pilot was assigned to cover a flight. Under these circumstances, the trier-of-fact could conclude that if SkyWest had to cover for Cassell on a few Sabbaths during his first six or so months of employment, it would have been no different than covering for pilots who were absent for other reasons. And would not have disrupted or violated the seniority system because SkyWest's data show that at on all weekends during 2017-2019, SkyWest had more than enough to cover for Cassell without having to have additional pilots on duty. *RSOF* ¶*54.* Although an employer incurs an undue hardship "if it must bear more than a de minimus cost" (*Tabura v. Kellogg USA*, 880 F.3d 544, 557 (10th Cir. 2018)) to provide the accommodation,[14] the evidence strongly supports the conclusion that even if SkyWest

[14] It is Cassell's position that the *de minimis* standard set out in its *Hardison* needs to be revisited and intends to ask the Supreme Court to do so if this Court and the 10th Circuit Court of Appeals were to find for the defendant under that standard. *See Patterson v. Walgreen, Co*, 140 S.Ct. 685

had been required to cover for Cassell on a few Sabbaths, it would not have created an undue hardship. In the least, there is a material dispute as to whether accommodating Cassell if he had been absent on a Sabbath would have violated the seniority system thereby causing an undue hardship for SkyWest.

## V. WHETHER THE CBA WOULD HAVE BEEN VIOLATED IS ALSO DISPUTED

### a. It is dispute whether bidding is covered under the Pilot Policy Manual

SkyWest also argues that because providing Cassell with an accommodation would violate the seniority system it would also be in breach of the CBA, because bidding by seniority was mandated by the CBA. This, argues SkyWest, would constitute another undue hardship.[15] *Def. Mot.*, pp. 25-6, 29-30. According to SkyWest, the seniority system is "reflected in SkyWest's Pilot Policy Manual" and the Pilot Policy Manual is a CBA between SkyWest and SkyWest Airlines Pilot Association ("SAPA"). *RSOF* ¶¶15-16. This argument is unavailing first for the reasons set forth in *Argument IV* – providing occasional Sabbath coverage for Cassell would not violate the seniority system (and therefore not violate the CBA either.) However, if it is assumed, *arguendo*, that such coverage would

---

(Mem) 2020 ("As the Solicitor General observes, *Hardison*'s reading does not represent the most likely interpretation of the statutory term 'undue hardship…' I thus agree with the Solicitor General that we should grant review in an appropriate case to consider whether *Hardison*'s interpretation should be overruled.")

[15]Cassell does not challenge SkyWest's assertion that an accommodation which requires the employer to violate a CBA may constitute an undue hardship.

have violated the seniority system, a jury still could conclude that there has been no CBA violation because bidding is not covered in the Pilot Policy Manual.

SkyWest contends that the Pilot Policy Manual constitutes a CBA and reflects the seniority system and the bidding process at (which is a policy labeled "Seniority – Standard Practice 3021.") *RSOF ¶15*. This contention is strongly disputed. Standard Practice 3021 primarily addresses the mechanics of the seniority system - how seniority is assigned and when it is forfeited (Part 1.A.(1)); how pilots who transfer in are assigned seniority (Part 1.A.(8)); when seniority lists are posted (Part 2.A.); and how pilots can challenge seniority assignments. (Part 3.A.). However, the one subsection that lists when seniority applies does not mention bidding by pilots:

> 1.A.3. Except as otherwise provided in this policy manual, seniority will govern pilots in the case of upgrade, displacement, filling of vacancies, furlough, recall, or assignment due to expansion or reduction in schedules.

*RSOF ¶15, spec. SkyWest 000529*.

Instead, seniority as it applies to bidding is addressed in a separate manual titled the "Company Policy Manual" which contains a number of what are called "Standard Practices." (*SkyWest 000112-299*). Standard Practice 64, titled "Seniority," specifically address bidding and seniority:

> 3.A. Bidding seniority is defined as the first day of continuous employment in a specific job classification. Bidding seniority is used for determining an employee's shift, workweek, area of work and <u>line preference</u>. Preference on domicile transfers is also given on the basis of bidding seniority. Bidding seniority is determined, maintained, and administered by each department for the job classifications in their area of responsibility.

