Scott M. Petersen, #7599
Tanner J. Bean, #17128
FABIAN VANCOTT
215 South State Street, Ste. 1200
Salt Lake City, Utah 84111-2323
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
spetersen@fabianvancott.com
tbean@fabianvancott.com
*Attorneys for Defendant SkyWest Airlines, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH - CENTRAL DIVISION**

| | |
|---|---|
| SHANE ANDREW CASSELL,<br>Plaintiff,<br>v.<br>SKYWEST, INC., d/b/a SKYWEST AIRLINES,<br>Defendant. | **REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br>Case No. 2:19-cv-00149-JNP-EJF<br>Judge Jill N. Parrish<br>Magistrate Judge Evelyn J. Furse |

Defendant SkyWest, Inc., d/b/a/ SkyWest Airlines ("SkyWest") submits the following reply memorandum in support of its motion for summary judgment. The Court should grant the motion and dismiss the complaint with prejudice.

## TABLE OF CONTENTS

TABLE OF CONTENTS .......... 2

INTRODUCTION .......... 3

STATEMENT OF FACTS .......... 4

ARGUMENT .......... 13

I. DESPITE DEMONSTRATING A PRIMA FACIE CASE, CASSELL'S CLAIMS STILL FAIL. .......... 13

A. SkyWest's Offered Accommodation Was Reasonable. .......... 14

B. Cassell Rejected SkyWest's Reasonable Accommodation. .......... 15

II. CASSELL'S SABBATH-FREE ACCOMMODATION WOULD IMPOSE AN UNDUE HARDSHIP. .......... 20

A. Requiring SkyWest to Fill Cassell's Absences with Other Employees Imposes an Undue Burden. .......... 21

B. Requiring SkyWest to Hire Cassell When He Would Not Commit to Working His Schedule Imposes an Undue Burden. .......... 22

C. A Guaranteed Sabbath-free Schedule Would Cause SkyWest to Violate Its Seniority System and Collective Bargaining Agreement. .......... 23

III. CASSELL PRESENTS NO EVIDENCE OF RETALIATION. .......... 26

CONCLUSION .......... 27

CERTIFICATE OF SERVICE .......... 28

## **INTRODUCTION**

Cassell's brief wades through hypotheticals, what-ifs, and possible futures. But it fails to come to grips with the question SkyWest has been asking Cassell from the inception of this case: If Cassell could not avoid a shift which conflicted with his Sabbath-day beliefs, even given all the tools available to Cassell through SkyWest's proffered accommodation, would he have shown up for work? Cassell's answer is "No." It was no when he was training with SkyWest in 2016, it was no when his 2017 interviewers asked him, it was no when he sent a follow up letter to SkyWest, it was no when he answered written discovery, it was no when he was deposed, and Cassell's own statements and arguments opposing this motion show that his answer is still no.

In short, Cassell wanted more than SkyWest's reasonable accommodation. He wanted a guaranteed Sabbath-free schedule. His insistence on this schedule is a rejection of SkyWest's reasonable accommodation, dooming his claims as a matter of law. Otherwise, Cassell's guaranteed Sabbath-free schedule imposes an undue hardship, as undisputed case law in the Tenth Circuit makes clear. This is of no import to Cassell, however, as he apparently intends to change the law of "undue hardship," not only within the Tenth Circuit, but nationwide. *See Opp.* at 18, n. 14. This Court lacks the authority to make this change and should therefore grant SkyWest's motion for summary judgment.

## REPLY TO STATEMENT OF FACTS[1]

SkyWest addresses its statement of facts, Cassell's response to those facts, and Cassell's additional facts in the attached table.[2] Between the 104 facts alleged by the parties, the Court need review only the 9 set forth below to dismiss Cassell's claims (SOFs 42, 45, 57 and AMFs 19, 21, 25-28). The remainder are either completely undisputed (SOFs 10, 18, 20-21, 27-28, 31, 40-41, 44, 47, 51, 58-59 and AMFs 2-4, 7, 8, 15-16, 20, 22-23, 29-31, 34, 35, 38, 42-43); are undisputed, but provide additional information (SOFs 1-5, 8, 14, 23- 26, 30, 32, 43, 46, 48-49, 50, 52-53, 55-56 and AMFs 9, 33, 36, 41, 44-45); or are immaterial because they predate the events giving rise to Cassell's claims (SOFs 9, 11-13, 29, 33- 37, 39, 49 and AMFs 1, 5-6, 10-14, 17) or because they cannot alter the fact that Cassell rejected SkyWest's reasonable accommodation (SOFs 6-7, 15-17, 19, 22, 38, 54 and AMFs 17-18, 32, 37, 39, 54).

**SOF ¶ 1:** No one at SkyWest indicated to Cassell, in writing or otherwise, that they were aware of the EEOC charge or upset with Cassell for filing it. (Cassell Dep., Ex. B, at 228:2—229:10.)

**RSOF ¶ 1:** Denied. Cassell has testified that no one at SkyWest told him that SkyWest was upset about his filing a charge. He did not discuss whether SkyWest knew about his charge. *App. Exh. 2, Cassell Dep. 228:2-229:10.* Moreover, less than a month after the EEOC told Cassell it would notify SkyWest a second time of his pending charge, SkyWest rejected Cassell's application and refused to hire him. *App. Exh. 18.*

---

[1] Despite DUCivR 56-1(g)(1) limiting Cassell's opposition brief to 40 pages or 10,000 words, Cassell filed a 65-page brief without motioning for leave to file an overlength brief according to DUCivR 7-1(e). Twenty-two pages of the brief are devoted to responding to SkyWest's facts and twelve pages are devoted to additional facts, many of which are duplicative of SkyWest's facts or are facts that Cassell himself claims to be immaterial. This substantially overlength brief has made it impossible for SkyWest's reply brief to comply with the typical word and page limit. Thus, SkyWest requests the Court apply the consequence set forth in DUCivR 7-1(e): that in the absence of any showing of good cause or exceptional circumstances, Cassell's overlength brief not be approved and the Court cease its review of the opposition at page 40 or at 10,000 words.

[2] The table continues the use of abbreviations Cassell employed in his brief. *See Opp.* at 4, n. 9.

