**SkyWest's Statements of Material Fact**

| | SkyWest's Statements of Material Fact ("SOF") | Cassell's Response to SkyWest's Statements of Material Fact ("RSOF") | SkyWest's Response to Cassell's Response to SkyWest's Statements of Material Fact ("RRSOF") |
|---|---|---|---|
| 1 | Cassell is a practicing Seventh-day Adventist and sincerely holds the religious belief that one must not perform work on the Sabbath, a period lasting from Friday sundown through Saturday sundown. (Exhibit A, at CASSELL_001, 13, 16; Shane Cassell Dep., attached as Exhibit B, at 15:1-22, 16:9-12, 19:1-11, 19:23—23:9.) | Admitted. Cassell believes that no work should be performed on the Sabbath (with certain exceptions as set forth in response to the next paragraph) based on the 4th Commandment from Exodus 20 which states "On that day, you shall do not work." He has held this belief for as long as he "can remember being taught it." *App. Exh. 2, Cassell Dep. 19:6-20:12.* | No dispute. |
| 2 | For Cassell, an exception to the belief against performing work on the Sabbath exists for unforeseen circumstances, such as emergencies or when there is life in danger, especially where there is a healing element to the work. (Cassell Dep., Ex. B, at 16:9—17:8, 17:24—18:2, 167:10—168:2.) | Denied as incomplete. Cassell testified that in addition to those instances listed by SkyWest there were other circumstance under which he would work on the Sabbath:<br><br>So there was a question asked of me later on by SkyWest, would there be a situation you would be willing to work on the Sabbath. I say, yes, if there was an emergency; if someone's life was in danger; maybe there was a maintenance delay or a weather delay that caused us to get stuck at an outstation that was not a SkyWest domicile. I would be more than happy to bring that aircraft back to domicile.<br><br>*App. Exh. 2, Cassell Dep. 16:15-25.* In addition, Cassell submitted a statement to SkyWest in June of 2017, which set forth the following parameters as to when he would work on the Sabbath:<br><br>If there was an unforeseen circumstance, such as (but not necessarily limited to) a | No dispute. |

| | | | |
|---|---|---|---|
| | | maintenance delay at an outstation and my duty time is extended, I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within in my religious beliefs.<br><br>*App. Exh. 10.* | |
| 3 | Cassell determines at what time the Sabbath begins and ends by viewing a sundown calendar on his phone or on a computer. (Cassell Dep., Ex. B, at 15:23—16:8.) | Admitted—although Cassell makes clear that he was not unilaterally or arbitrarily deciding when the Sabbath began, but rather this is a process that his family and other Seventh-day Adventists use to determine when sundown occurs for their location. *App. Exh. 2, Cassell Dep. 15:23-16:8.* | No dispute. |
| 4 | Before Cassell applied for employment with SkyWest, he spent "extensive time on the phone" with individuals working at SkyWest, including at least one pilot who was also a Seventh-day Adventist. In those conversations, Cassell discussed "how the schedule was handled, from training all the way through being a line pilot." (Cassell Dep., Ex. B, at 11:17—12:2, 13:17—14:3, 26:16-20, 84:23—85:3; *December 7 Shane Cassell*, Lincoln Northside Seventhday Adventist Church (Dec. 14, 2019), https://www.youtube.com/watch?v=y6ZOdFilmzo&t=2s, attached as Exhibit C, at 4:35-5:04; Jake Whicker Dep., attached as Exhibit D, at 59:24—60:2; Declaration of | Denied. Cassell did speak with Steve Horne before he was hired by SkyWest in the fall of 2016 (hire is not at issue here—see paragraph 10 below and the Additional Material Facts (hereinafter "Additional Facts")) but SkyWest's description of what Cassell learned from his multiple conversations with Mr. Horne is incomplete. Horne also explained to Cassell how he had avoided working on the Sabbath by trading, dropping, and swapping flights, the tools which made up the 2016 accommodation. And how during training sessions he was able to avoid working on the Sabbath by picking simulator slots that did not conflict with the Sabbath and by making requests of staff not to be scheduled on the Sabbath. *App. Exh. 2, Cassell Dep. 12:2-13, 21:15-22:18, 26:16-28:8.* Additionally, after Cassell resigned from SkyWest on November 30, 2016, Cassell talked with Michael Wahlen, who had been | No dispute. Cassell's denial simply provides additional detail regarding the individuals and contents of the communications. SkyWest notes that Cassell's *App. Exh. 11* & *37* do not discuss these communications. |

| | | | |
|---|---|---|---|
| | Jake Whicker, attached as Exhibit E, at ¶¶ 6-10.) | hired by SkyWest in November 2016. Wahlen also discussed with Cassell how he avoided Sabbath work by the way he organized his bids and by dropping, trading, and swapping flights after he became a line pilot. Wahlen also told Cassell that during training he was able to make requests of the training department to not be scheduled on the Sabbath. *App. Exh. 2, Cassell Dep. 23:13-25:14; App. Exh. 11; App. Exh. 37, Dec. of Wahlen.* | |
| 5 | Through these discussions, Cassell gained an understanding that SkyWest used a seniority-based shift bidding system. (Cassell Dep., Ex. B, at 29:5—30:22; Ex. C, at 3:14-5:04.) | Admitted though incomplete. As set forth in the Additional Facts, Cassell also learned that SkyWest had a post-bid system that allowed pilots to swap, drop and trade flights and pairings after they were assigned flights through the bidding process. *App. Exh. 4, Esplin Dep. 48:11-49:11; App. Exh. 12, Tabs 11(a) & 11(b).* | No dispute. |
| 6 | Additionally, through his discussions, Cassell believed that at least two Seventh-day Adventist pilots working for SkyWest had managed to completely avoid work on the Sabbath. (Cassell Dep., Ex. B, at 12:3-9, 13:23-25, 20:13-21, 21:20—22:18 (Mr. Horne), 23:12—24:23, 50:7-13, 74:23—75:5 (Mr. Wahlen).) | Admitted. But see the response to paragraph 7. | No dispute. |
| 7 | This belief was incorrect, as both pilots had worked numerous shifts that infringed on the Sabbath. (Ex. A, at SkyWest_002050-2123.) | Denied. Exhibit G, at SkyWest_002050-2123 assigns the wrong "Day of the Week" (column 3) to the "Flight Dates" (column 2). Specifically, the flights that are shown has having taken place on Friday actually took place on Wednesday, and the flights designated as occurring on Saturday actually took place on Thursday. This can be confirmed through any number of ways, | Immaterial dispute. SkyWest acknowledges that its Exhibit G, SkyWest_002050-2123, incorrectly and mistakenly lists the days of the week as Friday and Saturday when it should be Wednesday and Thursday. SkyWest_002124-2444 (*App. Exh. 13*) contains the correct Friday and Saturday flight histories for Mr. Horne and Mr. Wahlen.<br><br>The data taken from SkyWest_002124-2444 (*App. Exh. 13*), together with sunset data (*see* |

| | | | |
|---|---|---|---|
| | | such as at the website Calculator.net, or in an Excel spreadsheet. *App. Exh. 36, Declaration of Yoko Fujioka-Matthew.*<br><br>The complete flight histories for Horne and Wahlen (also produced by SkyWest) confirm that SkyWest miscalculated the days of the week. *App. Exh. 13.* The complete flight history shows that Wahlen has <u>never</u> flown during the Sabbath by using the same "tools" offered to Cassell in 2016. The same history shows that there have been a handful of times early in his career that Horne flew on the Sabbath. However, Horne recommitted himself to the teaching of the Seventh-day Adventist Church of not working on the Sabbath towards the end of 2011. From that time forward he only flew on the Sabbath if a flight was delayed or the like. *App. Exh. 37, Wahlen Dec. ¶17; App. Exh. 38, Horne Dec. ¶3-6.* | *https://www.timeanddate.com/sun/*) for the days and locations listed on the spreadsheet indicate that Mr. Wahlen has not yet worked any shifts on Fridays or Saturdays which might infringe on his Sabbath.<br><br>The data shows that Mr. Horne, however, worked at least 12 Friday shifts which infringed on the Sabbath and at least 25 Saturday shifts that infringed on the Sabbath. These shifts were worked between 2007 and 2016. (*See* <u>Exhibit R</u>, attached to SkyWest's reply, which contains the flights Mr. Horne flew during his Sabbath. This data is drawn directly from SkyWest_002124-2444 (*App. Exh. 13*). Newly added columns to the right indicate the sunset time for the applicable departing or arriving airport.) Mr. Horne's declaration does not speak to his Sabbath shifts in 2016, even though he states that in 2011 he changed his base of operations and "had no similar events [of working on the Sabbath] after that." *See App. Exh. 38*.<br><br>However, Mr. Wahlen and Mr. Horne's track records in working Sabbath shifts is ultimately immaterial. Unlike Cassell, neither rejected SkyWest's reasonable accommodation or refused to work a Sabbath shift if they could not avoid it through the tools available to them.<br><br>There is no evidence that Mr. Horne ever made any religious accommodation request to SkyWest. In contrast, Mr. Wahlen, whose employment with SkyWest began after Cassell had resigned, did make a request for religious accommodation, which Cassell attached as Exhibit A to *App. Exh. 37*. He, just as Cassell, requested to "be allowed to not work or train during the time period of Fridays at sunset to Saturdays at sunset." SkyWest responded in identical fashion to Mr. Wahlen as it had to Cassell: with a memorandum of understanding stating that "it has been determined that we are unable to honor the specific request with work scheduling. However, as an accommodation we have provided FO Wahlen with tools to meet his religious requirements. Options include pursuit of schedule changes as defined by company and departmental resources (e.g. drop/trade shift, bid for desired work |

| | | | |
|---|---|---|---|
| | | | assignments, domicile staffing/available shifts).” Although Mr. Wahlen characterized this memorandum of understanding as “very generic and non-committal,” he recognized it did not provide the Sabbath-free schedule accommodation he had requested. Cassell provides no evidence that Mr. Wahlen signed the attached memorandum of understanding or indicated his acceptance of the accommodation in any way. *App. Exh. 37* at ¶ 5. Despite this, Mr. Wahlen continued his employment with SkyWest, operating under the same accommodation that was offered to Cassell in 2016 and 2017.<br><br>Thus, the only relevant differences between Mr. Horne, Mr. Wahlen, and Cassell is that Cassell rejected SkyWest’s accommodation, while Mr. Horne and Mr. Wahlen chose to continue their employment using SkyWest’s accommodation tools. |
| 8 | Additionally, before Cassell applied for employment with SkyWest, he knew that SkyWest had flights every day. The job description for Cassell’s position required travel on holidays and weekends. Cassell knew that after his training he could be scheduled to work on a Saturday. (Cassell Dep., Ex. B, at 138:11—139:6, 191:10-15; *see also* Roy Glassey Dep., Vol. 1, attached as Exhibit F, at 37:24—38:4.) | Denied—SkyWest has not provided a job description for the position sought by Cassell—First Officer on the CRJ. However, it is admitted that Cassell knew that SkyWest had flights on holidays and weekends. | No dispute. |
| 9 | During the interview process with SkyWest, SkyWest told Cassell that ground school (training required before Cassell could begin regular shifts) in Salt Lake City, Utah would be scheduled Monday through Friday from 8:00 a.m. to 5:00 p.m., but that simulator training scheduling would be random because it was based on | Denied as not material. Cassell was hired by SkyWest in September 2016, completed the CTP course in Atlanta, and then started ground school training with SkyWest in Salt Lake City, which he understood would take place between 8:00 a.m. and 5 p.m. Cassell was forced to resign on November 30, 2016, because Matrix training (training using computer monitors) conflicted with his Sabbath observance. Cassell is not seeking | Immaterial dispute. Because Cassell has clarified that he does not seek damages from his resignation in 2016, this fact, and Cassell’s dispute of it, does not control resolution of Cassell’s present claims. |

