IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SHANE ANDREW CASSELL<br><br>                Plaintiff,<br><br>v.<br><br>SKYWEST, INC., d/b/a/ SKYWEST AIRLINES,<br><br>                Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S CORRECTED MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00149-JNP-DAO<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

Before the court is a corrected motion for summary judgment filed by Defendant SkyWest, Inc. ("SkyWest" or "Defendant") [ECF No. 48]. The court held oral argument on the motion on January 26, 2022. At the conclusion of the hearing, the court took the motion under advisement. After considering the written submissions and the arguments presented at the hearing, the court DENIES SkyWest's motion for summary judgment.[1]

**FACTUAL BACKGROUND**

This case arises from a complaint filed by Plaintiff Shane Cassell ("Cassell"), a practicing Seventh-Day Adventist. SkyWest refused to hire Cassell based on concerns that his religious

---

[1] SkyWest complains that Cassell filed a 65-page opposition brief, despite District of Utah rules that limit opposition briefs on motions for summary judgment to forty pages or 10,000 words. *See* DUCivR 56-1(g)(1) (2020). The court firmly reminds Plaintiff's counsel that "a party must first obtain a court order authorizing the additional pages or words before filing a motion, response, or reply that exceeds the page or word limits." DUCivR 7-1(a)(6)(A) (2021). Moreover, "[t]he motion must be filed, and the order obtained, before filing the overlength motion, response, or reply." *Id.* Although the Plaintiff submitted a brief that blatantly disregards this rule, the court accepts it in this instance only. If counsel disregards this rule again in this or another case before this court, the court will exercise its discretion to impose sanctions under DUCivR 7-1(e)(2)(j).

obligation to observe the Sabbath would interfere with his ability to perform his duties. Cassell asserts that SkyWest's decision not to hire him violates protections against religious discrimination in Title VII.

## I.    SKYWEST AND PILOT SCHEDULING

SkyWest is a regional airline carrier based out of St. George, Utah. SkyWest uses a seniority-based shift bidding system to assign pilots to flights. A collective bargaining agreement between SkyWest Airlines Pilot Association ("SAPA") and SkyWest governs the shift bidding system. Pilots use the Preferential Bidding System ("PBS") software to express scheduling preferences that the software accommodates based on seniority. SkyWest also has a separate software system, SkedPlus+, which pilots can use to trade, swap, or drop shifts that they receive through the PBS software. SkyWest's Crew Support team works with pilots to facilitate such changes whenever possible. In sum, SkyWest's scheduling system works as follows: Pilots bid on their preferred schedule using PBS, pilots receive shifts from PBS with their preferences honored based on seniority, then pilots use SkedPlus+ to swap unwanted shifts without regard to seniority.

SkyWest's Pilot Reliability Program governs absences from work. The policy states that "[e]xcessive occurrences [i.e., absences] and schedule assignment deviations (SAD) will result in disciplinary action." ECF No. 48-2, at 131. Ultimately, the chief pilot at a domicile exercises discretion to determine the disciplinary action that results from an absence. *See* ECF No. 53-2, at 26 ("There's nothing in writing anywhere, and I know that because we had instances of other pilots having other reliability issues that one chief pilot might handle . . . different[ly] than another chief pilot . . . so I know that they're handled on a case-by-case basis."). A single absence could lead to termination. *Id.* at 230. But in the first instance, the chief pilot "would

more likely counsel, correct, and define expectations for that pilot moving forward." *Id.* A higher form of discipline, like termination, would take place if "it continues or it occurs again." *Id.*

## II.     SEVENTH DAY ADVENTISTS AT SKYWEST

Cassell belongs to the Seventh-Day Adventist Church. As a Seventh Day Adventist, Cassell observes the Sabbath by refraining from work on the Sabbath. The Sabbath lasts from sundown on Friday to sundown on Saturday. Seventh Day Adventist doctrine allows, and Cassell observes, an exception to the rule prohibiting Sabbath work in the case of unforeseen circumstances. Accordingly, in the event of an emergency, a mechanical issue, or some other unforeseen delay, Cassell's religion permits him to work on the Sabbath.

Cassell interacted with two other Seventh Day Adventists employed by SkyWest who shared their experiences using PBS and the post-bidding tools to avoid Sabbath work. Michael Wahlen ("Wahlen") began working for SkyWest in June 2017 and is presently employed by SkyWest. Upon Wahlen's hire, he signed a Memorandum of Agreement for Religious Accommodation Request. ECF No. 53-2, at 1273. The memorandum states that while SkyWest was "unable to honor the specific request with work scheduling," "as an accommodation we have provided FO Wahlen with tools to meet his religious requirements." *Id.* The tools included "pursuit of schedule changes as defined by company and departmental resources (e.g. drop/trade shift, bid for desired work assignments, domicile staffing/available shifts)." *Id.* He initially received a few Sabbath assignments from PBS because he lacked the seniority necessary to receive a Sabbath-free schedule, although he always bid for one. When Wahlen received a Sabbath trip, he used SkedPlus+ to drop his Sabbath shifts, sometimes by offering other pilots $100 to take them. After working for SkyWest for six months, Wahlen accumulated enough seniority to avoid Sabbath conflicts through PBS, so Wahlen no longer needed to use SkedPlus+

to trade flights with other pilots. Wahlen avers—and SkyWest agrees—that during his entire employment with SkyWest, he has never flown on the Sabbath.

