# Exhibit A

CASSELL

vs

SKYWEST, INC.

SHANE ANDREW CASSELL

September 28, 2020

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH - CENTRAL DIVISION

* * *

SHANE ANDREW CASSELL, )
)
Plaintiff, ) Case No.
) 2:19-cv-00149-JNP-EJF
v. )
) Videoconference
SKYWEST, INC., d/b/a ) Deposition of:
SKYWEST AIRLINES, )
) SHANE ANDREW CASSELL
Defendant. )
)
)
)
)
)
)

* * *

Monday, September 28, 2020
9:41 a.m. MDT

Remotely Via Zoom

* * *

Jessica Croxford
Registered Professional Reporter

A P P E A R A N C E S

For the Plaintiff: Erik Strindberg
STRINDBERG & SCHOLNICK, LLC
675 East 2100 South
Suite 350
Salt Lake City, Utah 84106
Todd R. McFarland
GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Spring, Maryland
20902

For the Defendant: Scott M. Petersen
FABIAN VANCOTT
215 South State Street
Suite 1200
Salt Lake City, Utah
84111-2323

Todd Emerson
SKYWEST AIRLINES
444 South River Road
St. George, Utah 84790

* * *

# I N D E X


| EXAMINATION | PAGE |
|---|---|
| By Mr. Petersen | 5 |

| EXHIBITS | | PAGE |
|---|---|---|
| No. 1 | Employment Application History, Aug 1, 2016 - Present, CASSELL 43 - 193 | 63 |
| No. 2 | Wage and Tax Statements, CASSELL 191 - 193 | 92 |
| No. 3 | Schedule, CASSELL 177 - 190 | 95 |
| No. 4 | Saturday Matrix Lab, Dec. 10, 2016, SkyWest_000588 | 109 |
| No. 5 | Email Correspondence, Subject: Clarification of Yesterday Events, SkyWest_000038 - 39 | 118 |
| No. 6 | Email Correspondence, Subject: Religious Accommodation Form, SkyWest_000017 - 19 | 120 |
| No. 7 | December 8, 2016, Letter, Re: Shane Cassell, SkyWest_000042 - 43 | 128 |
| No. 8 | February 3, 2017, Letter, Re: Shane Cassell, SkyWest_000001 - 2 | 143 |
| No. 9 | CRJ Domicile Request, SkyWest_000049 | 151 |


(Continued on next page)

EXHIBITS (Continued) PAGE
No. 10 Email Correspondence, Re: Letter Regarding Religious Beliefs, SkyWest_000007 155
No. 11 June 29, 2017 Letter from Shane Cassell, SkyWest_000006 156
No. 12 Pay Stubs, Benefits Overview, Manager Assessment, CASSELL 216 - 221 174
No. 13 Email Correspondence, Subject: Shane Cassell, SkyWest_000026 190
No. 14 October 27, 2016, Memorandum of Agreement, SkyWest_000021 192
No. 15 Pairing Optimization Factors, SkyWest_000061 197
No. 16 PBS User Guide, SkyWest_300 - 303 202
No. 17 Standard Practice Policies Excerpt, SkyWest_000418 - 421 203
No. 18 Crew Flight & Duty Time Record, CASSELL 194 - 215 206
No. 19 Corrective Action and Employment Separation, Standard Practice 3024 Excerpt, SkyWest_000546 - 547 214

* * *

PROCEEDINGS

SHANE ANDREW CASSELL,

the plaintiff, called as a witness by and on behalf of the defendant, being duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PETERSEN:

Q. Mr. Cassell, thank you for joining us via Zoom. My name is Scott Petersen. I represent SkyWest Airlines in defense of the discrimination suit you've brought.

I'm going to ask you a bunch of questions. I'm sure that your counsel has spoken to you in some measure about certain rules, but I'm just going to go over so that I know that you understand this.

Because your deposition is being taken today, what's happening is, the young lady in -- on the screen, Jessica, is writing down everything that's being said by anybody on this Zoom call. And as a result, we need that record, which will be in writing, to be clear. And that means that we need to listen to the questions that are asked and wait until they're asked before we respond.

Does that make sense?

A. Yes.

Q. And it's important -- you know, when we talk to each other, we use a lot of grunting and nodding and shaking of our heads, but that won't look good on paper when this is all done. It will look the same whether you've shaken your head or nodded your head. So it's important to be audible in our responses, yeses and noes and not do what we all do, which is, you know, grunt and say "uh-huh" and "huh-uh" because that kind of looks the same.

Does that make sense?

A. Yes.

Q. I will be asking you a lot of questions. Your counsel may be objecting. I would just ask that you wait until I'm done asking the question before you respond so that you understand the question. If you do not understand the question, please let me know, and I will try to rephrase it in such a manner that you do understand it.

Any questions with that?

A. No.

Q. And you understand you've been placed under oath; is that correct?

A. Correct.

Q. And what do you understand the oath to mean?

A. That I have to tell the truth. I can't make things up. I can't falsify anything.
Q. You understand that there are penalties associated with people who do not tell the truth under oath?
A. Yes, I do.
Q. Okay. I will let you take a break if you need a break, but I will just ask that if I have asked you a question, I'm going to require that you answer the question before we take the break.
Does that make sense?
A. Yes.
Q. Are you on any medications today?
A. Am I on any medications?
Q. Yes.
A. No.
Q. All right. Is there any reason why you would not be able to testify truthfully today?
A. No.
Q. Is there any reason why you would not be able to recall, to the best of your recollection, facts and circumstances?
A. No.
Q. All right. Then please give me your full name.

A. My full name is Shane Andrew Cassell.
Q. And what's your date of birth, Mr. Cassell?
A. My date of birth is April 18, 1991.
Q. And your current address?
A. 2121 West Garfield Street, Lincoln, Nebraska 68522.
Q. How long have you been there?
A. Just under two years.
Q. All right. And before that, were you in Nebraska?
A. Yes.
Q. Same place, just different apartment or home or whatever?
A. Yeah, different apartment.
Q. Okay. Have you ever been deposed before?
A. I have not.
Q. I'm going to ask you some kind of goofy questions that may seem goofy to you, but they're kind of important. But just bear with me.
Have you ever been convicted of a crime?
A. No, I have not.
Q. Have you ever been arrested?
A. No, I have not.
Q. Have you ever been in a lawsuit before?

A. No.
Q. All right. I want to talk to you a little bit about your employment history.
Can you just tell me when you graduated from high school?
A. Yeah. I graduated from high school in the spring of 2010.
Q. And what high school was it?
A. Spring Valley Academy.
Q. Where was that?
A. Centerville, Ohio.
Q. All right. And then did you get a job after high school?
A. No. I went to college.
Q. All right. What college did you go to?
A. I attended Andrews University in Berrien Springs, Michigan.
Q. Did you graduate?
A. I did. 2014.
Q. And what did you graduate in -- with?
A. I graduated with a bachelor's in technology in aviation.
Q. Is that what -- were you intending to be a pilot when you went to Andrews?
A. Yes.

Q. Is that a college that gears people toward becoming pilots, or is that just a college -- like a regular college that gives bachelor's degrees in a variety of places?
A. It's a liberal arts college, and they happen to have an aviation program.
Q. I see.
When you graduated in 2014, what did you do?
A. I had a job lined up as an aerial photographer based in Lowell, Indiana.
Q. And you did that for a while?
A. Yeah. I did that until 2016.
Q. All right. And then what did you do in 2016?
A. I applied at SkyWest.
Q. Had you -- in 2016 when you applied at SkyWest, did you have a pilot's license?
A. Yes.
Q. And then is that something that you get from getting your degree at Andrews?
A. Yes.
Q. But you hadn't applied or -- I'm sorry.
You hadn't worked for any kind of airline prior to applying for SkyWest?

A. That's correct.

Q. Let me ask you this: Where were you living at the time that you applied at SkyWest Airlines?

A. When I applied, I was living in Lowell, Indiana.

Q. And why did you apply at SkyWest?

A. Well, SkyWest had and still has an excellent reputation in the industry of stability, a growing fleet, good training, good work culture, compared to a lot of other regionals that don't quite have the same standards that SkyWest does. And I wanted to be a part of a company where the pilots enjoy going to work, that had a good work culture, that had good training and good stability. So that was very attractive to me about SkyWest.

Q. At the time that you applied, did you do any research to decide what kind of a schedule you would be working with at SkyWest?

A. Yeah. I knew an individual that was working there, and I spent extensive time on the phone with him discussing how his schedule was. I actually knew several people that were working there, but one in particular that I spent a lot of time on the phone with, discussing how the schedule

was handled, from training all the way through being a line pilot.

Q. Who was this individual you're talking about?

A. His name is Steve Horne.

Q. H-O-R-N or R-N-E?

A. R-N-E.

Q. And was he a pilot?

A. He was.

Q. Do you know how long he had worked at SkyWest?

A. I don't know exactly. It was eight -- somewhere between eight and ten years.

Q. Okay. How did you know him?

A. He -- I was -- I was given his number by a former professor of mine from Andrews.

Q. Okay. And other than your pilot's license, do you have any other professional licenses besides like -- not talking about a driver's license, but a professional license of sorts?

A. I'm a flight instructor, and I'm also a ground instructor for aviation-related topics.

Q. How long have you had your flight instructor's license?

A. I got it in March of 2013, so six, seven

years.
Q. And your ground instructor's license, how long have you had that one?
A. I don't remember the year I got it, but it was no later than 2014.
Q. Have you ever had your -- either your flight instructor, your ground instructor, or your pilot's licenses suspended or revoked?
A. No, sir.
Q. Have you ever been disciplined by any industry or trade group relative to those licenses?
A. No.
Q. Tell me -- I apologize, but tell me again when you applied to SkyWest.
A. I applied to SkyWest in the summer of 2016.
Q. And at the time, when you were speaking to Mr. Horne, did any -- did the discussion about work schedule come up?
A. Yeah. That was the majority of what we discussed about in our conversations, was the schedule.
Q. What -- do you know, does Mr. Horne have a particular religion that he belongs to?
A. He's also Seventh-day Adventist.

Q. And he's a pilot for SkyWest?
A. He -- yeah, he was working there. He no longer works there.
Q. When did he quit? Do you know?
A. I don't know when he quit.
Q. Or was he terminated, I guess? Do you know if he quit or was terminated?
A. I -- I presume he was not terminated. He's now flying for another carrier, a major airline. So my presumption is that he wouldn't have been able to get that job if he was terminated.
Q. Do you know what airline he's working for now?
A. FedEx.
Q. FedEx?
A. Uh-huh.
Q. Okay. That's a "yes," right?
A. Yes, he's -- yeah, he's working for FedEx.
Q. At the beginning when I said you've got to respond with audibles, that's what I mean, as opposed to "uh-huh."
A. Sorry about that.
Q. It's hard to read. No, it's okay. I'm just trying not to -- so you're not offended.
A. Yeah.

Q. All right. And you are also a Seventh-day Adventist; is that right?

A. That is correct.

Q. And have you been that essentially your whole life?

A. Yeah. I was -- I guess you could say I was born into it. My parents were both Seventh-day Adventists, and they raised me in the church. I made the decision to be a baptized member when I was 10 years old.

Q. And what -- in relation to your religious views about the Sabbath, can you explain those to me?

A. Yeah, I can. So Seventh-day Adventists believe that the Sabbath starts at Friday sundown and ends at Saturday sundown. During this period, we follow what's -- what's written in Exodus Chapter 20, in the 4th Commandment that we're not supposed to do any work between -- in that time period. It's a day of rest from kind of the responsibilities of the world, and we don't partake in commerce or anything like that.

Q. And the sundown, how do you determine what Friday sundown to Saturday sundown is?

A. Well, it kind of depends on who you ask.

But most Adventists will just look at the sundown calendar. Like on the iPhone, it will tell you when sundown is, or you can go to timeanddate.com and it will also tell you. And that's how my family's always -- that's what my family has used. We use the sundown time.

Q. From your phone? Your handheld?

A. Phone or some form of computer.

Q. Okay. And then when it comes to work, you indicated that your religious beliefs prohibit work during the Sabbath; is that right?

A. Correct.

Q. And does that apply regardless of what your work is?

A. Well, I would say that the exception here, if you want to call it that, would be if -- if it's an unforeseen circumstance. So there was a question asked of me later on by SkyWest, would there be any situation you would be willing to work on the Sabbath. I say, yes, if there was an emergency; if someone's life was in danger; maybe there was a maintenance delay or a weather delay that caused us to get stuck at an outstation that was not a SkyWest domicile. I would be more than happy to bring that aircraft back to the domicile.

And the reason I'm willing to do this is because I look at the example of Jesus in the New Testament, and he was not afraid to work in terms of healing on the Sabbath, doing good on the Sabbath. And so I can within -- I can, with good conscience and staying within my religious beliefs, do something like that. But a regularly scheduled event, I would not do during the Sabbath.

Q. So what about -- from your religious beliefs, what about a first responder like a police officer or a firefighter or an ambulance driver? If you were to choose one of those occupations, is that -- does that also prohibit you from working on the Sabbath even though you might be a police officer or a firefighter in your religious belief?

MR. STRINDBERG: I'm going to object to the question. It's not relevant.

But, Shane, you can try to answer.

A. I think it depends on the individual. Some individuals choose not to. Others do. Me personally, I don't know that I have an answer for that necessarily because I don't work in that industry. I would have to consider all the options.

I know that I don't have a problem with healing on the Sabbath. So if somebody asks me to

help with a healing project, I would be more than happy to do that.

Q. (BY MR. PETERSEN): If you had been asked to be, say, a highway patrolman on -- or -- well, let me ask you this: From your religious point of view for a Seventh-day Adventist to be, say, a highway patrolman, would it, from your position -- I'm not asking from your church's, but from your personal belief, would it be appropriate for that person to work on the Sabbath to do highway patrol duties that may or may not involve any kind of healing?

MR. STRINDBERG: Object again. Not relevant. And I don't know if Shane is an expert in these type of religious questions.

MR. PETERSEN: I'm not asking for his expert opinion. I just want his belief.

Q. (BY MR. PETERSEN): Go ahead, Shane.

A. My belief is that if an individual chose -- that was Seventh-day Adventist chose to be a highway patrolman, I would not have a problem with them working, and neither -- if I was in that situation, I would do it.

Q. You would, you said? I'm sorry.

A. Yes, I would.

Q. Okay. Okay. And then why is it that you do not work on the Sabbath?

A. Why is it that I don't work on the Sabbath?

Q. Yeah.

A. Well, like I said, Seventh-day Adventists believe, based off the 4th Commandment, the seventh day of the week is the Sabbath. It starts Friday sundown through Saturday sundown. And in the 4th Commandment, it states, "On that day, you shall do no work."

Q. So the difference for, say, a highway patrolman versus a pilot, is there a -- from your religious belief, what's the difference to you there, if there is one?

A. Well, police officers are called to serve and protect. You have to have that in society to retain law and order. If an individual that is an airline pilot is not able to show up, people don't go on their vacations, et cetera, it's not a -- in my mind, it is not as crucial of a position to healing and protecting and serving in society.

Q. Okay. And you sincerely believe that not working on the Sabbath -- you sincerely hold that belief, that you should not be working on the

Sabbath, which you've identified as Friday sundown to Saturday sundown?

A. I do.

Q. And your belief in that doctrine or that principle, where does that come from, do you know, your belief?

A. Yeah. The 4th Commandment found in Exodus 20. That's what my church believes and that's what I believe.

Q. And how long have you held that belief? Do you know?

A. As long as I can remember being taught it.

Q. Do you know if Mr. Horne worked on the -- on your Sabbath?

A. Mr. Horne told me he had never worked on a Sabbath at SkyWest Airlines.

Q. Did you ever talk to Mr. Horne about his time as a trainee at SkyWest?

A. I did. He said that he did not have difficulties getting through training in regards to keeping the Sabbath.

Q. Was Mr. Horne ever a reserve pilot, that you know of?

A. Yeah, he was.

Q. Do you know where he was domiciled as a

reserve pilot?
A. I -- I do not.
Q. Do you know when he was a reserve pilot, like what year?
A. I don't.
Q. And I know I asked you how long he worked there, and I can't recall your answer. So I apologize.
But do you remember?
A. It was somewhere between eight and ten years. He had been there for a while.
Q. Okay. And you're not sure -- do you know where he was domiciled when you were speaking to him?
A. Yes. When I started speaking with him, he was domiciled in Chicago, and then he switched to Detroit.
Q. I'm sorry. Then he switched to Detroit?
A. Yes.
Q. Okay. And your understanding is that Mr. Horne never worked a Saturday or a Sabbath, as you've identified and described it, ever at SkyWest?
A. That is correct.
Q. And that understanding comes from Mr. Horne?

A. Yes. Conversations we had.
Q. All right. And when you asked him -- or did you ever ask him how he avoided Saturday or Sabbath work?
A. Yeah. That was the majority of our conversations, me asking him, "How did you handle this situation" or "What did you do in this situation?" And he was very helpful in explaining how he had gotten through.
Q. And how did he get through?
A. Well, so as a line pilot, he -- as his seniority group, he was able to bid out of it. When he was younger, he would use things like trading and dropping trips and stuff like that. He told me that when it came to training and IOE, he was able to make requests with the individuals who scheduled those to avoid being placed on -- on a schedule that went over a Sabbath.
Q. Do you know how many flights SkyWest flew each day at the time that you applied?
A. I don't.
Q. Do you know how many flights SkyWest flew at the time that Mr. Horne worked for SkyWest?
A. I do not.
Q. Do you have any understanding as to

whether the amount of work and the number of flights that SkyWest took while Mr. Horne was there increased from the time he started versus the time he left?

A. Well, I -- I'm sure that the amount increased because I know that SkyWest was growing.

Q. Okay. Had you talked to anyone else at SkyWest that avoided a particular day of work?

A. Before I was training, no.

Q. How about while you were training?

A. It was still Steve.

Q. So was Steve the only person that you're aware of who was able, from your understanding, to avoid working any particular day of the week there in flying for SkyWest?

A. I'm aware of one other individual who started after I left.

Q. And who was that?

A. His name is Michael Wahlen.

Q. How do you spell his last name? Do you know?

A. W-A-H-L-E-N.

Q. And what day did he try to avoid working?

A. Sabbath, Saturday -- Friday sundown through Saturday sundown.

Q. Is he also a Seventh-day Adventist?
A. He is.
Q. And a pilot?
A. Uh-huh. Yes.
Q. Do you know when he started working at SkyWest?
A. He started January or February of 2017. I don't know the exact day he started.
Q. And from your understanding, to this day or to the last time you spoke with him, he had not worked a Sabbath?
A. That is correct.
Q. And did you ask him how he avoided it?
A. Yeah, I did. And he shared the same things. The way he organized his bids, there were some that he told me he had to trade and drop during -- as a line pilot. During training, he was able to -- his training schedule was different than mine, so he didn't have the -- the same set of issues that I did. But he was also able to make requests within the training department to not be scheduled when there were areas that were out of his control with the bidding process.
Q. Let me ask you about Mr. Horne.
Is his first name with a P-H or a V? Do

you know?
A. Steven is his first name.
Q. S-T-E-V-E-N or S-T-E-P-H-E-N? Do you know?
A. I don't. I think it's a V, but I don't know.
Q. Okay. Is Mr. Wahlen still at SkyWest?
A. He is, yes.
Q. Do you know if he's a captain or a first officer?
A. He's a first officer, last I knew.
Q. Do you know where he's domiciled last you spoke with him?
A. Detroit.
Q. And do you know if Mr. Horne was a captain or a first officer?
A. Mr. Horne was a captain.
Q. And how long has Mr. Wahlen been at SkyWest? Do you know?
A. He started in early 2017, so it would be a little -- three, almost four years now.
Q. All right. And Mr. Horne was almost -- something like ten, that you were -- that you recall?
A. Yes.

Q. And -- all right. So let me ask you about your training, then.
You -- you were hired as a pilot by SkyWest in the fall of 2016; is that right?
A. Yes.
Q. Do you remember the month?
A. That I was hired?
Q. Yeah. It's not a trick question. If you don't remember, I get it.
A. Yeah, I don't remember when I received my conditional job offer. I -- yeah.
Q. And you applied at SkyWest because you thought they were essentially a better regional airline than their competitors?
A. Yeah.
Q. And you spoke with Mr. Horne.
How many conversations did you have with Mr. Horne before you applied to SkyWest?
A. At least four or five, that I can remember.
Q. How did you know him?
A. He -- I was given his contact information by a former professor of mine. I never actually met him face-to-face.
Q. Okay. And at the time that you applied,

what did you understand your schedule would be like at SkyWest as a trainee?  Did you -- or if you had an understanding at the time?

