# Exhibit D

# Remote Deposition of

# Todd C. Emerson



Date: October 2, 2020

Case: Cassell vs. SkyWest, Inc.

Civil No: 2:19-cv-00149-jnp-dao

*Reporter: Susette M. Snider, CSR, CRR, RPR*


ASSOCIATED REPORTING & VIDEO

*Next-Level Litigation Support*

The Owyhee
1109 Main Street, Suite 220
Boise, Idaho 83702

Phone: (208) 343-4004
Facsimile: (208) 343-4002
production@arvboise.com
arvboise.com

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| SHANE ANDREW CASSELL,<br><br>Plaintiff,<br><br>vs.<br><br>SKYWEST, INC., d/b/a<br>SKYWEST AIRLINES,<br><br>Defendant. | Civil No. 2:19-cv-00149-jnp-dao<br><br>Judge Jill N. Parrish<br>Magistrate JudgeDaphne A. Oberg |

REMOTE DEPOSITION OF TODD C. EMERSON

October 2, 2020

Salt Lake City, Utah

Repored by: Susette M. Snider, CSR, CRR, RPR

REMOTE DEPOSITION OF TODD C. EMERSON

BE IT REMEMBERED that the remote deposition of TODD C. EMERSON was taken via videoconference by the Plaintiff before Associated Reporting & Video, Susette M. Snider, Court Reporter in and for the County of Salt Lake, State of Utah, on Friday, the 2nd day of October 2020, commencing at the hour of 10:03 a.m. in the above-entitled matter.

APPEARANCES (Remotely):

For the Plaintiff: STRINDBERG & SCHOLNICK, LLC
By: Erik Strindberg, Esq.
1516 West Hays Street
Boise, Idaho 83702
Telephone: (208) 336-1788
Facsimile: (208) 287-3708
erik@utahjobjustice.com

ASSOCIATED GENERAL COUNSEL
GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS
By: Todd R. McFarkabd, Esq.
12501 Old Columbia Pike
Silver Springs, Maryland 20902-6600
Telephone: (301) 680-6321
Facsimile: (301) 680-6329
mcfarlandt@gc.adventist.org

For the Defendant: FABIAN VANCOTT
By: Scott M. Petersen, Esq.
215 South State Street, Suite 1200
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
spetersen@fabianvancott.com

# I N D E X

## E X A M I N A T I O N


TODD C. EMERSON PAGE

By: Mr. Strindberg...............................5


## E X H I B I T S


NO. PAGE

23. Email chain ending with a December 2,........21 2016 Email from Jake Whicker to Shane Cassell, CASSELL 004-005

24. December 4, 2016 Email from Alan.............30 Reinach to Coy Bryant, CASSELL 006

25. December 8, 2016 letter from Todd............32 C. Emerson to Alan Reinach, CASSELL 007-008

26. SkyWest Airlines Pilot Policy Manual,........44 Skywest 389 to Skywest 586

27. February 3, 2017 letter from Todd...........100 C. Emerson to Alan J. Reinach, CASSELL 010-011

28. Email chain ending with a February 6,.......117 2017 Email from Todd Emerson to Alan Reinach and Johanna Baker, SkyWest_000003 to 000004

29. Skywest form letter from Chandler...........120 Larsen to Shane Cassell, CASSELL 161-162

30. Email chain ending with a June 26, 2017.....121 Email from Chandler Larsen to Monica Sorensen, SkyWest 000081

EXHIBITS (Contd.)

31. June 26, 2017 Email from Chandler...........127
Larsen to Coy Bryant and Maime
Sorensen, SkyWest_000005

32. June 29., 2017 memo from Shane Cassell......131
to Coy Bryant, CASSELL 020

33. Partially redacted Email chain starting.....134
with a July 11, 2017 Email from Coy
Bryant to Roy Glassey,
SkyWest_000009-10

34. July 12, 2017 SkyWest form letter from......143
SkyWest Airlines Recruitment to Shane
Cassell, CASSELL 176

35. Position statement of SkyWest Airlines,.....148
SkyWest_000012-15

P R O C E E D I N G S

TODD C. EMERSON,

called as a witness, having been first duly sworn remotely, was examined and testified as follows:

EXAMINATION

BY MR. STRINDBERG:

**Q. Please state your full name.**

A. Todd Covey Emerson.

**Q. And your current address?**

A. Work?

**Q. Sure. That's fine.**

A. 444 South River Road, St. George, Utah 84790.

**Q. May I call you by your first name?**

A. Please.

**Q. So, Todd, I imagine, I could be wrong, that you're fairly familiar with depositions, so I'm not going to go over the preliminaries with you.**

**How long have you been with SkyWest?**

A. Seventeen years.

**Q. And what position do you currently hold with SkyWest?**

A. I'm the director of government and legal

affairs.

**Q. And have you always had that position, Todd?**

A. Yes.

**Q. What involvement, if any, do you have with -- I guess you guys call it the employee relations department?**

A. Yes.

**Q. What involvement do you have with that department?**

A. Generally employee relations works independently of me, but when they run into problems that require legal advice or when a lawyer pops up in one of their cases, then they will walk it over to me seeking legal advice or hand the case off to me to communicate with counsel for the employee or whoever is grieving.

**Q. Okay. Are you the only attorney that SkyWest has, in-house attorney?**

A. Yes.

**Q. And who -- who is the director of employee relations currently?**

A. Casey Madsen, spelled with a C.

**Q. Is that a man or a woman?**

A. That's a man.

**Q. And was Casey Madsen the head of employee relations in 2016 and 2017?**

A. Yes.

**Q. And I assume that Mr. Madsen is located in St. George along with you somewhere?**

A. Yes. We're in the same building.

**Q. How did you become involved in the Shane Cassell issue on his request for accommodation?**

A. I believe my first involvement was when I was contacted by employee relation manager Coy Bryant, who told me he had been contacted by a lawyer representing Mr. Cassell.

MR. STRINDBERG: Let me pull up -- it's offering to give me a tour. I don't want a tour.

MR. PETERSEN: Hit the share screen.

MR. STRINDBERG: Yeah, I want to make sure I have the right screen. Okay.

**Q. (By Mr. Strindberg) Todd, can you see this? This is an Email, I believe, from Alan to Coy Bryant. Were you shown this Email?**

A. Yes.

MR. PETERSEN: Hold on. What time period are you talking about? Are you talking about the time that Coy first spoke with him, Erik?

MR. STRINDBERG: Yeah. I was just about

to get to that. Thanks.

MR. PETERSEN: All right.

**Q. (By Mr. Strindberg) Do you recall when Coy Bryant first contacted you about Mr. Cassell and his request for an accommodation?**

A. I am estimating. I don't have a specific independent recollection, but I'm estimating that Mr. Bryant contacted me on December 5th, 2016, and showed me this Email from Mr. Reinach. That would have been my first involvement in the matter.

**Q. And what did Mr. Bryant tell you about the Shane Cassell situation?**

**Q. He told me that he had received this Email from Mr. Reinach, and I asked him to -- he explained the case to me, and he told me that a trainee pilot, who was a Seventh-Day Adventist, had asked for guaranteed Saturday-free work -- I should say sabbath free, as he counts his sabbath from Friday sundown to Saturday sundown, and that they had gone through the interactive process, "they" being Mr. Bryant, consulting with Jake Whicker, who is a trainer in Salt Lake City, and Mr. Cassell to talk about the rigors of the training course and line flying and what accommodations should be made to help him avoid sabbath work, but that they could not guarantee he**

**would never be assigned Saturday work, that he would thereafter have to decline for some reason and have a conflict with his requirement to be able to fly.**

**Q. Did Coy Bryant use the word "guarantee"? In other words, did he say that Shane was asking him to guarantee that he wouldn't work on the sabbath?**

A. I don't recall if he used the word "guarantee." The conflict boiled down to there were certain instances where Mr. Cassell would be willing to violate his sabbath and others where he would not; but after talking about the reasonable accommodation, the tools, the scheduling, the systems available to him at the end of that process, Mr. Cassell indicated that it was insufficient for his needs and he would still run afoul of his sabbath if that system did not produce a schedule or a result where he was free from sabbath labor.

**Q. Did Mr. Bryant, when he talked with you, tell you what reasonable accommodations and tools that he and Jake Whitaker [sic] had talked with Shane Cassell about?**

A. Jake Whicker, W-i-c-k-e-r [sic].

**Q. Yes. Sorry.**

A. Yes.

**Q. What did he tell you they said to**

**Mr. Cassell about possible accommodations?**

A. He said they discussed the preferential bidding system and seniority scheduling systems used by SkyWest from the first day of training that flowed into line flying and the tools available in those systems to add, drop, swap, trade, bid-avoid, use vacation, all of the different avenues you could adjust -- I'm sorry -- that you could request a particular schedule, and if that schedule was undesirable, you could use other tools to modify that schedule. That's what he discussed with Mr. Cassell.

**Q. And he relayed this to you when he talked with you on or about December 5th?**

A. Yes.

**Q. And I gather that neither Coy Bryant or Jake Whicker are still with SkyWest. Is that correct?**

A. Coy Bryant is not with SkyWest. I don't know about Jake Whicker.

**Q. And what position did Jake have?**

A. He was a training instructor in Salt Lake City. I don't know his specific job title, but he would have led other trainers and supervise them as they ran training classes. He might have done some training himself.

**Q. Did Mr. Bryant, when he talked with you -- first of all, was that an in-person conversation with Mr. Bryant?**

A. Yes.

**Q. And where did it take place?**

A. Right here in this office.

**Q. Did Mr. Bryant discuss with you or tell you what the issue had been when Mr. Cassell was in training?**

A. Yes.

**Q. What did he tell you in that regard?**

A. He told me that Mr. Cassell had been scheduled for matrix training, and that training would violate Mr. Whicker's sabbath because it began on a Friday afternoon or evening and was scheduled to continue past sundown Friday, that Mr. Cassell was unwilling to do that because it violated his religious tenet of not working on the sabbath.

**Q. Did you ask Mr. Bryant if he and Mr. Whicker had explored options for rescheduling that matrix training?**

A. Yes.

**Q. And what did Mr. Bryant say when you asked him?**

A. Mr. Strindberg, I don't recall.

**Q. Erik, please. We've known each other for a while.**
A. Erik, I don't recall. It's either Mr. Bryant or Mr. Whicker who answers my questions about how matrix training -- and I would think Mr. Whicker as the person who conducts it. So whether I got this information from Mr. Bryant or Mr. Whicker, I was informed that the training was tightly scheduled and regulated, that it was done with a partner. You sat at a computer screen that was very close to a flight simulator, but not a flight simulator, and you and your partner working together as a mock flight crew operated this matrix computer for several hours together as a team and that this training needed to be unbroken because immediately the class moves on to the next thing. So rescheduling it would not just mean rescheduling Mr. Cassell but also another classmate who would need to sit with him and operate the matrix in tandem.
They also told me, and I knew independently, that even missing one day of training, particularly at the early stages, would require the trainee to reboot and start over. For example, if they called in sick that day and said, I have the flu, they would not reschedule that class. That

trainee would be pulled from class and then would have to restart training at another class in the future, to highlight the rigorous-type, fast, compacted nature of training to get these pilots on line as fast as possible.

