**preferences for these pilots?**
A. I don't know. That wasn't his assignment.
**Q. So after getting Alan Reinach's letter from December 12th, is there anything else you did in preparation for responding to that letter besides having Mr. Oyler crunch the data?**
A. I don't recall doing anything else to prepare to respond to the letter.
**Q. Did you talk with anyone else other than Glassey or the other people you mentioned about the issue?**
A. At some point I spoke with Lori Hunt, who is my supervisor, and kept her apprised of my work, which would have included this.
**Q. What position does Lori Hunt have?**
A. She's the vice president of people.
**Q. Was she over human -- employee relations as well?**
A. She is.
**Q. And the purpose for speaking with her was what?**
A. To keep her updated on the projects I was working on.
**Q. It wasn't substantive? In other words, you weren't asking her whether she thought**

**Mr. Cassell could be accommodated; you were just telling her what was going on?**

A. Yes.

**Q. Okay. Todd, I'm showing you what's been marked -- it hasn't been marked. It's Cassell 10 to 11.**

MR. PETERSEN: There is a SkyWest version that we did mark as an exhibit in Mr. Cassell's depo, I believe, but you can -- it was a SkyWest version, so you can mark this one.

MR. STRINDBERG: I guess we're up to Exhibit 26.

(A discussion was held off the record.)

MR. PETERSEN: It's 27. 26 is your Pilot Policy Manual.

(EXHIBIT 27 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) Okay. Exhibit 27, which is Cassell 10 and 11, Todd, can you tell us what this is?**

A. Would you mind pulling it down a little further?

This is a letter I authored to Mr. Reinach on February 3rd, 2017.

**Q. That's your signature there?**

A. It is.

**Q. I want you to look at this paragraph here where you discuss the training schedules. You say:**

**I would be pleased to discuss how training schedules could be altered to accommodate Seventh-Day Adventists who wish to observe the sabbath. However, in the case of Mr. Cassell, unless he is willing to work on the sabbath after he leaves training, resuming his training would be futile.**

**Are you saying in there that it would have been possible to accommodate Mr. Cassell's sabbath beliefs during the training session, or during training.**

A. It appeared that that had already happened in his prior trip through training when he was doing CBT training and had another class where there was conflicts. The training department was able to work around it until he ran into matrix training where they couldn't. But there had been some flexibility in the training department that we could continue to explore, and I was happy to do it. But we needed to have a better understanding of what happens once he's out on a line, so I wanted to have that discussion with Mr. Reinach.

**Q. And you're also aware that perhaps some of**

**the, like, matrix conflict could have been avoided if that class had occurred, say, during June of the year when days are longer so that sundown is later on Friday, correct?**

A. If the same scenario that happened on December 3rd happened in June?

**Q. Right.**

A. It would not have caused a conflict, as I understand Mr. Cassell's religious requirements.

**Q. You say:**

**However, in the case of Mr. Cassell, unless he is willing to work on the sabbath after he leaves training, resuming his training would be futile.**

**Why were you not willing or unwilling to allow him to go through training and for him to determine whether he could avoid working on the sabbath using the tools that you say were available to him?**

A. Because Mr. Cassell at that point had declined the accommodation offered to him and made it clear that if the accommodation still results in a Saturday schedule that he could not add, drop, or swap, he would refuse to fly it.

**Q. When had he declined accommodation?**

A. With his discussions with human resources and Mr. Whicker they had with him I believe in October and again in December, as they came to understand his religious requirements, it was ultimately a guarantee of sabbath-free scheduling with some exceptions for emergencies or other issues; but if he had been handed a sabbath schedule on Tuesday and he could not add, swap, or drop it, he would decline to work it because that would not be an emergent situation or a continuation of a flight that he had already began, which was a rejection of the accommodation we offered.

**Q. So, Todd, are you saying that if he had said to -- and maybe you're not the person that can answer this. If he had said to Coy Bryant or Jake Whicker back in November of 2016, Okay, that accommodation is acceptable, you would have allowed -- you would have made an accommodation in his training schedule to allow him to continue?**

A. You've got two parts there.

**Q. I do.**

A. I don't -- I don't know if --

MR. PETERSEN: Hold on. I'm going to object. It's a compound question. Go ahead.

