# Exhibit G

# Remote Deposition of
# Roy William Glassey, Jr.

Date: February 24, 2021

Case: Cassell vs. SkyWest, Inc.

Case No: 2:19-cv-00149-jnp-dao

*Reporter: Kelly Fine-Jensen, CSR, RPR*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

SHANE ANDREW CASSELL, )
)
Plaintiff, )
) Civil No. 2:19-cv-00149-jnp-dao
vs. )
) Judge Jill N. Parrish
SKYWEST, INC., d/b/a ) Magistrate JudgeDaphne A. Oberg
SKYWEST AIRLINES, )
)
Defendant. )
___________________________)

REMOTE DEPOSITION OF ROY WILLIAM GLASSEY, JR.

February 24, 2021

Salt Lake City, Utah

Repored by: Kelly Fine-Jensen, CSR, RPR

REMOTE DEPOSITION OF ROY WILLIAM GLASSEY, JR.

BE IT REMEMBERED that the remote deposition of ROY WILLIAM GLASSEY, JR. was taken via videoconference by the Plaintiff before Associated Reporting & Video, Kelly Fine-Jensen, Court Reporter in and for the County of Salt Lake, State Utah, on Wednesday, the 24th day of February, 2021, commencing at the hour of 11:50 a.m. in the bove-entitled matter.

APPEARANCES (Remotely):

For the Plaintiff: STRINDBERG & SCHOLNICK, LLC
By: Erik Strindberg, Esq.
1516 West Hays Street
Boise, Idaho 83702
Telephone: (208) 336-1788
Facsimile: (208) 287-3708
erik@utahjobjustice.com

ASSOCIATED GENERAL COUNSEL
GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS
By: Todd R. McFarkabd, Esq.
12501 Old Columbia Pike
Silver Springs, Maryland 20902-6600
Telephone: (301) 680-6321
Facsimile: (301) 680-6329
mcfarlandt@gc.adventist.org

For the Defendant: FABIAN VANCOTT
By: Tanner J. Bean, Esq.
215 South State Street, Suite 1200
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
tbean@fabianvancott.com

Also Present: Todd C. Emerson

# I N D E X

## E X A M I N A T I O N

ROY WILLIAM GLASSEY, JR. PAGE

By: Mr. Strindberg....................................4

## E X H I B I T S

NO. PAGE

43. E-mail String, SkyWest 000079-80.................33

44. Interview Notes, SkyWest 000069-78...............27

P R O C E E D I N G S

ROY WILLIAM GLASSEY, JR.,

called as a witness, having been first duly sworn remotely, was examined and testified as follows:

EXAMINATION

BY MR. STRINDBERG:

Q. Please state your full name.

A. Say again, please?

Q. Please state your full name.

A. Okay. And just so you know, you're sounding a little bit muffled.

My full name is Roy William Glassey, Jr.

Q. Let me double check my microphone.

Well, if you can't hear me, let me know.

A. Yeah. I can hear you now. It just sounded a bit muffled. But it sounds clearer now.

Q. Okay. Sounds good.

So, let's just sort of jump into it. You know, the same rules as last time, answer audibly, using words. If you don't understand one of my questions, please let me know.

You indicated, from the last deposition, that in approximately the middle of 2016 you became

the chief pilot and director of flight ops for SkyWest; is that correct?

A. Yeah. That's in that testimony. I believe it was August 2016. Is that what I said?

Q. And as chief pilot for SkyWest, what are your job duties?

A. Well, I stated that when we spoke previously. That should all be in the records from before.

Q. Well, it wasn't clear. So, could you please tell me what your -- I mean, is chief pilot and director of flight operations one position or two positions?

A. It's -- it's one position. Chief pilot is the FAA equivalent title for the Part 119 responsibilities.

Q. Okay.

A. Director of flight operations is our corporate title.

Q. Okay. And what are your job duties as chief pilot/director of flight ops?

A. Well, those are stated specifically in SB 3100. But, in general, just as I stated before, I'm responsible for assuring safety of the airline, policy, compliance of the pilots, and safe

operations.

There are numerous duties. That's why I would refer you back to my previous testimony and/or the SB 3100 reference that lists those out specifically.

Q. Uh-huh (affirmative). So, how do you go about ensuring policy compliance?

A. Can you be more specific? That's a very broad question. We have multiple policies. And as we track the airline and the operation, we just assure that things are running smoothly and as are supposed to run. We have thousands of policies.

So, which specific policies are you asking about?

Q. Well, you said policy compliance is one of our job duties, assuring policy compliance. So, I'm just asking how you go about doing that job duty?

A. Okay. Well, I have a staff. And we monitor and track pilot performance in all areas. We have a very broad collective bargaining agreement, policy manual. We have a flight operations manual. Policies within that. So, we track the -- that's a very broad question for -- for this. We -- we watch the operation very closely. We -- we track the flights. We track the pilots. We stay ahead of

that. And when we see something that might not be within compliance, we investigate further.

Q. And how many people report to you directly?

A. Well, I'd have to look at that. But I have a team of chief pilots, with assistant chief pilots and supervisors. And then we have line pilots. And I'd have to look at the latest, but we're in the neighborhood of 5,000 line pilots. That number varies based on attrition and such.

Q. Right. When you say you track flights, what exactly are you tracking and how do you go about tracking it?

A. Again, that's a very broad question. You know, there's a lot that goes into launching a flight. We have an operational control center that tracks flights. They notify me if there is a concern that's noted. We have a scheduling department that schedules flight crews. I'm notified if there's a concern in that area. That's a very broad question. We have a very robust and broad infrastructure for tracking flights to ensure safety.

Q. Right. But you indicated -- and may I call you "Roy"? Is that all right?

A. Certainly. Uh-huh (affirmative).

Q. Roy, you indicated that you track flights as part of what you did. So, I'm just asking what you do?

A. Well, that's my responsibility, to keep track of this. I'm fed information from multiple data sources.

Q. Uh-huh (affirmative). And what are you looking for as far as tracking the flights? What kind of aberrations or deviations are you looking for?

A. Again, that's -- that is a very broad question. There are unlimited things with that. I'll -- I'll name a few. I need to track -- I assure that flights are operating on time, safely, without any deviations. I'm notified by the FAA if there are deviations, such as course deviations and such. I ensure that pilots are compliant with the policies. You know, when it has to do with just a flight, moving a flight from point A to point B, I'm looking at all the operational touch points as the information is provided to me.

Q. Prior to 2020, how many flights a day would SkyWest typically operate? Do you have any idea?

A. Prior to what date in 2020?

Q. Well, prior to the pandemic sort of causing havoc.

A. Well, I would estimate -- I don't know specifically. But I would estimate prior to the first quarter of 2020, where things slowed down tremendously, I would estimate 2,700 to 2,900 flights per day, depending on the day. But that's a general range. I would have to look at historic data to see what we operated. But that's a general range.

Q. You used the term "deviations." What is a "deviation"?

A. A deviation is any sort of -- as the word implies, it's an excursion from the expected pathway. For instance, if a flight is assigned a flight level of 27,000 feet, and they're at 27,300 feet, they've deviated from their altitude. Same with course. There's -- a flight is supposed to remain on course. And if it deviates off course or if there's an excursion, that's a deviation.

Q. And do you personally keep track of all the deviations from every flight or do other people do that?

A. No. I track what's fed to me that's relevant.

Q. Uh-huh (affirmative). And who -- who is

doing the feeding to you?
A. That's a broad question. We have multiple departments and agencies that watch every flight.
Q. Uh-huh (affirmative). So, I gather what you're saying, like crew scheduling will feed you certain information?
A. Yes. If it's in that area.
Q. What kinds of information -- I mean, I can't imagine that they give you information about every flight. What would cause them -- crew scheduling to feed you information, to use your terminology?
A. Well, if -- again, that's a very broad question. You know, with 5,000 pilots, we may have scheduling issues to get flights covered if we have an absence that disrupts the operation. You know, if we need help or assistance with coverage. If we have an absence that results in an operational disruption, such as a delay or a cancelation, I'm certainly notified.
Q. Okay. Do you meet on a regular basis with the head of crew scheduling?
A. What do you mean "a regular basis"?
Q. Well, do you -- let me ask this. Do you ever meet with the director of crew support, let's

say?

A. Certainly.

Q. How -- and that's Anita Spencer; correct?

A. Correct.

Q. How often do you meet with her?

A. Just as -- as required. We don't have a standing meeting. We -- we meet when it's appropriate to meet.

Q. How about with the people in crew scheduling, do you have any set time or schedule for meeting with people in crew scheduling?

A. I -- we meet as -- just as I said, we meet when it's appropriate to do so, when there's business to take care of or when we have things to work on. So, as far as a set time, like every Tuesday at four o'clock, no.

Q. Uh-huh (affirmative). The reason I ask, Roy, is when I deposed Coy Bryant, he sort of -- and I can't remember the term he used -- but it sounded like there was some kind of a regular meeting that took place in flight ops to review what was going on.

A. We have multiple meetings.

Q. I'm sure you do.

A. Yeah. We have multiple meetings with various participants. So, you know, your question is

very broad. This is a big company, a big airline, a lot of moving parts. We have multiple meetings with multiple individuals.

You asked about a specific meeting with Anita or a standing schedule, it's difficult to answer that question.

Q. So, there's not like a set time that all the directors and flight ops get together?

A. Well, it depends on the week. We have set times and set meetings, and then those meetings get -- times get amended as need be. We do have director meetings, certainly. Every corporation does.

Q. And how often do the directors and flight ops get together?

A. It depends on the week.

Q. Is a weekly meeting scheduled?

A. Normally.

Q. When is it normally scheduled?

A. It depends on the week. You know, the days can change. It gets rescheduled. I'd have to look at my calendar to see what it's scheduled this week. It could be Tuesday and Thursday. It could be Monday, Wednesday, Friday. You know, I don't have it scheduled this week. But, you know, those

meetings -- we have the meetings, but the times are somewhat flexible based on our workload.

Q. And these director meetings, who -- who goes to them?

A. Well, they're generally conducted by the vice president -- or the senior vice president of flight operations, Tracy Gallo, and his director core attend the meetings.

Q. And who is that "core"?

A. That would be the director of crew support, Anita Spencer; director of training, which is David Moxham; director of aircraft operations, which is Chris Brown. And then if somebody else needs to be in the meeting for some specific reason, they'll be brought into the meeting as well.

