# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | | |
|---|---|---|
| SHANE ANDREW CASSELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. 2:19-cv-00149-jnp-dao |
| vs. | ) | |
| | ) | Judge Jill N. Parrish |
| SKYWEST, INC., d/b/a | ) | Magistrate JudgeDaphne A. Oberg |
| SKYWEST AIRLINES, | ) | |
| | ) | |
| Defendant. | ) | |
| ______________________________ | ) | |

REMOTE DEPOSITION OF ANITA SPENCER

February 24, 2021

Salt Lake City, Utah

Repored by: Kelly Fine-Jensen, CSR, RPR

Page 66

who maybe wanted to drop a flight or trade a flight, that type of thing?
A. Yeah.
Q. I'm going to show you a document which has been previously marked as Exhibit 24.
There's the number on it.
This is an e-mail that Alan Reinach, who was an attorney representing Mr. Cassell at the time, sent to Coy Bryant regarding the fact that Mr. Cassell was forced to resign his position.
Have you ever seen this document before?
A. No. I have not.
Q. Mr. Reinach's e-mail was responded to by Todd Emerson. And I can show you that document as well.
Have you ever seen this letter before?
A. No. I have not.
Q. Do you recall talking with Mr. Emerson about this situation?
A. No.
Q. At any point?
A. No.
Q. So, you don't recall Mr. Emerson coming to you and asking you whether Mr. Cassell might be able to avoid working on Saturday after he was hired?

Page 67

A. No. I do not.
Q. Has anyone ever asked you that?
A. No.
Q. Do you have an opinion -- we looked at Exhibit 14, where the company provided Mr. Cassell with certain tools, as they called it, which he could use to avoid flying on a Saturday once he was hired.
Do you have an opinion as to whether or not those tools would have allowed him to avoid working on the Sabbath?
A. I don't know that it would have stopped him from working. He has those tools available to him, and if the resources were available, then he could have potentially been successful in dropping his trips.
Q. The company has stipulated that if Mr. Cassell had been hired in 2017, he would have been assigned to Detroit.
I gather in Detroit there were lots of new pilots being assigned there, so people were moving up the seniority list fairly quickly; is that true?
A. I do not recall how the domicile was moving back in 2017.
Q. Have you -- prior to this deposition or being asked to be a deponent here, did you have any

Page 68

idea who Shane Cassell is?
A. No. I did not.
Q. Had you ever heard that name?
A. No.
Q. Do you have any knowledge as to what this litigation is about?
A. No. I do not.
Q. I'll represent to you that Mr. Cassell resigned a position at SkyWest in late 2016 because of a conflict with his training.
I gather at the time, training scheduling was done not in your department; correct?
A. That is correct.
Q. And who was doing it again?
A. It was -- the manager was Kim Ence.
Q. And is she still over training scheduling?
A. No. She is not.
Q. Who is now over training scheduling?
A. Trisha Bennett.
Q. Do you know, does the training scheduling under Trisha Bennett, do they also schedule the Matrix training?
A. The "Matrix training"?
Q. Yes.
A. Can you tell me what Matrix training --

Page 69

Q. Matrix training is some kind of computerized system which -- it's not -- it sort of replicates a pilot being in the cockpit of a plane, sort of one step down from simulators. So, it's some kind of computerized system.
Do you know if the training department, and the training schedule under Trisha Bennett, schedules Matrix training?
A. I believe so. That, I -- I can't confirm.
Q. I gather that would be something that Trisha would have to answer?
A. Yes.
Q. Kim Ence, the prior scheduler, is she still with the company? Do you know?
A. No. She is not.
Q. When did she leave?
A. October of 2020.
Q. Okay. Do you know where she went?
A. I believe she retired.
Q. So, as I was saying, I represented to you that Shane Cassell had to resign his position with SkyWest in the fall of 2016.
He then reapplied and was interviewed the following year, in the early summer of 2017. But SkyWest refused to hire him, saying that they

Page 70

**couldn't accommodate his religious requirements.**
**Did anyone consult you at that time about hiring Mr. Cassell?**
A. No.
**Q. Did anyone ask you at that time, Roy Glassey or anyone, ask you whether or not SkyWest might be able to accommodate his religious -- his request for a religious accommodation?**
A. No.
**Q. I'm going to show you another exhibit.**
**This has been previously marked as Exhibit 22. This was something that Steve Spagnolo used during his deposition.**
**Have you ever seen this document before?**
A. No. I have not.
**Q. He indicated -- in looking, say, at -- and Detroit is DTW; correct?**
A. That is correct.
**Q. On January, it's got 76 lines. That would represent -- would represent 76 separate pilots; is that correct?**
A. That would be correct.
**Q. And the number of reserves would be the number of people on reserves for that month; is that correct?**

