# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

SHANE ANDREW CASSELL,

Plaintiff,

vs.

SKYWEST, INC. d/b/a SKYWEST AIRLINES,

Defendant.

Case No. 2:19-cv-00149-JNP-DAO
Judge Jill N. Parrish
Magistrate Judge Daphne A. Oberg

VIDEO DEPOSITION OF ARIC PAUL ARNOLD
December 28, 2022

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
ERIK STRINDBERG, ESQ.
Strindberg Scholnick Birch Hallam Harstad Thorne
40 South 600 East
Salt Lake City, Utah 84102
Phone: 801-359-4169
Email: erik@utahjobjustice.com

ON BEHALF OF THE PLAINTIFF:
TODD R. McFARLAND, ESQ.
Seventh-day Adventist Church
Office of General Counsel
12501 Old Columbia Pike
Silver Spring, Maryland 20904
Phone: 301-680-6321
Email: mcfarlandt@gc.adventist.org

ON BEHALF OF THE DEFENDANT:
TODD C. EMERSON, ESQ.
SkyWest Airlines
444 South River Road
St. George, Utah 84790
Phone: 435-634-3530
Email: temerson@skywest.com

A. That's through the Sked+ system --
Q. Uh-huh.
THE REPORTER: I'm sorry. The "Sked+"?
THE DEPONENT: Sked+, yes. It's S-k-e-d with a plus sign.
Yeah, that's a scheduling tool that we use for the pilots.
Q. (By Mr. Strindberg) And my understanding -- tell me if I'm wrong, Mr. Arnold -- is that for pilots who want to pick up these flights in open time, it's a first-come, first-serve basis; is that correct?
A. Yes.
Q. So that's an example of where seniority really doesn't play into the assigning of flights?
MR. PETERSEN: Objection. I think it's vague and ambiguous. And mischaracterizes his testimony.
MR. CRAIGIE: Join.
A. I don't -- I really don't know how it would work. If -- if two people got there at the exact same time --
Q. (By Mr. Strindberg) But it's --
A. -- it would go to the seniority. It would --
Q. Okay. But --



A. -- defer to seniority.
Q. But otherwise it's first come, first serve?
A. Yes. Yeah.
Q. When -- you said someone wants to just drop a flight and where they don't want to take it and they don't -- aren't worried about losing the money, you said that crew scheduling has to determine if there's adequate staffing?
A. Yes.
Q. What does that mean, "adequate staffing"?
A. That someone would be there to fly that trip that they're getting rid of.
Q. So, in other words, are you saying that they try to determine if there's a reserve pilot --
A. Yes.
Q. -- available?
And how much notice does someone have to give when they drop a flight? In other words, can you do it 15 minutes before your flight or --
A. I would have to look. I'm not positive. I know it's a time frame, but I'm not positive.
Q. And when someone wants to drop a flight, do they just -- is there some designation that they put into open time to indicate that or do they have to call crew scheduling?



A. No, you can do it through the automated system. You can right click and put "drop" on the -- on the trip.
Q. Can you also do it by calling crew scheduling?
A. You can. But that's a manual processing, and that may take longer.
Q. If someone drops a flight in open time, how -- how does crew scheduling get involved? How are they informed of that?
A. Through the automated system. I'm sure they have a queue that shows people trying to drop trips and what their staffing is.
Q. Go back to paragraph 5 there.
MR. CRAIGIE: You're referring to Exhibit?
THE DEPONENT: 51.
MR. STRINDBERG: 51. Yeah, paragraph 5.
Q. (By Mr. Strindberg) It says "SkyWest has not asked, and I would never agree to, a change in the scheduling system that degrades a senior pilot's ability."
I want to ask about that in regards to Shane Cassell. Were you ever contacted by anyone from SkyWest in 2016 or 2017 to ask if SAPA would be willing to make some accommodation or help with some accommodation for Mr. Cassell to allow him to avoid working on the



Sabbath?
A. No.
Q. Do you know if anyone from SAPA was ever contacted by SkyWest to see if they might be agreeable to some change in a -- seniority or bidding?
A. Not that I know of.
MR. CRAIGIE: Yeah, just a belated objection that calls for speculation.
Q. (By Mr. Strindberg) It goes on and says, "I would never agree to a change in the scheduling system that degrades a senior pilot's ability to choose their preferred work schedules."
Does -- does this apply to situations where someone needs some accommodation because of religious beliefs or practices?
A. Well, I mean, from my position, I want everyone to have the days off that they need. I mean, I -- I absolutely want that for everyone. But the needs are so diverse, whether it be a sick family member or a prior obligation or anything. I mean, everyone has different needs.
So the only way that we look at it to be fair is by using the people who have been doing it longer to get the most preferential setup, which is the way the system is set up with seniority.