*(RSOF ¶19, spec. SkyWest 000150 – emphasis added)*

The reference to "line preference" is key. As explained by Spencer, manager of Crew Support, a "line" is made up of a series of flights, which are referred to as a pairing, that a pilot will fly that month. A line (which is put together by Crew Support) is what a pilot bids on and is awarded monthly. *AMF ¶30*. In short, it is the Company Policy Manual which specifically references pilot bidding for flights and not the Pilot's Policy Manual. Accordingly, the trier-of-fact could (and probably should) conclude that seniority as it pertains to bidding is not mandated or established by the Pilot's Policy Manual, which SkyWest refers to as the CBA.

This is significant because SkyWest has reserved the right to make changes in the Company Policy Manual as it sees fit:

> Policies set forth in the SkyWest Airlines Company Policy and the SkyWest Airlines Employee Handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between the employer and any of its employees. The provisions of the policy and handbook have been developed at the discretion of management and <u>may be amended or cancelled at any time at the organization's sole discretion</u>. (Emphasis added)

*RSOF ¶19, spec. SkyWest 000114*, *Policy 51, ⁋ 1.B*.

In addition, SkyWest has specifically reserved the right to deviate from the seniority bidding:

> B. In cases where strict adherence to bidding seniority would be likely to have an adverse impact on the safety of operations, our customer or ability to serve our customer, management reserves the right to assign personnel as needed to insure a safe and efficient operation.

(*RSOF ¶19, spec. SkyWest 000150, Standard Practice 64, ¶3.B.*)[16]

In short, SkyWest had the discretion to assign a more senior pilot to cover for Cassell, and such an assignment would not have violated any agreement.

**b. It is questionable whether the Pilot Policy Manual is a CBA**

Finally, even if flight bidding were covered by the Pilot Policy Manual, it is not clear that the Pilot Policy Manual constitutes an enforceable CBA. SkyWest Airlines Pilot Association (SAPA), which is a signatory to that document, is not a recognized representative of the pilots as defined under Railway Labor Act, 45 U.S.C. § 151. To be a recognized representative, an entity must be certified by the National Mediation Board. SAPA has not been certified. *RSOF ¶16*. In addition, under 29 U.S.C. §402(j)(2) a duly recognized representative is required to file reports with the Department of Labor, but SAPA has not filed any such reports. *Id.* Because SAPA is not the duly recognized representative of pilots, then the policies contained in the Pilot Policy Manual are not

[16]That SkyWest had the ability to modify the seniority bidding but argues that it would not do so to accommodate Cassell's religious beliefs (if needed) is by itself evidence of discriminatory intent. In *Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868 (2021) the City had the discretion to grant a Catholic adoption agency an exception to the legal requirement that it not discriminate against individuals based on sexual orientation when placing children. Because of the presence of this provision, the Court concluded the ordinance was not generally applicable nor neutral and therefore the City could not refuse to extend the exemption to the Catholic agency without a compelling reason (meaning it was subject to strict scrutiny by the court). Granted SkyWest is not a government agency, but how *Fulton* treated the discretionary exemption is illustrative. Here, SkyWest had the discretion to modify seniority bidding, but chose not to do so (or offer to do so), to accommodate a religious belief. Accordingly, it could be argued that it was not acting in a neutral fashion but was discriminating against Cassell when it chose not to exercise that discretion.

equivalent of a CBA, which means SkyWest has the sole discretion to change them. *See International Broth. of Teamsters, Airlines Div. v. Allegiant Air, LLC, 788 F.3d 1080, 1088 (9th Cir. 2015)*. Although, for the reasons set forth in both this argument and Argument IV, the court need not reach the certification issue.

To summarize: 1) seniority as it applies to bidding is not covered in the Pilots Policy Manual which SkyWest refers to as its CBA; 2) instead it is addressed in the Company Policy Manual; and 3) SkyWest has reserved the unilateral right to modify the Company Policy Manual and deviate from strict adherence to "bidding seniority." Accordingly, a trier-of-fact could conclude that even if SkyWest had to depart or deviate from the seniority bidding to accommodate Cassell's religious beliefs (which it would not have had to do) it would be neither a violation of the CBA nor create an undue hardship.