**RRSOF ¶ 1:** Immaterial dispute. Mr. Cassell has presented no evidence that anyone at SkyWest was aware of his first charge of discrimination until the EEOC informed SkyWest. Rather, Cassell's second charge of discrimination states he discovered from the EEOC *after* his interview and follow-up phone calls with SkyWest, that SkyWest had not even viewed his first charge of discrimination. *App. Exh. 18.* SkyWest notes that *App. Exh. 18* does not establish a timeline between the date of Cassell's interview, the date of the EEOC notifying SkyWest of his first charge of discrimination, and SkyWest notifying Cassell of its decision not to rehire him. Even if it had, SkyWest disputes that temporal proximity alone is sufficient to raise an inference of retaliation.

**SOF ¶ 45:** However, Cassell expressed to his interviewers and other SkyWest personnel that he was unwilling to work any shifts falling on his Sabbath. (Ex. G, at SkyWest_000078, 85-86; Emerson Dep., Ex. H, at 119:10-23, 137:7—139:4; Roy Glassey Dep., Vol. 2, Ex. L, at 38:2-20, 39:5-11, 40:2-11; *see also* Cassell Dep., Ex. B, at 150:13-25.)

**RSOF ¶ 45:** Denied. In his June 29th letter Cassell made clear that there were circumstances under which he would fly on the Sabbath, which was communicated to SkyWest through Coy Bryant. *App. Exh. 10.* Further, the documents and deposition testimony cited by SkyWest are inapposite. Glassey never spoke or communicated with Cassell so he cannot testify as to what Cassell said or did not say to interviewers or other SkyWest personnel. Similarly, Emerson never spoke or communicated with Cassell. Emerson did correspond with Cassell's then attorney, Alan Reinach, but Reinach never said that Cassell would never work on the Sabbath. *App. Exh. 19.* Additionally, *SkyWest 00078, 85-6* (the documents cited by SkyWest) purport to be notes made by an interviewer in 2017 but they have not been verified, are not verbatim and the person entering the notes has not been identified. Finally, Cassell did not say in his deposition at page 150 that he would never work on the Sabbath. Rather, he reiterated that there were circumstances under which he would work on the Sabbath.

**RRSOF ¶ 45:** While SkyWest acknowledges that Coy Bryant and Todd Emerson did not communicate directly with Cassell, they did directly communicate with Cassell's interviewers and other SkyWest personnel reviewing his application. Further, the interview notes *do* identify

Cassell's interviewers: Troy King and Jason Cordova. (Ex. G, at SkyWest_000074; *see also* Roy Glassey Dep., Vol. 2, Ex. L, at 34:1-12.)

The notes of Cassell's interviewers stated the following: "Third interview[.] Declined once in favor of a chief pilot position at current job[.] Resigned from SkyWest training during Matrix session. Thought ground school would be 8-5 Monday through Friday. He was not able to maintain a commitment outside of this schedule[.] Has expressed unwillingness to be flexible with schedule without any acceptation [sic][.] Based on his history with SkyWest and his schedule constraints, the team has concerns of reliability[.] Has a plan for negotiation with chiefs and schedules; however this may not be realistic when it comes to reserve and junior scheduling[.] . . ." (Ex. G, at SkyWest_000078.)

After these notes were made, on June 22, 2017, Jason Cordova forwarded the notes to Ian Whiting, a flight operations employee and to Roy Glassey, director of flight operations. He asked for a "Review due to scheduling conflicts. Please see interview notes." (Ex. G, at SkyWest_000079-80, 82.) Mr. Whiting then emailed Mr. Glassey with the request, "Can you give me a call on this one when you get a moment please?" (Ex. G, at SkyWest_000079.) Additional emails were exchanged between Chandler Larsen, recruitment & hiring specialist, to Coy Bryant, Jaime Sorensen, and Monica Polad on June 26, 2017. Mr. Larsen stated that "in the interview notes they only highlight his schedules conflicts due to his religion." Ms. Polad also stated that "the main reason he was reject was because of scheduling reasons, which it says in the interview notes due to his religion." (Ex. G, at SkyWest_000081, 83-84.) An email between Mr. Larsen, Ms. Sorensen, and Rachelle Kolb, lead specialist-recruitment & hiring, on July 12, 2017, indicates the explanation for SkyWest's decision not to hire Cassell was "Candidate expressed

unwillingness to be reliable and work his awarded schedule if hired. Candidate also communicated multiple times that he would be unwilling to accommodate his schedule due to unforeseen circumstances." (Ex. G, at SkyWest_000085.) On July 19, 2017, Mr. Whiting emailed Mr. Glassey regarding Cassell, stating "Funny thing is in his interview he basically said he cannot work no matter what." (Ex. G, at SkyWest_000086.) All of these individuals have been identified as those involved in SkyWest's hiring process. (Glassey Vol. II, at Ex. L, at 34:24—35:7; *App. Exh.* 1, *Bryant Dep.*, at 56:1-6, 74:10-14.)

Cassell's dispute regarding his testimony is immaterial. Cassell was asked "if it had turned out that you had not been able to get the Sabbath off, you would not have worked it outside of it being an emergency, correct." He answered, "That is correct." (Cassell Dep., Ex. B, at 150:13-25.) SkyWest does not dispute that there are some circumstances in which Cassell's Sabbath beliefs permit him to work on his Sabbath. *See* RRSOF ¶ 2. But beyond these circumstances, and in the event that Cassell was unable to use SkyWest's accommodation tools to avoid a shift on his Sabbath, Cassell would not have worked on his Sabbath. *See* RRSOF ¶ 57 (other evidence that Cassell demanded a Sabbath-free schedule).

**SOF ¶ 57:** If SkyWest granted Cassell's requested accommodation of a guaranteed Sabbath-free work schedule, the impact on other SkyWest pilots would be extensive. Principally, it would require pilots with higher seniority to fill in for Cassell (effectively moving Cassell ahead of pilots with greater seniority) which violates SkyWest's seniority system and CBA. Additionally, Cassell's absence from the schedule would cause a domino effect, triggering the use of a reserve pilot, or, if no reserve pilot were available, requiring other pilots to come in on their days off and paying them overtime. In turn, these changes could disrupt multiple flight schedules and cause SkyWest to reschedule the staffing or occurrence of other flights. (Glassey Dep., Vol. 1, Ex. F, at 70:9—71:16.)