| | | | |
|---|---|---|---|
| | simulator availability. (Cassell Dep., Ex. B, at 26:25—27:10.) | damages arising from this constructive discharge. *Complaint, Dkt. #2, ¶ 18.* Rather his claims arise from SkyWest's failure to rehire him in June of 2017. *Id., Counts I, II and III; App. Exh. 2, Cassell Dep. 11:2-128:9, 141:20-142:4.* Accordingly, what SkyWest may or may not have told Cassell about simulator training is not material to this litigation. | |
| 10 | Cassell was hired by SkyWest as a pilot on September 1, 2016. (Ex. A, at CASSELL_001, 15, 32; Cassell Dep., Ex. B, at 26:3-5.) | Admitted. | No dispute. |
| 11 | On or before this same date, Cassell notified a SkyWest recruitment specialist of his Sabbath observance. He was able to schedule Cassell for classes in a required Airline Transport Certification Training Program ("CTP") held in Atlanta, Georgia that did not conflict with Cassell's Sabbath observance. (Ex. A, at CASSELL_032; Cassell Dep., Ex. B, at 28:14—29:4, 77:15—79:8, 81:4—82:3; Ex. C, at 5:40-6:50; Exhibit G, at SkyWest_000026; Todd Emerson Dep., attached as Exhibit H, at 101:1-19, 106:3-6.) | Denied as not material (See response to paragraph 9). | Immaterial dispute. Because Cassell has clarified in his RSOF ¶ 9 that he does not seek damages from his resignation in 2016, this fact does not control resolution of Cassell's present claims. However, it relevantly indicates SkyWest's history of accommodating Cassell's religious belief regarding his Sabbath. |
| 12 | SkyWest's training program, including the CTP course and ground school, is mandatory and tightly scheduled. (Cassell Dep., Ex. B, at 125:4-7, 125:19-23; Whicker Dep., Ex. D, at 9:10-22, 13:18-21, 46:8-10 ("You know, | Denied as not material (See response to paragraph 9). In addition, the cited testimony and exhibits do not support the facts set forth in this paragraph. Rather, they just go to SkyWest's contention that when Cassel was in training in the fall of 2016 there were no alternative matrix sessions he could attend (other than those that | Immaterial dispute. Because Cassell has clarified in his RSOF ¶ 9 that he does not seek damages from his resignation in 2016, this fact, and Cassell's dispute of it, does not control resolution of Cassell's present claims. |

| | | | |
|---|---|---|---|
| | training, you can't really trade a ground school day per se. It's just scheduled."), 51:1-21; Ex. G, at SkyWest_000038; Emerson Dep., Ex. H, at 12:20—13:5.) | conflicted with his Sabbath observance) and that if any trainee missed a session, he or she would "essentially have to join the following class" as there was no time for that person to catch up. *App. Exh. 9, Wicker Dep. 51:10-21; App. Exh. 2, Cassell Dep. 125:4-12.* Additionally, the cited portion of Emerson's deposition consists of inadmissible hearsay testimony (he is simply repeating what he was told by Whicker and Bryant) and should not be considered. | |
| 13 | SkyWest leases various training resources, such as flight simulators, across the country to train its pilots according to resource availability. (Whicker Dep., Ex. D, at 17:12-19, 21:24—23:4.) | Disputed as not material. The availability of flight simulators or other training resources and the training of pilots are not at issue in this case. See response to paragraph 9 above. | Immaterial dispute. Because Cassell has clarified in his RSOF ¶ 9 that he does not seek damages from his resignation in 2016, this fact, and Cassell's dispute of it, does not control resolution of Cassell's present claims. |
| 14 | Among other things, during Cassell's training, Cassell received training on SkyWest's shift bidding system which gives senior pilots more power than junior pilots to select preferred schedules. (Ex. A, at CASSELL_033.) | Denied. SkyWest has not cited to any testimony or document which supports this statement of fact. The document it cites to is the Position Statement it submitted to the EEOC in response to Cassell's first Charge of Discrimination (which was withdrawn and is not at issue here) and was not a training document. *SkyWest's Appendix, Dkt. #48-1 (hereinafter "Dkt.#48-1"), bates numbered Cassell 030-035.* Nonetheless. Cassell admits that he knew that SkyWest had some sort of seniority system used in the bidding process. *App. Exh. 2, Cassell Dep. 29:24-30:19.* | No dispute. |
| 15 | SkyWest's seniority system has been in place since the early 1980s. It is reflected in SkyWest's Pilot Policy Manual. (Ex. G, at SkyWest_000529-34; Emerson Dep., Ex. H, at 33:20—34:2; | Admitted that SkyWest claims the seniority system has been in place since the early 1980's. However, the remaining portion of paragraph is denied because seniority for the purposes of bidding on flights (which is the issue in this case) is <u>not</u> covered in the | No dispute as to SkyWest's seniority system being in place since the early 1980s. No dispute that Ex. G, at SkyWest_000529-533, discusses the seniority system and includes the quoted material.<br><br>SkyWest responds to Cassell's assertion that "seniority as it |

| | | | |
|---|---|---|---|
| | Steven Spagnolo Dep., attached as Exhibit I, at 19:1-9, 20:16-19; Anita Spencer Dep., attached as Exhibit J, at 28:24—29:9.) | Pilot Policy Manual. The Pilot Policy Manual sets forth how seniority dates are assigned and how seniority is handled when a pilot transfer domiciles (i.e., home base or airport) and states that seniority will be used for the following: "Except as otherwise provided in this policy manual, seniority will govern all pilots in the case of upgrade, displacement, filling vacancies, furlough, recall, or assignment due to expansion or reduction in schedules." It does not mention using seniority during the bidding process. As set forth in response to paragraph 19 below, seniority as it applies to the bidding process is covered in the Company Policy Manual. *App. Exh. 34, SkyWest 389-856.* | applies to the bidding process is covered in the Company Policy Manual" in RRSOF ¶ 19 below. |
| 16 | SkyWest's Pilot Policy Manual is a collective bargaining agreement ("CBA") between SkyWest and the SkyWest Airlines Pilot Association ("SAPA"), an organization that was created in the 1980s. (Ex. G, at SkyWest_000389-586; Emerson Dep., Ex. H, at 34:3—36:20; Spencer Dep., Ex. J, at 29:10-15; Declaration of Aric Arnold, attached as Exhibit K, at ¶¶ 2-4.) A Letter of Agreement between SkyWest and SAPA is found on the first page of The Pilot Policy Manual. (Ex. G, at SkyWest_000397.) | Denied. SAPA is not certified by the National Mediation Board and is therefore not a recognized representative under the Railway Labor Act which can enter into agreements that are binding on the employer (and employee). In addition, under 29 U.S.C. §402(j)(2) a duly recognized representative is required to file reports with the Department of Labor, and SAPA has not filed any such reports. *App. Exh. 35, Declaration of Ezzy Khaosanga.* SAPA is simply an "in-house association" and all pilots automatically become members when they are hired. The operation of SAPA and the president and members of the executive committee are funded by SkyWest. In addition, employees cannot have their grievances heard by an independent third party, but instead are decided by SkyWest's VP of Operation. *App. Exh. 3, Emerson Dep. 39:20-42:6.* | No dispute of fact, only a dispute of law. SkyWest acknowledges that SAPA has not been certified by the National Mediation Board, but only because SAPA has been voluntarily recognized by SkyWest and no representation dispute has risen to the level for the National Mediation Board to resolve and certify a representative. *See* Supp. Decl. of Aric Arnold, attached as Exhibit S. SkyWest also acknowledges the Department of Labor's Office of Labor-Management Standards' "union search" does not return any results for SkyWest.<br><br>However, neither of Cassell's assertions establish a dispute of fact, only a dispute of law regarding what constitutes a labor "representative" that can enter into a binding collective bargaining agreement. This legal argument is addressed in the body of SkyWest's reply memorandum.<br><br>SkyWest notes that beyond this legal argument, Cassell does not dispute SAPA was created in the 1980s, or that a Letter of Agreement between SkyWest and SAPA is found on the first page of the Pilot Policy Manual. |

| | | | |
|---|---|---|---|
| 17 | SAPA and its pilot members have consistently and successfully opposed any efforts or discussions aimed at altering, eliminating, or obtaining exceptions to the seniority system. (Emerson Dep., Ex. H, at 47:15-22, 48:21— 49:25, 69:23—70:16, 71:18—72:20, 73:20—75:5; Ex. K, at ¶ 5.) | Disputed as not material. See the Response to paragraph 19 below. | *See* RRSOF ¶ 19 below. |
| 18 | SkyWest assigns seniority to new hires based on their hire date. If two pilots share the same hire date, then the employee with the lowest last four digits of their social security number receives higher seniority. (Cassell Dep., Ex. B, at 30:6-11; Ex. G, at SkyWest_000150; Spagnolo Dep., Ex. I, at 22:2-24, 24:25—25:12, 29:9-22.) | Admitted. | No dispute. |
| 19 | Seniority is used in SkyWest's bidding system to determine "an employee's shift, workweek, area of work and line preference. Preference on domicile transfers is also given on the basis of bidding seniority." (Ex. G, at SkyWest_000150; *see also* Cassell Dep., Ex. B, at 129:19-25, 166:2-16; Ex. C, at 3:14-5:04; Glassey Dep., Vol. 1, Ex. F, at 28:10—29:2, 29:16—30:2, 30:16—31:14, 33:5-17; Spagnolo Dep., Ex. I, at 27:13—28:3; Spencer Dep., Ex. J, at 29:16-24.) | Denied as incomplete because SkyWest had the discretion to deviate from the seniority bidding system in assigning flights, work shifts, etc. Seniority as it applies to the bidding process is addressed in the Company Policy Manual, and not the Pilot Policy Manual. *App. Exh. 14, spec. SkyWest 150.*The policies in the Company Policy Manual could be changed by SkyWest at any time without approval from SAPA:<br><br>Policies set forth in the SkyWest Airlines Company Policy and the SkyWest Airlines Employee Handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between the employer and any of its employees. The provisions of the | Immaterial dispute. Cassell does not dispute that seniority is used in the bidding system to determine "an employee's shift, workweek, area of work and line preference. Preference on domicile transfers is also given on the basis of bidding seniority." Cassell only adds that this language appears in the Company Policy Manual, which "may be amended or cancelled at any time at the organization's sole discretion," and that where "strict adherence to bidding seniority would be likely to have an adverse impact on the safety of operations, our customer or ability to serve our customer," management may deviate from bidding seniority and "assign personnel as needed to insure a safe and efficient operation."<br><br>Neither addition undermines the existence, operation, or validity of SkyWest's seniority system or indicates that SkyWest has actually modified or deviated from its seniority bidding system. |

| | | | |
|---|---|---|---|
| | | policy and handbook have been developed at the discretion of management and may be amended or cancelled at any time at the organization's sole discretion.<br><br>*App. Exh, 14 SkyWest 000114, Policy 51.1 ¶B.* In addition, the Company's policy on seniority and bidding (SP-64, *SkyWest 000150*), provides:<br><br>B. In cases where strict adherence to bidding seniority would be likely to have an adverse impact on the safety of operations, our customer or ability to serve our customer, management reserves the right to assign personnel as needed to insure a safe and efficient operation. | |
| 20 | SkyWest's Preferential Bidding System software ("PBS") manages pilot shift scheduling. "PBS builds lines based on crewmember preferences, available pairings, seniority, and operational needs," among various other expressed preferences which pilots rank with varying levels of importance. (Cassell Dep., Ex. B, at 30:6-13; Ex. G, at SkyWest_000303, 300-88; Spagnolo Dep., Ex. I, at 72:4—73:18, 74:16—75:9, 77:15—78:8, 87:17-25, 88:7-12, 88:21—90:11, 92:17-22, 95:11-19, 98:18-22, 104:8—105:11; Spencer Dep., Ex. J, at 36:22-25.) | Admitted | No dispute. |
| 21 | SkyWest has used PBS for at least fifteen years. (Spencer Dep., Ex. J, at 23:12-15.) | Admitted | No dispute. |