Cassell also spoke with Stephen Horne ("Horne"), who worked for SkyWest from 2007 to 2018. Initially, Horne worked a number of Sabbath shifts. But in 2008, Horne recommitted himself to Sabbath observance. Since then, Horne has largely avoided working on the Sabbath. Horne notes that he had "incidents" in 2011 where he was required to work on the Sabbath and received discipline for not doing so. But Horne retained his job and changed his base of operation to a base where he had more seniority. Moving forward, Horne successfully used PBS to avoid Sabbath shifts.

## III. CASSELL AND SKYWEST'S RELATIONSHIP

Although this case arises from SkyWest's failure to hire Cassell in June 2017, the history between Cassell and SkyWest predates that decision. In 2015, Cassell received a job offer from SkyWest. He declined the offer to pursue other career opportunities. The more substantive relationship between the two parties began in fall 2016. While the facts surrounding Cassell's 2016 employment with SkyWest do not form the basis of the present claim, they are relevant to understanding the parties' arguments.

Around August 2016, Cassell applied for a job with SkyWest. SkyWest hired him. On October 26, 2016, Cassell requested a religious accommodation. Specifically, he requested that he "not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown." ECF No. 48-1, at 4. The following day, SkyWest and Cassell signed a "Memorandum of Agreement for Religious Accommodation Request."[2] *Id.* at 5. The agreement recognized that SkyWest was "unable to honor the specific request with work scheduling." *Id.*

---

[2] Indeed, the memorandum was identical to the one, referenced above, that Wahlen signed a few months later.

4

Instead, Sky West offered "as an accommodation" to "provide[] FO Cassell with tools to meet his religious requirements." *Id.* These tools included "pursuit of schedule changes, as defined by company and departmental resources (e.g. drop/trade shift, bid for desired work assignments, domicile staffing/available shifts)." *Id.* The memorandum did not explain whether Cassell had any tools available to navigate religious conflicts during training.

As it turns out, a training conflict arose. During the interview process, SkyWest told Cassell that his training would occur in Salt Lake City, Utah between 8:00 a.m. and 5:00 p.m., although it could not guarantee a particular time for simulator training. During the training, Cassell discovered that the training included an event called "Matrix Training" where the pilots used computer monitors to learn the proper order to flip switches during takeoff and landing. Trainers scheduled two slots for trainees to complete Matrix Training—Friday from 4:00 p.m. to 6:00 p.m. or Friday from 6:00 p.m. to 8:00 p.m. The sun set around 5:00 p.m., meaning that all of the scheduled options for Matrix Training required Cassell to violate his Sabbath. Cassell approached Jake Whicker, the training manager. While Whicker initially indicated that he might be able to accommodate Cassell, he later gave Cassell three options: Cassell could show up to the required training event; he could fail to show up and be fired; or he could resign effective immediately. Cassell elected to resign to avoid a termination on his record.

Cassell then filed a complaint with the EEOC in February 2017 claiming that SkyWest constructively discharged him based on his religious beliefs. But in June 2017, Cassell reapplied to SkyWest. Concerned that his pending EEOC complaint could dampen his chances for rehire, Cassell rescinded it. During the 2017 interview process, Cassell sent SkyWest a letter confirming that "I realize that SkyWest cannot guarantee that I will be provided a schedule that will always allow me to observe my beliefs." ECF No. 48-1, at 17. Cassell further indicated that "it has and

will continue to be my intent to use the tools that SkyWest has provided to either bid out of, drop, or trade a shift that may conflict with my beliefs" *Id.* Finally, Cassell promised that "[i]f there was an unforeseen circumstance, such as (but not necessarily limited to) a maintenance delay at an outstation and my duty time is extended, I would be willing to fly the aircraft back to base." *Id.*

At this point Cassell and SkyWest reached an impasse. SkyWest insisted that Cassell commit to working on the Sabbath if he could not use the available tools to avoid a shift. *See* ECF No. 53-2, at 264 ("He just . . . did not state that if unsuccessful after using all the tools that are available, that he would honor his schedule."). But Cassell refused. Instead, he recognized that SkyWest could not guarantee a Sabbath-free schedule but insisted that he could use the tools available to avoid a conflicting shift.

SkyWest elected not to rehire Cassell. His interview team noted that he "[h]as expressed unwillingness to be flexible with schedule without any acceptation [sic].") *Id.* at 948. On March 4, 2019, Cassell filed suit against SkyWest alleging the following claims under Title VII: (1) failure to hire, (2) failure to accommodate, and (3) retaliation.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must

"view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANALYSIS

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). Title VII, then, requires that "an employer, short of 'undue hardship,' make 'reasonable accommodations' to the religious needs of its employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 66 (1977). Additionally, "Title VII forbids retaliation against an employee because she has 'opposed' any practice made unlawful by Title VII." *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (quoting 42 U.S.C. § 2000e-3(a)).

## I.  FAILURE TO ACCOMMODATE AND FAILURE TO HIRE CLAIMS

SkyWest first moves for summary judgment on Cassell's failure to accommodate and failure to hire claims. Because these two claims have significant overlap, the court addresses them together.