A.    Certainly.  So in the interview, I asked what the schedule during training was, and they told me that ground school would be Monday through Friday from 8:00 to 5:00, your normal business hours, and that simulators, they couldn't give me, but they told me that it would be random based off simulator availability.

Q.    Did you let them know at that time that you were unwilling to work on the Sabbath?

A.    No, I did not.

Q.    Did you have any concerns that you would be required to work on your Sabbath, at least with simulator training?

A.    I had concerns.  But I spoke with Steve, and he -- he told me about his experience and that there was usually some simulator slots that you could avoid Saturdays with -- or the Sabbath time period with.

Q.    What did Steve do to avoid that simulator training on the Sabbath?  Did he tell you?

A.    Yeah.  He told me he just picked the ones that didn't have a time period over Sabbath.  So

sometimes he might be starting at 4:00 in the morning or ending at 2:30 in the morning. He picked the least desirable ones. Or if he couldn't, he told me that the option to trade with another classmate was available as well.

Q. And did he explain how you would do a trade with another classmate?

A. No, I don't think he did.

Q. All right. And then when you started, you're accepted at SkyWest as a pilot, correct?

A. Yes.

Q. And you began training?

A. Yeah, I began training.

Q. And where did training take place?

A. The first portion was a CTP course in Atlanta, Georgia.

Q. And what is a CTP? What does that stand for?

A. I don't know what "CTP" stands for, but I do know that the purpose of the course is for all pilots who fly for a 121 carrier, such as SkyWest Airlines, have to have an airline transport pilot license. In order to get that license, you have to go through a course that's called the "CTP course." It's three or four days of ground school

and ten hours of simulator time where they teach you about how -- basically, how to fly a jet safely. And then once passing that, you can -- you're eligible to take the ATP test.

Q. So when you applied at SkyWest, did you apply to fly a particular plane or just whichever one they wanted to assign you to?

A. I chose the CRJ due to the fact that it was -- it was going to be easier to avoid working on sabbaths in that airframe.

Q. And how did you have that understanding, that if you applied to fly the CRJ, it would easier to avoid sabbaths?

A. I was told that the other airframe was in higher demand, so everybody that had higher seniority in the company was wanting to go to that airframe. And they were hiring newer hires into it, but they were not getting very good schedules. Their seniority did not grow as quickly. So I chose the other one due to the fact that I would have a better chance of my seniority growing faster, which would allow me to bid out of flying during the Sabbath period.

Q. So at the time that you applied, you understood that SkyWest had a seniority system of

some sort --
A. Yeah.
Q. -- for purposes of deciding when people would fly?
A. Yes.
Q. Tell me what you understood the seniority system to be at the time that you applied.
A. I understood that the seniority system was based off of date of hire. And based off of that, you were assigned a schedule based off of your bid preferences in the PBS system.
Q. And you said "PBS system." What's that?
A. Preferential bidding system.
Q. Is that PBS something unique to SkyWest, or is that something that, in your understanding, applies in the industry?
A. As far as I know, there's only one airline that doesn't have that, and they might have switched.
Q. And who is the airline that doesn't have it?
A. PSA Airlines.
Q. Who do you currently work for?
A. Who do I currently work for?
Q. Right.

A. I work for Silverhawk Aviation.
Q. And have you worked for Silverhawk Aviation since your application for a job at SkyWest?
A. I started at Silverhawk Aviation in the fall of 2017.
Q. What's your position there?
A. I'm the assistant chief pilot.
Q. All right. Let me ask you a little bit about Silverhawk Aviation and your job there.
Assistant chief pilot, is that what you were since being hired in the fall of 2017?
A. No. I started at Silverhawk as a captain, a direct entry captain on a King Air 90 aircraft. From there, they allowed me to become a training pilot, an instructor pilot on that airframe. That happened in the summer of 2018.
In the fall of 2019, they added a second airframe to my job description. I became a second-in-command on a Cessna Citation and as well as becoming a check airman on a King Air 90 that I was flying.
Q. On the King Air 90?
A. Yes.
Q. Did you have to go through training with

Silverhawk?
A. Yes, I did.
Q. And how long is training there?
A. It was broken up into sections. The first two or three -- actually, the first month I was there, it was all computer-based training, which I did on my own at home. The -- then they sent me to FlightSafety, which is a simulation company, to get training in the King Air 90 simulator, and that was ten days.
Q. And where was that?
A. Wichita, Kansas.
Q. And so it went for -- it was ten consecutive days?
A. The total time was ten days. I had Saturday off.
Q. Did everybody have Saturday off?
A. Yes.
Q. So you worked Sunday?
A. Uh-huh.
Q. And not Saturday?
A. Correct. Yeah. I had class on Sunday.
Q. Are you aware that Sunday is the Sabbath for some people?
A. Yes, I do.

Q. Do you know whether anyone at Silverhawk during that time sought to have Sunday off?
A. I'm not aware of any.
I would like to clarify that -- that I was the only one from Silverhawk attending at the FlightSafety course.
Q. Okay. So did you ask to have that Saturday off?
A. I did.
Q. And they were okay with that?
A. They were okay with it. Originally, we had Sunday off, and they just moved the class over one day.
Q. So they switched the Sunday for Saturday?
A. Correct.
Q. I see.
How many pilots are at Silverhawk Aviation at the time that you applied in the fall of 2017?
A. Oh. I don't know.
Q. Does Silverhawk have a seniority system to determine what -- who flies what routes?
A. Not like SkyWest.
Q. All right. Explain their seniority system, if they have one.
A. Sure. So our seniority system, if you

would like -- if you even want to call it that, is basically, we take into consideration the amount of time a pilot has been working at the company when assigning schedules. We work a ten and five, ten days on, five days off, and we have three rotations. Pilots choose their first, second, and third choice. The pilots with the highest seniority are awarded which -- whatever they wanted, and then it goes down from there.

Secondly, when it comes to upgrades in aircraft, if a pilot wants to move into a new airframe or would like to upgrade from first officer to captain, we look at seniority as well as qualifications, because some that have higher seniority may not have the qualifications.

But we do take -- if there are two pilots that equally qualified, we will usually look at the -- how long the pilot has been at the -- with the company and take that into consideration as well.

Q. You said that you are currently the assistant chief pilot; is that right?
A. That's correct.
Q. So how many pilot -- is there a chief pilot?

A. Yes.
Q. Is it just one?
A. One chief pilot, two assistant chief pilots.
Q. All right. And so would that make you one of the more senior pilots at Silverhawk?
A. I'm in the top ten currently.
Q. So do you have any idea how many -- I know I asked you before and you were kind of thinking about it, and then I started asking more questions.
How many pilots does Silverhawk currently have, and then how many did it have in 2017?
A. Currently, we have right around 40 pilots. I don't know the exact number, but I know it's very close to 40. In 2017, it was less. I don't know how much less.
Q. And of those 40, do you know how many of them have been there -- have higher seniority than you? Best guess. If you don't know, you're not -- you know, your educated guess.
A. Educated guess, I'd say six or seven of them.
Q. So is it fair to say that Silverhawk -- is it sort of a stepping stone for pilots to get experience and then move on to a larger airline or a

different kind of airline?
A. Some pilots have chosen to view it that way. There are others that live in the Lincoln, Nebraska/Omaha, Nebraska area that are very happy to stay here and grow with the company. When I started, I think that that was kind of how Silverhawk was viewed. But in the last three years, we've grown quite a bit. We've added larger aircraft, more aircraft of the same type that we had. And so pilots are starting to stick around longer.
Q. Do you know how many aircraft Silverhawk flies?
A. Currently, we have 16 aircraft.
Q. 16 aircraft, is that more or less the same as it had in 2017? Do you know?
A. No. In 2017, we had -- give me a second. Let me think here. We had nine.
Q. So it's a growing company?
A. Yes.
Q. Is it a passenger flight company or is it cargo?
A. We're passengers. We fly charter on-demand as well as aircraft -- we provide aircraft management for aircraft owners.

Q. What does that mean, "aircraft management for aircraft owners"?
A. So aircraft management essentially would be -- let's say you owned your own jet but you didn't have a pilot. You would -- basically, Silverhawk would handle all of that for you. So we would provide maintenance. We would provide a crew, handling at outstations, et cetera.
Q. Of the 40 pilots you mentioned currently, do you know of those -- how many would you estimate are captains and how many are first officers?
A. Estimate that about 25 would be captains.
Q. And 15 first officers?
A. Roughly, yes.
Q. So does every flight require a captain and a first officer?
A. Depends on the airframe. We have five aircraft that require only one pilot. They're small enough that we can do that. All the jet aircraft require two pilots.
Q. So the five that require one pilot, those are prop planes?
A. Yeah. They're turboprops.
Q. Other than the private jets that people own, does Silverhawk own -- fly more than two types

of jets? How many types of planes does it fly?
A. We have five types.
Q. Of the five types, how many are turboprops versus jets?
A. One. One is a turboprop.
Q. Are you licensed or are you qualified to fly the turbo?
A. Yes, I am.
Q. And then the jets?
A. I fly one of the types of jets, yes.
Q. Is it fair to say that, to fly a different type of jet, you have to get training for that specific jet?
A. Yes.
Q. So how many -- so you can fly one turboprop and one type of the four other jets that Silverhawk flies; is that right?
A. That's -- that's what I do, yes.
Q. So how many pilots fly your type of jet and your turboprop? Do you know?
A. As captains, one. As first officers, we have three that do both.
Q. And at Silverhawk, can you fill in for a first officer, or do you have to be trained to be a first officer and vice versa?

A. As a captain, I can fill in for a first officer.

Q. But they can't fill in to be a captain, I suspect?

A. That is correct.

Q. So am I understanding this right that when you fly for Silverhawk, there are four -- or there's only one other person who can take your place on the jet that you fly or the turboprop?

A. No. That's -- that's not correct. I might have not been clear.

So there are pilots that are qualified on the same aircraft that I am. I am one of two captains that are qualified on both the King Airs and the Citations. We have other captains that are only qualified on the King Airs. We have other captains that are only qualified on the Citation jets that I fly. We have some captains that are qualified on the Citations and then some other jets that are larger.

80 percent or so of the pilot group at Silverhawk is qualified on two airframes.

Q. The turboprop is the King Air and the jet is the Citation?

A. That is correct.

Q. And which one of those two do you spend most of your time flying?

A. That depends on -- that depends on the schedule. The last two months, I spent more time flying the turboprop because that's where the need was. Historically, since I became a captain in the Citations, I've spent more time flying them overall.

Q. Do you get a schedule at Silverhawk on a weekly basis? a monthly basis? How often do you know when you're going to be flying?

A. So, like I mentioned earlier, we work a ten-and-five rotation. We're on call ten days, and then we have five days off. And that is scheduled in six-month periods. We bid twice a year for that.

Within those ten days, I am expected to be available within two hours of the Lincoln Airport to be -- to fly. Some flights have -- are pop-up trips. They happen the day of. Some flights are scheduled two or three weeks out. It's largely dependent on the client's needs.

So there's really no -- there's no way to determine how many days I'll be flying within those ten days. Sometimes I fly all ten. Sometimes I am only -- I'm just sitting on call and I only flew two or three of them.

Q. And so in terms of how you get paid, if you're on call, do you get paid the same as if you're flying, or do you get paid differently?
A. We're salary here, so we get paid the same regardless.
Q. Okay. And what's the salary that you make currently at Silverhawk?
A. I'm currently making 82,000 a year.
Q. Do you get benefits at Silverhawk?
A. I do. I have a 401(k) with a company match available to me. I have health insurance, dental, vision available to me as well.
Q. Do you participate in the 401(k)?
A. Not currently.
Q. So you don't put any money into the 401(k), and you receive no match from the company?
A. That is correct.
Q. Does the company subsidize -- pay some of your health insurance premium?
A. They do.
Q. Do you know what percentage or what actual amount per month they contribute for you?
A. So my plan that I have -- I don't know how it works with the other ones. But the plan I have is a high-deductible health savings account. The

company covers all of the premiums on that, so I don't pay anything.

Q. Do you put any money aside into that health savings account on a monthly basis?

A. I do. And the company contributes as well. Silverhawk contributes $1,000 a year, and I'm contributing $20 a month to add on to that.

Q. And in that, you pay for your preventive and your normal items, health care items out of that health savings account?

A. Yes.

Q. And then at some point, if you have some sort of expense that's significant, you'll reach a certain point that your insurance will then start covering you. Is that fair?

A. Yeah. The deductible is 6,500.

Q. Do you have options for different kinds of coverage that would maybe not have such a high deductible or require a health savings account?

A. Yeah. There are -- there are options with a lower deductible. There's one that was slightly lower, and then there was, I think, a $2,000 deductible. I chose not to participate in those plans.

Q. And why not?

A. I'm a fairly healthy guy. I had been using the lower deductible ones in the past and hadn't been -- I hadn't needed any major treatment. So I guess I just took a personal gamble on staying healthy.

Q. And what about your dental plan?

A. Dental plan and vision is separate. I don't remember exactly -- I'm sorry?

Q. No, I'm sorry. I cut you off. I apologize.

A. That's okay.

I don't remember exactly how much I pay per paycheck for those. It's not a very high amount. I think it's around $20 a paycheck.

Q. For both the dental and vision together?

A. Correct.

Q. And then do you have any idea how much Silverhawk is paying on your behalf?

A. I do not.

Q. Do you know if they're paying anything?

A. I've always presumed they were, but I guess I don't know.

MR. PETERSEN: (Inaudible.)

MR. STRINDBERG: What was that, Scott?

MR. PETERSEN: Sorry. I'm just taking

notes.
Q. (BY MR. PETERSEN): Tell me, Shane, are there other benefits that you get as a pilot for Silverhawk? Do you have flight benefits?
A. Silverhawk employees have access to the company aircraft at cost. So if I wanted to take one of the jets, I could use it at cost, which is still very expensive, so I don't.
And we're also allowed to fly on any unsold empty legs, repositioning legs. So sometimes a client will want to go to Fort Lauderdale, Florida, for example, for two weeks. We're not going to leave the airplane down there for two weeks. We'll fly it back. So it'll come back empty. And if a Silverhawk employee happened to be in South Florida, they could hitch a ride back to Lincoln for free on the company aircraft.
Empty legs don't happen very often. And when they do, it's typically between Lincoln and Omaha or some close city that's within driving distance.
Q. About how often do you fly? Or does it vary, as you were indicating, dramatically?
A. Yeah, it varies dramatically. Earlier this year, March, April, May, we did not fly a whole

lot.  I don't think many people were.  In July, we flew, as a company, nearly 600 hours.  I was flying -- on average, I was flying -- out of the ten days, I was either flying or gone eight of those days.
Q.    So getting back to -- you're saying you fly both the King Air and the Citation.
And when you're flying the King Air, is that schedule different than if you're flying the Citation in terms of seniority?
A.    No, not really.  It's just -- it's just based off of what pilot happens to be available that day.  So if they were holding me -- if they were keeping my schedule clear in anticipation of a trip and a Citation going, and then that trip canceled and then they needed help in the King Air, I would just get whatever they needed.  And it might be the worst trip ever.  But I would happen to be available that day, so I'm going to do it.
Q.    And when you get your schedule for either of those planes, is that an electronic item that you get off of some system similar to what you described as the PBS, or is that just a paper schedule that's handed to you?  How does that work?
A.    Yeah.  So we use a program called

"JetInsight" for all of our scheduling. And the way that that works is, flights themselves at Silverhawk are not assigned based off seniority at all. It's -- we have a trip, and we have these two available pilots that are both available, and we just plug them in.

So schedule is -- is just randomly assigned to pilots within their ten-day on-call period. And it's pushed through JetInsight. All the pilots have an application on their -- on their iPads. The company issues an iPad to each pilot. It has this application for JetInsight on there, and the flights show up in there.

Q. So is it fair to say, then, that flights are not assigned at Silverhawk based on the seniority of the pilots?

A. Yeah, that's fair to say.

Q. And so if you said, "I don't want to work on, you know, Friday sundown to Saturday sundown," and you got assigned -- well, let me ask: Would you then simply not be assigned a flight that's on Friday sundown to Saturday sundown?

A. That's how it's -- the agreement between myself and the company has been.

Q. Okay. Do you know if there's any sort of

a pilots' association that's involved in your -- in the pilots' bargaining of terms and conditions of employment at Silverhawk?

A. We don't have one.

Q. Do you know if there have been any efforts to form one?

A. Not to my knowledge.

Q. Do you have any idea about how long -- I mean, I'm -- you -- let me back up.

You indicated that there's about 40 pilots currently. 25 captains, 15 first officers. And your seniority, you're in the top ten or so; is that right? Did I understand that right?

A. Yeah.

Q. So that suggests to me -- you've been there about three years, maybe getting close to four -- that there's a fair amount of turnover; is that fair?

A. We have some turnover. It looks -- it looks worse than it actually is simply because of how fast my seniority grew there. We also went from 9 aircraft to 16 aircraft in the last two years, so we've had to hire a lot of pilots after me.

Q. I see.

A. I'm aware of a handful of individuals that

left to better things or different things. But it's not -- it's not a consistent overturn where we're constantly having to hire to replace. Most of our hiring has been to accommodate the added aircraft.

Q. All right. So is it fair to say, then, that, from your understanding, most of the pilots, around 30 or so, give or take, have less than four years' experience with Silverhawk?

A. Yeah.

Q. And those that have left, have they gone on to major airlines or regional airlines? Or do you have any idea?

A. Some have gone to regionals. Some have gone and worked for larger corporate or charter outfits. Some of them were terminated, and I don't know what they're doing now. Some of them chose to go and just have a complete career change.

Q. Do you know if any of the other 40 pilots are Seventh-day Adventists?

A. We have one.

Q. And does that person, does he or she fly on your Sabbath?

A. No, he does not.

Q. Okay. And have any of the other pilots requested -- at Silverhawk requested to have a

particular day of the week off, like Sunday?
A. No.
Q. Do you know if there have been any conflicts because of you or this other person -- this other pilot not having to work Saturdays?
A. What do you mean by "conflicts"? Like, difficulties in scheduling or actual, like, pilots being disgruntled?
Q. Yeah. Either one. I mean, particularly the latter. So a pilot suggesting, "Hey, I want Saturdays off, and Shane gets them off every time, and that -- that's not fair."
A. There has been -- there have been a couple of pilots that have been frustrated by that, definitely.
Q. And has the company made any formal announcement or response to that, that you're aware of?
A. Nothing formal, that I'm aware of. I know that the chief pilot has discussed with some of them explaining why they give myself and this other individual that particular time period off.
Q. And from your point of view, has that satisfied them?
A. It stops the -- the complaining. I

don't -- I mean, I don't know what's going on in their heads, but it's definitely stopped the complaining.

Q. What did the chief pilot say was the reason that you guys got that Saturday off?

A. Religious observance reasons.

Q. Okay. And it's your understanding that Mr. Wahlen, Michael Wahlen, at SkyWest has never had to work a Saturday?

A. That's my understanding.

Q. And do you have that understanding because that's what he told you?

A. Yes.

Q. So getting back to -- you said that at Silverhawk, they don't have a seniority-based flight assignment.

So what happens if there are four of five pilots for a particular flight on a particular day? How does the company decide, if you know, to whom to assign the flight?

A. Well, we'll typically look at how much each pilot has flown. And if one pilot has flown more, we'll try to schedule them -- try to not schedule them during that day and schedule somebody that's flown less, if possible. But some days, we

just have lots of flights going, so everybody that's available has to fly.

Q. Okay. But that's -- if you're not currently assigned a flight at Silverhawk, you are on call, so to speak, and you may be assigned a flight. Then you have a certain amount -- I think you said two hours -- to get into the airport and be ready to fly; is that right?

A. That's correct.

Q. Okay. And I may have asked you this. I apologize.

Have you worked a Saturday since 2017?

A. No.

MR. PETERSEN: Do you need to take a break, Jessica?

THE REPORTER: Maybe a five-, ten-minute break would be great.

(Recess taken, 10:40 a.m. to 10:56 a.m.)

Q. (BY MR. PETERSEN): Mr. Cassell, do you understand you're still under oath?

A. I do.

Q. Okay. Let me ask you a few more questions about kind of how flights work at Silverhawk.

A question I had is, I think you said that you fly ten on and then five off; is that right --

or work, you work ten on, five off with Silverhawk?

A. That's correct.

Q. So with your Sabbath, how do you work that since ten days on is always going to cover a Sabbath?

A. Yeah. So, like I mentioned, I have an agreement with the company that I don't fly from Friday sundown to Saturday sundown, so they don't schedule me during that time period. If somebody was dying or something, I would make an exception to that, of course, for emergencies, things like that. But they don't schedule me during that time period.

I do get scheduled for trips that maybe leave on a Friday and come back on a Sunday. So I'll leave Friday morning. I'll sit in a hotel on Saturday, and then we'll fly back Sunday. So that happens quite often.