**Q. I gather from what you're saying that at some point you talked with Jake Whicker. Is that correct?**

A. Yes.

**Q. And I'll represent to you that the response -- and we'll look at it in a moment -- your response to Alan Reinach was dated December 8th, 2016.**

A. Yes.

**Q. Does that help you place when you talked with Jake Whicker?**

A. Yes.

**Q. When did you talk with Jake?**

A. Sometime between December 5th and December 8th.

**Q. Was Coy Bryant involved in that conversation when you talked with Jake?**

A. I don't recall if he was present when I telephoned Mr. Whicker.

**Q. Go back for a moment to Coy Bryant, the**

**conversation you had with Coy Bryant. Is there anything you recall discussing with Coy Bryant on or about December 5th, 2016?**

A. Not that I can recall at this moment.

**Q. Did Coy show you any of the documents that had been created back when the training issue came up?**

A. Coy came into my office with his file.

**Q. Okay.**

A. In that file there was paperwork. I can't remember, as I sit here today, what I examined with him on December 5th. I have at some point seen the memorandum of accommodation that was signed by Mr. Whicker and by Mr. Cassell. That might have been on December 5th, Erik. It might have been sometime after. I can't tell.

**Q. Okay. I appreciate that.**

**Let me just show you a couple of documents. Maybe that will refresh you. Do you remember if this was one of the documents that you were shown by Coy Bryant on or about December 5th?**

A. I don't recall if this is one of the documents I saw on December 5th.

**Q. Let me scroll up through it. Included with it is this -- and if you can't read it, I can**

**blow it up again -- is the request for religious accommodation that Mr. Cassell had filled out back in November. Did Coy show you that document on or about December 5th?**

A. Yes.

**Q. Let me show you another document. Did Coy show you this document on or about December 5th?**

A. I believe so.

**Q. I gather from what you're saying, Todd, that you were not consulted about this memorandum of agreement back in October of 2016?**

MR. PETERSEN: Hold on. I just want to caution the witness.

Don't testify about any attorney-client discussions that -- the fact of being consulted is fine, but don't go any further.

**Q. (By Mr. Strindberg) Unless you want to, Todd.**

MR. PETERSEN: I'm instructing you not to go any further.

MR. STRINDBERG: I understand.

THE WITNESS: I'm going to take a minute and read this.

**Q. (By Mr. Strindberg) Okay.**

A. There's nothing I can tell you about this

document. I don't know who wrote it, whether it was Mr. Bryant or Mr. Whicker. Our standard procedure would be for Mr. Bryant to write it in consultation with Mr. Whicker for accuracy and also a plain understanding of how things work in CRJ training and flight operations.

I sometimes review documents like this for a legal consult. I don't remember if I was involved, if I reviewed or edited or gave any legal advice on this document. It's possible, but I don't have an independent memory of being involved with either reviewing or editing or commenting on this document. I do know clearly that it was reviewed by me at least as early as December 5th.

**Q. So what you're saying is you don't remember if you were consulted back in October, but you did review this document prior to responding to Alan Reinach's Email?**

A. That's true. It would be -- it wouldn't be uncommon for Coy to walk something like this to me and say, Would you look at it; this is a tough one. But I don't know if he did. I don't remember. For me the memory sparks at the start of the Reinach Email, my involvement in this matter.

**Q. Okay. I want to highlight here the phrase**

**"domicile staffing." Did Mr. Bryant talk with you about domicile staffing?**

A. Yes.

**Q. And what did he say about domicile staffing?**

MR. PETERSEN: For clarification, we're talking about that December 5th time frame?

MR. STRINDBERG: Yes. Thank you, Scott.

THE WITNESS: Domicile staffing relates to post-training and line flying employment. And so when me and Mr. Bryant spoke about that, it would have been in relation to what happens after training. Like I said, I didn't write this, but my understanding as I read this is they're communicating to Mr. Cassell that they're talking about scheduling him as a pilot, not in addition to training, but what he's going to encounter over the course of his career. We're not hiring trainees. We're hiring pilots, of course, to go out and fly.

**Q. (By Mr. Strindberg) Did he explain, though, what he meant by domicile staffing?**

A. Well, if your question is did we talk about this document and ask -- did I ask him what he meant by domicile staffing when he wrote it, I don't remember a conversation like that. When we talked

about a reasonable accommodation, what had been done so far for Mr. Cassell and what could be done in the future, we certainly discussed domicile staffing.

**Q. And what in regards to domicile staffing? In other words, how would that affect -- well, did you discuss how domicile staffing might affect someone's ability to avoid working on the sabbath?**

A. We did.

**Q. And what did you and Coy discuss?**

A. I don't have an independent recollection of what we discussed with domicile staffing. But Coy had been with SkyWest for maybe two to three years at that point, and I had been with SkyWest maybe 15, 14 at that point. I wanted to make sure he understood how domicile staffing worked. He's focused, of course, on fixing the training problem, but do we also understand as we divide any kind of accommodation for him that when he hits his first domicile, he will be a reserve with no schedule, typically has to work what other pilots are unwilling or didn't want to work, called in for sick days. And it's going to have an impact certainly on weekends. So having -- making sure that Coy understood, and he did, what happens next with trainees when they enter line flying.

**Q. Is it your understanding that in some domiciles -- I think Mr. Glassey has talked about junior domiciles -- that pilots move up the seniority list more quickly than other domiciles.**

A. How pilots move up the seniority list is independent from which domicile they're at. The concepts are not related.

**Q. I understand. But the bidding for lines with flights is done by domicile, correct?**

A. Correct.

**Q. And in some domiciles I assume that there's more pilots leaving, which would affect your ability to bid a better line, better flights, correct? People above you on the seniority list are leaving their domicile, correct?**

A. Yes.

**Q. And, also, when a domicile is adding a lot of junior pilots with less seniority than you, that would also impact your ability to bid lines, correct?**

A. Yes.

**Q. You didn't discuss that with Coy, though?**

A. I don't recall.

**Q. Let's go -- okay. One other document I want to have you look at. Did Coy show you or did Jake Whicker show you this Email which was between**

**Whicker and Cassell?**

MR. PETERSEN: Which Email? You're not showing us anything, Erik.

MR. STRINDBERG: Ah. Sorry. I forgot.

MR. PETERSEN: By the way, I just want to point out, too, I'm not sure you're identifying by Bates number the items you've shown so for, so I don't know what kind of record we're going to be looking at.

THE WITNESS: We'll start over. Let's just scratch and go back to 10:05.

MR. STRINDBERG: Thank you, Scott, for telling me.

In that regard, the document that I showed to Todd first, which was Alan's Email, Alan Reinach's Email to Coy Bryant dated December 4th, is marked CASSELL 6. We then looked at the form that had -- well, let me just pull it up. We then looked at what was Exhibit 6, which is SkyWest 17 through 19, and that is the Email that Shane wrote along with the request for religious accommodation that he made.

And then we were looking at -- we were talking about the memorandum of agreement for religious accommodation request. We were looking at Exhibit 14, which was SkyWest 21.

Thank you for pointing that out, Scott. It's easy to forget that we're not here in person.
Okay. I've now pulled up the document which is CASSELL 425, and let me go back in my notes here. Scott, do you remember offhand what exhibit number we're up to? I have -- the last one I have was Exhibit 22, which is SkyWest --
MR. PETERSEN: Yeah, I think that's right. I think this would be 23.
MR. STRINDBERG: Okay. So we will mark this exhibit, again, CASSELL 5 -- 4 through 5, as Exhibit 23.
(EXHIBIT 23 WAS IDENTIFIED.)
**Q. (By Mr. Strindberg) Did Mr. Bryant or Mr. Whicker at some point show you this Email chain, which is now Exhibit 23?**
A. At some point, yes.
**Q. Do you recall when?**
A. I do not.
**Q. Was -- was it on or about December 5th, or did you see it at some later point?**
A. I couldn't tell you.
**Q. And is it your understanding that Mr. Cassell was told that if he didn't resign -- that if he didn't show up for the matrix training, that he**

**would be fired?**

A. No, that's not my understanding.

**Q. What is your understanding?**

A. My understanding is that Mr. Whicker explained what happens when a pilot misses a key training event, that typically that pilot has to restart at a different training class maybe weeks or months down the road. It could end up with a termination if they don't come back to class and don't want to be rescheduled. But by missing a key training event, it couldn't be made up in that training footprint but would cause a reboot somewhere down the road.

**Q. Did Mr. Whicker tell you that he had told Mr. Cassell that?**

A. Yes.

**Q. The reason I ask is -- let's look at this. Shane wrote to Jake Whicker on December, and he said:**

**I'm emailing you just to clarify what happened Wednesday afternoon regarding my resignation.**

**And he goes on from there. Do you want to take a moment to read that?**

A. Yeah. Would you give me --

**Q. Yes.**

A. Okay. I've read it.

**Q. Okay. The key -- you know, he -- Mr. Cassell lays out what had occurred, but then he says here:**

**I wanted to clarify with you that if I had, indeed, left at sundown on Friday in the middle of a matrix section, my employment with SkyWest would have been terminated.**

**So he asked Mr. Whicker that, and then Mr. Whicker writes back to him and discusses a number of things, how they had signed this letter regarding the religious accommodation, discusses then how you were assigned to report to and attend the shift that began Friday -- begins tonight Friday, 12/2, at 1600 or 4:00 p.m. and would end at 1800, 6:00 p.m., and how this training is required. It must be completed in its entirety.**

**And then he says here:**

**Had you continued your employment and didn't report to work to complete the assignment, your employment would have been terminated as this is a required job function.**

**Did Mr. Whicker tell you that he had told Mr. Cassell something else, the something else being that if he didn't complete it, he would have to start**

**training again?**

A. My discussion with Mr. Whicker about what happened, he said that Mr. Cassell had come to him and said he was unable to work out a trade with another pilot or use the tools available to him to get out of the Friday evening training and that he didn't understand -- he'd been able to work around it before, but it wasn't working this time; that Mr. Whicker explained to him the importance of being in that class, that it was different than the other event he had circumnavigated and that he needed to be there or it would require him to either restart the training or be terminated, that it couldn't go past that point.

He said that Mr. Cassell was -- it was a quick meeting. He was emotional, maybe upset. It was understandable. This was a deeply held religious belief for him. He had -- it was sort of a rash resignation. He said, Okay, I quit, you know, and -- as an honorable expression of his faith, and that that was the substance of their exchange. It wasn't particularly long, but that he did tell him, If you miss the class, it's going to end your training. You're either going to have to restart or yes, you would be terminated.