MR. STRINDBERG: It's actually not.

**Q. (By Mr. Strindberg) Go ahead.**

A. If Mr. Cassell had accepted the reasonable accommodation, his training would have continued, certainly. If -- it's difficult because you've mixed two things there, Erik.

Let me go to his training. If there had been a reasonable accommodation we could have worked out with his training and he says, I accept these terms and conditions of my employment, I will use the preferential bidding system and all the tools available to me to avoid sabbath work, but if I get a sabbath assignment, I'll do it, he would absolutely be hired, kept on and kept in the system.

**Q. Well, I guess the question, though, is he was forced to quit because he was told that they couldn't adjust his matrix training on December 6, 2016. If he had -- and I'm not necessarily agreeing with what you said, but if he had said, Yes, the accommodation you're giving me as far as using these tools is enough, would there have been an adjustment made regarding his matrix training back in December of 2016?**

A. I don't know. I don't believe so. They're two different issues.

**Q. Right. He resigned instead of being**

**terminated because SkyWest refused to give him an accommodation during his training session, correct?**

MR. PETERSEN: Mischaracterizes his testimony. Calls for a legal conclusion.

THE WITNESS: SkyWest did give him an accommodation during his training session. Mr. Cassell found that to be insufficient for his needs and rejected it.

**Q. (By Mr. Strindberg) Yeah, but, Todd, you just said that I was conflating issues, and now your answer is doing the same thing.**

**During the training session, okay, when he was scheduled for the matrix training on December 2nd, which would have run into the sabbath, SkyWest refused to accommodate him in training by changing that schedule or assigning him to a different matrix training, correct?**

A. Correct.

**Q. The accommodation, as you call it, that was offered to him had nothing to do with training, it had to do with what happened when he became a pilot and was actually flying for SkyWest, correct?**

A. Well, both. The accommodation is the seniority-based scheduling system, which applied to him in both departments. My -- and you're right,

it's easy to conflate the two. But if he returns in the summertime, as you spoke earlier, and never runs into a sundown problem on Friday -- and the other accommodations that had previously been made for him in training, with his CBT training and the other mentioned somewhere saying, you know, you did this twice for me, how come you can't do it now, those apparently were accommodations that training could make.

So there is a blend of accommodations that are not an undue burden and are possible for SkyWest to make and some that SkyWest does not. So if he had returned in the summertime and the sundown problem was not an issue for matrix training, my point is we still haven't resolved the elephant in the room, which is what happens for the next ten months when you actually fly the line.

**Q. I understand your position.**

**Do you know how the matrix classes or sessions were assigned? In other words, my understanding is that someone in the training department assigned people to the various matrix training slots; it was not something that was bid on based on seniority. Is that your understanding as well?**

A. No.
**Q. What is your understanding of how the matrix sessions were assigned?**
A. Matrix sessions were posted and made available for pilots to choose when to go to matrix training based on their seniority. They go in pairs because the matrix has to be operated by two pilots at once. The pilot in that pair with the highest seniority will have the first pick of matrix scheduled training classes. The pair pilot with the lowest seniority will get what's left over.
I don't know how Mr. Cassell or and his partner shook out in this situation, but I do know that their matrix training was assigned on a seniority-based scheduling system. It was not randomly assigned by the company.
**Q. And how do you know that to be the fact?**
A. I learned that from Dave Moxham, the director of training that we spoke about earlier.
**Q. And where was the matrix classes or matrix class slots posted?**
A. I don't know.
**Q. David Moxham has basically taken Jake Whicker's position; is that correct?**
A. No. He has always been there and would

have been Jake Whicker's boss at the time.