Q. And you didn't name yourself, but I gather you also attend?

A. Okay. Roy Glassey, director of flight operations attends the director meeting.

Q. What I'm trying to get at, Roy -- I'm not trying to pin you down. Because I understand that your schedule probably varies day-to-day. I mean, what does a typical day look like for you? What do you do on a day-to-day basis, typically?

A. A typical day?

Q. Yes.
A. Oh, again, that's a very broad question. My typical day is -- depending on the day, the time, I have multiple meetings with various individuals. I meet with my chief pilot team. We review crew issues. We review operational issues. We look at performance, our on-time performance and completion, which is critical to our business success. We review that daily throughout the day. We look at crew member attendance. We look at crew member issues. I -- I -- we'd be here till next week with me telling you all the different things. But that's just a general beginning of the day.
Q. Okay. That's the beginning of the day. What then happens?
A. That's also throughout the day. You know, that all happens -- you know, I get multiple e-mails, messages, calls. We have operational issues. You know, if we have an aircraft issue, a return to field issue, we need to follow up with the crew members. It just goes on and on.
So, my typical day cannot be described as "typical."
Q. You used the term "return to field." What does that mean?

A. If an aircraft takes off with a destination in mind and they're unable to continue, they'll have to return -- and asks to return to field for a mechanical issue, we call that a "return to field." That's just an example of some of the operational issues that we might deal with. Obviously, a return to field situation requires follow up with the flight crew. So, I brought that up just to illustrate a typical task.

Q. Okay. And you used the term "we," saying we look at on-time performance, absences, things like that.

When you say, "we," who are you referring to?

A. Well, primarily myself and the chief pilot group, the supervisors, and assistants. My staff.

Q. How many people are there in this chief pilot group?

A. Well, I have -- and I went over that last time we met. So, do you want to refer back to the record? I believe we talked about that; didn't we?

Q. In part. I'm asking you to be more specific.

A. Well, I was very specific last time, from my recollection. I explained the regional oversight

structure.
Q. Uh-huh (affirmative).
A. Do you want me to restate that?
Q. Well, how many chief pilots do you have?
A. I have six chief pilots.
Q. And where are they located?
A. We have regions. But their primary work locations would be Portland, Los Angeles, Salt Lake City, Denver, Minneapolis, and Chicago.
Q. And how many assistant chief pilots are there?
A. Oh, I -- I might be off by one or two, but I think I have 28 that are divided among the regions. I'd have to look at my directory.
Q. And then you said below that, there were supervisors? Did I understand that correctly?
A. They're within the 28. So, with the -- or the -- that's a ballpark. We've had a few replacements. But there's assistant chief pilots and flight operation supervisors, whose function -- although their titles are different, the functions are very, very similar. They assist the regional chief pilot.
Q. Okay.
A. Local domicile staffing.

Q. We were just deposing Anita Spencer. And she was talking about pilots dropping flights and trading flights and those types of things.

I gather that's something her department takes care of, as opposed to your department; is that correct?

A. Primarily, yes. Yeah.

Q. And you would only get involved, say, in a drop or a trade, that type of thing, if it causes, in your words, an operational issue; is that correct?

A. Correct. That, or breach in seniority, breach in policy.

Q. Do breaches of seniority occur quite often or is it a rare occasion?

A. It -- it's rare because we have very specific policies to prevent that.

Q. But if there is, what happens? Might a pilot make a complaint regarding seniority issues that would come to you?

A. Yes. They could file a complaint. They could file it through the labor group.

Q. And are you the one who would ultimately resolve any seniority issue?

A. Well, I'm -- I assist with that.

Q. And who -- who else is involved in that?

A. Well, there are several. You know, the crew support department and -- because there's generally a scheduling issue or whatever. Yeah. Ultimately, comes to me.

Q. Okay. Does Tracy, your boss, get involved as senior VP?

A. He does when he needs to.

Q. And I gather you split your time between Chicago and St. George; is that correct?

A. Yes. My primary work location is St. George. With -- with the pandemic, I've been working remotely into the Chicago area more than normal. But my position does take me around the system. We have several domiciles, and I do need to get out to the domiciles and visit those.

Q. So, understanding that schedules have been changed because of the pandemic, but pre-pandemic, would you travel to each of the domiciles on a regular basis?

A. Yes.

Q. And how many domiciles does SkyWest have?

A. Well, pre-pandemic, 20. We're down to 18.

Q. And how often would you get to those 18 or 20 domiciles?

A. I can't really answer that accurately.

Really, as needed. You know, some I would visit more than others based on crew activity and such.

Q. Does your department -- do you call it a "department" that you're over? Is that the terminology you use?

A. Department?

Q. Yeah. Yes.

A. Yeah. Flight operations department. Yes.

Q. Okay. Does the flight operations department get involved in training issues at all?

A. Well, training is within the department. And that's assigned under our director of training.

Q. And who is the director of training?

A. Dave Moxham.

Q. But Dave doesn't report to you; does he? Or does he?

A. No. Dave reports -- David Moxham is the director of training. He reports to the senior vice president of flight operations.

Q. Okay. Is there anyone in your chain of command -- in other words, people who report to you -- who are responsible or get involved in training issues?

A. No. No. Not really. No.

Q. Who makes sure that pilots are -- I gather

they have certain -- a pilot has certain like annual requirements they have to meet for training; is that correct?
A. Correct.
Q. And who makes sure that pilots are meeting those requirements?
A. That would be under the training department. Flight operations training, to be specific.
Q. Okay. I'm going to show you a document.
A. Okay. It's on the screen here. Okay.
Q. What I'm showing you is what was previously marked as Exhibit 3. It's a document from Spencer Hinckley to Coy Bryant, from September 1st of 2016.
Have you ever seen this document before?
A. Let me read this.
Q. Please.
A. I don't recall seeing this.
Q. Do you -- who is Spencer Hinckley? Or I should say, what position did Spencer Hinckley have in September 2016?
A. I don't know. I don't know that name.
Q. Were you -- okay. Let me get another document up for you to look at.

Okay. Roy, I'm now showing you, with luck, what's been marked as -- previously marked as Exhibit 6. And it starts out -- there's a couple of e-mails. I want to focus on this one here.

So, the e-mail is from Shane Cassell to Coy Bryant, dated October 27, 2016. And the subject is Religious Accommodation Form.

And then in the next -- there's a second page to this, which is the Employee Request for Religious Accommodation, which was filled out by Mr. Cassell.

Have you ever seen that document before?

A. I don't recall seeing this. Let me read through this.

Q. Please.

A. I -- I don't recall seeing this.

Q. Were you notified back in this time frame, the time frame being September to November of 2016, that a newly-hired pilot was asking for a religious accommodation?

A. If that pilot was in training, I would likely not be notified. And I don't recall being notified of this one.

Q. Okay. Okay. Let me show you another exhibit.

Okay. This was previously marked as Exhibit 14. It's a Memorandum of Agreement for Religious Accommodation.

This version -- this one is signed by Jake Whicker. Eventually it was also signed by Coy Bryant.

Have you ever seen this document before?

And take whatever time you need to read it.

A. Yeah. Let me read through this.

No. I don't recall seeing this one before.

Q. About that time, around October 27, 2016, did you have any conversations with Jake Whicker regarding granting certain accommodations to Mr. Cassell?

A. I don't recall having a conversation. It wouldn't be up to me to grant the accomodation.

Q. Who would it be up to?

A. Employee relations, HR.

Q. Did Coy Bryant -- did you have any conversations around October 27th with Coy Bryant about granting him certain accommodations, religious accommodations?

A. I don't recall.

Q. There was an issue -- I'll represent to you there was an issue that came up about this time, the following month I should say, regarding some scheduling of Matrix training for Mr. Cassell, which led to his resignation.

Was that ever brought to your attention and were you ever brought into the loop on that?

A. Not back then. Just as of -- no, not back when that happened. This was something that I learned when I reviewed the most recent interview notes. But that's...

Q. When you say, "reviewed the most recent interview notes," what are you talking about?

A. Well, Mr. Cassell interviewed. And the interview -- the team takes notes. And it was noted that he had been here in 2016. So, that's really about all I can recall on this. He left training for a scheduling issue.

Q. Let me pull a document up.

Roy, you just referred to reviewing some interview notes. We have here -- and I can scroll through them. Whatever is best for you. They were provided to us by SkyWest. And it appears to be -- it says, "Interview Questions." And then in blue there's some kind of -- I gather -- notes that were

taken.

Are these the interview notes that you reviewed?

A. Scroll down for me, if you would, please.

Q. Okay.

A. Stop right there. Okay. And scroll down further. And scroll down further. And scroll down. And scroll down further. Okay. And scroll down further.

Q. These are a series of questions. Let's see when the notes start again.

This appears to be some notes that were done -- the first set of notes was in 2015, I gather. And then this one seems to be from 2016.

A. Yeah. This is not the most recent interview.

Q. Right. Let me keep scrolling.

So, this one, we're on page 5 of 10, seems to be, I gather, an interview he did in 2016. For whatever reason, these are not dated specifically.

Okay. Here, for example, on this page it shows: "Previously interviewed: Yes. 7/15/2016."

And then these notes say, "August 2016, accepted offer. Encountered a scheduling conflict in training. He resigned from SkyWest during Matrix

session."

Do you recall reviewing this note?

A. Yes.

Q. I'll keep scrolling so we can get through to the end.

A. Okay.

Q. This is just some notes on the -- some scenario he had to go through.

And then this talks about: "Recognizes how big a deal it is to have a third chance. Appreciates the opportunity."

A. Okay. You can scroll down.

Yeah. This -- this -- I recognize this.

Q. Okay. So, are these -- a moment ago, Roy, you said you reviewed some interview notes. Are these the interview notes you were referring to?

A. These are.

Q. And when did you review them?

A. Well, they were -- I don't recall the date. But following the interview, the file was sent to me for review, which I did.

Q. Following -- I'll represent to you, and I don't think there's any dispute, Mr. Cassell was offered a job in 2015. He turned that down because some -- it had nothing to do with SkyWest. He then

was hired in the latter part of 2016, and ran into this conflict in the training, which caused him to resign. And then applied again in 2017. So, there were these three separate interviews and hirings and job offerings.

When was the file sent to you?

A. I don't recall the date. There's an e-mail that would get sent to me. So, I would have to look for that to tell you what date it was sent. But it was post-interview.

Q. Was it -- can you put a year on it? Was it in 2017?

A. Well, is that when this interview occurred? 2017? I believe it was.

Q. The third interview was in 2017, yes.

A. Then it was sent to me shortly after that interview. The comments on this -- well, go ahead.

Q. No. Go ahead. Say what you were going to say.

A. No. This was sent to me after the interview in '17.

Q. Okay. I'll ask you more about that in a second. But --

MR. BEAN: Hey, Erik, did you want to mark that?