Page 71

A. That would be correct.
MR. STRINDBERG: Okay. Let's take a break. And I'll check my notes to see if there's any other questions that I have.
(Break taken at 10:58 to 11:03 a.m.)
**Q. (By Mr. Strindberg) Anita, I just have one or two more questions.**
**I had asked you about whether or not you thought Shane could have avoided working on the Sabbath using these various tools that SkyWest gave him or had available, such as dropping and trading and bidding and things like that, and you said he might have been able to.**
**Who would be -- is there someone who works for you or someone else at SkyWest who would be in a better position to answer that question than you?**
A. No. Because it would be speculation if he could have held it or not. It's all based on if he's -- if he's trying to drop a trip, it's all based on if there were resources available to cover his trip.
**Q. Okay. So, what you're saying -- just let me make sure it's clear -- it would be very hard to determine in the abstract whether or not someone could avoid -- a new pilot could avoid working on the**

Page 72

**Sabbath using the tools available to him or her at SkyWest?**
A. If they -- okay. So, say that again. Because I may have this confused a little bit with what you may be asking. So, you're asking if they could avoid working a Saturday or Sunday?
**Q. Just -- well, the Saturday in this case, the Sabbath, Friday night to Saturday night.**
A. Very unlikely.
**Q. And why do you say, "very unlikely"?**
A. Because he would have been junior in the system. And it would -- it's all based on seniority and preferences of all of those above.
**Q. And are you saying that more senior people tend to try to get the weekends off?**
A. Yes.
**Q. But the dropping and trading and all that stuff, that's not based on seniority; is it?**
A. Dropping and -- trading is based on another crew member wanting to pick your stuff up.
Dropping is if resources are available at the time you are requesting.
**Q. And that's not based on seniority; correct?**
A. It's based on when you submit your

Page 73

request.
**Q. So, as I understand it, you say it's unlikely, but it would very much depend on the domicile and just sort of depend on what's going on in any one week in that domicile as to whether he could avoid working on the Sabbath; is that what you're saying?**
A. It -- it -- can you repeat your question?
MR. STRINDBERG: Kelly, would you read it back?
(Record read as follows:
"QUESTION: So, as I understand it, you say it's unlikely, but it would very much depend on the domicile and just sort of depend on what's going on in any one week in that domicile as to whether he could avoid working on the Sabbath; is that what you're saying?")
THE WITNESS: Yes. It is unlikely that he could bid it. It would depend on the resources available.
MR. STRINDBERG: Thank you.
I have nothing further.
MR. BEAN: No questions from us.
MR. STRINDBERG: Tanner, do you want her to read and review?

MR. BEAN: Anita, basically what they're asking you here is you can get a copy of your deposition and you can go through it. And if you find there's any inconsistencies, typos, something that was incorrectly reported, you can read that and give a correction.

Is that something you would want to do?

THE WITNESS: Yes.

MR. BEAN: Okay. And we'll get a copy of that over to you once that's ready.

(The remote deposition concluded at 11:07 a.m.)

* * *

(Signature was requested.)



VERIFICATION

STATE OF ______________)
                        ) ss.
COUNTY OF _____________)

I, ANITA SPENCER, being first duly sworn remotely on my oath, depose and say:

That I am the witness named in the foregoing remote deposition taken the 24th day of February, 2021, consisting of pages numbered 1 to 74, inclusive; that I have read the said deposition and know the contents thereof; that the questions contained therein were propounded to me; that the answers to said questions were given by me, and that the answers as contained therein (or as corrected by me therein) are true and correct.

Corrections Made: Yes_______ No_______

___________________________
ANITA SPENCER

Subscribed and sworn to before me this ________ day of ________, 2021, at __________________, Utah.

_______________________________
Notary Public for Utah
Residing at______________, Utah.
My Commission Expires: ________.



REPORTER'S CERTIFICATE

STATE OF SALT LAKE )
                   ) ss.
COUNTY OF UTAH     )

I, KELLY FINE-JENSEN, Certified Shorthand Reporter and Registered Professional Reporter in and for the State of Utah, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn remotely by me to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 17th day of March, 2021.



________________________
KELLY FINE-JENSEN
CSR, RPR