Q. But say there's a, you know, situation -- you have a Seventh -- someone who's a member of the Seventh-day Adventist Church who won't fly on the Sabbath, which is Friday night to Saturday night. I mean, would SAPA -- if it was necessary, would SAPA agree to allow some kind of -- we call it preferential bidding, rights or something, to allow that person to avoid working on the Sabbath?
MR. CRAIGIE: I'm just going to object that it's an incomplete hypothetical. Lacks foundation. And calls for speculation.
A. I don't know how I would accommodate one request and not all.
Q. (By Mr. Strindberg) So are you saying that you -- SAPA wouldn't agree to any modification of the bidding system to allow -- to accommodate -- or religious practice?
MR. CRAIGIE: Just going to object that it misstates his testimony. And it calls for an incomplete hypothetical. Lacks foundation.
A. I don't know if that's possible.
Q. (By Mr. Strindberg) What do you mean?
A. I don't know how we would make an exception for one particular avenue, whether it be religion or family obligations or Sabbath, any -- any of



those, without doing it for every -- everyone.
Q. Well, you know, title -- you're aware -- or do you know about Title VII, which is the Civil Rights Act, which says you can't discriminate on the basis of religion?
MR. CRAIGIE: I'm just going to object that it calls for a legal conclusion.
MR. STRINDBERG: Yeah, I'm not asking for a legal conclusion. Just, I'm -- I wonder if he knows about it.
A. I've heard about it, but I'm not versed in it.
Q. (By Mr. Strindberg) Are you aware that under Title VII you're not allowed to discriminate against someone based on religious believes or practices?
MR. CRAIGIE: Objection, calls for a legal conclusion.
A. I don't know. No.
Q. (By Mr. Strindberg) Well, I'll represent to you -- well, I won't represent anything.
So are you saying that there's no circumstance under which SAPA would agree to some site of -- sort of modification of the seniority system to allow the company to accommodate a religious practice?
MR. CRAIGIE: Objection. Incomplete



hypothetical. Misstates his testimony.
MR. PETERSEN: Join.
A. Yeah. I don't know how to answer that. I probably --
MR. CRAIGIE: Asked and answered, as well.
A. Yeah, I probably made that clear, but I don't know how to accommodate one without accommodating all.
Q. (By Mr. Strindberg) So your -- your answer then is you would not -- SAPA would not agree to a modification of the seniority system to accommodate a religious practice?
MR. CRAIGIE: Same objections. And argumentative. And again, asked and answered.
MR. PETERSEN: Join.
A. No, no. I mean, we -- we want to accommodate everyone. I mean, that is my job, is to accommodate everyone, all the needs. I don't know if there's a way that that can be for anything in particular. So the only fair thing that I think that we can do is abide by the system that is put in place.
Q. (By Mr. Strindberg) You're aware that certain individuals, in this case, Mr. Cassell, had some very strongly held religious beliefs which precluded them -- precluded him from working on the Sabbath. Are



you aware of that?
A. Yes.
Q. Okay. And if there was a situation where Mr. Cassell -- say he had been hired by the company and was not -- not able to drop, trade, or swap away a Sabbath flight that he had been assigned, would the -- would SAPA, under those circumstances, be willing to allow the company to have someone take his flight, even if it meant a deviation from the seniority system?
MR. CRAIGIE: Just going to object that it -- incomplete hypothetical. Asked and answered. At this point argumentative.
A. Yeah, it's --
THE REPORTER: I'm sorry. "Join"?
MR. PETERSEN: Join.
A. Would you mind restating -- or reclarifying the question a little bit?
Q. (By Mr. Strindberg) Well, Mr. Cassell is a member of the Seventh-Day Adventist Church. And it's a fundamental belief that they don't -- won't work on the Sabbath, which is Friday sundown to Saturday sundown.
And what I'm asking is, assume that Mr. Cassell or any Seventh-Day Adventists had been hired, and he or she tried to use various mechanisms to avoid working on the Sabbath. That you try to use the bidding

system to not be assigned the Sabbath, and that if they were assigned a Sabbath flight, they would then try to trade, swap, or drop it.

Say all those efforts were unsuccessful. Would SAPA be willing to allow the company to deviate from the seniority system so that that flight would be covered?

A. No.

MR. CRAIGIE: Same objections.

Q. (By Mr. Strindberg) Why not?

A. Because it would mean that somebody else had to do the work, and they may have prior obligations or needs as well.

Q. But you understand that for someone like Mr. Cassell, those kind of religious beliefs and practices are -- are of utmost importance, correct?