## VI. WHETHER SKYWEST RETALIATED AGAINST CASSELL FOR ENGAGING IN PROTECTED ACTIVITY IS ALSO DISPUTED

SkyWest contends that Cassell's Third Cause of Action – for Retaliation for engaging in protected activity – should be dismissed because "Cassell has failed to provide any evidence that SkyWest was motivated by retaliatory animus in reaction to Cassell's first EEOC charge." *Def. Mot. p. 35*[17]. Instead of acting out of retaliatory motive, SkyWest claims it refused to hire Cassell because he had rejected the reasonable accommodation offered by SkyWest and demanded a complete elimination of the Sabbath conflict which

[17]Cassell acknowledges that SkyWest has correctly set forth the elements of a prima facie case retaliation under Title VII.

would have posed an undue hardship on SkyWest. *Id.*[18] As set forth in the **Argument IV** above, the reasons given by SkyWest for not hiring Cassell are disputed. Accordingly, a trier-of-fact could conclude that SkyWest did not have a legitimate non-discriminatory reason for not hiring Cassell, meaning the proffered reasons are pretextual. And if there is a factual dispute as to whether the proffered reasons are pretextual, summary judgment should be denied. *Randle v. City of Aurora*, 69 F.3d 441, 455 (10th Cir. 1995).

SkyWest also misstates or misunderstands the protected activity that is the basis of the retaliation claim. While filing a charge of discrimination is a protected activity, so is asking for an accommodation. *Foster v. Mountain Coal Company, LLC* 830 F.3d 1178, 1187 (10th Cir. 2016)(discussing an accommodation request under the ADA); *EEOC v. Jetstream*, 134 F.Supp.3d 1298, 1321-2 (D. Colo. 2015). Cassell had asked for and been granted an "accommodation" by SkyWest in 2016, and reiterated that request when in 2017 when he told the interviewer that he would use that accommodation to avoid working on the Sabbath (though he also clarified in his letter that there were circumstances under which he would work). *AMF ¶22.* It was this renewed "request" for an accommodation which caused Glassey to reject his application. As discussed at the end of **Argument II,** Glassey rejected Cassell's 2017 application out of hand, claiming that Cassell was unable to meet

---

[18]In making this argument it is not clear if SkyWest is contending that there is no causal connection between Cassell's protected activity and its decision not to hire him (the third element of the *prima facie* case) or if it is giving a non-discriminatory reason for its actions. But ultimately this is of little significance because the two are intertwined. If SkyWest had a non-retaliatory reason for not hiring Cassell (which it contends it does) then there is no causal connection between his protected activity and the non-hire decision.

the schedule SkyWest was hiring pilots for. *AMF ¶28*. Glassey's actions and comments evidence a clear animus towards Cassell for requesting an accommodation and his rejection of Cassell application can certainly be viewed as retaliation. Accordingly, a trier-of-fact could find that SkyWest refused to rehire Cassell in 2017 not just to avoid having to provide him the accommodation it had agreed to the prior year but in retaliation for Cassell having requested that accommodation in the first place.

SkyWest counters that Cassell's request for an accommodation in 2017 was not the reason for his non-hire, but rather it was because he had rejected the 2016 accommodation and demanded one that would cause undue hardship. However, as discussed above, the trier-of-fact could conclude that neither contention is true, and that SkyWest's reason for not hiring him was pretextual. Summary judgment on this claim is therefore also not appropriate. *Wells v. Colorado Dept. of Transp*., 325 F.3d 1205, 1220 (10th Cir. 2003).

## CONCLUSION

SkyWest's defense to both the failure to hire claim and the failure to accommodate claim is that Cassell rejected the terms of the 2016 accommodation and demanded a guaranteed a Sabbath free schedule, which would have caused an undue hardship. As set forth above, both contentions are in dispute. Accordingly, this Court should deny SkyWest's motion for summary judgment in its entirety.

DATED this 27th day of August, 2021.

**STRINDBERG SCHOLNICK BIRCH HALLAM HARSTAD THORNE**

*/S/ Erik Strindberg*
Erik Strindberg

**GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS**
/s/ Todd McFarland
Todd McFarland

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2021 I caused a true and correct copy of this Memorandum in Opposition to SkyWest's Corrected Motion For Summary Judgment to be served upon the following via CM/ECF:

Scott M. Peterson
Tanner Bean
Fabian Van Cott
spetersen@fabianvancott.com
tbean@fabianvancott.com

/s/ Dunja Subasic
Dunja Subasic