**RSOF ¶ 57:** Denied. While Cassell requested in 2016 that he not be assigned Sabbath shifts he agreed to the alternative accommodation offered to him by SkyWest—that he use the bidding process, and drops, trades, and swaps to avoid working on the Sabbath. This post-bidding

process did not violate SkyWest's seniority bidding process. Further, Cassell never demanded that SkyWest guarantee him a Sabbath free schedule. *See Response to paragraph 26 above, App. Exh. 16.* Additionally, as set forth in the *Declaration of Wahlen (App. Exh. 37)* the 2016 accommodation would have been sufficient for Cassell to avoid working on the Sabbath so there would have been no disruption to other pilots nor any domino effect. Further, the assertion that SkyWest might have had to call in pilots and pay them overtime, and/or disrupt flights if no other pilots were available is inaccurate. As set forth in response to paragraph 54 above, there were always CRJ reserve First Officers available in Detroit on Fridays and Saturdays who could have taken any flights that Cassell was unable to drop, trade or swap. *App. Exh. 12, Tab 9(d).*

**RRSOF ¶ 57:** Immaterial dispute. SkyWest acknowledges that the post-bidding tools of trading, swapping, and dropping shifts do not rely on SkyWest's seniority system. However, SkyWest does not concede that unless it gave Cassell seniority preferences during the bidding stage, he would have succeeded in using post-bidding tools (SkyWest's reasonable accommodation) to avoid *all* shifts on his Sabbath.

Cassell's assertion that he "never demanded that SkyWest guarantee him a Sabbath free schedule" is counter factual. From the beginning, Cassell made clear that absent an accommodation which guaranteed he would not work any Sabbath shift, he would not show up for a shift on his Sabbath absent emergency circumstances.

First, on Cassell's religious accommodation request form, he requested that he "not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown." He then indicated to SkyWest that there was no "other modification that would assist [him] in performing the essential functions of [the] job." (Ex. A, at CASSELL_001.)

Second, when SkyWest presented its memorandum of understanding to Cassell, rather than signing and accepting it in full, he signed it under protest, writing under his signature, "My signature does not relinquish my request for religious accommodation." (Ex. A, at

CASSELL_002; *see also* Cassell Dep., Ex. B, at 196:4-19.) In other words, although Cassell signed the memorandum, he still insisted on the request made on his religious accommodation request form.

Third, when Cassell was confronted with a training shift he could not avoid, Cassell resigned rather than work the shift, consistent with his unwavering Sabbath-free accommodation request. *See* SOF ¶ 37 and RRSOF ¶ 37. Fourth, in Cassell's first charge with the EEOC, he asserted that he had "filled out paperwork for a religious accommodation which was denied to me" and "I told SkyWest that I was asking for them to accommodate me *where I was not able to use the tools given to me* to attempt working outside the Sabbath hours . . ." (Ex. A, at CASSELL_013 (emphasis added).)

Fifth, when Cassell reapplied to SkyWest in 2017, he would not commit to working on his Sabbath if he was unable to use the accommodation tools to avoid it and no emergency existed. *See* RRSOF ¶ 45. Sixth, in Cassell's second charge of discrimination, he made the same statements as in his first—that he was denied his requested accommodation which was beyond what SkyWest had offered him. (Ex. A, at CASSELL_027.)

Seventh, during Cassell's deposition, he was asked "if it had turned out that you had not been able to get the Sabbath off, you would not have worked it outside of it being an emergency, correct." He answered, "That is correct." (Cassell Dep., Ex. B, at 150:13-25.) And in response to a request for admission, Cassell admitted "that if weeks before a flight date he had been assigned to a flight that started on the Sabbath, he would not have taken the flight," absent "unforeseen circumstances under which he would have been willing to fly on the Sabbath . . ." *See* SOF ¶ 52 and RSOF ¶ 52.

Eighth, Cassell's own arguments and responses to statements of fact in its opposition to SkyWest's motion to dismiss demonstrate Cassell would not work if he failed to successfully use the accommodation tools and no emergency existed (even though Cassell tries to contradict this fact elsewhere in the Opposition). *See Opp.* at ii ("Cassell . . . would not guarantee that, if needed, he would fly on the Sabbath in violation of his strongly held religious beliefs."), iv ("Cassell refused to pledge to work on the Sabbath if scheduled"), RSOF ¶ 46 ("Admitted [that] . . . SkyWest . . . would have hired [Cassell] if he had said he would take a flight on the Sabbath if he could not avoid working using the preferential bidding system and the other 'tools' available to him."), RSOF ¶ 56 ("Admitted that Cassell testified that if he was assigned a ready reserve shift on the Sabbath he would try to trade, drop it, or pick up another shift but if he had been unable to do so he would not have worked on the Sabbath."), 4 ("SkyWest chose not to hire Cassell in 2017 because it believed that Cassell's religious beliefs conflicted with what SkyWest viewed as an absolute job requirement—flying on the Sabbath if assigned."), 4 ("it was essential that Cassell agree in writing that if he could not use the tools given to him by SkyWest to avoid Sabbath work, he would work on the Sabbath . . . And because Cassell failed to do so, this meant (for Glassey) that Cassell would not be able to comply with all job requirements."), 10 ("when Glassey finally did read Cassell's letter, he claimed that Cassell had missed the core issue—that he would work on the Sabbath if he could not utilize the 'tools' to avoid the assignment.").

**AMF ¶ 19:** Because Wahlen was successful in completing training and having a flight schedule that did not conflict with the Sabbath, and following the suggestions of Whicker and Bryant, Cassell reapplied to SkyWest in the summer of 2017. *App. Exh. 2, Cassell Dep. 141:20-142:23.*

**RAMF ¶ 19:** Admitted in part and denied in part. Admitted that Cassell reapplied to SkyWest on June 12, 2017. This fact is substantially the same as SOF ¶ 40 and should be considered together.