| | | | |
|---|---|---|---|
| 22 | The PBS system does not apply to the scheduling of pilots' training shifts. However, seniority is still used when pilots wish to use a training device, or attend a limited size training event, offered at different hours, days, or locations. (Cassell Dep., Ex. B, at 123:21-24, 135:9-15, 159:19-21, 162:2-7, 196:19-21, 200:24—201:3; Whicker Dep., Ex. D, at 33:1-14, 34:23—35:8. 44:20—45:2; Spencer Dep., Ex. J, at 54:3-8, 54:21—55:8.) | Admitted—though not material (see response to paragraph 9 above). | No dispute. |
| 23 | On October 27, 2016, Cassell submitted a written request for religious accommodation. (Ex. A, at CASSELL_001, 32; Cassell Dep., Ex. B, at 82:15—83:4, 102:11-20, 111:8-25, 120:12-22, 193:11—194:3, 197:6-10; Ex. G, at SkyWest_0000017.) | Admitted—Cassell submitted his request for a religious accommodation while he was in the CTP class in Atlanta (before training started in Salt Lake City). *App. Exh. 02, Cassell Dep. 120:1-121:5.* | No dispute. |
| 24 | Cassell requested that he "not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown." He indicated to SkyWest that there was no "other modification that would assist [him] in performing the essential functions of [the] job." (Ex. A, at CASSELL_001; *see also* Whicker Dep., Ex. D, at 28:13-19; Ex. G, at SkyWest_000078; Emerson Dep., Ex. H, at 9:4-17, 102:10—103:12.) | Admitted.—Cassell did submit a Request for an Accommodation form asking not to be scheduled during the Sabbath, although the second "quotation" is a paragraph of question 5 on the form he submitted (to which he answered "no".) *App. Exh. 15.* | No dispute. |
| 25 | On October 27, 2016, SkyWest held a conference call with Cassell to discuss his accommodation | Admitted—However, the October 27, 2016, document was not simply a letter but a "Memorandum of Agreement for Religious | No dispute. Cassell has admitted this constituted a reasonable accommodation. *Opp.* at 7, n. 10 (" . . . Cassell agrees that the 2016 accommodation tools offered by SkyWest was |

| | | | |
|---|---|---|---|
| | request. That same day, it sent Mr. Cassell a letter, which he acknowledged with his signature, indicating that after "extensive evaluation and consideration of the request as well as evaluation of the quality, safety, operational impact as well as training footprint structure of SkyWest," SkyWest was denying Cassell's requested accommodation. Instead, SkyWest offered Cassell a different accommodation: "pursuit of schedule changes as defined by company and departmental resources (e.g. drop/trade shift; bid for desired work assignments, domicile staffing/available shifts)." (Ex. A, at CASSELL_002, 32; Cassell Dep., Ex. B, at 123:8-24, 192:15—193:9, 194:4-16; Whicker Dep., Ex. D, at 44:7—45:2, 45:16—46:10; *see also* Ex. C, at 6:61-7:22 (". . . they sent it back and they said, 'no we're not going to be able to guarantee you a schedule with Sabbaths off because of our seniority system for scheduling.' I was like, well I kinda figured that anyway. So, I decided to continue because my friend that was working there told me, 'You should be able to work around this.'"); Emerson Dep., Ex. H, at 9:18—10:11; Spencer Dep., Ex. J, at 52:3—55:17, 56:21—57:13). | Accommodation Request" and was agreed to and signed by Cassell, Coy Bryant in Employee Relations and Jake Whicker who was manager of CRJ (a type of plane) training. *App. Exh. 16.* | reasonable under the facts of this case."). |
| 26 | This accommodation was also available to other pilots for their | Admitted that the accommodation or "tools" set forth in "Memorandum of Agreement for Religious Accommodation Request" | No dispute. |

| | | | |
|---|---|---|---|
| | scheduling preferences. (Cassell Dep., Ex. B, at 196:8-10.) | were available to all pilots. *App. Exh. 16; App. Exh. 2, Cassell Dep. 196:8-10; App. Exh. 7, Spagnolo Dep. 111:9-116:24.* | |
| 27 | SkyWest noted that if Cassell elected to utilize this accommodation, that the "standard for all pilots unexcused work assignment [would] be addressed as defined by the Flight Operations reliability program PPM 3006." (Ex. A, CASSELL_002; Cassell Dep., Ex. B, at 194:17—195:8.) | Admitted. | No dispute. |
| 28 | SkyWest's Pilot Reliability Program states that "it is the pilot's responsibility to be available at the report for duty time," that "[e]xcessive occurrences and schedule assignment deviations (SAD) will result in disciplinary action," and that "excessive occurrences from duty are considered failure to assume responsibility and are ultimately cause for termination." (Ex. G, at SkyWest_000418, 546; *see also* Glassey Dep., Vol. 1, Ex. F, at 19:22—20:1, 20:6-12, 42:1—44:24, 49:4-24.) | Admitted. | No dispute. |
| 29 | A SAD includes where a "pilot fails to attend a scheduled day of ground school, and the absence has not been prearranged and approved by the Flight Operations Department." (Ex. G, at SkyWest_000420; *see also* Cassell Dep., Ex. B, at 204:5—205:1.) | Denied as not material (and not a complete definition of the term). | Immaterial dispute. Because Cassell has clarified that he does not seek damages from his resignation in 2016, this fact, and Cassell's dispute of it, does not control resolution of Cassell's present claims. |

| | | | |
|---|---|---|---|
| 30 | Cassell understood that missing a shift could result in discipline, including termination. (Cassell Dep., Ex. B, at 195:24—195:8, 203:2-17; *see also* Glassey Dep., Vol. 1, Ex. F, at 45:23—47:2, 56:24—57:13, 63:13-21.) | Admitted—however, the testimony of Glassey should be disregarded because Glassey never conveyed his understanding of the disciplinary process to Cassell and therefore it cannot be used to support what Cassell knew. It should also be noted that Glassey testified that a pilot would most likely only be counseled if he had one unexcused absence and that harsher punishment would be meted out only if the pilot had additional unexcused absences. *App. Exh. 5, Glassey Dep. Vol. I 63:7-21.* | No dispute. |
| 31 | SkyWest uses software called SkedPlus+ for pilots that want to trade, swap, or drop shifts for which they have already been scheduled after bidding through PBS. (Spagnolo Dep., Ex. I, at 111:9—113:10, 114:3—116:24, 133:24—134:23; Spencer Dep., Ex. J, at 59:22—60:4, 63:2-15.) | Admitted. | No dispute. |
| 32 | Shifts can only be traded, swapped, or dropped if approved by SkyWest. (Spencer Dep., Ex. J, at 55:9—56:20, 57:22—58:1, 64:4-6; Justin Esplin Dep., attached as Exhibit O, at 48:2-24.) | Admitted in part and denied in part. It was very common, for pilots to trade, swap and drop flights and, as Anita Spencer, manager of Crew Support, testified, Crew Support tried to work with pilots to facilitate such changes “as much as possible.” *App. Exh. 8, Spencer Dep. 64:23-65:9.* Further, SkyWest only would deny trades, swaps and drops of flights if no other pilot picked up the posted flight and assigning it to a reserve pilot caused the number of reserve pilots to fall below minimum requirements. Further, pilots could pick up any flight they wanted unless it put them in conflict with legal requirement for rest periods, hours flown in a month, or a similar governmental restriction. *App. Exh. 7, Spagnolo Dep.* | No dispute. Cassell’s denial only provides additional information about SkyWest’s reasoning and process for approving or not approving a trade, swap, or drop. |

| | | | |
|---|---|---|---|
| | | *114:17-115:20, 118:13-119:4.* And pilots were not penalized for drops or trades and could engage in such activity once every 24 hours. *Id. 117:10-118:10.* The Crew Support department continually monitor SkedPlus+ and tried to have all flights that are dropped or traded "cleared" within 24 hours. *App. Exh. 8, Specner Dep. 56:10-20.* | |
| 33 | Subsequent to the October 27, 2016 conference call and letter, Cassell commenced and completed the CTP course in Atlanta. (Ex. A, at CASSELL_032.) | Denied as not material. See response to paragraph 9 above. | Immaterial dispute. Because Cassell has clarified that he does not seek damages from his resignation in 2016, this fact, and Cassell's dispute of it, does not control resolution of Cassell's present claims. |
| 34 | During ground school in Salt Lake City, Cassell was expected to complete "matrix sessions" in which a trainee is paired with a partner. Matrix sessions put into practice the concepts trainees learn in classroom instruction. Trainees selected matrix shifts in pairs according to their seniority. (Cassell Dep., Ex. B, at 103:9-16, 113:7—114:4; Whicker Dep., Ex. D, at 14:16-25, 15:6-10, 23:22-24, 32:21-25, 33:1-14, 34:23—35:13, 37:9-15, 41:15-23, 4:24—45:2; Emerson Dep., Ex. H, at 12:3-14, 107:2-17, 108:13—109:3.) | Denied as not material. See response to paragraph 9 above. | Immaterial dispute. Because Cassell has clarified that he does not seek damages from his resignation in 2016, this fact, and Cassell's dispute of it, does not control resolution of Cassell's present claims. |
| 35 | On Friday, December 2, 2016, there were two available matrix shifts for those in Cassell's ground school class: 4:00 – 6:00 p.m. or 6:00 – 8:00 p.m. (The shifts were split because of limited matrix device resources.) Cassell was assigned to report to a training shift from 4:00 – | Correct but not material. See the response to paragraph 9 above. | No dispute. Because Cassell has clarified that he does not seek damages from his resignation in 2016, this fact, and Cassell's dispute of it, does not control resolution of Cassell's present claims. |

| | | | |
|---|---|---|---|
| | 6:00 p.m. There were no other training shifts for which Cassell could have swapped with another pilot without disrupting the schedule of ground school for all other trainees. (Ex. A, at CASSELL_004; Cassell Dep., Ex. B, at 103:1-16, 112:14-18, 124:21—125:18; Whicker Dep., Ex. D, at 35:24—36:13, 37:16—38:6, 38:16-19, 41:1-23, 42:12—43:6, 51:1-21; Emerson Dep., Ex. H, at 11:7-18, 12:8—13:5, 24:2-8, 105:12-18.) | | |
| 36 | On December 2, 2016, sundown was at approximately 5:00 p.m. in Salt Lake City, meaning Cassell's Sabbath conflicted with either of the available training shifts. (Cassell Dep., Ex. B, at 103:17-19; Emerson Dep., Ex. H, at 128:19-22.) | Correct but not material. See the response to paragraph 9 above. | No dispute. Because Cassell has clarified that he does not seek damages from his resignation in 2016, this fact, and Cassell's dispute of it, does not control resolution of Cassell's present claims. |
| 37 | On November 30, 2016, Cassell contacted a training manager and told him he would miss the matrix shift because of the conflict with his Sabbath. After discussing the matter with Cassell, SkyWest indicated that if Cassell missed the matrix shift, he would have to begin his training anew or be terminated. Shortly after, Cassell resigned. (Ex. A, at CASSELL_003-5, 32; Cassell Dep., Ex. B, at 103:19—105:16, 116:2—117:16, 126:16—127:9, 131:19-24, 229:15-22; Whicker Dep., Ex. D, at 29:9—30:25, 32:7- | Admitted. See the response to paragraph 9 above and the Additional Facts. | No dispute. Because Cassell has clarified that he does not seek damages from his resignation in 2016, this fact, and Cassell's dispute of it, does not control resolution of Cassell's present claims. However, this information is relevant background information for Cassell's exchange with SkyWest in 2017. |