In religious accommodation and failure to hire cases, courts apply a burden-shifting framework akin to that articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000). The plaintiff bears the initial burden to show a prima facie case for failure to

accommodate and failure to hire. *Id.* To establish a prima facie case, plaintiff must show that (1) the employee has a bona fide religious belief that conflicts with a job requirement; (2) the employee informed the employer of this conflict; and (3) the employer fired or failed to hire the employee for failing to comply with the conflicting job requirement. *See Tabura v. Kellogg USA*, 880 F.3d 544, 549 (10th Cir. 2018); *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1486 (10th Cir. 1989). Once a plaintiff establishes a prima facie case, the burden shifts to the defendant "1) to rebut an element of Plaintiffs' prima facie claims; 2) to show that it provided a reasonable accommodation for Plaintiffs' religious practice; or 3) to show that it could not offer a reasonable accommodation without undue hardship." *Tabura*, 880 F.3d at 550.

Here, SkyWest does not dispute that Cassell established a prima facie case for failure to accommodate or failure hire. ECF No. 58, at 13. Accordingly, all parties agree that the burden shifts to SkyWest. SkyWest advances the same two arguments to rebut liability on both the failure to hire claim and the failure to accommodate claim. *See Tabura*, 880 F.3d at 550 (prong (2) and (3)). First, it argues that it provided a reasonable accommodation for Cassell's religious practice. ECF No. 58, at 13. Second, it argues that SkyWest could not offer Cassell's preferred accommodation without "undue hardship." *Id.* The issue for the court, then, is whether SkyWest has demonstrated that, when construing the evidence in the light most favorable to Cassell, no genuine issue of material fact exists as to the fact that SkyWest offered a reasonable accommodation, or alternatively, could not accommodate Cassell without undue hardship.

### A.    *Reasonable Accommodation Defense*

A defendant may overcome a plaintiff's prima facie case by demonstrating that it offered plaintiff a reasonable accommodation. "Accommodate . . . means . . . allowing the plaintiff to engage in her religious practice despite the employer's normal rules to the contrary." *Tabura*,

880 F.3d at 550 (quoting *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 n.2

(2015)). But a reasonable accommodation need not be the employee's preferred accommodation.

*Pinsker v. Joint Dist. No. 28J*, 735 F.2d 388, 390-91 (10th Cir. 1984).

Parties often debate whether a particular accommodation is reasonable. But here, "Cassell

agrees that the 2016 accommodation tools offered by SkyWest w[ere] reasonable under the facts

of this case." ECF No. 53, at 48 n.10. Since the accommodation tools available in 2017—use of

the PBS software and post-bidding swaps—mirrored those offered in 2016, the court presumes

their reasonableness.[3] Accordingly, the court focuses not on whether the proposed

---

[3] The caselaw supports the parties' position. Courts regularly find that in the face of a seniority bidding system governed by a collective bargaining agreement, voluntary shift swapping is considered a reasonable accommodation. *See, e.g.*, *Hardison*, 432 U.S. at 77 (observing that TWA "did accommodate plaintiff's observance of his special religious holidays" where it allowed the employee to "swap shifts"); *Thomas*, 225 F.3d at 1156 (holding employer made reasonable accommodations of employee's Sabbath observance by approving employee leave and shift swaps); *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1322 (11th Cir. 2007) ("[A]n employer may be able to satisfy the requirements of Title VII by permitting an employee to swap shifts with other employees in the context of a neutral rotating shift system."). This rule arises from *Hardison*, 432 U.S. at 77. In *Hardison*, the Supreme Court stated that by "reasonable accommodation" Congress did not mean "that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others. 432 U.S. at 81. In essence, the Court "conclude[d] that Title VII does not require an employer to go that far." *Id.* Justice Marshall, in dissent, characterized the majority's opinion as holding that "an accommodation can be rejected simply because it involves preferential treatment." *Id.* at 87 (Marshall, J., dissenting).

However, the court notes that this position is in tension with Justice Scalia's position in *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, in which Justice Scalia stated that "Title VII does not demand mere neutrality with regard to religious practices" but rather the law "gives them favored treatment, affirmatively obligating employers to fail to refuse to hire or discharge any individual because of such individual's religious observance and practice." 575 U.S. 768, 775 (2015) (citation and alteration omitted). Indeed, Justice Scalia stated that "it is no response that the [employer's] failure to hire was due to an otherwise neutral policy." *Id.* Instead, "Title VII requires otherwise-neutral policies to give way to the need for an accommodation." The Tenth Circuit characterizes Justice Scalia's statement as "simply a summary that recognizes an employer cannot take refuge behind a neutral policy if something more is required to reasonably accommodate a religious need." *Tabura*, 880 F.3d at 554.

Therefore, this court is left to square *Hardison*'s statement that employers are not required to prefer the religious needs of employees with *Abercrombie*'s statement that employers must give

accommodation was reasonable but rather on whether SkyWest made the reasonable accommodation available to Cassell.[4]

Cassell contends that he accepted the 2016 accommodations when he reapplied in 2017, but that SkyWest still refused to rehire him notwithstanding his representations that he would abide by the 2016 accommodations. SkyWest counters that it offered the 2016 accommodations

religious practitioners favored treatment when accommodating their religious practice so requires. Perhaps the operative difference is that *Hardison* involved a neutral collective bargaining agreement—to which the Court would afford heightened deference—whereas *Abercrombie* simply involved a neutral employer policy. But if that is the case, the religious protections available to union members subject to a seniority system are severely curtailed. Indeed, the system that SkyWest has in place appears to provide *more* leeway to those seeking accommodations for other reasons, like military leave or sick leave. SkyWest policy permits those individuals to use the reserve system to obtain coverage for necessary leave without facing discipline, even while SkyWest was unwilling to permit Cassell to avail himself of the reserve system when necessary for religious accommodation. *See, e.g.*, ECF No. 53-2, at 266 ("Q: [W]hen you hire someone who's in the military, you know there's a possibility that they're going to take leave at some point for military training. That doesn't prevent SkyWest from hiring those pilots; correct? A: No."); *id.* ("Pilots must be fit for flight. If they're not fit for flight, they call off sick. Those would be excused, certainly."). Such a regime seems to run contrary to Justice Scalia's requirement that religious employees be provided "favored treatment." *Abercrombie*, 575 U.S. at 775. While the court is bound by precedent holding that voluntary shift swapping is a reasonable accommodation in light of a neutral union-mandated seniority system, clarification as to an employer's affirmative duty to accommodate religious practice in light of a neutral collective bargaining agreement would be useful to this court.