Q. What about the -- I think you mentioned there were some on-call assignments that your company gives out for those whose planes you're maintaining, I guess, or you're flying for them.

What happens when you get an assignment for somebody who wants to fly on your Sabbath?

A. They give it to another pilot.

Q. Oh. So is there never -- has there never

been a time when there are -- no one's available and you take that flight?

A. I've -- we haven't run into that. They've gone through great lengths to avoid scheduling me on that day, and they have been good to their word on that.

MR. STRINDBERG: And, Scott, can I --

Shane, you're talking about Saturday. We should clarify. As Shane said before, the Sabbath is sundown Friday to sundown Saturday. So there may be some instances -- Shane would have to clarify this -- where he's flown after sundown on Saturday. So when you use the term "Saturday" and "Sabbath" interchangeably, it's a little confusing.

MR. PETERSEN: I understand.

Q. (BY MR. PETERSEN): So to that point, Mr. Cassell, if you were asked to fly in the evening on a Saturday after sundown, that doesn't violate your Sabbath, correct?

A. Not at all. I've done that on occasion.

And I would just like to point out, right before we went on break, you asked me if I had ever flown on a Saturday. In my head, I was thinking Sabbath, so I answered no. I have not flown during the Sabbath hours. I have flown after the Sabbath

hours, so...
Q. Okay. Okay. So you mentioned that SkyWest was a -- I think you called it a part one -- a Part 121 or a 121 Part airline.
Do you know what part of the code governs Silverhawk?
A. Yeah. Part 135 as well as Part 91.
Q. 135 and 91?
A. Correct.
Q. And I'm not asking for a legal opinion. But when you say "135" or "91," that's obviously different from Part 121.
In your understanding, what is the difference?
A. Part 121 is scheduled air carrier operations like an airline. Part 135 would be on-demand charter where, if someone's calling and asking, "Hey, I need a jet to go to such-and-such a place," they don't own the aircraft; they're just chartering the jet, but it's on-demand.
Part 91 would be owners or a company. It's something internal, maybe.
Q. So that's like a corporate jet that just needs pilots?
A. Yes.

Q. And then -- so when you say that you -- you're a passenger airline, it's all privately owned jets?
A. Correct.
Q. Okay. And you own some of those jets -- by "you," I mean your company -- owns some of those jets or planes, and you lease them to people under some sort of charter agreement where you're going to fly their people at the times that they've requested to the places they've requested. Is that fair?
A. That's correct.
Q. Is there a limit on where you fly in your company?
A. So Silverhawk is limited to the lower 48 of the United States. We can fly to Canada, we can fly to the Caribbean, we can fly to Mexico, and we can fly to Central America. That is within our -- our operation specifications.
Q. So -- and then when -- you were saying that you were ten days on and five days off, but you don't have to work the Saturday or the Sabbath that Friday to Saturday evening.
What does the company do so that you don't have to work that day?
A. Well, a lot of times, they'll try to

schedule me on trips that sit over the weekend, and they'll put a note in the scheduling software to not quote additional trips on -- during that time. Also, sometimes they'll ask me, "Hey, the first day or last day of your rotation is on a Saturday. Would you be okay with working into one of your days off so that we can use you -- better utilize you with the schedule?" And, of course, I have no problem with that because they're helping me, and so I can help them.

Q. Do they ever have to call in somebody to fill in for you on that Sabbath?

A. They have had to do that before.

Q. Is that where that -- you've mentioned before that a couple of pilots have complained that it wasn't really fair that you got your Saturdays off and they had to work those days? Is that when that would happen, because they were being asked to come in and work when they were otherwise scheduled off?

A. They have the choice to say yes or no on their days off. Even if they answer the phone, they don't have to say yes. And if they do come in, they're paid $500 for working that day regardless of how long the flight is.

Q. So Silverhawk pays extra to its pilots to cover your Sabbath?

A. Yes, sometimes. Not always. It has happened before.

Q. And what would happen at Silverhawk if no one was willing to cover you on your Sabbath? What would -- what -- would you work that Sabbath?

A. No, I would not.

Q. What would be the result, then? Do you know?

A. We've never run into that issue. We've never really discussed that. I don't know how they would handle that.

Q. If no one were willing to fly it and you were unwilling to fly it on that -- because of your Sabbath, wouldn't the company have to cancel the flight?

A. Most likely. Or tell the client that they just didn't have any pilots available. Anything --

Q. Do you know what --

A. I'm sorry.

Q. -- the company -- sorry. Go ahead. I cut you off.

A. Anything within 48 hours, the company has the right to refuse. So if a client says, "Hey, I

want to leave Saturday morning" and I'm the only pilot available but they call, like, within 12 hours, the company has the right to say, "I'm sorry. We don't have the pilot staffing available." And they've done that on occasion, not with Saturdays, but with -- with just examples of that coming up, pop-up trips. We do our best to accommodate it, but it might have to leave earlier or later.

Outside of 48 hours, we can usually schedule trips in different aircraft. We can do crew swaps, changes on the schedule to accommodate the needs, which is why we've been able to accommodate two pilots that don't fly from Friday sundown to Saturday sundown.

Q. If the company doesn't make that flight, though, it doesn't earn that revenue; isn't that right?

A. Yeah.

Q. And are you aware of any flights that Silverhawk has had to cancel because you are unwilling to work on your Sabbath?

A. I'm not aware of any.

Q. Has anyone told you that that's happened?

A. No one has shared that information with

me.

Q. Okay. In your understanding, is there different requirements to fly for a Part 135 or Part 91 airline versus a Part 121 airline?

A. I know that there are different requirements in terms of pilot qualifications. I know that airlines such as SkyWest that are operating under 121 have -- tend to have a broader training program. There's more to cover there, so training sometimes takes longer.

Q. Do you know whether the 121 airline also has different hours requirements for its pilots?

A. In terms of, like, duty day limitations, like how long a pilot can be on duty?

Q. Right.

A. I know under Part 135, we're allowed to be on duty for 14 hours, and then we're required to have 10 hours of rest. I -- I seem to recall 121 being the same, but I don't know if it is the same. I know that they have similar requirements.

Q. Okay. Do you know whether it requires more pilots to be available to fly a 121 -- a Part 121 airline versus a Part 91 or a Part 135 airline?

A. I don't know that it necessarily does or

does not. I think it just depends on how the company chooses to operate. Some 121 carriers are -- are more thinly staffed than others. Like, some 135 companies are very -- are staffed fairly robustly, and others are not. It just depends on -- depends on how much work the company has, how many airplanes.

Q. Have you had any discussions with Steven Horne since he left SkyWest and is working at FedEx?

A. Nothing formal. Just a Facebook comment or two. Like, I saw that he was working there, and I just told him congratulations.

Q. Do you know whether he has worked Saturdays while flying for FedEx?

A. I have no idea.

Q. You've not asked him that question?

A. I've not asked him, no.

Q. But it's your understanding that he never worked for SkyWest on a Saturday when he was a pilot?

A. That is my understanding.

Q. Whether he was a first officer or a captain?

A. Correct.

Q. Okay. Bouncing back, so I apologize because I kind of got off in the weeds for a bit.
I want to talk to you about any other benefits at Silverhawk besides the health, the dental, the vision, and the availability of a 401(k).
A. Like, I think I mentioned, use of company aircraft at cost.
Q. Yes, you did. Okay.
And the empty legs, free flights at any unsold legs, correct?
A. Yes. Yes.
Q. But you said those were infrequent and mostly to Omaha and Lincoln?
A. Yeah. They're usually very short hops. They're available to you for whatever reason you wanted to get on, though.
Q. Okay. Do you -- but you don't have any flight benefits on any other airlines?
A. No. We don't have jump seat privileges or anything like that with any carriers.
Q. When you left SkyWest, did you apply at any other airlines besides Silverhawk?
A. Yeah. I applied at quite a few different companies of all different sorts: cargo, air

ambulance, other airlines, like air carriers, like, similar to SkyWest, as well as charter and corporate. It was at least 20 different places over the span of -- from November through August.

Q. So I'm going to show you what's Bates-numbered CASSELL 43 through 193.

A. Okay.

Q. And I'm zipping through here. Whoops, that's not exactly what I was hoping it would be, so I hope I didn't just jack this up. Hold on one second.

MR. STRINDBERG: You probably did, Scott.

MR. PETERSEN: I'm sure I did. I have no defense to that. Seriously. All right. Here it is. I think this one's it. Well, no, it's not. But I'm going to do it, so I'll just use this.

Q. (BY MR. PETERSEN): It's CASSELL 43 through 193. And I -- I'm not -- I get that that's a lot of pages, 150 pages. But I want to talk to you initially about pages 43 through 176.

And there's a -- do you see this first page? It says, "Employment application."

Can you guys see this, by the way?

A. Yes, I can.

Q. Okay. So this is a document that was sent

over from your attorneys indicating -- it says, "Employment application history. August 1, 2016, to the present." And the present's probably a month or so ago or a few weeks. I'm not exactly sure. I'm not trying to trick you on that.

But as I glance through here -- and I want to mark this as Exhibit A -- or we will just go with 1.

MR. PETERSEN: Do you do 1's, Jessica? Or --

THE REPORTER: Usually, we do numbers.

MR. PETERSEN: In fact, Erik, do you have a problem if we just go numerically so we don't have Cassell 1 and then, you know, Emerson 1? It can all just be 1, 2, 3. Or what -- do you have any thoughts on that?

MR. STRINDBERG: Let me think about that. That's -- I prefer doing that, so probably yes.

MR. PETERSEN: Okay. Well, for now -- so I want to mark these as Exhibit A [sic].

(Exhibit 1 was marked.)

Q. (BY MR. PETERSEN): And then as I kind of skim through these, there's an Arrow Air.

Is that a place that you applied to, Mr. Cassell?

A. Yeah.

MR. STRINDBERG: Scott, these documents, I don't know how -- I'm not a wizard at this, either. But the document view is very small.

MR. PETERSEN: I'll try to make it bigger.

(A discussion was held off the record.)

Q. (BY MR. PETERSEN): How's that?

A. I can read that.

Q. Can you read that? So I want to just talk bigger picture about this.

So this is Arrow Air, correct?

A. Yes.

Q. And you -- is that a passenger airline or a cargo airline?

A. I'm trying to remember. This was -- I believe this was an air ambulance operation, the particular position I was applying for here.

Q. Okay. And then there's Silverhawk, and that had a cover letter and a resume. I'm just skimming through this because what I'm trying to get at is whether these documents that we've talked about with the Bates range we've talked about constitute part of your employment efforts after SkyWest to become employed. Essentially, it's what you did when you were not hired at SkyWest until you

were hired at Silverhawk. That's what I'm trying to get at.

A. Okay.

Q. Did you have a chance to review the documents before they were sent over?

A. I -- I did have a chance to look through them, yes.

Q. And in your best recollection -- and I'm happy to go through slowly if you want, and I'm just trying to save time -- do they more or less -- do they account fairly and accurately for your efforts to get employment after not getting hired at SkyWest?

A. I believe they do.

MR. STRINDBERG: Scott, are you asking -- this is Erik.

Scott, are you asking if there are other places he applied where he didn't have documents that we were able to furnish to you? Is that what you're asking?

MR. PETERSEN: Yes.

Q. (BY MR. PETERSEN): Do you understand that, Mr. Cassell?

A. There was one other place, and they did hire me part-time. I just walked into the place,

and I handed my resume. It was a flight school in Middletown, Ohio. I was hired part-time.

Q. What was that company called?

A. Middletown Regional Flight Training Institution. They might be in here and I just missed it. But that place, I know I didn't have a formal application with, so that could be missing.

Q. And you were hired as a flight instructor?

A. I was hired as a part-time flight instructor.

Q. Do you know how much you made?

A. I was making $22 an hour.

Q. And do you know how many hours you worked a week?

A. It was never more than 20, 15 to 20.

Q. And how long did you work there?

A. I worked there from December of 2016 until early August of 2017.

(Interruption.)

MR. PETERSEN: I don't know if that's mine, just so you-all know. My computer got all switched over a week ago. And so if it's dinging, I apologize. I don't think I can turn it off. Unless it's somebody else. The fact that I don't even know should tell you something about me and my IT

expertise.

Q. (BY MR. PETERSEN): All right. December of 2016 to early August 2017?

A. Yeah.

Q. Okay. Did you get offers from any of these other companies that you applied to?

A. Let me think here. I know -- I can think of two places that offered me positions that I turned down because it wasn't really going -- either it wasn't going to work with the schedule or they provided no benefits. And it was actually going -- I couldn't afford to take the job based off what they were willing to pay.

Q. And timing-wise, you went from -- because I believe that your -- when SkyWest told you you would not be hired on after training -- or in -- that was in July of 2017; is that correct?

A. Yes.

Q. So from July of 2017 until you were hired by Silverhawk -- and the month escapes me.

Do you know the month you were hired at Silverhawk?

A. I believe the -- the job offer was given to me sometime in July.

Q. All right. So -- and I'm looking -- in

fact, I'm looking at what's Bates-numbers CASSELL 56, 056 and 057. This looks like an email chain with a John Geary at Silverhawk Aviation.
Do you see that?
A. Yes. Oh, yes. Yes.
Q. And it says at the end -- I'm looking at the very top of the page that's CASSELL 57, it says, "Long story short, I believe you would make an excellent addition to our team, and I would like to offer you a position as King Air 90 and Cirrus captain."
So were you -- I mean, how is it that you didn't have to become a first officer at Silverhawk before you became a captain, I guess? That's my -- kind of a question I have.
A. Sure. So my -- for Part 135, there's no written requirement in the regulations that, in order to be a captain, you have to have accumulated a certain amount of flight time under that part of -- or under that operation. Like at SkyWest, I believe -- and I could be slightly off here, but I believe you have to have roughly 1,000 hours of Part 121 time to upgrade to captain.
Under Part 135, since some of these operations are single-pilot, you can be hired as a

captain. You just have to meet a certain time requirement, which is specified within that Part 135, which I -- I had that -- I had quite a bit over that time requirement. So they were willing to hire me as a captain.

Q. Okay. So you got to skip the first-officer position and go right in as a captain; is that right?

A. That is correct.

Q. Okay. And then this is dated July 25, 2017.

Do you know from that time, more or less, when you started working at Silverhawk?

A. My official date of hire at Silverhawk is September 6, 2017.

Q. September 6, 2017?

A. Yes.

Q. All right. So between the first time that you applied and were trained at SkyWest, which was in the fall and the winter of 2016, until -- and we can talk -- we'll talk about dates then -- until you were hired in September, September 6, 2017, with Silverhawk, did you -- other than the job you just mentioned at this Middletown Regional Flight Company, did you have any other employment?

A. I did not.
Q. And you were applying for positions during that time, based on the documents that were sent to me?
A. Yeah.
Q. And you're not aware of any other -- other than what we talked about with Middletown Regional Flight, any other efforts to get employment that would have any paper relative to that -- those efforts that have not been disclosed? Do you understand my question?
A. Yeah. I'm -- I'm thinking if there were any others.
MR. STRINDBERG: And, Shane, if you need to look through each one of these documents, you can.
A. I -- I have looked through these, the employment applications and stuff. I -- I've put this together as well.
Q. (BY MR. PETERSEN): So the question -- again, it's not intended to be a trick question, but I want it to be comprehensive, which is, is this the universe of documents, that you're aware of, that demonstrates your employment efforts from the time that you left training at SkyWest in the winter of

2016 and the time you were hired by Silverhawk Aviation on September 6th of 2017?

A. One other comes to mind. I applied to be an Uber driver, but they told me my car was too old.

Q. Okay.

A. So that didn't work.

Q. Do you have any documents that would support that?

A. I -- I could possibly dig them up. I would have to look for them. I don't know where they would be.

Q. All right. Other than that, any other airline efforts?

A. None that I'm aware of.

Q. Or other career efforts?

A. No, none that I'm aware of.

Q. Getting back to the time differences.

So when you were made a captain upon being hired at Silverhawk, do you know whether -- you mentioned that your understanding of a Part 121 airline is that it required to go -- to become a captain for a Part 121 airline, you had to have a certain number of Part 121 flight hours; is that right?

A. That's how I understand it.

Q. And when you say "flight hours," those are actual hours from, sort of, take-off to landing?
A. Yeah, essentially. I'm not sure how SkyWest chooses to count, if they count it from when the plane pushes or if it's take-off. But it would be something of that sort.
Q. And is it your understanding also that in order to get those flight hours, you would have to do that as a first officer before becoming a captain?
A. That's how I understand it, yes.
Q. All right. You never became a captain at SkyWest; isn't that right?
A. Correct.
Q. And did you actually ever fly a SkyWest plane when you were working there?
A. No. I never did.
Q. So is it, in your estimation, easier to acquire the kind of flight time that you need to become a captain at a company like Silverhawk that is governed by different regulatory parts than to become a captain at a company that's governed by Part 121, like SkyWest?
A. I wouldn't say it's necessarily easier. It requires hard work either way. There are

definitely more opportunities available to those who take advantage of them. But, you know, you can be a flight instructor like I was for years and bill time that way and go straight to 135, or you could do the same thing and go to a 121.

Both -- yeah, I guess if -- there are more opportunities available for individuals to bill time to become a -- a captain under 135 if the company is hiring at the bare minimum.

Q. All right. Have you spoken to Mr. Wahlen since you left SkyWest?

A. Yeah.

Q. And what was the nature of the conversations that you had with him after leaving SkyWest?

A. All different natures. Mr. Wahlen and I have been friends since 2010, and we've kept in touch. So we've discussed things regarding work as well as just things in our own lives. A good friend of mine.

Q. Did he seem surprised that you were not hired by SkyWest?

A. The second time?

Q. Yes.

A. He did, yeah.

Q. Did he explain why he was surprised?
A. Yeah. SkyWest, in the summer of 2017, as were most every carrier that I was aware of, were very hungry for pilots as there was a lot of overturn from retirements and majors and pilots being called up from regionals hired up in majors. So they were looking to replace, as well as parent airlines were adding more routes.
Q. And that would suggest to you, and I think it suggested to Mr. Wahlen as you're explaining it, that SkyWest needed more pilots, not less pilots; is that right?
A. Yes.
Q. Do you know if Mr. Wahlen has spoken to you, say, in the last year about his schedule for the last year?
A. He's probably -- I think he's mentioned it once or twice what -- like, specifically what days he was flying. There have been no -- no concerns or, "Hey, guys" -- you know, he hasn't -- he hasn't reached out to me about any concerns he has regarding his schedule.
Q. Okay. Do you know whether he's indicated to you if he's had to work on your Sabbath this year?

A. He -- he -- I know he has not worked on Sabbath this year.

Q. And you know that because that's what he told you?

A. He's told me that, yes.

Q. Okay. And that's why he seemed surprised that SkyWest, given the need for pilots, would suggest that you wouldn't be hired?

A. Yeah.

Q. Okay. Do you know how many hours it requires working for a Part 121 airline to go from being a first officer to a captain, how many 121 hours?

MR. STRINDBERG: Objection. Asked and answered.

Q. (BY MR. PETERSEN): All right. You probably did.

Was that 1,000? Is that what you told me?

A. Yes.

Q. Okay. Fair enough.

Do you know whether SkyWest had specific hours that were required just to be hired, flight hours just to be hired as a pilot, a first officer?

A. Yeah. Pilots that were applying had to meet some form of airline transport pilot minimums

whether -- and this is where -- depending on the training program you went through while you were getting your pilot's licenses, depended on how many hours that could be. For those coming from the military, it was 750. If you went through the program I went through, which was a unstructured training program, it was 1,500. And it could be any -- anything in between there depending on where the training came from.