**Q. All right. What I'm getting at, though, Todd, you know, this letter from Mr. Whicker -- in Email Mr. Whicker makes no mention of restarting training. It just says "would be terminated." So that's the difference. In other words, you know, between telling someone they would be terminated or giving them the option of starting training at a later date, that's a big difference.**

**Did you -- did you ever ask Mr. Whicker why he hadn't included this option of starting training at a later time in his Email to Mr. Cassell?**

A. Let me correct a little misconception there, Erik. When he says I have included a copy of the termination paperwork, Mr. Cassell had resigned. It's not that we made up our mind and, Here, you're fired. At this point Mr. Cassell had resigned, so Mr. Whicker is giving him a copy of the paperwork that comes along with a resignation and a termination of employment.

So if you're reading this as, we're done talking, you're fired, that's not it. He sent him the form again to continue this discussion with HR, to make that application, and -- and his paperwork that was consistent with that, he resigned a few days earlier.

And so -- and again, my understanding from discussing this with Mr. Whicker is that in their discussion about what would happen on Friday, he did highlight the importance to Mr. Cassell of not missing that class because it would end his -- it would end his training at this point. We couldn't go on without him, or he couldn't go out without us. So he'd have to either reboot or resign.

And I believe the resignation was the way to make it back to another class in the future, so he wasn't terminated for cause or for insubordination, but that he was eligible for rehire and could come back and try again if the schedule was better for him. That was my understanding from talking with Mr. Whicker.

**Q. Okay. So that's what Mr. Whicker told you that he had said to Mr. Cassell?**

A. Yes. The reason my mind goes there, Erik, is the resignation is his lifeboat to another class in the future, which was part of their discussion. The termination for insubordination, he would never be rehired or have a chance, likely, to work at SkyWest again; but this discussion of, well, you could resign and work in the future -- he was allowed to resign. I'll put it to you that way. In

Mr. Whicker's mind, that gave him the opportunity to try again in the future when they could work out another training footprint or scheduling footprint with him. That was the substance of our discussion.

**Q. But did Mr. Whicker tell Mr. Cassell what was in his mind regarding starting another training session?**

MR. PETERSEN: Objection. Speculation. Lacks foundation.

Go ahead.

THE WITNESS: I don't know.

**Q. (By Mr. Strindberg) And you said something -- did I understand this correctly, that Mr. Whicker indicated to you that he had told Shane that he could continue talking with employee relations about an accommodation?**

A. It was my understanding from talking to Mr. Whicker that he was hesitant to do this process without HR's involvement and that he had either asked Shane to reach back out to Coy or Whicker had reached out to Coy Bryant. But there was a discussion of -- I know Mr. Whicker was hesitant to simply end the training or terminate without getting involvement from HR. He -- he knew he was stuck with a situation he didn't have the training or background to resolve

on his own.

**Q. Did either Mr. Whicker or Mr. Bryant tell you that the two of them had talked on this right at the beginning of December about Mr. Cassell and the training issue?**

A. When Mr. Bryant briefed me on December 5th about the Shane Cassell matter, he told me he had been working closely with Jake Whicker and had consulted with him the week of the resignation.

**Q. Did he tell you what he and Mr. Whicker had talked about?**

A. Probably.

**Q. Do you recall what he told you that he and Mr. Whicker had talked about?**

A. Not today. Not at this point.

**Q. Is there anything that would refresh your recollection?**

A. Nothing comes to mind.

**Q. Did you ever ask -- the issue here, this matrix training that started at 4:00 p.m. and ended at 6:00 p.m, at that time of year, sundown is approximately at 5:00 p.m.**

**Did you ever ask Mr. Whicker if it would have been possible to move up the matrix training by an hour so that it started at 3:00 p.m. instead of at**

**4:00 p.m.?**

A. I don't recall.

**Q. These computers that this matrix training is done on, the facility where those computers are located, is that owned by SkyWest?**

A. The facility is owned by SkyWest, yes.

**Q. And does SkyWest control the scheduling for the matrix training?**

A. I don't know.

**Q. And where is that facility located, Todd?**

A. Salt Lake City, Utah, at the Salt Lake International Airport.

**Q. And is it still located there?**

A. Yes.

**Q. And do you know if the computers belong to SkyWest, the computers on which this matrix training is done?**

A. These training devices are extremely expensive, and I know that we own some and we lease some. And we lease from third parties and sometimes have to share with other carriers. I don't know if the matrix device falls into that category as other simulators do, but they can be tens of millions of dollars and thousands of dollars an hour to operate or lease. So whether we have sole control over

scheduling these devices or not I couldn't tell you, particularly in December of 2016, as I sit here today.

**Q. Okay. And who would be the best person to ask those type of questions to?**

A. David Moxham.

**Q. Who is David Moxham?**

A. He is the director of training for flight operations.

**Q. How is his last name spelled?**

A. M-o-x-h-a-m.

**Q. And where is he -- where does he work out of?**

A. I believe he resides in Denver, Colorado, and he's principally stationed at our Denver training facility, although he spends a good deal of time at the Salt Lake training facility.

**Q. Okay. So we started out -- I had shown you the Email from Alan Reinach to Coy Bryant that started this discussion, which is Cassell 6. Why don't we mark that as Exhibit 24.**

(EXHIBIT 24 WAS IDENTIFIED.)

MR. STRINDBERG: And, Scott, you and I, I think at some point next week, will need to probably sit and make sure we have all the exhibits properly

marked and identified, since --

MR. PETERSEN: Okay.

MR. STRINDBERG: -- it's been a little chaotic.

**Q. (By Mr. Strindberg) And if at any point you need a break, Todd, just tell me.**

MR. PETERSEN: I'm having a sinus headache or something, so I want to go take some drugs if I can at some point, so in the next 15 or 10.

MR. STRINDBERG: Let's take a break until eleven o'clock. Is that okay?

MR. PETERSEN: That's okay.

THE WITNESS: If my counsel needs drugs, can I switch to another lawyer, Erik? Will you allow?

(Laughter.)

(Recess from 10:52 a.m. to 11:09 a.m.)

MR. STRINDBERG: Okay. Let's go back on the record.

**Q. (By Mr. Strindberg) Okay. So we were -- we had started all this -- we were looking at -- and I will share the screen -- what's now been marked as Exhibit 24, CASSELL 006. Todd, you told us about the conversation you had with Coy Bryant; then you told us about a conversation you believe you had with Jake**

**Whicker on the phone. Have you told us everything that you can recall about your conversation with Jake Whicker?**

A. Yes.

**Q. Okay. I'm going to show you a document. It's a letter -- appears to be a letter dated December 8th, 2016. It's CASSELL 007 through 008. Let's designate that as Exhibit 25.**

(EXHIBIT 25 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) Todd, is this a letter that you authored? Is that your signature on the second page?**

A. I authored it, and that is my signature.

**Q. Prior to sending this letter, which is dated December 8th, 2016, to Alan Reinach, did you talk with anyone else besides Coy Bryant and Jake Whicker about Mr. Cassell?**

A. Yes.

**Q. Who else did you speak with?**

A. Sarah Wimberly.

**Q. And who is Sarah Wimberly? In other words, what position does she hold?**

A. She's a lawyer.

**Q. Is she employed by SkyWest?**

A. No.

**Q. Do you know who she's employed by?**
A. The law firm of Ford & Harrison.
**Q. And where are they located?**
A. Several offices across the country. She's in Atlanta.
**Q. What was the purpose for speaking with Sarah Wimberly?**
A. I was seeking her legal counsel.
**Q. You don't care, I imagine, to tell us what you and she discussed, do you?**
MR. PETERSEN: I direct you not to answer on the basis of attorney-client privilege.
**Q. (By Mr. Strindberg) Besides Coy Bryant, Jake Whicker, and Sarah Wimberly, did you speak with anyone else about Mr. Cassell and his request for an accommodation prior to sending this letter to Alan Reinach, "this letter" being Exhibit 25?**
A. I have no memory of speaking to anybody else.
**Q. In this letter you talk about the robust seniority system. I have that highlighted. What is your understanding of who developed the seniority system and when it started?**
A. My understanding is the pilot seniority system at SkyWest, it predates me, so it began in the

late '70s, early '80s as a way to schedule the pilots. I couldn't give you an exact date.

**Q. And so we're clear, there's this pilot association called SAPA?**

A. Yes.

**Q. SAPA does not have a collective bargaining agreement with SkyWest?**

A. It does. SkyWest and SAPA are subject to the collective bargaining agreement.

**Q. And have you produced that document to us?**

A. I don't know.

**Q. What is that document called?**

A. The Pilot Policy Manual, PPM.

**Q. So you believe that the Pilot Policy Manual is a collective bargaining agreement?**

A. Yes. Let me amend my answer. I know you have reviewed parts of our collective bargaining agreement with Mr. Glassey and Mr. Spagnolo; so I don't know if the entire thing has been produced, but you certainly have portions of it.

MR. PETERSEN: We have produced it.

MR. STRINDBERG: Right. I don't think there's any question there.

**Q. (By Mr. Strindberg) So it's your opinion that the Pilot Policy Manual is a collective**

**bargaining agreement?**
A. Yes.
MR. PETERSEN: Hold on. Objection. Calls for a legal conclusion.
Go ahead.
THE WITNESS: Same answer.
**Q. (By Mr. Strindberg) And let me explore that. Can SkyWest make changes to that collective bargaining agreement unilaterally?**
A. No.
**Q. To that policy manual unilaterally?**
A. No.
**Q. What is the process that SkyWest has to go through to make changes to that Pilot Policy Manual?**
A. Anytime management or the pilot group wish to alter one of the terms and conditions found in the collective bargaining agreement, one side or the other will call for a meeting. It's generally between the president of SAPA and his board and the members of management to oversee that policy issue, and they will bargain and negotiate for a change to the contract. It is not closed. It's open and amendable and can be changed at any time if the parties agree.
**Q. And what happens if the parties don't**

**agree on the change?**

A. Then there's no change.

**Q. Is SAPA recognized by any governmental agencies as a union representing pilots?**

MR. PETERSEN: Hold on.

Objection. Calls for a legal conclusion.

Go ahead.

THE WITNESS: What do you mean by governmental agency?

**Q. (By Mr. Strindberg) Well, any agency associated with either the federal government or the state government. Does anyone recognize SAPA as an independent union?**

MR. PETERSEN: Same objections.

THE WITNESS: You mean agency in the executive branch of the federal government?

**Q. (By Mr. Strindberg) Any branch of the federal government.**

A. I'm not aware of any agency recognizing SAPA as a union, no.

**Q. Let me show you another document, Todd. This is the Pilot Policy Manual or portions thereof, and I will designate -- it starts at SkyWest 389. And it's not continuous, but I will designate this as Exhibit 26.**

MR. PETERSEN: Hey, Erik, do you want to designate the entire manual as Exhibit 26 so that when we refer to it we can just refer to the pages?
MR. STRINDBERG: I was just going to suggest that. I don't have all the pages here, but let's agree that we will --
MR. PETERSEN: I do. Just let me -- just give me a second. Keep going, and I'll pipe in in a minute.
MR. STRINDBERG: Okay.
**Q. (By Mr. Strindberg) Todd, one other question about this policy manual. You said that if there was going to be a change, SkyWest would meet with the -- usually with the president of SAPA.**
**Who is the president of SAPA currently?**
A. Currently it is Aric Arnold. He spells it A-r-i-c.
**Q. I was thinking you were spelling Arnold there for a moment.**
**Okay. And do you know how long Aric Arnold has been president?**
A. I would estimate four years.
**Q. If you know, is the president of SAPA elected?**
A. Yes.