**Q. Who's taking Jake Whicker's position?**

A. I don't know. We're not doing any training right now. We haven't hired a pilot in six months; so...

**Q. I won't ask you why.**

**How much has your schedules been cut back, if I may ask?**

A. In April it was cut back 70 percent.

**Q. Wow.**

A. It has climbed gradually to about 50 to 60 percent and holding.

**Q. Do you know how the partners in the training class -- you said two people had to go into whatever -- the matrix simulator at one time. Do you know how partners were chosen?**

A. It's my understanding that they chose each other. They would pair up.

**Q. Do you know -- did you ever ask Mr. Whicker if he asked anyone who had more seniority to bid for a better matrix class if they would be willing to switch and allow Mr. Cassell to take their place?**

A. My understanding is that all of those options were explained to Mr. Cassell, and he

attempted those, was unable to work it out with the other pilots to get a schedule that was agreeable to him.

**Q. Do you know if any of the matrix classes, back in that period, right around December 1st, if any of them were scheduled during daylight hours on a day other than Saturday?**

A. I don't know.

**Q. Do you know if Mr. Whicker or anyone else in the training department tried to help Mr. Cassell switch matrix classes or matrix partners?**

A. The help that I understood he received was guidance and instruction on using those tools to interface with other pilots to get the schedule that he wanted.

**Q. I don't know if, like, someone -- do you know how many pilots there were in that class?**

A. I do not.

**Q. And what's a typical class -- what was a typical class?**

MR. PETERSEN: You're talking about in 2017, middle of 2017, right?

MR. STRINDBERG: Late 2016.

MR. PETERSEN: Late 2016, okay.

THE WITNESS: Roughly 30 pilots.

**Q. (By Mr. Strindberg) Do you know if Mr. Whicker or anyone in the training department got up in front of the class and asked if anyone would be willing to trade with Mr. Cassell?**

A. I do not.

**Q. Okay. In your letter -- let's go back to it -- you talk -- I just highlighted or will highlight it.**

**My statement was drawn from conversation with the leadership in our crew scheduling department and based on their long experiences.**

**Who is the leadership you're referring to there.**

A. The director of crew scheduling is a woman named Anita Spencer. Her second in command was Jay Oyler. That's who I mean when I talk about the leadership of the crew scheduling department.

**Q. And is Anita still there?**

A. Yes.

**Q. And I gather crew scheduling, their function is to schedule pilots and to schedule reserve pilots. Is that correct?**

A. Among other things, yes.

**Q. What other things do they do?**

A. I understand that they receive all the

flying assignments from our major partners about a month and a half to two months in advance. And then they pair that flying with aircraft type and pilots available and certified to fly those aircraft, and they attempt to build the most efficient schedules possible and then put together a schedule that is published and available for bid to not only the pilots, but also the flight attendants, who access the preferential bidding system to bid for and obtain a schedule for the following month.

**Q. So did you -- prior to sending out this February 3rd letter to Alan, did you also talk with Anita Spencer about the issue?**

A. Yes.

**Q. And when did you talk with Ms. Spencer about it?**

A. My first call on this issue was likely to her all the way back in December. Anita's response then and ever since has been, it would seem impossible to me to avoid a Saturday schedule, but you should talk to Jay Oyler. He runs this day in and day out and knows it backwards and forwards.

So she gave me an opinion based on her experience, which is, like, 30 years of doing this; but because she wasn't hands-on and running the

system like Jay did, she referred me to him.
So when I say my statement was drawn from conversations with the leadership, I got Anita's opinion, but her referral to our subject matter expert, Jay Oyler.
**Q. Did you have other conversations with Anita Spencer about the possible accommodations for Mr. Cassell other than --**
A. No.
**Q. And have you told us about all your conversations with Jay Oyler about the subject matter of accommodations for Mr. Cassell?**
A. I would estimate I had four to five conversations with Mr. Oyler over this time period. It's difficult for me to parse them, but I could tell you there was an initial discussion in December in preparation for answering Mr. Reinarch's letter and more extensive fact-based data research conversations with him over December and January to prepare the February 3rd letter.
**Q. Do you recall the substance of any of those subsequent conversations?**
A. Some of them were follow-ups on where is my data, question, will we see the report soon, how's it coming, his staffing issues. And then once the

report was produced, longer questions with him about what it meant, what he did, how do you know no pilot was ever required to work on a Saturday? So he answered probably 20 to 30 of my questions on that as he referred to whatever data report his people gave him in the preparation for the February 3rd record.

I couldn't give you the dates. I can tell you that the most substantive conversations happened at the end of January, early February, and the first conversation in December.