MR. STRINDBERG: Yes. We will mark that as Exhibit 44. SkyWest 69 through 78 are the Bates numbers it.

Thank you for reminding me.

MR. BEAN: Thank you.

(EXHIBIT 44 WAS MARKED.)

Q. (By Mr. Strindberg) I'm going to ask you about that in a moment, Roy.

At the end of -- end of 2016, Mr. Cassell's attorney sent a letter which referred to Mr. Emerson, Todd Emerson, who I gather is in the room with you. And there was some correspondence that went back and forth between that attorney, a gentleman by the name of Alan Reinach, went back and forth between him and Todd Emerson.

Were you -- did you see any of that correspondence between the two attorneys?

A. No. It does not sound familiar.

Q. Let me show you -- just so we can orient you in time.

I'm showing you what's been marked as exhibit -- previously marked as Exhibit 7.

A. Okay.

Q. This is a letter from Mr. Emerson that was sent to Alan Reinach, addressing some of the issues

he had raised -- Mr. Bryant had raised in his e-mail.
A. Okay. Can you scroll down?
Q. Yes.
A. Okay.
Q. Have you ever seen this document before?
A. I don't recall seeing this. No.
Q. Do you recall having any conversations with Mr. Emerson about Mr. Cassell or his request for an accommodation around this time period, which is December of 2016?
MR. BEAN: Erik, I'll object to the extent this goes to any privileged information that you were seeking legal advice in this matter.
MR. STRINDBERG: Are you going to direct him not to answer then?
MR. BEAN: There might be another question or two before we get there.
Q. (By Mr. Strindberg) Well, the general question -- I just want to know if he had any conversations with Todd Emerson about Mr. Cassell or his need for an accommodation around this time, around December of 2017?
MR. BEAN: And, Roy, you can go ahead and answer that.
THE WITNESS: I don't -- I don't recall

specifically that. No.
Q. (By Mr. Strindberg) You say you don't recall that "specifically." Is there something generally you recall?
A. No. I'm just -- you were asking the question. And as posed, I don't recall a conversation.
Q. Okay. I can re-share this with you, but in the letter -- let me just share it again.
It says here -- and I can try and outline it. Be really clever.
One of the statements that Mr. Emerson says is: "When Mr. Cassell has low seniority, he will absolutely and unavoidably be required to work on Saturday and other holidays as more senior pilots typically avoid working those days."
Have you at any point had any conversations with Mr. Emerson regarding whether or not someone -- a new pilot could avoid working on Saturdays?
A. Well, it's -- perhaps. Everybody knows -- in my experience, weekends off just are not available for newer pilots. Traditionally, weekend scheduling is put on the more junior pilots. Senior pilots are generally able to have more of an opportunity. And

it depends on the base. But junior pilots get stuck working weekends. My experience is they just can't get weekends off.

Q. Okay. My question, though, was: Did you ever talk with Todd Emerson about that topic?

A. I don't recall. Perhaps. I mean, this is several years ago. And we've had lots of conversations about pilot policies and such in general.

Q. Well, I'm specifically referring to Shane Cassell and his request for an accommodation, which was to try and avoid working on his Sabbath, which was Friday night to Saturday night.

A. Again, I don't recall specifically. But in my experience, a junior pilot will -- it's very unlikely a junior pilot would be able to get Fridays, Saturdays, and Sundays off.

Q. But you don't recall having a conversation with Todd Emerson about that issue, about Shane Cassell's requested accommodation?

A. Well, I've just answered that. This is four years ago and I've had several conversations. So, to connect it per your question, I can't answer that accurately.

Q. Several conversations with Todd or with

other people?
A. I -- I don't understand what you're asking me.
Q. Well, you just said you've had several conversations. So, I want to know who you've had conversations with?
A. You need to be more specific on the conversations' subject matter. Because my statement was general. I speak with HR. I speak with Todd. I speak with my chief pilots. I speak with the front line pilots.
Who are you asking about a conversation with?
Q. Okay. I'll be more specific. Thank you.
Have you ever talked with Todd Emerson about Shane Cassell and his religious beliefs and the need to have the Sabbath off?
A. Are you asking me if I consult with our legal team if there is somebody that is requesting an accommodation?
Q. Well, I'll ask that next.
I'm first asking specifically about Shane Cassell. Have you ever talked about Shane Cassell with Todd Emerson?
A. I -- I may have. I don't recall

specifically. But...

Q. Okay. Have you ever talked with Todd Emerson about any pilot who was requesting some sort of an accommodation because of their religious beliefs or practices?

A. I don't -- I don't recall.

Q. Do you have any recollection of talking with Todd Emerson about an Orthodox Jewish pilot who was requesting the Sabbath off?

A. I -- I don't recall specifically. No. I'd have to look in my notes. I don't recall.

Q. What notes would you look at, Roy?

A. I don't have notes, really, on something like that. I would just -- I don't recall.

Do you have a name for that individual? It might help me recall.

Q. I don't.

Do you recall any conversations with anyone at SkyWest about whether it might be possible to alter someone's schedule so they wouldn't have to work on the Sabbath?

A. I vaguely -- and this might be connected to your earlier question. I vaguely recall a pilot that needed a specific day off. I don't recall which day. And I just sent that over to -- to human

resources.
Q. Do you recall who in human resources?
A. I don't recall. Whoever the HR manager was at the time.
Q. What else do you recall about that?
A. That's -- that's about -- really nothing more than that. There was a need for a day off. It was something to refer to HR, so I did.
Q. And do you know what the outcome of that was, of that referral?
A. I -- I don't recall specifically. No.
Q. Do you know of any situations in which SkyWest has granted any type of religious accommodation to a pilot?
A. I don't know.
Q. You don't know of any? And I'm going beyond just scheduling issues, Roy. I'm talking about maybe a religious accommodation regarding a piece of clothing, that type of thing.
A. I don't know.
Q. I'm going to show -- share with you a document which we will mark as Exhibit 43.
(EXHIBIT 43 WAS MARKED.)
Q. (By Mr. Strindberg) And it's a two page document. I'll start at the second page.

It is from someone -- a Jason Cordova. Do you know who that is?
A. Yes. Jason is no longer with the company. But Jason was a -- he was part of the interview -- pilot selection team.
Q. And were they -- that pilot selection team, was that part of human resources?
A. Well, no. This -- Jason -- I'm trying to think back. He worked in the pilot sourcing section for flight operations. So, Jason was a coordinator. He conducted interviews, along with the pilot recruiting team.
Q. Okay. And, so, it says: "I've placed the following pilot candidate on the hiring dashboard for your review."
Do you know what the "hiring dashboard" is?
A. That's the software system we use to record interview -- well, keep the resume, the interview notes, and all that. It's the hiring tool.
Q. Okay. And then let's look at this -- I'm going to reduce the size a little bit so we get more of it in here.
It says, "Ian Whiting." First of all, who is Ian Whiting?

A. Ian Whiting, he's currently a flight operations analyst. But back in -- that's 2017? Ian was -- he had oversight of the pilot sourcing activities. So, that's why he would be consulted here.

Q. And what do you mean by "pilot sourcing"?

A. Pilot hiring.

Q. It says: "Can you give me a call on this one when you get a moment, please?"

And you say: "Will do."

I assume you did, at some point, talk with Mr. Whiting about Mr. Cassell then?

A. I don't recall if I called him on this or not.

Q. Do you recall receiving this e-mail from Ian regarding Mr. Cassell?

A. I -- well, I suppose I do. I receive several e-mails. This one looks familiar.

Q. Okay. What did you do regarding Mr. Cassell and this e-mail you received from Ian Whiting?

A. Nothing regarding this e-mail.

But if you scroll down to the bottom of that, from Jason Cordova -- down further. Okay. That was sent -- that was sent to Ian. And then I

receive something that looks just like that normally.
Q. Well, I gather just -- it appears -- this seems to be a string of e-mails that was put together.
A. Okay.
Q. For example, in other words, this -- this top part with SkyWest -- or, excuse me, the bottom of SkyWest 79 seems to be attached to what's the top of 80, SkyWest 80. And then I guess attached to this, it says, "Shane Cassell resume."
A. That's a standard e-mail that's sent out when there's an applicant that needs further review.
Q. Okay. And then I gather it was forwarded to you from Ian.
Were you also forwarded Shane Cassell's resume?
A. Well, I would have had an e-mail that looked just like that one down there from Jason Cordova for me. So, this one to Ian, he likely was assuring that I had that in my review bin.
Q. So, someone else would have sent it to you directly is what you're saying?
A. Well, right. One of the recruiters. Jason Cordova, perhaps, in this case. I'd have to look. But I imagine I received the same e-mail.

Q. Okay.
A. Sent to Ian first and then to me or in duplicate. But I should have received an e-mail.
Q. Okay. So, you recall receiving the e-mail either from Jason Cordova or from Ian Whiting.
What did you do once you got it?
A. I conducted a file review.
Q. And what's involved in conducting a file review?
A. I review the interview notes.
Q. Anything else?
A. Well, review the interview notes, the resume to determine if the applicant will be -- move forward for hire.
Q. Do you do that with every applicant or just ones that are referred to you?
A. Those that are referred to me. They're put in a -- what's called a "review bin."
Q. Okay. And who puts them in the review bin? In this case, would it have been Ian or Jason?
A. No. In this case, it would have been -- whoever is listed on that -- more than likely, Jason, in this case. But whoever conducted the interview that required the further review.
Q. Okay. And what do you recall about your

review?

A. Well, I reviewed the application. And it was quite clear that there was a schedule -- the applicant was unable to accommodate the schedule that we were hiring pilots for.

Q. And why was that?

A. What do you mean "why was that"? Why was he unable --

Q. Yeah. What was -- what did you feel was lacking?

A. Well, he expressed that he would -- he had scheduling limitations that he would be inflexible on. And the notation -- if you want to go back to that previous interview note from 2017, I'll point out exactly what was said.

Q. Okay.

A. Yeah. He was inflexible. So, we --

Q. Those were --

A. He stated his insubordination before he even started.

Q. Okay. Just give me one second.

A. Okay.

Q. I'm going to pull up again Exhibit 44. And I'll go down to the bottom.

Are these the notes you're referring to,

Roy?

A. I'm not seeing anything on the screen.

Q. Yeah. Sorry. I apologize. Probably rather look at that than me, I'm sure.

A. Okay. So, "Additional Comments. Third interview." It says, "Has expressed unwillingness to be flexible with schedule without any exception."