A. I do.

Q. So -- so under those circumstances, why wouldn't SAPA be willing to allow the company to accommodate that by deviating, if necessary, from the seniority system?

MR. CRAIGIE: Same objections. Asked and answered, multiple times. Go ahead.

MR. PETERSEN: Join.

A. As I mentioned, the -- the need of the person doing it is just as valid as the -- as the person



needing that time off, right? I mean, I have to meet the needs of each pilot. So how do I tell one that the need is more important than the other?

And that could be for religious reasons or family reasons or prior obligations. So just as important to the person. So the only way that we can do the system is by following the rules that are set up in it now.

Q. (By Mr. Strindberg) And when you say "the rules," you mean following the seniority system?

A. Yes.

Q. So you think the seniority -- following the seniority system is very important, I gather?

A. Yes.

Q. And are you saying that following that seniority system and the bidding -- based on seniority, is as important or more important than someone's religious beliefs?

MR. CRAIGIE: Objection. Misstates his testimony. Argumentative.

Q. (By Mr. Strindberg) You're not?

A. I'm not saying that. I'm saying that's the system in which we have in place, and that's the system in which we follow.

Q. So that, to me, is saying that that system,



the seniority system, is more important than someone's religious beliefs.

MR. CRAIGIE: That's not a question.

Q. (By Mr. Strindberg) Is that --

MR. CRAIGIE: So you don't answer that. If it's not a question, you don't answer.

Q. (By Mr. Strindberg) Is that what you're saying, that the seniority system is more important than someone's religious beliefs?

MR. CRAIGIE: Objection. Asked and answered. Argumentative. Misstates his testimony.

Q. (By Mr. Strindberg) Go ahead, Mr. Arnold.

MR. PETERSEN: Hang on. I join those objections as well.

MR. STRINDBERG: I'm trying to clarify. I want to understand what he's saying.

Q. (By Mr. Strindberg) So go ahead and answer the question.

A. The question, as I've already stated, is we only have this system in place already, and we don't have a way to acknowledge all of the needs of all of the pilots. So this is probably the most fair way to look at it.

Q. I'm -- but I'm just asking about one type of need. In other words, a religious observance, not



every other type.

A. Okay.

MR. CRAIGIE: Same objections. And that wasn't a question.

Q. (By Mr. Strindberg) Well, have you -- are you aware of any situations in the time you've worked for SkyWest where there's been deviations from the seniority bidding system?

MR. CRAIGIE: Objection. Calls for speculation.

THE REPORTER: I didn't hear the answer.

THE DEPONENT: Not that I know of.

Q. (By Mr. Strindberg) I'm going to hand you what's been previously marked as Deposition 26 [sic]. And it's labeled --

MR. PETERSEN: You can keep that. I'm trying not to kill trees here.

MR. STRINDBERG: I carry all these. I want you to take it. Come on.

MR. PETERSEN: Well, I have a stack this big in my suitcase, and it turns out that I didn't grab that one. So I've got it online.

Q. (By Mr. Strindberg) Mr. Arnold, could you tell us what this is?

A. This is the Pilot Policy Manual dated 12

into long-term training on the CRJ, you get, what, 2 point -- you get paid 2.3 hours per day? Is that what that is?
A. Yeah, that goes -- that gets into your pay guarantee of 70 hours of training pay. And this one, it says long-term training. It's because once you transition from one airplane to the other, or upgrade, you're no longer qualified, if it's a different airplane, for that airplane. So you're in what's considered long-term training so that they don't schedule you.
Q. Okay. You're going to have to explain that to me.
A. Okay. So you -- when you're using your seniority to bid for another airplane or another position, like a captain or -- well, that's pretty much the only one besides a transition -- you can go into what's considered long-term training. And that just means that you're going to be not qualified as -- as a captain flying, once you've taken your check ride and you've become a captain, until you've had IOE.
You're in this bucket of long-term training where you are able to pick up as a first officer, but once you take and complete that training, you get out of the long-term training footprint and you become a captain only.