Denied that the cited evidence indicates Cassell reapplied because of Mr. Wahlen's success or the suggestions of Mr. Whicker or Mr. Bryant, although this dispute is ultimately immaterial.

**AMF ¶ 21:** Bryant called the pilot recruiter and told him that the training conflict Cassell had in 2016 no longer existed because of the time change. Bryant also told the recruiter that it would be good to have Cassell go through training and begin to work as a pilot to see if the "tools available to him" would allow him to avoid Sabbath flights. Bryant also told Larsen, another recruiter, that Cassell might be able to make his schedule work and that SkyWest could not discriminate based on religion. *App. Exh. 1, Bryant Dep. 56:19-59:25; App. Exh. 27.*

**RAMF ¶ 21:** Admitted in part and denied in part. Denied that Mr. Bryant testified that Cassell might be able to make his schedule work. He testified only that he wanted SkyWest to give an individual like Cassell a chance to see if the schedule would work. *App. Exh. 1, Bryant Dep. 58:5-13, 59:14-25.* This was the case even though Mr. Bryant testified he had never seen someone with "a specific scheduling conflict" like Cassell successfully make it through training. Everybody he had seen with a conflict "had washed out or resigned before they completed training." *App. Exh. 1, Bryant Dep. 57:8-25, 58:5-13.* Otherwise, admitted.

**AMF ¶ 25:** Bryant sent copies of the letter to Glassey, SkyWest's Chief pilot, Whicker, and several other persons in Employee Relations. Bryant sent the letter to Glassey with a cover email that reads "[b]ased on the attached email Employee Relations recommends we allow Shane Cassell an opportunity. Certainly it is your call." *App. Exh. 1, Bryant Dep. 68:20-72:4; App. Exh. 29.*

**RAMF ¶ 25:** Undisputed.

**AMF ¶ 26:** Before receiving Cassell's letter, Glassey was asked to review the interview notes which had been entered into the "hiring dashboard." The 2017 interview notes read in part "Has expressed unwillingness to be flexible with schedule without any acception [sic]" and "the team has concerns of reliability." Glassey did not review anything else, nor did he talk with Cassell. *App. Exh. 30; App. Exh. 6, Glassey Dep. Vol II, 33:21-40:11.*

**RAMF ¶ 26:** Undisputed. This fact is substantially related to SOF and RRSOF ¶ 45. They should be considered together.

**AMF ¶ 27:** Based on these notes alone, Glassey decided that Cassell was unable to "accommodate the schedule we were hiring pilots for" and that because he was "inflexible" (according to the notes) "he stated his insubordination before he even started." *App. Exh. 6, Glassey Dep. Vol II 37:25-38:20, 48:9-13; App. Exh. 5, Glassey Dep. Vol. I 59:5-23* (*stating that pilot who refused to fly for religious reasons (but were otherwise able to do so) would be considered insubordinate.)*

**RAMF ¶ 27:** Undisputed. Mr. Glassey's testimony indicates that his decision, based upon the interview notes alone, was not based upon Cassell's religion, but upon Cassell's inability to commit to the necessary schedule. *App. Exh. 6, Glassey Dep. Vol II 37:25-40:11.* Mr. Glassey maintained that decision after receiving a follow-up letter from Cassell, which Mr. Glassey testified missed the "core issue" of whether Cassell would work a Sabbath shift in the event Cassell could not use SkyWest's accommodation to avoid it. *App. Exh. 6, Glassey Dep. Vol II 45:16—48:21.*

Additionally, SkyWest notes that Mr. Glassey's specific testimony regarding the last citation to his deposition reads: "I would consider the pilot's refusal to fly if . . . they are able to fly but just unwilling and outside of our requirements and there's no accommodation, I would consider that refusal to fly, and that would be an unexcused absence for whatever reason. They don't have an accommodation not to fly. So they're able, they're just unwilling. So that is treated consistently." *Glassey Dep. Vol. I 59:15-23.*

This fact is substantially related to SOF ¶ 45 and RRSOF ¶ 45. They should be considered together.

**AMF No. 28:** After reviewing the file Glassey told HR to reject (or regret according to SkyWest's terminology) Cassell's application. *App. Exh. 6, Glassey Dep. Vol II 25-43:3.*

**RAMF No. 28:** Undisputed.

## ARGUMENT

The Court need answer only one question to resolve this case: did Cassell reject SkyWest's reasonable accommodation? The undisputed evidence says "Yes," despite Cassell's contrary arguments. Cassell was not willing to work if the tools offered by SkyWest did not guarantee him a Sabbath-free schedule. Thus, SkyWest did not hire him. This alone is sufficient to dismiss Cassell's Complaint.

Moreover, the facts show that guaranteeing Cassell a Sabbath-free schedule would violate SkyWest's seniority system, its collective bargaining agreement, and impose a heavy financial burden on SkyWest, all evidence of undue hardship. The Court should grant SkyWest's motion.

### I. DESPITE DEMONSTRATING A PRIMA FACIE CASE, CASSELL'S CLAIMS STILL FAIL.

SkyWest admits Cassell demonstrates a prima facie case of failure to accommodate or hire. *Opening Br.*, at 22, 32. However, his claims still fail because (1) SkyWest "provided a reasonable accommodation for [Cassell's] religious practice" that Cassell rejected and (2) SkyWest could not offer the accommodation Cassell demanded "without undue hardship." *Tabura v. Kellogg USA*, 880 F.3d 544, 550 (10th Cir. 2018).[3]

"Once [an] employer has provided a reasonable accommodation, it need not further show that each of the employee's alternative accommodations would result in undue hardship." *Tabura*, 880 F.3d at 551; *see also Opp.* at 11, citing *Ansonia Bd. Of Educ. v. Philbrook*, 479 U.S.

---

[3] Cassell admits his claims relate only to his 2017 rehiring exchange with SkyWest. Thus, his 2015 application, his 2016 hiring, training, and resignation, and even his first discrimination charge with the EEOC are not at issue, though they provide relevant background regarding SkyWest's reasonable accommodation and Cassell's rejection of it in 2017. *See Opp.* at xi (RSOF ¶ 9), xii (RSOF ¶ 14); RRSOF ¶ 39.

60, 68-9 (1986) ("where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship").