| | | | |
|---|---|---|---|
| | 12, 35:14-20, 48:21—49:10, 49:25—50:25, 51:1-21, 52:1-19, 54:7-14, 57:8-15; Ex. G, at SkyWest_000029-30; Emerson Dep., Ex. H, at 11:7-18, 21:23—23:25, 25:12—27:4, 105:12-18.) | | |
| 38 | In response to an inquiry from a lawyer from Mr. Cassell's church, SkyWest analyzed data of 100 pilots hired a year prior to Mr. Cassell. It found that no matter what scheduling preference the pilots requested under SkyWest's bidding and seniority system, or what attempts they made to swap shifts, every pilot received a schedule that required them to work on at least one Saturday during that year. The average pilot worked seventeen Saturdays during the one-year period. This was an unsurprising finding for SkyWest, as the newly hired pilots lacked seniority to consistently obtain the most desirable Monday-Friday shifts through SkyWest's bidding system. (Cassell Dep., Ex. B, at 144:17—<br>145:3, 147:10—148:1; Ex. C, at 3:14-3:55 (". . . if I've been with a company for two weeks, I'm probably gonna get the flight that leaves at five a.m. on Friday morning and comes back at midnight on Monday. That's just how it works."); Ex. G, at SkyWest_000001, 1858-59; Emerson Dep., Ex. H, at 46:16—48:10, 52:17—53:17, 66:1-9, | Denied as incomplete. First, the data do not reflect, nor did SkyWest know, if any of the 100 pilots attempted to avoid working on the Sabbath. *App. Exh. 3, Emerson Dep. 97:19-99:2.* Additionally, as Cassell testified, new pilots generally wanted to get as many flight hours as possible so they could quickly upgrade from First Officer to Captain. Because SkyWest experienced a higher rate of absences on the weekend, a junior pilot who wanted more hours and did not care if he/she flew on the Sabbath would very likely choose Saturday flights. *App. Exh. 2, Cassell Dep. 145:22-147:9.* Second, the research did not focus on pilots who just flew out of Detroit, the domicile to which Cassell would have been assigned. [See footnote 5 below.] *App. Exh. 3, Emerson Dep. 94:4-10.* The Detroit domicile was rapidly expanding in 2017. This meant that new pilots quickly moved up in seniority and within a short time frame could, if they chose, bid Sabbath free schedules. *App. Exh. 37, Wahlen Dec. ¶10*. Finally, the document produced by SkyWest was created for this litigation and was SkyWest's attempt to recreate the research that had been done in 2017. *App. Exh. 3, Emerson Dep. 85:89:6.*<br><br>[Footnote 5:] SkyWest has stipulated that if Cassell had been hired in 2017 he would have been assigned to the Detroit domicile. | Immaterial dispute. While SkyWest acknowledges its analysis of the 100 pilots (Ex. G, at SkyWest_001858-59), which was re-created for litigation, does not set forth each pilot's bidding preferences on the document, Cassell's assertion that junior pilots "would very likely choose Saturday flights" to more quickly upgrade to captain is speculation, and, in fact, contrary to the evidence. SkyWest also acknowledges the document does not identify the domicile of the 100 pilots, although Mr. Emerson testified that the "majority of them would certainly go to" the domiciles of either Detroit, Minneapolis, or Chicago. (Emerson Dep., Ex. H, at 93:23—94:23; *see also App. Exh. 37, Wahlen Dec. ¶10* (demonstrating that in 2017 *all* new pilots in several training classes were assigned to Detroit).)<br><br>In Mr. Emerson's deposition, he testified that "Saturday, Sunday, Easter, holidays, yes. They–those are popular bid-avoids." (Emerson Dep., Ex. H, at 97:19—98:8.) Cassell himself acknowledged that new pilots got "the bottom of the barrel," referring to Saturday work, and that new pilots' "general attitude" was that "they were just going to get what they were going to get. They were expecting to work on weekends." Cassell agreed that "all Monday-to-Friday trips were selected by senior pilots." (Cassell Dep., Ex. B, at 144:17—148:1; *see also* Ex. C, at 3:14-3:55 (". . . if I've been with a company for two weeks, I'm probably gonna get the flight that leaves at five a.m. on Friday morning and comes back at midnight on Monday. That's just how it works.").)<br><br>Additionally, the amount of hours a pilot flies are not determinative of whether that pilot will be upgraded to captain status more quickly. Advancement to captain is predicated upon seniority. (Ex. G, at SkyWest_00529 (" . . . seniority will |

| | | | |
|---|---|---|---|
| | 68:11—69:7, 85:10—93:19, 97:19—98:22, 111:15—112:5, 113:11—115:23; Spencer Dep., Ex. J, at 72:3-16; Roy Glassey Dep., Vol. 2, attached as Exhibit L, at 29:17—30:3, 30:10-17.) | See Defendant's Responses to Plaintiff's Fifth Set of Written Discovery to Defendant (dated January 28, 2021), response to Interrogatory #13. *App. Exh. 17.* | govern all pilots in the case of upgrade . . .").) For example, a pilot who comes to SkyWest with many flight hours will not be upgraded to captain before those pilots already working for SkyWest, even though those pilots have much fewer flight hours.<br><br>Ultimately, this dispute is immaterial because it cannot alter the fact that Cassell rejected SkyWest's reasonable accommodation and insisted on a Sabbath-free accommodation. |
| 39 | Cassell filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 8, 2017. He alleged that SkyWest had not properly evaluated his request for a religious accommodation, did not present him with sufficient accommodation options, and was motivated to do so by a religiously discriminatory motive. (Ex. A, at CASSELL_012-13; Cassell Dep., Ex. B, at 141:20-22.) | Admitted but not material. This charge that was withdrawn and is not at issue in this litigation. | No dispute. Because Cassell has clarified that he does not seek damages from his resignation in 2016 and the associated charge of discrimination filed with the EEOC (first charge), this fact, and Cassell's dispute of it, does not control resolution of Cassell's present claims. Cassell's assertion here that this fact is immaterial is significant because it limits Cassell's retaliation claim to the alleged protected acts related to his 2017 exchange with SkyWest. |
| 40 | Cassell reapplied for a position as a pilot with SkyWest on June 12, 2017. (Ex. A, at CASSELL_026, 28, 33; Emerson Dep., Ex. H, at 119:10-16.) | Admitted. | No dispute. |
| 41 | During the reapplication process, Cassell notified the EEOC of his intent to withdraw his charge of discrimination. The EEOC responded that SkyWest had not yet viewed the charge and that it would again convey the charge to SkyWest before it being withdrawn. | Admitted. | No dispute. |

| | | | |
|---|---|---|---|
| | (Ex. A, at CASSELL_028; Cassell Dep., Ex. B, at 141:20—142:4.) | | |
| 42 | No one at SkyWest indicated to Cassell, in writing or otherwise, that they were aware of the EEOC charge or upset with Cassell for filing it. (Cassell Dep., Ex. B, at 228:2—229:10.) | Denied. Cassell has testified that no one at SkyWest told him that SkyWest was upset about his filing a charge. He did not discuss whether SkyWest knew about his charge. *App. Exh. 2, Cassell Dep. 228:2-229:10.* Moreover, less than a month after the EEOC told Cassell it would notify SkyWest a second time of his pending charge, SkyWest rejected Cassell's application and refused to hire him. *App. Exh. 18.* | Immaterial dispute. Mr. Cassell has presented no evidence that anyone at SkyWest was aware of his first charge of discrimination until the EEOC informed SkyWest. Rather, Cassell's second charge of discrimination states he discovered from the EEOC *after* his interview and follow-up phone calls with SkyWest, that SkyWest had not even viewed his first charge of discrimination. *App. Exh. 18.* SkyWest notes that *App. Exh. 18* does not establish a timeline between the date of Cassell's interview, the date of the EEOC notifying SkyWest of his first charge of discrimination, and SkyWest notifying Cassell of its decision not to rehire him. Even if it had, SkyWest disputes that temporal proximity alone is sufficient to raise an inference of retaliation. |
| 43 | In connection with Cassell's reapplication to SkyWest, on June 29, 2017, he submitted a letter in an attempt to provide further clarity regarding his religious beliefs and his previously requested accommodation. | Admitted but incomplete. Cassell submitted the letter because he received a call from Coy Bryant in Employee Relations asking him if there were some exceptions [to not working on the Sabbath] and what those parameters were. *App. Exh. 2, Cassell Dep. 156:8-25.* | No dispute. |
| 44 | In the letter, he stated "I realize that SkyWest cannot guarantee that I will be provided a schedule that will always allow me to observe my beliefs, therefore it has and will continue to be my intent to use the tools that SkyWest has provided to either bid out of, drop, or trade a shift that may conflict with my beliefs." He continued, "If there was an unforeseen circumstance, such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended, I would be willing to fly the aircraft back to base as my | Admitted. | No dispute. |

| | | | |
|---|---|---|---|
| | concern for the safety and well-being of my passengers falls within my religious beliefs. As my tenure increases, my likelihood of conflict decreases due to my increase in seniority, allowing the system to work as designed." He added, "I do not expect SkyWest to give me special or preferential treatment." (Ex. A, at CASSELL_020; Cassell Dep., Ex. B, at 156:10—157:1, 158:19—159:12, 167:10—168:18; Emerson Dep., Ex. H, at 136:21—137:6; Glassey Dep., Vol 2, Ex. L, at 46:11—48:13; *see also* Ex. C, at 3:14-3:55.) | | |
| 45 | However, Cassell expressed to his interviewers and other SkyWest personnel that he was unwilling to work any shifts falling on his Sabbath. (Ex. G, at SkyWest_000078, 85-86; Emerson Dep., Ex. H, at 119:10-23, 137:7—139:4; Roy Glassey Dep., Vol. 2, Ex. L, at 38:2-20, 39:5-11, 40:2-11; *see also* Cassell Dep., Ex. B, at 150:13-25.) | Denied. In his June 29th letter Cassell made clear that there were circumstances under which he would fly on the Sabbath, which was communicated to SkyWest through Coy Bryant. *App. Exh. 10.* Further, the documents and deposition testimony cited by SkyWest are inapposite. Glassey never spoke or communicated with Cassell so he cannot testify as to what Cassell said or did not say to interviewers or other SkyWest personnel. Similarly, Emerson never spoke or communicated with Cassell. Emerson did correspond with Cassell's then attorney, Alan Reinach, but Reinach never said that Cassell would never work on the Sabbath. *App. Exh. 19.* Additionally, *SkyWest 00078, 85-6* (the documents cited by SkyWest) purport to be notes made by an interviewer in 2017 but they have not been verified, are not verbatim and the person entering the notes has not been identified. Finally, Cassell did not say in his deposition at page | Immaterial dispute. While SkyWest acknowledges that Coy Bryant and Todd Emerson did not communicate directly with Cassell, they did directly communicate with Cassell's interviewers and other SkyWest personnel reviewing his application. Further, the interview notes *do* identify Cassell's interviewers: Troy King and Jason Cordova. (Ex. G, at SkyWest_000074; *see also* Roy Glassey Dep., Vol. 2, Ex. L, at 34:1-12.)<br><br>The notes of Cassell's interviewers stated the following: "Third interview[.] Declined once in favor of a chief pilot position at current job[.] Resigned from SkyWest training during Matrix session. Thought ground school would be 8-5 Monday through Friday. He was not able to maintain a commitment outside of this schedule[.] Has expressed unwillingness to be flexible with schedule without any acceptation [sic][.] Based on his history with SkyWest and his schedule constraints, the team has concerns of reliability[.] Has a plan for negotiation with chiefs and schedules; however this may not be realistic when it comes to reserve and junior scheduling[.] . . ." (Ex. G, at SkyWest_000078.) |

| | | | |
|---|---|---|---|
| | | 150 that he would never work on the Sabbath. Rather, he reiterated that there were circumstances under which he would work on the Sabbath. | After these notes were made, on June 22, 2017, Jason Cordova forwarded the notes to Ian Whiting, a flight operations employee and to Roy Glassey, director of flight operations. He asked for a "Review due to scheduling conflicts. Please see interview notes." (Ex. G, at SkyWest_000079-80, 82.) Mr. Whiting then emailed Mr. Glassey with the request, "Can you give me a call on this one when you get a moment please?" (Ex. G, at SkyWest_000079.) Additional emails were exchanged between Chandler Larsen, recruitment & hiring specialist, to Coy Bryant, Jaime Sorensen, and Monica Polad on June 26, 2017. Mr. Larsen stated that "in the interview notes they only highlight his schedules conflicts due to his religion." Ms. Polad also stated that "the main reason he was reject was because of scheduling reasons, which it says in the interview notes due to his religion." (Ex. G, at SkyWest_000081, 83-84.) An email between Mr. Larsen, Ms. Sorensen, and Rachelle Kolb, lead specialist-recruitment & hiring, on July 12, 2017, indicates the explanation for SkyWest's decision not to hire Cassell was "Candidate expressed unwillingness to be reliable and work his awarded schedule if hired. Candidate also communicated multiple times that he would be unwilling to accommodate his schedule due to <u>unforeseen</u> circumstances." (Ex. G, at SkyWest_000085.) On July 19, 2017, Mr. Whiting emailed Mr. Glassey regarding Cassell, stating "Funny thing is in his interview he basically said he cannot work no matter what." (Ex. G, at SkyWest_000086.) All of these individuals have been identified as those involved in SkyWest's hiring process. (Glassey Vol. II, at Ex. L, at 34:24—35:7; *App. Exh.* 1, *Bryant Dep.*, at 56:1-6, 74:10-14.)<br><br>Cassell's dispute regarding his testimony is immaterial. Cassell was asked "if it had turned out that you had not been able to get the Sabbath off, you would not have worked it outside of it being an emergency, correct." He answered, "That is correct." (Cassell Dep., Ex. B, at 150:13-25.) SkyWest does not dispute that there are some circumstances in which Cassell's Sabbath beliefs permit him to work on his Sabbath. *See* RRSOF ¶ 2. But beyond these circumstances, and in the event that Cassell |