[4] This case differs from other cases where employees resigned or refused to work after failing to secure a guarantee from the employer that the employee would never have to work on the Sabbath. *See, e.g.*, *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1021 (10th Cir. 1994) ("Without attempting [defendant's] proposed accommodation, [plaintiff] rejected it because it did not absolutely guarantee that he would be free from work on each observance of his Sabbath."); *E.E.O.C. v. Delta Airlines, Inc.*, No. 97 CV 5646(SJ), 2002 WL 1447582, at *6 (E.D.N.Y. June 26, 2002) (finding shift-swap accommodation reasonable where the plaintiff "never waited for this moment [i.e., assignment to a Sabbath shift] to come to pass" but instead "refused the accommodation offered by Delta because it could not guarantee that he would be able to observe the Sabbath"). SkyWest attempts to fit this case into that mold by claiming that Cassell demanded a guarantee of a Sabbath-free shift. But Cassell never made such a demand. In fact, Cassell acknowledged that "I realize that SkyWest cannot guarantee that I will be provided a schedule that will always allow me to observe my beliefs." ECF No. 48-1, at 17. Rather, SkyWest is the party demanding an unconditional guarantee that Cassell will work on the Sabbath.

to Cassell when he applied in 2017, and that Cassell rejected them by failing to promise to work on Sabbath if the tools available failed to provide a Sabbath-free schedule. The court finds that the facts, viewed in the light most favorable to Cassell, do not clearly establish that SkyWest afforded Cassell the opportunity to avail himself of the reasonable accommodations.

### i.    Opportunity to Accept the Reasonable Accommodations

SkyWest never gave Cassell the opportunity to exercise the proposed reasonable accommodations. When an employer offers a reasonable accommodation, the employee has a duty "to make a good faith attempt to satisfy his needs through means offered by the employer." *Lee*, 22 F.3d at 1022-23 (quoting *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982)); *see also Tabura*, 880 F.3d at 557 ("Of course, an employee has a duty to cooperate with his employer's attempts to accommodate the employee's religious practices."). But SkyWest never gave Cassell that opportunity. In the words of a SkyWest Employee Relations agent, "we didn't give him a shot." ECF No. 53-2, at 23.

"Employee Relations recommend[ed] [SkyWest] allow Shane Cassell an opportunity." *See id.* at 936. Instead of granting him the opportunity to exercise the proposed reasonable accommodations, SkyWest declined to hire Cassell. A jury could find that the evidence, viewed in the light most favorable to Cassell, demonstrates not only that Cassell would have exercised his duty to cooperate vigorously, but also that Cassell could have succeeded in avoiding religious conflicts, rendering unnecessary and unreasonable SkyWest's demand that Cassell pledge to work on scheduled Sabbaths in order to avail himself of the reasonable accommodations.

Cassell committed to utilizing the accommodations available to all SkyWest employees to accommodate his religious practice when he reapplied in 2017. During the 2017 application process, he expressly conveyed to SkyWest that "it has and will continue to be my intent to use

11

the tools that SkyWest has provided to either bid out of, drop, or trade a shift that may conflict with my beliefs." ECF No. 48-1, at 17. And Cassell was "willing to bid for the most undesirable flights, stay at the most junior base, and fly the most junior aircraft in order to avoid conflict with corporate policy." *Id.* Finally, he promised to work with mentors to understand "how to properly use the [PBS] system in order to create a schedule that both meets company and personal needs." *Id.* Thus, the evidence shows that, given the opportunity, Cassell would have eagerly pursued the tools available to craft a schedule that comported with his religious views.

And, when viewed in the light most favorable to Cassell, the evidence suggests he could have succeeded. As one SkyWest employee noted "we've hired others in the same situation." ECF No. 53-2, at 932. At least one Seventh Day Adventist (Wahlen) avoided working on the Sabbath for the duration of his tenure at SkyWest by using the same accommodations granted to Cassell. *See id.* at 1269, 1273. That is, he worked over three years at SkyWest, beginning at the most junior level, without a single Sabbath conflict. *Id.* at 1268-69. Avoiding the Sabbath required serious commitment to using the post-bidding trade system, including paying other pilots to take Sabbath flights. But the evidence indicates that Cassell expressed a similarly serious commitment to using the tools available to avoid Sabbath flights. Another Seventh Day Adventist (Horne) worked for over a decade at SkyWest while committed to observing the Sabbath. He appears to have flown one flight over the course of ten years that clearly violated the Seventh Day Adventist Sabbath (i.e., clearly did not result from unforeseen circumstances).[5] He

---

[5] SkyWest attempts to raise doubt as to Horne's claim that he only worked Sabbath shifts under unforeseen circumstances after he recommitted to his faith. SkyWest attaches an exhibit to its Reply listing all of the instances when Horne flew on the Sabbath. ECF No. 58-2, at 2. The court disregards the 2007 flights, which occurred before Horne recommitted himself to his religion. All of the relevant Friday flights (of which there are eight) overlap with the Sabbath by less than three hours, meaning it is plausible that each of the flights is the result of an unforeseen delay that caused Horne to work into the Sabbath on a Friday night. *Id.* In fact, half of them overlap

flew several flights that may have resulted from unforeseen circumstances extending shift schedules. But similar to Cassell, flying on the Sabbath in the face of unforeseen circumstances did not violate Horne's religious beliefs. And even when Horne faced discipline for not working one Sabbath, he resolved the issue without being terminated. *Id.* at 1276-77.