Q. Does Silverhawk have the same hours requirements?

A. Silverhawk requires for their -- for the position I filled, it had to meet full ATP minimums, which is 1,500 hours.

Q. When you say "ATP," what does that stand for?

A. Sorry. Airline transport pilot.

Q. And that's -- is that the same kind of hours as what would be required to be a pilot at SkyWest?

A. That would be the maximum. So to be a -- to be a first officer at SkyWest, pilots could apply -- or could apply under restricted airline transport pilot minimums, which means that they could obtain a restricted airline transport pilot

license, allowing them to act as second in command.
But when you -- my understanding is, when you became a captain, the restriction was lifted from your airline transport pilot license.
Q. All right. You applied at SkyWest at least twice to be a pilot, right?
A. That's correct.
Q. And the first time was in the fall of 2016?
A. The first time was in the summer of 2015.
Q. And when you applied in 2015, you applied just to be a pilot and go through the SkyWest training so that you could fly the CRJ?
A. That is correct.
Q. And your complaint references what you've stated as "certification training program," CTP.
Is that -- what do you mean by that?
A. I'm sorry. You cut out there. Could you repeat the question?
Q. Sorry. Every time I turn my head, I think it's not very good, so I'll try to keep it straight. This Zoom thing's kind of got my notes and --
So you mentioned in your complaint that, at SkyWest, you went through what's called -- what you labeled as "certification training program,"

paragraph 14 of your complaint.
Is that what -- is that pilot training?
A. Yeah. So earlier I -- I might have mentioned, in order to take the airline transport pilot written test, you had -- the FAA, Federal Aviation Administration, mandated that all pilots take a -- had to go through this CTP, or certification training program, course, which was -- it was three or four days of ground school, discussing jet aerodynamics, jet systems, stuff like that. And then it was ten hours in a simulator, full-motion simulator in a transport category aircraft. Since this was required and SkyWest was needing pilots, SkyWest was providing the course.
Q. Do you know whether -- do you get paid to go through that training course?
A. I think my -- yeah, my paycheck reflected that, so I was paid to do that.
Q. Do you know how much you were paid?
A. I -- training guarantee at the time was 65 hours paid at 36.50 an hour, I seem to recall. But that's -- that's my recollection. 65 hours paid out at 36.50 an hour, and it's 65 hours of pay monthly during training.
Q. And how long was the training? Do you

know?

A. The CTP course?

Q. Yes.

A. I was there for a week and a half.

Q. When you say "there," where is "there"?

A. I'm sorry. Atlanta, Georgia.

Q. And you're not from Atlanta?

A. No, I am not.

Q. So did you have to get a hotel or rent a house or something?

A. SkyWest provided lodging for us.

Q. What about your flight from where you were to Atlanta?

A. They provided a flight from -- yeah, from where I was to Atlanta.

Q. Did they feed you?

A. No.

Q. How about transportation? Did you have transportation from the airport to the hotel and to your training?

A. There was an airport shuttle that was operated by the hotel -- sorry. There was a hotel shuttle between the airport and the hotel. It was operated by the hotel. And there was a shuttle between -- I seem to recall there being a shuttle

between the hotel and the training center, but it was right across the street, so most everyone decided to walk.

Q. Okay. But other than your food and your incidentals, everything else was paid for by SkyWest while you were training?

A. Yeah. That's -- that's my -- I would say SkyWest provided lodging, and they provided the airfare to and from, that I know.

Q. Okay. Do you know how much SkyWest -- how much it cost SkyWest to train you?

A. I have -- I don't know how much it cost them to train me.

Q. Did you have any discussions with Mr. Horne or Mr. Wahlen about those costs?

A. No, I did not.

Q. And nobody at SkyWest ever explained to you what the cost of your training would be?

A. No.

Q. All right. So did you successfully complete your training in Atlanta?

A. I did, yeah. I completed the CTP course.

Q. And when the Sabbath came around in Atlanta, what did you do when Friday sundown rolled around?

A. I'm not sure I understand exactly what you're asking. Like, what I did personally or how I handled the potential conflict?

Q. Yeah, that's fair.

So your training, did it ever bleed into your Sabbath while you were in Atlanta?

A. Yeah. The schedule for the CTP course was given to me sometime before. I believe it was in October, that the schedule was given to me. And I saw that I was scheduled Sabbath -- Saturday morning for a simulator session. So I reached out to the individual who was in charge of scheduling. I explained my predicament, and they agreed to move me to a different simulator slot that gave me Saturday off.

Q. Do you know how many simulators are accessible in that training facility in Atlanta?

A. I don't know how many are accessible.

Q. Do you know whether SkyWest owns those simulators or leases them?

A. I -- I don't know.

Q. Do you have any idea how much it costs?

A. I don't know how much it costs.

Q. Okay. But at the time that you're in Atlanta, you were able to reschedule your simulator

training so that you did not have to do your simulator training on a Saturday; is that right?

A. Yeah, that's correct. They --

Q. When did they switch it to?

A. They switched it to -- I think my first simulator session was on Monday, and it was over by Wednesday. It was only three nights.

Q. Okay. So they -- you were originally scheduled for Saturday to Monday, and you ended up getting Monday to Wednesday? Is that -- am I getting that right?

A. That's -- I recall being scheduled Saturday through Monday, and they switched it, yeah. That's correct.

Q. Okay. And so you successfully completed the CTP program.

And what happened next?

A. So I finished that on Wednesday. They flew us to Salt Lake City where our ground training would start for SkyWest from Atlanta. They -- I believe we left the next day. And so we had Friday off to take our -- our written test for the airline transport pilot license, which everybody that was flying out there with me did on Friday.

And then SkyWest had put us in a hotel

where -- for when we would take the test, and then they moved us to a different hotel on Sunday where we were going to remain for our ground training, which was going to start on Monday.

MR. PETERSEN: So, Jessica, do you need another break, or can you go until noon?

THE REPORTER: I can go until noon. That's fine. Thanks for asking.

(A discussion was held off the record.)

Q. (BY MR. PETERSEN): So after that, the flight to Salt Lake and the lodging, all of that, that continued to be paid for by SkyWest?

A. Yeah. SkyWest provided lodging for the pilots that were in training.

Q. And you continued to be paid for the time that you were required to be at places and continue your testing at the 36.50 an hour; is that right?

A. That's my understanding.

Q. Okay. All right. So after that testing, then, you're still not a first officer yet, or are you a first officer? Do you know?

A. No. I am -- I'm sorry. I'm interrupting.

No. I -- I guess -- I applied for the position of first officer. I don't know if SkyWest would have considered me a first officer until after

I passed my check ride or not, though. I don't think they would have. I guess "first officer in training" would be a good way of describing what I was.

Q. Okay. You weren't flying actual passenger flights, though, right?

A. That's correct.

Q. And while you're in this training and then when you're taking your test in Salt Lake City, are you speaking with Mr. Horne or Mr. Wahlen? I can't remember his name now.

A. Mr. Wahlen?

Q. Wahlen. Sorry.

A. I was speaking with Mr. Horne. I called him once. And then I -- I think I -- I was in touch with Mr. Wahlen just explaining to him, "Hey, this is what happened. This is what you can expect in training." He had some questions. That's all.

Q. Did you ever -- sorry. I didn't mean to cut you off. Go ahead and finish.

A. He was starting after I was, so that's why he was curious.

Q. Did you ever talk to them about what it would be like to be a reserve pilot?

A. Yeah. I spoke with Steve about that, and

he shared -- he just shared how he bid and traded, et cetera, to get reserve periods that were outside of the Sabbath hours.

Q. So you -- there are no reserve pilots at Silverhawk that are reserve pilots by title. Is that fair?

A. Yeah, that's fair. That's correct.

Q. You act as reserve pilots in a way, I suspect, because you're there on call at times for anyone who needs a plane to go.

Is that fair, too?

A. Yeah, that's correct.

Q. But there are pilots that are specifically provided the job duties of reserve pilot at SkyWest; is that right?

A. That's how I understand it, yes.

Q. And those pilots are not scheduled a particular leg or line, correct?

A. That's correct.

Q. Tell me what you understand the duties of a reserve pilot at SkyWest to be, if you have an understanding.

A. So I -- I'm sorry. Finish.

Q. Yeah. If your understanding has changed from the 2016 time period when you were applying --

or the 2015 time period to now, I'd like to know the change. But, otherwise, just tell me what your understanding has been about what a reserve pilot does at SkyWest.

A. Certainly. So my understanding -- and this is based off of my limited knowledge -- is that SkyWest had a reserve pool. The pilots were expected to be available. I think it was a two-hour callout for -- if a pilot were to get sick or maybe a flight got delayed inbound and the crew wasn't going to make it to their next airplane, whatever multitude of reasons that the crew couldn't make it to the flight they were supposed to be on, they would call a reserve crew in that was expected to be at the airplane within two hours. They were essentially paid to be available.

Q. Are you familiar with something called a "ready-reserve"?

A. Yeah. The pilot sits at the airport.

Q. And is that different from the reserve duties you just described of being available in two hours?

A. Yeah, that would be different. I -- I -- I recall there being different levels of reserve. There was short-call, long-call, and ready-reserve.

Q. Yeah. And the short-call, is that a time frame that was shorter than the two hours you just described?
A. My understanding is, short-call reserve was two hours, unless it's changed.
Q. And then long call was what?
A. I think it was a 12-hour callout.
Q. Okay. Have you ever heard of a callout being a 30-minute callout?
A. I have not, no.
Q. Okay. And a ready-reserve, tell me how the duties of a ready-reserve differ from the short- or long-call reserves, if you know?
A. Well, the ready -- sorry?
Q. I said if you know.
A. I don't -- like I said, I have very limited knowledge on this because I never experienced it. But my understanding is, ready-reserve sits in the crew lounge or somewhere at the airport with their phone on, and they -- they could be -- you know, they're probably going to be the ones that are called first for anything that's an immediate need, versus the other ones would be categorized for less immediate and maybe, like, up to half a day out with a 12-hour callout.

Q. And what -- do you have any idea as to what the purpose of a reservist is?

A. Yeah.

Q. Go ahead.

A. The reserve pilot essentially fills in when there's a need in the company. Like I said, maybe a crew misses a connection somewhere and they're going to be late, and so the flight they were supposed to be on isn't going to have a crew available if it's going to leave on time. So they call a reservist in, hoping that they'll be there in time to get the flight off on time.

Q. Do you know whether reservists tend to be more senior or more junior pilots?

A. My understanding is, it's a mix of both. Typically, all your new pilots will start off on reserve. But I have heard of senior pilots that like to bid reserve because they live in -- at base close to the airport, and they can just stay at home and get paid.

Q. Do you know whether they're paid -- the reservists are paid as much as those who actually fly a line?

A. My understanding is, reservists are given a 76-hour guarantee. And if they exceed that, then

great. If not, they're going to get paid for at least 76 hours for being available.

Q. And do you know whether that's true on -- at SkyWest, the 76 hours? Is that what your understanding is, is that SkyWest did that?

A. Yeah. My understanding is, SkyWest's minimum guarantee is 76 hours.

Q. Would you sit -- at SkyWest, had you been hired as a pilot and were scheduled as a reservist on your Saturday, would you have sat at the airport as a reservist, a ready reservist over your Sabbath?

A. No. I -- I was -- as I understood, you had to be specifically placed on ready-reserve. That wasn't a choice you had. So if they asked me to do that, I mean, I wasn't willing to take a flight assignment on Sabbath -- during the Sabbath hours that were scheduled out. I would have tried to trade that with some other pilot, drop it, and pick up something else. I would have done my best to move my schedule around so it wasn't a conflict.

Q. And if you had been unable to get somebody to take it, would you have then sat ready-reserve at the airport?

A. No, I wouldn't have.

Q. Would you have called off sick if you had

not been able to fly -- so let me back up.

So let's say that you were hired by SkyWest as a ready reservist and scheduled for Saturday, or for your Sabbath.

And when I say "Sabbath," you know I'm talking Friday sundown to Saturday sundown, right?

A. Yes. Yes.

Q. And you're unable to swap it with somebody. You said you would not fly it.

What would you do at that time -- at that point?

MR. STRINDBERG: I'm going to object to the question. You're asking him to speculate. He was never in that position, Scott. So I don't know if he knows how he would have handled it.

Q. (BY MR. PETERSEN): Let me assume that that's the position that you're in, Mr. Cassell.

By the way, is it "Cassell" or "Cassell"? Am I even pronouncing your name right?

A. It's "Cassell."

Q. Okay. I apologize. I've heard it both ways, and I've been saying "Cassell" the whole time. I meant to ask you, so I apologize. I apparently was right anyway, so...

A. No, it's -- I go by both. I hear both all

the time, so it's no problem.

Q. Okay. So if you had been asked and you couldn't get it off, did you -- had you thought to yourself what you would do at the time?

A. Yeah. I would have called -- if it got to the point where it was beyond my ability to trade, drop, et cetera, I would have called -- probably would have called crew scheduling and let them know. And if they couldn't do anything, I would have called the base chief pilot and let them know that I wasn't going to be available.

I'm not the kind of person that wasn't going to show up unannounced. I would have let -- I would have given as much notice as I was able to to the appropriate individuals, explaining what was going on.

Q. And you wouldn't have lied about it to say like "I'm sick" or anything along those nature -- that nature, right?

A. No. I -- I think that would be dishonest. That doesn't -- I think it's counterintuitive. Later on in the commandments, it talks about not bearing false witness. So break one to not break another doesn't make sense to me.

Q. Okay. Fair enough. So that I can move

off, I'm going to switch gears before lunch.

I am showing you now what are Bates-numbered CASSELL 191 through 193.

Do you see those documents? They're wage and tax statements, W-2s.

A. Yeah.

Q. And I'm looking at the employer on the first one, which is 191.

MR. PETERSEN: And by the way, Jessica, I'd like to mark this one as Exhibit 2, which is -- it'll be Bates numbers 191 to 193.

(Exhibit 2 was marked.)

Q. (BY MR. PETERSEN): The first one, 191, the employer is Middletown Regional Flight Training Institute.

Is that the entity you mentioned earlier that you worked for part-time from December 2016 until early August 2017?

A. Yes, that would be them.

Q. And that indicates that your compensation, your W-2 wages, were, what, $7,198.30; is that right?

A. Yes, that's correct.

Q. Were you given any other compensation through them that is not reported on this W-2?

A. Not that I remember.

Q. Okay. Now I'm going to the next page, CASSELL 192. And this one has Silverhawk Aviation, Inc.

Do you see that one?

A. Yes.

Q. And that one -- oh, let me go back first. 191 is for 2017.

Did you get a W-2 from Middletown Regional Flight that's from 2016?

A. Yes, I -- I would have.

MR. PETERSEN: All right. I -- unless I'm missing it, I don't think I have that one, Erik. Is there a way to get the W-2 for 2016 from Middletown Regional Flight?

MR. STRINDBERG: Do you mean 2017?

MR. PETERSEN: Well, this is 2017. I'm looking for 2016 since he said he worked from December 2016 until early August 2017. So, presumably, he would get two W-2s.

MR. STRINDBERG: I will ask Shane to try to find it.

MR. PETERSEN: Okay.

Q. (BY MR. PETERSEN): Then going to 192, this is -- says it's Silverhawk, and this is also a

2017 W-2. And it shows $14,575.18.
Does that seem to you -- or do you have any reason to think that that's not the amount of income that Silverhawk paid you in the year 2017 for your work for them?
A. That all looks correct.
Q. Then I'm going to the last page, which is 193. This is a 2018 W-2 that shows wages of 58,544.91 for work at Silverhawk.
Have you got any other compensation in 2018 from Silverhawk besides that that is shown?
A. No.
Q. Do you have any -- did you receive any compensation from any other employer in 2018, that you're aware of?
A. No.
Q. How about 2017? Any other income besides what it shows on the two W-2s we've already gone over indicating income from Silverhawk and from Middletown Regional Flight?
A. No, not that I can remember. Just those two companies.
Q. All right. And you don't have any 2016 W-2 statements from any other entities, other than we think you got one from Silverhawk -- or from --

yeah -- or Middletown. Sorry.

MR. STRINDBERG: Scott, we produced a bunch of other tax information, I think, ten days ago. I don't know if it included his other W-2s, but you might want to check those as well.

MR. PETERSEN: Okay. Fair enough. Thank you.

Q. (BY MR. PETERSEN): All right. Then I want to go and mark as Exhibit 3 CASSELL -- if I had done this the way I thought I did it last night, this would not be an issue because this would be a separate file. But, apparently, I didn't do it right, so I apologize. My other files, I think, are better.

This is marked CASSELL 177 through CASSELL 190.

(Exhibit 3 was marked.)

Q. (BY MR. PETERSEN): I'd like to mark that as Exhibit 3 and have you -- as soon as I get up there. I'm sorry. I'm probably bugging your eyes out. I apologize.

Can you -- do you recognize these documents, Shane?

A. Yeah. That was -- there was a request made that I get the schedule that I worked at

Silverhawk. And this was at the time what I was able to produce as far back as December 2018. We changed scheduling software at that point, so anything before then was lost.

Q. Okay. And the schedule that I'm looking at -- and I get it's probably really small where you're at, but it looks like it's -- you've got December 2018, January 2019, February 2019. So it looks like it's by month that there's a schedule.

Is that -- is that a -- well, let me ask this: What are these? What does this show? What do these documents show? Is this something that's handed to you or that you see online? Are you creating this? What are these?

A. This is what's -- this is one view of the schedule that I have available to me. This information can be found -- I sent some duty logs that are a lot cleaner than this that show a day-by-day kind of in a line format that'll give the same information as this. It's a lot cleaner.

MR. STRINDBERG: And we produced those to you, Scott, ten days ago.

MR. PETERSEN: Yeah, I'll talk to you about them.

Q. (BY MR. PETERSEN): So these -- there's

nothing in these documents that are not shown in those later day-by-day schedule documents? Is that a fair statement?

A. Yeah, that's correct. And even on these, I was unable to remove some company events like maintenance and other random company flights that they put on there. So not -- not all of this is entirely reflective of my schedule. This was just the best I could come up with at the time.

Q. So just -- and then I'll move on.

But what are the difference -- what's the difference between the gray, the yellow, and the blue, if anything?

A. I'm looking.

MR. STRINDBERG: Can you make them bigger there, Scott?

MR. PETERSEN: Yeah. It'll bump them off the page, but I can do that. Yes.

Q. (BY MR. PETERSEN): Is that big enough for you, Mr. Cassell?

A. Yeah, I can see that.

So it appears that the gray is -- anything with a line through it, like the dash -- diagonal lines appear to be maintenance. I don't know why some are gray, some are blue, and some are yellow,

though.

Q. Okay. This is not a calendar you prepared; this is something that you pulled off of your company's system?

A. Correct. Yeah. I recognize that it's kind of difficult to read.

Q. And if I were to click on one of these and open it up, it would probably give me more information about the event. Is that fair?

A. Yeah, it would. Anything that says "Silverhawk" is something to do with maintenance or a company flight. Anything else, you'll see it doesn't have the lines through it. That's -- that's all -- those were revenue flights of some sort.

Q. So do you see my cursor, my little hand? I'm circling around. Just to give me an example, I'm looking at this blue one, 12a Silverhawk maintenance, Lincoln-Lincoln.

That's not a flight?

A. Correct, yeah. That was just a -- they pulled an aircraft in for maintenance.

Q. But the one above it that's yellow, Silverhawk Link-Link, that means that is a flight?

A. No. That also looks like maintenance. Like I said, I don't -- I don't entirely remember

what the key here was.
So if you look at NPPD, Lincoln to Lincoln right next to it on December 18, 2018.
Q. Yes.
A. Do you see how that doesn't have lines going through it like the other ones do?
Q. Right.
A. That was a flight that I did.
Q. And these are your -- the other question is: This is your schedule, not somebody else's schedule?
A. Yeah, that's my schedule.
(Reporter clarification.)
A. It is my schedule.
Q. So best you can tell -- we'll get to the other documents. From this document, if it has -- if it doesn't have the vertical lines, the slanted lines through them, that shows a flight?
A. Yes. Oh, hang on. I know what the colors are now. It just came to me.
So the colors represent aircraft types.
Q. So this gray one on December 10, 2018, that shows that you did a flight in a -- whatever aircraft the gray represents?
A. Yes.

Q. What does "Bryan Heart" stand for?
A. Bryan Heart was the name of the client we flew. It's a hospital.
Q. And then LNK to LNK, what does that mean?
A. So LNK is the airport identifier for Lincoln. We flew from Lincoln to another airport and back to Lincoln. So the trip started and ended in Lincoln.
Q. I see. Okay. Okay.
MR. STRINDBERG: Scott?
MR. PETERSEN: Yeah.
MR. STRINDBERG: Not to tell you how to do your job. But Shane earlier said, you know, that he's paid a salary, so the number of hours he flies is not really that important, I would assume.
MR. PETERSEN: Well, I'm just trying to find out what the schedule is.
MR. STRINDBERG: Okay.
Q. (BY MR. PETERSEN): I mean, I'm assuming, Mr. Cassell, that the gray one here, I'd have to -- would it actually indicate how many hours you flew for that flight?
A. It would -- it would not show how many were flown. And that's why, like, the duty logs that I sent at a later date do show, like, how much

flight time was logged, how many hours I was on duty, et cetera, where these just show what was scheduled.

Q. Do you get tips or bonuses for what you fly?

A. If I work on a day that I was scheduled off within my five days off or vacation time that I would have taken, I get paid $500 per day. Some clients --

Q. Plus --

A. I'm sorry. What?

Q. Plus -- I'm sorry.

Just plus your salary?

A. Yes.

Q. In addition to salary. Okay.

A. And then some clients do tip. It doesn't happen very often.

Q. Do you have -- I mean, like, if I said, "How much have you made in -- or how much did you make in 2019 in tips," do you have any idea?