**Q. So you had said earlier that if SkyWest wanted to make a change in the policy manual that it would meet generally with the president of SAPA. Did I understand you correctly?**
A. Yes.
**Q. And if, say, the parties, you and Mr. Arnold, agree on some change, does that change get voted on by the members of SAPA?**
A. Sometimes.
**Q. When would it be voted on by members and when wouldn't it be voted on?**
MR. PETERSEN: Objection. Calls for a legal conclusion.
Go ahead.
THE WITNESS: My understanding is that SAPA has empowered its president and executive board to negotiate on its behalf and enter into agreements on certain policies which do not require an entire membership vote to ratify. However, anytime we negotiate pay and compensation, any change to the pilot pay package is put out to the pilot group for a ratifying vote.
**Q. (By Mr. Strindberg) The pay scale, though, is not contained in the Pilot Policy Manual, is it?**

A. I believe that it is.
**Q. Okay. So you believe that pay issues are voted on, but other changes to the Pilot Policy Manual are not subject to a vote by the membership?**
A. Erik, I don't know where SAPA draws the line between what it decides to put out to a pilot vote versus what it negotiates or is empowered to negotiate without a pilot ratification. I can tell you that issues of compensation always go out to a pilot vote, and they're sometimes bundled with other policy changes.
But I also know that the president of SAPA can -- he's authorized to sign a policy change on behalf of SAPA. Say it's three words in a paragraph that get changed. I have seen it where the president of SAPA has signed on behalf of the membership without asking 5,000 pilots to vote on a three-word policy change.
Does that make sense?
**Q. Yes. Thank you for the clarification.**
**Do all of the pilots at SkyWest belong to SAPA?**
A. Yes.
**Q. When you become a pilot at SAPA [sic], are you automatically enrolled as a member of SAPA?**

A. When you become a pilot at SkyWest, you are automatically a member of SAPA, yes.
**Q. And do the pilots pay dues to SAPA?**
A. They do not.
**Q. Who funds SAPA? In other words, like, I assume the president gets some money or some compensation for being president. Who pays for that?**
A. The president of SAPA's compensation is paid for by SkyWest Airlines.
**Q. And the president of SAPA, does he have duties other than being president of SAPA?**
A. The president of SAPA is a captain who is licensed and qualified to operate his aircraft and will fly from time to time to remain current on that aircraft and is compensated for line and revenue flying. But the majority of his time is spent doing SAPA business, so it is a hybrid of line flying pay and compensation for his full-time work at SAPA.
Does that make sense?
**Q. Yes. I missed a word you said. Is -- predominantly his time is spent on SAPA business? Is that what you were saying? You broke up there.**
A. Yes.
**Q. Are there any other members of the executive team of SAPA who also devote a predominant**

**amount of their time to SAPA business?**
A. I don't know.
**Q. The other people on the executive team or executive board at SAPA, are they also paid by SkyWest?**
A. Yes.
**Q. If SAPA feels that there's -- that SkyWest has violated the Pilot Policy Manual, does it have a right to file a grievance over that violation?**
A. Yes.
**Q. And who does that grievance get filed with?**
A. The vice president of flight operations.
**Q. And the vice president of flight operations, is that Mr. Glassey?**
A. No.
**Q. Who is that?**
A. Tracy Gallo.
**Q. Is that a man or a woman?**
A. That's a man.
**Q. And if SAPA does not like a decision that Tracy Gallo makes, does it have a right to go to arbitration, which would involve a hearing before a neutral hearing officer?**
A. We have not negotiated an arbitration

provision with SAPA in our CBA.

**Q. So the answer, then, is no, they cannot go to arbitration over a decision of Tracy Gallo's?**

A. It could. SkyWest would have to agree to arbitrate. There is no arbitration right found in the CBA.

**Q. Okay. Thank you.**

**Do the pilots at SkyWest have the right to strike if they're not satisfied with, say, the wage scale that's being offered?**

A. Yes.

MR. PETERSEN: Objection. Calls for a legal conclusion.

Go ahead.

**Q. (By Mr. Strindberg) I didn't hear your answer, Todd.**

A. Yes.

**Q. And has that ever occurred?**

A. Not to my knowledge.

**Q. And what would SkyWest do if its pilots went on strike? Would it fire them?**

MR. PETERSEN: Objection. Calls for a legal conclusion, speculation, and to the extent it involves attorney-client privilege.

MR. STRINDBERG: I didn't hear you, Scott.

MR. PETERSEN: Can you hear me?
MR. STRINDBERG: Yeah. I heard your objection, but there was something you added on --
MR. PETERSEN: Yeah. I just -- and to the extent it calls for attorney-client privilege. Are you saying whether they have the right to fire or whether that's a business decision that SkyWest would make? The first may be a legal conclusion, but it's not attorney-client. The second is.
MR. STRINDBERG: So are you instructing him not to answer?
MR. PETERSEN: Well, I want a clarification on your question before I instruct him. Are you suggesting in theory they have a right to fire them if they strike? Or are you saying would they, in fact, fire them if they strike?
MR. STRINDBERG: Well, I'm sort of asking both.
MR. PETERSEN: All right. Well, if I don't get clarification, I'm going to claim that it calls for attorney-client privilege and instruct Mr. Emerson not to answer.
MR. STRINDBERG: And you believe it's attorney-client privilege about whether they would fire a pilot who went on strike; is that correct?

MR. PETERSEN: Yeah. You're asking their legal counsel whether the company would fire its employees if they strike, and that's a legal -- that's asking him what his legal opinion would be about it.

**Q. (By Mr. Strindberg) Okay. Does the company have any policies regarding how it will deal with pilots that go on strike, any written policies?**

A. I don't know. It's possible.

**Q. But you're not aware of them, sitting there?**

A. I would have to do some research.

**Q. Okay.**

MR. PETERSEN: As a side note, before you move on, the Bates numbers for the Pilot Policy Manual are SkyWest 389 to SkyWest 586.

MR. STRINDBERG: Okay. And we'll make that -- when we get all of our exhibits together, we'll make that Exhibit 26; is that correct?

MR. PETERSEN: Yeah.

MR. STRINDBERG: Okay.

(EXHIBIT 26 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) Todd, I'm going to have you look in a second at part of that manual, policy manual. It's -- SkyWest 529 is the page**

**number. Let me share that with you. Okay. And it is titled "Seniority Standard Practice 3021."**

**Are you familiar with that provision in the policy manual?**

A. I am.

**Q. I want to draw your attention to Section 1A(3) and specifically this line which I've highlighted which reads:**

**Except as otherwise provided in this policy manual, seniority will govern all pilots in the case of upgrade, displacement, filling of vacancies, furlough, recall, or assignment due to expansion or reduction in schedule -- schedules.**

**There's no mention made there of seniority governing regarding bidding. Is there some provision somewhere in this manual that you're aware of in which it says that seniority shall govern in regards to bidding? I ask that because I could not find any such provision, Todd.**

A. Assignment due to expansion or reduction in schedules refers to the flight assignments that pilots receive every month. If the schedules -- let me just say this covers bidding, but I'm not aware -- I could do some research and look; but if you're

asking whether the word "bidding" appears in the Pilot Policy Manual, it's a huge document and I'd need to do some research.

**Q. So I understand your answer, you believe this last bit here that -- this last phrase, "assignment due to expansion or reduction in schedules," it's your opinion that that covers bidding rights? Is that what you were telling me?**

A. Among many things, one of the things that would fall under that would be pilot bidding for their schedules, yes.

**Q. All right. But you're not aware offhand of any specific language which says seniority will govern in the case of bidding?**

A. Not off the top of my head, no.

**Q. Okay. And let's go back to Exhibit 25, which is your letter dated December 8th. It says here -- let me highlight it here. This whole paragraph or sentence there, sentence fragment.**

**...over the course of his first few years of employment, when Mr. Cassell has low seniority, he will absolutely and unavoidably be required to work on Saturday and other holidays.**

**What was the factual basis for you saying that, Todd?**

A. There are two or three bases. First one, over the course of my employment at SkyWest, I've had occasion to interact with pilots as they wished to negotiate different terms of their collective bargaining agreement and improve their quality of life; and a constant refrain from new hire pilots is that it is next to impossible to get a weekend or a holiday off.

So a new pilot will say, I've never seen my son play soccer. He plays soccer every Saturday, and I've missed nine of his last ten games. How do we fix that? Or a pilot say, I haven't opened presents with my children on Christmas in two years. How do we fix that?

And as we analyze certain fixes, it all comes back to the seniority-based bidding system and the marketplace for shifts and schedules that these pilots compete for. The only way really to address that problem that new hire pilots face is to renegotiate seniority and status, which SAPA has never been willing to do as a group. That's the first basis.

The second basis is speaking to a crew scheduler by the name of Jay Oyler about this problem and having Jay walk me through the difficulties of a

new hire pilot on reserve avoiding weekend and holiday work.

**Q. And did you -- Okay. That's two. Any other bases for that statement?**

A. The third one would be speaking to Roy Glassey about the same subject.

**Q. Any other basis for that statement that he would absolutely and unavoidably be required to work on Saturdays and other holidays?**

A. That's all that comes to mind.

**Q. You said you -- in response to junior pilots complaining about working on Saturdays or weekends and holidays, you analyzed certain fixes. What types of fixes were you looking at?**

A. Those fixes would involve moving away from scheduling, compensating, rewarding pilots based on their seniority and moving to a merit or some other system of incentives where a junior pilot would be as -- as easy to get a Saturday off as a more senior pilot.

But, again, as I said, that would take sacrificing seniority, which is a sacred cow in the industry, and certainly to the pilot group. They much prefer to be compensated and scheduled and rewarded based on their seniority more than any other

factor. So reducing or eliminating a pilot's seniority has typically been a non-starter in any negotiation.

**Q. And who has told you that the seniority -- pilot seniority is a sacred cow? Has someone said that to you or something like that, or is that something you've picked up in the course of your interactions with pilots?**

A. "Sacred cow" is my term.

**Q. All right. But has someone said to you something similar along those lines, that seniority is super important to the pilots?**

A. Yes.

**Q. And who has said that to you?**

A. Current and past presidents of SAPA, as well as members of management who have engaged in these discussions before and found them very difficult to alter or change.