**Q. Do you recall any of the other questions you asked Mr. Oyler?**

A. I asked him if he could see their bidding preferences. Can you tell if they tried to avoid a Saturday, for example. He said yes, he could see that.

**Q. And this is where he apparently looked at the monthly preferences or bids that these people had put in; is that correct?**

A. Some of them.

**Q. Some of them?**

A. His comment was, Todd, you're asking now for me to do thousands of records. You take a hundred pilots times 12 months, you've got 1,200 bids and all of their preferences. And I didn't do that,

but I'll start to look. What do you want to look for?

Then did any of them make it a high priority not to work a Saturday? And as he looked at a report, he said, I am seeing that. Do you want me to look at all 1200?

I said no.

**Q. What do you mean made it a high priority?**

A. So as Mr. Spagnolo testified, there were several layers of preferences that a pilot could put into the system.

**Q. I think seven layers. Right?**

A. Yes. And within those layers are multiple preferences as well, so you might have 20 to 30 different variables. And I understand it works where if you -- whatever you put in first and make your highest priority, the algorithm will then do its best to give you that if it's left over. If your number one choice is no Saturday flying and it's now your turn to come to the market and get some work, but all the remaining work is Saturday flying, then your second choice will now be honored. Your first choice will be ignored because it couldn't be filled. The second choice is I never want to work with Jeff Smith, and then they'll see, oh, Jeff is on these

four flights. So then you'll get what you want --
**Q. So do you --**
A. -- to avoid another crew member, for example.
**Q. So do you know if any of those pilots you looked at actually put as their number one preference no Saturday flying?**
A. I recall asking Jay, Look at it for me. You don't have to look -- spend weeks on it, but tell me if bid-avoiding Saturday is something you see high ranked and appearing often.
**Q. Yeah. And when I --**
A. He got back to me later and said, Yes, I'm not going to look at all 1200. I've looked at a couple. I'm telling you I see it all the time; they want their weekends off and holidays and a Saturday avoid is common.
**Q. And when you say I've made it a higher priority, you're not saying they made it number one priority, but it was -- what? -- one of their top -- what? -- two, three, four, five preferences?**
A. That's what I understood him to be saying, yes.
**Q. Okay. So there's not a precise --**
A. By the way, Erik, they don't fill out all

30, right? At some point you go, Here's the things I want; here's the things I don't want. And they may not complete the rest of the preferences. So they may not care what day of the week they work, and so it's just not even listed at all.

**Q. All right. I remember that from the manual. You don't have to fill out every level of preference.**

**You referred to Mr. Oyler, and then later this year using the data set, crunching information on the data set. What were you meaning there? What are you referring to when you say "the data set"?**

A. I probably misspoke. What I mean is all of this data still exists. It's --

**Q. It's what? You broke up.**

A. It's knowable.

**Q. Okay.**

A. The data still exists, so although Jay Oyler did not deliver a report to me in 2017 when your client asked to us produce the data, reports, information that I referred to in my letter, this is our best effort at replicating the research that was done then. It may not be spot on, granted; but the data exists. And we could query it any number of different ways. I did my best to replicate the study

that was done in 2017.

**Q. And does that data still exist? In other words, Mr. Glassey wasn't clear about that on how far back the bids -- the monthly bids were kept. Do you have any idea?**

A. We didn't go -- so let me clarify. I don't know that this is drawn from the monthly bids. This data is drawn from what happened. So what actually happened we have. Did you work Saturday? When were you hired? How many Saturdays did you work? And at the time you can see bid and bid preferences. I don't know how long those bids and bid preferences are archived or stored. I don't know.

**Q. All right. Sorry. Just a second. Pulled up the wrong document here.**

**I'm going to show you a document which has been Bates stamped SkyWest 3 -- 3 and 4. We'll make that Exhibit 28.**

(EXHIBIT 28 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) I guess it starts, Todd, with an Email from Johanna Baker and Alan Reinach, and she's forwarding, I assume, your February 3rd letter.**

**Who is Ms. Baker?**

A. She's a paralegal that works for SkyWest Airlines.

**Q. Okay. And the attachment that -- it says:**
**Please see Todd Emerson's response letter.**
**That's the letter we just looked at, correct?**

A. Yes.

**Q. And do you recall receiving this Email back from Mr. Reinach?**

A. I do.

**Q. And you then responded to him later that same day?**

A. Yes.

**Q. Did you have any follow-up conversations with Mr. Reinach prior to the mediation that you both attended?**

A. I don't believe I ever had a conversation with Mr. Reinach until the mediation, and I believe this is the end of our written communication until the mediation.