Q. Is that what you were referring to when you said that he was expressing he would be insubordinate?

A. Yes.

Q. So, once you reviewed these minutes -- or excuse me, these notes, do you recall what else you reviewed?

A. Well, just this -- I don't recall specifically, but anything I had in this document.

And, also, if you move up, it has a statement that he had been hired -- where was it? Just scroll on up, if you would, please.

Q. Well, it says here, "Emphasized the reality of schedule bidding and reserve. Explained that we are a 24/7/365 operation."

Is that what you're referring to or do you want me to keep going?

A. That's one of the lines. But the entire

document's looked at.

But it's quite clear from the interview notes that the applicant was unable to work the schedule.

Q. And that was because he had told the -- I assume he had told the interviewers that he needed to have the Sabbath off; is that what you're referring to?

A. I don't know what he told the interviewers, other than he had a schedule restriction and he would be inflexible.

Q. Now, let me show you another document, though.

I've put up what's been marked as Exhibit 11, which is a letter that Shane wrote to Coy Bryant regarding this issue of the Sabbath observance.

Why don't you just take a moment to read that.

Do you want me to make it bigger, Roy?

A. I can see. I'm squinting a little bit.

Q. I can make it a little bigger.

A. That's better right there. Okay.

Okay. Can you scroll down, please? Okay.

Q. Have you ever seen that document before?

A. Yes.
Q. When did you see it?
A. I don't recall. Whenever it was sent.
Q. Was this document -- Exhibit 11, was this part of the materials you reviewed?
A. What's that?
Q. Was this document, this letter from Shane outlining his religious beliefs and observances, was that one of the documents you reviewed as you were reviewing his application?
A. No. This was after the application -- this wasn't part of the application process.
So, go to the date on this.
Q. Right. This is June 29th. The e-mails from Ian that we had just looked at were June 22nd. So, about a week earlier.
A. So, what date was the regret notification sent?
Q. Let me show you that document.
This is a document --
A. I can't see it.
Q. Sorry.
A. It's still obscured.
MR. BEAN: I think we might have lost Erik for a second there.

(Brief pause.)
Q. (By Mr. Strindberg) I believe this is the regret letter you were referring to, Roy?
A. No. That's -- that looks like the regret. No. I hadn't seen that.
Q. Okay. Well, you were asking for the date of the regret letter. So --
A. No. What I wanted was the date of that memo from Jason Cordova.
Q. That was June -- the one we looked at a moment ago was June 22nd.
A. Okay. And what was the date of the letter that Shane sent?
Q. June 29th.
A. Okay.
Q. And then this was -- Shane was informed on July 12th that he would not be hired.
A. Okay. And you had a question about -- you asked -- did you ask if I reviewed that letter as part of the file review?
Q. Well, part of your review of the situation.
A. No. No. The interview notes are what I reviewed.
Q. Okay. And what did you do after you

reviewed the interview notes?
A. I elected to not further the application. I recommended regret.
Q. And who did you recommend that to?
A. What I do with the -- well, I notify our HR team, who puts that in a queue to notify the applicant of the decision.
MR. STRINDBERG: And -- okay. Let's take a break at this point. Todd -- my Todd -- needs a moment. And then we'll get back, say, in ten minutes.
MR. BEAN: Okay.
(Break taken at 12:55 to 1:18 p.m.)
Q. (By Mr. Strindberg) So, Roy, let's just make -- get the dates correct.
The e-mail we looked at from Ian was dated 6/22. Okay.
And the regret letter, which was Exhibit 34, was July 12th. So, 20 days later.
And then we looked at this Exhibit 10, which was the -- excuse me, Exhibit 11 -- which was the --
A. And I can't see that. I'm just seeing where the exhibits were -- okay. Here we go.
Q. Exhibit 11 is dated June 29th.

A. Okay.
Q. And you said after reviewing the interview notes, you contacted HR. Do you know when you contacted HR? The date?
A. I don't recall the date.
Q. Do you recall how you contacted them?
A. E-mail response.
MR. STRINDBERG: Tanner, have you produced that e-mail? I don't recall seeing an e-mail from Roy to HR.
MR. BEAN: Let me check the e-mails here real quick.
I could be wrong about this, but I don't have an e-mail from Roy to HR.
THE WITNESS: Well, it could have been a phone call. I don't -- I don't recall, you know. I get these notifications about the review board and I'll reply regret or accept, depending on the file. And sometimes it's a phone call.
Q. (By Mr. Strindberg) And would you have had -- we don't have an e-mail. If you had called them, who would you have called?
A. Whoever sent the notification over. Which would be, in this case -- well, it could be -- it could be anybody that's involved in the hiring

process.

Q. But it would likely have been either Jason or Ian?

A. Or a point of contact in HR. Again, I don't recall. It's been four years ago.

Q. And you said a few seconds ago you would have typically, what, just said accept or regret, that type of thing?

A. Yes. It's generally the most efficient. And that's -- yeah.

Q. And do you know if that's what you did in this case?

A. I said I don't recall.

Q. Okay.

A. It's four years ago.

Q. Do you know -- this Exhibit 11, which is June 29th, so approximately seven days after you were notified of the issue with Shane Cassell, do you know if you contacted HR before or after you received this June 29th letter, which is Exhibit 11?

A. Well, I -- the regret decision was made before that letter.

Q. Okay. But you do recall receiving this letter, which is Exhibit 11? I can share that again with you.

A. Yeah. If you would pull that up again.
Oh, yes. I saw that. But long after the regret.
Q. Okay. And did you contact Coy Bryant after you received this letter?
A. I don't -- I don't recall. I believe it was just shown to me.
Q. By whom?
A. I don't -- I don't recall. It's -- I don't know.
Q. Do you recall any conversations with Coy Bryant about getting such a letter from Shane?
A. Only that he still did not indicate unrestricted schedule adherence. He didn't -- he didn't get to the core issue in this letter.
Q. That -- is that what you told Coy Bryant?
A. I don't recall what I told Coy Bryant.
Q. And why do you believe that Mr. Cassell had not gotten to the core issue in this letter?
A. Well, read the letter. It's quite clear.
Q. Well, could you just -- why don't you look at it and tell me what in that letter you feel showed that he didn't get to the core issue?
A. You want me to read the sentences? What do you want me to do?

Q. Yes. Why don't you tell me which sentences.

A. Well, I know there's a sentence that's missing.

Okay. Let's take a look here. "SkyWest can rest assured I will represent the company with the utmost professionalism and integrity both on and off the clock. I realize that SkyWest cannot guaranteed that I will be provided a schedule that will always allow me to observe my beliefs. Therefore, it has and will continue to be my intent to use the tools that SkyWest has provided to either bid out of, drop, or trade a shift that may conflict with my beliefs. I have mentors within SkyWest that understand the PBS system. They have offered to teach me how to properly use the system in order to create a schedule that both meets company and personal needs. I'm willing to bid for the most undesirable flights, stay at the most junior base, and fly the most junk aircraft in order to avoid conflicts with corporate policy. If there was an unforeseen circumstance, such as, but not necessarily limited to, a maintenance delay at an out station and my duty time was extended, I would be willing to fly the aircraft back to the base, as my concern for the

safety and wellbeing of my passengers falls within my religious beliefs."

Q. Okay.

A. He does not state that if I -- if he bids a schedule for PBS and gets an assignment on the day he wants off, the Sabbath in this case, he does not state that he will -- if he's unsuccessful in utilizing our tools, he will honor the schedule.

Q. Okay. So, are you saying it's not so much what's in this letter as what's not in the letter?

A. He just -- he did not state that if unsuccessful after using all the tools that are available, that he would honor his schedule.

Q. I'm going to have you look at -- okay. And your recollection, just so I'm clear, is by the time you were shown this letter, which is Exhibit 11, you had already told HR not to go forward with hiring Mr. Cassell; is that correct?

A. Correct. Shortly after reviewing those interview notes that you saw, I made my decision to regret.

Q. Okay. Let me show you another document.

Okay. This has previously been marked as Exhibit 30. It's a series of e-mails. One is from Monica Polad, Jaime Sorenson, a copy to Chandler

Larsen.

And then on top is from Chandler Larsen back to them.

And do you know who Chandler Larsen is?

A. She was in the HR department.

Q. How about Monica Polad?

A. Yeah. It's down here in the signature line. She's in the HR department.

Q. And Jaime Sorenson, do you know who that is?

A. He's with HR.

Q. Okay. Were any one of those three the people you talked with when you told them to regret Mr. Cassell?

A. I don't recall. They would all be notified when the regret decision is made. But I don't recall.

Q. Okay. There's a sentence here: "Based on conversations Coy has had with Shane, we will probably have to get Todd in the loop."

Coy said that's a reference to Todd Emerson.

Around this time, late June of 2017, did you have any conversations with Todd Emerson about hiring or not hiring Shane Cassell?

MR. BEAN: Object. Asked and answered.
Q. (By Mr. Strindberg) Go ahead.
A. Ask that again, please.
Q. In late June of 2017, did you have any conversations with Todd Emerson about hiring or not hiring Shane Cassell?
A. At that time, I don't recall.
Q. So, when you say you don't recall, does that mean it's possible you had some or -- and you just don't recall or are you saying you just didn't have any?
A. It means I don't recall.
Q. Recall whether or not you talked with him; is that what you're saying?
A. You asked the question, and I don't recall if I did or not.
Q. Okay. Thank you.
Let me show you another.
I'm showing you what's been previously marked as Exhibit 10, which is an e-mail from Coy Bryant to Shane Cassell regarding the letter regarding his religious beliefs. It says, "Can you add one more aspect of what happens if your training goes late?"
Have you ever seen this e-mail before?

A. No. I don't recall seeing that. No.
Q. I'm showing you, hopefully, some e-mails that have been previously labeled as Exhibit 33. And particularly focusing on this one from Coy Bryant to you, dated July 11, 2017.
Do you recall receiving that one?
A. Yes.
Q. And Coy indicated, as I remember, in his deposition, that attached to this e-mail was that June 29th letter from Cassell.
What, if anything, did you do when you received this e-mail from Coy?
A. What do you mean what did I do?
Q. Well, I assume you read it; right?
A. I -- I read it. But my -- but the regret decision was made long before this -- this came across.
Q. Okay. So, you read it. And then are you saying you didn't do anything further?
A. Well, I'm not sure I understand your question. What do you mean "didn't do anything further"?
Q. Well, when one gets an e-mail, one can read it and trash it or respond to it or it can cause you to take some other actions, like calling someone.