Page 106

Q. You say you're familiar with the designation for SAPA. Is it just you -- your executive committee that gets paid for SAPA meetings or do other SAPA people get paid for meetings?
A. When we preassign a meeting, they get paid for the meetings that they are not able to go and fly. Similar to a flight loss pay, because they're doing work for the association. They --
Q. So -- so if someone is, say, a member of the -- SAPA is -- member is part of the safety committee, that would show up -- and there's a safety meeting scheduled for a Friday, that would show up on their schedule as an excused absence for SAPA?
A. It would say "SAPA," and it would be preassigned. So before they bid, those days would be blocked out from allowing them to bid on those days. It's a preassigned meeting.
Q. Who -- who puts -- when you say "preassigned," who puts these preassignments in the -- whatever program, before they bid?
A. One of the scheduling supervisors does it for our association. We submit those and say, "Put these -- please put these on these schedules," and that's -- and then we -- they just put it in, and...
Q. Is that the same thing -- for example,

Page 107

there's one, unpaid moving day, MOV. Is that the same thing, it would be somehow put into their -- the system so that they wouldn't be assigned a flight for that day?
A. Yeah. Yes.
Q. And what is a moving day?
A. When pilots transfer between domiciles are given days when staffing is -- when staffing can handle it, they'll be given a mutually agreed-upon moving days to get their new accommodations at their new base.
Q. Up on the top of this list there's "company business." Do you know what -- what constitutes company business?
A. That's similar to what SAPA designation is, but the company uses that for their meetings.
Q. Okay. How about "administrative leave"? What is that used for?
A. That is used for the either somebody who's been pulled from flying for various reasons, whether they're in a safety investigation or in a disciplinary investigation.
Q. Why on -- on this sheet there's like a termination of employee, TRM. Then it shows 2.54 hours per day. What does that mean? You pay someone when they're terminated?
A. I believe they set that up. And, again,

Page 108

it has the asterisk there. It says "virtual credit values." So I think they do that so if someone is leaving at the end of the month, when it's building their schedule, when it looks for the target credit range of hours, it doesn't stuff all of the hours in the front half of the month. So that they are working every legal day that they can so that they can at least honor their seniority until their date of departure.
Q. Okay. You've been handed what's been marked as Exhibit 14. Why don't you take a moment to review that, and then I'm going to then ask you if you've seen this before.
A. No, I've never seen it.
Q. Have you ever seen any memorandum of agreement for religious accommodation request form?
A. No.
Q. And just so we're clear, you were not consulted by -- consulted regarding this agreement before it was given to Mr. Cassell, were you?
A. No.
Q. No, you were not consulted?
A. No, I was not.
Q. Okay. In the second paragraph, it says, "However, as an accommodation, we have provided FO Cassell with tools to meet his religious requirements. Options

Page 109

include pursuit of schedule to -- changes as defined by company and departmental resources for an EG, drop/trade shift, bid for desired work assignments, domicile staffing/available shifts."
Now, the -- these tools that are referred to here, those are tools available to every pilot, correct?
A. Correct.
Q. And the -- SAPA, I assume, would not object to Mr. Cassell, if he had been hired, using these tools to avoid working on the Sabbath, would it?
A. No. I mean, everyone has the opportunity to use them.
Q. So you wouldn't -- if he had been hired and used these tools, SAPA would be fine with that?
A. Yes.
Q. And these tools that are addressed in Exhibit 14, they do not violate the seniority system, do they?
A. They're based on seniority.
Q. And by -- because they're based on seniority, it means they don't violate the seniority system, correct?
A. Correct.
Q. Do you know how -- do you know who Michael

Page 110

Wallen [phonetic] is?
A. Yes.
Q. And how do you know who Michael Wallen is?
A. He was mentioned in the summary judgment.
Q. Did you review some pleadings in regards to -- in summary judgment pleadings?
A. No.
Q. So you said he was mentioned in the summary judgment. What are you referring to?
A. I looked up the summary judgment that SkyWest put in.
Q. Oh, so you did read their summary judgment motion?
A. Yeah. Yeah. Yes.
Q. When did you do that?
A. Right after I provided my second deposition [sic], I believe. Shortly after that.
Q. When you say "deposition," you mean declaration?
A. Declaration, yeah. Sorry.
Q. And what -- why did you do that? Why did you look it up?
A. Because I'm putting dec- -- declarations into a case.
Q. And what pleading did you recall reading?

Page 111

A. Just that he was mentioned in there.
Q. Yeah. But I'm --
MR. PETERSEN: Objection. Asked and answered.
Q. (By Mr. Strindberg) A pleading is the document -- a pleading is something that's filed with the court. In other words, a declaration is a type of pleading. Okay?
Do you recall what pleadings you looked up and reviewed?
A. Just the summary judgment.
Q. Was it the motion filed by SkyWest that you reviewed?
A. I --
MR. CRAIGIE: If you know. If you know.
A. Yeah, I think it was. I -- I'm pretty sure it was.
Q. (By Mr. Strindberg) There is -- in a summary judgment, the moving party which, in this case, was SkyWest, will file a motion in memorandum. And that's one pleading. Then Mr. Cassell filed a responsive pleading. And then SkyWest filed a reply.
A. Oh, I didn't -- no. I just looked at the initial summary judgment, is what I believe I looked at.
Q. Did you review the order entered by the