**A. SkyWest's Offered Accommodation Was Reasonable.**

Cassell admits the accommodation SkyWest offered him in 2016 was reasonable. *Opp.* at 7, n. 10. The reasonableness of SkyWest's accommodation was explained at length in its opening brief, pp. 22-25, 28-29, none of which Cassell refutes. Moreover, this is the same accommodation SkyWest offered to give Cassell in 2017.[4] Thus, all the Court must determine is whether Cassell accepted or rejected the offered accommodation in 2017.

Cassell argues that "an accommodation will not be reasonable if it only provides [the employee] an opportunity to avoid working on some, but not all, Saturdays." *Opp.* at 2 (quoting *Tabura*, 880 F.3d at 550). This is not the law in the Tenth Circuit. In fact, the Tenth Circuit in *Tabura* stated the opposite: to "be reasonable, an accommodation need not provide a 'total' accommodation; that is, [an employer] is not required to guarantee [an employee] will never be scheduled for a Saturday shift." *Tabura*, 880 F.3d at 550; *id.* at 553 ("we see no need to adopt a per se rule requiring that an accommodation, to be reasonable, must eliminate, or totally eliminate, or completely eliminate, any conflict between an employee's religious practice and his work requirements").

In *Tabura*, the employer allowed Seventh-day Adventist employees to use their vacation and other paid time off to avoid shifts on their Sabbath, as well as the ability to swap shifts with

---

[4] For example, Mr. Wahlen, another Seventh-day Adventist who began as a pilot at SkyWest after Cassell resigned, received an accommodation identical to the accommodation SkyWest offered to Cassell in 2016. *See* RRSOF ¶ 7.

other employees. *Tabura*, 880 F.3d at 555. The court found that even using all their time off, the employees would need to rely on shift swaps for their remaining Saturday shifts and there was a dispute of material fact as to whether the shift swapping system afforded the employees a *genuine opportunity* to avoid the shifts on their Sabbath. *Id.* at 555-57 (emphasis added). Because of this, the court found the employer was not entitled to summary judgment. *Id.* at 557.

The correct reading of *Tabura* is critical to this case. It undergirds the sufficiency of SkyWest's reasonable accommodation. Unlike *Tabura*, SkyWest provided Cassell the *opportunity* to avoid every shift he might have scheduled on his Sabbath, had he simply agreed to work if he could not get his schedule changed. Cassell rejected SkyWest's accommodation.

**B. Cassell Rejected SkyWest's Reasonable Accommodation.**

Cassell claims that while SkyWest offered him the accommodation in 2016, it did not offer it in 2017. This argument is contradicted by the evidence. Throughout Cassell's rehiring process in 2017, SkyWest's central concern was whether Cassell would agree to its accommodation, understanding that it would not guarantee him a Sabbath-free schedule. *See* RRSOF ¶¶ 45, 46. Because he would not agree to the accommodation—i.e., assure SkyWest he would work a shift on his Sabbath if he could not avoid it—he was not rehired. *See* SOF, RSOF, and RRSOF ¶ 46.

Alternatively, Cassell argues he did not reject SkyWest's accommodation, but accepted the accommodation in 2016 and then resigned intending to accept it on rehire in 2017. Additionally, Cassell now claims, for the first time, that he never demanded a Sabbath-free schedule from SkyWest, implying that he would have worked a shift on his Sabbath if he could not avoid it through the tools SkyWest provided him through the accommodation. *Opp.* at 5-9.

This assertion is untrue, for had this been the case, SkyWest would have hired Cassell in 2017. *See* SOF, RSOF, and RRSOF ¶ 46. In truth, as multiple pieces of evidence demonstrate, Cassell made clear that if he were scheduled on a Sabbath, and he could not successfully get his schedule changed, he would not report for work.

First, on Cassell's 2016 religious accommodation request form, he requested that he "not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown." He then indicated to SkyWest that there was no "other modification that would assist [him] in performing the essential functions of [the] job." *See* SOF and RSOF ¶ 24; RRSOF ¶ 57.

Second, when SkyWest presented its memorandum of understanding to Cassell, rather than signing and accepting it in full, he signed it under protest, writing under his signature, "My signature does not relinquish my request for religious accommodation." RRSOF ¶¶ 9, 57. In other words, although Cassell signed the memorandum, he still insisted on the request for a Sabbath-free schedule made on his religious accommodation request form.

Third, when confronted with a training shift he could not avoid in 2016, Cassell resigned rather than work the shift, consistent with his unwavering Sabbath-free accommodation request. RRSOF ¶ 57.

Fourth, although Cassell tries to paint his resignation as part of a plan to later avail himself of the accommodation upon rehire, the fact that he then proceeded to file a charge of discrimination with the EEOC is, itself, evidence that he did not accept SkyWest's accommodation. Cassell's first EEOC charge asserts that he had "filled out paperwork for a religious accommodation which was *denied to me*" and "I told SkyWest that I was asking for

them to accommodate me *where I was not able to use the tools given to me* to attempt working outside the Sabbath hours . . ." *Id.* (emphasis added). Both statements make clear that Cassell did not accept SkyWest's offered accommodation as something that would suffice upon rehire.

Fifth, when Cassell reapplied to SkyWest in 2017, he would not commit to working on his Sabbath if he was unable to use the accommodation tools to avoid it and no exception to his Sabbath beliefs applied. *See* RRSOF ¶¶ 45, 57. This was SkyWest's principal concern during Cassell's 2017 rehiring process. *See* RRSOF ¶ 46. Although Cassell did send SkyWest a letter in which he stated that he "realize[d] that SkyWest cannot guarantee that I will be provided a schedule that will always allow me to observe my beliefs," the letter does not contain a commitment to work a shift on his Sabbath should that likely event occur. *See* SOF ¶ 44; RSOF and RRSOF ¶ 45. He only committed to do so if an exception to his belief about not working on his Sabbath applied. *Id.* Otherwise, there was no commitment to work.