| | | | |
|---|---|---|---|
| | | | was unable to use SkyWest's accommodation tools to avoid a shift on his Sabbath, Cassell would not have worked on his Sabbath. *See* RRSOF ¶ 57 (other evidence that Cassell demanded a Sabbath-free schedule). |
| 46 | SkyWest would have hired Cassell if he acknowledged SkyWest could not guarantee him a Sabbath-free schedule and he agreed to perform all assigned duties, including those that might fall on his Sabbath, if the accommodation could not avoid that assignment. (Emerson Dep., Ex. H, at 104:2-13.) | Admitted, although SkyWest has never communicated to Cassell that it would have hired him if he had said he would take a flight on the Sabbath if he could not avoid working using the preferential bidding system and the other "tools" available to him. | No dispute. SkyWest notes, however, the purpose of SkyWest's further inquiry after his interview was to determine the answer to this very question: if the accommodation could not avoid a Sabbath assignment, would Cassell work the shift? His responses in his interview and his follow-up letter failed to answer this question in the affirmative. *App. Exh.* 1, Bryant Dep., at 65:7—66:6. |
| 47 | On July 12, 2017, SkyWest notified Cassell that it was not extending an offer of reemployment. (Ex. A, at CASSELL_033, 176.) | Admitted. | No dispute. |
| 48 | On July 21, 2017, the EEOC provided notice that Cassell's charge of discrimination was formally withdrawn. (Ex. A, at CASSELL_021.) | Admitted that the letter from the EEOC indicating that Cassell has withdrawn his Charge is dated July 21, 2017. It is not known when SkyWest received the notice. | No dispute. |
| 49 | On September 19, 2017, Cassell filed a second charge of discrimination with the EEOC. Cassell reasserted his allegations from his withdrawn charge and added allegations that SkyWest had declined to rehire him because of his religious beliefs and because he had brought the first EEOC charge against SkyWest. (Ex. A, at CASSELL_022.) | Admitted in part, denied in part. Cassell did file a second charge of discrimination alleging that SkyWest refused to hire him "in part because of my religious beliefs and also due to the fact that I had an open charge against them at the time they chose not to hire me." *App. Exh. 20.* However, although the charge form references the constructive discharge from the prior year, Cassell is not seeking damages arising out of that discharge. See Response to paragraph 9 above. | No dispute. |
| 50 | On December 7, 2018, the EEOC dismissed Cassell's second charge of discrimination and issued a right to sue letter, noting that after its | Admitted that the EEOC issued a Dismissal and Notice of Rights letter dated December 7, 2018, which states | No dispute. |

| | | | |
|---|---|---|---|
| | investigation, "the EEOC does not believe that additional investigation would result in our finding a violation." (Ex. A, at CASSELL_039-40.) | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes.<br><br>*App. Exh. 21.* | |
| 51 | Cassell initiated this suit by filing his Complaint on March 4, 2019. | Admitted. | No dispute. |
| 52 | In response to SkyWest's requests for admission, "Plaintiff admit[ed] that if weeks before a flight date he had been assigned to a flight that started on the Sabbath, he would not have taken the flight." (Plaintiff's Response to SkyWest's Request for Admission, attached as Exhibit M, at Nos. 3-4.) | Denied as incomplete. Cassell's responses to Requests for Admission no. 3 & 4 read as follows:<br><br>**<u>REQUEST FOR ADMISSION NO. 3</u>:** Admit that, at all times relevant to this lawsuit, your sincerely held religious belief proscribed you from working as a commercial airline pilot on the Sabbath, which is defined as the period after sundown Friday continuing until sundown the following day (Saturday).<br><br>**<u>ANSWER:</u>** Admitted in part and denied in part. Plaintiff's sincerely held religious belief does proscribe him, in most circumstances, from working as a commercial airline pilot on the Sabbath, which is defined as sundown Friday continuing until sundown the next day (Saturday). However, the Request is denied in part because, as SkyWest was informed at the time Plaintiff applied for a position, "[i]f there is an unforeseen circumstance, such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended, I would be willing to | No dispute. |

| | | | |
|---|---|---|---|
| | | fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious beliefs."<br><br>**<u>REQUEST FOR ADMISSION NO. 4</u>:** Admit that, at all times relevant to this lawsuit, you would not violate this sincerely held religious belief (*i.e.*, working on the Sabbath) by operating a SkyWest flight which commenced during the Sabbath, which was assigned to you in advance by the seniority-based bidding system, and which you were unable to exchange, swap, or drop under SkyWest's scheduling system.<br><br>**<u>ANSWER:</u>** Admitted in part and denied in part. As set forth in response to the previous Request, Plaintiff had informed SkyWest that there were unforeseen circumstances under which he would have been willing to fly on the Sabbath. However, Plaintiff admits that if weeks before a flight date he had been assigned to a flight that started on the Sabbath, he would not have taken the flight.<br><br>*App. Exh. 22.* | |
| 53 | Had Cassell successfully completed training with SkyWest, he would have first become a reserve pilot, remaining on call to fill in for gaps that often arise from a pilot falling ill, a flight scheduling change, etc. (Cassell Dep., Ex. B, at 84:23—85:3, 85:13—89:7, 198:25—199:4; Emerson Dep., Ex. H, at 96:16—97:2; Spagnolo Dep., Ex. I, at 44:2- | Admitted that Cassell probably would have been a reserve pilot when he first got out of training (if he had been hired by SkyWest in 2017). It should be noted, however, that the deposition testimony of Emerson, Cassell, Spencer, most of Spagnolo, and Defendant's Response to Interrogatory no. 12, do not support he facts alleged by SkyWest in this paragraph. In addition, Spagnolo did testify that that he did not | No dispute. |

| | | | |
|---|---|---|---|
| | 10, 90:12—91:7; Spencer Dep., Ex. J, at 21:21—22:10; Defendant's Responses to Plaintiff's Fifth Set of Written Discovery to Defendant, at Nos. 12 and 14, attached as Exhibit N.) | know how long a pilot would be on reserve status. *App. Exh. 7, Spagnolo Dep. 44:2-45:18. Id.* | |
| 54 | Because reserve pilots are often needed to fill in, SkyWest tries to staff each of its domiciles with 18% reserve pilots, adjusting that number for domiciles that have more reserve pilot demand. (Spencer Dep., Ex. J, at 31:7-15, 33:6-10.) Despite this, SkyWest's domiciles sometimes run out of reserve pilots. (Spencer Dep., Ex. J, at 50:14—51:1.) | Admitted in part and denied in part. Admitted that SkyWest tries to have about 18% of its pilots on reserve status at each domicile and that Spencer testified that very occasionally SkyWest would run out of reserve pilots at a particular domicile. However, the data provided by SkyWest in Response to Interrogatory 9(a) shows that in Detroit on Fridays and Saturdays from June of 2017 through the end of 2019, there was always at least 1, and usually several, CRJ First Officers (those who were trained on the CRJ aircrafts) available as reserve pilot who were not assigned flights. *App. Exh. 12, Tab 9(a).* And on most Fridays and Saturdays during 2019-2019 SkyWest used excess CRJ First Officers domiciled in Detroit to take flight for First Officers from other domiciles. *App. Exh. 12, Tab 9(d).* Additionally, if it had been needed, SkyWest could have transferred reserve pilots between domiciles on an as-needed basis. *App. Exh. 3, Emerson Dep. 96:16-97:2.* | Immaterial dispute. Cassell's denial in part simply adds additional information to this statement of fact regarding a particular domicile. However, Cassell draws conclusions from this additional information that Justin Esplin, SkyWest's Vice President of Information Technology, who pulled and produced the information refused to draw.<br><br>Mr. Esplin clarified that the data shown in 9(a) only reports "pilots who were assigned a reserve, on-call code on their schedule that did not have any flights on that day." (Esplin Dep., Ex. O, at 30:9-18.) However, he testified that this information was insufficient to conclude whether there were no days in which all reserves were used. (Esplin Dep., Ex. O, at 31:14-25 ("I have not looked at that report for that reason to see if there was [sic] any zeros on that day; *or if a day was left out and it was a zero*.") (emphasis added), 32:16-25 (responding to whether it is possible to determine if there are days no reserve pilots are available to fly: "I don't know if that is a hundred percent possible historically . . . I don't know all the specifics that would go into determining if someone could flown [sic] that day or not.").) Further, Mr. Esplin testified that 9(a) does not indicate that SkyWest did not have a need for additional reserves that day because pilots "could have been sitting in reserve for 10 minutes in the afternoon or reserve all day. Those type of factors would indicate whether they were available to fly or not at a specific time for a specific flight." (Esplin Dep., Ex. O, at 33:1-13.)<br><br>SkyWest does not dispute that it can and does send pilots domiciled in one location to another airport to cover flights when needed.<br><br>Ultimately, this dispute is immaterial because it cannot alter |

| | | | |
|---|---|---|---|
| | | | the fact that Cassell rejected SkyWest's reasonable accommodation and insisted on a Sabbath-free accommodation. |
| 55 | Reserve pilots are normally on a two-hour call and are not required to be on site. Some of these reserve pilots may be assigned a "ready reserve" shift, which requires the pilot to be physically at the airport and available to fly upon 20 minutes notice. Ready reserve shifts are not bid for or awarded through the PBS system, other than for reserve pilots to obtain days off, but are assigned to a reserve pilot based on need, logistics, and, at times, seniority. (Spagnolo Dep., Ex. I, at 94:6—98:12; Spencer Dep., Ex. J, at 33:11—34:25, 35:9-18, 37:1-5.) | Admitted and Denied. Admitted that there are three categories of reserve pilots. Ready reserves were required to be at the airport while waiting to see if they were assigned a flight (or be able to present themselves for a flight within 20 minutes). Short reserves were on call for 12 hours and had to be able to be at the airport within 2 hours. Long reserves were on call for 24 hours and were given 12-hour notice if they were to take a flight. Twenty percent of reserve pilots were "long calls" and all other reserves were designated as short reserves. *App. Exh. 8, Spencer Dep. 33:11-35:13; App. Exh. 7, Spagnolo Dep. 95:3-19.* Denied that ready reserve shifts were not bid on. Spencer testified a ready reserve was technically a short reserve who had been converted to a ready reserve, and pilots bid on the days they did not want to be on reserve status through the PBS system. Crew Support did have the discretion to "convert" a pilot who was on short reserve, to ready reserve status, but only on the days that have been assigned through the bid process. *App. Exh. 8, Spencer Dep. 35:9-22.36:17-21, 37:1-5; App. Exh. 7, Spagnolo Dep. 95:20-96:2.* | No dispute. Cassell's statement simply provides additional detail to SkyWest's statement of fact that "[r]eady reserve shifts are not bid for or awarded through the PBS system, other than for reserve pilots to obtain days off . . ." |
| 56 | If assigned to a reserve pilot shift that required Cassell be present at the airport on his Sabbath, he would not have presented himself if he were unable to trade the shift with another pilot. (Cassell Dep., Ex. B, at 89:8-24, | Admitted that Cassell testified that if he was assigned a ready reserve shift on the Sabbath he would try to trade, drop it, or pick up another shift but if he had been unable to do so he would not have worked on the Sabbath. He also indicated that if on reserve status or if he had been assigned a flight on the Sabbath that he could not trade, | No dispute. Cassell's testimony makes clear that regardless of the type of shift, he would not have worked a shift on his Sabbath where there were no emergency circumstances and he was unable to trade, drop, or pick up another shift. (Cassell Dep., Ex. B, at 150:13-25 ("Q. And if it had turned out that you had not been able to get that Sabbath off, you would not have worked it outside of it being an emergency, correct? A. That is correct."), 151:7-18 (". . . as soon as it got to the point |