SkyWest attempts to counter Cassell's evidence with its own "study" suggesting that Cassell could never avoid a Sabbath shift were he hired. But SkyWest's data fails to conclusively establish that fact. The data shows that one hundred pilots hired about a year prior to Cassell received at least one Saturday assignment during the year studied. *Id.* at 149. Cassell points out a number of flaws in the study. As an initial matter, the data covers the wrong time period. It compiles Saturday assignments, not flights during the Sabbath, which lasts from sundown on Friday to sundown on Saturday. *Id.* Cassell would face no religious barrier to flying an assignment that left after sundown on a Saturday. And SkyWest does not indicate if any of the pilots studied ever attempted to avoid Saturday work. As Cassell points out, many junior pilots who want more flight hours to move up in rank pick up Saturday flights intentionally. ECF No. 48-1, at 150-52. Finally, the study included pilots domiciled outside of Detroit, where Cassell would have been located. Because the Detroit domicile was growing, pilots there moved up the ranks—and got better bids—more quickly than in other domiciles. Given these shortcomings, a

---

with the Sabbath by less than an hour (and one overlaps by only two minutes). *Id.* Thus none of the Friday flights contradict Horne's claim that he "was largely able to avoid Sabbath work except for a handful of times when, to the best of [his] memory, there were unforeseen circumstances that cause[d] [him] to work into the Sabbath on Friday evenings." ECF No. 53-2, at 1276. And Horne flew four relevant Saturday flights. One of the flights departed exactly three minutes before the end of Sabbath—possibly the result of an unforeseen circumstance where a flight's departure got moved up slightly. ECF No. 58-2, at 2. The other three flights appear to be part of one series of flights that Horne flew on the Sabbath. *Id.* It is unclear if these flights are related to the 2011 incident to which he refers in his declaration. But regardless, SkyWest can point to only one shift worked by Horne that clearly constitutes a Sabbath violation—not the result of an unforeseen circumstance—in the course of Horne's decade of work at SkyWest.

factfinder could easily conclude that the study does not definitively establish that Cassell necessarily would have had to work on the Sabbath had SkyWest hired him. But the court leaves that decision to a jury, which has the responsibility of weighing the evidence and resolving such factual disputes. *See, e.g.*, *Stanolind Oil & Gas Co. v. Kimmel*, 68 F.2d 520, 522 (10th Cir. 1934) ("It is the province of the jury, and not the court, to weigh evidence, and, where there is a conflict, decide that which it would believe . . . .").

At bottom, SkyWest's representation that Cassell "will absolutely and unavoidably be required to work on Saturday and other holidays" is not beyond dispute when the evidence is viewed in the light most favorable to Cassell. ECF No. 48-2, at 2. Rather, the question of whether Cassell could have exercised the accommodations to avoid Sabbath shifts, if given the opportunity, is a question of fact for the jury. If a jury determines that Cassell could exercise the accommodations to avoid a Sabbath shift, then SkyWest's demand that Cassell commit to working on assigned Sabbath would impose an unnecessary—and perhaps, discriminatory— barrier to Cassell exercising his reasonable accommodation.

### ii.   Preemptive Rejection

SkyWest contends that it never gave Cassell a shot at using the accommodations because he preemptively refused the proposed accommodations. Specifically, SkyWest claims that Cassell refused the accommodations by insisting on a Sabbath-free schedule. SkyWest provides a laundry list of reasons demonstrating that Cassell would not, if required, show up to work on a scheduled Sabbath shift. This, SkyWest claims, shows that Cassell refused the accommodations.[6]

---

[6] It is not clear that this evidence demonstrates that Cassell rejected the accommodations. For example, SkyWest cites Cassell's 2016 religious accommodation request form, where he requested that he "not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown" and indicated that there was no "other modifications that would assist [him] in performing the essential functions of [the] job" as

But SkyWest misses the point. Even if the facts show that Cassell intended not to work if scheduled to a Sabbath shift in advance, a question of fact remains as to whether this amounted to a rejection of SkyWest's offer of accommodation. To put it differently, there is sufficient evidence from which a jury could credit Cassell's contention that he accepted the accommodations, committed to using them to avoid Sabbath work, and SkyWest nevertheless disregarded his acceptance and refused to hire him. In that case, SkyWest's actions would contravene Tenth Circuit law, which provides that "acting to the detriment of an applicant or employee because of his religion *before* attempting accommodation is illegal." *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1487-88 (10th Cir. 1989) (finding a Title VII violation where the defendant "rejected [plaintiff] based solely on his religious practices without an attempt to accommodate him").