A. I have no idea. Maybe $200. Nothing -- it's not a small amount, but it's not a substantial amount, either.

Q. But you think it's less than $1,000 for the whole year?

A. Yeah. I think it's definitely less than 1,000 for the whole year.

MR. PETERSEN: Okay. All right. Why don't we take a break, and I'll have better documents next time, too.

(Recess taken, 12:05 p.m. to 12:35 p.m.)

Q. (BY MR. PETERSEN): All right. Mr. Cassell, do you understand you're still under oath?

A. I understand.

Q. All right. When you finished your certified training program and then you were flown out to Salt Lake City, how long did your training in Salt Lake City continue? And this is back in the fall of 2015.

A. My understanding was, my training was supposed to go at least another four weeks. I did not stay through the entirety of that. I made it through about a week and a half.

Q. A week and a half.

And then were you paid for that week and a half?

A. To the best of my knowledge, yes.

Q. And then what happened at the week and a half?

A. So after the first week, we had a test over what we covered on the first week on Tuesday. And they gave us a schedule of what was to come over the next -- I think it was the next three weeks.

And the -- that first Friday, there was an event that was scheduled -- it had two parts. Pilots could choose which part they wanted to be a part of. There was a 4:00 to 6:00 p.m. and then there was a 6:00 to 8:00 p.m. This event they called the "matrix session" where they would essentially be teaching pilots. They call them "flows." And what that is is you -- basically, they're teaching you which button, which switch to flip when -- for which phase of flights for takeoff. You flip these in this order. For landing, you want to do these in this order, et cetera.

Sundown was at 5:00 p.m. in Salt Lake City, so neither of those options were going to work. So as soon as I was given that schedule, I went to the class teacher and I said -- I explained my predicament.

And he said, "Well, you need to get in touch with Mr. Jake Whicker." He was not in his office, so I got his phone number from his secretary and -- I believe she was his secretary. And she

said, "Give him a call. He'll call you back."

So I called him. And later that evening, he called me back explaining that there might be a way to accommodate me. Come visit him the next day at lunch.

So the next day at lunch -- excuse me.

Q. Do you need a break?

MR. STRINDBERG: Do you need some water there, Shane?

THE WITNESS: I have a little bit here. Give me -- pardon me for just a second.

MR. PETERSEN: Yeah, no, take a second here.

THE WITNESS: All right. I think I'm okay now.

Q. (BY MR. PETERSEN): Okay.

A. So, yeah. He called me, and he said they might be able to do something to help me, to come visit him the next day at lunch.

I showed up at his office the next day at lunch, and he said he had not had a chance to talk to anybody at that point. This would have been Wednesday afternoon.

So lunch break was over. We all went back into class. And not too long later, maybe 30,

45 minutes after we started class, he came and called me out of class to come to his office. He explained to me that SkyWest would not be providing an accommodation and that I had three options available to me: I could make it work with my religion and show up to the required training event; I could not show up and be fired; or I could resign, effective immediately.

Given the fact that the night before, he said that there might be something that they could do for me, I was kind of expecting a conversation about that. So I was kind of taken by surprise. And I chose to resign because I did not want to put on my record that I had been fired, especially from a airline. So I resigned, effective immediately. And, yeah, that's -- that's basically how it went.

Q. And I think we said that this was in 2015.

But isn't it in 2016? Are we talking about 2016, December?

A. Oh, yes. So I guess some clarification on this. I was confused. I applied in 2015. They offered me a job. The company I was currently working -- had been working at offered me a promotion to chief pilot. And so I weighed my career options, and I thought that, from a career

standpoint, the chief pilot position would be better.

I got into that position and did not enjoy it. So I applied in 2016 with SkyWest again. And this is when all this happened, was in 2016.

Q. Okay. And the company that you applied for in 2015 -- that you applied for.

The company you were working for in 2015, who were they?

A. That company was called "AirScout."

Q. And what kind of company is AirScout?

A. They did aerial photography.

Q. And how long did you work for AirScout?

A. I worked for AirScout during the summers of 2013, 2014, and 2015, and 2016. And fall of 2015, I went full-time, and I worked there through winter as well.

Q. And what did they pay you? How did they pay you?

A. So 2013, 2014, and through the summer of 2015, I was paid per flight hour. I was paid $35 per flight hour. And then from fall of 2015 through fall of 2016, the year that I was a chief pilot, I was paid a salary of 36,000 a year.

Q. Did they offer you any benefits?

A. No benefit. One benefit was, they provided housing, which they took the payment out of my paycheck pretax. That was the only benefit.
Q. Where was this?
A. Lowell, Indiana.
Q. So did you get at W-2 in 2016?
A. From AirScout?
Q. Yeah.
A. I -- yeah, I would have.
Q. Do you know whether it's been produced? That's not a trick question. Just -- I don't know.
A. No. My understanding was, the documents that were requested were from 2017 and onwards, so I produced nothing for 2016.
Q. Okay. But you worked -- did you work with AirScout, then, between the time that you resigned at SkyWest and the time that you were not hired by SkyWest in July of 2017?
A. I did not work for AirScout beyond when I left in 2016.
Q. Okay. In hindsight, do you think that was a good idea, that you worked for AirScout instead of the offer with SkyWest, the initial one?
A. Oh, I don't know. I think there's advantages to both, and there were disadvantages to

the decision I made, too. I gained some invaluable experience in management that I think helped me get into the position that I'm in now. But it definitely was not the most fun I've ever had at a job. So I think it could have gone either way.

Q. Yeah, well, I was going to ask, what was it that you did not like about your job at AirScout?

A. I was working 80 hours a week.

Q. Were you working on your Sabbath?

A. No, I was not working on Sabbath. But they -- they expected long days. And I would get done with a long flight day, and I'd have a bunch of other problems I had to deal with. And it just -- it wasn't enjoyable.

And other -- other things that I don't necessarily want to get into between myself and other parties that didn't always see eye to eye. But it just wasn't fun.

Q. So if you were not working on your Sabbath, you were putting in 13 hours a day?

A. Roughly.

Q. And the things that you didn't -- that you struggled with with other pilots, did those have to do with your religious beliefs or your religion?

A. No, I didn't have -- I didn't have major

conflicts with any of the pilots there.

Q. How many pilots did AirScout employ?

A. Including myself, we had 11.

Q. And how many aircraft did they fly?

A. Four.

Q. Same aircraft?

A. No. These were small single-engine piston-powered aircraft. They're very, like -- four-seaters, including the pilot.

Q. Okay. So I'm showing you what is marked SkyWest 588, and which I would like to mark as Exhibit 4.

(Exhibit 4 was marked.)

Q. (BY MR. PETERSEN): Do you recognize this document at all, Mr. Cassell? Have you seen it before?

A. No.

Q. All right. I am going to just represent to you that it's a Saturday matrix lab for December 10, 2016. I guess -- and it says "instructor" down here at the bottom left going up, Dave Cannon.

Do you recall whether Dave Cannon was your instructor in December of 2016?

A. I do not remember any names of my

instructors.
Q. All right. But it was -- so it was clear, though, at the time, wasn't it, that you had -- that you were going to be scheduled for training that would bleed over into your Sabbath, and you raised that issue with your instructor at the time?
A. Correct.
Q. And who was -- what was Jake Whicker -- what did you think -- what was his position at the time?
A. Mr. Wicker's position was, he was the CRJ training manager, I think is -- was his title. He was the head of training for the CRJ.
Q. And do you know a Dave Cannon?
A. I -- I might have had classes from him, but I don't remember any names beyond Jake's.
Q. Okay. Those -- do you know how many you were training with at SkyWest at the time?
A. There was a little over 30 in the class, I think. Somewhere between 30 and 40.
Q. Do you know whether any of the others were Seventh-day Adventists?
A. I'm not aware of any that were. There might have been, but they didn't make themselves known if that was the case.

Q. Okay. So when you requested that you not work your Sabbath or that it not bleed into your Sabbath, tell me how that came about.

How did you first learn that you were going to be working on your Sabbath and that you -- you know, what did you do at that point? Help me understand kind of the steps as to what happened.

A. Sure. So after we took our test on Tuesday over the previous week's content, they gave us a new binder. The -- I'll provide some clarification. The first week was over -- it was company indoc. So we cover company policies, regulations, operations, specifications, things that apply to how you operate at SkyWest.

The second, third, and fourth weeks and anything beyond that -- I don't remember if it was beyond that, but we were going to talk about the aircraft specifically, getting into the systems, how did the landing gear work, how does the fuel system work, the electrical system, et cetera.

So after the test on Tuesday, they gave us a new binder with material for the upcoming weeks. And it had a schedule in there as well on the first page. I looked it over, and I saw the date and times for that Friday evening.

And that's when I -- I brought it -- we had a break in class. And I went to the teacher, and I explained -- like I said, I explained my predicament to him. And that's when he referred me to Mr. Whicker.

Q. Who was the teacher of the class?

A. I don't remember his name.

Q. Did you talk to either the teacher or Mr. Whicker about whether you could talk to anyone else in your class to see if they would be willing to swap with you? Or were you going to be working over your Sabbath no matter what? In other words -- let me back up.

From what you can see on your schedule, was everybody going to be working over your Sabbath?

A. Yeah. The whole class was scheduled to either be in the 6:00 to 8:00 -- or, sorry, 4:00 to 6:00 or 6:00 to 8:00 time slot on Friday evening.

Q. So what did you think the options would have been, that you would have preferred at the time if the whole class was working during your Sabbath?

A. Sure. I would have been perfectly fine with some one-on-one time with one of the teachers. I would have been happy to come in after class any of the eight days leading up to that or afterwards

before the next session -- because there were four of those matrix sessions -- to make up for it. I would have been happy to come in on a weekend day. If it came down to it, I would have even accepted them putting me in a class later on that didn't have the conflict.

Q. Did the schedule that you got that was working into Friday, was that classroom time or was that simulator time? Do you remember what the class activity was supposed to be?

A. Yeah. So it was -- I guess -- I guess it would be considered classroom time because it wasn't in a simulator. What they did is, they took several touch screen monitors, and they lined them up in a position that simulated the flight deck of the CRJ aircraft. And from there, they would have us -- they told us they were going to have us be going through the sequences and pushing different buttons going through -- like I said, they called them "flows." So you have your takeoff flow. These are the buttons you push when you're getting ready to take off. This is the after-takeoff flow. You do these buttons next.

And that was the point of these matrix sessions. They have four of them scheduled

throughout the system -- the systems training. It was going to be done at the simulator building, but it wasn't going to be in a simulator, was my understanding.

Q. Were you aware of other times where the same activity was taking place, or were you just assuming that, if you got scheduled with another class, it might be in a different time other than that Friday?

A. My hope was that it would be different with another class. And I would have been willing to wait until sundown was after 6:00 p.m. or however late it needed to be to make that work.

Q. Did you bring all that up with your teacher or with Mr. Whicker?

A. No. I was never given the opportunity.

Q. All right. So when your teacher said, "Come talk to Mr. Whicker," then that was the next day?

A. That was the day of. So that was on Tuesday, as I recall. And I went to his office. He was in a meeting. So I got his phone number. I called him after class let out at 5:00. He called me back around 11:00 p.m. or so and asked me to come see him the next day.

Q. So on Wednesday, you went in and saw Mr. Whicker?
A. Correct.
Q. On a time that wasn't training time, I'm assuming?
A. It was during lunch.
Q. All right. And you sat down at his office, or did he come to you? How did that go?
A. I went to his office, and he told me he had not had a chance to speak with anybody about possible accommodations and that he would come and pull me out of class later, or he would come find me later and we would talk.
And then about 30 or 45 minutes after lunch break had ended, he came and pulled me out of class. And that's when he told me that they were not going to make an accommodation.
Q. Did he have somebody with him?
A. He had a -- in the office, between he and I, there was nobody. When I signed the resignation paperwork, he called in a -- one of the secretaries. And I recall him having -- I recall him having been on the phone, or maybe he had Mr. Coy Bryant on the phone still. I know he had been talking to him. I don't recall if Mr. Bryant was still on the phone

with him or not, though.

Q. When he pulled you out after that 30 to 45 minutes later, what did he say? Tell me what the conversation was, the substance of it.

A. The summary of the conversation -- I don't remember exactly how it went. But the summary of the conversation was that SkyWest was not going to be providing an accommodation, and I had three options available to me. I could make it work with my religion, and I can show up to the event on Friday evening; I could not show up to the event, and I would be terminated; or I could resign, effective immediately.

And I was kind of caught off-guard with the options that were given to me, given that he had mentioned the night before that he thought there could be an accommodation made. So being kind of caught off-guard, I chose the latter of resigning because I didn't want to report that I had been fired. I didn't want to be fired.

Q. So did he say, "SkyWest will not provide it" or "SkyWest cannot"? Do you remember his exact words?

A. I recall it being "SkyWest would not." It wasn't a "can."

Q. Did he say why not?
A. He didn't explain why.
Q. Did you ask him?
A. No. I was completely caught off-guard.
Q. Okay. Did you ask for some time to think about it?
A. No, I didn't.
Q. So he offered you could either work it, not show up and be terminated, or resign.
Did he explain to you why he was offering you a resignation?
A. No.
Q. And you picked resignation in order to avoid having a resume that said you were terminated by SkyWest, right?
A. That's correct.
Q. And did you have any other follow-up conversations with Mr. Whicker?
A. Yes. The next day, I sent an email asking for clarification of the events. I don't remember exactly what I said in the email, but I -- I think -- I think I said, "If I misunderstood anything," and I -- I asked him if I misunderstood the fact that I would have been terminated. I said, "I apologize, and I'd like my job back, if possible.

Or if not, you know, this is what it is, but I would like some clarification on what happened."

I believe that email is some -- yeah, right there.

Q. So I'm showing you what's been Bates-numbered SkyWest 38 to 39, which looks like an email chain between you and Jake Whicker; is that right?

A. Correct.

Q. And you just mentioned that you emailed something to Mr. Whicker the next day, which I guess would be Thursday, December 1st?

A. Yeah.

Q. That's what your email looks like.

So tell me what these two emails show, if you know.

A. Sure. Let me read through them.

Q. Sure.

MR. STRINDBERG: Scott, are you going to mark these?

MR. PETERSEN: Yes. This would be Exhibit 5, I believe.

(Exhibit 5 was marked.)

Q. (BY MR. PETERSEN): And, Mr. Cassell, you just tell me when you're ready.

Are you good, Mr. Cassell, or are you still reading?

A. I'm still reading.

Q. I'm not trying to push you. I'm really not. I just didn't know if you were waiting for me.

A. No, it's fine.

Okay. I've read it.

Q. So this first one, which is your email dated December 1, 2016, tell me what the purpose of that email was.

A. Just to make sure that I hadn't acted irrationally. I got caught up in -- I guess my emotions kind of clouded my judgment a little bit, or I perceived that they may have.

Like I said, I was not expecting to be given those three options. I was expecting to have a conversation of, well, these are some options we have for you. The very least being, we'll have you just go to a different ground school and start this over again, which was not provided. I felt as though I had kind of been backed into a corner, which is why I sent that email.

Q. Okay. And then his response, is that what's above?

A. Yeah.

Q. And he references an October 27, 2016, letter, a signed letter regarding your request for religious accommodation. I want to pull that up.

Does this look like -- and I'm adding your email that accompanied that from you and then a response from Coy Bryant.

But let me just go back to -- these are Bates-numbered SkyWest 17 through 19.

Do you recognize those documents?

A. I do recognize them.

Q. Tell me what they are.

A. So this was a document that they requested that I fill out. When I asked -- when I initially requested to have the simulator time switch during the CTP course, they provided this document for me to train out as well -- or, sorry, for me to fill out as well for training and that I was to send it to Coy Bryant.

Q. Okay. And you did that?

A. I did.

MR. PETERSEN: So I want to mark this as Exhibit 6, I believe it is.

(Exhibit 6 was marked.)

Q. (BY MR. PETERSEN): Then there's a response. If you look at Bates number 17, there's a

response on October 27, 2016, from Coy Bryant that says, "The other pilot that has requested accommodation is Mikhail Belov. He gave me permission to disclose this information to you in hopes that you can coordinate your schedule."

Do you know what he's talking about?

A. Yeah. There was another pilot that had requested a form of accommodation. I believe it was also Friday sundown through Saturday sundown off. He was not Seventh-day Adventist. I reached out to him, and we discovered that we were not in the same class.

Q. So that didn't help you in any kind of coordinating efforts?

A. That's correct.

Q. Do you know whether Mr. Belov had to work on that Friday to Saturday time period?

A. I'm not aware.

Q. Did he ever tell you whether SkyWest had agreed that he could not -- that he didn't have to work that day?

A. He didn't mention it.

Q. Okay. So you had one call with him, you think, and that's as far as that went?

A. Yeah. I think we texted back and forth a

couple messages, and then we realized we were not in the same class. So we realized that nothing was going to work there.

Q. So not being in the same class, why did that make it so it wouldn't work?

A. The schedules were most likely going to be different, and we wouldn't have been able to pair up together in any events.

Q. So then going back to Exhibit --

MR. PETERSEN: Is this 4, Jessica, this one here, the one we marked previously?

MR. STRINDBERG: 5, I think.

MR. PETERSEN: So the one we just marked, was that 6?

THE REPORTER: Yes, the last one was 6.

Q. (BY MR. PETERSEN): Okay. Then 5. Okay. Thank you there.

So looking back at Exhibit 5, Mr. Cassell, the response -- there's a response in here from Mr. Whicker saying, "It has been determined." This is the bullet points. Do you see that paragraph? And this is on December 2, 2016. "It has been determined that we are unable to honor the specific request with work scheduling... We have provided FO Cassell with tools..." And then there's a

sub-bullet point. "Options include pursuit of schedule changes as defined by company and departmental resources." And there's an even further indented bullet point, "Drop/trade shift, bid for desired work..."

Do you recognize that wording from Mr. Whicker?

A. Yeah. They sent a letter with a response regarding my request for accommodation.

Q. And was -- this is back in October?

A. Yes.

Q. Did that letter, that you can recall, explain that they -- that SkyWest was unable to honor your request to have Friday at sundown to Saturday at sundown off?

A. They told me that they couldn't guarantee anything and that they gave me these tools listed in this email.

Q. Okay. And what did you understand the tools to be?

A. Trading, drop shifts, bid for desired work, none of which applied to training because it was all assigned, except for simulators, is my understanding.

Q. So at the time, your understanding was

that you couldn't trade any of your training sessions other than the simulator time; is that right?
A. Correct.
Q. And to trade the simulator time, how would you have traded that?
A. I don't know exactly how things work. But my understanding is, if -- if you got a simulator session that you didn't like and you wanted to try and trade with somebody that had one that you did like, you just approach the pilot and ask if they would be willing to trade.
Q. Okay. And did you ever have occasion to do that at SkyWest?
A. No. I never got to simulators.
Q. Okay. If I look at the third paragraph of Mr. Whicker's email, it says, "You were assigned to report to and attend a shift that begins tonight, Friday, December 2, 2016, at 1600 and would end at 1800."
So yours started at 4:00 p.m. and went to 6:00 p.m., right?
A. Yeah, that would have been it.
Q. So the other -- the rest -- there was a chunk of the class that had your scheduled 4:00 to

6:00 time period, and then the other group of the class had a 6:00 to 8:00 p.m. time period?
A. Yes.
Q. And then it says, "This shift is a normal part of CRJ ground training."
Do you agree with that?
A. Yeah. Everybody had to go through it.
Q. Then it said -- it says, "And, unfortunately, there were no alternative shifts for which you could trade or bid for in accordance with established practices."
Do you agree with that?
A. They didn't have any scheduled alternative shifts, no.
Q. And that's because you're in training as opposed to bidding for a line of some sort. Is that fair?
A. Correct.
Q. Okay. Then it says, "The training in this shift is required training and must be completed in its entirety."
Do you agree with that sentence?
A. Yes.
Q. Did you have that discussion with Mr. Whicker or anyone else at -- like Mr. Bryant or

anyone else at SkyWest at or around the October 27, 2016, time period?

A. No, not that I recall.

Q. All right. When you received the email from Mr. Whicker, did you respond to it? Is that the 3:28 email -- or, I mean, not -- I'm sorry.

Did you respond to this email? Not the December 1st at 3:28 email. That's the one you sent to them on the 1st.

He responded on the 2nd, correct?

A. Yeah, he respond -- yeah. He replied on Friday, is what it looks like.

Q. Okay. And then did you reply to him?

A. I don't remember if I replied or not. Yeah, I don't -- I don't recall if I did or not.

Q. He says at the second to last paragraph, "After weighing your options, you stated that you were unwilling to attend the training as scheduled this evening."

Is that true?