**Q. Has SkyWest tried to change the seniority system or how it worked?**

A. Yes.

**Q. On how many occasions?**

A. I couldn't tell you. It comes up from time to time at contract negotiations. It usually doesn't get very far.

**Q. And when you say "contract negotiations," you mean negotiations regarding the pay scale; is that correct?**

A. Pay scale and work rules and quality of life issues for the pilots, yes.

**Q. When did your discussion with Jay Oyler regarding this issue of working on Saturdays and holidays come up?**

A. I had multiple discussions with Mr. Oyler on this subject. The first one would have been the week of December 5 --

**Q. So we talked --**

A. -- briefly, and then extensively throughout the month of December and January.

**Q. So what did you and Jay talk about during the week of December 5th in regard to schedule issues?**

A. We talked about how pilot seniority works in relation to scheduling, particularly for a new hire pilot.

**Q. Do you recall any other specifics of that conversation?**

A. I was dialed in on Mr. Cassell's concern, so I was asking Mr. Oyler to teach me about how pilots are scheduled, how they bid, what the

preferences are and if it was possible for a new hire pilot to bid-avoid sabbath work with success over the long haul.

**Q. Did you ever talk, as you recall -- and I can pull it up if you want, the memorandum that you thought Coy Bryant prepared. This was a discussion of tools or reasonable accommodations, including dropping flights, swapping, trading, things like that.**

**Did you have any discussions with Jay Oyler about whether a new hire might avoid working on the sabbath using those tools or what you referred to as reasonable accommodations that were offered to Shane?**

A. Yes.

**Q. And when did you have that discussion with Mr. Oyler?**

A. Multiple discussions with Mr. Oyler that would have commenced the week of December 5 and --

**Q. Go ahead.**

A. -- and through February of 2017.

**Q. Can you separate those discussions out, or do they blend together?**

A. That has been my labor all day, Erik. I've tried very hard to -- I've seen all of the

documents, of course, and I'm trying to parse in my mind specific conversations and first times that I've seen things. So I can only tell you that I spoke to Jay Oyler prior to writing my December 8th letter about the ability of a pilot to successfully avoid Saturday assignments during their first year or so until they had enough seniority to use their tools more effectively.

Now, I already understood all the tools just from working here for 14 years. Asking him what a bid-avoid is or a swap or a trade, that I already had foundational knowledge of. We discussed probabilities and likelihoods if -- of avoiding a sabbath assignment for a new hire pilot in the first 12 months. I didn't have those answers, and I needed his expertise to help.

**Q. And what did Mr. Oyler tell you, did he say to you?**

A. It was his opinion it would be impossible for a new hire pilot to avoid weekend or holiday work completely, guaranteed, never get stuck with one of those assignments. He viewed that as an impossibility within the first 12 months.

**Q. And that was his opinion, I gather, is what you're telling us?**

A. Yes.

**Q. And that -- these discussions included using not only the bid process but these other tools or reasonable accommodations you talked about, such as dropping flights, posting them on the board, trades, swaps, those types of things?**

A. Yes.

**Q. Did you specifically talk about those other tools with Mr. Oyler?**

A. I don't know if we spoke about each tool separately or said taking all the tools at a pilot's disposal in their first year. The conversation, I believe, at least from my side, was, Jay, if a pilot makes their only choice, only preference to avoid Saturday, that is the only thing they care about, using all the tools at their disposal, could they avoid Saturday work? And his response was no.

**Q. What position did Jay have at the time?**

A. He had the same position that Steve Spagnolo occupies now, which I believe is the manager of crew support scheduling.

**Q. And is Jay still with SkyWest?**

A. No. He left, and Steve-O took his position.

**Q. Do you know why Jay left?**

A. I don't know why.
**Q. Do you know where he's currently working, if he's working?**
A. I believe Jay is at another airline. I don't know which one.
**Q. How is his last name said?**
A. O-y-l-e-r.
**Q. I assume at the time you were talking with him in early 2017 -- or late 2016 or early 2017, he was living in St. George. Is that correct?**
A. I don't know where Jay lived, but he worked at headquarters in St. George.
**Q. Do you know where he lives now?**
A. I do not.
**Q. Did you -- during this period of time -- and I gather you're using the December through early February time period because you wrote this letter on December 8th, and as we'll look later in your mass communications to and from Alan Reinach were about February, early February, February 6th. Is that correct? Do you remember that?**
A. That's right. In mid-February we -- Mr. Reinach and I met at a mediation the following year and had verbal communications, but I don't recall any other written communication with

Mr. Reinach after February of 2017.

**Q. Did you during that period of time make any effort to determine if there were any other Seventh-Day Adventists who were working for SkyWest?**

A. No.

**Q. Have you ever tried to determine if there were other Seventh-Day Adventists working for SkyWest, whether they were able to avoid working on the sabbath?**

A. No.

**Q. And let me broaden that, because there's obviously some other religious groups, I'm thinking of religious Orthodox Jews, who would not work on the sabbath, either. Have you ever tried to find out if you have any Jewish pilots who observe the sabbath who work for SkyWest?**

A. Your question is have I tried to find out. Certainly they've come to my attention over time, but we don't have a database where we track employees by religion. I would have no way of knowing how many or whether any particular employee was a Seventh-Day Adventist unless they self-identified as such. So I am aware that we have Orthodox Jewish employees as well as Seventh-Day Adventists as that is brought to my attention through their self-identification.

**Q. And are any of these Orthodox Jews pilots?**
A. Yes.
**Q. And do they observe the sabbath?**
MR. PETERSEN: Objection. Speculation.
Go ahead.
THE WITNESS: I know of one orthodox SkyWest pilot who observed the sabbath. I don't know if all the other Orthodox Jewish pilots that work for us observe the sabbath or not.
**Q. (By Mr. Strindberg) And when did this -- this Orthodox Jewish pilot you've referred to who observes the sabbath, when did he or she start working for SkyWest?**
A. I don't know.
**Q. And what is that person's name?**
A. I don't know.
**Q. And do you know whether or not this one Orthodox Jewish pilot was able to avoid working on the sabbath by using these various tools you've identified?**
A. He was not.
**Q. And how do you know that?**
A. I was told that by Roy Glassey.
**Q. And when did Roy Glassey tell you that?**
A. I don't remember the first time, but it

was recently brought to my attention in preparation for my deposition and his.

**Q. You said you're also aware that there are some Seventh-Day Adventist pilots working for SkyWest?**

A. Yes.

**Q. And how did you learn that?**

A. I believe through Mr. Reinach during the course of discovery this week.

**Q. And when did Mr. Reinach tell you that there were Seventh-Day Adventist pilots working for SkyWest?**

A. During the course of the mediation.

**Q. And did you ever attempt to determine who those pilots were and ask them if they were able to avoid working on the sabbath?**

A. I don't know how to answer. Let me just say I'm hesitant, because all of this happens in a mediation, Erik. I don't know if I'm legally able to disclose the conversations that were had at that mediation and the names that were offered and how -- I simply don't know, and I don't want to violate the terms of the mediation agreement.

But I can generally tell you that Mr. Reinach gave the names of some Seventh-Day

Adventists who were successful pilots at other flying operations and said some had attempted to apply at SkyWest and not made it very far.

And then you also have Mr. Emerson, Seventh-Day Adventists actually working for you now, whether you know it or not. He didn't give me their names I think out of -- I don't know why, some caution. And the discussion -- and I don't know --

Scott, I don't know, like, designate this part? I mean, I'm talking to you.

MR. PETERSEN: Well, let me just -- let me just --

THE WITNESS: I mean, we're talking among the parties, everybody --

MR. PETERSEN: Hold on a second, Todd.

So I wasn't at the mediation, Erik. My understanding is, though, that it was -- it was agreed to be confidential. And so, you know, I didn't -- I haven't looked at any kind of signed confidentiality statement there. We're not in a position to want to unilaterally breach confidentiality at that mediation, so I -- I mean, I'll put the ball in your court, Erik, as far as that goes, because I wasn't there. But I did ask if the mediation -- if Todd's understanding of the mediation

was it was confidential, and the answer is yes, so we're not inclined to disclose what was confidential in that mediation.

MR. STRINDBERG: I'm not really asking what happened at the mediation or what was said at the mediation. I'm more asking if, based on what he learned at the mediation, Todd then contacted Seventh-Day Adventist pilots to see if they were able to avoid working on the sabbath.

MR. PETERSEN: Well, that's a different set of questions than what I heard. I heard you asking him what these conversations with Mr. Reinach were on, whether those pilots existed and then their names. And if those were disclosed to him in the mediation, I would instruct him not to answer them based on confidentiality.

If the answer is after the mediation you looked up certain pilots to see if they were able to avoid Saturday work, I think that's a fair question, generally, but not if it requires him to disclose the names and those names were somehow disclosed during the mediation.

So maybe -- I mean, what you're saying to me now, Erik, is a little different than my understanding of what your line of questions were.

MR. STRINDBERG: Right.

MR. McFARLAND: This is Todd. And maybe I'm just being particularly dense. I mean, I agree that mediations are generally confidential, but that's usually with the same people that were involved. I mean, even though it's different people, I mean, neither Erik nor I nor you, Scott, were there. We all represent the same people, so I don't see how -- I agree it's confidential, but I don't see how discussing it in this would violate confidentiality. We may have to mark part of this deposition as being confidential, but maybe I'm missing something.

MR. PETERSEN: Well, I wasn't counsel for SkyWest in the mediation, so if he discloses it to me and then I'm aware -- we haven't designated this deposition to be confidential, so if it were used in a motion or at a hearing, it would not be confidential at that point. I'm just trying to avoid any allegation that we somehow are disclosing outside of the confines of that mediation any information that we agreed at the time to be confidential.

MR. STRINDBERG: My understanding of the confidentiality in mediation is somewhat different. I mean, you know, obviously you can't disclose, you

know, or use, say, at trial something -- say, Yes, SkyWest offered us money in the mediation to settle this. I mean, that would clearly be -- something like that would be inappropriate, not just based on the confidentiality in mediation. But discussing a name or names that came up, I don't see how that would be prohibited. But let me ask --

THE WITNESS: Can I just -- can we take a break and let me consult with my counsel? I'm concerned about breaking an agreement, and I don't want to do that for my own personal liability. So --

**Q. (By Mr. Strindberg) Let me ask one -- let me ask a foundation question. This was a mediation with Mr. Cassell and his attorney?**

A. Mr. Cassell was present along with Alan Reinach and a mediator I believe from the Equal Opportunity Employment Commission.

MR. PETERSEN: And I just want to point out that usually in those -- and I'm not talking about a legal confidentially, it's that the parties agree; they sign a document. And the mediator for both EEOC and UALE generally say to the parties, Everybody knows that the discussions and conversations had are confidential so that you could be free to say what you think. And I have always

interpreted that -- and I couldn't repeat any of the language of the little signature you do, but you do sign something. And I've always interpreted that as it means, look, if I say stuff to you that would -- maybe isn't involving the amount we're offering or the amount you want to accept or you're demanding, but all the discussions about the facts of the case given in that mediation are kept confidential. That's my understanding.