**Q. Was there any written communication after the mediation with Mr. Reinach?**

A. I don't believe so.

**Q. Have you ever had any written communications with Todd McFarland?**

A. That's possible. I see him copied here. So this is an example of a written communication with Mr. McFarland, but I believe that's because Mr. Reinach copied him on his earlier message. But a direct written letter to Mr. McFarland, I -- it might have happened if he took over from Mr. Reinach. I think I spent my time communicating only with Mr. Reinach, but there might be communication like this with Mr. McFarland.

**Q. Okay. Did you learn at some point that Mr. Cassell had reapplied for a position with SkyWest? And I don't know exactly when the application was, either May or June of 2017.**

A. Yes.

**Q. And how did you learn that?**

A. Coy Bryant brought it to my attention.

**Q. And how did he bring it to your attention?**

A. I believe he walked into my office with a copy of an Email that he received from Mr. Cassell and told me that he had reapplied and maybe had even been interviewed for a position at SkyWest and had run into the same issue with can he get a guaranteed sabbath-free schedule.

**Q. Let me show you a document. I've shown you a document. It's CASSELL -- marked CASSELL 161**

**0to 162. We'll make that Exhibit 29.**

(EXHIBIT 29 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) Have you ever seen this document before?**

A. Can you tell me the Bates numbers again, Erik?

**Q. 161 --**

A. To 62?

**Q. -- to 162.**

MR. PETERSEN: Okay.

MR. STRINDBERG: You can see it on your screen, can't you, Scott?

MR. PETERSEN: Yeah. Well, some of it. You just had it above the numbers so I couldn't see the numbers.

MR. STRINDBERG: Okay. I did that purposely.

MR. PETERSEN: I bet you did.

**Q. (By Mr. Strindberg) Todd, do you remember -- have you ever seen this document before?**

A. This is a form letter with some variation. I've seen this form letter before. This particular letter addressed to Mr. Cassell I can't say. This might be the first time I've ever seen it.

**Q. I'm going to show you another document.**

**It's SkyWest 81.**

MR. STRINDBERG: Do you see that, Scott?

MR. PETERSEN: I can't see the Bates number, but that's fine.

MR. STRINDBERG: We're going to mark that Exhibit 30.

(EXHIBIT 30 WAS IDENTIFIED.)

**Q. (By Mr. Strindberg) And these are a series of emails between Chandler Larsen, Jaime Sorensen and Monica Polad.**

**Who is Chandler Larsen?**

A. Chandler Larsen is a woman who used to work in our human resources department.

**Q. And she's no longer there?**

A. She's not.

**Q. And who is Monica Polad?**

A. Monica is also a specialist who works with the human resources department.

**Q. Is she still there?**

A. Yes.

**Q. And Jaime Sorensen, who is that?**

A. She's a manager in the human resources department, and she still works here.

**Q. But Chandler does not, is what you're saying?**

A. That's correct.
**Q. Have you ever seen this document, Exhibit 30, before?**
A. Yes.
**Q. And when did you first see it?**
A. During document production.
**Q. Did you see it back in June of 2017?**
A. No.
**Q. Did you -- at any point have you had any conversations with Chandler, Monica or Jaime regarding Mr. Cassell or his request for accommodation?**
MR. PETERSEN: Hold on. Prior to June of 2017. If you've had discussions with them since then, don't answer that.
MR. STRINDBERG: Why can't he answer it since then?
MR. PETERSEN: Because we're in litigation. If he's had discussions with them since litigation has started, it would be in his capacity as counsel for SkyWest. Those would be attorney-client.
MR. STRINDBERG: Not all communications that an attorney has are attorney-client privileged, and so --