Did you do any of those things?

A. I don't recall what I did after reading that.

Q. There is a blacked out part here that says, "Attorney work product," which indicates that an attorney, I think Mr. Emerson, somehow contributed to this discussion.

Does that refresh your recollection of whether or not you had any discussions with Todd Emerson about hiring or not hiring Shane Cassell?

MR. BEAN: And, Erik, I'll object to the content of that conversation obviously as privileged.

Q. (By Mr. Strindberg) Right. And I'm not asking about content. I'm just asking if it refreshes his recollection whether he talked to Todd.

A. Well, I don't recall. If it's blacked out, I can't see what's in there.

Q. I'm going to show you another e-mail here in a second, with any luck.

This is a -- an e-mail which has been previously marked as Exhibit 36. And it's from Chandler to Sorenson and Kolb. And it says, "How does this sound to you guys?"

Have you ever seen this before?

A. No. I don't recall seeing that.

Q. Do you -- this is dated July 12th, this e-mail, which is the same day that the regret letter is dated.

You indicated that you saw the e-mail -- the first e-mail referring the matter to you on or about June 22nd.

Do you have any idea why it took HR like another 20 days or so before they sent out the regret letter?

A. I don't know.

Q. There must be situations, I assume, Roy, where you hire pilots who you know are going to have some scheduling conflicts, like military, pilots in the military; correct?

A. Well, we hire military pilots.

Q. Right. And you know that if someone's on active -- you know, in the military, that they're going to have to take leave during the year, throughout the year for practice or whatever, training; is that correct?

A. Well, military pilots follow the approved and legal process for military leave from time to time.

Q. What do you mean the "approved and legal process"?

A. Are you familiar with USERRA and the military leave process?
Q. Well, why don't you explain to me what you're referring to.
A. Well, that would be better explained by HR. But you're asking if military pilots take leave, and the answer is some do, some don't.
Q. Well, when you hire someone who's in the military, you know there's a possibility that they're going to take leave at some point for military training. That doesn't prevent SkyWest from hiring those pilots; correct?
A. No.
Q. "No" what?
A. Restate your question. I thought I answered.
Q. Well, yeah. Your "no" is confusing.
A pilot has applied and he or she indicates that they are in the military and that in all likelihood they're going to have to take time off for training, in those situations, would that preclude SkyWest from hiring them?
A. No.
Q. When you say, "no," you mean, no, it would not preclude SkyWest from hiring them; is that

correct?
A. Well, that's what you asked me.
Q. Right. I'm just making sure I understand your answer.
The fact that a pilot might have training obligations in the future does not prevent SkyWest from offering them a position; is that correct?
A. Specifically with a military pilot, active military --
Q. Yes.
A. -- it does not preclude hiring.
Q. It does not preclude hiring? I'm sorry. I didn't hear you.
A. Maybe ask the question again. Because you asked about military. Then you asked without using the term "military."
So, ask the question as you intend it --
Q. We're talking about military pilots.
A. Okay.
Q. An applicant comes in, qualified, but they're in the military, and they indicate they're going to, in all likelihood, have time off for training in the future. Does that preclude SkyWest from hiring them?
A. No.

Q. And then I was clarifying what you were saying. And you indicated that, no, SkyWest -- or you meant SkyWest would go ahead and offer them a job if they were otherwise qualified; is that correct?
A. If the applicant is otherwise qualified, certainly.
Q. Okay. Give me one second.
Did you, Roy, at any point in this process ever talk to anyone from SAPA to see if they would be willing to, if necessary, make changes in the seniority bidding system to allow Mr. Cassell to avoid working on the Sabbath?
MR. BEAN: I'll just object as to vague. If you could specify the time period a little bit.
Q. (By Mr. Strindberg) Well, at any time in 2016 or 2017, Roy, did you ever talk with anyone in SAPA about whether SAPA might be willing to agree to some modifications in the seniority bidding system to allow someone like Shane Cassell to avoid working on Saturday?
A. I don't recall a conversation like that. No.
Q. Have you ever had such a conversation with SAPA?
A. I just answered that.

Q. Well, I was asking specifically about 2016 and 2017. Now I'm expanding it to ever. Have you ever talked with anyone at SAPA about a possible modification to the seniority bidding system to allow someone to avoid working, say, on the Sabbath?
A. No. I don't recall ever having a conversation to that effect. No.
Q. Do you know who Jay Oyler is?
A. Yes.
Q. And does he -- he no longer works for SkyWest; correct?
A. I don't believe he does. No. I believe he left.
Q. Have you -- do you recall ever talking with Jay Oyler about scheduling issues and whether new pilots might be able to avoid working on the Sabbath and using the tools that SkyWest has provided to them?
A. I don't recall any such conversation.
MR. STRINDBERG: I have nothing further. Thank you.
MR. BEAN: No questions on our end.
MR. STRINDBERG: Okay. Do you want the witness to review and sign?
MR. BEAN: I think yes. That would be good.

(The remote deposition concluded at 1:42 p.m.)

* * *

(Signature was requested.)

VERIFICATION

STATE OF ______________)
) ss.
COUNTY OF _____________)

I, ROY WILLIAM GLASSEY, JR. , being first duly sworn remotely on my oath, depose and say:

That I am the witness named in the foregoing remote deposition taken the 24th day of February, 2021, consisting of pages numbered 1 to 58, inclusive; that I have read the said deposition and know the contents thereof; that the questions contained therein were propounded to me; that the answers to said questions were given by me, and that the answers as contained therein (or as corrected by me therein) are true and correct.

Corrections Made: Yes_______ No_______

_________________________________
ROY WILLIAM GLASSEY, JR.

Subscribed and sworn to before me this ________ day of ________, 2021, at __________________, Utah.

_________________________________
Notary Public for Utah
Residing at______________, Utah.
My Commission Expires: ________.

REPORTER'S CERTIFICATE

STATE OF SALT LAKE )
) ss.
COUNTY OF UTAH )

I, KELLY FINE-JENSEN, Certified Shorthand Reporter and Registered Professional Reporter in and for the State of Utah, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn remotely by me to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 17th day of March, 2021.

____________________________
KELLY FINE-JENSEN
CSR, RPR

**Exhibits**

**Exhibit 43** 33:22,23
**Exhibit 44** 27:2, 6 38:23

**1**

**10** 24:18 43:20 50:20
**11** 40:15 41:4 43:21,25 45:16, 20,24 48:16 51:5
**119** 5:15
**12:55** 43:13
**12th** 42:17 43:19 53:1
**14** 22:2
**17** 26:21
**18** 18:22,23
**1:18** 43:13
**1:42** 58:1
**1st** 20:14

**2**

**2,700** 9:6
**2,900** 9:6
**20** 18:22,24 43:19 53:8
**2015** 24:13 25:24
**2016** 4:25 5:4 20:15,22 21:6,18 22:13 23:16 24:14,19,23 26:1 27:9 28:10 56:16 57:1
**2017** 26:3,12,14, 15 28:22 35:2 38:14 49:23 50:4 51:5 56:16 57:2
**2020** 8:22,25 9:5
**22nd** 41:15 42:11 53:6
**24/7/365** 39:22
**27** 21:6 22:13
**27,000** 9:15
**27,300** 9:15
**27th** 22:22
**28** 16:13,17
**29th** 41:14 42:14 43:25 45:17,20 51:10

**3**

**3** 20:13
**30** 48:24
**3100** 5:23 6:4
**33** 51:3
**34** 43:19
**36** 52:21

**4**

**43** 33:22,23
**44** 27:2,6 38:23

**5**

**5** 24:18
**5,000** 7:9 10:14

**6**

**6** 21:3
**6/22** 43:17
**69** 27:2

**7**

**7** 27:22
**7/15/2016** 24:22
**78** 27:2
**79** 36:8

**8**

**80** 36:9

**A**

**aberrations** 8:9
**absence** 10:16, 18
**absences** 15:11
**absolutely** 29:14
**accept** 44:18 45:7
**accepted** 24:24
**accommodate** 38:4
**accommodation** 21:7,10,20 22:3 28:9,21 30:11,20 31:20 32:4 33:14, 18
**accommodations** 22:15,23,24
**accomodation** 22:18
**accurately** 18:25 30:24
**actions** 51:25
**active** 53:17 55:8
**activities** 35:4
**activity** 19:2
**add** 50:23
**Additional** 39:5
**addressing** 27:25
**adherence** 46:14
**advice** 28:13
**affirmative** 6:6 7:25 8:7 9:25 10:4 11:17 16:2
**agencies** 10:3
**agree** 56:17
**agreement** 6:20 22:2
**ahead** 6:25 26:17,18 28:23 50:2 56:3
**aircraft** 13:12 14:19 15:1 47:20, 25
**airline** 5:24 6:10 12:1
**Alan** 27:14,25
**alter** 32:20
**altitude** 9:16
**amended** 12:11
**analyst** 35:2
**and/or** 6:3
**Angeles** 16:8
**Anita** 11:3 12:5 13:11 17:1
**annual** 20:1
**apologize** 39:3
**appears** 23:23 24:12 36:2
**applicant** 36:12 37:13,15 38:4 40:3 43:7 55:20 56:5
**application** 38:2 41:10,11,12 43:2
**applied** 26:3 54:18
**Appreciates** 25:11
**approved** 53:21, 24
**approximately** 4:25 45:17
**area** 7:20 10:7 18:12
**areas** 6:19
**asks** 15:3
**aspect** 50:23
**assigned** 9:14 19:12
**assignment** 48:5
**assist** 16:22 17:24
**assistance** 10:17
**assistant** 7:6 16:10,19
**assistants** 15:16
**assume** 35:11 40:6 51:14 53:11
**assure** 6:11 8:13
**assured** 47:6
**assuring** 5:24 6:16 36:20
**attached** 36:8,9 51:9
**attend** 13:8,17
**attendance** 14:10
**attends** 13:19
**attention** 23:6
**attorney** 27:10, 13 52:5,6
**attorneys** 27:17
**attrition** 7:10
**audibly** 4:21
**August** 5:4 24:23
**avoid** 29:16,19 30:12 47:20