Page 112

judge?
A. I think it's included.
Q. When you say "included," did someone give you something to read?
A. No. Well, Alex sent me the summary judgment.
Q. Okay. So we sort of got off track. So you saw that Mr. Wallen's name was mentioned in the summary -- some summary judgment document. What do you remember about Mr. Wallen, what was mentioned about him?
A. You just asked his name, and that's what I recognized.
Q. Okay. Have you had any discussions with Mr. Wallen?
A. He has reached out to SAPA, yes.
Q. In regards to what?
A. His schedule.
Q. When did he reach out to SAPA?
A. Recently.
Q. Was it --
A. The last few weeks, I believe.
Q. Was this something about the mandatory upgrades that first officers were required to go -- are required to go through by SkyWest?
A. I did not speak to him. But I know that

Page 113

he spoke to a SAPA rep.
Q. And how do you know he spoke with a SAPA rep?
A. Because the SAPA rep reached out to our disciplinary chair about his -- he received a SAD, is what it was. He received -- received a scheduling assignment deviation.
Q. Do you know why Mr. Wallen received a SAD?
A. No. I believe he didn't show up to work. One of those -- one of the criteria based in the manual.
Q. When you say "work," do you mean for a flight or for a training session?
A. I'm not sure.
Q. And who was the rep who reached out to the disciplinary committee?
A. Tyler Muse.
THE REPORTER: I'm sorry. Last name?
THE DEPONENT: M-u-s-e.
Q. (By Mr. Strindberg) And do you know the outcome of Mr. Muse reaching out to the disciplinary committee?
A. I do not. I --
Q. Do you -- go ahead.
A. I haven't heard the follow-up, so...
Q. Were you aware that Mr. Wallen was hired by



SkyWest as a first officer in late spring of 2017?
MR. CRAIGIE: Objection. Assumes facts not in evidence.
A. Yeah. I don't -- I don't recall when he was hired or -- I don't know.
Q. (By Mr. Strindberg) Were you -- do you have any knowledge or are you aware that Mr. Wallen has been able to use the tools listed in Exhibit 14 to avoid working a Sabbath flight?
MR. PETERSEN: Objection. Assumes facts not in evidence.
A. Yeah. I don't know.
Q. (By Mr. Strindberg) So you have no knowledge one way or the other?
A. No.
Q. No, you don't have any knowledge?
A. No, I do not.
Q. Do you know who Mr. Steve Horn [phonetic] is?
A. Other than the name also mentioned in the same thing that I read, but, no, I don't know him as -- either.
Q. Do you have any knowledge -- or information about Mr. Horn's ability to avoid working on the Sabbath when he worked for SkyWest?



A. No.
MR. PETERSEN: Could we take a five-minute break to go to the restroom? Unless you're about done.
MR. STRINDBERG: Yeah, go ahead. That's fine.
MR. PETERSEN: Could we go off?
THE VIDEOGRAPHER: Going off the record at 2:43 p.m.
(Recess from 2:43 p.m. to 3:00 p.m.)
THE VIDEOGRAPHER: We're back on record at 3:00 p.m.
Q. (By Mr. Strindberg) Just a few other topics, Mr. Arnold.
Have you ever had any training as to what obligations the union has under Title VII?
A. No.
Q. Were you aware that unions can be found to have violated Title VII if they attempt to -- or cause the employer to discriminate against someone?
A. No.
MR. CRAIGIE: So we'll -- I'm just going to object that it calls for a legal conclusion. You did answer it, so...
Q. (By Mr. Strindberg) Going back to -- a moment regarding a disciplinary issues. You were talking



about discipline. How does this discipline committee work? I guess I didn't really get into that with you.
A. If a pilot is approached by the company, the -- someone from the disciplinary committee or one of the SAPA reps is invited to be part of that meeting.
Q. And what takes place at the disciplinary meeting?
A. The employee's made aware of what they're not in compliance with in the -- in the company's eyes in context to the Pilot Policy Manual, and then they're made aware and then given either a suggestion or further levels of discipline, depending on the offense.
Q. And in this disciplinary committee meeting, does the -- does SAPA advocate for -- on behalf of the pilot to try to get lesser discipline?
A. Yes.
Q. Are you aware of any pilots who've been fired for excessive absences?
A. Yes.
Q. On how many -- how many pilots are we talking about?
A. I don't know offhand.
Q. And at what level do the absences become so excessive that it might lead to termination?
MR. CRAIGIE: That's an -- objection,