Additionally, Cassell's 2017 interviewers documented Cassell's refusal to commit to a shift on his Sabbath. They stated that Cassell "was not able to maintain a commitment outside of this schedule[.] Has expressed unwillingness to be flexible with schedule without any acceptation [sic][.] Based on his history with SkyWest and his schedule constraints, the team has concerns of reliability[.] Has a plan for negotiation with chiefs and schedules; however this may not be realistic when it comes to reserve and junior scheduling[.] . . ." *See* RRSOF ¶ 57. The interviewers reported to SkyWest's human resources department that in Cassell's "interview he basically said he cannot work no matter what." *Id.* Ultimately, the reasoning for not hiring Cassell was recorded as "Candidate expressed unwillingness to be reliable and work his awarded

schedule if hired. Candidate also communicated multiple times that he would be unwilling to accommodate his schedule due to unforeseen circumstances." *Id.*

Despite this evidence, Cassell argues SkyWest's reason for not rehiring him was to avoid providing any accommodation. He claims Mr. Glassey, by relying on interview notes and not changing his mind after receiving Cassell's letter, was motivated by religious animus when he declined to rehire Cassell. *Opp.* at 9-10. The evidence belies this conclusion. No evidence shows any animus. To the contrary, SkyWest offers literally the same accommodation it offered to Cassell in 2016 and 2017 to every pilot it employs, regardless of whether they have a religious need, *See* SOF and RSOF ¶ 26, so SkyWest had no motivation to avoid providing a reasonable accommodation.

Additionally, that Mr. Glassey made his decision not to rehire Cassell based upon the interview notes and associated documents that he reviewed does not indicate animus. From his review of the notes, Mr. Glassey concluded "it was quite clear that there was a schedule—the applicant was unable to accommodate the schedule that we were hiring pilots for." This was because Cassell "expressed that he would—he had scheduling limitations that he would be inflexible on." This "stated his insubordination before he even started." *See* AMF and RAMF ¶ 27. Thus, Mr. Glassey was simply evaluating whether Cassell could meet the basic scheduling requirements for the position. His testimony does not indicate anything remotely related to religious animus. *Id.*

That Mr. Glassey did not change his mind after receiving Cassell's follow-up letter is no indication of animus. Mr. Glassey read Cassell's letter and correctly found the letter missed the "core issue": Cassell "did not indicate unrestricted schedule adherence." Cassell did "not state

that if I—if he bids a schedule for PBS and gets an assignment on the day he wants off, the Sabbath in this case, he does not state that he will—if he's unsuccessful in utilizing our tools, he will honor the schedule." *Id.* Mr. Glassey properly evaluated whether Cassell would commit to an essential job function. Cassell's attempt to flavor Mr. Glassey's decision otherwise, is wholly speculative and lacks evidentiary support.

Sixth, that Cassell would not accept anything less than a Sabbath-free schedule during the 2017 rehiring process is clear from the second charge of discrimination that he filed with the EEOC where he again asserted: "I told SkyWest that I was asking for them to accommodate me *where I was not able to use the tools given to me* to attempt working outside the Sabbath hours . . ." *Id.* (emphasis added).

Seventh, during Cassell's deposition, he was asked "if it had turned out that you had not been able to get the Sabbath off, you would not have worked it outside of it being an emergency, correct." He answered, "That is correct." *Id.* And in response to a request for admission, Cassell <u>admitted</u> "that if weeks before a flight date he had been assigned to a flight that started on the Sabbath, he would not have taken the flight," absent "unforeseen circumstances under which he would have been willing to fly on the Sabbath . . ." *See* SOF and RSOF ¶ 52; RRSOF ¶ 57.

Eighth, Cassell's own arguments and responses to statements of fact in his Opposition demonstrate Cassell would not work if he failed to successfully use the accommodation tools and no unforeseen circumstances existed. *See Opp.* at ii ("Cassell . . . would not guarantee that, if needed, he would fly on the Sabbath in violation of his strongly held religious beliefs."), iv ("Cassell refused to pledge to work on the Sabbath if scheduled"), RSOF ¶ 46 ("Admitted [that] . . . SkyWest . . . would have hired [Cassell] if he had said he would take a flight on the Sabbath if

he could not avoid working using the preferential bidding system and the other 'tools' available to him."), RSOF ¶ 56 ("Admitted that Cassell testified that if he was assigned a ready reserve shift on the Sabbath he would try to trade, drop it, or pick up another shift but if he had been unable to do so he would not have worked on the Sabbath."), 4 ("SkyWest chose not to hire Cassell in 2017 because it believed that Cassell's religious beliefs conflicted with what SkyWest viewed as an absolute job requirement—flying on the Sabbath if assigned."), 4 ("it was essential that Cassell agree in writing that if he could not use the tools given to him by SkyWest to avoid Sabbath work, he would work on the Sabbath . . . And because Cassell failed to do so, this meant (for Glassey) that Cassell would not be able to comply with all job requirements."), 10 ("when Glassey finally did read Cassell's letter, he claimed that Cassell had missed the core issue—that he would work on the Sabbath if he could not utilize the 'tools' to avoid the assignment.").

Cassell tries to dispute this mountain of evidence by asserting that he told SkyWest there were instances where his religious beliefs permitted him to work on the Sabbath. *See Opp.* at 8. But this avoids the question SkyWest has been asking Cassell from the start: where no exceptions to Cassell's Sabbath observance applied *and* where Cassell was unable to avoid a Sabbath shift through SkyWest's accommodation tools, would he work the shift? The undisputed answer is "No." Because SkyWest provided a reasonable accommodation that was rejected by Cassell, his claims fail and summary judgment in SkyWest's favor is warranted.

## II. CASSELL'S SABBATH-FREE ACCOMMODATION WOULD IMPOSE AN UNDUE HARDSHIP.

While SkyWest's offered accommodation is reasonable, the accommodation Cassell insisted upon—a Sabbath-free guarantee—is not. It imposes an undue hardship on SkyWest

because it would violate SkyWest's seniority system and collective bargaining agreement and impose a significant financial burden.

Cassell mischaracterizes SkyWest's position, asserting that SkyWest is claiming if it had "provided Cassell with the 2016 accommodation [SkyWest] eventually would have suffered an undue hardship." *Opp.* at 10-11. Not so. Rather, SkyWest asserts that under Cassell's requested Sabbath-free accommodation, SkyWest would suffer undue hardship. This is a key distinction that Cassell tries to muddy. SkyWest does not argue that while the 2016 accommodation was reasonable, the same accommodation in 2017 was not. *Opp.* at 11.