| | | | |
|---|---|---|---|
| | 91:2-24.) The same is true for any other shift Cassell might have been assigned. (Cassell Dep., Ex. B, at 150:13-25, 151:7-18.) | drop, or swap, he would have notified either Crew Support or the chief pilot ahead of time so SkyWest could get a pilot to cover for him. *App. Exh. 2, Cassell Dep. 89:8-24, 91:2-24, 150:13-25, 151:7-18.* | where I knew—I would have known I wouldn't be able to get out of a trip that was on Saturday . . . I would have called somebody and let them know 'This is what's happening. I will not be attending this work shift' . . . ."").); *see also* RRSOF ¶ 57 (other evidence that Cassell demanded a Sabbath-free schedule). |
| 57 | If SkyWest granted Cassell's requested accommodation of a guaranteed Sabbath-free work schedule, the impact on other SkyWest pilots would be extensive. Principally, it would require pilots with higher seniority to fill in for Cassell (effectively moving Cassell ahead of pilots with greater seniority) which violates SkyWest's seniority system and CBA. Additionally, Cassell's absence from the schedule would cause a domino effect, triggering the use of a reserve pilot, or, if no reserve pilot were available, requiring other pilots to come in on their days off and paying them overtime. In turn, these changes could disrupt multiple flight schedules and cause SkyWest to reschedule the staffing or occurrence of other flights. (Glassey Dep., Vol. 1, Ex. F, at 70:9—71:16.) | Denied. While Cassell requested in 2016 that he not be assigned Sabbath shifts he agreed to the alternative accommodation offered to him by SkyWest—that he use the bidding process, and drops, trades, and swaps to avoid working on the Sabbath. This post-bidding process did not violate SkyWest's seniority bidding process. Further, Cassell never demanded that SkyWest guarantee him a Sabbath free schedule. *See Response to paragraph 26 above, App. Exh. 16.* Additionally, as set forth in the *Declaration of Wahlen (App. Exh. 37)* the 2016 accommodation would have been sufficient for Cassell to avoid working on the Sabbath so there would have been no disruption to other pilots nor any domino effect. Further, the assertion that SkyWest might have had to call in pilots and pay them overtime, and/or disrupt flights if no other pilots were available is inaccurate. As set forth in response to paragraph 54 above, there were always CRJ reserve First Officers available in Detroit on Fridays and Saturdays who could have taken any flights that Cassell was unable to drop, trade or swap. *App. Exh. 12, Tab 9(d).* | Immaterial dispute. SkyWest acknowledges that the post-bidding tools of trading, swapping, and dropping shifts do not rely on SkyWest's seniority system. However, SkyWest does not concede that unless it gave Cassell seniority preferences during the bidding stage, he would have succeeded in using post-bidding tools (SkyWest's reasonable accommodation) to avoid *all* shifts on his Sabbath.<br><br>Cassell's assertion that he "never demanded that SkyWest guarantee him a Sabbath free schedule" is counter factual. From the beginning, Cassell made clear that absent an accommodation which guaranteed he would not work any Sabbath shift, he would not show up for a shift on his Sabbath absent emergency circumstances.<br><br>First, on Cassell's religious accommodation request form, he requested that he "not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown." He then indicated to SkyWest that there was no "other modification that would assist [him] in performing the essential functions of [the] job." (Ex. A, at CASSELL_001.)<br><br>Second, when SkyWest presented its memorandum of understanding to Cassell, rather than signing and accepting it in full, he signed it under protest, writing under his signature, "My signature does not relinquish my request for religious accommodation." (Ex. A, at CASSELL_002; *see also* Cassell Dep., Ex. B, at 196:4-19.) In other words, although Cassell signed the memorandum, he still insisted on the request made on his religious accommodation request form.<br><br>Third, when Cassell was confronted with a training shift he |

| | | | |
|---|---|---|---|
| | | | could not avoid, Cassell resigned rather than work the shift, consistent with his unwavering Sabbath-free accommodation request. *See* SOF ¶ 37 and RRSOF ¶ 37.<br><br>Fourth, in Cassell's first charge with the EEOC, he asserted that he had "filled out paperwork for a religious accommodation which was denied to me" and "I told SkyWest that I was asking for them to accommodate me *where I was not able to use the tools given to me* to attempt working outside the Sabbath hours . . ." (Ex. A, at CASSELL_013 (emphasis added).)<br><br>Fifth, when Cassell reapplied to SkyWest in 2017, he would not commit to working on his Sabbath if he was unable to use the accommodation tools to avoid it and no emergency existed. *See* RRSOF ¶ 45.<br><br>Sixth, in Cassell's second charge of discrimination, he made the same statements as in his first—that he was denied his requested accommodation which was beyond what SkyWest had offered him. (Ex. A, at CASSELL_027.)<br><br>Seventh, during Cassell's deposition, he was asked "if it had turned out that you had not been able to get the Sabbath off, you would not have worked it outside of it being an emergency, correct." He answered, "That is correct." (Cassell Dep., Ex. B, at 150:13-25.) And in response to a request for admission, Cassell admitted "that if weeks before a flight date he had been assigned to a flight that started on the Sabbath, he would not have taken the flight," absent "unforeseen circumstances under which he would have been willing to fly on the Sabbath . . ." *See* SOF ¶ 52 and RSOF ¶ 52.<br><br>Eighth, Cassell's own arguments and responses to statements of fact in its opposition to SkyWest's motion to dismiss demonstrate Cassell would not work if he failed to successfully use the accommodation tools and no emergency existed (even though Cassell tries to contradict this fact elsewhere in the Opposition). *See Opp.* at ii ("Cassell . . . |

| | | | |
|---|---|---|---|
| | | | would not guarantee that, if needed, he would fly on the Sabbath in violation of his strongly held religious beliefs.”), iv (“Cassell refused to pledge to work on the Sabbath if scheduled”), RSOF ¶ 46 (“Admitted [that] . . . SkyWest . . . would have hired [Cassell] if he had said he would take a flight on the Sabbath if he could not avoid working using the preferential bidding system and the other ‘tools’ available to him.”), RSOF ¶ 56 (“Admitted that Cassell testified that if he was assigned a ready reserve shift on the Sabbath he would try to trade, drop it, or pick up another shift but if he had been unable to do so he would not have worked on the Sabbath.”), 4 (“SkyWest chose not to hire Cassell in 2017 because it believed that Cassell’s religious beliefs conflicted with what SkyWest viewed as an absolute job requirement—flying on the Sabbath if assigned.”), 4 (“it was essential that Cassell agree in writing that if he could not use the tools given to him by SkyWest to avoid Sabbath work, he would work on the Sabbath . . . And because Cassell failed to do so, this meant (for Glassey) that Cassell would not be able to comply with all job requirements.”), 10 (“when Glassey finally did read Cassell’s letter, he claimed that Cassell had missed the core issue—that he would work on the Sabbath if he could not utilize the ‘tools’ to avoid the assignment.”). |
| 58 | The training cost of a new pilot is $27,000.00. (Declaration of Todd Emerson, at ¶ 5, attached as Exhibit P.) | Cassell does not have sufficient information to either admit or deny this paragraph. Additionally, SkyWest had not provided any documentary foundation for this claim. *See Dkt. # 48-1, Emerson Dec, Exhibit K.* | No dispute. Cassell does not seek to avail himself of Federal Rule of Civil Procedure 56(d) or claim that he cannot present facts to justify his opposition. Thus, in the absence of any citation to evidence, this fact is undisputed. *See* Fed. R. Civ. P. 56(e)(2). |
| 59 | SkyWest pilots do not become profitable for SkyWest for 1.5 years. (Ex. P, at ¶ 9.) | Cassell does not have sufficient information to either admit or deny this paragraph. *See Dkt. # 48-1, Emerson Dec, Exhibit K.* | No dispute. Cassell does not seek to avail himself of Federal Rule of Civil Procedure 56(d) or claim that he cannot present facts to justify his opposition. Thus, in the absence of any citation to evidence, this fact is undisputed. *See* Fed. R. Civ. P. 56(e)(2). |

| Cassell's Additional Material Facts | | |
|---|---|---|
| | **Cassell's Additional Statement of Material Fact ("AMF")** | **SkyWest's Response to Cassell's Additional Statement of Material Fact ("RAMF")** |
| 1 | Cassell first applied to be a pilot at SkyWest in 2015. Although he was offered a position, he decided not to accept it because his then current employer, AirScout (which did aerial photography), promoted him to chief pilot. *App. Exh. 2, Cassell Dep. 77:10-15, 105:17-106:12.* | Undisputed, but immaterial as this case does not relate to Cassell's hiring exchange with SkyWest in 2015. |
| 2 | Because Cassell did not enjoy being a chief pilot at AirScout he had several conversations with Steven Horne, a Seventh-day Adventist member who had been working at SkyWest since May of 2007, about potential Sabbath conflicts if he went to work for SkyWest. *App. Exh. 2, Cassell Dep. 11:17-12:16, 105:17-106:2; App. Exh. 38, Horne Dec. ¶8.* | Undisputed. This fact is substantially the same as SOF ¶ 4 and should be considered together. |
| 3 | Horne told Cassell that he did not have any difficulty keeping the Sabbath during training. Horne also discussed how to avoid working on the Sabbath once Cassell became a pilot and explained how to use the bidding process and how dropping and trading flights worked. *App. Exh. 2, Cassell Dep. 20:17-21, 22:1-18; App. Exh. 38, Horney Dec. ¶8.* | Undisputed. This fact is substantially the same as SOF ¶¶ 4-6 and should be considered together. |
| 4 | Cassell reapplied at SkyWest in the Summer of 2016. Before starting his training with SkyWest, Cassell completed a CTP course in Atlanta, Georgia. *App. Exh. 2, Cassell Dep. 77:11-80:9.* [Footnote 6:] "During his deposition Cassell mistakenly stated he reapplied at SkyWest in the Summer of 2015 but then clarified that he had misspoken and meant 2016. *App. Exh. 2, Cassell Dep. 105:17-20.* | Undisputed. This fact is substantially the same as SOF ¶¶ 10, 11, and 33 and should be considered together. |
| 5 | While at the CTP course Cassell asked, and the trainers agreed, to move his simulator training so that it would not conflict with the Sabbath. *App. Exh. 2, Cassell Dep. 81:5-15.* | Undisputed, but immaterial. This case does not relate to Cassell's hiring exchange with SkyWest in 2016, as Cassell himself acknowledges in RSOF ¶ 11 related to the CTP course. This fact is substantially the same as SOF ¶ 11 and should be considered together. |
| 6 | Cassell's request apparently was sent to Coy Bryant who was a manager in SkyWest's Employee Relations Department assigned to pilots. *App. Exh. 1, Bryant Dep. 30:11-31:13; App. Exh. 23.* | Undisputed, but immaterial. This case does not relate to Cassell's hiring exchange with SkyWest in 2016. SkyWest notes that Coy Bryant's testimony, where he reviews an email, *App. Exh. 23* (SkyWest_000026), indicates a recruiting specialist was simply informing Mr. Bryant of the CTP course accommodation, not sending it to him for his approval. *App. Exh. 1, Bryant Dep. 30:11-31:13.* |
| 7 | Cassell's request prompted Bryant to send Cassell an Employee Request for Religious Accommodation form. Cassell filled it out and returned it to Bryant. *App. Exh. 24; App. Exh. 1, Bryant Dep. 32:21-33:2; App. Exh. 2, Cassell Dep. 120:1-23.* | Undisputed. This fact is substantially the same as SOF ¶¶ 23 and 24 and should be considered together. |
| 8 | After talking with other employees in Employee Relations and with Jake Whicker, who was a training program manager, Bryant sent an email to | Undisputed. This fact is substantially the same as SOF ¶ 25 and should be considered together. |