Of course, the law does not require SkyWest to hire anyone who asserts that she will use the accommodations to achieve a schedule that comports with her religious beliefs if those assertions are unreasonable. *See id.* at 1489 ("[I]t is certainly conceivable that particular jobs may be completely incompatible with particular religious practices. It would be unfair to require employers faced with such irreconcilable conflicts to attempt futilely to resolve them."). But, as discussed above, there are legitimate questions of fact as to the reasonableness of Cassell's assertion that he would use the PBS and post-bidding systems to avoid all Sabbath work. SkyWest cannot dismiss an applicant as "refusing the accommodation" when an otherwise

---

evidence that Cassell rejected the accommodations. ECF No. 48-1, at 4. But Wahlen made an identical representation on his form, which SkyWest never treated as a rejection. *See* ECF No. 53-2, at 1271 (requesting "[t]o be allowed to not work or train during the time period of Fridays at sunset to Saturdays at sunset" and indicating was no "other modifications that would assist [him] in performing the essential functions of [the] job"). In fact, SkyWest elsewhere says that Wahlen "indicated that the tools SkyWest offers . . . are sufficient to accommodate [his] religious practice" ECF No. 58, at 23.

qualified candidate expresses a clear plan to utilize the proposed accommodations to create a conflict-free schedule—a plan that appears reasonable because it has previously worked for another employee. Because there are issues of material fact as to whether Cassell rejected the accommodations, or SkyWest refused to allow him to exercise the accommodations, the court continues to SkyWest's undue hardship defense.

### B.      Undue Hardship Defense

An employer incurs an undue hardship if it must "bear more than a de minimis cost in order to give [an employee] Saturdays off" to observe her Sabbath. *Hardison*, 432 U.S. at 84. Thus, an employer is not required to sustain "[a]ny cost in efficiency or wage expenditure that is more than de minimis." *Lee*, 22 F.3d at 1023. Here, context matters. "Whether an employer will incur an undue hardship is a fact questions that turns on the particular factual context of each case." *Tabura*, 880 F.3d at 557 (citations omitted). Finally, "[i]t is the employer's burden to show that it cannot offer a reasonable accommodation without undue hardship." *Id.*

SkyWest does not argue that accommodating Cassell by allowing him to use to bidding and post-bidding tools available to all employees would cause the company undue hardship. Rather, it argues that it would create an undue hardship to hire Cassell absent a commitment that he would work if he ended up with a Sabbath shift. In essence, all parties agree that Cassell would not show up to work if he were scheduled in advance for a Sabbath shift and could not trade or otherwise drop the shift. *See* ECF No. 53-2, at 155 ("Q. And if it had turned out that you had not been able to get that Sabbath off, you would not have worked it outside of it being an emergency, correct? A. That is correct."). So, the essential question is whether dealing with Cassell's failure to show up for work would create an undue hardship for SkyWest.

SkyWest points to three main sources of hardship if it accommodated Cassell without a commitment to working assigned Sabbath shifts. First, SkyWest argues that accommodating Cassell would require it to violate its collective bargaining agreement and the associated seniority system. Second, SkyWest argues that hiring Cassell would cause it to incur a significant financial burden. Specifically, SkyWest contends that it would pay to train Cassell with no hope that SkyWest could recoup that investment because Cassell would never reach profitability as a SkyWest pilot before he resigned or faced termination. Third, SkyWest argues that Cassell's absence would burden other employees who would be forced to cover his shift.

SkyWest's argument that the proposed accommodation would require SkyWest to give Cassell preferential seniority during bidding is a red herring. SkyWest correctly points out that Title VII does not require an employer to violate a valid labor agreement to accommodate an employee. *See Hardison*, 432 U.S. at 81 (holding that reasonable accommodation does not require an employer to "deny the shift and job preferences of some employees . . . in order to accommodate or prefer the religious needs of others"); *Lee*, 22 F.3d at 1023. But SkyWest never offered, and Cassell never requested, preferential bids. Rather, when he applied in 2017, Cassell made clear his intent to work within the collective bargaining framework to accommodate his religious beliefs. And any use of the SkedPlus+ system to trade Sabbath shifts that he received through PBS falls outside of the seniority system. Accordingly, the proposed accommodations do not require SkyWest to violate its seniority system to give preferential bids to Cassell.[7]

---

[7] The parties argue over whether SkyWest Airlines Pilot Association ("SAPA") is a recognized labor representative under the Railway Labor Act, and thus whether the collective bargaining agreement negotiated by SAPA is valid. The court need not reach this issue because it determines that the proposed accommodations do not require a violation of the collective bargaining agreement.

SkyWest next argues that it has "no hope" of recouping its investment in training Cassell because he will inevitably resign or face termination before reaching profitability, imposing an undue financial hardship on the company.[8] *See* ECF No. 48, at 33. But a question of fact remains as to whether this argument holds up. In SkyWest's view, "the study [of 100 pilot schedules] was a reasonable indication to SkyWest that if Cassell refused to work on his Sabbath, he would be disciplined and terminated," thus leaving SkyWest with the $27,000 price tag of his training. ECF No. 58, at 23. But, as discussed above, SkyWest's "study" was not definitive. And evidence presented by Cassell shows that at least two Seventh Day Adventist pilots navigated SkyWest's system for over fourteen years, collectively, without a termination—and both pilots reached profitability for the company. A reasonable jury could conclude in light of the evidence presented that, far from having "no hope" of recouping its investment in training Cassell, SkyWest would likely profit off of Cassell, undermining any claim of financial hardship. Accordingly, SkyWest has not carried its burden of showing that hiring Cassell without a promise to work on the Sabbath would cause an undue financial hardship in the form of paying for an unprofitable pilot's training.