A. Correct.

Q. And then it says, "Subsequently, you resigned your employment with SkyWest Airlines."

I think you said you did that in order to avoid it showing up as a termination on your resume;

is that right?
A. Correct.
Q. And then it says, "Had you continued your employment and didn't report for or complete the assignment, your employment would have been terminated as this is a required job function."
Is that consistent with what they told you at or around December 2nd or December 1st?
A. Yes.
Q. Okay. And then it says, "I have attached your religious accommodation request and a copy of the termination paperwork. If you have any further questions, please work directly with Coy Bryant on this issue."
Do you recall whether -- it looks to me from the email that there was a copy of the accommodation form and then your termination paperwork.
Do you remember receiving those at the time?
A. I did receive them.
Q. Okay. So at this point, you had resigned from SkyWest. And then shortly thereafter, you filed a discrimination charge against SkyWest; is that correct?

A. That's correct.
Q. And is it -- was the basis for the discrimination charge that they didn't work with you to give you an alternative means of finishing that training?
A. Yeah.
Q. And then at some point, you withdrew that discrimination charge; is that right?
A. That's correct.
Q. All right. I'm going to show you another document. This is a document that's Bates-numbered SkyWest 42 to SkyWest 43.
(Exhibit 7 was marked.)
Q. (BY MR. PETERSEN): Do you see this document?
A. Yes.
Q. It's a letter from Todd Reinach. I don't know how you say that. Reinach, Reinach.
Do you know how to pronounce that?
A. Reinach.
Q. Reinach? Okay.
And it's dated December 8, 2016.
Have you ever seen this letter?
A. Yes. He -- Mr. Reinach sent it to me.
Q. All right. And do you know why it was

sent to you? Not by your attorney, but why SkyWest sent this letter to you?

A. I don't remember if SkyWest sent this to me or if this was -- Alan sent this to me.

Q. Yeah, sorry. That was a bad question. I wasn't trying to get at who literally sent it to you.

Do you know -- were you ever told what the purpose of this letter was?

A. No.

Q. All right. I'm going to look at -- just go over this letter really quickly with you.

The second paragraph says, "SkyWest employs more than 4,000 pilots."

Do you know -- do you have any reason to disagree that that's an estimate of the number of pilots that SkyWest employed in December of 2016?

A. I have no reason to disagree with that.

Q. And then the second -- the third paragraph says, "As such, we have developed a robust seniority system with shift trades and vacation days to help employees manage their work schedules."

Do you agree with that sentence as a characterization of SkyWest's seniority system?

A. I agree.

Q. And then it says, "As Mr. Cassell gains seniority, he will be able to utilize these tools to avoid working on the Sabbath."
Do you agree with that sentence?
A. I agree.
Q. And it says, "However, over the course of his first few years of employment, when Mr. Cassell has low seniority, he will absolutely and unavoidably be required to work on Saturday and other holidays, as more senior pilots typically avoid working those days."
I want to -- there's a lot in there, but let me ask you one question.
Is it your experience that more senior pilots typically avoid working Saturdays and holidays?
A. In my experience, that is not necessarily the case. I -- I have spoken with some pilots who chose -- go to overnights. They didn't care if they flew over the weekend. Most pilots don't seem to care if they have to fly on a Sunday or a Saturday, typically. They understand the line of work we're in. They're more interested in if the trip is good or not. For example, someone might choose an overnight in Nashville, Tennessee over Flint,

Michigan, even if that meant that they had to fly on a weekend.

Q. Okay. What about the statement, "As Mr. Cassell gains seniority, he will be able" -- I'm sorry. I already asked you that.

"Over the course of his first few years of employment, when Mr. Cassell has low seniority, he will absolutely and unavoidably be required to work on Saturday and other holidays."

Do you agree with that sentence as it relates to working as a pilot at SkyWest?

A. I do not agree with that. As I've said, I know pilots that have avoided it.

Q. Okay. And then the avoiding working Saturdays is through the trading and the seniority and the bid system that you've described. Is that fair?

A. Yes.

Q. Okay. The last paragraph says, "Mr. Cassell resigned from our flight training program because a training class would extend one hour into the Sabbath."

Is that accurate?

A. That's accurate.

Q. "I admire his faithfulness. But if he

returns, he will unavoidably be tasked with working on all or part of the Sabbath for several years to come."

You disagree with that?

A. I do.

Q. Now look at the rest of that sentence -- of that paragraph, "If he has changed his position on Sabbath observance or if he can think of another acceptable accommodation, please let me know and I would be pleased to discuss it with you."

Did you or anyone on your behalf discuss with SkyWest alternative accommodations to just the seniority system and the trading that we've already discussed with SkyWest?

A. I -- I believe I gave some ideas to Mr. Reinach. Whether or not he passed those on, I am not aware.

Q. Okay. I'm not looking for a discussion with Mr. Reinach. I don't need to know what you guys discussed. But can you -- do you -- let me word it a different way.

What other options do you see that SkyWest could have employed at this time, other than what we've already discussed with the bidding system and the swapping, that could have allowed you to work

for SkyWest while still avoiding working on your Sabbath?

A. Certainly. So I'm going to discuss training because this is an area where the system really is not -- it's not implemented.

With training and other training events that are scheduled like this, pilots who have these requests could come to the training manager, and the training manager could look for people within the training department that would be willing to do a session over a weekend or after hours on class -- class days to help those that do need to accommodate -- those types of accommodations, help them get the training that they needed so they can still complete the course.

I was willing to come in on a Sunday and do two hours. It might have been less time, even, because instead of teaching a group of 20, they would be teaching a group of just myself. So we could have done that. I would have also been happy to come in after 5:00 p.m. and work with somebody one-on-one. That was not something that was ever offered to me.

I would have also been willing to wait and do my class later on in the year, maybe in April or

maybe even May or so when the sun went down later to avoid running into this conflict.

I was not aware that this was going to be a problem. Had I known, I wouldn't have even started class at this time. So in the interview, they told me class -- ground school would be from 8:00 to 5:00 Monday through Friday.

Q. Okay. But I thought that you told me that your earlier -- when you filled out what is Exhibit 6, I believe, that -- I'm looking at it now, that there was not a sure -- they couldn't guarantee you wouldn't work a Saturday.

Was that not in reference to training?

A. It did not sound to me as though their response from SkyWest was in reference to training.

Q. So look at page SkyWest 18. It says -- and I'm looking at number 1. It says, "Describe the purpose of your request for a religious accommodation."

It states, "The purpose is to request accommodations with work and training so that I'm able to uphold my deeply held, sincere religious convictions as a Seventh-day Adventist Christian."

Is that language you wrote, or did somebody else write that?

A. I wrote this.
Q. So doesn't that suggest you were talking about training as well?
A. Yes.
Q. And so when they responded that they couldn't guarantee what you were seeking for an accommodation, you didn't understand that it applied to training back then?
A. The tools -- they said that they gave me tools, which would be the bidding system, trading, and dropping. And I knew enough about the training program that that didn't work for that. You were assigned a schedule in the classroom. I can't trade classroom days with another pilot. That wasn't available to me.
Q. And then if you look at number 3 on the same SkyWest 18, it says, "I am asking that I not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown. My religious convictions do not limit my ability to perform the essential functions of my job as a pilot. I am just requesting this time off each week."
So -- and those are your words?
A. Those are my words.

Q. So is it a fair statement to say that you could perform your job's essential functions so long as the performance of those functions did not fall on your Sabbath or otherwise be an emergency -- I know you have an exception for the emergency area. I'm not talking about that. I'm talking about nonemergency items -- that you are able to perform the essential functions of your job, but not if those functions require work on that Sabbath that are nonessential -- or nonemergency?

Hold on. I think you've got an objection coming.

MR. STRINDBERG: The way you phrased it -- yes, I do object. You're basically asking for a legal conclusion since you've used the phrase "essential functions of the job," because it's assuming that working on Saturday is an essential function of the job. So I object to the question as asking for a legal conclusion.

MR. PETERSEN: So let me rephrase it.

Q. (BY MR. PETERSEN): And I'm not using "essential functions of the job" in a legal sense. I'm using it because those are the words you used, Mr. Cassell.

So when you say, "It does not limit my

ability to perform the essential functions of my job as a pilot," is it your position, Mr. Cassell, that working on your Sabbath is not an essential job function?

MR. STRINDBERG: Same objection.

Q. (BY MR. PETERSEN): Go ahead. Essential function of your job as you've listed it.

A. Well, I would choose not to work on Saturday -- or during the Sabbath.

Q. Okay. Do you -- is it your position -- and this -- I'm just asking for your belief, and it's not a legal question that I'm asking for.

But who gets to decide what the job's essential functions are? You or the employer?

A. I think the employer would determine what the essential functions are. They're the ones writing the job description.

Q. Okay. So if SkyWest said to you, "Hey, Mr. Cassell, it's an essential function that you work on some Saturdays whether you want to or not," what would be your response to that?

MR. STRINDBERG: Again, I object. You're asking for a legal conclusion.

Q. (BY MR. PETERSEN): All right. I don't want a legal conclusion. I understand the

objection. But I want your understanding, Mr. Cassell, your opinion.

A. I would -- I would tell them I wouldn't be able to work on Saturdays. I would explain that I would be happy to work on Sundays. I'd request an accommodation at that point.

(A discussion was held off the record.)

MR. PETERSEN: Okay. 42 to 43 I want to mark as Exhibit 7.

(A discussion was held off the record.)

Q. (BY MR. PETERSEN): Do you know whether SkyWest flies -- has flights that go out 24 -- or every single day, 365 days a year, Mr. Cassell?

A. I know they have flights every day.

Q. So you would be familiar that they fly every Saturday?

A. Yeah.

Q. And every Friday and every Sunday?

A. Yes.

Q. And that hasn't changed since before you applied at SkyWest; isn't that correct?

A. Yeah.

Q. Do you know whether SkyWest requires its pilots to be available to fly 24 hours a day, 7 days a week, 365 days a year?

A. The job description when I applied required travel on holidays and weekends.

Q. Wouldn't that suggest to you that they had -- that SkyWest required its pilots to be available to fly any day of the year?

A. Yeah.

Q. When you and Mr. Whicker were discussing at the time of the resignation, did you have any discussions with him about what the schedule would be like after training?

A. He mentioned that I would fight this particular request I had until I gained enough seniority. And I knew that I would. Being low seniority, you get when nobody else wants. And as you gain seniority, you're able to pick. And, yeah, we had that discussion briefly.

Q. Did he explain to you that it would be more difficult or less difficult after training to get Saturdays off?

A. He didn't say either way. He just mentioned being low seniority, you will have a hard time getting your weekends off. And I -- I acknowledge that. And, again, I have no problem taking flights on Sunday or after sundown on Saturday.

Q. Do you know whether he -- you would have -- if you had decided at that time to work the shift or to, you know, go to the training class, there wouldn't have been any additional piece of paper for you to complete or fill out in order to make that decision, would there?
A. I'm not following what you mean.
Q. So at the time, you said they had a form for you to fill out when you resigned; is that right?
A. Correct.
Q. There wasn't a form for just saying, "I'm going to stay and work the shift," right?
A. Correct.
Q. That would have been just, okay, thanks and we'll see you back here when it's time --
A. Yes.
Q. -- right?
A. Yes.
Q. And if you had failed to show and were going to be terminated, were you aware, did they mention a written form or any kind of piece of paper you would need to fill out to take that route?
A. No, they didn't talk about that.
Q. So the only thing that really required a

form that you were made aware of at that time was a resignation; is that correct?

A. Yeah, that I was aware of. I don't know how their termination process works.

Q. Did you say anything to anyone else, Mr. Horne or anyone else, about your resignation?

A. Yeah. I called Steve and I called Michael and I shared what I had experienced. And Steve was very surprised. And I called Michael because I knew he was coming into class just after me, and I told him he might want to wait until the sun goes down later because he still had the option to move his class date back.

Q. So what did he do? Do you know?

A. I don't -- I think he checked sundown times, and he was going to be there at a time where sundown was late enough that it wouldn't have been a problem. So I believe he stayed with his original class date, Michael Wahlen did.

Q. And I mentioned that, in February of 2017, you filed a charge of discrimination. You withdrew that charge.

Why did you withdraw it?

A. I withdrew that -- well, I had applied a third time at SkyWest in the summer of 2017 because

I was not having luck finding work elsewhere. So I withdrew the charge as an act of good faith that I was willing to let the whole thing go if they would give me another chance.

Q. And did it surprised you that SkyWest was willing to look at you again?

A. I -- I guess in my recollection, I didn't really know what to expect. I could have seen it going either way. I knew SkyWest needed pilots badly, but I also knew that there was a little bit of history between myself and the company and was very hopeful that they wouldn't hold that against me. They invited me to an interview.

Q. Did you talk to anybody before you decided to apply again? Anybody at SkyWest. I'm sorry.

A. I spoke with Steve and Michael again and just said, "Hey, this is what I'm considering" and got their opinions on it. I asked Michael some questions about training, some experiences he had had because he had been through it a lot more recently than Steve had. And then I made the decision to pull the trigger and go ahead and reapply.

Q. I'm going to show you Bates number SkyWest 1 through 2 .

Do you see this document? It's a letter from Todd Emerson to Alan Reinach.

MR. STRINDBERG: We're going to make this Exhibit 8?

MR. PETERSEN: This is Exhibit 8, yes.

(Exhibit 8 was marked.)

Q. (BY MR. PETERSEN): Do you recognize or have you ever seen this document, Mr. Cassell?

A. Yes, I have seen this document. It was sent to me.

Q. Was it sent to you around the earlier part of February?

A. I don't remember when it was sent to me. I don't -- yeah, I don't remember. I know that Alan sent me some correspondences that he had had with SkyWest, but I don't remember when it was given to me.

Q. Okay. So it says, "I am writing in reply to your December 12th letter. You felt my statement that Mr. Cassell 'will absolutely and unavoidably be required to work on Saturday and other holidays' was speculation."

Did you have a sense yourself -- and I'm not talking about your discussions with Mr. Reinach. I don't want to know those.

I just want to know, did you -- I think you said that you thought Mr. Emerson's statement that you would have to work Saturday after training was incorrect; is that right?

A. Based off of other pilots' experiences, I would say yes.

Q. Then -- so the sentence of the second paragraph says, "My statement was drawn from conversations with the leadership in our crew scheduling department and based on their long experience."

Did you have any discussions with anyone at -- in the leadership of SkyWest crew scheduling department regarding Saturday work for Sabbath, your Sabbath work?

A. I did not.

Q. The letter says, "Since receiving your letter, I directed an analyst in the flight operations department to review the schedules for 100 recently hired pilots over the past 12 months, including Mr. Cassell's classmates. No matter what scheduling preferences they requested, each pilot got a schedule that required them to work on a Saturday."

Do you have any reason to believe that

that's incorrect?

A. I have no reason to believe that that is incorrect.

Q. Does that surprise -- let's say that that's exactly right, that that's true.

Does that surprise you?

A. Not really.

Q. And why is that, that it doesn't surprise you?

A. Low seniority. You get kind of the bottom of the barrel.

Q. So then the next sentence that Mr. Emerson says, where he says, "None of the 100 pilots, no matter how they bid or attempted to drop or swap an undesirable trip, were able to avoid Saturday work."

Do you know whether there were any Seventh-day Adventists in the 100 pilots he's talking about?

A. I -- I'm not aware. I don't know -- I don't know the parameters for the -- which he selected the 100 recently hired pilots.

Q. Okay. If, in fact, they all worked a Saturday, what would be your explanation as to why every one of them worked at least one Saturday? Do you -- let me rephrase that.

You said it didn't surprise you that -- assuming this is true, it didn't surprise you.

And I guess my question is, why would it not surprise you that nobody could get a Saturday off in all the 100 pilots?

MR. STRINDBERG: Objection. You're assuming facts not in evidence. Specifically, you're assuming that some of these 100 pilots wanted Saturday off. There's no evidence to that effect, Scott.

MR. PETERSEN: That's what I'm getting at.

Q. (BY MR. PETERSEN): Why are you surprised if I say this is true? You said you're not surprised. I want to know why.

A. Sure. In talking with my classmates, the general attitude that a lot of them had that I spoke with was, they knew they were just going to get what they were going to get. They were expecting to work on weekends. They weren't going to necessarily try to bid out of it. They were going to take what gave them the most flight hours, because the ability to upgrade was at -- so short -- and by "upgrade," I mean move from first officer to captain.

Their concern was not days-of-the-week work. Their concern was, let me get as much flight

time as I can; what days, what trips will give me the most flight time so that I can upgrade to captain as soon as possible.

You know, a lot of people were able to do that within a year to 14 months, 12 to 14 months, saying that they were able to upgrade quickly, which is great. But that was what they had to do. They had to fly as much as possible to get that 1,000 hours of 121 time. That's what their concern was.

Q. Okay. Mr. Emerson makes this statement in -- before the end of the second paragraph: "This is because all Monday-to-Friday trips were selected by senior pilots."

Do you agree with that?

A. Yeah, that -- I would -- that does not surprise me.

Q. And then he says, "This is not surprising as most employees attempt to match their work schedules with their family schedules where spouses and children are typically free on the weekends."

Does that seem -- would you agree with that?

A. I would agree with that generally, yeah. Like I said, I've talked with some that don't care about that. But I know that there are some that do,

so, yes.

Q. Do you know whether there's at a -- a Part 121 -- 121 airline, whether there are more flights on, say, Monday through Friday than there are on Saturdays or Sundays? Do you know?

A. I don't know how the schedules were -- I have no idea what the -- what the schedules are like.

Q. Do you know whether Saturdays is a comparatively lighter time to fly?

A. I don't know.

Q. Then going to the next paragraph, it says, "I am sorry that I did not specifically address your concern with training schedules. I would be pleased to discuss how training schedules could be altered to accommodate Seventh-day Adventists who wish to observe the Sabbath. However, in the case of Mr. Cassell, unless he is willing to work on the Sabbath after he leaves training, resuming his training would be futile."

Do you agree -- well, let me ask first: Did you have any discussions with SkyWest after February 3, 2017, regarding how training schedules might be altered to accommodate your Sabbath observance?

A. No, I didn't.
Q. Do you -- did you direct anybody to?
A. No. I --
Q. Go ahead. Sorry.
A. I had left correspondence between SkyWest and myself between Alan Reinach and SkyWest. And he was not -- he was not communicating things to me right away.
Q. Okay. I want to get to the last sentence of this paragraph: "In the case of Mr. Cassell, unless he is willing to work on the Sabbath after he leaves training, resuming his training would be futile."
Do you disagree with that sentence?
A. Yeah. Based off the experiences of other pilots, I would.
Q. All right. And that experience, just to summarize, is, it was your belief that there was a way you could work it out as these others, in your understanding, had done where you could work there as a pilot without working on your Sabbath?
A. Correct.
Q. All right. And the accommodation wasn't -- didn't require any additional work on SkyWest's part; it was use of the seniority and

trading and bidding system? Or was there something additional that you thought needed to happen in order to accomplish that goal?

A. At that point, from the -- from what I had heard from other pilots, once you were out of training, it could be done with the trade, bid, drop process.

Q. So the last sentence of this letter, which is on Bates number 2, "We believe that a balancing of these religious preferences is best met through our seniority system, and the courts have concurred." Forget the courts part.

Do you believe that SkyWest's seniority system provided a proper balance of religious preferences such that you could, within that seniority system, avoid working your Sabbath?

A. I think that it gave an opportunity for it.

Q. Without a guarantee?

A. Without a guarantee.

Q. And if it had turned out that you had not been able to get that Sabbath off, you would not have worked it outside of it being an emergency, correct?

A. That is correct.

Q. And you would not have lied to SkyWest about, say, "I'm going to be sick" when you're not sick. Isn't that fair, too?

A. That's correct.

Q. And so what the fallout of that would have been is just speculative to you at this point?

A. Yeah. Like I -- like I mentioned, as soon it got to the point where I knew -- I would have known I wouldn't be able to get out of a trip that was on a Saturday, I would have called crew scheduling, or maybe the chief pilot would have been the better person to call. I'm not familiar with the policies. It's been quite some time.

I would have called somebody and let them know, "This is what's happening. I will not be attending this work shift" so that they could get a reserve pilot who didn't have a problem working on Saturdays on that shift.

Q. Okay. I'm going to show you what has -- I'm wanting to mark as Exhibit 9.

(Exhibit 9 was marked.)