But I haven't -- you know, I've looked at that document. I just don't want SkyWest to breach an agreement it made with the EEOC and your client. And since I wasn't there, I mean, the disclosure to me is not -- is outside the confines of that mediation, is kind of what -- I just want to be careful.

MR. STRINDBERG: Right. And I'm not so much interested in names. I mean, if I were to ask Mr. Emerson if he was given the names of any SkyWest pilots at that mediation, Seventh-Day Adventist pilots, and did he subsequently try to contact them to determine if they were able to avoid working on the sabbath, would you object to that?

MR. PETERSEN: In those subsequent conversations he would be -- you'd be asking him to

disclose the names of those people? Let me talk to Todd, and then let's get back to you. Because I want to get more information about the confidentiality.

MR. STRINDBERG: Okay. Let's take a two-minute break.

MR. PETERSEN: Okay.

(Recess from 12:02 p.m. to 12:19 p.m.)

MR. PETERSEN: So, Erik, I've got a couple of things. SkyWest is willing to talk about the mediation, but only if both parties on the record agree to waive confidentiality. And that's a concern to us as a bigger picture thing.

But I also am not convinced that -- I think your line of questions, -- I don't know that you need to go there, because your line of questions can be taken along with just the communications that we all know in the record are back and forth between Mr. Reinach and Todd.

MR. STRINDBERG: Right.

MR. PETERSEN: Does that make sense?

MR. STRINDBERG: Yeah, I agree. We sort of got off in this tangent because your client first said that he didn't know about any Seventh-Day Adventist pilots because they don't keep records of it, but then he mentioned that he learned the names

of some at this mediation. That's the only reason we got there. I just want to know if he's talked with any Seventh-Day Adventist pilots working for SkyWest and, if so, whether they've been able to avoid working on the sabbath. I don't really care --

MR. PETERSEN: Yeah. I mean, we would prefer -- let's not do anything about the mediation and instead just ask the questions I think directly --

MR. STRINDBERG: One second, Scott. Let me have a few minutes. Alan just called me. Hold on.

MR. PETERSEN: Okay.

(Recess from 12:20 p.m. to 12:24 p.m.)

MR. STRINDBERG: Okay. Let's go back on the record.

Todd Emerson, you're muted.

**Q. (By Mr. Strindberg) Okay. Let's try to avoid this whole mediation issue. Todd, have you ever talked with any Seventh-Day Adventist pilot working for SkyWest and asked them if they were able to avoid working on the sabbath?**

A. No.

**Q. You had mentioned that there was an Orthodox Jewish pilot. Have you talked with that**

**person?**

A. No.

**Q. You got the information about that pilot from Mr. Glassey, you said?**

A. He refreshed my recollection, yes.

**Q. So you -- when you say he refreshed your recollection, you had talked with this pilot at some point, the Orthodox Jewish pilot?**

A. I have never spoken to the Orthodox Jewish pilot. In the course of my responsibilities, legal puzzles like this will come up from time to time in over 17 years. That one was rattling around in the back of my brain, and Mr. Glassey reminded me of the time that an Orthodox Jewish pilot requested a sabbath exemption and how we dealt with it.

**Q. How did you deal with it?**

A. The same way.

MR. PETERSEN: Whoa, whoa, whoa. If the question is how did SkyWest deal with it, that's fine.

MR. STRINDBERG: Yeah.

MR. PETERSEN: If it's how you dealt with it, Todd, then don't answer that.

So what's the -- is that SkyWest --

**Q. (By Mr. Strindberg) How did SkyWest**

**address that request?**

MR. PETERSEN: Go ahead.

THE WITNESS: It is my understanding that we engaged in the interactive process with this pilot who ran into conflicts with sabbath observance. He was offered the preferential bidding system and its various tools as an accommodation. He understood that -- or came to the belief that that accommodation would not guarantee him a sabbath-free schedule and chose to resign.

**Q. (By Mr. Strindberg) Did he -- did he resign before he actually started flying for SkyWest?**

A. It is my understanding that he was flying for SkyWest and at some point received -- Erik, I think, if I remember correctly, he became observant sometime over the course of being a pilot. Let me make sure I've got that right. So I believe he trained and was flying without being sabbath observant, and then there was a renaissance or conversion of faith where it became important to him to have the sabbath free. And then we couldn't work it out, and he resigned.

**Q. Okay. Thank you. Well, that was a long detour for no apparent reason, but that's how it goes.**

**Todd, I'm going to go back to your letter of December 8th. You mention here:**

**He will absolutely and unavoidably be required to work on Saturdays and other holidays.**

**I gather from this that the more senior pilots who want holidays off often seek to have holidays off. Is that correct?**

A. That has been my experience, yes.

**Q. Does SkyWest have any difficulty in filling flights that occur on holidays?**

A. Yes.

**Q. And how does SkyWest address that issue?**

A. There's a combination of factors that come into play with a very popular holiday, we'll say Christmas. So a bid will go out. Somebody low seniority will end up with a Christmas trip on their schedule. They will try to add, drop, swap, or get rid of it and cannot. They -- they become suddenly ill on Christmas Eve, and reserve is then pulled up to handle that trip so that we are able to cover the flight.

So between a combination of having extra reserves available around the holidays and emphasizing the importance of pilot reliability, we

do get those holidays covered. But the difficulty is there. It's just incredibly important to a lot of people, and they'll do everything possible to avoid working them, which means sometimes dipping into our reserves who will end up flying on that holiday.

**Q. We were talking about the -- your statement here that you absolutely and unavoidably would be required work on Saturdays and other holidays, and you said you talked with Jay Oyler and Roy Glassey.**

**Tell me about the discussions you had with Roy Glassey which led you to believe that Mr. Cassell would absolutely and unavoidably be required to work on Saturdays?**

A. The conversation with both gentlemen was informational for me. I'm not a crew scheduler and I'm not a chief pilot, so I don't really know how it works unless somebody teaches me. So the point of speaking to Mr. Glassey as a chief pilot who runs a domicile and seen it work in action, and then Mr. Oyler, who had actually been tasked with assembling the schedules and filling in reserves when somebody didn't make it, was to answer my question about whether or not a Seventh-Day Adventist could successfully avoid Saturday work. So I talked to

both of them because they had different perspectives.

**Q. And did Mr. Glassey say anything different than Mr. Oyler had said to you?**

A. No. He said from his experience as a chief pilot it would be incredibly difficult to impossible for a new hire pilot to not work a Saturday sabbath over the course of his first year.

**Q. Did either of them know whether or not there had ever been a pilot with SkyWest who had attempted to avoid working on the sabbath?**

A. Yes. I believe Mr. Glassey was the chief who dealt with the Orthodox Jewish pilot --

**Q. Okay.**

A. -- who was attempting to do that.

**Q. Was there ever any discussion around this time, this December to February time frame that we've been talking about, any discussion with either Mr. Oyler or Mr. Glassey or anything about, say, allowing Mr. Cassell not to work on Saturdays in exchange for him being required to work on some of these holidays which SkyWest has trouble filling?**

A. I don't recall.

**Q. So when you say you don't recall, does that mean you didn't have any conversations, or does it mean you might have had some of those**

**conversations and just don't remember them?**

A. It would be improbable to have that conversation from SkyWest's side as something SkyWest would do to the schedule, as we would be constrained from doing that under the seniority bidding system we have negotiated with the pilots. What you just suggested would be an excellent idea for Mr. Cassell to attempt, to trade a holiday for a weekend under the PBS system. But for SkyWest to agree to do that and impose it would violate our CBA, and we couldn't do it without violating the contract.

So asking me if we had that discussion, maybe. It wouldn't last long, because you're suggesting that we violate the CBA. So if Roy raised that or I raised that, somebody would have said, The pilots will go bananas if you do that.

**Q. Did you -- did either you or did you ever direct anyone to talk with SAPA to see if they might be willing to work with SkyWest to accommodate Mr. Cassell's request for a sabbath off?**

A. Erik, I'm not being tough. That was compound. There was, like, three or four things in there. Can you just break up that question up a little bit?

**Q. Sure. Did you -- in regards to**

**Mr. Cassell, did you ever contact SAPA to ask if they might be willing to work with SkyWest to accommodate Mr. Cassell's request?**

A. I did not.

**Q. Did you ever direct anyone or ask anyone to contact SAPA to ask them if they would work with SkyWest to accommodate Mr. Cassell's request?**

A. I did not.

**Q. Did you ever tell SAPA that there was this issue that had come up with a request for a sabbath accommodation?**

A. I have likely had hundreds of conversations with the president or board of SAPA since this incident. We certainly talked about it. I don't know when or in what context, but it wouldn't surprise me that SAPA knows about it and had discussions.

**Q. But do you have a recollection of ever asking them whether in regards to Shane or someone else, you know, Hey, SAPA, if we have an issue that comes up for a request for a sabbath accommodation, would you be willing to work with us to try to accommodate the pilot?**

A. Yes.

**Q. You've had those discussions?**

A. Yes.
**Q. And with whom at SAPA?**
A. Aric Arnold.
**Q. And do you recall when those conversations took place?**
A. Winter of 2019.
**Q. Why were you discussing that with Aric Arnold in the winter of 2019?**
A. I met with SAPA in the winter of 2019 for a long-ranging meeting, maybe four to five hours long, where we discussed this CBA, SAPA's bylaws and 10 to 15 open items and issues that they wanted to discuss. In the course of that discussion -- and I don't know if it was specific to Mr. Cassell or generally -- I raised the issue of whether SAPA had flexibility from their side to compromise seniority and allow one of their pilots seeking an accommodation to, I don't know, be granted a waiver or find a way to put it into the CBA to grant more flexibility in these areas.
**Q. And who were you meeting with from SAPA?**
A. I met with the SAPA board. The entire board wasn't present. It might have been their executive board. I believe there are 20 members of the SAPA board and maybe five that constitute their

executive board, which would be the president, vice president, secretary and perhaps a couple others. I see the room; there's five to six people in it. I know Aric Arnold is there. I couldn't identify, as I sit here today, the other attendees.

**Q. And where did the meeting take place?**

A. Denver, Colorado.

**Q. And were there minutes taken of that meeting?**

A. I don't know.

**Q. Were there recordings made of that meeting?**

A. I didn't take any minutes or make any recordings.

**Q. Was there any kind of a memorandum prepared after the meeting detailing what had been discussed and agreed upon?**

A. I don't know. I didn't prepare a memorandum.

**Q. So explain to me, this issue of sabbath observance, was that specifically discussed? I guess I didn't quite follow you. Was that a specific topic?**

A. It was like this. I'm going to call you Mr. Strindberg because I'm going to use the word

"Aric," but Aric means Aric Arnold. So I would say I said something along the line of, Aric, we have from time to time pilots who want particular days off for sabbath observance or other religious holidays, Yom Kippur, Ramadan, Easter. It comes up. Is there a way -- is there any way for us to work this into the contract so that we can get there?