56:12,19 57:5,16

B

**back** 6:3 15:20 21:17 23:8 27:13, 14 34:9 35:2 38:13 43:10 47:25 49:3
**ballpark** 16:18
**bargaining** 6:20
**base** 30:1 47:19, 25
**based** 7:10 13:2 19:2 49:18
**basis** 10:21,23 13:24 18:19
**Bates** 27:2
**BEAN** 26:24 27:5 28:11,16,23 41:24 43:12 44:11 50:1 52:11 56:13 57:22,25
**beginning** 14:13,14
**beliefs** 31:16 32:5 41:8 47:10, 14 48:2 50:22
**bid** 47:13,18
**bidding** 39:21 56:11,18 57:4
**bids** 48:4
**big** 12:1 25:10
**bigger** 40:20,22
**bin** 36:20 37:18, 20
**bit** 4:13,18 34:22 40:21 56:14
**blacked** 52:4,16
**blue** 23:24
**board** 44:17
**boss** 18:5
**bottom** 35:23 36:7 38:24
**breach** 17:11,12
**breaches** 17:13
**break** 43:9,13
**broad** 6:9,20,23 7:14,20,21 8:11 10:2,13 12:1 14:2
**brought** 13:15 15:8 23:6,7
**Brown** 13:13
**Bryant** 11:18 20:14 21:6 22:6, 21,22 28:1 40:16 46:4,12,16,17 50:21 51:4
**business** 11:13 14:8

C

**calendar** 12:22
**call** 7:24 15:4 19:3 35:8 44:16, 19
**called** 4:4 35:13 37:18 44:21,22
**calling** 51:25
**calls** 14:18
**cancelation** 10:19
**candidate** 34:14
**care** 11:14 17:5
**case** 36:24 37:20,21,23 44:24 45:12 48:6
**Cassell** 21:5,11 22:16 23:4,14 25:23 28:8,20 29:13 30:11 31:16,23 35:12, 16,20 36:10 45:18 46:18 48:18 49:14,25
50:6,21 51:10 52:10 56:11,19
**Cassell's** 27:10 30:20 36:15
**caused** 26:2
**causing** 9:2
**center** 7:16
**chain** 19:20
**chance** 25:10
**Chandler** 48:25 49:2,4 52:22
**change** 12:21
**changed** 18:17
**check** 4:15 44:11
**Chicago** 16:9 18:9,12
**chief** 5:1,5,11,14, 21 7:6 14:5 15:15,17 16:4,5, 10,19,23 31:10
**Chris** 13:13
**circumstance** 47:22
**City** 16:9
**clarifying** 56:1
**clear** 5:10 38:3 40:2 46:20 48:15
**clearer** 4:18
**clever** 29:11
**clock** 47:8
**closely** 6:24
**clothing** 33:19
**collective** 6:20
**command** 19:21
**comments** 26:17 39:5
**company** 12:1 34:3 47:6,17
**complaint** 17:18,20
**completion** 14:7
**compliance** 5:25 6:7,15,16 7:2
**compliant** 8:17
**concern** 7:17,20 47:25
**concluded** 58:1
**conducted** 13:5 34:11 37:7,23
**conducting** 37:8
**conflict** 24:24 26:2 47:13
**conflicts** 47:21 53:13
**confusing** 54:17
**connect** 30:23
**connected** 32:22
**consult** 31:18
**consulted** 35:4
**contact** 45:4 46:4
**contacted** 44:3, 4,6 45:19
**content** 52:12, 14
**continue** 15:2 47:11
**contributed** 52:6
**control** 7:16
**conversation** 22:17 29:7 30:18 31:12 52:12 56:21,23 57:7,19
**conversations** 22:14,22 28:7,20 29:18 30:8,22,25 31:5,6 32:18 46:11 49:19,24 50:5
**conversations'** 31:8
**coordinator** 34:10
**copy** 48:25
**Cordova** 34:1 35:24 36:19,24 37:5 42:9
**core** 13:7,9 46:15,19,23
**corporate** 5:19 47:21
**corporation** 12:12
**correct** 5:2 11:3, 4 17:6,10,11 18:9 20:3,4 43:15 48:18,19 53:14, 20 54:12 55:1,7 56:4 57:11
**correctly** 16:16
**correspondence** 27:12,17
**couple** 21:3
**coverage** 10:17
**covered** 10:15
**Coy** 11:18 20:14 21:6 22:5,21,22 40:15 46:4,11,16, 17 49:19,21 50:20 51:4,8,12
**create** 47:17
**crew** 10:5,10,22, 25 11:9,11 13:10 14:5,9,10,20 15:8 18:2 19:2
**crews** 7:19
**critical** 14:8

D

**daily** 14:9
**dashboard** 34:14,16

**data** 8:6 9:8

**date** 8:25 25:20 26:7,9 41:13,17 42:6,8,12 44:4,5

**dated** 21:6 24:20 43:16,25 51:5 53:1,3

**dates** 43:15

**Dave** 19:14,15, 17

**David** 13:12 19:17

**day** 8:22 9:7 13:23,25 14:3,9, 13,14,16,22 32:24,25 33:7 48:5 53:2

**day-to-day** 13:22,24

**days** 12:21 29:16 43:19 45:17 53:8

**deal** 15:6 25:10

**December** 28:10,22

**decision** 43:7 45:21 48:20 49:16 51:16

**delay** 10:19 47:23

**Denver** 16:9

**department** 7:18 17:4,5 18:2 19:3,4,6,8,10,11 20:8 49:5,8

**departments** 10:3

**depending** 9:7 14:3 44:18

**depends** 12:9, 16,20 30:1

**deposed** 11:18

**deposing** 17:1

**deposition** 4:24 51:9 58:1

**destination** 15:2

**determine** 37:13

**deviated** 9:16

**deviates** 9:18

**deviation** 9:11, 12,19

**deviations** 8:9, 15,16 9:10,21

**difficult** 12:5

**direct** 28:14

**directly** 7:4 36:22

**director** 5:1,12, 18 10:25 12:12 13:3,7,10,11,12, 18,19 19:12,13, 18

**directors** 12:8, 14

**directory** 16:14

**discussion** 52:7

**discussions** 52:9

**dispute** 25:23

**disruption** 10:18

**disrupts** 10:16

**divided** 16:13

**document** 20:10,13,16,25 21:12 22:7 23:19 28:5 33:22,25 39:16 40:12,25 41:4,7,19,20 48:22

**document's** 40:1

**documents** 41:9

**domicile** 16:25

**domiciles** 18:14,15,18,21, 24

**double** 4:15

**drop** 17:9 47:13

**dropping** 17:2

**duly** 4:4

**duplicate** 37:3

**duties** 5:6,20 6:2,16

**duty** 6:17 47:24

**E**

**e-mail** 21:5 26:8 28:1 35:15,20,22 36:11,17,25 37:3, 4 43:16 44:7,9, 14,21 50:20,25 51:9,12,23 52:18, 20 53:2,4,5

**e-mails** 14:17 21:4 35:18 36:3 41:14 44:11 48:24 51:2

**earlier** 32:23 41:16

**effect** 57:7

**efficient** 45:9

**elected** 43:2

**Emerson** 27:11, 15,24 28:8,20 29:12,18 30:5,19 31:15,24 32:3,8 49:22,24 50:5 52:6,10

**Emphasized** 39:20

**Employee** 21:9 22:20

**Encountered** 24:24

**end** 25:5 27:9 57:22

**ensure** 7:22 8:17

**ensuring** 6:7

**entire** 39:25

**equivalent** 5:15

**Erik** 26:24 28:11 41:24 52:11

**estimate** 9:3,4,6

**Eventually** 22:5

**EXAMINATION** 4:7

**examined** 4:5

**exception** 39:7

**excursion** 9:13, 19

**excuse** 36:7 39:13 43:21

**exhibit** 20:13 21:3,25 22:2 27:2,6,22 33:22, 23 38:23 40:15 41:4 43:18,20,21, 25 45:16,20,24 48:16,24 50:20 51:3 52:21

**exhibits** 43:24

**expanding** 57:2

**expected** 9:13

**experience** 29:22 30:2,15

**explain** 54:3

**explained** 15:25 39:21 54:5

**expressed** 38:11 39:6

**expressing** 39:9

**extended** 47:24

**extent** 28:11

**F**

**FAA** 5:15 8:15

**fact** 55:5

**falls** 48:1

**familiar** 27:18 35:18 54:1

**fed** 8:5 9:23

**feed** 10:5,11

**feeding** 10:1

**feel** 38:9 46:22

**feet** 9:15

**field** 14:19,24 15:3,5,7

**file** 17:20,21 25:20 26:6 37:7,8 42:20 44:18

**filled** 21:10

**flexible** 13:2 39:7

**flight** 5:1,12,18, 21 6:21 7:16,19 8:18,19 9:14,17, 21 10:3,10 11:21 12:8,14 13:7,18 15:8 16:20 19:8, 9,19 20:8 34:10 35:1

**flights** 6:25 7:11, 17,22 8:1,8,14,22 9:6 10:15 17:2,3 47:19

**fly** 47:20,24

**focus** 21:4

**focusing** 51:4

**follow** 14:20 15:8 53:21

**Form** 21:7

**forward** 37:14 48:17

**forwarded** 36:13,15

**frame** 21:17,18

**Friday** 12:24 30:13

**Fridays** 30:16

**front** 31:10

**full** 4:9,11,14
**function** 16:20
**functions** 16:21
**future** 55:6,23

G

**Gallo** 13:7
**gather** 10:4 13:16 17:4 18:8 19:25 23:25 24:13,19 27:11 36:2,13
**general** 5:23 9:7, 9 14:13 28:18 30:9 31:9
**generally** 13:5 18:3 29:4,25 45:9
**gentleman** 27:14
**George** 18:9,11
**give** 10:9 35:8 38:21 56:7
**Glassey** 4:2,14 13:18
**good** 4:19 57:25
**grant** 22:18
**granted** 33:13
**granting** 22:15, 23
**group** 15:16,18 17:21
**guaranteed** 47:9
**guess** 36:9
**guys** 52:23

H

**happened** 23:9
**havoc** 9:2
**head** 10:22
**hear** 4:16,17 55:13
**Hey** 26:24
**Hinckley** 20:14, 20,21
**hire** 37:14 53:12, 15 54:8
**hired** 26:1 39:18 42:17
**hiring** 34:14,16, 20 35:7 38:5 44:25 48:17 49:25 50:5,6 52:10 54:11,22, 25 55:11,12,24
**hirings** 26:4
**historic** 9:8
**holidays** 29:15
**honor** 48:8,13
**HR** 22:20 31:9 33:3,8 43:6 44:3, 4,10,14 45:4,19 48:17 49:5,8,11 53:7 54:6
**human** 32:25 33:2 34:7