### A. Requiring SkyWest to Fill Cassell's Absences with Other Employees Imposes an Undue Burden.

To fulfill Cassell's Sabbath-free accommodation, other SkyWest employees would have to cover his absences if he failed to avoid a Sabbath shift. *See Opp.* at 15-19. Yet, "[a]ny cost in efficiency or wage expenditure that is more than de minimis constitutes undue hardship. The cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable due to a religious conflict can amount to undue hardship." *Tabura*, 880 F.3d at 557-58; *Equal Employment Opportunity Comm'n v. JBS USA, LLC*, 115 F. Supp. 3d 1203, 1232 (D. Colo. 2015).

Requiring SkyWest to schedule other employees to cover Cassell's absences is an undue burden, even if those employees are reserve pilots, because those pilots will be unavailable for other shifts. It reduces the number of available pilots. And without sufficient reserve pilots, SkyWest risks additional flight scheduling, delay, and potential cancellation.

Plaintiff claims SkyWest already deals with pilot absences unrelated to religious accommodation, thus Cassell's absences will not impact SkyWest. Yet "reflowing" a pilot,

flight, or pairing, can come at great cost to SkyWest, up to and including flight cancellations. *See* SOF ¶ 57. Although Cassell points to data regarding reserve pilots in the Detroit domicile as evidence that SkyWest always had enough reserve pilots to cover for Cassell, *see Opp.* at 17, the data does not actually reach that conclusion. Mr. Esplin, who pulled the data, testified that it was insufficient to conclude there were "no days" in which all reserve pilots were used. *See* RRSOF ¶ 54. He also testified that even for days on which several reserve pilots did not fly, the data does not indicate a lack of need for additional reserve pilots because the timing of the reserve shifts could mean there were still staffing gaps those reserves could not cover. *Id.* Thus, Cassell cannot assert that requiring SkyWest to provide him a substitute employee comes at no cost.

### B. Requiring SkyWest to Hire Cassell When He Would Not Commit to Working His Schedule Imposes an Undue Burden.

Despite arguing that SkyWest should cover Cassell's Sabbath absences, Cassell also argues he would not need any cover because he would *always* be able to use SkyWest's bidding, swapping, trading, and dropping tools to avoid working a shift on his Sabbath. *See Opp.* at 11-15. Cassell goes to great lengths to sketch out possible futures wherein he may avoid working every Sabbath shift, pointing to pieces of SkyWest data, criticizing others, and then attempting to analogize the experience of other Seventh-day Adventist pilots. *Id.* However, he never comes to grips with SkyWest's primary concern: working a Sabbath shift if he could not avoid it through SkyWest's tools. Cassell's consistent answer is that he will not. The law does not require SkyWest to hire a pilot that will not commit to his schedule.

And Cassell's problem-free future is not realistic anyway. At the time of Cassell's rehiring decision, SkyWest looked at 100 pilot schedules hired in the prior year. None avoided working a Saturday shift. Rather, the average Saturdays worked was 17. *See* SOF ¶ 38. Cassell

tries to discredit this study by arguing that none of the pilots were trying to avoid Saturday work, but actively sought it out. This is wholly speculative and inconsistent with the evidence. Testimony from Mr. Emerson and Cassell himself shows that senior pilots avoided weekend work and new pilots were stuck with "the bottom of the barrel." *See* RSOF and RRSOF ¶ 38. Thus, the study was a reasonable indication to SkyWest that if Cassell refused to work on his Sabbath, he would be disciplined and terminated. In turn, the study indicated to SkyWest that spending $27,000 on Cassell's rehiring would be a waste, especially as Cassell very likely would not even make it to the 1.5-year profitability mark for SkyWest pilots, *see* SOF ¶¶ 58-59, both of which impose an undue financial hardship on SkyWest.

Regarding comparable pilot experience, one of the Seventh-day Adventist pilots, Mr. Horne, who told Cassell he had never worked a shift on his Sabbath, *see* SOF ¶ 6, actually worked numerous shifts on his Sabbath, including on Sabbaths years after he declaredly became more committed to his faith. *See* SOF, RSOF and RRSOF ¶ 7. The other comparable Seventh-day Adventist pilot, Mr. Wahlen, who was hired after Cassell, does appear to have so far avoided working shifts on his Sabbath. *Id.* But both pilots have indicated that the tools SkyWest offers them—bidding, trading, swapping, and dropping—are sufficient to accommodate their religious practice. Mr. Horne never made any request for a religious accommodation. Mr. Wahlen made an accommodation request, but received the same one as Cassell rejected. *Id.*

Had Cassell simply accepted SkyWest's accommodation and agreed to work his schedule if he failed to get it changed, he would have been hired. But he refused. Requiring SkyWest to hire Cassell without that assurance imposes an undue hardship.

**C. A Guaranteed Sabbath-free Schedule Would Cause SkyWest to Violate Its Seniority System and Collective Bargaining Agreement.**

Cassell concedes that SkyWest has in place a seniority system under which Cassell would have been governed. *See* SOF and RSOF ¶¶ 5, 14-15. Cassell further concedes that violating a seniority system would amount to an undue burden. *Opp.* at 15-19. But Cassell claims the seniority system would be unaffected because he would *always* be able to use SkyWest's bidding, trading, swapping, and dropping tools, which did not relate to the seniority system, to avoid shifts on his Sabbath, and if he could not, then SkyWest's reserve pilots, which allegedly operate outside of the bidding system, could be assigned to cover his shift. *See Opp.* at 16-19. Both arguments fail as addressed above.

First, despite Cassell's arguments, it is not established that Cassell could have avoided every Sabbath shift. Thus, absent intervention by SkyWest to give him preferential seniority during bidding, SkyWest could not guarantee him a Sabbath-free schedule. Second, requiring SkyWest to use a reserve or other pilot to cover Cassell's absences imposes an undue burden. It would cause SkyWest to violate its seniority system on the front end or substitute additional employees on the back end. Both impose undue burdens.