| | | |
|---|---|---|
| | Cassell saying that SkyWest couldn't grant him the exact accommodation he had requested (not to be assigned Sabbath flights). Instead, SkyWest would offer him "all the tools available" to avoid working on the Sabbath. These included using the bidding system, swapping and trading flights, and "all that stuff." *App. Exh. 1, Bryant Dep. 33:3-25; App. Exh. 9, Whicker Dep. 43:12-46:20; App. Exh. 25.* | |
| 9 | SkyWest's proposed accommodation was set forth in a "Memorandum of Agreement for Religious Accommodation Request" which Bryant prepared and sent to Cassell (who signed it along with Bryant and Whicker). In relevant part the memorandum provides:<br><br>It has been determined that we are unable to honor the specific request with work scheduling. However, as an accommodation we have provided FO Cassell with tools to meet his religious requirement. Options include pursuit of schedule changes as defined by company and departmental resources (e.g. drop/trade shift, bid for desired work assignments, domicile staffing/available shifts)<br><br>*App. Exh. 25; App. Exh. 1, Bryant Dep. 40:8-42:7; App. Exh. 9, Whicker Dep. 46:11-47:12.* | Undisputed. This fact is substantially the same as SOF ¶ 25 and should be considered together. SkyWest adds that Cassell signed the memorandum under protest, by including underneath his signature, "My signature does not relinquish my request for religious accommodation." *App. Exh. 25; see also* Cassell Dep., Ex. B, at 196:4-19. |
| 10 | The "tools" in the 2016 accommodation, which were available to all SkyWest pilots, only addressed flight schedules and did not address conflicts that might arise during training. *App. Exh. 7, Spagnolo Dep. 104:11-119:4; App. Exh. 2, Cassell Dep. 195:24-197:5; App. Exh. 1, Bryant Dep. 42:3-7.* | Admitted in part and denied in part. Admitted that the accommodation tools were available to all SkyWest pilots. This fact is substantially the same as SOF ¶ 26 and should be considered together. Denied that the accommodation did not provide tools to address conflicts during training, as certain training shifts could be traded or swapped. The cited testimony does not support this assertion. The citations to the testimonies of Mr. Spagnolo and Mr. Bryant do not address training, although Mr. Bryant did address it elsewhere. And Cassell's cited testimony shows that he, too, understood the tools applied at least in some circumstances during training. *See App. Exh. 1, Bryant Dep. 24:1-20, 27:1-7* (stating that seniority and a type of bidding applied to at least some components of training); *App. Exh. 2, Cassell Dep. 195:24-197:5* ("when you get into training, I don't have the ability *in all situations* to bid, drop, or trade" (emphasis added)).<br><br>Ultimately, however, this dispute is immaterial because this case |

| | | |
|---|---|---|
| | | does not relate to Cassell's hiring exchange or training with SkyWest in 2016, as Cassell acknowledges in RSOF ¶ 9. |
| 11 | Cassell started training with SkyWest in Salt Lake City in November of 2016. When Cassell received his schedule for the second week of training he learned that a computer-based Matrix training class was scheduled for 4 to 6 pm on Friday. At that time of the year, sundown in Salt Lake City was 5 p.m. Cassell immediately contacted Whicker and Bryant to discuss the conflict. *App. Exh. 2, Cassell Dep 102:24-105:16.* | Undisputed, but immaterial. This case does not relate to Cassell's hiring exchange or training with SkyWest in 2016, as Cassell acknowledges in RSOF ¶¶ 9, 34-37.<br><br>This fact is substantially the same as SOF ¶¶ 34-37 and should be considered together. |
| 12 | Apparently, the only way to accommodate Cassell would have been to start and end the ground school an hour earlier (which would have allowed the first Matrix training class to end by sundown.) Bryant asked Whicker to make this change, but Whicker did not discuss it with his boss, who was the person who had the authority to do so. *App. Exh. 9, Whicker Dep. 35:14-41:23; App. Exh. 1, Bryant Dep. 44:6-47:4.* | Disputed, but immaterial. Coy Bryant testified only that when he became aware of Cassell's scheduling conflict, he called Jake Whicker to see if the matrix session could be shifted an hour earlier. Mr. Bryant testified Mr. Whicker said he was unable to do that because it would affect others' schedules and it was too short of notice. *App. Exh. 1, Bryant Dep. 44:6-47:4.*<br><br>Mr. Whicker testified only that when he became aware of Cassell's scheduling conflict with the matrix training, he discussed it with "someone in HR and [his] boss," "considered all of the available matrix shifts . . . All of [which] encroached on the sabbath," that there could not be a "modification of the matrix training," "without interrupting ground school itself, the classroom time itself" or by "scheduling something on a Saturday," or by "let[ting] out a class sooner or change a class day" or by making "a drastic change that would have been very difficult to manage with the number of students and the resources that we have available such as the matrix and the instructors." *App. Exh. 9, Whicker Dep. 35:14-41:23.*<br><br>Neither Mr. Bryant nor Mr. Whicker testified that the only way to accommodate Cassell would have been to start and end ground school an hour earlier. Additionally, Cassell does not cite any evidence that Mr. Whicker did not discuss that mode of accommodation with his boss, or that his boss was the only person with authority to make that change. All that Mr. Whicker testified to was that he didn't "recall a discussion" along those lines. *App. Exh. 9, Whicker Dep. 40:4-12.*<br><br>In any event, this case does not relate to Cassell's hiring |

| | | |
|---|---|---|
| | | exchange or training with SkyWest in 2016, as Cassell acknowledges in RSOF ¶¶ 9 and 35. |
| 13 | The next day Whicker told Cassell that SkyWest would not provide him with an accommodation which would have allowed him to complete Matrix training before sundown. He then told Cassell he had three options: make it work with his religion and show up at the class, not show up and be fired, or resign effective immediately. *App. Exh. 2, Cassell 104:16-105:16.* | Disputed, but immaterial. Mr. Whicker's testimony is that he discussed with Cassell the possibility of being terminated for not showing up for a shift, and that resignation would avoid that and getting blacklisted. He did not recall specifically telling Cassell he would be terminated. (Whicker Dep., Ex. D, at 52:1-19.)<br><br>In any event, this case does not relate to Cassell's hiring exchange or training with SkyWest in 2016, as Cassell acknowledges in RSOF ¶¶ 9 and 37.<br><br>This fact is substantially the same as SOF ¶ 37 and should be considered together. |
| 14 | Both Whicker and Bryant told Cassell that if he resigned, he could return for a class in the spring when the extended day light hours would eliminate the conflict with the Matrix training. Accordingly, Cassell chose to resign. *App. Exh. 1, Bryant Dep. 44:23-25:14; App. Exh. 9, Whicker Dep. 49:25-50:25.* | Undisputed, but immaterial. This case does not relate to Cassell's hiring exchange or training with SkyWest in 2016, as Cassell acknowledges in RSOF ¶¶ 9 and 37.<br><br>Much of this fact is substantially the same as SOF ¶ 37 and should be considered together. |
| 15 | Whicker marked on the termination paperwork that Cassell was eligible for rehire because he had resigned. *App. Exh. 9, Whicker Dep. 53:10-55;13; App. Exh. 26.* | Undisputed. |
| 16 | Whicker sent an email to Cassell a day or two later reaffirming that Cassell had resigned from his employment because of the Matrix training conflict and to avoid being terminated. Whicker reiterated that SkyWest had agreed to an accommodation which provided Cassell with "tools" that he could use to avoid working on the Sabbath. *App. Exh. 11; App. Exh. 9, Whicker Dep.56:2-58:8.* | Undisputed. |
| 17 | Cassell told Michael Wahlen, a friend and Seventh-day Adventist who was applying for a pilot position with SkyWest, what had occurred. A few months later, Wahlen was able to avoid the matrix training conflict by not starting his training until day-light savings time. *App. Exh. 2, Cassell Dep. 23:12-25:12, 141:5-19 (Cassel also told Horne what had happened); App. Exh. 37, Wahlen Dec. ¶6.* | Undisputed, but immaterial. This case does not relate to Cassell's hiring exchange or training with SkyWest in 2016, as Cassell acknowledges in RSOF ¶ 9. Additionally, Mr. Wahlen's training schedule is not material to the case at hand regarding Cassell's rehiring. |
| 18 | After completing training Wahlen began flying as a First Officer on the CRJ airplane and was domiciled in Detroit. Wahlen only held a reserve assignment for three weeks and during that time was not required to work on | Undisputed, but immaterial. Undisputed that Mr. Wahlen was able to avoid working shifts on his Sabbath using the accommodation tools SkyWest offered him, which was identical |

| | | |
|---|---|---|
| | the Sabbath. By his second month Wahlen was able to start bidding a line (a set group of flights and trips for the month) and was largely able to avoid Sabbath assignment. When he could not bid out of a Sabbath flight, Wahlen was able to trade it away by posting it on Open Time. Within roughly six months Wahlen had enough seniority that he could avoid all Sabbath conflicts through the bidding process and did not need to trade flights with another pilot. In sum, Wahlen was able to avoid flying on the Sabbath using the accommodation that SkyWest had agreed to provide to Cassell. Wahlen told Cassell of his success in avoiding Sabbath shifts. *App. Exh. 2, Cassell Dep. 50:7-13; App. Exh. 37, Wahlen Dec. ¶¶ 10-15; App. Exh. 13.* | to that offered to Cassell.<br><br>This fact is substantially the same as RSOF ¶ 7 and should be considered together, along with RRSOF ¶ 7. |
| 19 | Because Wahlen was successful in completing training and having a flight schedule that did not conflict with the Sabbath, and following the suggestions of Whicker and Bryant, Cassell reapplied to SkyWest in the summer of 2017. *App. Exh. 2, Cassell Dep. 141:20-142:23.* | Admitted in part and denied in part. Admitted that Cassell reapplied to SkyWest on June 12, 2017. This fact is substantially the same as SOF ¶ 40 and should be considered together.<br><br>Denied that the cited evidence indicates Cassell reapplied because of Mr. Wahlen's success or the suggestions of Mr. Whicker or Mr. Bryant, although this dispute is ultimately immaterial. |
| 20 | During the application process Bryant learned that Cassell had reapplied for a position with SkyWest. Bryant was told that although SkyWest was aware of what had occurred the prior year, Cassell had done very well on his interview "so he looked good and was going to come back." *App. Exh. 1, Bryant Dep. 55:3-15.* | Undisputed. |
| 21 | Bryant called the pilot recruiter and told him that the training conflict Cassell had in 2016 no longer existed because of the time change. Bryant also told the recruiter that it would be good to have Cassell go through training and begin to work as a pilot to see if the "tools available to him" would allow him to avoid Sabbath flights. Bryant also told Larsen, another recruiter, that Cassell might be able to make his schedule work and that SkyWest could not discriminate based on religion. *App. Exh. 1, Bryant Dep. 56:19-59:25; App. Exh. 27.* | Admitted in part and denied in part. Denied that Mr. Bryant testified that Cassell might be able to make his schedule work. He testified only that he wanted SkyWest to give an individual like Cassell a chance to see if the schedule would work. *App. Exh. 1, Bryant Dep. 58:5-13, 59:14-25.* This was the case even though Mr. Bryant testified he had never seen someone with "a specific scheduling conflict" like Cassell successfully make it through training. Everybody he had seen with a conflict "had washed out or resigned before they completed training." *App. Exh. 1, Bryant Dep. 57:8-25, 58:5-13.* Otherwise, admitted. |
| 22 | Bryant also called Cassell and asked him to explain the parameters of when he would work on the Sabbath. Cassell prepared several drafts of a letter to address the specific issues that Bryant raised—such as what he would do if his flight was delayed into the Sabbath due to maintenance issue or weather, and how he would handle conflicts during training. *App. Exh. 2, Cassell* | Undisputed. This fact is substantially the same as SOF ¶ 43 and should be considered together. |