SkyWest next argues that accommodating Cassell's desire observe the Sabbath would result in strain on SkyWest's reserve system and its reserve employees, thereby resulting in undue hardship. The Tenth Circuit advises that "[t]he cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable due to a religious conflict can amount to undue hardship." *Lee*, 22 F.3d at 1023. But, again, SkyWest fails to sustain its burden of demonstrating undue hardship with any degree of certainty. First, Cassell

---

[8] SkyWest claims that it expends $27,000 on every pilot it trains. It further claims that newly hired pilots do not become profitable for 1.5 years after hire. Because SkyWest contends it has "no hope" that Cassell would make it to the 1.5-year mark, he would be a drain on SkyWest resources.

shows that missed shifts, including during the Sabbath, occurred relatively regularly at SkyWest. The evidence presented shows that between September 2017 through the end of 2019, on each Friday or Saturday approximately ten to twenty pilots who flew Cassell's type of plane missed a scheduled flight due to circumstances such as illness, family leave, fatigue, emergency, or on-the-job injury. ECF No. 53-2, at 952-1032. And, more generally, pilots at SkyWest missed an average of 5.3 assigned flights per year. *Id.* at 233. Cassell argues that accommodating his religious beliefs would be no different from accommodating the pilots who miss flights for the reasons listed above.

Cassell next argues that SkyWest had in place a system to accommodate absences without efficiency costs. Specifically, Cassell contends that the data produced by SkyWest shows that in Detroit on Fridays and Saturdays from June 2017 through the end of 2019, SkyWest had at least one—and usually several—reserve pilots available who could have subbed in for Cassell. In fact, Cassell claims that on most Fridays and Saturdays during that time period, SkyWest had enough excess reserve pilots in Detroit that it used excess reserve pilots domiciled in Detroit to take flights for absent pilots in other domiciles. SkyWest counters that this data is insufficient to support Cassell's conclusions. In particular, the data is insufficient to conclude that there were no days in which SkyWest used all the reserve pilots in Detroit (i.e., to conclude that SkyWest would have always had a reserve pilot available to sub in for Cassell). But the employer carries the burden of demonstrating undue hardship. By arguing that the data is "insufficient" to conclude that SkyWest would have had a reserve pilot available to cover for Cassell, SkyWest has not discharged its burden. It has failed to conclusively demonstrate that Cassell's requirement to forego any Friday evening or Saturday shifts would have caused a "cost in efficiency" to SkyWest or imposed a duty on other employees beyond a pre-existing reserve duty. Instead, a

19

reasonable jury could conclude that an occasional absence by Cassell constituted exactly the type of absence that SkyWest designed its system to absorb without any efficiency loss or need to pay an additional employee. *See Brown v. Gen. Motors Corp.*, 601 F.2d 956, 959 (8th Cir. 1979) (finding "no actual cost in accommodation" where "(s)ufficient numbers of substantially qualified workers were available without any additional cost in wages or overtime to the defendant to take over the plaintiff's job on [the Sabbath]").

This case stands in contrast to another case involving a Seventh Day Adventist and a collective bargaining agreement in the Tenth Circuit, *Lee v. ABF Freight System*, 22 F.3d 1019 (10th Cir. 1994). In that case, the plaintiff, a truck driver, sought an accommodation to avoid working on the Sabbath. But the plaintiff's proposed accommodations required the defendant to change its scheduling system in violation of its collective bargaining agreement or to bring in a "foreign" driver to cover the plaintiff's shifts. *Id.* at 1023-24. In contrast, Cassell does not ask SkyWest to alter its union-mandated scheduling system. Nor does Cassell propose paying an additional employee to cover his shifts. Rather, if Cassell were to end up with a Sabbath shift after using the scheduling tools available, SkyWest could simply use the system it *already has in place* for missed shifts to assign a reserve pilot to Cassell's shift. *See* ECF 53-2, at 20 ("[I]f [Cassell] didn't show up that day . . . [SkyWest] would put somebody in the cockpit and fly the route.").

In conclusion, the Tenth Circuit is "skeptical of hypothetical hardships." *Toledo*, 892 F.2d at 1490; *see also E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988) ("A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships; instead, it must be supported by proof of actual imposition on co-workers or disruption of the work routine." (citation omitted)). As such, "[t]he employer is on stronger ground when he has

attempted various methods of accommodation and can point to hardships that actually resulted." *Toledo*, 892 F.2d at 1490. Further, "[a]n employer . . . cannot rely merely on speculation" in proffering a hardship. *Id.* at 1492 (citation omitted). But SkyWest's proffered hardship has no basis in actual disruption. Indeed, the parties need not rely on mere speculation because SkyWest has actually tried the accommodations at issue. At least two other Seventh-Day Adventist pilots have worked for SkyWest. Neither one indicates that he gave any promise to work if the bidding and post-bidding systems failed to accommodate his religion. In fact, Horne actually appears to have missed one or more flights because of his religion. SkyWest absorbed the missed shift and did not fire Horne. So, although Cassell never got the opportunity to use the accommodations, the court is not left to rely on mere speculation about the hardships that hiring an observant Seventh Day Adventist would impose on SkyWest. It is a hardship that the company has already absorbed, without any demonstrated measurable cost, for at least two other employees. *See Brown*, 601 F.2d at 960 ("If an employer stands on weak ground when advancing hypothetical hardships in a factual vacuum, then surely his footing is even more precarious when the proposed accommodation has been tried and the postulated hardship did not arise.").