Q. (BY MR. PETERSEN): Do you recognize this document, Mr. Cassell? It's SkyWest Bates number 49.

A. Yes, I do recognize this.

Q. Tell me what it is, if you recognize it.
A. Yeah. So they -- they handed us a domicile request, and we were able to put what domiciles we wanted on there.
Q. And I have you on line 20, and then there's a -- the whole line is filled out. And I guess the request -- your first choice is DTW.
Isn't that Detroit?
A. That's correct.
Q. And then ORD, is that Chicago?
A. Correct.
Q. And then SEA, is that Seattle?
A. That's correct.
Q. COS?
A. Colorado Springs.
Q. DEN is Denver?
A. Uh-huh. Yes.
Q. PHX is Phoenix?
A. Yes.
Q. Is that SLC? I'm sorry. I'm on the wrong one.
Is that FAT?
A. Fresno, California.
Q. Okay. And then fill out the next three for me because I can't read them very well.

A. Sure. MSP would Minneapolis, Saint Paul; SFO would be San Francisco; and SLC would be Salt Lake City, Utah.

Q. So that was the order of preference you had for a domicile?

A. Correct.

Q. And what was the reasoning, if any, for your rank order there?

A. Sure. They had told us that everybody in class was getting Detroit or Chicago. So those -- I put whichever two -- Detroit's slightly closer to where I would have been living, which was in Cincinnati, Ohio, so I put that as my first one. And then O'Hare was my second one because that was just a little bit further. And I knew I was going to end up with one of those two based off of seniority.

Q. And is the rank order of your domicile request -- did you have any intent that, by rank ordering this way, it might make it more or less easy for you to get Saturday -- your Sabbath off from work?

A. Yeah. I knew that I would either get sent to Detroit or Chicago. I knew that Detroit was a little more junior than Chicago. The pilots there

had lower seniority. So I had the ability to let my seniority grow faster in a base like Detroit as opposed to a base like Chicago, which, while still junior, it would have taken a little bit longer. So I went with what I believed to be the best option for that, which is Detroit.

Q. Do you know how many pilots fly out of -- are domiciled in Detroit, how many SkyWest pilots?

A. I have no idea how many pilots are there.

Q. And you don't have any idea how many of those pilots are first officers?

A. I don't.

Q. Do you know how many ready reservists they had at the time, you know, in November of 2016 in Detroit?

A. I don't know.

Q. Do you know how many long or short reservists they used at the time at this domicile?

A. I do not know.

Q. Okay. Then the Seattle, the Colorado Springs, those others, are those sort of wish list items, or were they all part of your plan to try to pick the most junior domicile so that you could rise up more senior quicker?

A. Those were wish list items. I knew that I

wasn't going to get anything beyond that point, so I just started filling in blanks just because I thought we had to fill all of them out.

Q. Okay. Did you talk to anybody else in your class that -- this list of 34, about which ones you should put or that they were putting?

A. Yeah. There was discussion at -- over -- over dinner or lunch. People -- everybody had where they wanted to be, and everybody had where they felt like they would end up.

Q. Okay. All right. I'm going to show you an email. This is an email from Coy Bryant to you, it looks like. It's dated June 29, 2017.

Do you recognize this email?

A. Yes. That email was in response to a memo I sent regarding exceptions to when I would work during the Sabbath hours.

Q. All right. Hold on, then. So I want to mark this one as Exhibit 10. Mark this one as Exhibit 10, but I want to talk about Exhibit 11 first.

(Exhibit 10 was marked.)

Q. (BY MR. PETERSEN): So let me show you --

(A discussion was held off the record.)

Q. (BY MR. PETERSEN): This one I would like

to make -- this one will be Exhibit 10, and this one I want to mark as Exhibit 11.

(Exhibit 11 was marked.)

Q. (BY MR. PETERSEN): Do you recognize this document, Mr. Cassell?

A. Yes, I do.

Q. Tell me what it is.

It's Bates number 6, by the way. SkyWest 6.

A. So this document was in response to -- well, I'll back up a little bit.

So when I interviewed at SkyWest, long story short, they didn't know I had worked there before. So when that came out, they asked me why I quit. I explained to them sort of what happened. And they told me that they weren't going to tell me no, but they would have to discuss with HR at corporate.

A couple of days after the interview, I got a phone call -- I believe it was a phone call -- from Coy Bryant where he said that he wanted to know kind of what were some exceptions, like what are the parameters of this when you would or wouldn't be able to work on the Sabbath.

So this document was what I sent to him in

response to his question.

Q. Okay. So let me go over this with you real quick. I'm going to start the second sentence. You state, "I would like to say up front that it has never been my plan nor intent to be a liability to SkyWest Airline as an employee."

What did you mean by "liability"?

A. I don't want to cause problems for them in any way, whether -- with scheduling specifically, is what I meant by that.

MR. PETERSEN: Okay. And, by the way, before I get going into this, Jessica, do you need a break?

THE REPORTER: I'm okay if everyone else is.

MR. PETERSEN: All right. I'll keep going. You just let me know, then. How about that?

THE REPORTER: Oh, thanks so much.

Q. (BY MR. PETERSEN): And then it says -- you say, "Since my graduation from university, I have observed from the outside as SkyWest has grown into a regional airline powerhouse." And then you say you want -- essentially, that you want to work with SkyWest and you wanted to be a pilot.

You state -- and this is the sentence

started "given."

"Given my desire to be a pilot for SkyWest, I would like to assure SkyWest management that I will not let my religious beliefs come in the way of allowing SkyWest to operate and function as it always has, with a high level of quality, timeliness, and overall success."

So I think you recognize that SkyWest flies every day of the week.

How, without working on your Sabbath, would you not let your religious beliefs come in the way of allowing SkyWest to operate and function?

A. Well, like I said, I would give adequate notice to the base chief pilot or crew scheduling that I wasn't going to be able to be at a -- on a flight, if I couldn't get out of it, over the Sabbath hours so that they could have somebody to take my place to avoid the flight being delayed.

Q. Okay. And then two sentences later, you say, "I realize that SkyWest cannot guarantee that I will be provided a schedule that will always allow me to observe my beliefs." And it keeps going.

So at that point, that's an acknowledgment I think that we've already gone over, that you might get a schedule that unavoidably has you working a

Sabbath; is that correct?
A. Uh-huh. Yes, that's correct.
Q. And then you state, "Therefore, it has and will continue to be my intent to use the tools that SkyWest has provided to either bid out of, drop, or trade a shift that may conflict with my beliefs."
So if I understand that part of your sentence, that's you suggesting that you will use the bidding system and the tools in place through that bidding system to get out of working on your Sabbath, correct?
A. Correct.
Q. Let me ask you this. You state in here, "bid out of, drop, or trade a shift." I want to talk about each one of those three items.
How do you bid out of a shift at SkyWest? Or how did -- at the time you wrote this, what was your understanding as to how you bid out of a shift?
A. So my understanding -- granted, I never used the system, so I might have not been completely understanding of every aspect of it. But from those who were in SkyWest that I was speaking with that were getting out of working on Saturdays, you would just select what days you don't want to be on or you would select days you do want to be on.

A lot of -- so the two Adventists that I was speaking with said that they just selected their flights to start on Sunday mornings, early Sunday mornings, because that's still the weekend. Not a whole lot of people wanted that, and they had a lot of success with that.

Q. So that's -- that would be just how you bid your legs, the flights, right?

A. Yes.

Q. Okay. And then you say, "Drop."

What does "dropping a shift" mean?

A. This one, I don't know exactly how it works, because I know there are work rules related to it, things you can and can't do.

But my understanding is, you are able to drop flights as long as you didn't go below a certain amount of hours of flight time. So if you were going to drop, you had to -- to go below that certain hours, you had to pick something else up somewhere else to make it so that you were still working enough for the company.

Q. Did dropping a flight have any -- in your understanding, did it require that you have somebody to pick it up, or was it just "dropped" dropped?

A. My understanding is, you could drop.

Q. And somehow SkyWest would get somebody to take it?

A. Yeah. They had, like, open-time boards where they would pay extra for pilots to come in and do shifts that didn't have a crew, stuff like that.

Q. Okay. But if somebody didn't take your offer -- well, let me back up.

When you say "pay somebody extra to take the shift," is that you paying them extra, or is that SkyWest paying them extra?

A. SkyWest would pay extra for certain flights.

Q. Okay. And so if you wanted to drop a shift but you were unaware of anybody that would pick it up, your understanding was, you could still drop it and SkyWest would simply have to get somebody to work that shift?

A. That's how I understood it.

Q. And that understanding, does that come from Mr. Horne and Mr. Wahlen? Is it "Wahlen"?

A. Wahlen.

Q. Wahlen. Sorry.

A. That, and other pilots I knew at SkyWest that were doing the -- that were using the system. I have other acquaintances that are not Adventists

that work there or have worked there.

Q. Do you know whether there was a written policy behind how shifts could be bid and dropped and how all that worked? Like, some writing?

A. Yeah. I believe there was, but I -- I didn't know how it worked because I never got to that point.

Q. Okay. And then you say "or trade a shift."

Tell me how trading a shift is different than bidding out of or dropping a shift.

A. Trading a shift would be if you were unable to drop or you got something on your bid that you didn't like. You could trade what you had with another pilot as long as it was within the legal duty-day parameters for both of you. So --

Q. So as long as -- sorry. Go ahead.

A. I was going to say, maybe I have a trip that's Saturday and Sunday, and then I have the rest of the week off for some reason. And somebody else has a three-day that goes Monday, Wednesday, Thursday, but they had the weekend off. But my trip has more flight time. Maybe the other person would want it, so we would trade.

Q. I see. And as long as both of you were

not over your flight hours or whatever the regulations required that you not go over in terms of time, then you could trade with them?
A. That's how I understood it, yes.
Q. So let me ask this: Why would you ever just drop a flight if you could always trade?
A. It might be easier to drop a flight than -- rather than trade it, because to trade, you have to have somebody else that wants it. To drop a flight, you just drop it.
And, again, I don't know all the work rules associated with that. I know that there were some restrictions with it, but I'm not -- I don't know them. I know that there were some.
Q. Is it possible that the drop and trade is really one policy, that you can drop but only if somebody's willing to take it? Does that ring a bell to you at all?
A. That could be the case.
Q. Okay. Okay. When you say, "They have offered to teach me how to properly use the system in order to create a schedule that both meets company and personal needs," who's the "they" that you're referring to here?
A. The mentors I had within SkyWest. That

would have been Steve Horne and Mike Wahlen.
Q. Okay. And then you said, "I'm willing to bid for the most undesirable flights, stay at the most junior base, and fly the most junior aircraft in order to avoid conflicts with corporate policy."
Help me understand what undesirable flights, junior bases, and junior aircraft -- how would those three items help you avoid Saturday -- or a Sabbath work?
A. Well, there was definitely a pecking order when it came to what aircraft you flew there. All the senior pilots wanted to fly the newer ERJ aircraft, and so they would bid to switch into that one. Those with low seniority that got into -- that did manage to get into the ERJ sat reserve for a long time. And even when they did get off reserve, they didn't really have a lot of control over their schedule.
Those that flew the CRJ were able to have their seniority grow quickly because, you know, people were trying to get out of that airframe. People didn't really like to fly it. So if I stay in that airframe, my seniority grows quicker and I'm able to have more control over my schedule .
Regarding bases, everybody likes to live

in Denver or San Francisco or Seattle. They're beautiful cities with a lot to do. Nobody really wants to live in Detroit or Chicago, especially an airline like SkyWest attracted a lot of West Coast pilots because there weren't a whole lot of airlines that had West Coast bases. So if you wanted to fly for an airline, you would pick SkyWest if you lived in Los Angeles or Salt Lake or Denver because of the bases. So they were trying to get out of Detroit or Chicago or Minneapolis as soon as they could, which caused your -- helped your seniority grow there quickly.

Regarding undesirable shifts, some people might like getting up early. I don't think most people like to go to work at 5:00 in the morning, though. So if I bid for flights that left at 5:00 a.m., I probably had a better chance of getting those than if I bid for flights that left at noon. Flights that left on Sunday would probably be more likely to fall into my -- fall into my bid rather than flights that left on Monday or Tuesday as a junior pilot.

Flights that get back late, too. Maybe they land at midnight or 1:00 in the morning and they have minimum rest. You're on ten hours of

rest, and then you go again.
Q. So -- but you understand, right, that at the time, seniority determined your domicile, correct?
A. Correct.
Q. And seniority was set for you based on the -- the 34 in your training class, you guys got rank-ordered by some system. But within that class, you had a seniority, and then that class was junior to everybody else that was already a pilot; is that right?
A. That's right.
Q. And so when you picked domiciles, your class was subject to everybody else's initial preference, correct?
A. Correct.
Q. And then once you're there, isn't it true that the captains had a seniority system and the first officers had a seniority system? Let me rephrase it.
When you were bidding for something out of training, you would be a first officer, correct?
A. Yes.
Q. And you're not bidding for a captain's spot, correct?

A. Correct.

Q. So you're bidding against other first officers under the seniority system?

A. That's correct.

Q. Okay. And so when you say you're willing to take flights, it's the flights that are available to you as a first officer at the domicile where you've been placed, correct?

A. Correct.

Q. All right. And then you state in here, "If there was an unforeseen circumstance, such as, but not necessarily limited to, a maintenance delay at an outstation and my duty time's extended, I would be willing to fly the aircraft back to base as my concern for the safety and well-being of my passengers falls within my religious beliefs."

So if I understand that sentence, and consistent with what you've testified to earlier today, if you are starting a flight that is intended to either end or begin outside of your Sabbath, and for reasons that are unforeseen, it bleeds one way or the other, you would be willing to take that flight for the benefit of the passengers?

A. Yes.

Q. And finish the flight, really, is, I

think, what you're contending there?

A. Yeah.

Q. And then you state, as your tenure increases, "my likelihood of conflict decreases due to my increase in seniority, allowing the system to work as designed."

Essentially, as you become senior, you can -- you have more power to ensure that you're not working on your Sabbath; is that right?

A. That's correct.

Q. In the second paragraph, the third sentence, you state, "I do not expect SkyWest to give me special or preferential treatment."

And if I understand that sentence, that's your way of saying you're willing to work within SkyWest's seniority system, correct?

A. Yeah. I'm willing to work with them as they see fit, yeah.

Q. And that if that system -- okay.

And then you say, "At the same time, I appreciate SkyWest's stance as being an equal opportunity employer."

What did you mean by that sentence?

A. Well, SkyWest claims on their website to be an equal opportunity employer, meaning that they

don't discriminate against an employee based off of race, religion, disability. There's other things I'm sure that are in there, but I know that those three are included in that.

Q. When you say that you do not expect SkyWest "to give me special or preferential treatment," if you request a religious accommodation, is it your belief that that's not a special or preferential treatment?

A. I would see special or preferential treatment outside of the law, them going far -- I don't expect SkyWest to do anything that would be unreasonable. I'm not asking for -- I never felt that I was asking for anything unreasonable, and that's what I mean by this.

Q. Okay.

A. That's -- that's what I mean.

Q. So "special or preferential" in that sentence is referring to something beyond what the law would require?

A. Correct.

Q. Okay. You state that you will bring -- "I will also bring ideas and recommendations as to how we can work through the problems together so that SkyWest does not feel that I view my beliefs as an

entitlement."

Were there any recommendations that you had and wanted to give SkyWest that you were unable to give them?

A. Yeah. I mean, I don't -- I don't feel that I personally was ever given that opportunity. It appears that, in correspondence between Alan Reinach and Tom Emerson, that the question was raised. However, it was never -- I -- I don't know. It appears that it was never addressed.

Q. When you wrote this letter on June 29, 2017, why didn't you put in what you were asking for if you felt like you didn't have the opportunity before?

A. Well, I -- that's a good question. I guess I was answering the question that was given to me, and I wasn't really going to go beyond that at that point.

Q. Okay.

A. I didn't want to be pushy and tell people how to do their jobs.

Q. Okay. Now going back to Exhibit 10, I believe. This is the Thursday, June 29th email from Coy Bryant.

Is this in response to the letter we just

reviewed?

A. Yeah.

Q. And what were the circumstances that surrounded getting this email? Do you know?

A. I guess the original copy may not have said anything about training. And then I added -- I would have to look at the previous one to see if there was a training aspect added to this or if there's a second one that has it. He wanted to know how I would handle training.

Q. Okay.

MR. STRINDBERG: Scott, would this be a good time to take a short break?

MR. PETERSEN: Yeah, actually, it is a good time. Let's take a five-minute break.

(Recess taken, 2:06 p.m. to 2:13 p.m.)

Q. (BY MR. PETERSEN): Mr. Cassell, you understand you're still under oath, correct?

A. I understand.

Q. So is there any reason that you applied to fly again for SkyWest in June -- or in the summer of 2017 as opposed to another time of year?

A. Yeah. I -- I felt that if -- if I applied and started work when the sun was going down late in the evening, that I had a better chance of avoiding

the problem I had back in the wintertime.

Q. Well, and this is a sincere question.

The worship -- your Sabbath worship actually shrinks as the days of the year get shorter and lengthens as the days get longer; is that true?

A. It's still a 24-hour period. It just shifts when it starts. So in the wintertime, it ends early on Saturday because the sun goes down at 4:30 or 5:00 p.m., so then it's over. But in the summertime, it would be -- it would end later -- start later and end later.

Q. So what would you do in, like, some of the northern parts of Alaska where you get very little sunlight? Does that -- is it a different process to figure out what the Sabbath is?

MR. STRINDBERG: I was going to object because you're asking him to speculate, although I have much the same thought about, what if you were, like, in Iceland, but --

Q. (BY MR. PETERSEN): I'm very -- I understand your point. And it's easy to do when you live in a place like, you know, the United States where we -- we have a fair amount of daylight always at some point. But just curiously speaking, have you thought about that, or is there a doctrinal

point on that?

MR. STRINDBERG: Todd, can you explain?

MR. MCFARLAND: Yeah. And, Mr. Petersen, I am happy to explain this to you. I mean, I'll let his -- the only way I'm weighing in here is as an Adventist.

There are church approaches on this and ways this is handled historically. I'm happy to talk about that later. But I don't know if this is really something that Mr. Cassell should be expected to know.

MR. PETERSEN: Okay. No, that's fair.

Q. (BY MR. PETERSEN): You don't have anything to add, Mr. Cassell?

A. Yeah. I don't really know what they do up there. I've never been there.

Q. Okay. Fair enough. And I agree. It's not exactly relevant. I'm just very curious because of kind of how you're calculating it, so...

MR. MCFARLAND: And I'll be happy to explain how it's historically been handled once we -- yeah, on a break.

MR. PETERSEN: Okay.

Q. (BY MR. PETERSEN): All right. I'm going to show you what have been marked as Exhibit -- this

would be Exhibit 12.

(Exhibit 12 was marked.)

Q. (BY MR. PETERSEN): And it's Bates numbers CASSELL 216 to 218 and then 219 to 221. So 216 to 221. Because the way the documents are placed, it looks kind of small right now. Let me blow that thing up.

All right. Mr. Cassell, do you recognize Exhibit 11 [sic], especially the -- for now, the Bates number CASSELL 216 through 218?

A. Okay.

Q. Do you see those documents?

A. I do.

Q. There's three of them.

Tell me what they are.

A. These appear to be year-to-date pay stubs between myself and my current employer.

Q. Okay. And when I look at -- and I'm looking at number 216, and this has a pay period beginning of 12/2/2018 and ending on 12/15/2018. It says "80 hours."

You may or may not have worked 80 hours, is that right, that pay period; it's just that you're salaried? So is that just part of your wage statement, or did you actually work 80 hours?

A. No. That's -- as pilots, they told us to put in 40 hours a week. Some weeks we worked more; some weeks we worked less. It's just how they determine us to be full-time or not.

Q. Okay. And then you have vacation -- some paid vacation and paid sick leave; is that true?

A. True.

Q. I'm looking at the vacation and sick here.

Is that -- how much paid sick leave do you get a year?

A. 40 hours a year, and we get 80 hours of vacation a year.

Q. Can you use vacation for sick leave, if necessary?

A. You can, yeah.

Q. And then there's a statement that says, "Pay correction, 192.30."

What is that? Do you see that? I'm circling it with my little --

A. Yeah, I see that. They might have messed my paycheck up.

Q. All right. Then I'm looking at your taxes and withholdings. You have federal income tax, Medicare, social security, NE withholding.

Is that your state income tax withholding?