Aric's response is, I don't see how any of the other pilots will give up their seniority and put at risk working at Christmas, Easter or something else for somebody else who wants it. You get into the difficult position of determining what a deeply held religious belief is.

**Q. Let me interrupt you. Is that -- are you saying what Aric said to you?**

A. I'm summarizing. My question is, What do you think, Aric? Can we get to a place in the contract where we can negotiate exceptions into the seniority for a religious observance, and the answer was no. He explained his answer, but in the end it was no.

**Q. What was the explanation he gave you?**

A. Too hard to juggle with 5,000 pilots. What if they all want Christmas? How can you distinguish between somebody who's religiously

observant and really wants Christmas versus some dude who just wants off Christmas? Everybody's going to want off Christmas. I can't deal with 5,000 pilots yelling at me over who gets Christmas. We have to stick with the system.

**Q. Going back for a moment regarding this idea, this holiday -- trading holidays for Saturday work, when you were having those discussions with Coy Bryant and Jake Whicker in early December before you wrote the December 8th letter, did that idea ever come up?**

MR. PETERSEN: What idea?

**Q. (By Mr. Strindberg) The idea that maybe one accommodation would be to allow Mr. Cassell to not work on the sabbath in exchange for requiring him to work on these holidays that SkyWest had trouble staffing.**

A. I don't recall it coming up.

**Q. Thank you.**

**In this letter -- and I'll pull it back up on the screen -- in the last line there, you talk about another acceptable accommodation. Did you have anything in mind when you used that phrase, "another acceptable accommodation"?**

A. I -- what I had in mind was whether

Mr. Reinach or Mr. Cassell had any other ideas to discuss --

**Q. Okay. And what --**

A. -- to accommodate his needs.

**Q. Are you able to tell us what would have been an acceptable accommodation from SkyWest's point of view?**

MR. PETERSEN: No, don't answer that. That's attorney-client privilege if there's something published; but if that's something he's conjuring up because of discussions internally, I'd say don't answer that question.

MR. STRINDBERG: Well, Scott, he's talking about an acceptable accommodation, so I'm trying to determine what would have constituted an acceptable accommodation. He's used the phrase. I think I'm entitled to know that, particularly in the context of this lawsuit.

MR. PETERSEN: All right. So -- well, with that clarification -- so your question is was there an acceptable accommodation he had in mind in relation to Cassell at the time this was going on? Is that what your question is?

MR. STRINDBERG: No. It's broader than that. He's talking about another acceptable

accommodation, and I guess I'm asking him to define what would have constituted an acceptable accommodation from SkyWest's point of view.

MR. PETERSEN: I guess if you can limit it to what he was thinking at the time, I'm okay with that, but not something that would come up later on down the road, if anything.

Does that make sense?

So, Todd, I'm going to instruct you to answer -- if you can come up with -- if there's a response to that question relative to the time frame, go ahead.

THE WITNESS: I'm sorry. Would you restate the question?

**Q. (By Mr. Strindberg) Back in December of 2016 when you wrote this letter, you used the phrase "another acceptable accommodation." What would SkyWest have considered to be an acceptable accommodation at that time?**

A. I don't know.

**Q. One question -- and maybe you're not the person to answer this, Todd, but when pilots are on reserve, is seniority an issue as far as the days they bid for, or are the days that people are on reserve just assigned by someone in --**

A. You're right, I'm not the person to ask; but it is my understanding that a reservist with higher seniority will get the reserve schedule they prefer ahead of a reservist with lower seniority.

**Q. Do you know, are the -- are reserves -- reserve pilots regularly used by SkyWest, or are they just there for emergencies?**

MR. PETERSEN: Objection as to vague and confusing.

Go ahead, Todd, if you understand what he's saying.

THE WITNESS: I do understand what you're saying. From my experience and understanding in the legal department divorced from operations, it is my understanding that reserves are regularly used and called upon to handle flights.

**Q. (By Mr. Strindberg) Do you know -- I'll show you -- let me pull it up. As you know, we were looking at Exhibit 22 at some point, which was this chart that had been prepared showing the number of reserves by jurisdiction -- or by domicile, I should say, broken down by captains and then by first officer.**

**Do you have any idea -- like, for example, in January of 2017 this shows, you know, like, 8**

**reservists in Detroit and 23 in Chicago. Is MSP Minneapolis?**

A. Yes.

**Q. So it shows 57 at Minneapolis.**

**Do you have any idea how many of those pilots, reserve pilots at those jurisdictions would have actually been asked to cover a shift or a flight?**

A. Not with any certainty, no.

**Q. Knowing that you're not certain, what would be your answer?**

MR. PETERSEN: Objection. Calls for speculation.

Go ahead, Todd, if you can.

THE WITNESS: I'll give you my business understanding. Pilots are expensive. We don't like to pay them to sit around and do nothing. We're going to schedule reserves because historically that particular domicile has drawn heavily on or not at all on reserves. And so going off of years' worth of experience, historical demand and operations, one domicile may have a much higher complement of reserves than another, but it is due to need and historical experience of needing to -- if we're going to take off and land and complete our flights on

time, we may very well need to call reserves in to handle it.

Minneapolis you pointed to is a very large hub for Delta Air Lines, and it doesn't surprise me at all to see that amount of reserves there so that we can supply flexibility around the system. The fact that they're sitting in Minneapolis doesn't mean they're just needed for Minneapolis; it means they're sitting in a hub and we can put them on an airplane and get them to Tallahassee really quickly for a problem there.

And Scott's going to club me for saying too much, because I can't help it, but those reserves, you're wrong to think of them just sitting in one city. They're sitting in a hub where they can be dispatched all over the country as quickly as possible to meet a need. So it's not just that Minneapolis pilots don't come to work like they should or have poor lockability, it's just that we can dispatch reserves from Minneapolis much better than we can from Sioux Falls, South Dakota.

Not a two-word answer. Sorry, Scott.

MR. PETERSEN: I instruct you not to answer on our communications.

THE WITNESS: Erik, the longer you wear me

down, I'm just going to keep yapping. So keep going. I'll give you my Social Security number; I'll tell you where all the secrets are.

**Q. (By Mr. Strindberg) I don't want your Social Security number.**

**So I gather that what you're saying is SkyWest obviously doesn't want to ever have to cancel a flight, because that costs money, and that's, I guess, balanced against you don't want too many reserve pilots sitting around because that also costs SkyWest money?**

A. Half of that's right. We don't want too many reserves sitting around, because it costs money. Canceling a flight, the money is a small aspect of it. Canceling of a flight causes massive disruptions for the passengers, for the crews and for our partners. So we're graded from Delta and United and American for how reliable we are, and late and canceled flights are hard on our business relationship and obviously very hard on passengers who want to be at a wedding tomorrow in Fresno but their flight canceled.

So the -- the difficulty of canceled flights -- one particular canceled flight isn't going to cost a tremendous amount of money, but it's going

to cost a lot more in passenger goodwill and goodwill of our partners.

MR. STRINDBERG: Thank you.

Scott, I have a bit more here. Do you guys want to take a break and grab something to eat?

MR. PETERSEN: Yeah, I'd like to. I mean, I don't know what Todd is thinking. I could go on if you need to, but I have a small reserve tank that needs to be refilled on a regular basis. I may not look small, but I have a small tank.

MR. STRINDBERG: Why don't we take a half hour. It's now five minutes to one. Let's come back at 25 minutes after one.

(Recess from 12:54 p.m. to 1:34 p.m.)

**Q. (By Mr. Strindberg) I just wanted to follow up on a couple of things about the reserves. You said that there was, like, historical data on how many reserve pilots were needed. Who would have that information at SkyWest?**

A. Steve-O would be a good place to start. That's who I would call. I said Steve-O, like a nickname, which stands for Steve Spagnolo, S-p-a-g-n-o-l-o. He goes by Steve-O. That's Steve with a v, a dash, and a capital O.

**Q. So you're saying I can just give him a**

**buzz, right?**

MR. PETERSEN: No.

THE WITNESS: But -- well, I don't -- I'm happy to give that information to Erik in some form if you'd like to analyze it.

**Q. (By Mr. Strindberg) Okay. Let's go --**

A. By that I mean historical reserve needs in these different domiciles, whatever. Send us an interrogatory and I'll give you the data.

MR. PETERSEN: By the way, Erik, too, just to clarify, you asked Todd if there was any reference in the Pilot Policy Manual to bidding. There's actually a huge section, so I was going to just clarify. I don't think Todd realized that.

THE WITNESS: Oh, no, I did. It's a bad memory exam, but SP3O17 covers scheduling and preferential bidding in the Pilot Policy Manual.

MR. PETERSEN: For your reference, Erik, it starts on page 489, SkyWest 489. I have not looked to where it ends, but that's the chunk. I meant to bring that up while you were talking to him, and I got sidetracked. So, sorry.

**Q. (By Mr. Strindberg) Okay. So, Todd, just to refresh your recollection, we have been talking about the letter you sent to Alan Reinach on**

**December 8th. Let's actually move forward a little bit. I'm going to show you a letter dated December 12th from Alan Reinach, which is addressed to you.**

**Do you recall receiving this letter from Alan?**

A. I do.

**Q. And I'll represent to you -- we can look at it, and we will in a second -- you didn't respond to this until February 3rd of 2017. Why was there a delay in responding to him?**

A. I remember reading Mr. Reinach's letter, and he claimed that I had not addressed his concerns and I didn't provide any factual basis for my assertion that his client would unavoidably be scheduled to work on his sabbath during the initial period of his employment.

**Q. That's the part I have highlighted there in yellow.**

A. Yeah. So I decided to direct Mr. Oyler to back up his opinion with research that was data based more than him opening up something on a computer screen and looking at it, saying, It will never work, I've never seen it work, can't think of a time I've ever seen it, to actually draw a sample set from this

time period that I could show to Mr. Reinach to further the discussion and help us find that reasonable accommodation if there was one.

So this took about a month, maybe a little bit longer. December is a very busy time for any airline, and especially us. So around Thanksgiving and Christmas is all hands on deck. I don't think we had an analyst who was free to do this until after the new year.

**Q. Did you give Mr. Oyler any specific instructions on how to go about his analysis, or did you just say you wanted backup for this opinion?**

A. No. I -- I asked him to study a hundred pilots that had been recently hired and see if in the first year of their employment they were able to avoid working on a Saturday. That was the parameters of the research assignment I gave him.

**Q. Okay. Did Mr. Oyler do the research, or did he assign it to someone else?**

A. It's my understanding he assigned it to an analyst in his department.

**Q. And who was that?**

A. I don't know.

**Q. Did you have any discussions with that analyst directly?**

A. No.

**Q. Is this what you received back from the analyst, obviously without the names blacked out?**

A. No.

**Q. What did you receive from the analyst?**

A. I didn't receive anything from the analyst.

**Q. Did you receive anything from Mr. Oyler?**

A. No.

**Q. How was the results of that investigation communicated to you?**

A. Via conversation with Mr. Oyler.

**Q. And when did that take place?**

A. Sometime at the end of January 2017.

**Q. And what did -- and where did this conversation take place?**

A. SkyWest headquarters.

**Q. And who was involved in the conversation?**

A. Myself and Mr. Oyler.

**Q. And tell us what he said and what you said.**

A. I was pressing Mr. Oyler for the results of the research because I knew that Mr. Reinach was waiting for a reply. So the initial conversations would have been follow-ups: Are you done? How's it

coming?