I

**Ian** 34:24,25 35:1,2,16,20,25 36:14,19 37:2,5, 20 41:15 43:16 45:3
**idea** 8:24 53:7
**illustrate** 15:9
**imagine** 10:9 36:25
**implies** 9:13
**individual** 32:15
**individuals** 12:3 14:4
**inflexible** 38:12, 17 40:11
**information** 8:5, 21 10:6,8,9,11 28:12
**informed** 42:16
**infrastructure** 7:21
**instance** 9:14
**insubordinate** 39:10
**insubordination** 38:19
**integrity** 47:7
**intend** 55:17
**intent** 47:11
**interview** 23:10, 13,15,21,24 24:2, 16,19 25:15,16, 20 26:13,15,17, 21 34:4,19,20 37:10,12,23 38:14 39:6 40:2 42:23 43:1 44:2 48:20
**interviewed** 23:14 24:22
**interviewers** 40:6,10
**interviews** 26:4 34:11
**investigate** 7:2
**involved** 17:8,25 18:5 19:10,22 37:8 44:25
**issue** 14:19,20 15:4 17:10,23 18:3 23:1,2,18 30:19 40:16 45:18 46:15,19, 23
**issues** 10:15 14:6,10,18 15:6 17:18 19:10,23 27:25 33:17 57:15

J

**Jaime** 48:25 49:9
**Jake** 22:4,14
**Jason** 34:1,3,4, 8,10 35:24 36:18, 24 37:5,20,22 42:9 45:2
**Jay** 57:8,15
**Jewish** 32:8
**job** 5:6,20 6:16, 17 25:24 26:5 56:3
**Jr** 4:2,14
**July** 42:17 43:19 51:5 53:1
**jump** 4:20
**June** 41:14,15 42:10,11,14 43:25 45:17,20 49:23 50:4 51:10 53:6
**junior** 29:24 30:1,15,16 47:19
**junk** 47:20

K

**kind** 8:9 11:20 23:25
**kinds** 10:8
**Kolb** 52:22

L

**labeled** 51:3
**labor** 17:21
**lacking** 38:10
**Lake** 16:8
**Larsen** 49:1,2,4
**late** 49:23 50:4, 24
**latest** 7:8
**launching** 7:15
**learned** 23:10
**leave** 53:18,22 54:2,6,10
**led** 23:5
**left** 23:17 57:13
**legal** 28:13 31:19 53:22,24
**letter** 27:10,24 29:9 40:15 41:7 42:3,7,12,19 43:18 45:20,22, 24 46:5,12,15,19, 20,22 48:10,16 50:21 51:10 53:2, 9
**level** 9:14
**likelihood** 54:20 55:22
**limitations** 38:12
**limited** 47:23
**lines** 39:25
**listed** 37:22
**lists** 6:4
**Local** 16:25
**located** 16:6
**location** 18:10
**locations** 16:8
**long** 46:2 51:16
**longer** 34:3 57:10
**looked** 36:18 40:1 41:15 42:10 43:16,20
**loop** 23:7 49:20
**Los** 16:8
**lost** 41:24
**lot** 7:15 12:2

**lots** 30:7
**low** 29:13
**luck** 21:2 52:19

M

**made** 45:21 48:20 49:16 51:16
**maintenance** 47:23
**make** 17:18 40:20,22 43:15 56:10
**makes** 19:25 20:5
**making** 55:3
**manager** 33:3
**manual** 6:21
**mark** 26:24 27:1 33:22
**marked** 20:13 21:2 22:1 27:6, 21,22 33:23 40:14 48:23 50:20 52:21
**materials** 41:5
**Matrix** 23:4 24:25
**matter** 28:13 31:8 53:5
**means** 50:12
**meant** 56:3
**mechanical** 15:4
**meet** 10:21,25 11:5,7,8,12 14:5 20:2
**meeting** 11:7,11, 20 12:4,17 13:14, 15,19 20:5
**meetings** 11:22, 24 12:2,10,12 13:1,3,8 14:4
**meets** 47:17
**member** 14:10
**members** 14:20
**memo** 42:9
**Memorandum** 22:2
**mentors** 47:14
**messages** 14:18
**met** 15:20
**microphone** 4:15
**middle** 4:25
**military** 53:13, 14,15,17,21,22 54:2,6,9,10,19 55:8,9,15,16,18, 21
**mind** 15:2
**Minneapolis** 16:9
**minutes** 39:12 43:11
**missing** 47:4
**modification** 57:4
**modifications** 56:18
**moment** 25:14 27:8 35:9 40:18 42:11 43:10
**Monday** 12:24
**Monica** 48:25 49:6
**monitor** 6:19
**month** 23:3
**move** 37:13 39:17
**moving** 8:19 12:2
**Moxham** 13:12 19:14,17
**muffled** 4:13,18
**multiple** 6:9 8:5 10:2 11:22,24 12:2,3 14:4,17

N

**necessarily** 47:22
**needed** 19:1 32:24 40:6
**neighborhood** 7:9
**newer** 29:23
**newly-hired** 21:19
**night** 30:13
**normal** 18:13
**notation** 38:13
**note** 25:2 38:14
**noted** 7:18 23:15
**notes** 23:11,13, 15,21,25 24:2,11, 12,13,23 25:7,15, 16 32:11,12,13 34:20 37:10,12 38:25 39:13 40:3 42:23 43:1 44:3 48:20
**notification** 41:17 44:23
**notifications** 44:17
**notified** 7:19 8:15 10:20 21:17, 22,23 45:18 49:16
**notify** 7:17 43:5, 6
**November** 21:18
**number** 7:10
**numbers** 27:3
**numerous** 6:2

O

**object** 28:11 50:1 52:11 56:13
**obligations** 55:6
**obscured** 41:23
**observance** 40:17
**observances** 41:8
**observe** 47:10
**occasion** 17:14
**occur** 17:13
**occurred** 26:14
**October** 21:6 22:13,22
**offer** 24:24 56:3
**offered** 25:24 47:15
**offering** 55:7
**offerings** 26:5
**on-time** 14:7 15:11
**operate** 8:23
**operated** 9:9
**operating** 8:14
**operation** 6:10, 24 10:16 16:20 39:22
**operational** 7:16 8:20 10:18 14:6,18 15:6 17:10
**operations** 5:12,18 6:1,21 13:7,12,19 19:8, 9,19 20:8 34:10 35:2
**opportunity** 25:11 29:25
**opposed** 17:5
**ops** 5:1,21 11:21 12:8,15
**order** 47:16,20
**orient** 27:19
**Orthodox** 32:8
**outcome** 33:9
**outline** 29:10
**outlining** 41:8
**oversight** 15:25 35:3
**Oyler** 57:8,15

P

**p.m.** 43:13 58:1
**pandemic** 9:1 18:11,17
**part** 5:15 8:2 15:22 26:1 34:4,7 36:7 41:5,12 42:20,21 52:4
**participants** 11:25
**parts** 12:2
**passengers** 48:1
**pathway** 9:13
**pause** 42:1
**PBS** 47:15 48:5
**people** 7:3 9:21 11:9,11 15:17 19:21 31:1 49:13
**performance** 6:19 14:7 15:11
**period** 28:9 56:14
**personal** 47:18
**personally** 9:20

**phone** 44:16,19
**piece** 33:19
**pilot** 5:1,5,11,14 6:19 14:5 15:15, 18 16:23 17:18 20:1 21:19,21 29:19 30:8,15,16 32:3,8,23 33:14 34:5,6,9,11,14 35:3,6,7 54:18 55:5,8
**pilot/director** 5:21
**pilots** 5:25 6:25 7:6,7,8,9 8:17 10:14 16:4,5,10, 19 17:2 19:25 20:5 29:15,23,24 30:1 31:10,11 38:5 53:12,13,15, 21 54:6,12 55:18 57:16
**pin** 13:21
**place** 11:21
**point** 8:19 29:17 35:11 38:14 43:9 45:4 54:10 56:8
**points** 8:20
**Polad** 48:25 49:6
**policies** 6:9,12, 13,22 8:17 17:16 30:8
**policy** 5:25 6:7, 15,16,21 17:12 47:21
**Portland** 16:8
**posed** 29:6
**position** 5:12,14 18:13 20:21 55:7
**positions** 5:13
**possibility** 54:9
**post-interview** 26:10
**practice** 53:19
**practices** 32:5
**pre-pandemic** 18:17,22
**preclude** 54:22, 25 55:11,12,23
**president** 13:6 19:19
**prevent** 17:16 54:11 55:6
**previous** 6:3 38:14
**previously** 5:8 20:13 21:2 22:1 24:22 27:22 48:23 50:19 51:3 52:21
**primarily** 15:15 17:7
**primary** 16:7 18:10
**prior** 8:22,25 9:1, 4
**privileged** 28:12 52:12
**process** 41:12 45:1 53:22,25 54:2 56:8
**produced** 44:8
**product** 52:5
**professionalism** 47:7
**properly** 47:16
**provided** 8:21 23:23 47:9,12 57:17
**pull** 23:19 38:23 46:1
**put** 26:11 29:24 36:3 37:18 40:14
**puts** 37:19 43:6

**Q**

**qualified** 55:20 56:4,5
**quarter** 9:5
**question** 6:9,23 7:14,20 8:12 10:2,14 11:25 12:6 14:2 28:16, 19 29:6 30:4,23 32:23 42:18 50:15 51:21 54:15 55:14,17
**questions** 4:23 23:24 24:10 57:22
**queue** 43:6
**quick** 44:12

**R**

**raised** 28:1
**ran** 26:1
**range** 9:8,9
**rare** 17:14,15
**re-share** 29:8
**read** 20:17 21:13 22:8,10 40:18 46:20,24 51:14, 15,18,24
**reading** 52:2
**real** 44:12
**reality** 39:21
**realize** 47:8
**reason** 11:17 13:14 24:20
**recall** 20:19 21:13,16,22 22:11,17,25 23:17 25:2,19 26:7 28:6,7,25 29:3,4,6 30:6,14, 18 31:25 32:6,10, 11,14,16,18,23, 24 33:2,3,5,11 35:13,15 37:4,25 39:13,15 41:3 44:5,6,9,16 45:5, 13,23 46:6,9,11, 17 49:15,17 50:7, 8,10,12,13,15 51:1,6 52:2,16,25 56:21 57:6,14,19
**receive** 35:17 36:1
**received** 35:20 36:25 37:3 45:19 46:5 51:12
**receiving** 35:15 37:4 45:23 51:6
**recent** 23:10,12 24:15
**recognize** 25:13
**Recognizes** 25:9
**recollection** 15:25 32:7 48:15 52:8,15
**recommend** 43:4
**recommended** 43:3
**record** 15:21 34:19
**records** 5:8
**recruiters** 36:23
**recruiting** 34:12
**reduce** 34:22
**refer** 6:3 15:20 33:8
**reference** 6:4 49:21
**referral** 33:10
**referred** 23:20 27:10 37:16,17
**referring** 15:13 25:16 30:10 38:25 39:8,23 40:7 42:3 53:5 54:4
**refresh** 52:8
**refreshes** 52:15
**regional** 15:25 16:22
**regions** 16:7,13
**regret** 41:17 42:3,4,7 43:3,18 44:18 45:7,21 46:3 48:21 49:13, 16 51:15 53:2,8
**regular** 10:21,23 11:20 18:19
**Reinach** 27:14, 25
**relations** 22:20
**relevant** 9:24
**religious** 21:7, 10,19 22:3,23 31:16 32:4 33:13, 18 41:8 48:2 50:22
**remain** 9:17
**remember** 11:19 51:8
**reminding** 27:4
**remote** 58:1
**remotely** 4:5 18:12
**replacements** 16:19
**reply** 44:18
**report** 7:3 19:15, 21
**reports** 19:17,18
**represent** 23:1 25:22 47:6
**request** 21:9 28:8 30:11
**requested** 30:20 58:3