Also, guaranteeing Cassell a Sabbath-free schedule would violate SkyWest's collective bargaining agreement ("CBA"), and thereby impose an undue burden. Cassell agrees that violation of a CBA may constitute an undue hardship. *See Opp.* at 19, n. 15. However, he argues that the CBA between SkyWest and its pilots is invalid because it was negotiated with the SkyWest Airlines Pilot Association ("SAPA"), which he claims is not a recognized labor representative under the Railway Labor Act ("RLA"). *See Opp.* at 22. Cassell provides a declaration of an attorney that states the National Mediation Board ("NMB") told her SAPA was

not certified by it and that SAPA does not have reports on record with the Department of Labor. *See* RSOF ¶ 16. This argument misapprehends the requirements of the RLA.

The RLA requires only that a labor representative "be designated by the respective parties without interference, influence, or coercion by either party." 45 U.S.C. § 152(Third); *see also* 45 U.S.C. § 151 ("The term 'representative' means any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them."); 29 C.F.R. § 1201.6 (same). The representative "need not be persons in the employ of the carrier." *Id.* In fact, NMB certification is relevant only if there is a dispute as to who the designated representative is. 45 U.S.C. § 152(Ninth); *see also* 29 C.F.R. § 1203.2; National Mediation Board, *How to Apply for Representation* (last visited Sept. 21, 2021), https://nmb.gov/NMB_Application/index.php/how-to-apply-for-representation/.

*Int'l Bhd. of Teamsters, Airlines Div. v. Allegiant Air, LLC*, 788 F.3d 1080 (9th Cir. 2015), which Cassell cites, is not inconsistent. *Teamsters* holds that "employees can 'designate' an RLA representative in two ways:" voluntary recognition of their representative or, in the event of a dispute, by petition to "the [NMD] to certify a labor representative." *Id.* at 1090-92. SkyWest has voluntarily recognized SAPA and no disputes have called for NMB certification, thus, the NMB has had no cause to certify SAPA. *See* RRSOF ¶ 16. SAPA can validly enter into a collective bargaining agreement with SkyWest. Additionally, that the DOL lacks publicly accessible reports from SAPA on its website in no way changes this analysis. Nothing in the RLA predicates representative status on the filing of any reports with the DOL.

Despite all this, Cassell attacks SkyWest's CBA by claiming the portion governing the seniority system extends only to assignment, forfeiture, transfer, posting, and challenges of

seniority, *see Opp.* at 20, and that SkyWest's bidding system is set forth outside the CBA and in the Company Policy Manual ("CPM"). Cassell's claim oversimplifies and limits the scope of SkyWest's CBA. First, the specific provision Cassell refers to in the CBA is descriptive language, not limiting language. It describes the types of subjects governed by seniority, but by its language does not intend any exhaustive list. Second, as the supplemental declaration of Aric Arnold attests, seniority in bidding is a core right jealously guarded and preserved by SAPA. Mr. Arnold, SAPA's current president, states that should SkyWest seek to modify that current system without bargaining with SAPA, SAPA would regard that modification as a material breach of its CBA with SkyWest. *See* RRSOF ¶ 16.

Regardless of where and how SkyWest's seniority system is set forth, Cassell understands it remains a SkyWest policy. *See* SOF and RSOF ¶ 15. And Cassell presents no evidence that SkyWest has ever deviated from, amended, or modified the seniority system in any way. Rather, it is clear that SAPA and its members have consistently and vigorously opposed any efforts or discussions aimed at altering, eliminating, or obtaining exceptions to the seniority system. *See* SOF and RSOF ¶ 17; RRSOF ¶ 19. Requiring SkyWest to violate its seniority system to give preferential bidding would constitute undue hardship.

## III. CASSELL PRESENTS NO EVIDENCE OF RETALIATION.

With no actual evidence of retaliation, Cassell attempts to manufacture animus to peddle his retaliation claim. His animus arguments fail to establish either a prima facie case of retaliation or pretext. For purposes of this motion, SkyWest concedes that Cassell has established

the first two elements of retaliation,[5] but he fails to demonstrate the third element—that a causal connection exists between the protected activity and SkyWest's decision not to hire him. In other words, Cassell cannot demonstrate that SkyWest's "desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 133 S. Ct. 2517, 2528, 186 L. Ed. 2d 503 (2013). Similarly, Cassell cannot show SkyWest's reason for not rehiring him was pretextual.

As discussed above, SkyWest's reason for not rehiring Cassell was that he would not commit to working a shift on his Sabbath if, after using the accommodation tools provided, he could not avoid the shift. This was *the* but-for cause of Cassell not being rehired. In fact, but for Cassell's refusal to commit, SkyWest *would have* rehired him. *See* SOF and RSOF ¶ 46.

Despite this, Cassell argues, without any evidentiary support, that Mr. Glassey's "actions and comments evidence a clear animus towards Cassell for requesting an accommodation . . ." and that Cassell's 2017 request for an accommodation "caused Glassey to reject his application." *See Opp.* at 24-25. But as discussed above in Part I, none of the evidence supports any religious animus by Mr. Glassey. To the contrary, the evidence shows that Mr. Glassey did not want to hire a pilot who would not commit to the schedule he was given. Thus, Cassell's retaliation claim should be dismissed.

## CONCLUSION

For the foregoing reasons, and those submitted in its original brief, the Court should grant SkyWest summary judgment on all Cassell's claims.

[5] First, that he engaged in protected activity (requesting an accommodation of SkyWest in 2017, see Opp. at 24) and second, that a reasonable employee would have found the challenged action (failure to hire) materially adverse.

DATED this 30th day of September 2021.

/s/ *Scott M. Petersen*
Scott M. Petersen
Tanner J. Bean
FABIAN VANCOTT
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of September 2021, I caused a true and correct copy of the foregoing **REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** to be served via the Court's filing system to the following:

Erik Strindberg
STRINDBERG & SCHOLNICK, LLC
675 East 2100 South, Suite 350
Salt Lake City, Utah 84106
erik@utahjobjustice.com

Todd R. McFarland
GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Springs, MD 20902
mcfarlandt@gc.adventist.org

*/s/ Scott M. Petersen*
Tanner J. Bean