| | | |
|---|---|---|
| | *156:4-170:10; App. Exh. 1, Bryant Dep. 65:14-68:3; App. Exh. 28.* | |
| 23 | Cassell explained, in his letter, that he was not asking SkyWest to guarantee a Sabbath free schedule and that he would use the "tools SkyWest has provided to either bid out of, drop, or trade a shift that conflicted with his beliefs. *App. Exh. 2, Cassell 156:4-170:10; App. Exh. 28.* | Undisputed. This fact is substantially the same as SOF ¶ 44 and should be considered together. |
| 24 | Cassell also indicated that if there was an unforeseen circumstance, "such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended [into the Sabbath], I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious beliefs." Cassell also explained how he would avoid conflicts during training sessions. *App. Exh. 2, Cassell 156:4-170:10; App. Exh. 28.* | Undisputed. This fact is substantially the same as SOF ¶ 44 and should be considered together. |
| 25 | Bryant sent copies of the letter to Glassey, SkyWest's Chief pilot, Whicker, and several other persons in Employee Relations. Bryant sent the letter to Glassey with a cover email that reads "[b]ased on the attached email Employee Relations recommends we allow Shane Cassell an opportunity. Certainly it is your call." *App. Exh. 1, Bryant Dep. 68:20-72:4; App. Exh. 29.* | Undisputed. |
| 26 | Before receiving Cassell's letter, Glassey was asked to review the interview notes which had been entered into the "hiring dashboard." The 2017 interview notes read in part "Has expressed unwillingness to be flexible with schedule without any acception [sic]" and "the team has concerns of reliability." Glassey did not review anything else, nor did he talk with Cassell. *App. Exh. 30; App. Exh. 6, Glassey Dep. Vol II, 33:21-40:11.* | Undisputed. This fact is substantially related to SOF and RRSOF ¶ 45. They should be considered together. |
| 27 | Based on these notes alone, Glassey decided that Cassell was unable to "accommodate the schedule we were hiring pilots for" and that because he was "inflexible" (according to the notes) "he stated his insubordination before he even started." *App. Exh. 6, Glassey Dep. Vol II 37:25-38:20, 48:9-13; App. Exh. 5, Glassey Dep. Vol. I 59:5-23 (<u>stating that pilot who refused to fly for religious reasons (but were otherwise able to do so) would be considered insubordinate.)</u>* | Undisputed. Mr. Glassey's testimony indicates that his decision, based upon the interview notes alone, was not based upon Cassell's religion, but upon Cassell's inability to commit to the necessary schedule. *App. Exh. 6, Glassey Dep. Vol II 37:25-40:11.* Mr. Glassey maintained that decision after receiving a follow-up letter from Cassell, which Mr. Glassey testified missed the "core issue" of whether Cassell would work a Sabbath shift in the event Cassell could not use SkyWest's accommodation to avoid it. *App. Exh. 6, Glassey Dep. Vol II 45:16—48:21.*<br><br>Additionally, SkyWest notes that Mr. Glassey's specific testimony regarding the last citation to his deposition reads: "I would consider the pilot's refusal to fly if . . . they are able to fly but just unwilling and outside of our requirements and there's no |

| | | |
|---|---|---|
| | | accommodation, I would consider that refusal to fly, and that would be an unexcused absence for whatever reason. They don't have an accommodation not to fly. So they're able, they're just unwilling. So that is treated consistently." *Glassey Dep. Vol. I 59:15-23.*<br><br>This fact is substantially related to SOF ¶ 45 and RRSOF ¶ 45. They should be considered together. |
| 28 | After reviewing the file Glassey told HR to reject (or regret according to SkyWest's terminology) Cassell's application. *App. Exh. 6, Glassey Dep. Vol II 25-43:3.* | Undisputed. |
| 29 | SkyWest notified Cassell in a letter dated July 12, 2017, that it would not hire him. *App. Exh. 31; App. Exh. 1, Bryant Dep.76:19-77:3.* | Undisputed. This fact is substantially the same as SOF ¶ 47 and should be considered together. |
| 30 | The Crew Support department ("Crew Support"), which is headed by Anita Spencer, is responsible for, among other things, planning flight schedule and assignment pilots. Planning involves taking the routes or flights that they receive from their partner airlines and building them into "pairings" (groups of flights) and "lines" (a group of pairing) which the pilots bid on. *App. Exh. 8, Spencer Dep. 7:14-13:22.* | Undisputed. |
| 31 | One factor that Crew Support must account for in scheduling and assigning flights is pilot absences and other situations where pilots are unable to take their assigned flights. According to Glassey, on average, pilots miss their assigned flights 5.3 days a year. *App. Exh. 5, Glassey Dep. Vol. I. 75:3-76:3.* | Undisputed. |
| 32 | Information provided by SkyWest also shows that just for the Detroit domicile, between approximately 10 and 20 CRJ First Officers [see footnote 7 below] were unable to take their scheduled flight on every Friday, Saturday and Sunday from September 9, 2017 through the end of 2019. *App. Exh. 8, Spencer Dep. 39:19-42:22; App. Exh. 32* (which shows absences for any number of reasons including family and military leave, sickness, fatigue, and pilots who were off with no pay); See also *App. Exh. 4, Esplin Dep. 28:13-29:24, 49:5-51:1; and App. Exh. 12, Tab 8(c)* (which shows even more absences than Dep. Ex. 41).<br><br>[Footnote 7:] This is the position, airplane (CRJ) and domicile that Cassell would have had if SkyWest had hired him in 2017. | Admitted in part and denied in part. Admitted that *App. Exh. 32* lists between approximately 10 and 20 CRJ First Officers that were unable to take their shifts for a variety of reasons. Denied that *App. Exh. 12, Tab 8(c)* shows more absences than *App. Exh. 32*.<br><br>Ultimately, however, this dispute is immaterial because it cannot alter the fact that Cassell rejected SkyWest's reasonable accommodation and insisted on a Sabbath-free accommodation. |
| 33 | Pilots are required to notify Crew Support if they are unable to fly and provide a reason for their absences. This gives Crew Support the opportunity to have the flight covered by another pilot. As discussed by Spencer, head of | Undisputed. SkyWest adds that both Anita Spencer and Roy Glassey also testified that reflowing involved using a reserve pilot and that Mr. Glassey testified that this is the first thing |

| | | |
|---|---|---|
| | Crew Support, if a pilot called in sick, for example, Crew Support would first try to find a pilot who was already working and switch their route to accommodate the sick pilot. This was referred to as "reflowing" a pilot. *App. Exh. 8, Spencer Dep. p. 22:2-10, 49:18-50:12; App. Exh. 5, Glassey Dep. Vol I 20:23-21:15.* | Crew Support would do. *App. Exh. 8, Spencer Dep. p. 22:2-10; App. Exh. 5, Glassey Dep. Vol I 20:23-22:6.* |
| 34 | In addition, to ensure that flights were not canceled, Crew Support determined the number of reserve pilots (who can fill in for absent pilots) that were needed at each domicile, based on the number of lines (a line is a pilot's assigned flights for the month) and how many pilots were on leave or out for training. *App. Exh. 8, Spencer Dep. 30:8-31:15.* | Undisputed. |
| 35 | Generally, about 18% of the pilots in each domicile were on reserve status, meaning that they are available to fill in for absent pilots. *App. Exh. 8, Spencer Dep. 33:6-34:25.* | Undisputed. This fact is substantially the same as SOF ¶ 54 and should be considered together. |
| 36 | Although it varied by month, SkyWest had between approximately 200 and 400 First Officers trained on the CRJ assigned to the Detroit domicile. *App. Exh. 4, Esplin Dep. 19:14-22:7; App. Exh. 33, tab 7(a).* [Footnote 8:] A pilot could only take a flight for a pilot of the same rank and in the same type of aircraft he was trained to fly. Since Cassell would have been trained as a First Officer on the CRJ and assigned to Detroit, the data provided by SkyWest was limited to CRJ trained first officers domiciled in Detroit and for weekends (Friday-Saturday-Sunday). | Undisputed. SkyWest notes that the number of pilots, precisely, was between 192 and 379. *App. Exh. 33, tab 7(a).* |
| 37 | And on any Friday, Saturday or Sunday, SkyWest usually had between thirty and fifty CRJ trained First Officers on reserve status in Detroit who were available to take flights for absent pilots. *App. Exh. 4, Esplin Dep 24:6-25:9; App. Exh. 33, tab 7(c).* | Disputed, but immaterial. The number of pilots, precisely, was between 7 and 67. The average number of pilots assigned to a reserve shift each day was 29 pilots. The median number of pilots was 26. *App. Exh. 33, tab 7(c).* However, this dispute is immaterial because it cannot alter the fact that Cassell rejected SkyWest's reasonable accommodation and insisted on a Sabbath-free accommodation. |
| 38 | This number was needed because there was a lot of day to day juggling of flights and crews—such as when a plane broke down or a crew member was sick or otherwise absent. *App. Exh. 8, Spencer Dep. 21:21-22:10, 50:5-13.* | Undisputed. |
| 39 | SkyWest's data show that on Fridays through Sundays, the majority of reserve First Officer pilots in Detroit were given flights. *App. Exh. 4, Esplin Dep. 34:1-11; App. Exh. 33, tab 9(b).* This included flights where the pilot who had bid the flight was absent for one reason or another. *App. Exh. 4, Esplin Dep. 36:15-37:23; App. Exh. 33, tab 9(c).* | Admitted in part and denied in part. Admitted that the majority of reserve First Officer pilots in Detroit were given flights. Disputed that Mr. Esplin testified that *App. Exh. 33, tab 9(b)* included flights where the pilot who had bid the flight was absent for one reason or another. *Esplin Dep. 36:15-37:23.* However, this dispute is immaterial because it cannot alter the fact that Cassell rejected SkyWest's reasonable accommodation |

| | | |
|---|---|---|
| | | and insisted on a Sabbath-free accommodation. |
| 40 | But at no time did SkyWest's Detroit domicile run out of First Officer reserve pilots on a Friday, Saturday or Sunday from mid-2017 through the end of 2019. *App. Exh. 4, Esplin Dep. 30:9-32:7; App. Exh. 12, tab 9(a).* | Disputed, by immaterial. Mr. Esplin testified that *App. Exh. 12, tab 9(a)* was insufficient to conclude whether there were no days in which all reserves were used. This fact is substantially the same as RRSOF ¶ 54, where SkyWest sets out this argument in full, and should be considered together. |
| 41 | In fact, reserve First Officer pilots in Detroit were often used to cover flights from domiciles other than Detroit. *App. Exh. 4, Esplin Dep. 36:15- 37:9; App. Exh. 12, tab 9(d).* | Undisputed. SkyWest notes that, precisely, between 1 and 17 pilots were used daily to cover flights from other domiciles. *App. Exh. 12, tab 9(d).* |
| 42 | SkyWest allows pilots to trade, swap or drop flights (after flights have been assigned through the bidding process) through the SkedPlus+ system. Swapping involves a pilot trading one flight or pairing (a group of linked flights) for another flight or pairing without involved another pilot. Trading involves trading flights or pairings with another pilot. Dropping a flight or pairing involves posting the flight into the SkedPlus+ system on Open Time, which allows other pilots to pick up the flight or pairing if they chose to do so. Pilots can also post a flight or pairing in Open Time and offer to pay the pilot who picks up the flight or pairing some sum of money. Pilots are not penalized for dropping a flight and can trade down (i.e., take a shorter flight or pairing) or swap once every 24 hours. *App. Exh. 7, Spagnolo Dep. 99:8-19, 104:11-24, 111:9- 113:10, 114:3-116:24; App. Exh. 37, Dec. of Wahlen; App. Exh. 8, Spencer Dep. 54:21-55:17, 57:13-58:1.* | Undisputed. This fact is substantially related to SOF ¶¶ 31 and 32 and should be considered together. |
| 43 | Once a flight is in Open Time, it is a first come, first serve as to which pilot picks up the flight. In other words, picking up flights after they are posted in Open Time is not based on seniority but rather when the pilot submits a request. *App. Exh. 8, Spencer. 57:1-:12, 72:17-73:1.* | Undisputed. |
| 44 | Pilots can also call Crew Support directly to request a change in their schedule. *App. Exh. 8, Spencer Dep. 63:12-22.* | Undisputed. Calling Crew Support is simply an alternative means to using the SkedPlus+ system. *App. Exh. 8, Spencer Dep. 63:12-22.* |
| 45 | This post-bid process of exchanging flights was used extensively. For example, in the Detroit domicile First Officers who were qualified to fly the CRJ airplane traded some 522 flights in October of 2017 alone and posted some 1690 flight on SkedPlus+ for other pilots to pick up. *App. Exh. 4, Dep. of Justin Esplin, 48:11-49:11; App. Exh. 12, Tab 11(a) & 11(b).* | Undisputed. SkyWest notes that the monthly amounts of successful assignment trade, swap, or drop transactions varied between 125 and 522, although 522 is a clear outlier. In most months, the successful transitions were in the 100s. Additionally, the total amount of trade, swap, or drop postings, including those which were unsuccessful varied between 486 and 1690, although 1690 is a clear outlier. *App. Exh. 12, Tab 11(a) & 11(b).* |