## II.    RETALIATION CLAIM

Cassell also asserts a retaliation claim, alleging that SkyWest failed to rehire him either because he requested a reasonable accommodation or because he filed a charge of discrimination with the EEOC. The Tenth Circuit applies the *McDonnell Douglas* framework when assessing a retaliation claim. A plaintiff establishes a prima facie case for retaliation by showing that "(1) she engaged in protected opposition to discrimination; (2) [the employer] took an adverse employment action against her; and (3) there exists a causal connection between the protected activity and the adverse action." *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004).

"[O]nce the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a non-discriminatory reason for the conduct, and then the plaintiff has the burden of demonstrating pretext." *Fischer v. Forestwood Co.*, 525 F.3d 972, 979 (10th Cir. 2008).

SkyWest concedes that Cassell has established the first two elements of a prima facie case.[9] *See* ECF No. 58, at 26-27. Instead, SkyWest argues that Cassell fails to demonstrate any causal connection between Cassell's protected activity and SkyWest's desire not to hire him. In essence, SkyWest argues that the sole but-for cause of SkyWest's failure to hire Cassell was his inability to commit to working a shift on the Sabbath if he could not avoid a shift.

"The causal-connection element of a prima facie retaliation claim requires the employee to show that the employer's motive for taking adverse action was its desire to retaliate for the protected activity." *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir.2003). "For purposes of establishing a prima facie case of retaliation, a plaintiff can establish a causal connection by temporal proximity between the protected activity and the adverse action." *Fye v.*

---

[9]At least one circuit court has held that "merely requesting a religious accommodation is not the same as opposing the allegedly unlawful denial of a religious accommodation." *E.E.O.C. v. N. Mem'l Health Care*, 908 F.3d 1098, 1102 (8th Cir. 2018) (citation omitted). In the Eighth Circuit, asking for a reasonable accommodation is not a protected activity in the Title VII context. The Tenth Circuit has not directly addressed the issue in the Title VII context, but it has read protected activity broadly. *See Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to supervisors."). And the Tenth Circuit has clearly "treated requests for reasonable accommodations as protected activity under the ADA." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007). Courts within the Tenth Circuit have translated this standard to the Title VII context. *See, e.g.*, *E.E.O.C. v. JBS USA, LLC*, 339 F. Supp. 3d 1135, 1193 (D. Colo. 2018) (treating a request for a religious accommodation as protected activity). The opposition-clause test in Title VII is nearly identical to the opposition clause in the anti-retaliation provision of the ADA. Thus the court agrees with the dissent in *North Memorial* that interpreting language in Title VII consistently with the nearly identical language in the ADA leads to the conclusion that an accommodation request in the Title VII context constitutes protected activity. *See North Mem'l*, 908 F.3d at 1104-06. Accordingly, even absent the parties' stipulation, the court would find that Cassell's request for an accommodation constituted protected activity under Title VII.

*Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008); *see also Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013). Here, Cassell reiterated his request for the previously offered reasonable accommodation on June 29, 2017, and SkyWest sent its rejection letter on July 2, 2107. ECF No. 48-1, at 17, 35. The close proximity between these two events is sufficient to establish a causal connection for purposes of a prima facie case.

SkyWest has offered a legitimate nondiscriminatory reason for its decision to reject Cassell's application. It claims that it failed to hire Cassell because he rejected SkyWest's proffered accommodations and because he requested a complete elimination of the possibility that he would be required to work on his Sabbath. ECF No. 48, at 37. Thus, the burden shifts back to Cassell to demonstrate pretext.

The question of whether SkyWest's legitimate nondiscriminatory reason is pretextual is bound up in the previously discussed fact issues. How a factfinder weighs the evidence discussed in the prior section will impact the factfinder's perspective on whether SkyWest refused to hire Cassell for a legitimate, nondiscriminatory reason or whether SkyWest offered a pretextual reason to mask its intent to pass over Cassell's application because of its unwillingness to accommodate his religious needs. Specifically, a conclusion on the pretext prong turns on a trier-of-fact's determinations about (1) the likelihood that Cassell would have been assigned to a Sabbath shift; (2) the frequency with which that would have occurred; and (3) the feasibility of replacing Cassell with a reserve pilot for any missed shifts. If Cassell could avoid Sabbath assignments, or if accommodating his absence from infrequent Sabbath assignments imposed no undue hardship on SkyWest, then the inference of pretext strengthens. On the other hand, if Cassell would likely face frequent Sabbath assignments, and his absences would disrupt SkyWest's reserve system, then SkyWest's decision appears legitimate. The evidence presented

on these points is inconclusive. Therefore, for the same reasons discussed above, a jury—not the court—should weigh the evidence of pretext.

At trial, of course, Cassell will bear the burden of proving—without the benefit of any presumptions—that SkyWest's decision not to hire him resulted from illegal discrimination. But for the purposes of summary judgment, a plaintiff need only "establish a sufficient possible inference of discriminatory intent by demonstrating that there is a genuine dispute as to whether the reasons offered for the challenged employment decision were pretextual—e.g. that they were not the true motivating reasons defendant professed them to be." *Randle v. City of Aurora*, 69 F.3d 441, 455 (10th Cir. 1995). The factual questions raised above are sufficient to establish such an inference. For that reason, the court DENIES summary judgment on the retaliation claim.

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motion for summary judgment.

DATED February 8, 2022.

BY THE COURT

Jill N. Parrish
United States District Court Judge