A. Yeah. "NE" is Nebraska.
Q. Okay. And then Medicare employee additional tax doesn't have -- it doesn't show anything there.
And then I look at the right where it says "adjustments." Do you see that, this area right in here?
A. Yes.
Q. Yes?
A. Yes.
Q. Principal vision pretax, $2.16.
Is that a payment for your vision benefits?
A. Yes.
Q. And then the dental, Principal dental pretax, $6.40; is that right?
A. Uh-huh. Yes.
Q. Then what is Assurity critical III?
A. Oh. So that would be critical illness insurance. The best I can describe it is, a portion of my health insurance that I'm able to enroll in that writes -- like, if I were to break my arm, they would write me a check for a lump sum while I was out.
Q. And even though it says "minus 1.4," is

that a dollar forty that they're taking out? Is that what that means?
A. Yeah. It's not very expensive. It's pretty nice to have.
Q. And then "expense reimbursement," it shows "1." What is that? Is that a dollar that has been put into your expense reimbursement for the year? Or tell me what that line is.
A. Yeah. I don't know why it says "1." What I presume is the case here is, I had to pay extra for -- on my phone plan when I flew into Canada, which cost me money personally. So they reimbursed that expense. I don't know why it's listed as 1. It could be that they gave me one expense reimbursement year to date. That was probably what they're getting at there.
Q. And then the total year-to-date salary, it also shows a $7,108 bonus. I asked you about bonuses before.
What is this bonus number for?
A. So there's a number of situations where Silverhawk will pay bonuses, one of which being working on a day off, and that's paid as a day rate. So if I work three of my days off, I would get $500 for each day.

They would also give bonuses based off of performance. And so, like, for fuel consumption specifically, if we were able to operate a flight over our -- all of our flights over a quarter and come in under a certain amount of fuel burn, target fuel burn, they would pay us up to $1,000 bonus per quarter.

Q. And so the fact that it says your current rate is 500, that would -- like what you were saying, is working on a day off?

A. Correct.

Q. Year-to-date is not a round number to 500. That's because you're getting some sort of fuel -- the fuel bonus in there or something like that?

A. I don't know why that's not a round number, to be perfectly honest with you. There could have been other things that they awarded me that caused it to be off that -- like that. But I -- I don't know.

Q. Okay. And then the next document, 217, says -- 12/20/2019 is the date on it. It's pay period beginning 12/1/2019 and ending 12/14/2019.

And it has over on the right a whole slew of additional adjustments. The H SA employee that didn't show up before.

Critical illness, I'm assuming that's your Assurity critical?

A. Yeah.

Q. Is that what used to be that?

A. Yeah. I know we changed providers at one point.

Q. Okay. And then you got the Principal vision and Principal dental.

And then accident insurance pretax?

A. Yeah.

Q. What is that?

A. You know, that might actually be the -- the one that they pay out if I broke my arm. And then critical illness, I don't remember exactly what that one is. The accident insurance is where they pay out a lump sum for an accident like a broken arm or a leg. Critical illness, I don't remember.

Q. How would I find out -- I need to compare these benefits with what SkyWest offers.

So how would I find out what this critical illness is and this accident insurance is?

MR. STRINDBERG: Scott, if I can interject. We'll -- I'll have my client get specific information on that and pass it on to you. It sounds like one of them is some sort of

short-term disability plan. I will get him to ask his employer specifics on those.

MR. PETERSEN: Okay.

Q. (BY MR. PETERSEN): And then 64-, I'm looking up here at your salary, year to date. And this is 2019, 12/14, pay period ending 12/14. It shows 64,480.71.

You indicated that you were normally paid --

A. 82,000.

Q. -- 82,000.

So where do we get to 82- from 64- in 14 days?

MR. STRINDBERG: I think you're looking at a 2019 slip, Scott. He's talking about -- he said his salary was 82- for this year.

Q. (BY MR. PETERSEN): Is that right? So in 2019, you made less than 82-?

A. Correct.

Q. Do you know how much you made in 2019?

A. It would have been roughly 65,000. I had -- I had a lot of promotions. I wouldn't say "a lot." I had a couple promotions. And the introduction of a pay scale at my company was -- allowed everybody to get paid a little more.

So what I was doing, as a captain on the Citations -- which I upgraded to not long after I became a first officer on the Citations. Captain's starting pay for year number 2, which I would have been in, was 67,500. But I didn't upgrade -- I didn't start getting paid as such until April, which is why it's not reflected right away like that. I think -- I didn't start making 67,5 until almost the middle of the year.

Q. Okay. So when you say that you're paid 82,000, that's 82,000 and change, not -- currently, not counting bonus money. Is that fair?

A. Yeah, that's correct.

Q. And if I look at 2019 -- and this looks like it's almost the year-end payment but not quite. You've got one more payment that's coming at the end -- you know, the 5th of January or something for the end of December of 2019. You made --

A. Yeah.

Q. -- 10,450.

And is that an average year of bonus for you?

A. No.

Q. Is it low or high?

A. That seems high.

Q. So you worked there since the end of 2016. So you have a full year in '17, a full year in '18, and then this in '19. And then, you know, we're in October, almost, of 2020.

Do you know what your bonus was in relation to $10,450 in 2018 and 2017?

A. I would have to look at pay stubs to figure that out. Maybe I just underestimated how much I was making in bonuses. But the 10 -- 10,400 seems high. But the more I think about it, the more I realize that that could be accurate because I did work quite a few days off.

Q. If I look at this thing back in -- this is your similar time period in 2018. It says "7,108."

A. Yeah.

Q. But there's some differences between these two years to me, in that the second one shows 64,000, but it also shows there's a separate line item, your salary, vacation, and your bonus. And then it also shows a separate item for profit sharing.

Tell me what the profit-sharing is.

A. Profit sharing, they just take a chunk of the profits we made as a company, a percentage, and they distribute it throughout the pilot group. So

that would have been what I got paid that year in profit sharing.

Q. Do you know what -- did you receive profit sharing in 2018 and 2017 as well?

A. I don't recall getting profit sharing in 2017, but I did in 2018.

Q. I guess what I'm trying to get at is, I'm trying to figure out -- if I look at this pay stub, which is CASSELL 217, if you're making something above 65-, this looks to me like in 2019, if you count your bonus, your profit sharing, and your salary, that you were making about 79,000. More than that. It will be 80- by the time you get paid again.

A. Uh-huh, yeah.

Q. Or something close to that, right? I'm roughing here, so if we're down a couple thousand. But that included all of your bonus. And I get that you're saying that you made less in 2019 than you made in 2020, but I'm trying to figure out how much -- what's the difference.

So you have W-2s for all of those years, from 2016 forward, I'm assuming?

A. Yeah, I have those available.

MR. PETERSEN: Okay. I don't think we

have all of those, Erik. So I would like to ask if we can get the W-2s for all -- from 2016 forward. We may have -- I think we have one or two of those years. I don't think we have all four -- well, three years because 2020 is not done yet.

MR. STRINDBERG: Okay. I'm writing it down. Probably it would be good if you could remind me, though.

MR. PETERSEN: Okay.

Q. (BY MR. PETERSEN): All right. Then I want to look at -- I'm going to shrink this now.

So looking at 219 and 220. I'm going to shrink them down again a little more.

Can you see these? I can't get them to go the whole screen, but --

A. I can see them.

Q. What are they?

A. They're benefits that are available to me as an employee of Silverhawk Aviation.

Q. So are these printed off a website? Or, I mean, is this -- what is -- what am I looking at? What are these copies of?

A. Yeah. So this is -- this is a screenshot through an employee portal that I have access to as a Silverhawk employee that gives -- it shows me what

benefits I have and what I'm enrolled in. So anything with a red dot next to it, I'm enrolled in.

Q. Okay. So when I look at this, I see a red dot on your health savings account and that you don't put anything in. The company pays 182.05, correct? Page number 219, CASSELL 219.

A. Yes. Scroll to the -- scroll over to the right a little bit. That's interesting.

Q. And it says "every other week."

A. I think that's what the company is paying as a principal, not what I'm contributing.

Q. I see that in the middle, it says, "Employee, 0."

A. Yeah. I don't -- I don't pay anything to be enrolled in that. I do contribute to it, but -- yeah. So the company -- that must be where the company shows what they're contributing in terms of premiums.

Q. Okay. It says "UHC HSA." And then if you go to the next page, there's an HSA that says "West Gate Bank account." And your contribution, it shows -- well, it says $10 and 38. It doesn't really say whose is whose.

A. I'm 10. And then I think if you look -- so it would just go up. "Employee pays," and then

you go straight down from and it shows "10." Company pays 38.46.
Q. So is that the HSA you were talking about?
A. That is the HSA.
Q. So are there two HSAs, one at West Gate Bank account and one at UHC?
A. No. So the UHC HSA plan, that's the insurance plan. And the savings account itself is associated with West Gate Bank.
Q. Okay. And then going up to 219, it says, "Principal dental." You pay 13.87 every other week, and the company pays zero, correct?
A. Yeah.
Q. And then Principal vision, you pay 4.69 every other week and the company pays zero?
A. Correct.
Q. And then going down, voluntary accident, you pay a dollar; the company pays a dollar every other week.
Is that accidental death and dismemberment insurance? Do you know?
A. I'm not positive.
Q. Okay. And then this critical -- voluntary critical illness. You pay $1.40; the company doesn't pay anything.

You're not quite sure what that is, either, correct?

A. Yeah. I would have to dig into my benefits package to figure out what it is exactly.

(A discussion was held off the record.)

MR. PETERSEN: This one, again, I thought was split, but apparently not because I'm an idiot, so...

MR. STRINDBERG: Don't sell yourself short, Scott.

Q. (BY MR. PETERSEN): All right. The last one, Manager Assessment.

What is that, Mr. Cassell?

A. That is the one written performance review that I have for my time at Silverhawk.

Q. Okay. And that was given to you on February 11, 2019?

A. Correct.

Q. And that's the sum total of it, is -- the two questions are answered by your supervisor, Mr. James Allen?

A. Yeah.

Q. All right. Did you meet with him?

A. Nope. It just showed up one day on my account.

Q. Okay. And you've received no other performance reviews since you've been at Silverhawk?

A. I received one at the end of my first year, but it was just an in-person meeting where they basically told me they were happy with my performance. All my performance reviews, the two I've had -- there's this one that's in writing, and that was the extent of it. There was no verbal meeting or anything like that. And then the first one was just a meeting where they sat down with me and they said, "Hey, you're doing a good job."

And everything else has just kind of been in passing, a pat on the back or, "Hey, we need you to do this differently" or something. I haven't had any negative feedback on my performance here, though.

Q. Is Mr. Allen a Seventh-day Adventist?

A. He is not.

Q. Do you know of any others that belong to that religion at Silverhawk?

A. There's one other pilot.

Q. And he's a pilot?

A. He's a pilot.

Q. What's his name?

MR. STRINDBERG: Objection. I don't --

what's the relevancy of this, Scott? I think it's --

MR. PETERSEN: Well --

MR. STRINDBERG: It serves no purpose.

MR. PETERSEN: Well, I -- if I -- if he wants to tell me that Mr. Cassell's worked on Saturday or Mr. Cassell has told him something significant about the religion that impacts what he's testified to today, I think it's worth knowing.

MR. STRINDBERG: No, I disagree. We gave you his logs so you can see whether or not he's worked on Saturdays. So I don't think this -- I think starting to contact other people that Mr. Cassell works with has some real risks. And we would object to it, and I'm going to instruct the witness not to answer that question.

MR. PETERSEN: I don't think you're entitled to instruct him not to answer.

MR. STRINDBERG: I'm going to instruct him whether I'm entitled to or not.

MR. PETERSEN: Okay. I'll just note for the record, then, that I asked for the name of the person who is also a Seventh-day Adventist at Silverhawk, and Mr. Cassell was instructed not to answer that question, which I think is inappropriate

under the rules.

MR. STRINDBERG: Well, I think it's an inappropriate question. And in the scope of a deposition, there's no other way that I can prevent that information from coming out when I don't think it's an appropriate question but I think runs some risks. This is the type of stuff we were talking about before, Scott, when you wanted to subpoena his employer. So that's why I'm doing it.

If we argue about it later and we come to some other conclusion, we'll provide you with a name. But I'm not going to have him answer the question.

MR. PETERSEN: All right. I'm still leaving my objection on there.

MR. STRINDBERG: Understood.

Q. (BY MR. PETERSEN): I'm going to show you an email that was sent. And I'm not -- I just want to know if you've seen this email. It's an email from Spencer Hinckley to Coy Bryant. It's dated September 1, 2016.

Do you see this -- have you ever seen this email, Mr. Cassell?

A. I saw it just a couple of days ago.

(Exhibit 13 was marked.)

Q. (BY MR. PETERSEN): And this is Exhibit 13. SkyWest 26.

I'm just going to ask you if you were aware at or about this early September 2016 time period. It says in the middle of the email, "We have scheduled him into a CTP class that will allow him to not work on Saturday. However, he will definitely be scheduled for reserve duties on a Saturday when he is online."

Did you have an understanding back in September of 2016 that if you were -- that if you passed your training, that you would be scheduled for reserve duties on Saturday?

A. I knew that there was a chance that it could happen.

Q. And then it says, "This will pose a problem for us."

Do you have any idea what he might be talking about?

A. I reckon scheduling.

Q. Okay. "I wanted to give you a heads-up so you can have that conversation with him."

Did Mr. Bryant have a conversation with you after September 1, 2016, about your Sabbath posing a problem for scheduling for reserve duties

once you passed training?

A. I recall getting a phone call from him in relation to the request-for-religious-accommodation form that was sent to me where they discussed that they couldn't guarantee that when I was on the line as a pilot that the bidding process would keep me free from Saturdays. Nothing that we haven't discussed previously. It's kind of the same tune there.

Q. All right. I'm going to show you Exhibit 14.

(Exhibit 14 was marked.)

Q. (BY MR. PETERSEN): This is SkyWest number 21.

Have you seen this document before, Mr. Cassell?

A. Yes, I have.

Q. Tell me what it is.

A. This was SkyWest's response to my request for religious accommodation.

Q. Okay. And if you look at the second paragraph, it says, "After extensive evaluation and consideration of the request, as well as evaluation of the quality, safety, operational impact, as well as training footprint structure for SkyWest, it has

been determined that we are unable to honor the specific request with work scheduling."

My question is, what's the specific request that is referenced here?

A. Well, it would be what I requested in my request for religious accommodation. I asked that they keep me from being scheduled during Friday -- during the Sabbath period for training and work events.

Q. And I'm going to click on this.

Is this the request you're talking about? I can't remember which exhibit it is, but it's SkyWest 17 through 19.

Is this the request?

A. That is the request.

Q. What's that?

A. That is the request.

Q. All right. And it's number 3 specifically, right? "I am asking that I not be scheduled for work shifts or training functions during the period of Friday sundown through Saturday sundown. My religious convictions do not limit my ability to perform the essential functions of my job as a pilot. I am just requesting this time off each week."

That's the specific request that's referred to in that memorandum?
A. That is correct.
Q. Okay. And it then says, "However, as an accommodation, we have provided FO Cassell" -- that's First Officer Cassell?
A. Yes.
Q. -- "with tools to meet his religious requirements."
And those tools are the bidding system we've already gone over probably two or three times. Am I right? Or are there other tools we have not yet discussed?
A. No. That's what it -- drop, trade, shift, yeah, that's the bidding -- that's all done within the bidding system.
Q. All right. And then it says, "As standard for all pilots, unexcused work assignments will be addressed as defined by the flight operations reliability program PPM 3006."
Do you know what that's referring to?
A. That would be a written policy they have on how they discipline pilots.
Q. At the time that you received this October 27th memorandum, did you have an

understanding that, if you refused to work a Saturday as scheduled and you couldn't get somebody to take your shift, that the refusal to work would result in discipline?

A. I understood that.

Q. Did you understand that that discipline could include termination?

A. I understood that as well.

Q. Did you -- at this point when you got this memorandum -- I'm assuming you got a copy since your signature's there. Is that fair?

A. Yeah.

Q. And then under your signature -- just before I forget -- is this your handwriting under your signature?

A. Yes, that is mine.

Q. It says, "My signature does not relinquish my request for religious accommodation."

What did you intend by writing that?

A. I wrote that there because I didn't want my signature -- I didn't basically -- basically, I did not want to sign away any chance of a potential accommodation coming forth later.

Q. Okay. So if I go back to the center -- the middle of the second paragraph, it says,

"However, as an accommodation, we have provided FO Cassell with tools to meet his religious requirements."

Is your handwritten signature below your -- is your handwriting below your signature an indication that you didn't agree that this was an accommodation being offered to you?

A. Well, that's a standard tool given to every pilot that works at SkyWest. They have that bid -- the ability to bid, drop, trade shifts. So I didn't really feel as though it was an accommodation because it was -- it was available to everybody and it's standard practice for everyone who puts their schedule together.

Q. So your writing under your signature is, essentially, an acknowledgment that you're not waiving your position that there should be more than what's listed in Exhibit 14?

A. Yeah. And, again, like when you get into training, I don't have the ability in all situations to bid, drop, or trade. That's when things are assigned, and I need assistance -- I might need assistance from somebody in management to help me by moving a shift or scheduling a separate shift in that situation, which is why I wrote that as well.

Again, like I said, I didn't want to sign away any potential opportunity for an accommodation that could have made itself known in the future. I didn't want to sign that away, which is why I put that comment.

Q. When you got this and you signed this, did you then thereafter go look up PPM 3006?

A. No. This was before I started class, so I didn't have access to any of these documents, that I recall.

Q. Okay. Did anybody contest your handwriting at the bottom? Was anyone upset that you wrote that there?

A. If they were, they never made mention of it to me.

Q. Okay. I'm going to show you what's been marked as -- well, I want to mark as Exhibit 15. And this is Bates number SkyWest 61.

(Exhibit 15 was marked.)

Q. (BY MR. PETERSEN): Do you recognize that document at all? Have you ever seen it?

A. I saw it a couple of days ago. I have no idea where it's from.

Q. It indicates that SkyWest mainland partners provides SkyWest with the flights that

SkyWest is responsible for operating on any given day in a bid period.

Do you understand that SkyWest has no flights that are not either a Delta or a United or an American or an Alaskan flight? In your understanding, do you know whether there are actual SkyWest flights that are on SkyWest planes under SkyWest's logo?

A. My understanding is, all their flights came from Delta, United, American, Alaska. They don't operate -- maybe they do now. I don't know. But my understanding was, all their flights were operated for those carriers.

Q. Okay. And the dates and times of those flights, do you know whether those dates and times were determined by SkyWest or by its partner, like Delta or American?

A. I don't know who determined when the flights would leave.

Q. Do you know what "pairing optimization" means? Do you have any understanding?

A. I do not know, though it clearly states it in the document if I would have just continued to read.

Q. Were you ever explained that there was a

probationary period at SkyWest when you were a reserve pilot?

A. Yeah. I knew I would be on probation. I don't remember what the -- how long it was.

Q. And what did you understand probation to mean when it says you're on probation? What's your understanding? I'm not asking for a legal conclusion. I just want to know what your understanding was.

A. They would kind of be monitoring you a little more closely to see how you fit in at the company, if you had any number of incidents or occurrences that would require disciplinary action. Are you on time, do your -- you know, are there complaints about your dress and attire, showing up in uniform, stuff like that. You know, they're just kind of looking to make sure you are doing everything that's expected of you.

Q. Do you know whether you had more performance reviews on probation than when you're not on probation? Did anyone talk to you about that?

A. I seem to recall them mentioning, like, for the first year, you had to get captains to fill out a certain form for you. And if you didn't, then

it could be met with disciplinary action. But I don't remember anything beyond what I've just said.

Q. Did you have any understanding that, as a probationary employee, you had less security in your employment than if you were not a probationary employee?

A. Yeah, I was -- I was aware of that.

Q. Have you ever heard of the word "pilot reliability"?

A. I -- I guess -- what do you mean?

Q. Just if you've heard that word, "pilot reliability." Is that a reference to punctuality or a timely -- you know, attendance? Do you know?

A. Yeah. I mean, it would make sense that that would be, though I don't know what definition SkyWest would choose to use it. There could be more than just that.

Q. Okay. I'm going to show you -- well, let me go back to Exhibit 15 here. Or 16. Is it 16?

THE REPORTER: It's 15.

Q. (BY MR. PETERSEN): 15. So if -- you've never -- have you ever heard of these five criteria being used for determining how lines are assigned?

A. No. I -- I was -- I don't -- like I said, I never got to get into the bidding system and how

everything worked. I knew that there were some criterias, but I was not made aware of how they determined things aside from seniority.

Q. Okay. And you've mentioned PBS, the preferential bidding system, but you're not aware as to what goes into that system for determining how lines are assigned; is that correct? Other than seniority. Sorry.

A. I know seniority, and I know they have to keep things legal within the time requirements and duty days and everything. And I think that first officers are allowed to put a captain or two on their no-fly list, guys they don't want to fly with for whatever reason.

Yeah, I mean, they're going to -- you know, each -- each domicile is -- or each pilot is matched up with another one in their domicile. So they're not going to -- or at least I don't think they would assign a Seattle-based pilot with a Detroit-based pilot.

Q. Do you know if that ever happens? I mean, is it that you could be paired with somebody on a line that's not from your domicile?

A. I -- I would think not, but I don't know.

Q. Okay. I'm going to show you what's been