And at some point in the end of January Mr. Oyler called me and said, We've got this study done. And I asked him what the results were, and he reported that of the 100 pilots that they studied hired in 2016, and maybe even a little earlier, but of a hundred pilots that he could see a year's worth of their schedule, that none of those 100 pilots had successfully avoided working on a Saturday.

**Q. And do you know how Mr. Oyler or the person he assigned to do the task did the actual analysis, what they looked at, what parameters they used?**

A. Other than the parameters I gave them -- I don't even know if they followed those parameters, to tell you the truth, because I didn't see the data or question the analyst. I followed up with Jay on my question, Having done the research, did you find 100 pilots you could track for 12 months recently hired? Were any of them able to avoid Saturday work? I don't know if I put Friday night in there. I think we discussed it, and it was too difficult or onerous. And I said, Fine, let's just stick with Saturday for now and see what we get.

And the report came back of 100 recently

hired pilots tracked for 12 months, which would include most, if not all of their reserve period, did any avoid a Saturday work assignment. And his answer was all of the 100 pilots have worked a Saturday. They were not able to avoid it. At least one; I don't know how many.

But I was looking for a percentage. I gave him a hundred because I thought he'd come back and say, no, 97 percent had to work a Sunday, and so he -- well, actually, all of them. 100 percent of those pilots somewhere along the way had to work a Saturday was his answer.

**Q. I'm going to pull up again what's been marked as SkyWest 1858 and 1859. And we've previously marked this as an exhibit. It's Exhibit 20.**

**Have you ever seen this document before? Just a second. I haven't shared it. I apologize. Have you ever seen this document before?**

A. Yes.

**Q. When did you see it for the first time?**

A. Earlier this year. I'm going to say spring.

**Q. And what were the circumstances under which you first saw it?**

A. This document was created to respond to interrogatories and requests for production issued by your client.

**Q. So this document, Exhibit 20, SkyWest 1858 and 59, does not reflect the research that Mr. Oyler did back in early 2017?**

MR. PETERSEN: Mischaracterizes his testimony.

**Q. (By Mr. Strindberg) Todd?**

A. Yeah, I heard you. I don't know if it does or not.

**Q. What do you understand Exhibit 20 to be, then?**

A. Exhibit 20 was created with the following parameters. Not having actually received a physical report from Mr. Oyler and Mr. Oyler no longer being here, we went back to the data set, and I asked an analyst to track 100 pilots that had been hired in early 2016 and track their Saturdays worked to replicate the research assignment that I had handed to Mr. Oyler in February of -- January of 2017.

**Q. Do you know how closely this replicated what Mr. Oyler did?**

A. Like I said earlier and you pointed out, Erik, I don't know how Jay ordered the research from

his analyst, and I don't know which analyst he used. So I gave this analyst the same instructions I gave Jay, to go with that same data set and pull the same sort of report.

It is my hope and intention that it replicates or gives the same data that Jay drew and saw and reported, but I can't tell you if I have captured the same 100 pilots that Jay looked at or, you know, if I've got 95 out of 100 or 10 are missing. I can't tell you for sure if this is a perfect replication of the research that Mr. Oyler did.

But the data still exist, so the instruction to this analyst was to replicate the same assignment that was given to Mr. Oyler, and this is the report that he generated on my instructions.

**Q. And who was the analyst you asked to do this?**

A. His name is Paxton, P-a-x-t-o-n. Let me -- if you'll allow me to look up his last name, I'll spell it correctly for you.

**Q. Go ahead.**

A. It's a little bit exotic. Last name Catten, C-a-t-t-e-n.

**Q. And do you know how Mr. Catten chose the**

**100 pilots?**

A. I do not.

**Q. The left-hand column here, the employee numbers, how are employee numbers given out?**

A. The first line is 53,197.

**Q. Right.**

A. The first employee ever hired at SkyWest, his employee number is 1.

**Q. Okay.**

A. This employee was the 53,197th employee hired.

**Q. Okay. So someone I noticed on here, like, a 20 -- 27000, that employee, that pilot would have been hired a lot sooner than -- or a lot earlier than the pilot who has No. 53000, correct?**

A. Not necessarily. That indicates to me that this is a rehire and that this employee might have been hired 10 to 15 years ago, quit, left and has now returned. Your employee number will never change. You won't get a second employee number if you are a rehire, so seeing a number half the size of the other ones tells me he's a rehire.

**Q. Did you tell -- I guess I'm just trying to get at, I mean, did you tell him to look at pilots hired between two dates, two certain dates, or what?**

A. Yes.
**Q. What were those dates?**
A. I told him to begin with January 1, 2016 --
**Q. And --**
A. -- and start tracking from there. I also said I wanted to capture pilots that would have historically been hired around Mr. Cassell's time when he was hired in October. This analyst pointed out that if we start back at January 1, 2016, we may not actually capture his class. We get a hundred people before we get there. So he adjusted his search closer to March or April to get there.
So, as I understand it, his hundred pilots that he chose were hired or went through class in early 2016 but didn't start actually flying until April, March -- April, May of 2016, which would get us closer to Mr. Cassell's class to track what happened after that.
So to answer your question, he altered the research assignment that I initially gave him.
**Q. And do you know -- so did this include the pilots who were in that class that Mr. Cassell was in in November of 2016?**
A. I don't know. I'd need to double-check

that.

**Q. Do you know why these -- you've explained this one variance, the 20 -- 20-something-thousand number, but do you know why the numbers are not consecutive?**

A. I think this chart is ordered -- I think it's ordered by the pilot's name, which has been redacted.

**Q. Okay. And this is Saturdays worked, and there's a series of numbers here. For what period of time is that? In other words, numbers of Saturdays worked, during what time period or length of time?**

A. I believe it's out of a 12-month period, although, as you can see, several of these pilots quit before they made it to 12 months. So it's however much they worked in the first year of their employment for these 100 pilots. They might have quit in training, as some did. They might have made it the full 12 months.

**Q. Do you know what domiciles these pilots were assigned to after training?**

A. I don't.

**Q. SkyWest answered one of our interrogatories that I recall indicating that the pilots hired in late 2016 and 2017 were basically or**

**entirely being sent to Detroit or Minneapolis or Chicago. Does that comport with your understanding?**

A. Yes.

**Q. Do you know if these hundred pilots, other than the ones who washed out or terminated in training, were all from those three domiciles?**

A. I -- I don't know with any certainty. The majority of them would certainly go to those domiciles, although a few of them may have landed in others.

**Q. And why would you say the majority certainly would have been in one of those three domiciles?**

A. Those three domiciles are major hubs. Detroit is a major hub for Delta; Chicago is a major hub for United; Minnesota is a major hub for Delta. And so these are excellent staging points for new hires and reserves to be based so that they can fill in for flying as needed out of those hubs, but also then immediately dispatched to other locations and fill in as needed for missing pilots. So new pilots tend to go to reserve and tend to go to major hubs in the system.

**Q. What are the major hubs for SkyWest?**

A. Now or --

MR. PETERSEN: Let me -- I'm going to object. It's vague and ambiguous. Are you asking for where SkyWest major hubs are or where another airline's major hub is where SkyWest has a presence?
MR. STRINDBERG: The latter.4.
MR. PETERSEN: Okay.
THE WITNESS: I'm sorry. Now I'm confused. Do you want Delta's hubs or SkyWest hubs?
**Q. (By Mr. Strindberg) Well, you talked about Minneapolis, Chicago, and Detroit being major hubs for Delta and United.**
A. Yes.
**Q. So are there other major hubs for the carriers that SkyWest works with?**
A. Yes.
**Q. And where are those other major hubs?**
A. Atlanta is a major hub for Delta. So is Cincinnati, so is Detroit, so is Minneapolis, so is Seattle. United's major hubs are Houston, Los Angeles, Denver, San Francisco, and Chicago. American --
**Q. Any other --**
A. -- major hubs are Dallas; Dulles, which is also a major hub for United; Phoenix. And Alaska Airlines' major hubs are Seattle, Portland,

San Francisco and Los Angeles.

**Q. And are those the four -- what do you call them? A parent company -- not parent companies. How do you refer to Delta, United, American and Alaska?**

A. They are either code share partners or major airlines or our contract partners. We do regional flying for those four carriers.

**Q. And Salt Lake City is not considered a major hub?**

A. Sorry. It is. That is a major Delta hub. Thank you.

**Q. And does Delta fly to -- does SkyWest have other what it would consider major hubs that are other than these cities that you've given me?**

A. No.

**Q. And so I understand what you're saying, is the reason that people are -- that new pilots would be sent to Minneapolis, Detroit and Chicago is because if they're on the reserve board, it's easier to get them to lesser airports, smaller airports to fill in as needed?**

A. That's right. Those three airports are located in the Midwest, making it easier to get someplace in the country versus a domicile like Los Angeles or Seattle. There's a bunch of reserves

there. They are helpful regionally, but you can't do much with them nationally.

**Q. Were Detroit, Minneapolis and Chicago new hubs in 2016?**

A. No.

**Q. Had they been growing? And by that I mean were there more flights out of those hubs that SkyWest was covering since 2016, not including this year?**

A. I don't know that data. It's certainly shrinking this year.

**Q. Do you know -- if Paxton Catten, when he did this list, or Mr. Oyler back in 2017, do you know if either of them actually contacted any of these pilots who are on the list?**

A. If they did, they didn't tell me, and it would be extremely surprising if they did. Their job was to crunch data.

**Q. The reason I ask is you used the term that these studies showed that pilots were not able to successfully avoid working on a Saturday. You don't know based on this data whether or not any of these pilots attempted to avoid working on Saturday, do you?**

A. I couldn't tell you which, if any,

particular pilot attempted to avoid working on Saturday. When I questioned Mr. Oyler, I said, Can you see their preferences?

Yes.

Can you tell whether or not they attempted to bid-avoid Saturday?

His answer was, Saturday, Sunday, Easter, holidays, yes. They -- those are popular bid-avoids.

**Q. So --**

A. We didn't drill down to anything beyond that.

**Q. So are you saying that Mr. Oyler back in 2017 looked at the monthly bid preferences for each one of the pilots that was on his list to determine if they had tried to bid around a Saturday or holiday at that point?**

A. He looked at some and then stopped.

THE REPORTER: I'm sorry. I didn't hear the question.

**Q. (By Mr. Strindberg) Do you know how many pilots he looked at their preferences for?**

A. I don't.

**Q. Do you know if Paxton Catten did the same thing earlier this year or whenever it was when he created this document by looking at bidding**