**requesting** 31:19 32:3,9

**required** 11:6 29:14 37:24

**requirements** 20:2,6

**requires** 15:7

**rescheduled** 12:21

**reserve** 39:21

**resign** 26:3

**resignation** 23:5

**resigned** 24:25

**resolve** 17:23

**resources** 33:1, 2 34:7

**respond** 51:24

**response** 44:7

**responsibilities** 5:16

**responsibility** 8:4

**responsible** 5:24 19:22

**rest** 47:6

**restate** 16:3 54:15

**restriction** 40:11

**results** 10:18

**resume** 34:19 36:10,16 37:13

**return** 14:19,24 15:3,4,7

**review** 11:21 14:5,6,8 25:18,21 34:15 36:12,20 37:7,9,10,12,18, 19,24 38:1 42:20, 21 44:17 57:24

**reviewed** 23:10, 12 24:3 25:15 38:2 39:12,14 41:5,9 42:19,24 43:1

**reviewing** 23:20 25:2 41:10 44:2 48:19

**robust** 7:21

**room** 27:12

**Roy** 4:2,14 7:24 8:1 11:18 13:18, 20 21:1 23:20 25:14 27:8 28:23 32:12 33:17 39:1 40:20 42:3 43:14 44:10,14 53:11 56:8,16

**rules** 4:21

**run** 6:12

**running** 6:11

**S**

**Sabbath** 30:12 31:17 32:9,21 40:7,16 48:6 56:12 57:5,17

**safe** 5:25

**safely** 8:14

**safety** 5:24 7:22 48:1

**Salt** 16:8

**SAPA** 56:9,17,24 57:3

**Saturday** 29:15 30:13 56:20

**Saturdays** 29:20 30:17

**SB** 5:22 6:4

**scenario** 25:8

**schedule** 11:10 12:5 13:22 32:20 38:3,4 39:7,21 40:4,10 46:14 47:9,17 48:5,8,13

**scheduled** 12:17,19,22,25

**schedules** 7:19 18:16

**scheduling** 7:18 10:5,11,15,22 11:10,11 18:3 23:4,18 24:24 29:23 33:17 38:12 53:13 57:15

**screen** 20:11 39:2

**scroll** 23:21 24:4,6,7,8 25:12 28:2 35:23 39:19 40:24

**scrolling** 24:17 25:4

**seconds** 45:6

**section** 34:9

**seeking** 28:13

**selection** 34:5,6

**senior** 13:6 18:6 19:18 29:15,24

**seniority** 17:11, 13,18,23 29:13 56:11,18 57:4

**sentence** 47:3 49:18

**sentences** 46:24 47:2

**separate** 26:4

**September** 20:14,22 21:18

**series** 24:10 48:24

**session** 25:1

**set** 11:10,15 12:7,9,10 24:13

**Shane** 21:5 30:10,19 31:16, 22,23 36:10,15 40:15 41:7 42:13, 16 45:18 46:12 49:19,25 50:6,21 52:10 56:19

**share** 29:9 33:21 45:24

**shift** 47:13

**shortly** 26:16 48:19

**show** 20:10 21:24 27:19 33:21 40:12 41:19 48:22 50:18 52:18

**showed** 46:22

**showing** 20:12 21:1 27:21 50:19 51:2

**shown** 46:7 48:16

**shows** 24:22

**sign** 57:24

**signature** 49:7 58:3

**signed** 22:4,5

**similar** 16:22

**situation** 15:7 42:22

**situations** 33:12 53:11 54:21

**size** 34:22

**Skywest** 5:2,5 8:23 18:21 23:23 24:25 25:25 27:2 32:19 33:13 36:7, 8,9 47:5,8,12,14 54:11,22,25 55:6, 23 56:2,3 57:11, 17

**slowed** 9:5

**smoothly** 6:11

**software** 34:18

**someone's** 32:20 53:16

**Sorenson** 48:25 49:9 52:22

**sort** 4:20 9:1,12 11:18 32:3

**sound** 27:18 52:23

**sounded** 4:18 11:19

**sounding** 4:13

**sounds** 4:18,19

**sources** 8:6

**sourcing** 34:9 35:3,6

**speak** 31:9,10

**specific** 6:8,13 12:4 13:14 15:23, 24 17:16 20:9 31:7,14 32:24

**specifically** 5:22 6:5 9:4 24:20 29:1,3 30:10,14 31:22 32:1,10 33:11 39:16 55:8 57:1

**Spencer** 11:3 13:11 17:1 20:14, 20,21

**split** 18:8

**spoke** 5:7

**squinting** 40:21

**St** 18:9,11

**staff** 6:18 15:16

**staffing** 16:25

**standard** 36:11

**standing** 11:7 12:5

**start** 24:11 33:25

**started** 38:20

**starts** 21:3

**state** 4:9,11 48:4, 7,11

**stated** 5:7,22,23 38:19

**statement** 31:8 39:18

**statements** 29:12

**station** 47:23

**stay** 6:25 47:19

**Stop** 24:6

**Strindberg** 4:8 27:1,7 28:14,18 29:2 33:24 42:2 43:8,14 44:8,20 50:2 52:13 56:15 57:20,23

**string** 36:3

**structure** 16:1

**stuck** 30:1

**subject** 21:6 31:8

**success** 14:8

**Sundays** 30:17

**supervisors** 7:7 15:16 16:16,20

**support** 10:25 13:11 18:2

**suppose** 35:17

**supposed** 6:12 9:17

**sworn** 4:4

**system** 18:14 34:18 47:15,16 56:11,18 57:4

T

**takes** 15:1 17:5 23:15

**talk** 30:5 35:11 56:9,16

**talked** 15:21 31:15,23 32:2 49:13 50:13 52:15 57:3

**talking** 17:2 23:13 32:7 33:17 55:18 57:14

**talks** 25:9

**Tanner** 44:8

**task** 15:9

**teach** 47:16

**team** 7:6 14:5 23:15 31:19 34:5, 7,12 43:6

**telling** 14:11

**ten** 43:10

**term** 9:10 11:19 14:24 15:10 55:16

**terminology** 10:12 19:5

**testified** 4:5

**testimony** 5:3 6:3

**thing** 17:9 33:19 45:8

**things** 6:11 8:12 9:5 11:14 14:12 15:11 17:3 52:1

**thought** 54:15

**thousands** 6:12

**Thursday** 12:23

**till** 14:11

**time** 4:21 8:14 11:10,15 12:7 14:3 15:20,24 18:8 21:17,18 22:8,13 23:2 27:20 28:9,21 33:4 47:24 48:16 49:23 50:7 53:22, 23 54:20 55:22 56:14,15

**times** 12:10,11 13:1

**title** 5:15,19

**titles** 16:21

**Todd** 27:11,15 28:20 30:5,19,25 31:9,15,24 32:2,8 43:9 49:20,21,24 50:5 52:9,15

**told** 40:5,6,9 46:16,17 48:17 49:13

**tool** 34:20

**tools** 47:12 48:8, 12 57:17

**top** 36:7,8 49:2

**topic** 30:5

**touch** 8:20

**track** 6:10,19,22, 24,25 7:11 8:1,5, 13 9:20,23

**tracking** 7:12, 13,22 8:8

**tracks** 7:17

**Tracy** 13:7 18:5

**trade** 17:9 47:13

**trading** 17:3

**Traditionally** 29:23

**training** 13:11 19:10,11,12,13, 18,23 20:2,7,8 21:21 23:4,17 24:25 26:2 50:23 53:20 54:11,21 55:5,23

**trash** 51:24

**travel** 18:18

**tremendously** 9:6

**Tuesday** 11:15 12:23

**turned** 25:24

**type** 17:9 33:13, 19 45:8

**types** 17:3

**typical** 13:23,25 14:3,22,23 15:9

**typically** 8:23 13:24 29:16 45:7

U

**Uh-huh** 6:6 7:25 8:7 9:25 10:4 11:17 16:2

**ultimately** 17:22 18:4

**unable** 15:2 38:4,8 40:3

**unavoidably** 29:14

**understand** 4:22 13:21 16:16 31:2 47:15 51:20 55:3

**understanding** 18:16

**undesirable** 47:19

**unforeseen** 47:22

**unlimited** 8:12

**unrestricted** 46:14

**unsuccessful** 48:7,12

**unwillingness** 39:6

**USERRA** 54:1

**utilizing** 48:8

**utmost** 47:7

V

**vague** 56:13

**vaguely** 32:22, 23

**varies** 7:10 13:22

**version** 22:4

**vice** 13:6 19:18

**visit** 18:15 19:1

**VP** 18:6

W

**wanted** 42:8

**watch** 6:23 10:3

**Wednesday** 12:24

**week** 12:9,16,20, 23,25 14:11 41:16

**weekend** 29:23

**weekends** 29:22 30:2,3

**weekly** 12:17

**wellbeing** 48:1

**Whicker** 22:5,14

**Whiting** 34:24, 25 35:1,12,21 37:5

**William** 4:2,14

**word** 9:12

**words** 4:22 17:10 19:21 36:6

**work** 11:14 16:7 18:10 29:14 32:21 40:3 52:5

**worked** 34:9

**working** 18:12 29:16,19 30:2,12 56:12,19 57:5,16

**workload** 13:2

**works** 57:10

**wrong** 44:13

**wrote** 40:15

Y

**year** 26:11 53:18, 19

**years** 30:7,22 45:5,15